JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
STEPHEN KOCH, Individually and on Behalf of All Others Similarly Situated,

## DEFENDANTS
HEALTHCARE SERVICES GROUP, INC., and THEODORE WAHL,

**(b)** County of Residence of First Listed Plaintiff _____New York_____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____Bucks County_____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Gonen Haklay  [215-600-2817]
The Rosen Law Firm, P.A.
101 Greenwood Avenue, Suite 440, Jenkintown, PA 19046

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
§§10(b) and 20(a) of the Securities Exchange Act of 1934
Brief description of cause:
Defendants allegedly engaged in activities in violation of Federal Securities Laws

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE   03/22/2019

SIGNATURE OF ATTORNEY OF RECORD
*Gonen Haklay*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff:   505 West 54 St., Apt. 19 PH, New York, NY 10019

Address of Defendant:   3220 Tillman Dr # 300, Bensalem, PA 19020

Place of Accident, Incident or Transaction:   Bensalem, PA

---

*RELATED CASE, IF ANY:*

Case Number: _____     Judge: _____     Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☐   No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☐

I certify that, to my knowledge, the within case ☐ is / ☒ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE:   3/22/2019        *Gonen Haklay*        76446
                         *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.    Federal Question Cases:**

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☐ 7. Civil Rights
☐ 8. Habeas Corpus
☒ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
        *(Please specify):* _____

**B.    Diversity Jurisdiction Cases:**

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
        *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I,   Gonen Haklay                              , counsel of record *or* pro se plaintiff, do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs.

☐ Relief other than monetary damages is sought.

DATE:   03/22/2019        *Gonen Haklay*        76446
                         *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| STEPHEN KOCH, Individually and on Behalf of All Others Similarly Situated, | : : : | CIVIL ACTION |
| v. | : | |
| HEALTHCARE SERVICES GROUP, INC., and THEODORE WAHL, | : : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.                    ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.    ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.                    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)                    ( X)

(f) Standard Management – Cases that do not fall into any one of the other tracks.                    ( )

| | | |
|---|---|---|
| 03/22/2019 | Gonen Haklay | Stephen Koch |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-600-2817 | 212-202-3827 | ghaklay@rosenlegal.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| STEPHEN KOCH, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. |
| | CLASS ACTION |
| Plaintiff, | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. | |
| HEALTHCARE SERVICES GROUP, INC., and THEODORE WAHL, | |
| Defendants. | |
| | DEMAND FOR JURY TRIAL |

Plaintiff Stephen Koch ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Healthcare Services Group, Inc. ("Healthcare Services" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of the securities of Healthcare Services between April 11, 2017 and March 4, 2019, both dates inclusive (the "Class Period"). Plaintiff seeks to pursue remedies against Healthcare Services and certain of its most senior executives under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act.

3.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as the Company's principal executive offices are located within this District.

4.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

5.      Plaintiff, as set forth in the accompanying Certification, incorporated by reference herein, purchased Healthcare Services securities during the Class Period and has been damaged thereby.

6.      Defendant Healthcare Services, based in Bensalem, Pennsylvania, engages in the management, administrative, and operating services to the housekeeping, laundry, linen, facility maintenance, and dietary service departments to nursing homes, retirement complexes, rehabilitation centers, and hospitals in the United States. The Company's common stock was listed on the NASDAQ, an efficient market, throughout the Class Period, under the ticker symbol "HCSG," and, as of March 13, 2019, the Company had more than 73 million shares of common stock issued and outstanding.

7.      Defendant Theodore "Ted" Wahl ("Wahl") has served at all relevant times as a member of the Board of Directors, Chief Executive Officer ("CEO") and President of Healthcare Services.

8.      Defendants Healthcare Services and Wahl are sometimes referred to herein collectively as "Defendants."

## CLASS ACTION ALLEGATIONS

9.      Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the securities of Healthcare Services during the Class Period (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

10.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Healthcare Services common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Healthcare Services and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

11.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

12.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

13.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by Defendants as alleged herein;

(b)    whether statements made by Defendants misrepresented material facts about the business, operations and management of Healthcare Services; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

- 3 -

14.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## BACKGROUND

15.    Healthcare Services, founded in 1976, provides management, administrative, and operating services to the housekeeping, laundry, linen, facility maintenance, and dietary service departments to nursing homes, retirement complexes, rehabilitation centers, and hospitals.

16.    The Company operates through two segments, Housekeeping and Dietary. The Housekeeping segment engages in the cleaning, disinfecting, and sanitizing of resident rooms and common areas of a client's facility, as well as laundering and processing of the bed linens, uniforms, resident personal clothing, and other assorted linen items utilized at a client facility. The Dietary segment is involved in the food purchasing and meal preparation activities, as well as in the provision of professional dietitian services, which include the development of menus that meet the dietary needs of residents.

17.    After many years of purported growth and strong earnings on the part of the Company, on March 22, 2017, Monocle Accounting Research ("Monocle") published an article on the popular investor website Seeking Alpha, entitled "*Healthcare Services Group: A Decade of Strategic Rounding*" (the "March 2017 Article"). Among other things, the March 2017 Article stated that strong evidence suggests that the Company engages in "earnings management" and that there is a pattern of "strategic rounding" of quarterly earnings per share ("EPS"). The article

concluded that, at a minimum, this aggressive accounting increases exposure to restatement risk, enforcement proceedings, and securities fraud claims.

18.    The March 2017 Article contained the following graph depicting the "uncanny" manner by which Healthcare Services regularly met its quarterly consensus sell-side EPS expectations:



As shown by the graph above, Healthcare Services' actual quarterly consensus sell-side EPS (depicted in green) closely matched its mean estimate (depicted in blue), almost quarter for quarter over a period of years. As the March 2017 article put it:

> Whenever analyzing the equities of the various companies in which we have interest, we always keep in mind the axiom that "business is messy." In other words, even the best-run business is subject to the vagaries of its customers, vendors, competitors and/or industry. Considering that axiom, *it is strange indeed that HCSG's quarterly EPS has matched, to the penny, the consensus EPS expectation more often than not over the last five, 10, and even 20 years*.

(Emphasis added).

19.     By way of comparison, the March 2017 Article explained how normally a reported EPS—unmarred by earnings management and a pattern of strategic rounding—would appear over a number of years, usually having an equal (random) chance of either being rounded down or rounded up to the nearest cent each quarter:

> In any given quarter, a company's diluted EPS is simply the quotient of the company's quarterly net income and the average number of diluted shares outstanding. *If a company is not actively manipulating either the numerator in the equation (by making changes to specific cash or accrual expense items, and/or by making changes to how revenue is recognized) or the denominator in the equation (by buying or issuing shares), then a company's EPS in any given quarter, expressed in cents per share, should have an equal chance of rounding down to the nearest penny as rounding up to the nearest penny.*
>
> *An analysis of all stocks in the S&P 500 over the last number of years shows this to be the case, with companies' quarterly EPS figures rounding down to the nearest penny roughly the same number of times that they round up.* For example, over the last 10 years, Apple's (NASDAQ:AAPL) quarterly EPS has rounded up 18 times and has rounded down 22 times. *Most other companies' rounding history is similarly random.*

(Emphasis added).

20.     As the March 2017 Article went on to explain, Healthcare Services' quarterly-reported EPS was an extreme outlier in terms of how consistently its EPS was rounded up rather than rounded down, stating, in relevant part:

> And then there is Healthcare Services Group.
>
> On February 7, 2017, HCSG reported results for the three months and year ended December 31, 2016. In the fourth quarter, HCSG's diluted EPS was $0.28. However, as HCSG's net income was $20,299,000 and the diluted weighted average number of HCSG's common shares outstanding during the quarter was 73,590,000, then HCSG's diluted EPS, more precisely, was $20,299,000/73,590,000 shares, or $0.2758. *In other wo1rds, had HCSG's net income been a mere $62,000 less, then HCSG's diluted EPS would have been less than $0.2750, and would have, therefore, rounded down to $0.27, giving investors the disappointment of a $0.01 EPS miss.*

*In isolation, this good fortune of having EPS round up to $0.28 instead of down to $0.27 could easily be explained by simple luck of the draw. However, consider HCSG's earnings reports going back to the first quarter of 2006:*

| | Net income | Diluted weighted average shares | Earnings per share (A) | Rounded EPS (B) | B-A |
|---|---|---|---|---|---|
| Q416 | 20299000 | 73590000 | 0.2758 | 0.28 | 0.0042 |
| Q316 | 19711000 | 73592000 | 0.2678 | 0.27 | 0.0022 |
| Q216 | 18760000 | 73316000 | 0.2559 | 0.26 | 0.0041 |
| Q116 | 18626000 | 73014000 | 0.2551 | 0.26 | 0.0049 |
| Q415 | 9134000 | 72903000 | 0.1253 | 0.13 | 0.0047 |
| Q315 | 17086000 | 72691000 | 0.2350 | 0.24 | 0.0050 |
| Q215 | 16288000 | 72286000 | 0.2253 | 0.23 | 0.0047 |
| Q115 | 15516000 | 72159000 | 0.2150 | 0.22 | 0.0050 |
| Q414 | 15472000 | 71722000 | 0.2157 | 0.22 | 0.0043 |
| Q314 | -22182000 | 70671000 | -0.3139 | -0.31 | 0.0039 |
| Q214 | 13921000 | 71206000 | 0.1955 | 0.20 | 0.0045 |
| Q114 | 14639000 | 71072000 | 0.2060 | 0.21 | 0.0040 |
| Q413 | 5452000 | 70898000 | 0.0769 | 0.08 | 0.0031 |
| Q313 | 13790000 | 70531000 | 0.1955 | 0.20 | 0.0045 |
| Q213 | 12933000 | 69370000 | 0.1864 | 0.19 | 0.0036 |
| Q113 | 14954000 | 69361000 | 0.2156 | 0.22 | 0.0044 |
| Q412 | 12798000 | 68988000 | 0.1855 | 0.19 | 0.0045 |
| Q312 | 11517000 | 68635000 | 0.1678 | 0.17 | 0.0022 |
| Q212 | 11320000 | 68228000 | 0.1659 | 0.17 | 0.0041 |
| Q112 | 8578000 | 68085000 | 0.1260 | 0.13 | 0.0040 |
| Q411 | 10565000 | 67705000 | 0.1560 | 0.16 | 0.0040 |
| Q311 | 9996000 | 67530000 | 0.1480 | 0.15 | 0.0020 |
| Q211 | 9828000 | 67545000 | 0.1455 | 0.15 | 0.0045 |
| Q111 | 7767000 | 67454000 | 0.1151 | 0.12 | 0.0049 |
| Q410 | 9123000 | 67232000 | 0.1357 | 0.14 | 0.0043 |
| Q310 | 9169000 | 44719000 | 0.2050 | 0.21 | 0.0050 |
| Q210 | 8721000 | 44652000 | 0.1953 | 0.20 | 0.0047 |
| Q110 | 7428000 | 44659000 | 0.1663 | 0.17 | 0.0037 |
| Q409 | 6566000 | 66705000 | 0.0984 | 0.10 | 0.0016 |
| Q309 | 8225000 | 44334000 | 0.1855 | 0.19 | 0.0045 |
| Q209 | 7815000 | 44262000 | 0.1766 | 0.18 | 0.0034 |
| Q109 | 7736000 | 44073000 | 0.1755 | 0.18 | 0.0045 |
| Q408 | 7283000 | 43948000 | 0.1657 | 0.17 | 0.0043 |
| Q308 | 5522000 | 43980000 | 0.1256 | 0.13 | 0.0044 |
| Q208 | 6953000 | 43962000 | 0.1582 | 0.16 | 0.0018 |
| Q108 | 6857000 | 44213000 | 0.1551 | 0.16 | 0.0049 |
| Q407 | 7305000 | 44033000 | 0.1659 | 0.17 | 0.0041 |
| Q307 | 7299000 | 43969000 | 0.1660 | 0.17 | 0.0040 |
| Q207 | 7524000 | 29140000 | 0.2582 | 0.26 | 0.0018 |
| Q107 | 7450000 | 29108000 | 0.2559 | 0.26 | 0.0041 |
| Q406 | 7227000 | 28986000 | 0.2493 | 0.25 | 0.0007 |
| Q306 | 6564000 | 28760000 | 0.2282 | 0.23 | 0.0018 |
| Q206 | 6203000 | 28691000 | 0.2162 | 0.22 | 0.0038 |
| Q106 | 5676000 | 28620000 | 0.1983 | 0.20 | 0.0017 |

> ***Remarkably, <u>every single quarter over the past 11 years</u> has seen HCSG's quarterly earnings per share round up rather than round down to the nearest penny. Coincidentally, this strange pattern began just a few quarters after McCartney's two sons-in-law joined the company.***

(Emphasis added).

21.     The March 2017 Article further explained that the odds that Healthcare Services' reported EPS was consistently rounded up rather than rounded down to the nearest penny over such a length of time, without the "active management" of the Company, was statistically improbable:

> To put the magnitude of the improbability that this is the result of anything but the active management of the company's EPS, consider this: since the odds of a company's EPS rounding up to the nearest penny are theoretically the same as rounding down, HCSG's history of EPS rounding up is tantamount to HCSG flipping heads on a coin toss 44 straight times, the odds of which are a staggering **1 in 17.6 trillion**.

> If one peruses the right-hand column of this table though, one will notice that more times than not, HCSG's quarterly diluted EPS rounded up by more than 0.4 cents. The sum of the amounts by which HCSG's 44 diluted EPS figures rounded up is a shockingly large 16.59 cents. If HCSG's quarterly diluted EPS figures were, in fact, randomly derived over the past 11 years, then the odds of this occurring are roughly **1 in 600 quadrillion**.

* * *

> [A]ny rational human being who possesses common sense or a rudimentary understanding of statistics will look at the data and conclude that HCSG's management has actively managed its quarterly earnings per share for more than a decade.

(Emphasis in original).

22.     The March 2017 Article posited that the reason Healthcare Services would "fiddle[] with the way it recognizes revenue recognition or accrues expenses in order to achieve certain quarterly EPS results" could be to facilitate progressively higher valuation multiples for the stock, "which would be a good thing for anybody seeking to sell some of their HCSG stock."  As the

Match 2017 Article noted, "Chairman Daniel McCartney has been an aggressive seller of HCSG stock in recent years - since July 2015, McCartney has sold $23.4 million worth of stock at an average price of $36.61, and has gifted another $4.2 million worth of stock at an average price of $37.64."

23.    The March 2017 Article was left to guess at the actual reason behind the alleged EPS accounting manipulation because when "[Monocle] reached out to Daniel McCartney, Ted Wahl and Matt McKee to ask for an explanation of this unusual pattern . . . [Monocle] ha[d] yet to receive a response."

24.    Moreover, the March 2017 Article noted that, while this alleged practice of earnings management may not have necessarily been indicative of illegal activity, Monocle had nonetheless "spoken with the CFOs of multiple publicly-traded companies about what would be necessary to achieve a string of 44 straight EPS results that rounded up to the nearest penny."  According to Monocle, "the feedback that [it] ha[d] received is that it would be a fairly difficult thing to accomplish through legitimate accounting practices, considering the multitude of accounting entries that a company is faced with in any given quarter."  Thus, Monocle opted to reach out to the SEC regarding "the extreme outlier nature" of Healthcare Services' reported EPS history "to let that agency determine if [Healthcare Services'] accounting practices require a deeper dive."  As the March 2017 Article concluded:

> While one might argue that the practice of managing quarterly EPS to round up the numbers may not in and of itself be illegal, as the dollar amounts required to round up EPS by a fraction of a penny can be relatively small, it is worthwhile reading a working paper written a few years ago by Nadya Malenko and Joseph Grundfest entitled "Quadrophobia: Strategic Rounding of EPS Data," wherein the authors explored this practice by publicly-traded companies. *An examination of the data revealed that even if "strategic rounding" of companies' quarterly EPS "reflects the exercise of legitimate accounting judgment, our results suggest that its presence signals an aggressive approach to accounting that increases exposure to restatement risk, [SEC Accounting and Auditing Enforcement Releases]*

> ***proceedings, and class action securities fraud claims.***  " Investors in HCSG should
> ask themselves one question: if HCSG's management has been willing to
> manipulate its EPS in this manner for over a decade, what else might it be willing
> to do to achieve higher valuation multiples?

(Emphasis added).

25.    Finally, the March 2017 Article noted Monocle's qualms regarding Healthcare

Services' history of fraudulent accounting practices, as well as that of its leadership, stating, in

relevant part:

> In 1996, the SEC filed a lawsuit in federal district court in Philadelphia alleging
> violations of the anti-fraud, reporting, internal controls and books and records
> provisions of the federal securities laws by HCSG, the company's then-CEO and
> Chairman Daniel McCartney, as well as HCSG's former CFO and former VP. The
> allegations included one that HCSG's financial statements during 1990 and 1991,
> as filed with the SEC, were materially false and misleading. HCSG ended up paying
> a civil penalty of $650,000 and Mr. McCartney, himself, paid a civil penalty of
> $100,000 to resolve the allegations.
>
> While the nature of the SEC's allegations from 1996 are considerably different than
> the strategic rounding issue highlighted in this article, it nevertheless demonstrates
> that HCSG's current chairman has a history of taking actions that have raised
> accounting red flags.

## DEFENDANTS' MATERIALLY FALSE AND
## MISLEADING CLASS PERIOD STATEMENTS

26.    The Class Period begins on April 11, 2017, following publication of the March

2017 Article, when the Company reported that revenues for the three months ended March 31,

2017 increased approximately 5% to $404.5 million, and that net income for the three months

ended March 31, 2017 was $22.0 million, or $0.30 per basic and diluted common share, compared

to the three months ended March 31, 2016 net income of $18.6 million, or $0.26 per basic and

diluted common share.

27.    On April 12, 2017, the Company conducted its earnings conference call in

connection with these financial results. During the April 12, 2017 earnings call, a covering

securities analyst questioned Defendant Wahl about allegations in a recently published report—by

all indications, the March 2017 Article—that claimed the Company had engaged in a concerning pattern of "strategic rounding" of quarterly earnings per share.

28.     Defendant Wahl responded by stating he did not know "exactly what article" or "iterations of articles" to which the analyst had referred but nonetheless downplayed the significance of the article and its highly detailed allegations, stating that the Company did not concern itself with "the latest and greatest investor sentiment or third-party articles and blogs." Instead, Defendant Wahl assured investors the Company's track record spoke for itself during the following exchange with analyst Andy Wittman:

> **Andy Wittmann**: Great. Thank you for that. ***And my last question here is just on some of the reports that came out about the company quarterly results being rounded up for a long period of time in the quarter.*** The annual results clearly don't round up, but I think just ***given that this has gotten some attention, it would be worth having you guys comment on that and just give us your thoughts on that.***

> **Ted Wahl**: Well, I can tell you, ***without knowing exactly what article or more specifically what iteration of articles you're referring to***, I can tell you we believe our best efforts are spent actually running the company and delivering outcomes for our customers, our employees and all of our shareholders, ***not the latest and greatest investor sentiment or third-party articles and blogs.*** And I would say regardless of bias, Andy, whether they're positive or negative, God knows there is plenty of both out there. And when you look at over the past 10 or so years that you mention, ***our track record really speaks for itself.***

> We've tripled the size of the company, customers, employees, revenues, profits. We've paid out more than $400 million in dividends during that time frame. And most importantly, we've positioned the company today to surpass that performance and deliver for all of our stakeholders over the next decade. ***So again, I think our track record of performance over the past 10 years really stands on its own.***

29.     On July 11, 2017, the Company reported that revenues for the three months ended June 30, 2017 increased approximately 22% to $470.9 million. Net income for the three months ended June 30, 2017 was $22.6 million, or $0.31 per basic and $0.30 per diluted common share, compared to the three months ended June 30, 2016 net income of $18.8 million, or $0.26 per basic and diluted common share. Revenues for the six months ended June 30,

2017 increased approximately 13% to $875.4 million. Net income for the six months ended June 30, 2017 was $44.6 million, or $0.61 per basic and $0.60 per diluted common share, compared to the six months ended June 30, 2016 net income of $37.4 million, or $0.52 per basic and $0.51 per diluted common share.

30.    On October 17, 2017, the Company reported that revenues for the three months ended September 30, 2017 increased approximately 25% to $491.4 million. Net income for the three months ended September 30, 2017 was $23.5 million, or $0.32 per basic and $0.31 per diluted common share, compared to the three months ended September 30, 2016 net income of $19.7 million, or $0.27 per basic and diluted common share. Revenues for the nine months ended September 30, 2017 increased approximately 17% to $1.4 billion. Net income for the nine months ended September 30, 2017 was $68.0 million, or $0.93 per basic and $0.92 per diluted common share, compared to the nine months ended September 30, 2016 net income of $57.1 million, or $0.79 per basic and $0.78 per diluted common share.

31.    The statements set forth above at ¶¶26 and 28-30 were false and misleading at the time the statements were made for the following reasons:

(a)    At the time these statements were made, Defendant Wahl either knew or was reckless in not knowing that the Company was rounding quarterly earnings per share and therefore, investors could not rely upon the Company's track record without conducting a thorough investigation into the allegations, and

(b)    As a result, Defendants' statements about the Company's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

32.     In November of 2017, the Company received a letter from the SEC regarding an inquiry that the SEC was conducting into earnings per share calculation practices and requesting that the Company voluntarily provide certain information and documents relating to its earnings per share rounding and reporting practices.

33.     On February 6, 2018, the Company reported that revenues for the three months ended December 31, 2017 increased to $499.4 million compared to $398.6 million for the same period in 2016. Net income for the three months ended December 31, 2017 was $20.2 million, or $0.27 per basic and diluted common share. Revenues for the year ended December 31, 2017 increased to $1.87 billion compared to $1.56 billion for the same period in 2016. Net income for the year ended December 31, 2017 was $88.2 million, or $1.20 per basic and $1.19 per diluted common share.

34.     The statements set forth above at ¶33 were false and misleading at the time the statements were made for the following reasons:

(a)     At the time these statements were made, Defendant Wahl either knew or was reckless in not knowing that the Company had been accused of strategically rounding quarterly earnings per share and therefore, investors could not rely upon the Company's track record without conducting a thorough investigation into the allegations, and

(b)     Defendants concealed from investors that the SEC had written to the Company in November 2017 to inquire into the Company's earnings per share rounding practices, and

(c)     As a result, Defendants' statements about the Company's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

35.    In March of 2018, the Company received a subpoena from the SEC in connection with the inquiry that the SEC was conducting into earnings per share calculation practices at the Company, now directing the Company to produce documents explaining the Company's earnings calculations.

36.    On April 17, 2018, the Company reported that revenues for the three months ended March 31, 2018 increased to $501.8 million compared to $404.5 million for the same period in 2017. Net income for the three months ended March 31, 2018 was $0.1 million, or $0.00 per basic and diluted common share. The decline from the prior three month period ended March 31, 2017 related to the Company's first quarter 2018 increase in its accounts receivable allowance, primarily related to corporate restructurings of two privately-held, multi-state operators, as discussed in the Company's press release on April 16, 2018.

37.    On July 17, 2018, the Company reported that revenues for the three months ended June 30, 2018 increased to $503.7 million compared to $470.9 million for the same period in 2017. Net income for the three months ended June 30, 2018 was $25.8 million, or $0.35 per basic and diluted common share. Revenues for the six months ended June 30, 2018 increased to $1.0 billion compared to $875.4 million for the same period in 2017. Net income for the six months ended June 30, 2018 was $25.9 million, or $0.35 per basic and diluted common share.

38.    On October 16, 2018, the Company reported that revenues for the three months ended September 30, 2018 increased to $507 million compared to $491 million for the same period in 2017. For the three months ended September 30, 2018, net income was $26.1 million, or $0.35 per basic and diluted common share.

39.    On February 5, 2019, the Company reported that revenues for the three months ended December 31, 2018 were $496 million compared to $499 million for the same period in

2017. Revenues for the year ended December 31, 2018 increased to $2.01 billion compared to $1.87 billion for the same period in 2017. Net income for the quarter was $32 million, or $0.43 per basic and $0.42 per diluted common share.

40.    The statements set forth above at ¶¶36-39 were false and misleading at the time the statements were made for the following reasons:

(a)    At the time these statements were made, Defendant Wahl either knew or was reckless in not knowing that the Company had been accused of strategically rounding quarterly earnings per share and therefore, investors could not rely upon the Company's track record without conducting a thorough investigation into the allegations, and

(b)    Defendants concealed from investors the fact that the SEC had written to the Company in November 2017 to inquire into the Company's earnings per share rounding practices, and

(c)    The Company concealed from investors the fact that the SEC delivered a subpoena to the Company in March 2018 commanding the Company to produce documents to the SEC in connection with how it calculated earnings per share, and

(d)    As a result, Defendants' statements about the Company's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

41.    On March 4, 2019, in a Form 8-K filed with the SEC, the Company disclosed that it had received a letter in November 2017 from the SEC regarding an inquiry that the SEC was conducting into EPS calculation practices and requesting that the Company voluntarily provide certain information and documents relating to its EPS rounding and reporting practices. The March

4, 2019 Form 8-K further disclosed that the Company also had received a subpoena in March 2018

from the SEC in connection with these matters and that it had been providing information and

documents to the SEC.

42.    The March 4, 2019 Form 8-K also revealed to investors that, during the fourth

quarter of 2018, the Company authorized its outside counsel to conduct an internal investigation,

under the direction of the Company's Audit Committee, into matters related to the SEC subpoena.

The Form 8-K acknowledged that, as a result of these circumstances, the Company was unable to

file its Annual Report on Form 10-K for the year ended December 31, 2018 on time.

43.    Then, on March 4, 2019, Monocle published an article entitled *'Strategic*

*Rounding' At Healthcare Services Group: A Subpoena From The SEC And An Internal*

*Investigation* (the "March 2019 Article"). In pertinent part, the March 2019 Article stated that

**"Healthcare Services Group's decade of apparent earnings manipulation through the 'strategic**

**rounding' of its quarterly EPS has finally bitten the company and its investors."**

44.    The March 2019 Article referred back to Monocle's March 2017 Article, claiming,

in pertinent part, as follows:

> *[I]t appeared that the company had been actively engaging FOR OVER A*
> *DECADE in aggressive accounting by fiddling with its revenues and/or expenses*
> *in order to ensure that its earnings per share rounded up to the nearest penny*
> *every quarter. This helped enable the company to meet or beat the consensus sell-*
> *side earnings expectation most quarters*, which in turn helped the company
> achieve a premium earnings multiple for the stock. Arguably, this allowed founder
> and Chairman Daniel McCartney to personally realize millions of dollars more for
> the stock that he sold to the public than he otherwise would have.
>
> In our article, we informed readers that "we have alerted the Securities and
> Exchange Commission to the extreme outlier nature of HCSG's reported EPS
> history, and will let that agency determine if HCSG's accounting practices require
> a deeper dive." Our follow-up article in April 2017 stated that *"this troubling*
> *pattern should give investors considerable pause, and should result in investors*
> *questioning, in a very serious manner, among others, HCSG's CFO John Shea,*
> *HCSG's entire finance and accounting organization, HCSG's Audit Committee*

*(Robert Moss, John Briggs, and Dino Ottaviano), and HCSG's auditor (Grant Thornton), about the company's accounting processes, and checks & balances."*

*Well, it appears that the SEC took our concerns seriously. HCSG disclosed on Monday that it received a letter from the SEC in November 2017 inquiring about the company's EPS rounding practices, and then received a subpoena last March.* Furthermore, during the fourth quarter of 2018, HCSG authorized its outside counsel to conduct an internal investigation, under the direction of the Company's Audit Committee, into these matters. As a result, HCSG is unable to file its Annual Report on form 10-K on time.

(Emphasis added.)

45.     Additionally, according to the March 2019 Article, Healthcare Services "dramatically amend[ed]" the way it managed its quarterly EPS following Monocle's publication of the March 2017 Article, as well as after Monocle informed the Company, the Company's sell-side analysts, and the SEC of its findings. Monocle illustrated this in the March 2019 Article using the following graph:



46.    The March 2019 article also noted how Healthcare Services' EPS continued to climb dramatically in the wake of Monocle's release of the 2017 article, stating, in relevant part:

As well, the Wall Street Journal reported last summer that, according to people familiar with the matter, "*[e]nforcement officials at the Securities and Exchange Commission have sent queries to at least 10 companies, asking the firms to provide information about accounting adjustments that could push their reported earnings per share higher*." Based on our in-depth analysis of historical earnings data for all publicly-traded companies, *we were highly confident that the SEC would never find a more outlandish "strategic rounding" offender than it would in HCSG.* As a result, *we knew with certainty that HCSG would have been on this short list of companies to which the SEC sent queries*.

It is difficult to conclude with any certainty what will become of the SEC's investigation and HCSG's internal investigation into this matter. However, we can state with absolute certainty that investors have not heard the last of this. We would not be at all surprised if senior executives at the company lose their jobs and if the company and its executives eventually enter into settlement agreements with the SEC that result in meaningful financial payments to the government. As well, the legal costs that the company ends up incurring will most certainly be meaningful.

When we published our articles on this matter in 2017, we became the objects of derision, both in the comments sections of our articles and offline, by many people who were invested in the company. We attempted to make the point that "if HCSG's management has been willing to manipulate its EPS in this manner for over a decade, what else might it be willing to do to achieve higher valuation multiples"; however, *our argument fell on many deaf ears, as HCSG's stock continued to soar throughout 2017. Including Monday's $366 million of value destruction, HCSG has now underperformed the S&P 500 by more than 40% since we published our initial article.* This goes to show that sometimes it's worth paying attention to the details when analyzing one's investments.



Cumulative Stock Price Returns, Healthcare Services Group v. S&P 500 - 3/22/17 to 3/4/19

(Emphasis added).

47.     As the March 2017 Article highlighted:

•     The rate at which Healthcare Services' reported EPS was rounded up to the nearest penny, rather than rounded down, quarter by quarter, was improbable without the alleged "earnings management" and pattern of "strategic rounding" of quarterly EPS;

•     One reason Healthcare Services would "fiddle[] with the way it recognizes revenue recognition or accrues expenses in order to achieve certain quarterly EPS results" may have been to facilitate progressively higher valuation multiples for the stock, which would benefit those seeking to sell the Company's stock;

•     Healthcare Services' then-Chairman of the Board and former-CEO, Daniel McCartney, was one such individual who actively sold and stood to gain from the alleged EPS accounting manipulation; and

•     Whether this activity was itself illegal or merely immoral, it nonetheless signaled an aggressive approach to accounting that increased Healthcare Services' exposure to restatement risk and SEC enforcement proceedings.

48.     Following these disclosures, the Company's stock price fell $4.96 per share, or 13.14%, to close at $32.78 on March 4, 2019.

## POST-CLASS PERIOD STATEMENTS

49.     On March 18, 2019, Healthcare Services filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2018 (the "2018 10-K"). In the 2018 10-K, Healthcare Services advised investors that the Company's outside counsel had completed its investigation into Healthcare Services' "EPS calculation, rounding and reporting practices" "in March 2019, prior to the filing of this Annual Report on Form 10-K." The Company did not disclose the internal investigation's findings.

## ADDITIONAL SCIENTER ALLEGATIONS

50.     As alleged herein, Healthcare Services and Defendant Wahl acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding Healthcare Services, their control over, and/or receipt and/or modification of Healthcare Services allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Healthcare Services, participated in the fraudulent scheme alleged herein.

## NO SAFE HARBOR

51.     The "Safe Harbor" warnings accompanying Healthcare Services reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the

Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

52.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Healthcare Services who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

53.     Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's securities traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Plaintiff and other members of the Class purchased Healthcare Services securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

54.    At all relevant times, the market for Healthcare Services securities was efficient for the following reasons, among others:

(a)    As a regulated issuer, Healthcare Services filed periodic public reports with the SEC; and

(b)    Healthcare Services regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## LOSS CAUSATION/ECONOMIC LOSS

55.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Healthcare Services securities and operated as a fraud or deceit on Class Period purchasers of Healthcare Services securities by misrepresenting the value of the Company's business and prospects by overstating its earnings and concealing the significant defects in its internal controls. As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Healthcare Services securities fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of Healthcare Services securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against all Defendants

56.     Plaintiff incorporates ¶¶1-55 by reference.

57.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

58.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Healthcare Services securities during the Class Period.

59.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Healthcare Services securities. Plaintiff and the Class would not have purchased Healthcare Services securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against All Defendants

60.     Plaintiff incorporates ¶¶1-59 by reference.

61.    Defendant Wahl acted as a controlling person of Healthcare Services within the meaning of §20(a) of the Exchange Act. By reason of his positions with the Company, and his ownership of Healthcare Services common stock, Defendant Wahl had the power and authority to cause Healthcare Services to engage in the wrongful conduct complained of herein. Healthcare Services controlled Defendant Wahl and all of its employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

     Plaintiff demands a trial by jury.

DATED:  March 22, 2019                Respectfully submitted,

                                         **THE ROSEN LAW FIRM, P.A.**

                                         Gonen Haklay (PA I.D. #76446)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: ghaklay@rosenlegal.com

POMERANTZ LLP
Jeremy A. Lieberman
J. Alexander Hood II
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com
Email: jlindenfeld@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

HOLZER & HOLZER, LLC
Corey D. Holzer
1200 Ashwood Parkway
Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
Email: cholzer@holzerlaw.com

*Attorneys for Plaintiff*

- 25 -

DocuSign Envelope ID: C95C2228-8582-423F-A7C5-CAE1F6E26F1B

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| HCSG | 02/27/2018 | 15.66747 | $47.8699 |
| | 03/26/2018 | 0.29778 | $42.2799 |
| | 04/05/2018 | 11.53139 | $43.3599 |
| | 05/11/2018 | 13.17610 | $37.9475 |
| | 07/02/2018 | 0.47830 | $42.8599 |
| | 07/19/2018 | 12.94533 | $38.62397 |
| | 10/01/2018 | 0.57358 | $40.4999 |
| | 12/31/2018 | 0.59344 | $39.5999 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|
| HCSG | | | |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

None

DocuSign Envelope ID: C95C2228-8582-423F-A7C5-CAE1F6E26F1B

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___13___ day of ___March___, 2019 in ___New York___, ___New York___.

                                       City                       State

(Signature) X _Stephen Koch_
                      535DA170615C421...

(Print Name) Stephen Koch