**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

UTAH RETIREMENT SYSTEMS,

        Plaintiff,

v.

HEALTHCARE SERVICES GROUP, INC.,
DANIEL P. MCCARTNEY, THEODORE
WAHL, JOHN C. SHEA, and MATTHEW  J.
MCKEE,

        Defendants.

Case No. 2:19-cv-01227-ER

**ORAL ARGUMENT REQUESTED**

**DEFENDANT HEALTHCARE SERVICES GROUP, INC., DANIEL MCCARTNEY,
THEODORE WAHL, JOHN SHEA, AND MATTHEW MCKEE'S MEMORANDUM OF
LAW IN SUPPORT OF MOTION TO DISMISS**

Robert L. Hickok (PA Bar No. 30101)
Jay A. Dubow (PA Bar No. 41741)
Joanna J. Cline (PA Bar No. 83195)
Daniel J. Boland (PA Bar No. 91263)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

*Attorneys for Defendants*
*Healthcare Services Group, Inc., Daniel P.*
*McCartney, Theodore Wahl, John C. Shea, and*
*Matthew J. McKee*

Dated:  November 18, 2019

**TABLE OF CONTENTS**

**Page**

I.    Introduction ............................................................................................................ 1

II.   Factual Background ............................................................................................... 5

    A.    HCSG ............................................................................................................ 5

    B.    Individual Defendants .................................................................................. 8

        1.    Daniel P. McCartney ........................................................................ 8

        2.    Theodore Wahl .................................................................................. 9

        3.    John C. Shea ...................................................................................... 9

        4.    Matthew J. McKee .......................................................................... 10

III.  Legal Argument ................................................................................................... 10

    A.    Legal Standard ........................................................................................... 10

    B.    The Amended Complaint Fails to Allege Any Material Misstatement or Omission with Respect to Alleged EPS Rounding. ............................... 13

    C.    The Amended Complaint Fails to Allege any Material Misstatement or Omission with Respect to the Pendency of an SEC Investigation Because There Was No Duty to Disclose the SEC Investigation. ..................................... 18

    D.    The Amended Complaint Fails to Allege Any Misstatement or Omission Resulting from the Alleged "Management" of Labor Expenses. .......................... 23

    E.    Lead Plaintiff Failed to Meet the PSLRA's Requirements for a Strong Inference of Scienter. ................................................................................. 27

        1.    The "Stock Sales" Alleged by Lead Plaintiff Do Not Support a "Strong Inference of Scienter." ................................................... 29

            (a)    The Individual Defendants' Transaction Histories Negates Any Inference of Scienter. ................................................. 30

            (b)    McCartney's Stock Gifts Do Not Support a Strong Inference of Scienter. ................................................. 32

        2.    Defendant Wahl's Statements About the Monocle Report Are Insufficient to Support a "Strong Inference" of Scienter. .......................... 33

    F.    The Amended Complaint Fails to Adequately Plead Loss Causation. ................. 34

    G.    The Amended Complaint's Section 20(a) Claim Must Be Dismissed. ................. 35

IV.   CONCLUSION ................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ...............................................................18

*In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999) ................................................. passim

*In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137 (3d Cir. 2004)...........................................................12

*In re Am. Express Co Shareholder Litig.*, 840 F. Supp. 260 (S.D.N.Y. 1993)..............................20

*In re Amarin Corp. PLC Sec. Litig.*, 689 Fed. App'x 124 (3d Cir. 2017) ......................................11

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)...................................................................................18

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................................10

*In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) ....................31

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997)...........................5, 10, 29

*Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307 (11th Cir. 2019)......................................................22

*In re CDNow, Inc. Sec. Litig.*, 138 F. Supp. 2d 624 (E.D. Pa. 2001) .............................................35

*Ciresi v. Citicorp*, 782 F. Supp. 819 (S.D.N.Y. 1991)....................................................................19

*In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) ........................................20

*City of Cambridge Retirement Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872
    (3d Cir. 2018)........................................................................................................................10, 11

*City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159 (3d Cir. 2014)..................................11, 25

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 183 (2d
    Cir. 2014) ....................................................................................................................................20

*City of Roseville Employees Ret. Sys. v. EnergySols., Inc.*, 814 F. Supp. 2d 395,
    426 (E.D.N.Y. Sept. 30, 2011). ..................................................................................................22

*In re CommVault Sys., Inc. Sec. Litig.*, No. 14-cv-5628 (PGS), 2016 U.S. Dist.
    LEXIS 135257 (D.N.J. Sept. 30, 2016) ......................................................................................26

*in re Data Access Sys. Sec. Litig.*, 843 F.2d 1537 (3d Cir. 1988)..................................................26

*Fan v. StoneMor Partners LP*, 927 F.3d 710 (3d Cir. 2019) ......................................10, 13, 14, 15

*Gaer v. Educ. Mgmt. Corp.*, Civil Action No. 10-1061, 2011 U.S. Dist. LEXIS 153539 (W.D. Pa. Aug. 30, 2011) ...............................................................................21

*GAF Corp. v. Heyman*, 724 F. 2d. 727 (2d Cir. 1983) ...................................................21

*GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004) .........................27, 28

*In re Galena Biopharma, Inc. Sec. Litig.*, 336 F. Supp. 3d 378 (D.N.J. 2018) ...........................21

*In re Great Atl. & Pac. Tea Co.*,103 Fed. App'x 465 (3d Cir. 2004).............................................33

*In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383 (E.D.N.Y. 2003) ...............................31

*Hayes v. Gross*, 982 F.2d 104 (3d Cir. 1992) ...............................................................24

*In re Hertz Global Holdings, Inc.*, 905 F.3d 106 (3d Cir. 2018) ........................................... passim

*Institut'l Investors Group v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009)................................. passim

*In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262 (D.N.J. 2007) ...........................................33, 34

*In re NVIDIA Corp. Secs. Litig.*, 768 F.3d 1046 (9th Cir. 2014)....................................................22

*Kelly v. Healthcare Servs. Grp., Inc.*, No. 2:13-cv-00441-JRG (E.D. Tex. May 31, 2013) ...............................................................................................................27

*In re Lions Gate Entertainment Corp. Securities Litigation*, 165 F. Supp. 3d 1 (S.D.N.Y. 2016).......................................................................................................19, 20

*Martin v. GNC Holdings*, 757 Fed. App'x 151 (3d Cir. 2018)......................................................11

*Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011) ...................................................18

*Messner v. United States Techs.*, No. 15-5427, 2016 U.S. Dist. LEXIS 50132 (E.D. Pa. April 13, 2016) ..............................................................................................26

*Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902 (3d Cir. 1997).  ...............................................10

*Nat'l Junior Baseball League v. PharmaNet Dev. Group, Inc.*, 720 F. Supp. 2d 517 (D.N.J. 2010)......................................................................................................34

*Ont. Teachers' Pension Plan Bd. v. Teva Pharm. Indus.*, No. 3:17-cv-558 (SRU), 2019 U.S. Dist. LEXIS 164126 (D. Conn. Sep. 25, 2019) ....................................................20

*Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) ...............................................................21, 29, 31

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192 (3d Cir. 1993) ...................................................................................................................5

*In Re Radian Sec. Litig.*, 612 F. Supp. 2d 594 (E.D. Pa. 2009) ....................................26

*Rahman v. Kid Brands, Inc.*, 736 F.3d 237 (3d Cir. 2013) ............................................11

*Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996) ................................................5

*Stratte-McClure v. Stanley*, 776 F.3d 94 (2d. Cir. 2015) ...............................................21

*In re Suprema Specialties, Inc. Sec. Litig*, 438 F.3d 256 (3d Cir. 2006) ......................30

*Teamsters Local 456 Pension Fund v. Universal Health Servs.*, No. 17-2817, 2019 U.S. Dist. LEXIS 140131 (E.D. Pa. Aug. 19, 2019) .......................................24

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308 (2007). ...............................28

*TFM Inv. Grp. v. Bauer*, Civil Action No. 99-840, 1999 U.S. Dist. LEXIS 15821 (E.D. Pa. Sept. 24, 1999) .........................................................................................29

*Thor Power Tool Co. v. Comm'r*, 439 U.S. 522 (1978) .................................................25

*In re UBS Securities Litigation*, No. 07 Civ. 11225 (RJS), 2012 U.S. Dist. LEXIS 114144 (S.D.N.Y. Sept. 28, 2012) ..........................................................................19

*Wallace v. Sys. & Computer Tech. Corp*, No. 95-CV-6303, 1997 U.S. Dist. LEXIS 14677 (E.D. Pa. Sept. 23, 1997) ...............................................................15, 27

*In re Westinghouse Sec. Litig.*, 90 F.3d 696 (3d Cir. 1996) .....................................13, 14

*Williams v. Globus Med., Inc.*, 869 F.3d 235 (3d Cir. 2017) .........................................21

*Winer Family Trust v. Queen*, 503 F.3d 319 (3d Cir. 2007) ......................................11, 12

*Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014) .............................30

**STATUTES**

15 U.S.C. 78u-4(b) .....................................................................................................12, 27

15 U.S.C. § 78j(b) .............................................................................................................12

**OTHER AUTHORITIES**

17 C.F.R. § 240.10b-5 .......................................................................................................12

17 C.F.R. § 240.12b-25 .......................................................................................................6

Fed. R. Civ. P. 9(b) ...........................................................................................................10

Fed. R. Civ. P. 12(b)(6)......................................................................................................10

H.R. Conf. Rep. No. 104-369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679 ................................10

## I.    INTRODUCTION

Lead Plaintiff Utah Retirement Systems ("Lead Plaintiff") claims that Defendants[1] violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.  Despite its excessive 132 pages, Lead Plaintiff's Amended Complaint alleges (albeit repeatedly) only three material misstatements in support of its class action claims against Defendants: (1) that Defendants allegedly materially misstated the Company's earnings per share ("EPS"), the computations used to calculate EPS, and the adequacy of the Company's disclosure controls and procedures (*see* Am. Compl., ¶ 7); (2) that Defendants allegedly misled investors by concealing the existence of a Securities & Exchange Commission ("SEC") investigation into the Company's EPS calculations (*see* Am. Compl., ¶ 13); and (3) that the Company allegedly engaged in earnings management through "strategically manipulating expenses related to [its] hourly employees" (*see* Am. Compl., ¶ 19).[2]  Each of these claims fails for multiple independent reasons.

---

[1] "Defendants" are Healthcare Services Group ("HCSG" or "the Company"), and Daniel P. McCartney, Theodore Wahl, John C. Shea, and Matthew J. McKee (collectively, "the Individual Defendants").

[2] The Amended Complaint's lengthy and repetitive allegations, distilled to their substance, can be divided among these three categories.  *See*, *e.g.*, ¶¶ 4-10, 12, 14, 18, 42, 43, 51-89, 107, 141-276, 292-304, 317, 321-27, 331, 338 (relating to alleged material misstatements relating to the Company's EPS, the computations used to calculate EPS, and the adequacy of the Company's disclosure controls and procedures); ¶¶ 4, 10-17, 28, 31, 80-82, 90-108, 141, 245-248, 250-51, 258-259, 265, 272, 275-91, 303-16, 332 (relating to the alleged concealment of the existence of an SEC investigation into the Company's EPS calculations.); ¶¶ 19, 41-42, 49, 109-40, 328-30, 333 (relating to alleged earnings management through strategically manipulating labor expenses.)

First, at the heart of Lead Plaintiff's claims about the Company's EPS calculations is the March 22, 2017 "Monocle Accounting Research" report entitled "Healthcare Services Group: A Decade of Strategic Rounding" (the "Monocle Report"). *See*, *e.g.*, Am. Compl., ¶¶ 8, 9, 14, 26, 43, 66-78, 83-89, 223, 248, 251, 275, 304, 317, 321, 324-325. ***Based upon disclosed, publicly available earnings information***,[3] the Monocle Report discusses an alleged "pattern of strategic rounding" of its EPS—that is, the Company far more frequently rounded up (as opposed to down) its EPS calculation to the nearest penny for the past 11 years. Am. Compl., ¶ 8. According to the Amended Complaint, the Monocle Report suggests "potential fraud at the highest levels of the Company's management." Am. Compl., ¶ 8. Ironically, the Monocle Report, cited repeatedly throughout the Amended Complaint, relies totally on information in the Company's public disclosures which dooms any Rule 10b-5 claim based upon the Company's alleged rounding and manipulation of EPS. The Monocle Report conclusively establishes that prior to the alleged Class Period the Company publicly disclosed the information necessary to identify the alleged "pattern of strategic rounding" and, therefore, there can be no material misstatement violating Rule 10b-5.

Second, regarding Lead Plaintiff's claim that the Company concealed the existence of the SEC investigation into the Company's EPS calculations, the law does not impose a per se duty upon a company to disclose such investigations. Rather, under GAAP, disclosure only is required if a material loss is at least "reasonably possible." Here, the Amended Complaint makes no allegations sufficient to show that the Company had any duty to disclose

---

[3] The Monocle Report's EPS calculations utilized HCSG's quarterly net income and the weighted number of common shares outstanding during the quarter, both of which were disclosed in the Company's quarterly SEC filings. *See* Ex. 1, Mar. 22, 2017 Monocle Report.

the investigation at any point before it did so in March 2019. Indeed, to this day, the investigation's outcome remains uncertain. Implicitly recognizing that inability, Lead Plaintiff *egregiously* misrepresents the contents of a Credit Agreement that the Company entered into with various third parties and the Company's related December 2018 Form 8-K disclosure. Lead Plaintiff alleges that the Company stated "[t]here are no actions, suits, proceedings or investigations pending" (Am. Compl., ¶ 13), but *intentionally omits* the remainder of the sentence qualifying the disclosure and stating ". . . which individually or in the aggregate *could reasonably be expected to result in any Material Adverse Change*." *See* Ex. 2, Form 8-K filed Dec. 31, 2018, with attached Credit Agreement, at § 6.1.5 (emphasis added). Lead Plaintiff makes no allegations that the Company should have known (again, then or now) that the investigation will result in a Material Adverse Change as defined by the disclosed Credit Agreement. In sum, the Amended Complaint fails as a matter of law to allege any material misstatement based upon the Company's alleged failure to disclose the existence of the SEC's investigation earlier than March 2019.

Third, the Amended Complaint's allegations of "earnings management" through manipulation of HCSG's labor expenses do not even establish a material misstatement, so this allegation, too, must fail. The alleged facts provided by the four confidential witnesses go toward the Company's alleged reduction of its actual labor expenses—they do not support an allegation that the Company misrepresented labor expenses in its financial statements or anywhere else. Am. Compl., ¶¶ 109-140. For example, allegations that the Company "understaffed facilities to keep labor expenses below budgeted amounts" or "'sen[t] people home' for at least the last two weeks of the year," fail to even suggest that the Company misstated or manipulated its labor expenses. Am. Compl., ¶¶ 114, 115. The Amended

Complaint provides no allegations that the Company actually misrepresented its labor expenses and presents no link between the Company's alleged management of labor expenses and any financial statement misstatement, let alone a nexus to the alleged misstatement about the Company's EPS. Any Rule 10b-5 claim based upon the Company's alleged management of labor expenses must be dismissed and those allegations do nothing to support the Amended Complaint's other alleged material misstatements.

In addition to failing to allege a material misstatement, the Amended Complaint concedes that the Company's stock price did not drop until two years *after* the Monocle Report was published. *See* Am. Compl., ¶ 15. This fact repudiates Lead Plaintiff's ability to show loss causation and is an independent reason that the Amended Complaint fails.

Finally, all of Lead Plaintiff's claims must be dismissed for failure to plead facts sufficient to show a strong inference of scienter as required by the Private Securities Litigation Reform Act ("PSLRA"). The Amended Complaint alleges stock dispositions by only 1 of the 4 Individual Defendants. The Amended Complaint concedes, however, that Defendant McCartney's stock transactions during the alleged Class Period[4] were consistent with his transaction history during the five years preceding the alleged Class Period. Accordingly, there can be no inference of scienter. *See* Am. Compl., ¶ 15. In addition, McCartney and other Individual Defendants retained a significant portion of their stock holdings throughout the alleged Class Period and, in fact, Defendants Wahl and Shea significantly *increased* their holdings throughout the alleged Class Period. *See* discussion *infra*, at Section III(E). In light of these facts, Lead Plaintiff's efforts to plead scienter fail.

---

[4] Lead Plaintiff alleges a Class Period spanning from April 8, 2014 to March 4, 2019. Am. Compl., ¶ 1.

For these reasons and for those set forth below, the Amended Complaint should be dismissed in its entirety.

## II.    FACTUAL BACKGROUND

### A.    HCSG

Founded in 1976 and headquartered in Bensalem, PA, HCSG delivers housekeeping, laundry, dining, and nutrition services to healthcare facilities in the United States. *See* Am. Compl. ¶¶ 3, 25; Ex. 3, Form 10-Q filed Oct. 19, 2018, at 8.[5]  It currently services numerous "H&L" facilities and "D&N" facilities, which include nursing homes, assisted living facilities, skilled nursing facilities, rehabilitation centers, and psychiatric hospitals.  Am. Compl., ¶ 2, 34; Ex. 3, Form 10-Q filed October 19, 2018, at 24.  HCSG is currently traded on the NASDAQ under the ticker symbol "HCSG."  Am. Compl. ¶ 25.

Each year of the alleged Class Period, HCSG filed with the SEC quarterly and annual reports on Forms 10-Q and 10-K.  The reports included information regarding the Company's EPS, including HCSG's quarterly net income and the diluted weighted average number of common shares outstanding during the quarter.  *See* Ex. 1, Mar. 22, 2017 Monocle Report.  On March 22, 2017, Monocle Accounting Research published a report based on its analysis of publicly available information regarding HCSG's EPS.  *Id.*  The Report, entitled "Healthcare Services Group: A Decade of Strategic Rounding," suggested that the Company may have engaged in "'earnings management,' as revealed by a pattern of 'strategic rounding' of

---

[5] Courts are permitted to consider matters of public record when ruling on a motion to dismiss. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("[A] 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" (second alteration in original) (quoting *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996))).

its reported quarterly EPS," which the report described as an "aggressive approach to accounting that increases exposure to restatement risk, enforcement proceedings, and securities fraud claims." Am. Compl., ¶ 8. On April 17, 2017, a second Monocle Accounting Research Report was published, reiterating the content of the first Report. *See* Ex. 4, Apr. 17, 2017 Monocle Report.

The SEC commenced a "Matter Under Inquiry" ("MUI") into the Company's EPS practices in November 2017. Am. Compl. ¶¶ 10, 79, 81, 90. In March 2018, the SEC issued a subpoena to the Company, and later that year, the Company launched an internal investigation. Am. Compl. ¶¶ 11, 91, 92.

On March 4, 2019, HCSG reported in its Form 8-K that it would delay the filing of its annual Form 10-K. *See* Am. Compl., ¶ 343; Ex. 5A, Form 8-K filed Mar. 4, 2019. At the same time, the Company noted that the SEC was investigating its EPS calculation practices and that it had retained outside counsel to conduct an internal investigation, but that it did not expect its delayed 10-K filing "to reflect any changes to its results of operations as previously reported" in the Company's most recent earnings release. *Id*. In fact, the Company timely filed its annual Form 10-K report with the SEC on March 18, 2019, within the extended time allowed by SEC rule. Am. Compl., ¶ 105; *See* 17 C.F.R. § 240.12b-25; Ex. 5A, Form 8-K filed Mar. 4, 2019; Ex. 5B, Form NT 10-K filed March 4, 2019; Ex. 6, Form 10-K filed Mar. 18, 2019.

The allegations in Lead Plaintiff's Amended Complaint prominently feature the Monocle Report, even though: (1) the Report was based on publicly available information that had already entered the market and was available to investors; and (2) HCSG's stock price did not decrease following the release of the Monocle Report. *See* Ex. 7, HCSG Stock Price Chart (showing that the opening price for HCSG stock on March 22, 2017 was $43, and the closing

6

price was $42.95 and further showing that the stock continued to rise to over $53/share in the four months following publication of the Monocle Report). Indeed, the stock drop that Lead Plaintiff contends was the result of the Monocle Report occurred almost two years later, on March 4, 2019, when HCSG disclosed that it would miss the normal filing deadline. *See* Am. Compl., ¶¶ 14, 343; *See* Ex. 5A, Form 8-K filed Mar. 4, 2019.

Neither the SEC's investigation nor the Company's internal investigation caused the Company to restate its prior financial statements. Indeed, the Company's auditor would not have issued an unqualified opinion in March 2019 had it disagreed with the Company's conclusion that, prior to the first quarter of 2019, it was not at least "reasonably possible" that the SEC investigation would result in a material loss for the Company. *See* Ex. 8, Accounting Standards Codification (ASC) 450-20; Ex. 9, ASC 250-10; *see also* Ex. 6, Form 10-K filed Mar. 18, 2019, at 32. Consistent with that conclusion, in the context of a Credit Agreement into which the Company entered with certain third party lenders on December 21, 2018, the Company represented that there were no investigations that the Company believed would cause a Material Adverse Change (as defined in the Credit Agreement).[6] *See* Ex. 2, Form 8-K filed Dec. 31,

---

[6] The Credit Agreement defined a Material Adverse Change as "any set of circumstances or events which (i) has or could reasonably be expected to have a material adverse effect upon the validity or enforceability of this Agreement or any other Loan Document, (ii) is or could reasonably be expected to have a material adverse effect upon the business, properties, assets, financial condition or results of operations of the Loan Parties taken as a whole, (iii) impairs materially or could reasonably be expected to impair materially the ability of the Loan Parties taken as a whole to duly and punctually pay or perform any of the Obligations, or (iv) impairs materially or could reasonably be expected to impair materially the ability of the Administrative Agent or any of the Lenders, to the extent permitted, to enforce their legal remedies pursuant to this Agreement or any other Loan Document." *See* Ex. 2, Form 8-K filed Dec. 31, 2018, with attached Credit Agreement, § 1.1 (Definitions).

2018, with attached Credit Agreement.  This Credit Agreement was attached to the 8-K that the Company filed on December 31, 2018.  *Id*.

###### B.    Individual Defendants

Each of the four Individual Defendants is or was a director or officer of the Company, as described below.  Lead Plaintiff alleges that only 1 of the 4 Individual Defendants, Defendant McCartney, sold stock during the alleged Class Period.  Am. Compl., ¶¶ 26, 75, 326.  Not only does the Amended Complaint fail to allege any sales by the other Individual Defendants, the Company's public filings show that Defendants Wahl and Shea significantly increased their holdings throughout the Class Period.  *See* Exs. 10 and 11 (Schedules 14A dated Apr. 14, 2014, at 10 and Apr. 19, 2019, at 28) (reporting total beneficial holdings).

To the extent the compensation of the Individual Defendants was performance based, it was not tied to earnings per share but instead was tied to operating income.  *See* Ex. 12, Schedule 14A dated Apr. 26, 2018, at 19 ("Performance-based compensation for our executive officers is defined as a percentage of the Company's operating income.").

###### 1.    Daniel P. McCartney

Daniel P. McCartney founded HCSG in 1976, and served as Chief Executive Officer (CEO) until his retirement in May 2015.  Am. Compl., ¶ 26.  He remained Chairman of the Board until May 31, 2017, when he transitioned to "Chairman Emeritus." *Id.*  McCartney, as CEO of the Company, frequently disposed of and acquired stock prior to the Class Period alleged in the Complaint.  Indeed, the Amended Complaint concedes that McCartney sold approximately the same amount of stock during the 5-year period preceding the alleged Class Period as he did during the approximate 5-year alleged Class Period.  *See* Am. Compl., ¶ 26 ("[F]rom December 10, 2008 to May 11, 2017 . . . McCartney sold or gifted more than 2.8 million shares . . . for

gross proceeds of nearly $71.3 million, more than $35 million of which occurred during the Class Period."). Although the Amended Complaint alleges that McCartney sold 113,901 shares on May 11, 2017, it conveniently ignores that McCartney still owned *more than 1.9 million shares* of HCSG stock following the transaction. *See* Ex. 13, Form 4 dated May 15, 2017.

### 2.    Theodore Wahl

Theodore Wahl is the current CEO of HCSG, serving in this position since McCartney's retirement in May 2015. Am. Compl., ¶ 27. Defendant Wahl is also the son-in-law of Defendant McCartney. Am. Compl., ¶ 26. Prior to his promotion to CEO, Wahl served in various positions throughout the Company, including Chief Operating Officer (COO). Am. Compl., ¶ 27. The Amended Complaint does not allege any stock sales by Wahl. In fact, Wahl substantially increased his holdings during the alleged Class Period from 217,946 shares on April 4, 2014 to 382,520 shares on April 1, 2019—*a 75.5% increase* in his holdings. *See* Exs. 10 and 11 (Schedules 14A dated Apr. 14, 2014, at 10 and Apr. 19, 2019, at 28) (reporting total beneficial holdings). In addition, during the heart of the Class Period, Wahl elected to receive 65% of his 2017 performance based compensation as Company stock in 2018. *See* Ex. 12, Schedule 14A dated Apr. 26, 2018, at 23; *see* Ex. 11, Schedule 14A dated Apr. 19, 2019, at 25.

### 3.    John C. Shea

John C. Shea has been employed with HCSG since 2009, and has served as the Company's Executive Vice President and Chief Financial Officer (CFO) since April 2012. Am. Compl., ¶ 28. The Amended Complaint does not allege any stock sales by Shea. In fact, Shea substantially increased his holdings during the alleged Class Period from 9,406 shares on April 4, 2014 to 33,838 shares on April 1, 2019—*a 359.7% increase* in his holdings. *See* Exs. 10 and 11

9

(Schedules 14A dated Apr. 14, 2014, at 10 and Apr. 19, 2019, at 28) (reporting total beneficial holdings).

### 4.   **Matthew J. McKee**

Matthew J. McKee has been employed with HCSG since 2004, and currently serves as Chief Communications Officer (CCO).  Am. Compl., ¶ 29.  Lead Plaintiff does not allege that McKee sold or gifted any stock during the alleged Class Period.

## III.   LEGAL ARGUMENT

### A.   Legal Standard

Under the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead a claim for relief "that is plausible on its face."  *Id.* at 570.  Factual allegations that fail "to raise a right to relief above the speculative level," *id.* at 555, or merely state a "conceivable" claim will not suffice, *id.* at 570 (holding that complaint must be dismissed "[b]ecause the plaintiffs here have not nudged their claims across the line from conceivable to plausible").  Furthermore, a court should not accept a complaint's "bald assertions" or "legal conclusions," *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429 (3d Cir. 1997), or give credence to "unsupported conclusions," "unwarranted inferences," "footless conclusions of law," or "sweeping legal conclusions cast in the form of factual allegations," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 n.8 (3d Cir. 1997).

Plaintiffs pleading securities fraud must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), requiring that "any fraud allegation 'must state with particularity the circumstances constituting fraud or mistake.'"  *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 879 (3d Cir. 2018) (quoting Fed. R. Civ. P.

9(b)).  The PSLRA further establishes "uniform and more stringent pleading requirements to curtail the filing of meritless lawsuits."  H.R. Conf. Rep. No. 104-369, at 41 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 740.  Lead Plaintiff filed its Amended Complaint pursuant to the PSLRA, and thus is subject to its heightened pleading requirements.

The Third Circuit has consistently upheld dismissals of federal securities fraud claims that fail to meet the stringent pleading requirements of the PSLRA.  *See Fan v. StoneMor Partners LP*, 927 F.3d 710, 717-18 (3d Cir. 2019) (dismissing Rule 10b-5 claim where defendant "sufficiently disclosed facts and information that render[ed] its alleged misrepresentations not misleading," and plaintiffs failed to plead "[a] strong inference of scienter"); *City of Cambridge*, 908 F.3d at 883 (dismissing Rule 10b-5 claim where plaintiffs "fail[ed] to plausibly allege that [their economic] harm arose from fraud"); *In re Hertz Global Holdings, Inc.*, 905 F.3d 106, 116 (3d Cir. 2018) (dismissing Rule 10b-5 claim where plaintiffs' "allegations [did] not give rise to a strong inference of scienter"); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 173 (3d Cir. 2014) (dismissing Rule 10b-5 claim where plaintiffs failed to adequately allege defendants' statements were false or misleading); *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 243 (3d Cir. 2013) (dismissing Rule 10b-5 claim where plaintiff "failed to plead scienter with sufficient particularity"); *Martin v. GNC Holdings*, 757 Fed. App'x 151, 154 (3d Cir. 2018) (dismissing Rule 10b-5 claim where plaintiffs failed to adequately plead scienter); *In re Amarin Corp. PLC Sec. Litig.*, 689 Fed. App'x 124, 131 (3d Cir. 2017) (dismissing Rule 10b-5 claim where plaintiffs failed to adequately allege defendants' statements were false or misleading).  "One of the purposes of the PSLRA's heightened pleading requirements is to limit abusive securities class-actions suits."  *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007); *see also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531 (3d Cir. 1999) (noting the PSLRA is designed to

11

limit: "(1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of 'deep pocket' defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys").

To prevail on a claim that a defendant made material misrepresentations or omissions in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, plaintiffs must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation, *i.e.*, that the plaintiff's reliance was the proximate cause of his injury.  *Inst'l Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 251 (3d Cir. 2009).  The failure to adequately plead any one of the essential elements of a Rule 10b-5 claim necessarily precludes such a claim.  *See Advanta*, 180 F.3d at 531.

In addition "[t]he PSLRA provides two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss."  *Avaya, Inc.*, 564 F.3d at 252.  *First*, under 15 U.S.C. 78u-4(b)(1), the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity."  *Id.* at 252-53 (quoting *Winer Family Trust*, 503 F.3d at 326).  *Second*, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with required state of mind."  *Id.* at 253 (quoting 15 U.S.C. § 78u-4(b)(2)).  "Significantly, both provisions require facts to be pleaded 'with particularity.'"  *Id.*

"The 'appropriate sanction' for complaints which fail to meet these requirements is dismissal." *In re Alpharma Sec. Litig.*, 372 F.3d 137, 147 (3d Cir. 2004).

Here, Lead Plaintiff's Section 10(b) and Rule 10b-5 claims should be dismissed on the following independent grounds: (1) the Amended Complaint fails to demonstrate with particularity that Defendants made a material misstatement or omission; (2) the Amended Complaint fails to meet the PSLRA's heightened pleading requirements for alleging a "strong inference of scienter"; and (3) the Amended Complaint fails to adequately plead loss causation.

**B.      The Amended Complaint Fails to Allege Any Material Misstatement or Omission with Respect to Alleged EPS Rounding.**

As an initial matter, the Amended Complaint fails to plead a materially misleading statement or omission in accordance with the heightened pleading requirements of the PSLRA.  While the crux of the Amended Complaint is the March 2017 Monocle Report which discussed alleged EPS rounding, the conduct described in the Monocle Report cannot serve as a basis for securities fraud for several reasons, as set forth further below.

First, the Monocle Report is based entirely upon information that was publicly available to all investors from the beginning of the alleged Class Period, rendering Lead Plaintiff's alleged misstatements or omissions immaterial as a matter of law.  *See StoneMor*, 927 F.3d at 716.  To successfully plead a Rule 10b-5 claim, plaintiffs must show not only a false or misleading statement, but also "that the alleged misstatement or omission is material." *Id.* "Materiality may be found when certain information, if disclosed, 'would have been viewed by the reasonable investor as having significantly ***altered*** the total mix of information available to that investor.'" *Id.* (emphasis added) (quoting *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714 (3d Cir. 1996)).

13

The Third Circuit's recent decision in *StoneMor* is instructive.  In *StoneMor*, the Third Circuit affirmed this Court's well-reasoned decision granting defendants' motion to dismiss a putative securities fraud class action complaint, finding plaintiffs had failed to meet this materiality requirement.  In holding that defendant StoneMor Partners—a seller of funeral products and services—sufficiently informed investors of its business practices to render the alleged omissions and misstatements in that case immaterial, the Third Circuit reiterated that a defendant's sufficient disclosure of information will render alleged misrepresentations immaterial when the alleged misrepresentations would not have been viewed by a reasonable investor as "having significantly altered the total mix of information available to that investor."  *Id.* at 716 (quoting *Westinghouse*, 90 F.3d at 714).  The *StoneMor* court explained, "when considering whether an alleged misstatement is material, we pay particular attention to whether or not Defendants sufficiently disclosed ***facts and information*** that would render the alleged misrepresentation not misleading."  *Id.* (emphasis added).  Applying this principle, the court found that although StoneMor was, as plaintiffs claimed, unsustainably funding its dividend distributions with borrowed cash, this alleged omission was immaterial, as StoneMor had consistently disclosed facts and information about how the company funded its distributions in its Form 10-Ks.  *Id.*  Because a reasonable investor could rely on these disclosures to discern StoneMor's business practices, the Third Circuit found the alleged omissions and misstatements to be immaterial and affirmed this Court's dismissal of the Rule 10b-5 claim.  Pursuant to *StoneMor*, a particular fact or issue does not have to be explicitly disclosed if sufficient information otherwise is available to allow a reasonable investor to ascertain that fact or issue.

Lead Plaintiff's claim regarding EPS rounding fails for the same reasons outlined in *StoneMor*: because the data and information underlying the Complaint's allegations was

14

publicly disclosed prior to the alleged Class Period, the Company's publicly-available disclosures "render[ed] any such perceived misstatement immaterial." *Id.* at 717.  The underlying data upon which Lead Plaintiff bases its allegations of earnings rounding was disclosed and publicly available in the Company's public filings long before the Monocle Report was published in March 2017.  In fact, these disclosures were the basis of the Monocle Report's conclusions.  The Monocle Report states that based on its "review of a decade's worth of earnings reports," the author discovered a "concerning pattern" of "earnings management" that while "not necessarily illegal" signals "an aggressive approach to accounting."  *See* Ex. 1, Mar. 22, 2017 Monocle Report.  Any reasonable investor could have performed the same analysis of HCSG's estimated and actual quarterly EPS from its earnings reports and come to the same conclusions by doing basic division.  As the Monocle Report explains, "[i]n any given quarter, a company's diluted EPS is simply the quotient of the company's quarterly net income and the average number of diluted shares outstanding."  *See id.*  As in *StoneMor*, Lead Plaintiff has failed to identify any information that would have altered the mix of information already available to investors, and its claim fails for that reason.

Relatedly, courts in this Circuit have long recognized that an "essential corollary" to the "fraud-on-the-market" theory is "a 'truth on the market' defense, recognizing that a statement is materially misleading ***only*** if the allegedly undisclosed facts have not already entered the market."  *Wallace v. Sys. & Computer Tech. Corp*, No. 95-CV-6303, 1997 U.S. Dist. LEXIS 14677, at *42 (E.D. Pa. Sept. 23, 1997) (emphasis added).  As the court in *Wallace* explained, "[i]f the market has become aware of the allegedly concealed information, the facts allegedly omitted by the defendant would already be reflected in the stock's price and the market would not be misled."  *Id.* at *42-43.  Thus, public disclosure of the allegedly omitted

15

information before or during the putative class period renders the defendant's alleged

misstatement or omission "immaterial or not misleading *as a matter of law*." *Id.* at *44

(emphasis added).  Thus, even if it were not the case that all investors could have conducted a

similar analysis from the Company's "decade's worth of earnings reports," for the purchasers in

the alleged Class Period whose purchase post-dates the publication of the Monocle Report

(March 2017 forward), the claims are further barred by the "truth on the market defense."  *See*

Ex. 1, Mar. 22, 2017 Monocle Report.  The Monocle Report was published during the alleged

Class Period and *over 2 years* before the alleged "stock drop" occurred on March 4, 2019.

Finally, as an additional and independent ground for barring these claims, the

information disclosed by the Monocle Report (the alleged "rounding scheme") was immaterial to

investors under Lead Plaintiff's alleged "efficient market theory."  Lead Plaintiff alleges that

> Plaintiffs are entitled to a presumption of reliance under the fraud
> on the market doctrine.  The market for the Company's securities
> was, *at all times, an efficient market that promptly digested*
> *current information with respect to the Company from all*
> *publicly-available sources and reflected such information in the*
> *prices of the Company's securities*.  Throughout the Class Period,
> (1) The Company's stock was actively traded on the NASDAQ; (2)
> The market price of the Company's stock *reacted promptly to the*
> *dissemination of public information* regarding the Company; (3)
> The Company's stock was followed by numerous financial
> analysts, include those cited herein.  Thus, the Company's **stock**
> *reflected the effect of information disseminated into the market*.

Am. Compl., ¶ 345 (emphasis added).  Taking Lead Plaintiff's allegations regarding the

efficiency of the market as true, as required at this procedural stage, the alleged "earnings

rounding" scheme was immaterial to investors because the stock price did not substantially

decrease following the release of the Monocle Report.  Rather, the opening price for HCSG stock

on March 22, 2017 was $43, the closing price on that day was $42.95, the closing price on March

16

23 was $42.16, and the closing price on March 24 was $42.40.  *See* Ex. 7, HCSG Stock Price Chart.

Based upon its allegations of a material misstatement regarding EPS, the Amended Complaint also alleges that the Company falsely stated that it believed the Company's "disclosure controls and procedures . . . are effective."  Am. Compl., ¶¶ 147, 153, 160, 166, 174, 179, 185, 192, 200, 206, 212, 218, 226, 232, 238, 243, 256, 263, 270.  Because the Amended Complaint fails to sufficiently plead a material misstatement regarding the Company's EPS, its "bootstrapped" claim based upon the Company's alleged material misstatement about the adequacy of its controls also must fail.  Moreover, although much of the Amended Complaint is dedicated to reciting the Monocle Report, the Report itself does not argue that the rounding is necessarily illegal or improper (and in fact concedes that it may be legal), further undercutting any claim based upon the alleged inadequacy of the Company's disclosure controls and procedures.  *See* Ex. 1, Mar. 22, 2017 Monocle Report.  Similarly, the Amended Complaint does not cite to a single GAAP principle or requirement allegedly violated by the Company's alleged pattern of strategic rounding.[7]  Moreover, following its 2019 disclosure of the SEC investigation,

---

[7] Lead Plaintiff cites to certain paragraphs of the FASB Statement of Concepts, No. 1, ¶¶ 34, 40, 42, 50; FASB Statement of Concepts ¶¶ 2, 58-59, 79, and 95.  Am. Compl., ¶¶ 292-296. FASB concepts statements, however, do not constitute GAAP standards or requirements.  *See* Ex. 14, ASC 105-10-05-3 ("Accounting and financial reporting practices not included in the Codification are nonauthoritative. Sources of nonauthoritative accounting guidance and literature include, for example, the following: . . . b.  FASB Concepts Statements."); *see also* Ex. 15, Preface, FASB Concept 1 (stating that "[u]nlike a Statement of Financial Accounting Standards, a Statement of Financial Accounting Concepts does not establish generally accepted accounting principles and therefore is not intended to invoke the application of Rule 203 of the Rules of Conduct of the Code of Professional Ethics of the American Institute of Certified Public Accountants"); *see* Ex. 16, Preface, FASB Concept 2 (stating same).

the Company received a clean audit opinion, further undercutting the Amended Complaint's

claim of any material misstatements.  *See* Ex. 6, Form 10-K filed Mar. 18, 2019, at 32.

> **C.       The Amended Complaint Fails to Allege any Material Misstatement
> or Omission with Respect to the Pendency of an SEC Investigation
> Because There Was No Duty to Disclose the SEC Investigation.**

On March 4, 2019, HCSG reported in its Form 8-K that the SEC was

investigating its EPS calculation practices, that it had retained outside counsel to conduct an

internal investigation, and that it would delay the filing of its annual Form 10-K.  *See* Ex. 5A,

Form 8-K filed Mar. 4, 2019, Item 8.01.  The Amended Complaint alleges that the Company

should have disclosed the SEC investigation earlier than it did.  *See, e.g.*, Am. Compl., ¶¶ 4, 13,

14, 247(d).[8]  However, Lead Plaintiff has alleged no facts that gave rise to a duty to disclose the

SEC investigation any earlier than March 4, 2019.

Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any

and all material information."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).

"Disclosure is required . . . only when necessary 'to make . . . statements made, in the light of the

circumstances under which they were made, not misleading.'"  *Id*. (second alteration in original)

(quoting 17 C.F.R. § 240.10b-5(b)).  Accordingly, "[s]ilence, absent a duty to disclose, is not

misleading under Rule 10b-5."  *Id.* at 45 (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 239 n. 17

(1988)).  Furthermore, "[m]ere allegations that statements in one report should have been made

---

[8] The Amended Complaint alleges that the Company concealed from investors that the SEC had written to the Company in November 2017 to inquire into the Company's EPS rounding practices, and that the SEC delivered a subpoena to the Company in March 2018 requiring that  the Company produce documents to the SEC in connection with its EPS calculations.  *See* Am. Compl., ¶¶ 93-98.

in earlier reports do not make out a claim of securities fraud." *Acito v. IMCERA Grp.*, 47 F.3d 47, 53 (2d Cir. 1995).

With respect to the duty to disclose the pendency of investigations in particular, courts have held that "a government investigation, without more, does not trigger a generalized duty to disclose." *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016).; *see also In re UBS Ag Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 U.S. Dist. LEXIS 14144, at *100 (S.D.N.Y. Sept. 28, 2012) ("[A]bsent an express prior disclosure, a corporation has no affirmative duty to speculate or disclose uncharged, unadjudicated wrongdoings or mismanagement" (quoting *Ciresi v. Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991)).  The receipt of a Wells Notice[9] or subpoena from the SEC does not give rise to a duty to disclose because "[t]here is no duty to disclose litigation that is not 'substantially certain to occur." *Lions Gate*, 165 F. Supp. 3d at 12.

In *Lions Gate*, plaintiff claimed that Lions Gate failed to disclose the details of an SEC Enforcement Division investigation, the possibility of an SEC enforcement proceeding, and an imminent settlement with the SEC.  The defendants had received Wells Notices, receipt of which indicated that the Division of Enforcement Staff was contemplating making a recommendation that the SEC bring an enforcement action against the company (and that the SEC was relatively far along in its investigation).  The court in *Lions Gate* nonetheless held that there was no disclosure requirement.  The court found that the defendants did not have a duty to disclose the SEC investigation and receipt of the Wells Notices because "the securities laws do

---

[9] A "Wells Notice" is a letter issued by the SEC informing individuals and companies that the agency intends to recommend enforcement action, and explaining the proposed charges against them.  *See* SEC, *Investor Bulletin: SEC Investigations* (Oct. 22, 2014), https://www.sec.gov/oiea/investor-alerts-bulletins/ib_investigations.html.

not impose an obligation on a company to predict the outcome of investigations." *Lions Gate*, 165 F. Supp. at 12.

Here, the SEC investigation that is the subject of Lead Plaintiff's allegations was in its infancy at the time Lead Plaintiff is now claiming it should have been disclosed, in contrast to Lions Gate's advanced-stage status that did not even result in a disclosure requirement, and the outcome here was (and still is) far less certain than it was in *Lions Gate*. In the Company's case, not only did the Company not receive a Wells Notice, but the case law is clear that even receipt of a Wells Notice would not have triggered a duty to disclose. Here, receipt of a mere subpoena cannot trigger a duty when even a Wells Notice would not have triggered a duty. There are simply no allegations, nor can there be, that the Company had a duty to disclose the investigation prior to its disclosure in March 2019.

Other cases have followed the logic of *Lions Gate*. In a recent decision addressing similar allegations, *Ont. Teachers' Pension Plan Bd. v. Teva Pharm. Indus.*, No. 3:17-cv-558 (SRU), 2019 U.S. Dist. LEXIS 164126 (D. Conn. Sep. 25, 2019), the District Court granted a motion to dismiss securities fraud claims to the extent they were based on the alleged failure to disclose subpoenas from the Department of Justice and Connecticut Attorney General. *Id.* at 73-75. The Court agreed with defendants that mere receipt of subpoenas did not trigger the defendants' duty to disclose. Relying on *Lions Gate*, the Court explained that the securities laws do not impose upon a Company an obligation to predict the outcome of investigations. *Id.* at 74-75. The Court explained that the duty to disclose is not a "rite of confession," *id.* at 53 (internal citations omitted), and "[t]he federal securities laws do not require a company to accuse itself of wrongdoing," *id.* at 74 (alteration in original) (quoting *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004)); *see also In re Am. Express Co S'holder Litig.*, 840 F. Supp.

20

260, 269-70 (S.D.N.Y. 1993) (finding that a company is not required to "accuse itself of antisocial or illegal policies" (quoting *GAF Corp. v. Heyman*, 724 F. 2d. 727, 740 (2d Cir. 1983)); *Ciresi*, 782 F. Supp. at 823 (S.D.N.Y. 1991) ("[T]he law does not impose a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement.").

To the extent Lead Plaintiff alleges that a duty to disclose existed as a result of a contractual or regulatory obligations, its arguments are similarly misplaced:

- The Credit Agreement referenced in Paragraph 97 of the Amended Complaint does not create a duty of disclosure because in that Agreement, the Company states only that there are no pending investigations that the Company believes would cause a "Material Adverse Change." See Ex. 2, Form 8-K filed Dec. 31, 2018, with attached Credit Agreement, § 6.1.5. A Material Adverse Change is defined in the Credit Agreement as an event that would cause the Company to question the validity or enforceability of the agreement at issue or impair its ability to pay under the agreement. *See id.* § 1.1 (Definitions). Because the SEC investigation did not meet that definition, the investigation was not required to be disclosed under the terms of the Agreement.

- S-K Item 103 does not create a duty of disclosure because it relates to a very specific requirement, *i.e.*, disclosure of "pending legal proceedings . . . any such proceedings known to be contemplated by governmental authorities." There is no allegation, nor can there be, that the Company knew at the time (or even that the Company knows now) that the SEC is contemplating a *legal proceeding* as a result of its investigation.

- S-K Item 303 does not create a duty of disclosure because it requires disclosure of "known trends . . . that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way," which are not at issue here. Moreover, even if Item 303 were applicable, in the Third Circuit, a violation of S-K Item 303 does not suffice to state a Rule 10b-5 claim. *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000) (then-circuit judge Alito stating "a violation of SK-303's reporting requirements does not automatically give rise to a material omission under Rule 10b-5."); *see also Williams v. Globus Med., Inc.,* 869 F.3d 235, 241 (3d Cir. 2017); *In re Galena Biopharma, Inc. Sec. Litig.,* 336 F. Supp. 3d 378, 389 (D.N.J. 2018); *Gaer v. Educ. Mgmt. Corp.,* Civil Action No. 10-1061, 2011 U.S. Dist. LEXIS 153539, at *67-68 (W.D. Pa. Aug. 30, 2011); *Stratte-McClure v. Stanley,* 776 F.3d 94, 103-34 (2d. Cir.

21

2015); *In re NVIDIA Corp. Secs. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014).[10]

- S-K Item 503 does not create a duty of disclosure because it does not create a duty independent of the 10b-5 standard. *See City of Roseville Employees Ret. Sys. v. EnergySols., Inc.*, 814 F. Supp. 2d 395, 426 (E.D.N.Y. Sept. 30, 2011) (noting the dearth of case law on Item 503, and that courts typically analyze the sufficiency of Item 503 disclosures with "the familiar materiality standard" of a Rule 10b-5 violation).

- ASC 450 codifies GAAP regarding "loss contingencies," which are defined as "an existing condition, situation, or set of circumstances involving uncertainty as to a possible loss that will be resolved when one or more future events occurs or fails to occur." Ex. 8, ASC 450-20, § 450-20-20. Loss contingencies include actual or possible claims and threatened or pending litigation. *Id.* § 450-20-05-10. GAAP requires disclosure of a loss contingency when a material loss is at least "reasonably possible." Given the infancy of the SEC's investigation (*see supra*, at 20), Lead Plaintiff cannot allege facts sufficient to show that GAAP required the Company to disclose the investigation prior to March 2019.

Even if Lead Plaintiff had any basis to allege a duty to disclose the SEC investigation—it does not—it is important to note that the Company here actually did disclose, in connection with the risk factors in each annual report during the alleged Class Period, that "our results could be affected by material investigations or governmental inquiries." *See* Ex. 17, Form 10-K filed Feb. 19, 2015, Risk Factors, at 13; Ex. 18, Form 10-K filed Feb. 19, 2016, Risk Factors, at 12; Ex. 19, Form 10-K filed Feb. 24, 2017, Risk Factors, at 10; Ex. 20, Form 10-K filed Feb. 23, 2018, Risk Factors, at 9; Ex. 6, Form 10-K filed Mar. 18, 2019, at 9-10.

---

[10] Other courts have recently adopted the Third Circuit's position. In August 2019, the Eleventh Circuit held that "[o]n its face, Item 303 imposes a more sweeping disclosure obligation than Rule 10b-5, such that a violation of the former does not ipso facto indicate a violation of the latter." *Carvelli v. Ocwen Fin. Corp.,* 934 F.3d 1307, 1331 (11th Cir. 2019) (noting also that a GAAP "accounting violation doesn't necessarily give rise to Rule 10b-5 liability any more than an Item 303 violation does").

**D.**     **The Amended Complaint Fails to Allege Any Misstatement or Omission Resulting from the Alleged "Management" of Labor Expenses.**

The Amended Complaint offers four confidential witnesses who allege that "the Company engaged in extensive and aggressive manipulation of labor-related expenses." Am. Compl., ¶¶ 136, 109-136. At most, those allegations establish the Company's management of its actual labor expenses—not the manipulation of the Company's financial statements reporting those expenses. Those allegations, therefore, cannot support a securities fraud claim. Second, the allegations of managing actual labor expenses have no link to the other alleged material misstatements and, therefore, cannot serve as support for Lead Plaintiff's claims based upon the Company's alleged misstating of EPS or failure to disclose the SEC investigation.

The Amended Complaint's confidential witnesses discuss at length that the Company:

- "intentionally understaffed facilities to keep labor expenses below budgeted amounts" (Am. Compl., ¶ 114);

- "cut[]… the number of hours worked by hourly employees" who were paid "at or near minimum wage" (Am. Compl., ¶ 114);

- "sen[t] people home for the last two weeks of the year" (Am. Compl., ¶ 115);

- relied on "salaried 'managers' to perform lower level work" (Am. Compl., ¶ 115);

- was "incestuous" (Am. Compl., ¶ 126) and its accounting function "small and controlled" (Am. Compl., ¶ 125); and

- failed to pay or paid hourly employees late  (Am. Compl., ¶¶ 127-135).

Even if true, these allegations cannot establish a securities violation. All of those allegations go entirely to the Company's operations and actual expenditures, and none even remotely suggest that the Company misrepresented its labor expenses in its financial statements.

23

For example, if the Company sent home hourly employees, thus reducing its actual labor expense, such a fact says nothing about whether the Company recorded its labor expenses in accordance with GAAP on its financial statements. Similarly, regardless of when the Company actually paid its employees (late or on time), the Amended Complaint concedes that the Company accrued for its labor expenses each month—that is, the Company recorded its labor expense each month irrespective of when it paid employees. *See* Am. Compl., ¶ 119 ("[T]he amount of the accrued labor expense was calculated pursuant to a formula required by the corporate headquarters."). Accepted as true, the Amended Complaint's allegations of the management of labor expenses at most suggest that the Company managed its costs. Even if the allegations had gone so far as to allege mistreatment of employees, they do not allege any misstatement and, as a matter of law, are insufficient to state a securities fraud claim. *See Advanta*, 180 F.3d at 538 ("Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b)); *see also Hertz*, 905 F.3d at 117 ("[W]e have long held 'that an allegation of mismanagement on the part of a defendant will not alone support' a securities fraud claim.'") (quoting *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992)); *Teamsters Local 456 Pension Fund v. Universal Health Servs.*, No. 17-2817, 2019 U.S. Dist. LEXIS 140131, at *84 (E.D. Pa. Aug. 19, 2019) ("[A]ccurate statements of a company's performance do not violate securities laws, regardless of whether that performance was generated by improper means.").

The only allegation in the Amended Complaint that comes close to addressing the Company's actual accounting for labor expenses similarly fails to allege any misstatement of the Company's labor expenses or any GAAP violation. Confidential Witness 2 ("CW2"), a former "District Manager" for the Company's dietary segment alleges that he would prepare "Monthly

24

Projections reports" each month estimating the amount of accrued payroll or labor expenses based upon salary information. Am. Compl., ¶ 118. CW2 provided the reports to the Regional Manager, who in turn provided them to the Divisional Vice President, who then sent them to Company headquarters. Am. Compl., ¶ 118. CW2 further alleges that District Managers subsequently received a "Monthly Operating Statement"—a different document representing the final monthly accounting for each division. Am. Compl., ¶ 120. CW2 alleges that "consistent and significant" differences routinely existed between the Monthly Projections reports and the Monthly Operating Statements. Am. Compl., ¶ 121. More specifically, CW2 alleges that "payroll accruals in the Monthly Operating Statements could be adjusted ***both downward and upward*** from the amounts that CW2 had reported, with 'no rhyme or reason' to those changes apparent to CW2 at the time." Am. Compl., ¶ 122 (emphasis added).

At most, CW2's allegations regarding the Monthly Projections reports and Monthly Operating Statements establish CW2's lack of understanding about the Company's accrual for labor expenses. The Amended Complaint does not allege that the Company's accrual for labor expense violated GAAP. Nor does it allege or explain how the Monthly Operating Statements—which are not GAAP financial statements but rather internal management reports—somehow morphed into a misstatement of the Company's labor expenses. Indeed, the Amended Complaint does not even allege that CW2 has any knowledge of GAAP or of the Company's actual accrual process. CW2's failure to understand the Company's labor expense accrual process and his or her disagreement with the Company's projections cannot state either a securities fraud claim or a GAAP violation. *City of Edinburgh*, 754 F.3d at 171 (dismissing Rule 10b-5 claim and finding that a confidential witness' allegations of "disagreement" regarding the company's "interpretation of clinical trial data and the critical strategic decision of initiating an

25

expensive Phase 3 trial does not render defendants' decisions unreasonable or their statements false").[11]   Moreover, CW2 alleges that the expenses differed both upward and downward—in other words, the differences at times ***increased*** expenses (thus reducing earnings) contrary to Lead Plaintiff's earnings management allegations.

At bottom, there is simply no link between of any of the Amended Complaint's allegations about the Company's manipulation of its labor expenses and any alleged misstatement.[12]   Those allegations, therefore, can neither independently make out a securities fraud claim nor support the Amended Complaint's claims based upon the Company's quarterly rounding up of its EPS calculation or its failure to disclose the SEC investigation.[13]   Given that

---

[11] The United States Supreme Court has explained that "'generally accepted accounting principles' are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. 'Generally accepted accounting principles,' rather, tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979); *see also Messner v. United States Techs.*, No. 15-5427, 2016 U.S. Dist. LEXIS 50132, at *19-25 (E.D. Pa. April 13, 2016) (dismissing amended complaint alleging securities fraud and explaining same); *In Re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 619 (E.D. Pa. 2009) (dismissing securities class action complaint and explaining same.)

[12] The allegations here stand in stark contrast to those cases where courts have found allegations of "earnings management" sufficient to state a Rule 10b-5 claim.  Such cases involve allegations of significant accounting fraud and GAAP violations. *See, e.g.*, *In re CommVault Sys., Inc. Sec. Litig.*, No. 14-cv-5628 (PGS), 2016 U.S. Dist. LEXIS 135257, at *2 (D.N.J. Sept. 30, 2016) (denying defendants' motion to dismiss where defendants were alleged to have "manipulated their financial results . . . in violation of [GAAP]" by intentionally deferring earnings to later periods).

[13] In addition, the Amended Complaint concedes that the Company's alleged management of its labor expenses was public knowledge in 2013 and, therefore, any claim based upon such allegations is barred by the statute of limitations. *See In re Data Access Sys. Sec. Litig.*, 843 F.2d 1537, 1550 (3d Cir. 1988) ("[T]he proper period of limitations for a complaint charging violation of section 10(b) and Rule 10b-5 is one year after the plaintiff discovers the facts constituting the violation, and in no event more than three years after such violation.").  The Amended Complaint further alleges that certain of the Company's employees filed class actions in "multiple states" that alleged facts demonstrating that the Company manipulated its labor

26

the *Kelly* and other cited lawsuits were publicly filed and thus available to investors at the start of

the putative Class Period, it and other similar lawsuits cannot serve as the basis for a Rule 10b-5

claim as the information was known to the market. *See Wallace*, 1997 U.S. Dist. LEXIS at *42

(the "'truth on the market' defense recognize[es] that a statement is materially misleading **only** if

the allegedly undisclosed facts have not already entered the market.") (emphasis added) (citation

omitted)).

> **E.      Lead Plaintiff Failed to Meet the PSLRA's Requirements for a Strong
> Inference of Scienter.**

The PSLRA requires that a Rule 10b-5 complaint "state with particularity [the]

facts giving rise to a strong inference" that the defendant acted with the required state of mind or

scienter, 15 U.S.C. § 78u-4(b)(2), which the Third Circuit "ha[s] described as one 'embracing

[an] intent to deceive, manipulate, or defraud,' either knowingly or recklessly." *Hertz*, 905 F.3d

at 114 (alteration in original) (quoting *Avaya*, 564 F.3d at 252). As to intent to defraud, "it is not

enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or

that defendants 'must have known' their statements were false," *GSC Partners*, 368 F.3d at 239,

and "[g]eneralized imputations of knowledge do not suffice, regardless of the defendants'

positions within the company," *Advanta*, 180 F.3d at 539. As to the recklessness standard,

reckless statements in this context do not involve "merely simple, or even inexcusable

---

expenses. The Amended Complaint specifies the *Kelly v. Healthcare Services Group, Inc.*, Civil Action No. 2:13-cv-00441-JRG (E.D. Tex.) lawsuit and other lawsuits filed in 2013. *See, e.g.,* Ex. 21, Original Complaint, *Kelly v. Healthcare Servs. Grp., Inc.*, No. 2:13-cv-00441-JRG (E.D. Tex. May 31, 2013). In *Kelly*, plaintiffs alleged that "they were underpaid pursuant to the Company's unlawful rounding timesheet practice and policy" and/or misclassified in violation of the Fair Labor Standards Act. *See* Am. Compl., ¶ 139. Because the *Kelly* complaint was public in 2013, the allegations in that complaint provided notice of the company's alleged management of labor expenses.

negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *GSC Partners*, 368 F.3d at 239 (quoting *Advanta*, 180 F.3d at 535). "[C]laims essentially grounded on corporate mismanagement" do not adequately plead recklessness." *Advanta*, 180 F.3d at 540.

To qualify as "strong" under the PSLRA, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 314 (2007). This pleading requirement "obliges courts to weigh the 'plausible nonculpable explanations for the defendant's conduct' against the 'inferences favoring the plaintiff.'" *Avaya*, 564 F.3d at 267 (quoting *Tellabs*, 551 U.S. at 324). A court considering the sufficiency of a plaintiff's scienter allegations "must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs,* 551 U.S. at 314. Any "omissions and ambiguities" in a plaintiff's allegations "count against inferring scienter." *Id.* at 325. In short, the court must ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326.

As explained below, Lead Plaintiff's scienter allegations fail to satisfy the PSLRA's stringent standards for pleading the scienter element of its claim against Defendants. Notably absent from the Amended Complaint are any contemporaneous facts that shed any light upon the Defendants' state of mind as to whether the alleged omissions were misleading. Lead Plaintiff's Amended Complaint also fails to allege anything more than conclusory statements of

28

conscious or reckless behavior.  For this reason alone, the Amended Complaint must be dismissed.

### 1.      The "Stock Sales" Alleged by Lead Plaintiff Do Not Support a "Strong Inference of Scienter."

Lead Plaintiff alleges that certain stock dispositions by one of the Individual Defendants demonstrate scienter.  Lead Plaintiff fails in this effort.  The stock dispositions here do not lead to a strong inference of scienter.  "The mere fact that an insider sold corporate stock . . . is not enough to give rise to an inference of scienter." *Hertz*, 905 F.3d at 119.  Stock sales may support an inference of scienter only if such sales were "unusual in scope or timing." *Oran*, 226 F.3d at 290 (quoting *Advanta*, 180 F.3d at 540). This is because "[a] large number of today's corporate executives are compensated in terms of stock and stock options. It follows then that these individuals will trade those securities in the normal course of events." *Advanta*, 180 F.3d at 541 (quoting *Burlington*, 114 F.3d at 1424).  Therefore, to allege a plausible motive for fraud, a plaintiff must aver more than "the mere fact that some officers sold stock" during the putative class period. *Id.* at 540 (quoting *Burlington*, 114 F.3d at 1424).  Instead, a plaintiff "must allege that the trades were made at times and in quantities that were suspicious enough to support the necessary strong inference of scienter." *Burlington,* 114 F.3d at 1424; s*ee also TFM Inv. Grp. v. Bauer*, Civil Action No. 99-840, 1999 U.S. Dist. LEXIS 15821, at *6 (E.D. Pa. Sept. 24, 1999) (in which this Court dismissed plaintiff's complaint noting that the mere fact of stock sales does not establish scienter).  Courts have weighed "a number of considerations when determining whether insider trading activity was 'unusual in scope or timing,' including 'the amount of profit made, the amount of stock traded, the portion of stockholdings sold, . . . the number of insiders involved[, and] . . . whether the profits were substantial relative to the seller's original

29

compensation.'" *Hertz*, 905 F.3d at 119 (quoting *In re Suprema Specialties, Inc. Sec. Litig*, 438 F.3d 256 (3d Cir. 2006)).

### (a)   The Individual Defendants' Transaction Histories Negates Any Inference of Scienter.

As an initial matter, Lead Plaintiff concedes that McCartney sold approximately the same amount of stock during the 5-year period preceding the alleged Class Period as he did during the approximate 5-year alleged Class Period.  *See* Am. Compl., ¶ 26 ("[F]rom December 10, 2008 to May 11, 2017 . . . McCartney sold or gifted more than 2.8 million shares . . . for gross proceeds of nearly $71.3 million, more than $35 million of which occurred during the Class Period.").  Because Defendant McCartney's stock dispositions were not "unusual when compared to [his] trading history," they do not suggest a strong inference of scienter.  *See Hertz*, 905 F.3d at 119.  Moreover, that Defendant McCartney sold and gifted a substantial amount of his holdings during the alleged Class Period is unsurprising given the "inordinately long" 5-year period alleged by Lead Plaintiff.  *See Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014); *Hertz*, 905 F.3d at 120 ("Courts have regularly concluded that an inference of scienter from insider trading is lessened when, as here, the class period is well over a year.").

In addition, although the Amended Complaint alleges that McCartney sold 113,901 shares on May 11, 2017, it ignores entirely that McCartney still owned ***more than 1.9 million shares*** of HCSG stock following the transaction.  *See* Ex. 13, Form 4 dated May 15, 2017.  Large retained aggregate holdings during the Class Period negate any inference of scienter.  *See, e.g.*, *Advanta*, 180 F.3d at 540-41 (holding that where individual defendants retained a sizeable amount of the company's stock, "[f]ar from supporting a 'strong inference' that defendants had a motive to capitalize on artificially inflated stock prices, these facts suggest that they had every incentive to keep [the company] profitable"); *see also Oran*, 226 F.3d at 289

(rejecting plaintiffs' scienter allegations based on alleged insider trading where the complaint did "not allege the total number of shares held by each of the officers").

The Amended Complaint fails to allege any sales by the remaining Individual Defendants. The Company's public filings show that Defendants Wahl and Shea significantly *increased* their Company holdings throughout the alleged Class Period. Indeed, Wahl increased his holdings during the alleged Class Period from 217,946 shares on April 4, 2014 to 382,520 shares on April 1, 2019—*a 75.5% increase*. Shea increased his holdings from 9,406 shares on April 4, 2014 to 33,838 shares on April 1, 2019—*a 359.7% increase*. *See* Exs. 10 and 11 (Schedules 14A filed Apr. 14, 2014 and Apr. 19, 2019) (reporting total beneficial holdings); s*ee also In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (noting that the fact that the Individual Defendants, in almost every instance, *increased* their BMS holdings during the Class Period was "wholly inconsistent with fraudulent intent") (citing *In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383 (E.D.N.Y. 2003) (explaining that the net acquisition of shares cuts against the notion that defendants sought to unload their holdings of KeySpan stock before their likely diminution in value following the disclosure of negative insider information, noting inferences of scienter can be undermined when an insiders sales of stock are offset by even larger stock acquisitions during the relevant time period)). Indeed, the stock sales at issue show that each of the Individual Defendants retained a strong vested interest in the continued positive performance of the stock. Wahl elected to receive Company stock as a portion of his 2017 and 2018 performance based compensation. Ex. 12, Schedule 14A filed April 26, 2018, at 23; Ex. 11, Schedule 14A filed April 19, 2019, at 25. In fact, Wahl elected to receive 65% of his 2017 performance based compensation as Company stock in 2018. *Id*. Those facts belie any allegation of scienter.

31

### (b)    McCartney's Stock Gifts Do Not Support a Strong Inference of Scienter.

Lead Plaintiff alleges that "Defendant McCartney sold or **gifted** more than 2.8 million shares of the Company's stock" during the Class Period.  Am. Compl., ¶ 26 (emphasis added).[14]  Defendant McCartney had a regular practice of gifting stock throughout the Class Period.  On April 30, 2014, McCartney gifted 30,000 shares, followed by 50,000 shares on November 19, 2014, 21,748 shares on July 30, 2015, 40,000 shares on December 4, 2015, and 50,000 shares on November 25, 2016.  Ex. 22, Form 4 dated May 1, 2014; Form 4 dated Nov. 21, 2014; Form 4 dated July 31, 2015; Form 4 dated Dec. 4, 2015; Form 4 dated Nov. 25, 2016.  Contrary to Lead Plaintiff's claims, gifts of stock show confidence in a company's strength.  The suggestion that anyone would try to "dump" stock to take advantage of an inflated stock price through gifting shares makes no sense.

---

[14] Lead Plaintiff further alleges that Defendant McCartney "informed the Company's Board that he would not stand for re-election as Chairman" a few weeks after the Monocle Report was published (Am. Compl., ¶ 88), but here no inference of scienter can be drawn from McCartney's retirement.  *Hertz*, 905 F.3d at 119 ("[P]leading scienter requires more than pleading a link between bad news and an executive's resignation. . . . Corporate resignations do not strengthen an inference of scienter when, as here, the allegations do not cogently suggest that the resignations resulted from the relevant executives' knowing or reckless involvement in fraud.").  The Amended Complaint's allegations do not even sufficiently support a causal link between McCartney's retirement and the alleged corrective disclosure, much less a particularized connection between McCartney's retirement and the alleged fraud.  McCartney gave notice in April 2017 that he would transition from Chairman to Chairman Emeritus of the Board in May of that year and the alleged stock drop occurred on March 4, 2019.  (Am. Compl., ¶¶ 88, 100-103).  Thus, the temporal distance is so great that it does not give rise to any "strong inference of scienter."  *See In re Great Atl. Sec. Litig. & Pac. Tea Co.*, 103 Fed. App'x 465, 470 (3d Cir. 2004) (holding that as the defendant's "resignation took place three months after [the company's] restatement, it is unclear that the resignation was at all related to the restatement. Thus, the personnel changes do not support a strong inference of scienter."); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 347-48 (D.N.J. 2007) (collecting cases across the country holding same).  Further weakening any inference of scienter, McCartney did not disassociate himself from the Company, but rather he changed his status from Chairman to Chairman Emeritus.

2.    **Defendant Wahl's Statements About the Monocle Report Are Insufficient to Support a "Strong Inference" of Scienter.**

In a failed effort to overcome the heightened pleading requirement for scienter, Lead Plaintiff claims that when Robert W. Baird analyst Andrew John Wittmann asked about "***some of the reports*** that came out," Lead Plaintiff claims that Defendant Wahl responded "evasively[,] . . . feigning ignorance of the Monocle Report."  Am. Compl., ¶ 85.

In this exchange, Mr. Wittmann asked: "My last question here is just on ***some of the reports*** that came out about the company quarterly results being rounded up for a long period of time on the quarter. The annual results clearly don't round up, but I think just given that this has gotten some attention, it'd be worth having you guys comment on that and just give us your thoughts on that." Am. Compl., ¶ 84 (emphasis added).  In response, Mr. Wahl responded, "***without knowing exactly what article or more specifically what iteration of articles you're referring to***, I can tell you we believe our best efforts are spent actually running the company and delivering outcomes for our customers, our employees and all our shareholders, ***not the latest and greatest investor sentiment with third-party articles and blogs***." Am. Compl., ¶ 85 (emphasis added).  Lead Plaintiff's allegation that Wahl was being evasive given his knowledge of the Monocle Report falls flat given the phrasing of the analyst's question, which referred explicitly to multiple reports.  Wahl, therefore, could not have known which report or reports the analyst was referring to, particularly if Wahl was only aware of the Monocle Report.  Defendant Wahl did not deny the existence of the Monocle Report as Lead Plaintiff suggests but instead merely stated that he was not sure exactly which reports or versions that Wittmann was referencing.  This allegation cannot serve as a basis for a "strong inference of scienter."

F.      **The Amended Complaint Fails to Adequately Plead Loss Causation.**

The Amended Complaint also fails to adequately plead loss causation, which is fatal to Lead Plaintiff's claims.  To plead loss causation, "a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.*, 720 F. Supp. 2d 517, 559 (D.N.J. 2010) (alteration in original) (quoting *Intelligroup*, 527 F. Supp. 2d at 297).  "In other words, the plaintiff is required to plead that ***the decline in the stock price was caused by the market's discovery of defendant's fraud***."  *Id.* (emphasis added).

Here, Lead Plaintiff cannot show that there was any decline in the Company's stock price following the publication of the March 22, 2017 Monocle Report.  The opening price for HCSG stock on March 22, 2017 was $43, the closing price on that day was $42.95, the closing price on March 23 was $42.16, and the closing price on March 24 was $42.40.  *See* Ex. 7, HCSG Stock Price Chart.  The Amended Complaint does not allege that the stock price fell until March 4, 2019—almost two full years later and in response to the Company's 8-K disclosing that the Company would miss the normal Form 10-K filing date, that the SEC was investigating the Company's EPS practices, and that the Company was conducting an internal investigation.  *See* Am. Compl., ¶¶ 100-103; 343.  The lack of any reaction to the alleged misstatement revealed by the Monocle Report runs counter to the Amended Complaint's allegation of an efficient market and that the market "promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities."  Am. Compl., ¶ 345.

34

If the Company's alleged misstatement of its EPS caused Lead Plaintiff losses, the Company's stock price should have fallen after the Monocle Report was published—not 2 years later.[15]  Because of the complete disconnect between the timing of the Monocle Report and the drop in the Company's stock price, Lead Plaintiff cannot plead loss causation in support of the alleged misstatements regarding EPS.

### G.       The Amended Complaint's Section 20(a) Claim Must Be Dismissed.

The Amended Complaint's claims under Section 20(a) of the Exchange Act are purely derivative of its Section 10(b) claims and therefore equally deficient as a matter of law.

Lead Plaintiff asserts a claim under Section 20(a) of the Exchange Act against Defendants McCartney, Wahl, Shea, and McKee.  Am. Compl., ¶¶ 371-375.  To maintain its claim under Section 20(a), a plaintiff must establish: "(1) an underlying violation by a controlled person or entity; (2) a controlling person; and (3) culpable participation in the fraud by the controlling persons 'in some meaningful sense.'"  *In re CDNow, Inc. Sec. Litig.*, 138 F. Supp. 2d 624, 644 (E.D. Pa. 2001).  Claims asserted under Section 20(a) are purely derivative.  *Avaya*, 564 F.3d at 252.  Therefore, absent an underlying violation of the securities laws, there can be no controlling person liability.  *Id.* at 280.   Because Lead Plaintiff has failed to prove a claim under Section 10(b) for all of the reasons stated in Section IV, *supra*, its derivative claim under Section 20(a) against the Individual Defendants must also fail.  *See Advanta*, 180 F.3d at 541 ("[C]laims under section 20(a) are derivative, requiring proof of a separate underlying violation of the Exchange Act.").

---

[15] The Amended Complaint further alleges that an analyst asked about the Monocle Report during an earnings call, further establishing that the Company's alleged misstatement of its EPS was public and in the market.  *See* Am. Compl., ¶¶ 83-87.

## IV.   CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the

Amended Complaint be dismissed in its entirety, with prejudice.


/s/ Robert L. Hickok
Robert L. Hickok (PA Bar No. 30101)
Jay A. Dubow (PA Bar No. 41741)
Joanna J. Cline (PA Bar No. 83195)
Daniel J. Boland (PA Bar No. 91263)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

*Attorneys for Defendants*
*Healthcare Services Group, Inc., Daniel P.*
*McCartney, Theodore Wahl, John C. Shea, and*
*Matthew J. McKee*

Dated:  November 18, 2019

## CERTIFICATE OF SERVICE

I certify that on the 18th of November, 2019, a true and correct copy of the

foregoing document was filed with the Clerk of Court using the CM/ECF system which will send

electronic notification of such filing to all counsel of record.


*/s/ Robert L. Hickok*