**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UTAH RETIREMENT SYSTEMS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HEALTHCARE SERVICES GROUP, INC., DANIEL P. MCCARTNEY, THEODORE WAHL, JOHN C. SHEA, and MATTHEW J. MCKEE,<br><br>Defendants. | Case No. Case 2:19-cv-01227-ER<br><br>**ORAL ARGUMENT REQUESTED** |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

Ira Neil Richards (PA Bar No. 50879)
Arleigh P. Helfer III (PA Bar No. 84427)
1600 Market Street, Ste. 3600
**SCHNADER HARRISON SEGAL & LEWIS LLP**
Philadelphia, PA 19103
Telephone: (215) 751-2503

*Counsel for Lead Plaintiff Utah Retirement Systems & Liaison Counsel for the Class*

| | |
|---|---|
| Nicole Lavallee (*Pro Hac Vice*)<br>**BERMAN TABACCO**<br>44 Montgomery Street, Suite 650<br>San Francisco, CA  94104<br>Telephone: (415) 433-3200 | Patrick T. Egan (*Pro Hac Vice*)<br>Steven J. Buttacavoli (*Pro Hac Vice*)<br>**BERMAN TABACCO**<br>One Liberty Square<br>Boston, MA 02109<br>Telephone: (617) 542-8300 |

*Counsel for Lead Plaintiff Utah Retirement Systems & Lead Counsel for the Class*

Dated:  January 17, 2020

**TABLE OF CONTENTS**

**PAGE**

I.    INTRODUCTION ........................................................................................................ 1

II.   FACTUAL BACKGROUND........................................................................................ 3

    A.   For Over A Decade, HCSG Consistently Reported Quarterly EPS Results That Met Analysts' Consensus EPS Estimates ................................................................... 3

        1.   The Investing Market Responded Favorably To The Company's Consistent Record Of Meeting Consensus EPS Estimates.................................................... 3

        2.   March 2017 Monocle Report On The Company's EPS Track Record................. 5

    B.   The Alleged Facts Support A Finding That HCSG's Consistent Meeting Of EPS Estimates Were The Result Of Fraud......................................................................... 6

        1.   Defendants Effectively Denied Questions Regarding EPS Manipulation............. 6

        2.   Unbeknownst To Investors, The SEC Launches – And Quickly Escalates – An Investigation Into The Company's EPS Practices, Prompting Defendants To Abruptly Halt Their Illicit EPS Manipulation...................................................... 7

        3.   Defendants Mislead Investors About The Existence of the SEC Investigation And, In December 2018, Falsely Stating That There Is No SEC Investigation.............. 7

        4.   The Facts Indicate That Defendants' Financially Engineered Labor Expenses and Related Accruals Without A Valid Business Justification................................. 8

        5.   Defendant McCartney Abruptly Announces His Departure From The Company's Board And Sells Millions In Company Stock Before Leaving........................... 10

    C.   Sixteen Months Later, Defendants Finally Disclose The SEC Investigation, Prompting The Largest One Day Stock Price Drop In The Company's History .................................... 10

III.  ARGUMENT ............................................................................................................. 12

    A.   The Complaint Sufficiently Alleges Defendants' Materially False And Misleading Statements And/Or Material Omissions ...................................................................... 12

        1.   Defendants' Materially False And Misleading Statements Concerning The Company's Quarterly EPS And Net Income Are Actionable ........................... 13

            a)   The EPS And Net Income Misrepresentations Were Material .............. 15

            b)   Defendants' Truth On The Market Defense Is Unavailing ................... 18

ii

2.    Defendants Wahl And McKee Made Actionable Materially False And Misleading Statements Denying the Monocle Report's Suspicions And Omitted To Disclose Material Information Regarding Defendants' Knowledge Of The Monocle Report's Findings........................................................................................ 20

3.    Defendants' Materially False And Misleading Statements And Material Omissions About The SEC Investigation Are Actionable.................................................... 21

    a)    Material Misrepresentations And Omissions Regarding The SEC's Investigation Of The Company's EPS Practices.................................. 22

    b)    Material Misrepresentations And Omissions In The December 2018 Credit Agreement ............................................................................ 27

4.    Materially False And Misleading Statements And Omissions About The Company's Internal Controls Are Actionable ................................................. 29

5.    Defendants' Arguments On The Manipulation Of Labor Expenses Are Misplaced ........................................................................................................ 30

B.    The Complaint's Allegations Give Rise To A Strong Inference Of Scienter.................... 31

1.    The Complaint's Uncontested Scienter Allegations Individually And Collectively Support A Strong Inference Of Scienter ........................................................... 33

    a)    The SEC Investigation Into Defendants' EPS Practices And Defendants' Deliberate Concealment Of This Investigation Strongly Supports An Inference Of Scienter.......................................................................... 33

    b)    The Abrupt End Of The Company's EPS Rounding Practices And Meeting Estimates Supports A Strong Inference Of Scienter................ 35

    c)    Defendants' Knowledge And Recklessness Regarding The Manipulation Of Labor Expenses And Related Accruals Through Internal Systems That Defendants Controlled Further Supports Scienter............................... 36

    d)    The Sheer Improbability of Healthcare Services' EPS Rounding Supports A Strong Inference Of Scienter.......................................................... 40

    e)    Prior SEC Fraud Charges Further Support A Strong Inference of Scienter .......................................................................................................... 41

2.    Defendants' Limited Challenges To Certain Scienter Allegations Fail............... 41

    a)    The Complaint Sufficiently Pleads A Strong Inference Of Scienter In Connection With Defendants Wahl And McKee's Denials Of The Monocle Report's Conclusions ......................................................... 41

iii

|  |  | b) | Defendant McCartney's Departure As Chairman Supports A Strong Inference Of Scienter.......................................................................... 42 |
|  |  | c) | Although Motive Is Not Required To Allege Scienter, Defendant McCartney's Insider Stock Sales Support A Strong Inference Of Scienter ............................................................................................... 43 |
|  | C. |  | The Complaint Properly Pleads Loss Causation............................................ 47 |
|  | D. |  | The Complaint Sufficiently Alleges Control Person Liability ....................... 49 |
| IV. | CONCLUSION |  | ............................................................................................................ 49 |

**TABLE OF AUTHORITIES**

**PAGE(S)**

**Cases**

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002)............................................................................... 35

*Amgen v. Conn. Ret. Plans & Trust Funds*,
  133 S. Ct. 1184 (2013)..................................................................................... 12

*Barrie v. Intervoice-Brite, Inc.*,
  409 F.3d 653 (5th Cir. 2005) ........................................................................... 21

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ......................................................................................... 15

*Beatty v. JRMB II, Inc.*,
  2013 WL 2458644 (W.D. Okla. June 6, 2013).................................................. 39

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ......................................................................................... 12

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ........................................................................... 27

*Bldg. Trades United Pension Tr. Fund v. Kenexa Corp.*,
  2010 WL 3749459 (E.D. Pa. Sept. 27, 2010) .................................................. 38

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
  2016 WL 2937483 (N.D. Cal. May 20, 2016).................................................. 17

*Buttonwood Tree Value Partners, LP v. Sweeney*,
  2012 WL 13026910 (C.D. Cal. Dec. 10, 2012) ............................................... 44

*Caiola v. Citibank, N.A.*,
  295 F.3d 312 (2d Cir. 2002) ............................................................................ 20

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) ............................................................................ 36

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*,
  2018 WL 1071442 (N.D. Ill. Feb. 27, 2018)................................................... 46

*Ciresi v. Citicorp*,
  782 F. Supp. 819 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1161 (2d Cir. 1992)........... 25

*Cutler v. Kirchner*,
　696 F. App'x 809 (9th Cir. 2017).................................................................................27

*De Vito v. Liquid Holdings Grp., Inc.*,
　2018 WL 6891832 (D.N.J. Dec. 31, 2018)..................................................................49

*Dura Pharms., Inc. v. Broudo*,
　544 U.S. 336 (2005) ....................................................................................................47

*Epstein v. World Acceptance Corp.*,
　203 F. Supp. 3d 655 (D.S.C. 2016)..............................................................................36

*Fan v. StoneMor Partners LP*,
　927 F.3d 710 (3d Cir. 2019) ........................................................................................17

*Frater v. Hemispherx Biopharma, Inc.*,
　996 F. Supp. 2d 335 (E.D. Pa. 2014) ..........................................................................15

*Ganino v. Citizens Utilities Co.*,
　228 F.3d 154 (2d Cir. 2000) ..................................................................................18, 19

*Garden City Employees' Ret. Sys. v. Psychiatric Sols., Inc.*,
　2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011)....................................................37, 38

*Gruber v. Gilbertson*,
　2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018) .............................................................34

*Helwig v. Vencor, Inc.*,
　251 F.3d 540 (6th Cir. 2001) .......................................................................................38

*Holmes v. Baker*,
　166 F. Supp. 2d 1362 (S.D. Fla. 2001)........................................................................44

*In re Advanta Corp. Sec. Litig*,
　180 F.3d 525 (3d Cir. 1999) ........................................................................................44

*In re AFC Enters., Inc. Sec. Litig.*,
　348 F. Supp. 2d 1363 (N.D. Ga. 2004) ..................................................................40, 41

*In re Am. Exp. Co. S'holder Litig.*,
　840 F. Supp. 260 (S.D.N.Y. 1993), *aff'd*, 39 F.3d 395 (2d Cir. 1994)......................25

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
　741 F. Supp. 2d 511 (S.D.N.Y. 2010).........................................................................26

*In re Ancor Commc'ns Inc.*,
　22 F. Supp. 2d 999 (D. Minn. 1998)............................................................................38

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010) .......................................................................... 38

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017) ............................................................................. 26

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015) ........................................................................ 23, 35

*In re Bristol Myers Squibb Co. Sec. Litig.*,
586 F. Supp.2d 148 (S.D.N.Y. 2008) ........................................................................... 34

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp.2d 549 (S.D.N.Y. 2004) ........................................................................... 44

*In re Cardinal Health Inc. Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) ......................................................................... 38

*In re Convergent Techs. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991) ...................................................................................... 27

*In re Converium Holding AG Sec. Litig.*,
2007 WL 2684069 (S.D.N.Y. Sept. 14, 2007) ............................................................. 31

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) .................................................................................... 39

*In re Enron Corp. Sec., Deriv., & ERISA Litig.*,
235 F. Supp. 2d 549 (S.D. Tex. 2002) ......................................................................... 38

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) ......................................................................... 34

*In re Hertz Global Holdings Inc.*,
*905 F.3d 106 (3d Cir. 2018)* ......................................................................... 43, 44, 46

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) ......................................................................... 19

*In re KeySpan Corp. Sec. Litig.*,
383 F. Supp. 2d 358 (E.D.N.Y. 2003) ......................................................................... 44

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008) ....................................................................... 31

*In re Lions Gate Entm't Corp. Sec. Litig.*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016) ........................................................................ 24, 25

*In re MBIA, Inc., Sec. Litig.*,
   2010 WL 1253925 (S.D.N.Y. Mar. 31, 2010) ................................................................ 20

*In re Merck & Co. Vytorin/Zetia Sec. Litig.*,
   2009 WL 2855601 (D.N.J. Sep. 2, 2009) ...................................................................... 15

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013) ........................................................................... 44

*In re OCA, Inc. Sec. & Deriv. Litig.*,
   2006 WL 3747560 (E.D. La. Dec. 14, 2006) ................................................................. 39

*In re Phillips Petroleum Sec. Litig.*,
   881 F.2d 1236 (3d Cir. 1989) ........................................................................................ 31

*In re Scottish Re Grp. Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. Nov. 1, 2007) ............................................................... 43

*In re Stellent, Inc. Sec. Litig.*,
   326 F. Supp. 2d 970 (D. Minn. 2004) ............................................................................ 19

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006) .......................................................................................... 46

*In re Symbol Techs., Inc. Sec. Litig.*,
   2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) ................................................................. 38

*In re Tyco Int'l, Ltd.*,
   2004 WL 2348315 (D.N.H. Oct. 14, 2004) .................................................................... 48

*In re UBS AG Sec. Litig.*,
   2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd*, 752 F.3d 173 (2014) ................. 25

*In re Urban Outfitters, Inc. Sec. Litig.*,
   103 F. Supp. 3d 635 (E.D. Pa. 2015) ............................................................ 45, 47, 48, 49

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009) ........................................................................... 43

*In re Vicuron Pharms., Inc. Sec. Litig.*,
   2005 WL 2989674 (E.D. Pa. July 1, 2005) .................................................................... 16

*In re ViroPharma Inc. Sec. Litig.*,
   21 F. Supp. 3d 458 (E.D. Pa. 2014) ............................................................................... 42

*In re Westinghouse Sec. Litig.*,
   90 F.3d 696 (3d Cir. 1996) ...................................................................................... 17, 18

viii

*In re Wilmington Tr. Sec. Litig.*,
   29 F. Supp. 3d 432 (D. Del. 2014)....................................................................................49

*In re Zillow Grp., Inc. Sec. Litig.*,
   2019 WL 1755293 (W.D. Wash. Apr. 19, 2019) ...............................................................36

*In re: Enzymotec Sec. Litig.*,
   2015 WL 8784065 (D.N.J. Dec. 15, 2015)........................................................................49

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) .................................................................................... passim

*Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Swanson*,
   2011 WL 2444675 (D. Del. June 14, 2011).......................................................................42

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ......................................................................................................12, 15

*McCullough v. Advest, Inc.*,
   754 F. App'x 109 (3d Cir. 2018)........................................................................................12

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
   164 F. Supp. 3d 568 (S.D.N.Y. 2016)...........................................................................23, 35

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013)..........................................................................................17

*Mild v. PPG Indus., Inc.*,
   2018 WL 6787351 (C.D. Cal. Dec. 21, 2018) ..............................................................16, 40

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) .................................................................................38

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) .............................................................................................23

*Okla. Firefighters Pens. & Ret. Sys. v. Lexmark Int'l, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019)..................................................................................32

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
   780 F. App'x 480 (9th Cir. 2019)......................................................................................27

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
   2019 WL 4674839 (D. Conn. Sept. 25, 2019) ...................................................................25

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000) ..............................................................................................44

*Phillips v. Cty. of Allegheny,*
    515 F.3d 224 (3d Cir. 2008) ................................................................................ 49

*Plumbers Union Local No. 12 Pension Fund v. Ambassador's Grp.,*
    717 F. Supp. 2d 1170 (E.D. Wash. 2010)............................................................. 21

*RNS Servicing, LLC v. Spirit Constr. Servs., Inc.,*
    2017 WL 3675815 (N.D. Ill. Aug. 25, 2017)...................................................... 39

*SEC v. Bonan Huang,*
    684 F. App'x 167 (3d Cir. 2017)......................................................................... 15

*SEC v. DiMaria,*
    207 F. Supp. 3d 343 (S.D.N.Y. 2016).................................................................. 16

*Semerenko v. Cendant Corp.,*
    223 F.3d 165 (3d Cir. 2000) ................................................................................ 12

*Smilovits v. First Solar, Inc.,*
    2012 WL 6574410 (D. Ariz. Dec. 17, 2012) ...................................................... 13

*Stratte-McClure v. Morgan Stanley,*
    776 F.3d 94 (2d Cir. 2015) ............................................................................ 26, 27

*Strougo v. Lannett Co., Inc.,*
    2019 WL 1172992 (E.D. Pa. Mar. 13, 2019)................................................. 18, 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ..................................................................................... passim

*Thomas v. Magnachip Semiconductor Corp.,*
    167 F. Supp. 3d 1029 (N.D. Cal. 2016)............................................................... 34

*Utesch v. Lannett Co., Inc.,*
    385 F. Supp. 3d 408 (E.D. Pa. 2019) .............................................................. 31, 34

*Wallace v. Sys. & Computer Tech. Corp.,*
    1997 WL 602808 (E.D. Pa. Sept. 23, 1997) ....................................................... 19

*Wight v. BankAmerica Corp.,*
    219 F.3d 79 (2d Cir. 2000) .................................................................................. 39

*Yates v. Mun. Mortg. & Equity, LLC,*
    744 F.3d 874 (4th Cir. 2014) ............................................................................... 44

**Statutes**

15 U.S.C. § 78p(a) ..................................................................................................... 46

17 C.F.R. § 249.104 ................................................................................................................. 46

xi

## I.    INTRODUCTION

For more than a decade, Healthcare Services Group, Inc. ("Healthcare Services," "HCSG" or the "Company") and its tightly-knit extended family of senior management, led by the Individual Defendants,[1] artificially inflated the price of Healthcare Services' stock by engaging in a pattern of covert manipulation of the Company's financial results to engineer false and misleading quarterly earnings per share ("EPS"). Through serial manipulation of the Company's net income, largely by relatively modest and essentially undetectable rigging of the Company's labor expenses and related accounting accruals, Defendants produced quarterly EPS results ending with a third digit – representing tenths of a cent – of five or greater, which allowed the Company's EPS to be "rounded up" to avoid missing analysts' consensus targets.

Analysts and the market relied closely on Defendants' reported net income and EPS results and pointed to the Company's impressive EPS track record quarter after quarter.  Based on these steady results, HCSG developed a reputation as a "safe haven" in a volatile market.  And, as a result of Defendants' financial engineering, the Company's stock price increased significantly during the Class Period (April 8, 2014 to March 4, 2019, inclusive), trading as high as $56.01 per share on January 26, 2018.

Healthcare Services' EPS manipulation only stopped – and did so immediately – after the U.S. Securities and Exchange Commission ("SEC") launched an investigation into the Company's EPS practices in November 2017 – an inquiry that was escalated to a formal investigation by March 2018 and remains ongoing more than two years later.  While the Company ceased its EPS manipulations under the watchful eye of the SEC, Defendants continued to mislead investors by concealing its past EPS practices, its false EPS results and the ongoing SEC investigation.  Far from remaining silent, Defendants affirmatively misrepresented that there were no pending investigations at times when Defendants knew of the SEC

---

[1] Unless otherwise specified herein, capitalized terms have the same meanings as defined in Lead Plaintiff's Amended Complaint for Violations of the Federal Securities Laws (the "Complaint"), ECF No. 31. References to "¶ _ " are to the paragraphs in the Complaint.

investigation into its EPS practices and, later, the Company's own internal investigation into those matters, which was costing millions of dollars.

When the ongoing SEC and internal investigations prevented the Company from filing its 2018 annual report on a timely basis, Defendants were forced to come clean. On March 4, 2019, Defendants finally revealed the existence of the long-pending SEC investigation and the Company's internal investigation into the Company's EPS practices. In response to this news, the price of Healthcare Services' stock plummeted more than 13%, in the largest single percentage decline in the Company's 39-year trading history and has never recovered.

Now, in an effort to escape liability, Defendants have filed a motion to dismiss (ECF No. 33-2, "Def. Br."), which fundamentally miscasts Lead Plaintiff's Complaint, ignores a host of allegations regarding the elements of falsity, scienter and loss causation, and otherwise fails to articulate a legitimate basis upon which the Court could dismiss the Complaint. Among other things, Defendants do not challenge directly the allegations of falsity or scienter for the alleged misrepresentations and omissions concerning Defendants' deliberate manipulation of net income and EPS. Rather, Defendants offer a flawed and easily rejected challenge to the materiality of those statements. Similarly, Defendants ignore a host of allegations supporting a strong inference of scienter, most significantly concerning Defendants' misrepresentations and omissions concerning the SEC investigation. Finally, Defendants' loss causation arguments rest on a selective reading of the allegations in the Complaint and an attempt to re-write history. In essence, Defendants argue that their manipulative conduct was long known, and that the market did not care. Defendants' revisionist history ignores long-standing denials by Defendants of any improper conduct and repeated statements that concealed the existence of the SEC investigation from the market. In the end, the market's strong reaction to the news of March 4, 2019 belie Defendants' arguments.

For these reasons and those set forth herein, the Motion to Dismiss must be denied.

2

II.    FACTUAL BACKGROUND

Healthcare Services provides housekeeping and dining services to more than 3,000 healthcare facilities through the U.S. ¶¶ 2, 33-34. The Company provides these services under "full service agreements" whereby the Company is responsible for the day-to-day management of employees who perform services at the client's facilities. ¶ 35. During the Class Period, labor costs accounted for the majority of the Company's expenses and thus were a key factor affecting the Company's profitability. ¶¶ 41, 137.

Since Defendant McCartney founded HCSG in 1976, the Company has operated as a tightly controlled, family run business led by Defendant Daniel McCartney ("McCartney"), his son-in-law and successor as Chief Executive Officer, Defendant Theodore Wahl ("Wahl"), and other McCartney family members and friends. ¶¶ 3, 27-29, 31, 46-47, 50, 116, 125, 318-20. Defendant Matthew J. McKee ("McKee"), another McCartney son-in-law, serves as the Company's Chief Communications Officer and Defendant John C. Shea ("Shea"), a personal friend of McCartney, serves as Chief Financial Officer ("CFO"). ¶¶ 26-29. Additional family members held senior-level positions as Divisional Vice Presidents. ¶ 46. As one former employee noted, the Company's senior leadership was a tightly knit "good old boys' club" that "[took] care of each other." ¶¶ 50, 116. The Company's accounting function was "small and controlled" by senior management, including Shea, and other key financial and operational personnel were nearly exclusively comprised of Defendants and other individuals related to or closely associated with the McCartney family. ¶¶ 50, 125, 320.

A.    **For Over A Decade, HCSG Consistently Reported Quarterly EPS Results That Met Analysts' Consensus EPS Estimates**

1.    **The Investing Market Responded Favorably To The Company's Consistent Record Of Meeting Consensus EPS Estimates**

For over a decade, starting before the Class Period and continuing throughout a large portion of the Class Period, Defendants trumpeted quarterly EPS results that, with few exceptions, consistently met or exceeded analyst consensus EPS expectations. ¶¶ 5, 65, 79. During the Class Period, over the course of 15

3

quarters prior to the start of the SEC investigation, the Company missed EPS estimates just three times – all of which were explained by extraordinary events. ¶¶ 65, 79-80, 82. The Company prominently touted its EPS results in press releases and other public filings and prioritized the EPS metric on quarterly earnings calls with securities analysts. *See, e.g.*, ¶¶ 52, 60-61, 143, 145-46, 149, 151-52, 158, 162-63, 165. Analysts closely focused on the Company's EPS results in assessing the Company's performance. *See, e.g.*, ¶¶ 62, 80, 82, 144, 164, 172, 183, 197, 203, 210, 235.

EPS is calculated by taking a company's net income for the particular period (quarterly or annual) and dividing that amount by the total number of outstanding common shares. ¶ 51. While a simple calculation, EPS is universally one of the most important financial metrics relied upon by investors and securities analysts. *Id.* Indeed, EPS is regarded as "contain[ing] all the information required for evaluating an investment in a company's shares, compressed (aggregated) into a single number that purports to represent how much the company earned per share of stock issued." *Id.* Thus, a higher reported EPS is attractive to investors because it reflects greater profitability. *Id.* Investment analysts include EPS estimates in their reports, which provide guidance to investors with respect to a company's expected earnings and profitability. *Id.* Analysts base their EPS estimates, in significant part, on companies' reported financial results from prior periods and their public statements including, in the case of Healthcare Services, more than a decade's worth of EPS results. ¶¶ 53-54. Because EPS estimates may vary from analyst to analyst, markets look to "consensus" EPS estimates, which are widely reported averages of multiple analysts' EPS estimates. ¶ 53.

As former SEC Chairman Arthur Levitt and others explain, whether a company meets or misses the consensus EPS target is so material that a reported EPS that falls short of consensus estimates by as little as one penny can have a major negative impact on a company's stock price. ¶¶ 55-57. Indeed, one observer has noted that because analyst "projections are based in part on information provided by the companies themselves, meeting them not only speaks to the value of the company's shares, but the company's credibility

4

as well." ¶ 58.  As Chairman Levitt further explained, the fraudulent manipulation of EPS, even in quantitively small dollar amounts, is material.  ¶ 295.  Indeed, following Chairman Levitt's comments, the SEC promulgated authoritative accounting guidance on materiality, Staff Accounting Bulletin No. 99 ("SAB 99") in 1999 to expressly state that earnings management that hides, among other things, a "failure to meet analysts' consensus expectations for the enterprise" could be material under GAAP.  ¶¶ 295-296.

It is not surprising then that analysts focused on Healthcare Services' long track record of consistently meeting EPS consensus estimates.  They questioned the Company about EPS figures, reacted favorably when the Company met its EPS estimates, reported that, but-for extraordinary events, the Company would have met EPS estimates in the few quarters when it missed them, and lowered guidance on EPS misses that occurred later in the Class Period.  ¶¶ 80, 82, 144, 150, 156, 164, 172, 183, 188, 189, 197, 203, 210, 215, 224, 229, 235, 282, 288, 307, 340, 342.  Indeed, in 2016, a William Blair analyst noted that the Company was viewed as a "high-quality long-term holding – one that offers healthcare investors a safe haven investment (and income) opportunity in volatile markets."  ¶ 210.

### 2.    March 2017 Monocle Report On The Company's EPS Track Record

On March 22, 2017, Monocle Accounting Research ("Monocle") issued a report entitled "Healthcare Services Group: A Decade of Strategic Rounding" (the "Monocle Report" or "Report").  ¶¶ 8, 66.  The Report identified an "odd and concerning pattern" of apparent "strategic rounding" of Healthcare Services' reported quarterly EPS.  ¶ 66.  Over the course of 44 quarters, from the first quarter of 2006 to the fourth quarter of 2016, every quarter saw the Company's quarterly EPS round up rather than round down to the nearest cent and that the Company met (in nearly every quarter) analysts' consensus estimates *to the penny*.  ¶¶ 8, 68, 72.

The Report described the highly improbable manner in which the Company met consensus EPS targets.  ¶¶ 8, 73.  An analysis of all stocks in the S&P 500 showed that if a company is not actively manipulating its results, then its EPS in a given quarter should have an equal chance of rounding down to the nearest penny as rounding up.  ¶ 67.  But in the case of Healthcare Services, every quarter over the past 11

5

years (predating the Monocle Report) saw quarterly EPS round up rather than round down. ¶ 68. The Monocle Report concluded that the odds of Healthcare Services always randomly rounding up EPS each quarter for the past eleven years was "roughly 1 in 600 quadrillion." ¶ 73.

The Monocle Report further noted that the Company began its pattern a few quarters after McCartney's sons-in-law (Wahl and McKee) joined the Company. ¶ 75. Moreover, the Report notes that Monocle reached out to McCartney, Wahl and McKee regarding the EPS rounding issue, but received no response. ¶ 76. Monocle also reported its findings to the SEC. ¶ 77. The Monocle Report, which was issued after the market closed on March 22, 2017, triggered a decline in the Company's stock price on above-average volume. ¶ 78.

### B.    The Alleged Facts Support A Finding That HCSG's Consistent Meeting Of EPS Estimates Were The Result Of Fraud

While Monocle expressed its suspicion that the Company's rounding up of EPS was improper, as Defendants note, the Monocle Report "does not argue that the rounding is necessarily illegal or improper (and in fact conceded that it may be legal)." *See* Def. Br. at 17. As the Complaint alleges, however, a confluence of facts that have unfolded throughout the Class Period support a strong inference that the EPS figures were fraudulently manipulated to deceive investors – the very type of misconduct that SAB 99 prohibits. In essence, the Company's consistent rounding up its EPS figures to meet EPS estimates for the last decade was not just fortuitous, it was the result of fraud.

### 1.    Defendants Effectively Denied Questions Regarding EPS Manipulation

On April 12, 2017, Defendants held an earnings call to discuss the Company's quarterly results for the first quarter of 2017 (the "April 12, 2017 Call"). ¶ 84. A Robert W. Baird analyst, Andrew John Wittmann ("Wittmann"), asked for comments on "reports that came out about the company quarterly results being rounded up for a long period of time on the quarter." *Id.* Notwithstanding that prior to publishing its Report Monocle reached out to Defendants McCartney, Wahl and McKee for an explanation of the rounding pattern

6

described in its Report, Wahl responded to Wittmann's question by feigning ignorance of the Report and implicitly denied any impropriety in the Company's practices, stating: "when you look at over the past 10 or so years that you have mentioned, our track record really speaks for itself." ¶ 85. The market reacted favorably to Wahl's reassurances, sending Healthcare Services' stock price up by nearly 8%. ¶ 86.

### 2. Unbeknownst To Investors, The SEC Launches – And Quickly Escalates – An Investigation Into The Company's EPS Practices, Prompting Defendants To Abruptly Halt Their Illicit EPS Manipulation

On or before November 2017, the SEC launched an initial-stage investigation into the Company's EPS reporting practices. ¶¶ 10, 90, 100. By March 2018, just five months later, the SEC had escalated its inquiry administratively and served a formal subpoena on the Company. ¶¶ 11, 91, 100.

Immediately after the SEC first contacted Healthcare Services in connection with its investigation in November 2017, the Company's decade-long pattern of rounding up its quarterly EPS results came to a sudden halt. ¶¶ 12, 79, 81, 107. From the fourth quarter of 2017 to the second quarter of 2019, the Company "rounded down" its EPS in five of seven quarters. ¶ 323. Without the fraudulent manipulation of EPS results, the Company began missing analyst estimates. In fact, for four consecutive quarters starting with the fourth quarter of 2017 and for the first six months of 2019, the Company failed to meet analysts' consensus estimates. ¶¶ 79, 81.[2] And each time, the Company's stock price declined. ¶¶ 339-42. The Company did not disclose that its sudden EPS misses were triggered by SEC scrutiny.

### 3. Defendants Mislead Investors About The Existence of the SEC Investigation And, In December 2018, Falsely Stating That There Is No SEC Investigation

Despite abruptly ceasing its EPS manipulation while under the SEC's microscope, Defendants hid the existence of the SEC investigation from investors during the Class Period. Throughout 2018, Defendants

---

[2] In the fourth quarter of 2018, the Company reported EPS that exceeded analysts' consensus estimates, driven by extraordinary items that temporarily increased net income in that quarter. ¶ 82. Absent the extraordinary events, the Company would have missed consensus EPS estimates for all seven consecutive quarters since the start of the SEC investigation. *Id.*

filed annual and quarterly reports and made other public statements that failed to inform investors of the ongoing and escalating SEC investigation. ¶¶ 252-79. In fact, they did so despite providing Risk Disclosures in the Company's public filings that warned that potential SEC investigations could be material and result in a decline in the stock price. ¶ 246, 259, 265, 272.

Then, on December 21, 2018, the Company entered into a new $475 million credit facility, documented by a Credit Agreement, which was filed with the SEC on December 31, 2018 as an exhibit to a Form 8-K signed by Defendant Shea (the "December 2018 Credit Agreement"). ¶¶ 96-97, 277-278. Section 6.1.5 of the December 2018 Credit Agreement stated:

> There are no actions, suits, proceedings, or investigations pending or, to the knowledge of any Loan Party, threatened against such Loan Party or any Subsidiary of such Loan Party at law or in equity before any Official Body which individually or in the aggregate could reasonably be expected to result in any Material Adverse change.

¶ 96. The agreement defined an "Official Body" to include the United States Government and governmental agencies that would include the SEC. ¶¶ 97, 277-78, 313.

When the December 2018 Credit Agreement was executed and filed with the SEC, the SEC had already been engaged in an investigation into the Company's EPS practices for over a year and had escalated to a formal investigation by March 2018. ¶¶ 98, 104. Moreover, undisclosed to the market, the Company had commenced an internal investigation into the EPS practices being investigated by the SEC during the fourth quarter of 2018 – prior to executing and publicly-filing the December 2018 Credit Agreement. ¶¶ 13-14, 92, 98-101, 279.

### 4. The Facts Indicate That Defendants' Financially Engineered Labor Expenses and Related Accruals Without A Valid Business Justification

Labor costs were the most significant expense item for the Company. ¶¶ 41-42, 110. These costs impacted the operating performance for the Company and accounted for substantial portions of the Company's revenues. ¶¶ 41-42, 137-38. The Company analyzed labor costs as a percentage of revenues to evaluate such costs and reflect changes in the Company's growth. ¶ 137. For example, from 2014 to 2018,

8

labor costs accounted for 78% to 81% of costs for the Company's housekeeping segment. ¶¶ 41, 137. Because payroll expenses were the "most expensive" cost component, the Company was interested in controlling those costs. ¶¶ 110, 138. This desire did not, however, give Defendants license to manipulate labor expenses in order to engineer desired quarterly EPS results – as SAB 99 prohibits (*see* ¶¶ 295-96), particularly where, as here, "management" of those costs had no legitimate business justification.

To boost its net income – and avoid missing analysts' EPS estimates for more than a decade – the Company manipulated its labor costs and related accruals in several ways (¶¶ 109-38), including:

- The Company understaffed facilities by cutting the number of hours worked by hourly employees who were paid at or near the minimum wage. ¶¶ 114-15. As a consequence, the quality of service and patient care suffered and the Company did not provide the services that it contracted to perform. ¶ 114.

- The Company tasked salaried managers and directors with filling in for hourly employees to make up for the staffing shortfall. ¶ 115. As a result, the Company lowered variable labor costs because the managers' salaries were booked as a fixed cost in comparison to the variable costs for the hourly workforce. *Id.*

- The Company withheld significant portions of paychecks from hourly employees for extended periods of time. ¶¶ 129-35.

- The Company furloughed hourly workers for at least the last two weeks of the year so that the Company did not have to pay those employees' wages or overtime. ¶ 115.

- The Company altered the financial information submitted from district managers in Monthly Projections and other internal reports, including accruals of labor expenses, without a valid business basis from the district or regional management's perspective. ¶¶ 49, 111-13, 118-23.

Defendants timed these practices, none of which support the provision of services that the Company's customers require, to coincide with the end of financial reporting periods. ¶¶ 19, 115.

By exploiting its workers and manipulating the accounting for labor expenses, the Company manipulated its net income in a manner that would have the effect of increasing EPS by tenths of a penny, allowing the Company to round up its reported EPS. ¶¶ 18, 43, 65. This financial engineering allowed the Company to increase net income just enough to round up EPS to meet or beat analyst estimates precisely to

9

the penny and avoid falling short of analyst targets.  ¶¶ 43, 65, 141.

As the Complaint further alleges, a reduction in the Company's reported net income by modest amounts would have material effects on EPS.  ¶ 43.  For example, for the fourth quarter of 2016, a reduction of net income of just $62,000 in one quarter would have shaved one-hundredths of a cent off its EPS.  *Id*. This would have resulted in a rounding-down of reported EPS and caused the Company to miss analysts' EPS target by a penny.  *Id*.  To put this in perspective, the difference between meeting and missing analysts' EPS target would have been achieved by reducing labor costs by an average of less than $21 at each of the Company's 3,000 customer facilities at the end of the fiscal quarter.  *Id*.

The facts supporting allegations of manipulation of net income and related calculations stem from reports from Confidential Witnesses (or "CWs") describing Class Period conduct, as well as pre-Class Period employment litigation against HCSG that generally corroborates those allegations.  ¶¶ 109-40.

**5.      Defendant McCartney Abruptly Announces His Departure From The Company's Board And Sells Millions In Company Stock Before Leaving**

Roughly three weeks after the Monocle Report's publication, and one day before the April 12, 2017 Call, McCartney informed the Board that he would not stand for re-election as Chairman.  ¶¶ 26, 88, 325.  On May 31, 2017, McCartney's term as Chairman ended.  *Id*.  Between the date on which he informed the Board that he would be departing as Chairman and the end of his term, McCartney sold more than $5 million in Healthcare Services' stock.  ¶¶ 26, 326.  During the Class Period as a whole, McCartney sold or gifted more than $35 million of the Company's stock.  ¶¶ 26, 327.  Additionally, during the course of Healthcare Services' EPS rounding practices (from December 10, 2008 to May 11, 2017), McCartney sold or gifted more than 2.8 million shares of the Company's stock for gross proceeds of nearly $71.3 million.  ¶¶ 26, 304.

**C.      Sixteen Months Later, Defendants Finally Disclose The SEC Investigation, Prompting The Largest One Day Stock Price Drop In The Company's History**

On March 4, 2019 – approximately sixteen months after the Company received notice that the SEC was investigating its EPS practices in November 2017, the Company finally revealed that it had been the

10

subject of an ongoing SEC investigation into the Company's EPS practices (the "March 4 Disclosure"). ¶¶ 14, 100. The Company also finally disclosed that, in the fourth quarter of 2018, the Company authorized an "internal investigation" to be conducted by "outside counsel" in connection with the subject matter of the SEC's investigation and under the direction of the Audit Committee, which was then ongoing. *Id.*

Following these announcements, the Company's stock fell by $4.96 per share, from $37.74 to close at $32.78 per share, a drop of 13.14%, on heavy trading volume. ¶¶ 15, 343. This was the largest single percentage decline in the Company's 39-year trading history, and translated to a loss of $367 million in shareholder value. ¶¶ 15, 103. Analysts reacted to this news and the specific information about the pending SEC investigation. ¶¶ 102, 285, 288-89, 307, 308. A Credit Suisse analyst characterized the announcement as "disappointing," adding, "we would have liked to have seen earlier disclosure of the SEC subpoena." ¶¶ 102, 307.

More than 26 months later, the SEC's investigation remains pending. ¶¶ 16, 305, 309. To date, the SEC's investigation and its fallout has cost the Company over $8 million, including $6 million reported in Q1 2019 from legal and professional fees related to the Company's internal investigation and $2 million reported in Q2 2019 in relation to the SEC's investigation. ¶¶ 92, 305. The Company has not revealed the findings of its "internal investigation." ¶ 16. In its Q2 2019 Form 10-Q, the Company acknowledged the potential for an adverse effect caused by the investigation: "[t]he SEC's investigation into our earnings per share ("EPS") calculation practices could result in potential sanctions or penalties, distraction of our management and result in further litigation from third parties, each of which could adversely affect or cause variability in our financial results." ¶¶ 17, 309.

Moreover, HCSG's stock price has never recovered, with shares currently trading around $27 per

11

share.  *See* Exhibit 1, attached hereto, which is an update of the Bloomberg chart at ¶ 15 of the Complaint.[3]

## III.    ARGUMENT

To state a claim for relief under Section 10(b) of the Exchange Act, a plaintiff must allege (1) defendants made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or the sale of a security; (4) upon which plaintiffs reasonably relied; (5) economic loss; and (6) loss causation.  *See, e.g., Amgen v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191-92 (2013); *see also Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 251 (3d Cir. 2009).  Defendants do not challenge the third, fourth or fifth elements.

To withstand a Rule 12(b)(6) motion, plaintiff "need only allege enough facts to state a claim [for] relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38, 45 n.12 (2011) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (quotation marks omitted).  To assess plausibility, the Court must "accept[] all well pleaded allegations in the complaint as true" and view them "in the light most favorable to [the] plaintiff." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 180 (3d Cir. 2000) (second alteration in original).

   **A.    The Complaint Sufficiently Alleges Defendants' Materially False And Misleading Statements And/Or Material Omissions**

Defendants mistakenly assert that "the Complaint fails to plead a materially misleading statement or omission in accordance with the heightened pleading requirement of the PSLRA." Def. Br. at 13.  However, even a cursory review of the Complaint belies this assertion.  The Complaint details, in 137 paragraphs, statements made over a nearly five-year period that Lead Plaintiff alleges to have been materially false and misleading.  ¶¶ 142-279.  These misleading statements fall within five categories:

- Defendants' materially false and misleading net income and EPS numbers, which were manipulated to meet analysts' quarterly EPS consensus targets, including through Defendants'

---

[3] The Court can take judicial notice of the chart as it is not subject to reasonable dispute and capable of ready determination.  *See McCullough v. Advest, Inc.*, 754 F. App'x 109, 110-11 (3d Cir. 2018) (per curiam).

violations of certain accounting standards and SEC regulations (¶¶ 142-69, 170-95, 196-221, 222, 225-44, 247(a), 247(c), 249, 252-57, 260-64, 266-71, 273-74, 275(c)-(d), 276, 292-95);

- Defendants Wahl and McKee's materially false and misleading statements regarding the Monocle Report's concerns about EPS manipulation (¶¶ 223-24, 248; *see also* ¶¶ 84-87);

- Defendants' materially false and misleading statements and omissions regarding the lack of any SEC investigation throughout the Class Period, including that Defendants violated SEC regulations regarding financial reporting (¶¶ 245-46, 247(b), 250-51, 258-59, 272, 275(a)-(b), 276, 297-303);

- Defendants' materially false and misleading statements and omissions in the Company's New Credit Facility denying the existence of the then-pending SEC investigation (¶¶ 277-79); and

- Defendants' materially false and misleading statements regarding HCSG's internal controls (¶¶ 147-48, 153-54, 160-61, 166-67, 174-75, 179-80, 185-86, 192-93, 200-01, 206-07, 212-13, 218-19, 226-27, 232-33, 238-39, 243-44, 256-57, 263-64, 270-71).[4]

Lead Plaintiff specifies why each such statement is materially false and/or misleading and/or omits material information. ¶¶ 168-69, 194-95, 220-21, 247-51, 275-76, 279.

### 1.    Defendants' Materially False And Misleading Statements Concerning The Company's Quarterly EPS And Net Income Are Actionable

The Complaint alleges that, starting before and continuing through most of the Class Period, Defendants intentionally or recklessly issued false and misleading statements concerning the Company's quarterly net income and EPS.  As alleged, these figures were false and misleading in two interrelated ways.

As a preliminary matter, Defendants concealed from investors the fact that the Company's reported quarterly EPS calculation was continually manipulated to generate EPS results that would have a third digit of five or more tenths of a cent that permitted the rounding up of reported EPS to artificially avoid falling short of analysts' consensus EPS targets. *See, e.g.*, ¶ 168.

To accomplish this, Defendants manipulated the Company's labor expenses in order to inflate

---

[4] The Court may deny Defendants' motion to dismiss in its entirety to the extent that Lead Plaintiff has sufficiently pled a single actionable false and misleading statement or material omission. *See, e.g., Smilovits v. First Solar, Inc.*, 2012 WL 6574410, at *4 (D. Ariz. Dec. 17, 2012) ("the Court need only find that some of the claims within that count are sufficiently pled to deny the motion to dismiss").

quarterly net income and, therefore, inflate EPS. In addition to alleging that the Company's track record of EPS "hits" was statistically remote and "a fairly difficult thing to accomplish through legitimate accounting practices," ¶ 74, the Complaint details specific facts to support the EPS and net income allegations, including facts from CWs, that: during the Class Period, (i) the Company's middle- to lower-level managers were regularly instructed to cut hourly workers without apparent customer service/business justification for doing so; (ii) the Company used salaried "managers" or "directors" to perform tasks ordinarily delegated to hourly workers to avoid additional hourly labor costs; (iii) accruals for labor expenses (*i.e.*, wages already earned but not yet paid) were prepared by lower-level personnel according to formulas required to be used by senior management (*i.e.*, at Defendants' direction), yet were changed by the Defendant-controlled corporate headquarters in ways that "never made any type of sense" and bore no relationship to actual circumstances at the operating level; and (iv) hourly employees' wages were routinely withheld for extended periods without justification, only to be paid at later dates, again without explanation or justification from the corporate headquarters. *See* ¶¶ 109-35.[5] The scope of the labor cost manipulations described by the CWs is consistent with the relatively modest adjustments to net income necessary to carry out Defendants' EPS manipulation. *See* ¶ 43.

Significantly, Defendants *do not challenge* the sufficiency of the allegations regarding the falsity of the Company's stated EPS and net income. Defendants do not contend that either the Complaint fails to sufficiently allege that EPS was *falsely* reported during the Class Period (due to having been deliberately manipulated to avoid missing the analyst consensus estimate) or that the Complaint fails to sufficiently allege that net income was persistently overstated throughout the Class Period to achieve the desired EPS target.

Rather, Defendants challenge the actionability of the EPS-related false and misleading statements

---

[5] Contrary to Defendants' suggestion, these allegations of labor cost manipulation are not the same as the "misclassification" claims that had been brought against the Company in pre-Class Period litigation. *See* ¶ 139. The nature of those practices does, however, corroborate the CWs' allegations.

only on grounds that investors did not care that the quarterly net income and EPS figures were artificially inflated because (i) the fact that Defendants manipulated EPS was not material, or (ii) alternatively, there existed "truth on the market." These arguments are legally and factually misguided.

### a) The EPS And Net Income Misrepresentations Were Material

The materiality requirement is satisfied where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives*, 563 U.S. at 29 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)); *SEC v. Bonan Huang*, 684 F. App'x 167, 172 (3d Cir. 2017).

There can be little doubt that investors cared whether EPS and net income figures were artificially inflated as demonstrated by the negative stock price reaction to the Company's EPS misses that occurred immediately following the launch of the SEC investigation (¶¶ 339-42) and to the disclosure that the SEC was investigating the Company's EPS practices (¶¶ 103, 306, 343). In fact, the share price has never recovered. ¶ 281; *see also* Ex. 1. *See In re Merck & Co. Vytorin/Zetia Sec. Litig.*, 2009 WL 2855601, at *3 (D.N.J. Sep. 2, 2009) ("because [p]laintiffs adequately allege that Merck's stock price experienced significant drops 'immediately following' disclosure of the ENHANCE study test results, the Court finds it 'plausible on its face' that [d]efendants' misstatements and omissions relating thereto were indeed 'material'"); *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 347 (E.D. Pa. 2014) (stock "drop subsequent to disclosure strongly suggests that the withheld and/or misrepresented information was material information to investors").

Further, the weight of the authority recognizes materiality in (i) the overall significance of EPS to investors as a single number that "contains all the information required for evaluating an investment in a company's shares" (¶ 51); (ii) the significance of a company meeting the analyst consensus EPS estimate, including the comments of the former SEC Chairman who described the problem of earnings management by companies "try[ing] to meet or beat Wall Street earnings projections" (¶¶ 55-58, 293-95); and (iii) the adoption of SAB 99 stating that to counter manipulative earnings management because it "is unlikely that it

15

is ever 'reasonable' for registrants to record misstatements or not to correct known misstatements – even immaterial ones – as part of an ongoing effort direct by or known to senior management for the purpose of 'managing' earnings." (¶¶ 295-96). *See Mild v. PPG Indus., Inc.*, 2018 WL 6787351, at *4 (C.D. Cal. Dec. 21, 2018) (denying motion to dismiss claims based on alleged overstatement of financial metrics including net income and "adjusted EPS," where it was alleged that the company "had a reputation for consistently meeting or exceeding consensus estimates," that EPS was "one of the key financial metrics [relied] upon" by analysts, and that EPS was "highlighted prominently" in the company's earnings releases); *SEC v. DiMaria*, 207 F. Supp. 3d 343, 353-54 (S.D.N.Y. 2016) (rejecting defendants' claim that EPS and another non-GAAP metric were immaterial to investors, noting the company's highlighting of those metrics in its press releases and management's focus on the metrics).

In fact, the Company concedes the materiality of the alleged EPS misconduct in its public filings. In its most recent Annual Report on Form 10-K (filed on Mar. 18, 2019) ("2018 Form 10-K"), the Company acknowledged that the Company's "EPS calculation, rounding and reporting practices" – the subject of the SEC investigation and Lead Plaintiff's claims here – are a *material* risk factor. 2018 Form 10-K at 12 (emphasis added).[6] *See also* ¶¶ 281-91 (describing post-Class Period events evidencing the materiality of EPS and SEC investigation).

Ignoring these specific allegations and admissions, Defendants concoct a materiality argument rooted in a single, flawed and incorrect assumption: that *all* of the information underlying Lead Plaintiff's net income and EPS allegations was a matter of public record prior to or during the Class Period. *See* Def. Br. at 13-16. However, Defendants misread the Complaint and misstate the facts.

---

[6]    *See* HCSG, Annual Report (2018 Form 10-K) (Mar. 18, 2019), https://www.sec.gov/ix?doc=/Archives/edgar/data/731012/000073101219000040/hcsg-20181231.htm; *see also In re Vicuron Pharms., Inc. Sec. Litig.*, 2005 WL 2989674, at *2 (E.D. Pa. July 1, 2005) (courts can take notice of public records and the like to determine what was said but not for the truth of the matters asserted).

Lead Plaintiff does not allege that Defendants committed fraud because the Company met analysts' consensus EPS figures for over a decade with EPS figures that simply happened to have rounded up. Rather, the allegations are that the Company's incredible track record was the result of fraud, not successful business operations as investors were led to believe. Specifically, the crux is that the Company *illicitly* rounded up EPS by manipulating net income through, among other things, improper treatment of labor expenses. Certainly, nowhere in the "decade's worth of earnings reports" that Monocle looked through did Healthcare Services ever suggest to investors that its quarterly EPS was deliberately manipulated.[7]

While the Monocle Report raised concerns that the Company's consistent meeting of EPS numbers was highly suspicious, the Report did not conclude that the Company's EPS results were the product of fraud and did not explain how the rounding up occurred. The Report therefore does not constitute evidence of fraud. Indeed, Defendants concede that the Report "does not argue that the rounding is necessarily illegal or improper (and in fact conceded that it may be legal)." Def. Br. at 17. As courts recognize, short-seller reports raising suspicions of wrongdoing should not generally be used to establish that the market fully understood Defendants' fraudulent conduct. *See Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 WL 2937483, at *5 (N.D. Cal. May 20, 2016) (finding an anonymous online short-seller report "cannot reveal to the market the falsity of [the defendant's] misrepresentations") (citing *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013)).

In any event, the issue of "[m]ateriality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714 (3d Cir. 1996) (alteration in original)

---

[7] In contrast, it was the company in *Fan v. StoneMor Partners LP*, 927 F.3d 710, 716-17 (3d Cir. 2019) (relied upon by Defendants) who provided investors with "clear and consistent" disclosures of the very facts that investors alleged were concealed, including through "transparent" financial information. *See id.* There was no such clarity or transparency on Defendants' part here.

(citation omitted). "Only if the alleged misrepresentations or omissions are *so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality* is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Id.* (emphasis added) (citation omitted).[8]

### b)      Defendants' Truth On The Market Defense Is Unavailing

"Truth on the market" is an affirmative defense whereby defendants attempt to rebut the presumption of reliance. As such, the "truth-on-the- market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000); *see also Strougo v. Lannett Co., Inc.*, 2019 WL 1172992, at *15 (E.D. Pa. Mar. 13, 2019) (quoting *Ganino*, 228 F.3d at 167, and rejecting defendants' truth on the market defense, finding that information reported by a single online blogger could not have fully revealed the allegedly concealed information to the market because one blogger's opinion "hardly conveys a widespread market belief").

Moreover, Defendants' truth-on-the-market defense fails in light of Defendant Wahl's denials of any wrongdoing. ¶ 85. When confronted during the Company's April 12, 2017 Call, Wahl effectively denied any illicit EPS rounding up by the Company and touted the Company's track record as evidence of its business success. Indeed, as alleged, the "market took comfort" in Defendant Wahl's statements and sent the Company's stock price climbing by 8%. ¶¶ 85-86. Moreover, HCSG continued to meet or exceed analysts' consensus EPS estimates and analysts continued to rely on this to support their buy recommendations through the third quarter of 2017. *See* ¶¶ 229, 235.

Even when appropriately considered in the context of summary judgment or trial, a truth-on-the-

---

[8] *Westinghouse* involved the *quantitative* materiality of alleged misrepresentations, including certain loan loss reserves of *de minimis* amounts that would not have sufficiently altered the mix of information available to investors. 90 F.3d at 714. Defendants do not raise similar quantitative materiality challenges here. And, in any event, as SAB 99 explains, even a quantitatively small EPS misrepresentation can be qualitatively very material. ¶¶ 295-96.

market defense may only prevail when the "corrective information" (revealing the alleged fraud) is "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Ganino*, 228 F.3d at 167 (citations and internal quotation marks omitted).  The ruling in *Strougo* is instructive.  There, like here, Defendants claimed that a blog post containing the author's analysis of publicly available information was not sufficient to convey a widespread market belief as to the allegedly false information.  *Strougo*, 2019 WL 1172992, at * 15.  Applying the stringent truth-on-the-market test from *Ganino*, Judge Kearney concluded that "[d]efendants are free to develop and present such a fact defense at summary judgment or trial, but we decline to draw such a substantial inference in their favor at the pleading stage."  *Id.*[9]  The same reasoning applies here.[10]  Even if certain initial suspicions entered the market with the Monocle Report, investors were not provided with the full truth with the "degree of intensity and credibility sufficient to counter-balance effectively any [subsequently provided] misleading information" about the Company's EPS practices.  *Ganino*, 228 F.3d at 167.[11]

---

[9] *See also In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1036 (S.D. Cal. 2005) (holding that "defendants bear a heavy burden of proof" on a truth on the market defense and that "the issue is more appropriately resolved by trial than by a motion to dismiss"); *In re Stellent, Inc. Sec. Litig.*, 326 F. Supp. 2d 970, 985-86 (D. Minn. 2004) (rejecting a truth-on-the-market defense on a motion to dismiss and noting that prevailing on such a defense "is a notoriously difficult burden to carry short of trial").

[10] Defendants' "truth-on-the-market" argument erroneously relies on *Wallace v. Sys. & Computer Tech. Corp.*, 1997 WL 602808, *10 (E.D. Pa. Sept. 23, 1997).  *Wallace* concerns immaterial, vague statements of corporate optimism or puffery "so devoid of concrete information that no reasonable investor would have relied on them," *id.* at *12, and statements wherein the alleged falsity was belied by contemporaneous financial statements.  *Wallace*, in fact, supports Lead Plaintiff's position, clearly stating that: "before the 'truth on the market' defense can be applied, the defendants must prove that the information that was allegedly withheld or misrepresented was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the defendant's statements," and that the truth on the market defense may only support a motion to dismiss "where the company's SEC filings or other documents *disclose the very information necessary to make their public statements not misleading*."  *Id.* at *10 (emphasis added) (citation omitted).  At no point did Defendants reveal that the Company was manipulating its net income to engineer an EPS result that would avoid missing analysts' consensus target.

[11] Defendants also contest the materiality of the EPS statements following the release of the Monocle Report based on a reference to the "efficient market theory" and an erroneous suggestion that there was no stock price

19

**2.    Defendants Wahl And McKee Made Actionable Materially False And Misleading Statements Denying the Monocle Report's Suspicions And Omitted To Disclose Material Information Regarding Defendants' Knowledge Of The Monocle Report's Findings**

Defendant Wahl's April 12, 2017 statements also constitute false and misleading statements for which both Wahl and McKee are liable. ¶¶ 84-85, 223-24, 247-48.

The Monocle Report expressly states that, prior to publishing its findings, Monocle "reached out to [Defendant] McCartney, [Defendant] Wahl, and [Defendant] McKee for an explanation of this unusual pattern [of EPS rounding]" but received no response. ¶ 76. Nonetheless, when asked directly by an analyst for comment on published reports "about the company quarterly results being rounded up for a long period of time on the quarter," Defendant Wahl chose a path of evasiveness, denying knowledge of the report. *See* ¶¶ 84-85, 224, 248.[12]

In addition to feigning ignorance of the Report, Wahl issued a misrepresentation by implicitly denying any impropriety in the Company's practices knowing full well about Monocle's Report, stating: "when you look at over the past 10 or so years that you have mentioned, our track record really speaks for itself." ¶¶ 85, 224, 248. Such a denial is an actionable misrepresentation. *See Avaya*, 564 F.3d at 263-64 (3d Cir. 2009) (finding that defendants' denials of "unusual" price discounts constituted actionable misstatements that concealed pricing pressure on the company).

Moreover, Defendants do not contest that Lead Plaintiff has sufficiently alleged that Defendant McKee, who was present and spoke on behalf of the Company during the April 12, 2017 Call, is also liable

---

reaction in response to the Monocle Report. *See* Def. Br. at 16-17. This argument should be rejected on the same basis as the "truth-on-the-market" defense to which it is functionally and logically tethered. Moreover, the issue is also addressed in the separate discussion of loss causation at Section III.C., *infra*.

[12] *See, e.g., Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[U]pon choosing to speak, one must speak truthfully about material issues. Once [defendant] chose to discuss a [topic] it had a duty to be both accurate and complete.") (internal citations omitted); *In re MBIA, Inc., Sec. Litig.*, 2010 WL 1253925, at *9 (S.D.N.Y. Mar. 31, 2010) (noting duty to make additional disclosures is triggered once a party "chooses to discuss material issues" (citing *Caiola*, 295 F.3d at 331)).

for Wahl's material misrepresentations and omissions of material fact when he failed to correct Wahl's misrepresentations and omissions regarding the Monocle Report.[13]

### 3.    Defendants' Materially False And Misleading Statements And Material Omissions About The SEC Investigation Are Actionable

The Complaint alleges that, starting after November 2017 and continuing through the end of the Class Period, Defendants issued several false and misleading statements and made material omissions concealing from investors the SEC investigation into the Company's EPS practices. These allegations fall into two categories: (i) misrepresentations and omissions regarding the SEC investigation in the Company's periodic reporting to investors (¶¶245-47, 250-51, 258-59, 265, 272, 275), and (ii) misrepresentations and omissions in the 2018 Credit Facility Agreement, filed on December 31, 2018 (¶¶ 277-79).

Defendants only disclosed the pendency of the SEC investigation on March 4, 2019 because the Company needed to inform investors that it would not be filing its 2018 Form 10-K on a timely basis. *See* ¶¶ 14, 101. At that time, the Company's previously undisclosed internal investigation remained ongoing. *See id.* In the absence of that significant filing deadline, it is not clear when, if ever, Defendants would have disclosed the existence of the SEC investigation. Further, the Complaint alleges that "[t]he SEC investigation of Healthcare Services remains ongoing and, to date, the Company has not revealed the findings of its 'internal investigation.'" ¶ 16. This remains true to this day. Defendants erroneously contend that Lead Plaintiff has not sufficiently alleged a duty to disclose the pendency of the SEC investigation prior to March 4, 2019. However, Defendants had a duty to disclose the investigation here for two reasons. First, Defendants'

---

[13] *See Plumbers Union Local No. 12 Pension Fund v. Ambassador's Grp.*, 717 F. Supp. 2d 1170, 1180 (E.D. Wash. 2010) ("Corporate officers, however, may not stand idly by as investors and analysts, upon whose recommendations other investors rely, are mislead [sic]. . . . Affirmative steps are required to prevent fraud, or to even merely clarify when a statement veers into a dangerous grey area. [A defendant] may not cloak himself in his silence and avoid liability for the misleading statements of his co-defendants made to public stock analysts during a conference call at which he was present."); *Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653, 656 (5th Cir. 2005) ("Where it is pled that one defendant knowingly uttered a false statement and the other defendant knowingly failed to correct it, … the fraud is sufficiently pleaded as to each defendant.").

statements were rendered misleading by the failure to disclose the investigation.  Second, Defendants were under a legal obligation to disclose the investigation under, *inter alia*, GAAP and the SEC Rule S-X.

> ### a)    Material Misrepresentations And Omissions Regarding The SEC's Investigation Of The Company's EPS Practices

The Complaint alleges false and misleading statements and material omissions with respect to the concealment of the SEC's investigation of the Company's EPS practices.  For example, the Company's 2017 Form 10-K (filed on February 23, 2018) states, in its Item 1A Risk Disclosures:

> ***Failure to maintain effective internal control over financial reporting could have a material adverse effect on our ability to report our financial results on a timely and accurate basis.*** (Emphasis in original.)

> Failure to maintain appropriate and effective internal controls over our financial reporting could result in misstatements in our financial statements and potentially subject us to sanctions or ***investigations by the SEC*** or other regulatory authorities, and ***could cause us to delay the filing of required reports with the SEC and our reporting of financial results***.

¶ 246.  The Company reaffirmed the above disclosure in each subsequent quarterly Form 10-Q filing in the Class Period (Q1-Q3 2018), noting in each instance, "there have been no material changes in the risk factors" – specifically including the risk of "investigations by the SEC."  ¶¶ 259, 265, 272.  The Complaint also alleges that the Q1 2018 Form 10-Q (filed on April 27, 2018) states that the "[t]he Company is subject to various claims and legal actions in the ordinary course of business.  Some of these matters include … *examinations by government agencies*." ¶ 258.  The Q1 2018 Form 10-Q added, "[i]f adverse outcomes of such claims and legal actions are reasonably possible, Management assesses materiality and provides financial disclosure, as appropriate."  *Id.*  The Q1 2018 Form 10-Q continued, "[t]he Company believes it is not a party to, nor are any of its properties the subject of, any pending legal proceeding or governmental examination that would a material adverse effect on the Company's consolidated financial condition or liquidity."  *Id.*

These statements were false and misleading because they omitted to disclose material information.  A reasonable investor would have interpreted these statements to mean that an SEC investigation remained

22

merely a potential risk – that the Company *was not then under investigation*.  In truth, the SEC had been actively investigating the Company's EPS practices in a lengthy, costly and ongoing investigation into an issue of material concern to investors that would ultimately lead to a delay in the filing of the Company's 2018 Form 10-K in March 2019.  ¶¶ 13-14, 90-92, 280, 284, 305.  These allegations sufficiently plead the falsity of the misrepresentations and omissions regarding the SEC investigation.[14]

In addition, the SEC's investigation of HCSG's EPS practices was demonstrably material to investors.  As discussed above, a company's EPS is a key financial metric relied upon by investors in assessing a company's financial condition (¶¶ 4, 51) and that missing analysts' consensus EPS estimates can have a significant and negative impact on a company's stock price (¶¶ 55-58. 295).  It follows that manipulation of that metric would similarly be material to investors.  In fact, analysts immediately questioned the Company about it practices in light of the Monocle Report (¶ 84) and have continued to raise questions and concerns since the revelation of the SEC investigation (¶¶ 102, 285-86, 289-90).

The Company now acknowledges that the ongoing investigation – in which there have been *no apparent developments or changed circumstances* since the early 2018 administrative escalation of the SEC investigation and the subpoena to the Company – is a material matter that could have a "substantial" impact

---

[14] *See In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015) (representations that there was "no assurance that we will not receive subpoenas or be requested to produce documents in pending investigations or litigation from time to time" and "[f]rom time to time, the Company responds to subpoenas and requests for information from Governmental agencies" were misleading "because the inference is available that a reasonable investor could have read them to mean that [defendant] was not already in receipt of just such a request for information") (first alteration in original); *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 583-84 (S.D.N.Y. 2016) (disclosures, including that the company was "subject to scrutiny by regulatory agencies" which "has resulted or may in the future result in regulatory agency investigations, litigation, and subpoenas" did not insulate defendants because they "misled investors by suggesting that the company was not facing an investigation that could have a material impact on its business, when, in fact, it was facing such an investigation").  *See also No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) ("a reasonable investor would consider the potential effects of [these investigations] on the overall health of the company as significantly altering the total mix of information made available") (citation, internal quotation marks and alterations omitted).

on the Company's expenses and financials results.  ¶¶ 106, 283, 284, 287, 309; *see also* 2018 Form 10-K at 12 (describing the SEC investigation as a *material* risk factor for the Company).  It therefore strains credulity to suggest, as Defendants do (*see* Def. Br. at 19-20), that there was no duty to disclose the SEC investigation because it was in an "infancy" stage or otherwise that the investigation's outcome was somehow uncertain. Moreover, unbeknownst to investors, the Company was already responding to the SEC's concerns about the EPS rounding issue, including *stopping the very practice under investigation* after November 2017, implicitly acknowledging the validity of the SEC investigation.

In support of their contention that there was no duty to disclose the SEC investigation, Defendants rely substantially on *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016).  Def. Br. 19-20.  However, in explaining why plaintiffs there had not sufficiently articulated a duty to disclose an SEC investigation, *Lions Gate* actually provides support for Lead Plaintiff's position here:

> The plaintiffs' cases [finding a duty to disclose] stand for the proposition that when a company speaks on a subject, it cannot omit material facts about that subject, and cannot make a material misrepresentation about the existence of an investigation.  But in this case, the plaintiffs *point to no statements during the Class Period* about the Transactions *that were the subject of the SEC investigation or about the SEC investigation itself.*

*Id.* at 13 (emphasis added).  Therefore, according to *Lions Gate*, when defendants make statements on a topic that is the subject matter of an SEC investigation during the Class Period, it triggers a duty to disclose the investigation beacuse that information would sufficiently alter the "total mix of information" available to investors.  *Id.* (citation omitted).[15]  Indeed, Lead Plaintiff's allegations concerning the EPS issue provide precisely what the *Lions Gate* court contemplated might have flipped the duty to disclose result over to

---

[15] In addition to finding that plaintiffs there had not identified any class period statements on related topics that would have required disclosure of the SEC investigation, *Lions Gate* concluded that plaintiffs had not sufficiently alleged the materiality of the nature of the SEC investigation and a settlement reached in connection with that investigation.  *See* 165 F. Supp. 3d at 13-14.  In contrast, here, the Complaint alleges the materiality of EPS generally and the Company's deliberate EPS rounding practices that are the subject of the SEC investigation.

plaintiffs' favor there. *See id.*[16]

Defendants also erroneously contend, in a series of bullet points, that "regulatory obligations" do not create bases upon which Defendants had a duty to disclose the SEC investigation. *See* Def. Br. at 21-22. The disclosure requirements of SEC Regulation S-K required Defendants to include, in each Form 10-Q and 10-K filing, a narrative "Management's Discussion and Analysis of Financial Condition and Results of Operations," that was to include a discussion of all material events or uncertainties, including the SEC investigation, in its Class Period filings after November 2017. *See* ¶¶ 297-303. With respect to the Item 303 requirement, Defendants address only a portion of the regulation as it relates to matters concerning the Company's "liquidity." Def. Br. at 21. This ignores, however, that Item 303(a)(3) requires the disclosure of "unusual" events that can materially affect net income – an item that Lead Plaintiff alleges was deliberately manipulated to avoid missing EPS targets. *See* ¶ 299. The SEC investigation clearly falls into that category; indeed, the Company's recent cessation of deliberate EPS rounding shows that this issue appears to have been

---

[16] Defendants' reliance on cases following or consistent with *Lions Gate* is similarly misplaced. Notably, in *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 2019 WL 4674839, at *20 (D. Conn. Sept. 25, 2019), the company disclosed the receipt of a subpoena from the U.S. Department of Justice ("DOJ") within approximately six weeks and a subpoena from the Connecticut Attorney General within three weeks. *See id.* at *5, *20. *Teva* found the company's prompt disclosure of the subpoenas to be a crucial factor, noting that "defendants disclosed the subpoenas *in their next filing*, a mere two months after their receipt." *Id.* at *20 (emphasis added). This reasoning cannot apply here, where Defendants waited a full year or more before disclosing the SEC subpoena. Defendants' other authority is inapposite. *See In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *30-31 (S.D.N.Y. Sept. 28, 2012) (noting that the company had made "partial disclosures about the DOJ and SEC investigations," thus, "the reader of the company's public filings understood that there were "active investigations" and risk associated with the potential impact of those matters on the company), *aff'd*, 752 F.3d 173 (2014); *In re Am. Exp. Co. S'holder Litig.*, 840 F. Supp. 260, 268-70 (S.D.N.Y. 1993) (not addressing a failure to disclose a pending governmental investigation, but finding that plaintiffs had not alleged that a civil complaint had, in fact, been filed against the company's directors at the time certain actions were taken), *aff'd*, 39 F.3d 395 (2d Cir. 1994); *Ciresi v. Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991) (not addressing a failure to disclose a pending governmental investigation, but finding no duty to disclose that director defendants had breached fiduciary duties, since those were mere allegations in the complaint that were not the subject of any litigation, investigation or other action), *aff'd*, 956 F.2d 1161 (2d Cir. 1992).

addressed following the Class Period.[17]  Similarly, Defendants' only challenge to the Item 503 basis for a duty to disclose is that Item 503 does not create a duty independent from Rule 10b-5.  *See* Def. Br. at 22.  The Complaint has sufficiently alleged the materiality of the SEC investigation and Defendants' EPS-related misconduct to support the use of Item 303 and Item 503 as additional bases to establish Defendants' duty to disclose the SEC investigation.[18]

Lastly, in an apparent attempt to suggest that Defendants had sufficiently cautioned investors regarding the risk of an SEC investigation, Defendants quote from a "Risk Factor" included in the Company's Form 10-K filings from FYs 2015-2018 to claim that the Company "actually did disclose" that a governmental investigation was a risk.  Def. Br. at 22.  This form boilerplate risk disclosure cannot insulate Defendants from liability for concealing the existence of the SEC investigation and is, in fact, similar in substance to the risk disclosure regarding an SEC investigation that is alleged to be false and misleading statement.[19]  The fact that the exact same disclosure was made for FY 2015 and 2016, when there was *no*

---

[17] Further, with respect to Defendants' contention that an Item 303 violation alone cannot form the basis of a securities fraud claim, Lead Plaintiff does not allege that Item 303 is the only basis upon which Defendants were obligated to disclose the SEC investigation.  *See* Section III.B.3, *supra*.  A violation of Item 303's affirmative duty to disclose may "serve as the basis for a securities fraud claim under Section 10(b)" when, as here, the other elements of the violation are established.  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101, 103-04 (2d Cir. 2015).

[18] Defendants erroneously cite ASC 450-20 and ASC 250-10 for the proposition that there was no duty to disclose the SEC investigation.  Those provisions are inapposite.  As Defendants acknowledge (Def. Br. at 22), ASC 450-20 concerns the establishment of "loss contingencies" – accounting reserves for contingent financial losses.  The issue of whether the Company is sufficiently aware of an anticipated financial liability to the SEC to require reserving for that event under ASC 450-20 is a wholly separate issue from whether there was a duty to disclose the investigation itself.  Similarly, ASC 250-10 concerns technical changes to an "accounting principle" or an "accounting estimate," which encompass things like depreciation methods or valuation of intangible assets, neither of which apply to a duty to disclose the SEC investigation.

[19] "General disclosures" of risks that do not alert investors to known manifestations of those risks are insufficient.  *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 83 (S.D.N.Y. 2017) (rejecting mining company's generic safety and environmental risk disclosures, as well as those that failed to address circumstances known to the company, including disclosures that suggested that certain facilities "may not comply with our standards" when the company, in fact, "knew" that those standards were not being applied).  *See also In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) ("generic risk disclosures are inadequate to shield defendants from liability for failing to disclose known

*SEC investigation*, and again in 2017 and 2018, when the investigation was pending, further reveals the insufficiency of this disclosure.

    **b)**   **Material Misrepresentations And Omissions In The December 2018 Credit Agreement**

Defendants contend, in a single bullet point, that they were not required to disclose the SEC investigation in the December 2018 Credit Agreement. *See* Def. Br. at 21. Defendants completely miss the significance of this false and misleading statement. The December 2018 Credit Agreement includes an express representation that the Company was not subject to any governmental investigations. Specifically, Section 6.1.5 of the December 2018 Credit Agreement states:

> ***There are no*** actions, suits, proceedings, ***or investigations pending*** or, to the knowledge of any Loan Party, threatened against such Loan Party or any Subsidiary of such Loan Party at law or in equity ***before any Official Body*** which individually or in the aggregate could reasonably be expected to result in any Material Adverse change.

¶ 277.[20] Defendants do not contest that the SEC is included within the definition of an "Official Body" for purposes of this provision. ¶ 278.

---

specific risks") (citation omitted); *Stratte-McClure*, 776 F.3d at 105 (finding, in analysis under SEC Item 303, that "generic cautionary language" regarding potentially deteriorating markets was insufficient when the company was already facing those deteriorating markets). Moreover, warning of "***potential***" risks, or "***unexpected***" hurdles where severe problems were known, offers no protection and are, in and of themselves, misleading. *See, e.g., Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 (9th Cir. 2019) ("risk disclosures only discussed the possibility of future problems" and "did not warn investors" of current problems); *Cutler v. Kirchner*, 696 F. App'x 809, 813 (9th Cir. 2017) ("These statements were misleading because they disclosed a risk 'in the abstract' but omitted the fact that it had 'already … come to fruition.'") (alteration in original) (citation omitted); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (rejecting risk warnings that failed to alert the reader that "some of these risks may already have come to fruition"); *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 515 (9th Cir. 1991) ("There is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed problems so significant as to require months of delay. … To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.").

[20] Defendants' accuse Plaintiff of "egregiously misrepresent[ing]" the record by citing the above-quoted provision in abbreviated form in one paragraph of the Complaint, completely ignoring that the provision was quoted in full elsewhere in the Complaint. ¶ 277.

This statement is an unambiguous, express representation that there is no governmental investigation pending. There is no doubt that, as of the date on which the December 2018 Credit Agreement was filed with the SEC, the SEC's investigation was well underway – the Company received a subpoena from the Company in March 2018 and, during the fourth quarter of 2018, the Company commenced an internal investigation into the matters being investigated by the SEC and had already incurred substantial expenses in connection with that investigation. *See, e.g.*, ¶ 279.

Defendants do not – and cannot – dispute those allegations. Rather, Defendants suggest that the December 2018 Credit Agreement appears to limit the scope of government "investigations" to those that could result in a "Material Adverse Change" (as defined elsewhere in the agreement) and, without citation to authority, suggest that this language cannot support Lead Plaintiff's claims. *See* Def. Br. at 21. Defendants, however, selectively and narrowly address the term "Material Adverse Change," which is defined as:

> Material Adverse Change shall mean any set of circumstances or events which (i) has or could reasonably be expected to have a material adverse effect upon the validity or enforceability of this Agreement or any other Loan Document, (ii) is or could reasonably be expected to have a material adverse effect upon the business, properties, assets, financial condition or results of operations of the Loan Parties taken as a whole, (iii) impairs materially or could reasonably be expected to impair materially the ability of the Loan Parties taken as a whole to duly and punctually pay or perform any of the Obligations, or (iv) impairs materially or could reasonably be expected to impair materially the ability of the Administrative Agent or any of the Lenders, to the extent permitted, to enforce their legal remedies pursuant to this Agreement or any other Loan Document.

*See* ECF No. 33-4 at 42 (emphasis added).

The plain language of this definition makes clear that a potential "Material Adverse Change" applies to the SEC investigation, as well as Defendants' failure to disclose that investigation in connection with the December 2018 Credit Agreement. For example, by December 2018, the SEC investigation already had resulted in a "material adverse effect upon the business" and "results of operations" of Healthcare Services because the Company ceased manipulating its EPS to avoid missing analysts' consensus estimates (which it did promptly – and repeatedly – after the investigation launched in November 2017), and the Company's

28

recent public filings have since conceded that the EPS manipulation issue is a material matter. *See* ¶¶ 17, 98, 105, 283-84, 287. Moreover, Defendants' concealment of the SEC investigation could have a "material adverse effect upon the validity or enforceability" of the Agreement to the extent that the lender deems Defendants' misrepresentations to provide a basis for invalidating the Agreement. Eventually, on March 4, 2019, the Company revealed that the SEC had been investigating the Company's EPS calculations and practices for approximately sixteen months. ¶ 14. The Company also disclosed that it had authorized outside counsel to conduct an internal investigation into matters relating to the SEC investigation and that the internal investigation had cost the Company at least $8 million to date. ¶¶ 14, 92. Accordingly, the Complaint pleads an actionable misrepresentation in connection with the December 2018 Credit Agreement.

### 4. Materially False And Misleading Statements And Omissions About The Company's Internal Controls Are Actionable

Throughout the Class Period, Defendants consistently affirmed that the Company's "disclosure controls and procedures" were "effective." ¶¶ 147-48, 153-54, 160-61, 166-67, 174-75, 179-80, 185-86, 192-93, 200-201, 206-07, 212-13, 218-19, 226-27, 232-33, 238-39, 243-44, 256-57, 263-64, 270-71. These statements were false and misleading because, as described in Section III.A.4., *infra*, Defendants continually manipulated the Company's net income to generate artificial EPS results. Defendants failed to disclose that the Company lacked sufficient internal controls to prevent the Company from manipulating its net income and reporting EPS to artificially achieve EPS results that met or exceeded analysts' consensus EPS estimates. ¶¶ 169, 195, 221, 249, 276.

Defendants only challenge the sufficiency of the falsity allegations as to the internal controls on the grounds that they are wholly derivative of the sufficiency of the allegations regarding the EPS figures. Because Plaintiff has adequately alleged that the Company made material misstatements about EPS and the SEC investigation (*see* Sections III.A.1 and III.A.3), Defendants' material omissions about the Company's internal controls are actionable.

29

### 5.    Defendants' Arguments On The Manipulation Of Labor Expenses Are Misplaced

Defendants' contention that Healthcare Services' manipulation of its labor expenses cannot support a claim for securities fraud is based on a miscomprehension of these allegations.  *See* Def. Br. at 23-27. Specifically, Defendants mischaracterize the import of Lead Plaintiff's labor-expense allegations, including the allegations of former Healthcare Services' employees, including the CWs, who worked for the Company during the Class Period.  The CWs describe how (i) labor expenses and/or accruals related to labor expenses were manipulated by the Company's senior-most management; and (ii) management's changes were viewed by the Company's the middle- to lower-level managers (who were directly involved in providing services to the Company's customers) as having no apparent business or operational justification.  *See* ¶¶ 109-40.[21]

As a preliminary matter, it is important to note that Defendants do not challenge the truth or the specificity of the CW allegations or Lead Plaintiff's reliance on the CWs here.  Def. Br. at 23 (assumes the truth of these allegations and characterizes them as "managing actual labor expenses").

More importantly, Lead Plaintiff does not allege that "managing" labor expenses alone resulted in false statements.  Rather, Lead Plaintiff alleges that Defendants manipulated these expenses with the express intent to ensure that the Company could round up EPS each quarter.  It is the combination of the improper manipulation of the expenses to achieve certain EPS figures that constitutes the fraud.  While it is entirely proper to control expenses, it is improper to manipulate expenses for the express purpose of manipulating

---

[21] Defendants erroneously contend that claims "based upon" allegations concerning the manipulation of labor expenses to manipulate quarterly EPS are barred by the statute of limitations because allegations of Healthcare Services' improper labor practices had been alleged in pre-Class Period litigation.  *See* Def. Br. at 26-27 n.13. Defendants miss the import of Lead Plaintiff's allegations.  Lead Plaintiff alleges that EPS was being manipulated by, among other things, various machinations related to labor expenses and related accounting accruals that, as described in the Complaint, *occurred during the Class Period.*  ¶¶ 109-39.  Moreover, the pre-Class Period litigation did not link Defendants' alleged labor violations to the manipulation of quarterly EPS that is alleged here.  Rather, the fact that Defendants had previously engaged in improper conduct and then continued or restarted the same or similar practices during the Class Period supports a strong inference of scienter.

30

other metrics and mislead investors regarding the actual results in that quarter – as expressly set forth in SAB 99. ¶¶ 295-96.[22]

**B.    The Complaint's Allegations Give Rise To A Strong Inference Of Scienter**

The Third Circuit recognizes that a complaint satisfies the pleading standard for scienter when it alleges "facts giving rise to a strong inference of either reckless or conscious behavior." *Avaya*, 564 F.3d at 267 (citation, internal quotation marks and footnote omitted). Scienter can be shown through recklessness, which is "an extreme departure from the standards of ordinary care ... which presents a danger of misleading ... that is either known to the defendant or is so obvious that the actor must be aware of it." *Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 422 (E.D. Pa. 2019) (alteration in original) (quoting *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1244 (3d Cir. 1989)).

In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), the Supreme Court further clarified that, in assessing whether there is a "strong inference" of scienter under the Private Securities

---

[22] Defendants point to the fact that the Company received an "unqualified" or "clean audit opinion" as support for the sufficiency of the Company's disclosures. *See* Def. Br. at 7, 17-18. This can be rejected for several reasons. As alleged, the EPS manipulation appeared to cease in fiscal year 2018, thus there would be no expectation that the auditors would find an issue with that year's financials. For prior periods, as alleged, a relatively small manipulation of the Company's net income was all that was required to avoid missing the consensus EPS estimate, which could easily escape the eye of the auditors who do not provide for comprehensive monitoring of a company's business operations. For example, Public Company Accounting Oversight Board ("PCAOB") Auditing Standard 5 makes numerous references to "tests" and "testing" in connection with the conduct of an audit and limitations on the scope of an audit. *See* PCAOB Auditing Standard 5 (eff. Nov. 15, 2017 through Dec. 31, 2016), https://pcaobus.org/Standards/Archived/PreReorgStandards/Pages/Auditing_Standard_5.aspx; PCAOB Auditing Standard AS 2110 (eff. Dec. 31, 2010), https://pcaobus.org/Standards/Auditing/Pages/AS2110.aspx. Consistent with the audit standards, the Company's independent auditor notes, that its audit was comprised of procedures that examined, "on a test basis, evidence supporting the amounts and disclosures in the financial statements." *See* 2018 Form 10-K at 32. As a result, Defendants' manipulation of EPS was nearly a "perfect crime" because it was carried out through the manipulation of financial data that was largely invisible or otherwise unlikely to be detected. In any event, courts routinely find that a "clean" audit opinion does not negate a finding of either intentional or reckless misconduct. *See In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1246 (N.D. Cal. 2008); *In re Converium Holding AG Sec. Litig.*, 2007 WL 2684069, at *3 (S.D.N.Y. Sept. 14, 2007).

Litigation Reform Act of 1995 ("PSLRA"), all the allegations must be viewed collectively. *Id.* at 326. In fact, *Tellabs* instructs courts "not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* Moreover, the "inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324 (citation omitted).

When considering a defendant's competing inferences, the court must "accept[] the whole factual picture painted by the Complaint" and determine if "it is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269. In other words, under *Tellabs*, with allegations of scienter, any "tie . . . goes to the plaintiff." *Okla. Firefighters Pens. & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019) (alteration in original) (citation omitted).

Here, the Complaint sets forth a host of detailed allegations supporting a strong inference of scienter, virtually all of which Defendants ignore. The Complaint alleges scienter through, *inter alia*, (i) the fact that the SEC has been investigating Defendants' EPS practices since 2017 and that Defendants' concealed this investigation for 16 months after it was commenced and 13 months after the escalation of the investigation (¶¶ 90, 93-99); (ii) the abrupt halt to quarterly EPS rounding once the Company began to face SEC scrutiny (¶¶ 10, 12, 79, 323); (iii) accounting manipulations that included the deliberate manipulation of labor costs during the Class Period and other GAAP and financial reporting violations (¶¶ 112-15, 120-23, 129-35, 138-39, 292-96, 297-303, 331-32); (iv) detailed allegations of the Individual Defendants' positions within the Company, access to non-public information, tight control over HCSG's operations and financial reporting, and related matters – including through control exerted by McCartney family members and close friends (¶¶ 26-32, 41-42, 44-50, 64); (v) the extreme improbability that the Company's quarterly EPS would have consistently rounded up without internal manipulation (¶¶ 73, 321); (vi) the Company's prior history with labor lawsuits and accounting fraud (¶¶ 333-35); (vii) Defendants' deliberate concealment of their knowledge

32

of the Monocle Report and denial of any concerns raised therein during the April 12, 2017 Call (¶¶ 26, 83-87, 89, 317); (viii) Defendant McCartney's abrupt departure from his role as Chairman shortly after the release of the Monocle Report (¶¶ 88, 324-27); and (ix) Defendant McCartney's substantial and suspicious stock sales (¶¶ 26, 326). Taken as a whole, these allegations set forth the requisite strong inference of scienter. *See Tellabs*, 551 U.S. at 326.

Defendants' brief addresses only three of the myriad scienter allegations in the Complaint: Defendant McCartney's insider stock sales, including whether other Individual Defendants' "acquisitions" of HCSG stock undercut the Complaint's scienter allegations (*see* Def. Br. at 29-32); whether Defendant Wahl's response to an analyst question regarding EPS rounding during the April 12, 2017 Call revealed his knowledge of the Monocle Report (*see* Def. Br. at 33); and, limited to a footnote, whether the suspicious timing of Defendant McCartney's departure as the Company's Chairman supports scienter (*see* Def Br. at 32 n.14). Not only do Defendants' arguments regarding these three categories fail to tip the balance of the inferences in their favor as to any of those particular subjects in and of themselves, they utterly fail to defeat "the whole factual picture [of Defendants' scienter] painted by the Complaint." *Avaya*, 564 F.3d at 269.[23]

**1.    The Complaint's Uncontested Scienter Allegations Individually And Collectively Support A Strong Inference Of Scienter**

**a)    The SEC Investigation Into Defendants' EPS Practices And Defendants' Deliberate Concealment Of This Investigation Strongly Supports An Inference Of Scienter**

The SEC commenced an inquiry into Defendants' EPS practices in November 2017. This investigation was then elevated to a formal investigation in March 2018. To date, the Company's legal and professional fees related to and stemming from the SEC investigation have exceeded $8 million. ¶ 305. Given

---

[23] Defendants incorrectly assert that the Complaint does not allege any contemporaneous facts. *See* Def. Br. at 28. To the contrary, all the facts regarding the SEC investigation pending during the Class Period, Defendants' knowledge of the Monocle Report, the Class Period manipulation of costs of services and the CW's statements of Class Period events, amongst others, are contemporaneous facts.

their roles as officers and/or directors at HCSG, particularly given the tight family control over the Company (described herein), Defendants unquestionably were involved in and aware of the investigation and related information. *See*, *e.g.*, *Gruber v. Gilbertson*, 2018 WL 1418188, at *12 (S.D.N.Y. Mar. 20, 2018) (finding that corporate officers and directors "presumably" knew of a corporate internal investigation into stock manipulation scheme being investigated).

As courts recognize, an ongoing investigation represents a "piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter." *Utesch*, 385 F. Supp. 3d at 423 (quoting *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013)); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016) (ongoing SEC investigation is "part of a broader picture from which a court may, at the initial pleading stage, infer a compelling claim of scienter"); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp.2d 148, 168 (S.D.N.Y. 2008) (same).

The long-term, ongoing investigation is a particularly significant piece of the scienter puzzle here because the Defendants concealed this investigation from investors until forced to come clean at the close of the Class Period. As noted above, despite generically warning investors that "the failure to maintain appropriate and effective internal controls over [their] financial reporting could result in misstatements… and potentially subject [the Company] to sanctions or investigations by the SEC" (¶¶ 246-47), Defendants never disclosed that the SEC was, in fact, currently investigating the Company's EPS practices and quickly escalated that investigation by serving a formal subpoena on the Company (¶¶ 13-14, 91, 94). Then, on December 31, 2018, the Company publicly filed a copy of the December 2018 Credit Agreement, which explicitly denied the existence of any material investigation into the Company. ¶ 96.[24] As detailed above, the December 2018

---

[24] Because Defendant Shea signed the Form 8-K to which the December 2018 Credit Agreement was attached, and Defendants Wahl and Shea were each listed as an "authorized officer" for the Company in the December 2018 Credit Agreement, their knowledge of the contents of the December 2018 Credit Agreement – including the representation that no investigations were pending – is reasonably presumed.

Credit Agreement falsely represented that no investigations were pending against the Company. ¶¶ 96-99, 277-79. This statement was made at time when the Defendants knew or were reckless in not knowing that: (i) in November 2017, the SEC launched its "Matter Under Inquiry" into the Company's EPS practices and sent the Company a request for information (¶90); (ii) that within a few short months, the SEC had escalated the inquiry to a formal investigation by March 2018, serving a subpoena on the Company (¶ 91); (iii) that the investigation prompted the Company to abruptly halt the EPS rounding practices; (iv) that the Company had incurred significant time and costs to respond to the SEC investigation (¶¶ 92, 100, 284, 305); and (v) that in the fourth quarter of 2018, the Company commenced an internal investigation into the matter (¶¶ 13, 92, 280).

There can be no question that Defendants knew of the SEC investigation, and their decision to conceal the existence of the SEC investigation supports a strong inference of scienter. *See In re BioScrip*, 95 F. Supp. 3d at 733 (where a company treats a government investigation "as a mere hypothetical in its disclosures[,]" an inference of scienter is supported by allegations that a governmental investigation demand put a company on notice that it was "actively responding" to a subpoena and request for information); *Menaldi*, 164 F. Supp. 3d at 585 (holding plaintiffs plausibly alleged that defendants were "reckless in opting to misrepresent their exposure to civil and criminal liability" in the face of an SEC and DOJ investigation into certain practices); *see also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter.").

### b) The Abrupt End Of The Company's EPS Rounding Practices And Meeting Estimates Supports A Strong Inference Of Scienter

Defendants completely ignore that Defendants' engineered EPS rounding to avoid missing analysts' consensus targets abruptly ended once the SEC launched its inquiry in November 2017. ¶¶ 10, 12, 79, 81, 323. Indeed, the Company missed analyst estimates for four consecutive quarters starting with Q4 2017 and again continued to miss analyst estimates through the first six months of 2019. ¶¶ 81, 323. In the absence of

35

extraordinary events of Q4 2018, the Company would have missed consensus EPS estimates for all seven consecutive quarters since the start of the SEC investigation. ¶ 82. This abrupt change further supports a strong inference of scienter. *See In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, at *20 (W.D. Wash. Apr. 19, 2019) (finding that where company "altered [a] co-marketing program in the midst of the CFPB's investigation, but did not make the changes public" supported an inference that the defendants were at least deliberately reckless); *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 671 (D.S.C. 2016) (allegations of "accounts from [p]laintiff's confidential sources regarding the business culture," allegations of "government scrutiny and investigation" and "major changes in business practices" suffice to allege scienter).

> **c)** **Defendants' Knowledge And Recklessness Regarding The Manipulation Of Labor Expenses And Related Accruals Through Internal Systems That Defendants Controlled Further Supports Scienter**

Defendants' scienter argument largely ignores the allegations that Defendants knowingly or recklessly manipulated labor expenses and related accruals to achieve net income adjustments that allowed the Company to avoid missing analyst consensus EPS estimates. These allegations are supported by, among other facts, the reports of four CWs who describe the manipulation of labor expenses and related accruals, the importance of labor expenses to the Company, lawsuits against the Company alleging certain employment law violations, Defendants' tight control over key accounting and operational functions at the Company as described by the CWs and Defendants' expertise in financial and accounting matters.[25] These allegations, which are detailed above, provide further compelling support for a strong inference of scienter.

---

[25] The fact that Defendants do not challenge the CW allegations is not surprising because it is well-settled that a plaintiff may rely on confidential sources to plead facts supporting scienter where, as here, the nature of the sources' employment suggests they were in a position to have access to the information they provided. *See, e.g.*, *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 146-48 (3d Cir. 2004) (confidential sources meet the particularity requirements of the PSLRA when "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged").

*Manipulation of Labor Costs*.    The CW allegations in the Complaint explain how Defendants "reduced" labor costs by the small amounts (¶ 43) needed to financially engineer their way to the consensus EPS target.  *See*, *e.g.*, ¶ 114 (CW1 describing the intentional understaffing of facilities to keep labor expenses below budgeted amounts, including through cutting the number of hours worked by minimum wage employees), ¶ 115 (CW1 recalling that management would "send people home" for the last two weeks of each year), ¶¶ 118-23 (CW2 describing how "significant differences" would appear in reports submitted to and received back from corporate management, including changes to payroll accruals that "never made any type of sense" from an operational standpoint), ¶¶ 129-34 (CW4 describing how hourly employees would periodically not be paid for extended periods of time, and other payroll irregularities that included the non-payment of wages), and ¶ 135 (describing online reports of former employees who corroborate CW4's allegations).

Courts recognize that allegations that defendants deliberately understaffed client facilities to meet financial projections support an inference of scienter.  For example, in *Garden City Employees' Ret. Sys. v. Psychiatric Sols., Inc.*, 2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011), plaintiffs alleged that hospital executives "reported being under constant pressure from corporate headquarters to reduce staffing to meet financial targets." *Id.* at *59.  The *Garden City* complaint also alleged that, "[t]o meet quarterly expectations for PSI's financial performance, [d]efendants regularly ordered staffing cuts at PSI's hospitals based solely on the facility's EPOB ratio, which was closely monitored by PSI's top executives." *Id.* at *54.  The court credited these allegations in concluding that plaintiffs alleged a strong inference of scienter, *id.* at *59, and this Court should do the same here.

Defendants' knowledge or reckless disregard of the manipulation of labor expenses and accruals is underscored by the fact that labor costs constitute the primary source of the Company's expenses – and strain on net income – during the Class Period.  ¶¶ 41, 110, 137.  "Courts may presume that high-level executives

37

are aware of matters related to their business' operation where the misrepresentations as omissions pertain to 'central, day-to-day operational matters.'" *Garden City*, 2011 WL 1335803, at *57 (quoting *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 724 (S.D. Ohio 2006)). This is particularly appropriate for "[f]acts critical to a business's core management." *Id.* at *57 (quoting *In re Ancor Commc'ns Inc.*, 22 F. Supp. 2d 999, 1005 (D. Minn. 1998)); *see also Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 970 (N.D. Cal. 2014) ("scienter is strengthened by the allegation of pervasive and long standing problems").

Additionally, Defendants fail to address allegations that previous lawsuits echoing Lead Plaintiff's labor cost/accrual manipulation allegations add to an inference of scienter. *Compare* Def. Br. at 26-27, n.13 (referencing lawsuits in connection with a spurious falsity argument but failing to address that these allegations also support scienter) *with* ¶¶ 333-34. The "existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit" is a factor supporting an inference of scienter.[26]

*Manipulation Of Financials At Senior Level*. The Complaint alleges that the manipulation of the Company's financial results was directed and implemented by Defendants through their roles as senior management and/or through their familial or other personal influence over key personnel throughout the Company. ¶¶ 26-32, 46-47, 50, 64, 116-26, 329. At the Company's headquarters, the accounting function was "small and controlled" by Defendant Shea and senior management connected to the McCartney family. ¶¶ 125-26, 318-20, 329. Financial information flowed from headquarters to the Company's divisions in the form of "Monthly Operating Statements." ¶ 329. As reported by CW2, "consistent and significant"

---

[26] *Bldg. Trades United Pension Tr. Fund v. Kenexa Corp.*, 2010 WL 3749459, at *6 (E.D. Pa. Sept. 27, 2010) (citing *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001)); *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 720-21 (W.D. Tex. 2010) (allegations that settlement of insurance fraud lawsuits operated as red flag found by court to "may add somewhat to an inference of scienter"). *See also In re Symbol Techs., Inc. Sec. Litig.*, 2013 WL 6330665, at *10 n.3 (E.D.N.Y. Dec. 5, 2013) (concluding that, "admitted prior misconduct establishes a pattern of culpable conduct on the part of [the defendant company] and its management which supports a strong inference of scienter"); *In re Enron Corp. Sec., Deriv., & ERISA Litig.*, 235 F. Supp. 2d 549, 689 (S.D. Tex. 2002) (noting that allegations of prior misconduct may be considered in analysis of scienter).

differences existed between what had been reported at the facility level by CW2 and other district managers and the corporate payroll accrual numbers in Monthly Operating Statements. *Id.* The Monthly Operating Statements for CW2's district always contained different numbers from the numbers that CW2 submitted (pursuant to the formula Defendants required) and included payroll accrual numbers that "never made any type of sense" based on what CW2 knew as a result of CW2's position at the Company. *Id.* Substantially similar changes were made to the reports prepared by other District Managers. *Id.* These allegations support an inference that the Defendants – as the top executives or the tight-knit, family company – acted with the requisite scienter.

Tellingly, Defendants do not dispute that these allegations support an inference of scienter. Def. Br. at 24-25. Nor do they dispute that Defendant McCartney's family members and close family friends controlled the Company's the highest management levels, which further supports a strong inference of scienter. ¶¶ 318-20, 335.[27]

Allegations that a company's accounting department is small also support an inference of scienter. *See In re OCA, Inc. Sec. & Deriv. Litig.*, 2006 WL 3747560, at *18 (E.D. La. Dec. 14, 2006) (finding allegation that an accounting department consisted of fewer than 20 employees supported the conclusion that it would have been virtually impossible for the defendants to not have known of the Company's ongoing problems.). Defendants in this case fail to address the similar allegations here, including CW3's report that the Company's accounting function was small and controlled by management, including Defendant Shea. ¶ 320.[28]

---

[27] *See Beatty v. JRMB II, Inc.*, 2013 WL 2458644, at *5 (W.D. Okla. June 6, 2013) (alleging that each of the individual defendants had familial relationships); *RNS Servicing, LLC v. Spirit Constr. Servs., Inc.*, 2017 WL 3675815, at *5 (N.D. Ill. Aug. 25, 2017) (allegation that two of the defendants were brothers afforded a basis for believing that plaintiff could prove scienter); *Wight v. BankAmerica Corp.*, 219 F.3d 79, 92 (2d Cir. 2000) (alleged personal relationships supported opportunity to aid fraud).

[28] Additionally, Defendants fail to address that allegations of GAAP violations may be used to support the strong inference of scienter. ¶¶ 294, 331; *In re Daou Sys., Inc.*, 411 F.3d 1006, 1023 (9th Cir. 2005)

Defendants also ignore allegations concerning their accounting expertise. Where a defendant serves as a company's principal accounting officer and had numerous years of experience in finance and accounting, these allegations add to the strong inference of scienter. *See Mild*, 2018 WL 6787351, at \*7. *See also In re AFC Enters., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1375 (N.D. Ga. 2004) (noting that, where "[i]t looks like the company's earnings were being manipulated to meet market expectations. . . . the most likely senior executive to know about it would be the chief financial officer"). Here, Defendant Shea has served as the Company's CFO since April 2012, and before then served as the Company's Chief Accounting Officer and started his career as a senior manager at Ernst & Young LLP, one of the "Big Four" accounting firms. ¶ 28. Similarly, Defendant Wahl not only also previously served as a senior manager at Ernst & Young LLP, he also was touted in public filings as having "financial expertise," which enabled him to "provide guidance with respect to [the Company's] operations." ¶ 27. These allegations about Defendants' "position and background make it more likely that [they] knew or recklessly disregarded the impact that misrepresentations in the financial reports would have on investors." *Mild*, 2018 WL 6787351, at \*7.

### d) The Sheer Improbability of Healthcare Services' EPS Rounding Supports A Strong Inference Of Scienter

The Monocle Report calculated the standard odds that a company's EPS would round up consistently over eleven years at roughly 1 in 17.6 trillion, with the Company's particular results likely occur only on a 1 in 600 quadrillion basis. ¶73. While Defendants ignore these allegations, the statistically improbability that

---

(allegations that defendant executives ran the Company "top to bottom" with the help of other defendants and directed premature revenue recognition practices "without regard to any actual percentage of completion" of long-term projects supported alleged GAAP violations and an inference of scienter). While Defendants contend that FASB concept statements do not constitute GAAP standards, Defendants fail to cite any support for this proposition. To the contrary, these allegations arising from FASB Statement of Concepts are sufficient to support scienter. *Id.* at 1019 (holding that defendant's revenue recognition and related labor practices could violate GAAP principles such as FASB Statement of Concepts Nos. 1 and 2 and holding that inference of scienter was supported by allegations that executives directed the improper revenue recognition in violation of GAAP principles such as FASB Statement of Concepts Nos. 1 and 2).

the Company met EPS targets without manipulation for more than a decade further bolster the other facts to support an inference of scienter. *See In re AFC Enters.*, 348 F. Supp. 2d at 1375 (finding the "precise meeting of analysts' estimates" was among the allegations that were "sufficient in totality to satisfy the [PSLRA] pleading standard"); *see also* ¶ 74 (noting Monocle reached out to CFOs at "multiple publicly traded companies" and their feedback was that "it would be a fairly difficult thing to accomplish though legitimate account practices").

e)    **Prior SEC Fraud Charges Further Support A Strong Inference of Scienter**

Defendants ignore the allegations that Defendant McCartney's and the Company's scienter are supported by the fact that McCartney previously faced securities fraud allegations arising from improper accounting and financial reporting at the Company and paid hundreds of thousands of dollars in penalties related to those charges. ¶ 334. As noted above, the "existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit" is a factor supporting an inference of scienter. *See supra* at 38 and note 26.

2.    **Defendants' Limited Challenges To Certain Scienter Allegations Fail**

a)    **The Complaint Sufficiently Pleads A Strong Inference Of Scienter In Connection With Defendants Wahl And McKee's Denials Of The Monocle Report's Conclusions**

The fact that Defendants concealed their knowledge of the Monocle Report and then rebutted the conclusions also supports a strong inference of scienter. ¶¶ 83-85, 87, 317. Monocle "reached out to" Defendants "Daniel McCartney, Ted Wahl and Matt McKee . . . for an explanation of this unusual pattern" of EPS rounding prior to releasing its Report in March 2017. ¶¶ 76, 317. However, when asked during the April 12, 2017 Call on whether the Company's quarterly EPS had been rounded up for a "long period of time," Defendant Wahl feigned ignorance, highlighted the Company's efforts to deliver outcomes and brushed aside concerns about the Company engaging in illicit EPS manipulation. ¶¶ 85, 87, 224.

41

Defendants argue that the alleged misstatements and omissions from the April 12, 2017 Call do not evidence fraud because the analyst purportedly inquired about "multiple reports" – not a single report – and that "all Wahl did was state he didn't know which 'reports' the analyst was talking about." Def. Br. at 33. Defendants' spin is nothing more than an improper attempt to inject factual argument, impermissible on a motion to dismiss. Moreover, Defendants' interpretation is simply not credible. The only inference to be drawn from the fact that Defendants rely on the references to multiple reports to feign ignorance when they were expressly contacted regarding the precise subject of the Monocle Report, is that they were misleading to the market. Further, despite attaching over 500 pages of extraneous exhibits to their Rule 12(b)(6) motion, Defendants have not produced or pointed to any other "report" concerning the Company's EPS rounding practices issued around the time of the Monocle Report or the April 12, 2017 Call. Nevertheless, regardless of whether Wahl could recall the Monocle Report by name, Wahl effectively denied any manipulative conduct while McKee stood by in silence. Taken as a whole, the allegations support one compelling inference: that Wahl and McKee sought to conceal the Company's illicit EPS practices for as long as possible.[29]

### b)    Defendant McCartney's Departure As Chairman Supports A Strong Inference Of Scienter

Defendants erroneously contend, in a single footnote, that Defendant McCartney's abrupt decision to

---

[29] *See In re ViroPharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 473 (E.D. Pa. 2014) (delay in disclosure of negative information ties "directly to [p]laintiff's theory of [d]efendants' motive – that [d]efendants knew that exclusivity was not forthcoming, so they sought to mislead investors and delay the ultimate denial of exclusivity"); *Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Swanson*, 2011 WL 2444675, at *12 (D. Del. June 14, 2011) ("The inference that [d]efendants withheld material information because they did not want the market to learn that a secular shift was eroding the commercial viability of their key product, … is at least as cogent and compelling as the opposing inference that [d]efendants did not know or did not believe a secular shift was occurring."). Even if Defendants' suggested explanation could be deemed a reasonable inference from the facts, the choice between equally reasonable inferences is not one that a court can make at the pleading stage. *Tellabs*, 551 U.S. at 322-23. Plaintiffs must prevail if there is a tie between inferences.

step away from his position as Chairman in the wake of the Monocle Report does not support a strong inference of scienter. *See* Def. Br. at 32 n.14.

Prior to March 22, 2017, Monocle contacted Defendant McCartney seeking comment on the Company's EPS rounding practices. ¶ 76. Roughly three weeks after the Monocle Report was released, on April 11, 2017, Defendant McCartney informed the Company's Board that he would not stand for re-election, walking away from a position he held since he founded the Company in 1976. ¶ 26. McCartney's decision to leave the Company in the wake of serious allegations of EPS-related misconduct and a report to the SEC adds to the total mix and support a strong inference of scienter. *See In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. Nov. 1, 2007) (resignations "add to the overall pleading of circumstantial evidence of fraud").[30]

Defendants' reliance on *In re Hertz Global Holdings Inc.* is misguided. After concluding that the departure of executives "is a factor that can strengthen the inference of scienter," the court declined to draw such an inference there because it appeared that the change in leadership resulted from mismanagement, not fraud. 905 F.3d 106, 118-19 (3d Cir. 2018). Additionally, Defendants' argument that there is no "causal link" between McCartney's resignation and the alleged corrective disclosures (Def. Br. at 32 n. 14) conflates the distinct elements of scienter and loss causation (addressed below).[31]

c)    **Although Motive Is Not Required To Allege Scienter, Defendant McCartney's Insider Stock Sales Support A Strong Inference Of Scienter**

It is well established that it is unnecessary to allege "motive" in order to establish scienter. *See Tellabs*,

---

[30] *See also In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) ("Even though it is also possible to infer, for example, that Defendants left of their own volition or that they were removed for mismanagement unrelated to wrongdoing, the [c]ourt finds that the proximity of [d]efendants' departures to the financial restatements and investigations adds 'one more piece to the scienter puzzle.'") (citation omitted).

[31] Defendants do not cite authority for the proposition that the inference of scienter is weakened by the fact that McCartney changed his status from Chairman to "Chairman Emeritus."

551 U.S. at 325 ("the absence of a motive allegation is not fatal…. [rather] allegations must be considered collectively).  As a corollary to this, courts recognize that the mere fact that an insider does not engage in insider stock sales – or even purchases additional shares during the Class Period – does not undermine allegations of scienter.  *See*, *e.g*, *Buttonwood Tree Value Partners, LP v. Sweeney*, 2012 WL 13026910, at *2 (C.D. Cal. Dec. 10, 2012) ("the [c]ourt again rejects the proposition that a strong inference of scienter is negated by the fact that the [i]ndividual [d]efendants purchased and/or retained FRB stock during the [c]lass [p]eriod"); *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1378 (S.D. Fla. 2001) (rejecting argument that insider purchases negate inference of fraudulent intent); *see also In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 320 (S.D.N.Y. 2013) (finding that, while "under some circumstances [insider] purchases might suggest a lack of fraudulent intent … this possibility alone cannot counteract the circumstantial evidence of fraudulent intent described above; such a rule would create incentive for corporate officers to insulate themselves from liability by purchasing stock merely to negate an inference of fraud").

None of Defendants' cases stand for the proposition that the absence of insider sales negates an inference of scienter when viewing the complaint holistically.  Rather, the cases cited merely held that the allegations in those cases did not support allegations of motive or add to an inference of scienter.[32] Accordingly, the mere fact that certain Defendants did not sell shares or that Defendant McCartney did not dispose his entire holdings does not undermine the strong inference of scienter established by the foregoing allegations.[33]

---

[32] *See Hertz Global*, 905 F.3d at 121; *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014); *Oran v. Stafford*, 226 F.3d 275, 290 (3d Cir. 2000); *In re Advanta Corp. Sec. Litig*, 180 F.3d 525, 541 (3d Cir. 1999); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp.2d 549, 561 (S.D.N.Y. 2004); *In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383 (E.D.N.Y. 2003).

[33] In this respect, arguments that Defendants Wahl and Shea purportedly increased their holdings does not negate the strong inference of scienter based on the allegations detailed above.  Further, it is important to note that neither Wahl nor Shea spent any of their own money to make *any* open market purchases of HCSG common stock during the Class Period when it was trading at artificially inflated prices.  Instead, their holdings increased through the granting and exercising of options, obtained with strike prices far below the publicly

Nevertheless, the Complaint bolsters its compelling scienter allegations with allegations of motive, namely Defendant McCartney's stock sales totaling tens of millions of dollars.  ¶¶ 26, 326; *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 654 (E.D. Pa. 2015) ("[s]tock sales unusual in time and scope may give rise to an inference of scienter" (citing *Avaya*, 564 F.3d at 279)).  During the full period within which Healthcare Services was manipulating its EPS to avoid missing analyst consensus targets, from December 10, 2008 to May 11, 2017, Defendant McCartney sold or gifted more than 2.8 million shares for gross proceeds of nearly $71.3 million, more than $35 million of which occurred during the Class Period. ¶ 26.  This is an enormous profit, and Defendants' arguments to the contrary are legally and factually flawed.

First, Defendants' argument that McCartney's sales were not suspicious because he sold a similar number of shares during the Class Period as he sold during the five-year period as the preceding five-year period is misguided.  Defendants ignore allegations that their EPS manipulation occurred in the five plus years that preceded the Class Period.  ¶¶ 6, 72.  In fact, the starting date for the Class Period was limited to the applicable limitations period, not the period of wrongdoing.  Thus, the pre-Class Period is not a "clean" period for purposes of comparison.

In any event, McCartney's sales were suspiciously timed and suspicious in amount.  For example, McCartney sold 113,901 shares for gross proceeds of more than $5.2 million on May 11, 2017, between the date of the Monocle Report and the end of McCartney's term as Chairman.  ¶ 326.  Importantly, the sale occurred shortly after McCartney had been contacted by Monocle and when he was aware of the Monocle

---

traded price of HSCG common stock or, in Wahl's case, gifted shares from McCartney.  In the event the Court is interested in looking beyond allegations in or integral to the Complaint, the details of Wahl's and Shea's trading can be found not in the proxy statements cited by Defendants, but in the actual Form 4s filed with the SEC.  *See* HCSG Statements of Changes in Beneficial Ownership (Form 4s) for Defendants Wahl and Shea for the period 2014 through 2019, https://www.sec.gov/cgi-bin/srch-edgar?text=%22healthcare+services%22+AND+Wahl&first=2014&last=2020 (link to collection of Wahl's Form 4s) & https://www.sec.gov/cgi-bin/srch-edgar?text=%22healthcare+services%22+AND+%22Shea+john%22&first=2014&last=2020 (link to collection of Shea's Form 4s).

Report's findings and the fact that Monocle had reported the Company's EPS practices to the SEC. *Id.*[34]

This sale was larger than any sale of Healthcare Services' stock made by McCartney in over a year (*id.*) and dwarfed his 2016 compensation.[35]

Next, Defendants contend that Defendant McCartney's retention of stock following the May 11, 2017 transaction negates an inference of his scienter. As noted, since McCartney stepped down as Chairman, he no longer reports his trading. Thus, the public has no idea how many shares, if any, McCartney held at the close of the Class Period. Further, an argument that "stock sales did not represent a substantial portion of [the defendant's] holdings" raises a "factual issue that is also not properly decided at this stage of the litigation." *Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, 2018 WL 1071442, at *5 (N.D. Ill. Feb. 27, 2018).[36]

Finally, Defendant McCartney argues that gifts of stock show confidence in the Company's strength, but cites no authority for this proposition. Def. Br. at 32. Based on Lead Plaintiff's review of McCartney's public trading records, approximately 20% of his insider dispositions were via gift. Therefore, even if the Court credited McCartney's argument, the vast majority of insider sales would still support an inference of scienter. Moreover, because Defendants' motion is a 12(b)(6) motion to dismiss and absent discovery, Plaintiff cannot (and is not required at this stage to) determine specifically how, why or to whom McCartney's

---

[34] As Chairman (a corporate "insider" under SEC regulations), McCartney's stock transactions were required to be disclosed on an SEC Form 4. When he left that role and assumed the informal role of "Chairman Emeritus," McCartney was no longer subject to the SEC's reporting requirements. *See* 15 U.S.C. § 78p(a); 17 C.F.R. § 249.104. Thus, there is no public record of McCartney's transactions, if any, after May 31, 2017.

[35] *See* HCSG, Proxy Statement (Schedule 14A) (Apr. 17, 2017) at 13, https://www.sec.gov/Archives/edgar/data/731012/000073101217000048/hcsg2017def14a.htm (noting McCartney's 2016 compensation of $648,900. As Defendants' own cases recognize, insider sales far in excess of the executive's compensation can qualify as suspicious. *See Hertz Global*, 905 F.3d at 119 (citing *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006)).

[36] Any event, any increase in McCartney's holding was via the exercise of options, granted with strike prices far below the market price of HCSG's share price. For example, on November 21, 2014, he exercised options at a strike price of $6.068, when the stock was trading near $30 per share. *See* Defendants' Ex. 22.

46

shares were gifted and the surrounding circumstances of those gifts. In some instances, it appears shares were gifted to family members, like Wahl, but other shares may have been directed to charitable organizations, in which case McCartney would have directly benefited from the inflated stock price, by taking a larger charitable deduction. At this stage of the litigation, Defendants have provide no support for ignoring these transactions.

### C.      The Complaint Properly Pleads Loss Causation

Loss causation is "a causal connection between the material misrepresentation [or omission] and the loss [suffered]." *Urban Outfitters*, 103 F. Supp. 3d at 655. A complaint need only allege a "'short and plain statement' … provid[ing] the defendant with 'fair notice'" of the plaintiff's loss-causation theory. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (citation omitted). As the *Dura* Court recognized, pleading loss causation is "not meant to impose a great burden upon a plaintiff." *Dura*, 544 U.S. at 347.

As detailed above, Lead Plaintiff alleges that, during the Class Period, the Company's stock price was artificially inflated by Defendants' misrepresentations and omissions. *See* Section III.A. The Complaint further alleges that, as the EPS manipulation and its consequences were revealed, the artificial inflation came out of the Company's stock price in a series of partial corrective disclosures, each of which only partially revealed the Company's EPS manipulation as Defendants continued to misrepresent or conceal the Company's true EPS practices, internal control deficiencies and, after November 2017, the existence of the SEC investigation until the end of the Class Period on March 4, 2019. ¶¶ 337-42 (describing quarterly EPS results that missed analyst consensus after the start of the SEC investigation).

The final and most significant corrective disclosure occurred on March 4, 2019, when the Company revealed for the first time the long-running and ongoing SEC investigation into the precise practice at issue here – the manipulation of the Company's quarterly EPS. ¶¶ 14-15, 343. On this news, the Company's stock price plummeted by $4.96 per share (from $37.74 per share to $32.78 per share), a decline of more than 13% – the largest single-day percentage drop in the Company's history. ¶ 343. These allegations are

47

unquestionably sufficient to plead loss causation. *Urban Outfitters*, 103 F. Supp. 3d at 655-56.

Ignoring these clear allegations of loss caution, Defendants' entire loss causation argument rests on the fundamentally flawed premise that Defendants' fraud was fully revealed by the Monocle Report in March 2017, and that, from that time forward, the market fully understood that Healthcare Services was fraudulently manipulating its quarterly EPS to avoid missing analyst consensus estimates. *See* Def. Br. at 34-35. Relatedly, Defendants contend that there was no negative reaction in the Company's stock price in response to the Monocle Report. *See id.* Defendants' arguments do not withstand minimal scrutiny and must fail.

*First*, as discussed *supra* at 17, and as Defendants' admit (Def. Br. at 17), the Monocle Report did not reveal fraud – it only highlighted the suspicious nature of the consistent meeting of EPS consensus estimates. *Second*, Defendants' key factual premise, that there was no decline in Healthcare Services' stock price in response to the Monocle Report, is demonstrably false. The Monocle Report, which was issued after the market closed on March 22, 2017[37] and triggered a nearly 2% decline in the Company's stock price. ¶ 78.[38] *Third*, Defendants ignore the Complaint's allegations that the Company's stock price rose sharply – nearly 8% – in reaction to Defendant Wahl's denial of the Monocle Report and an analyst's question about whether the Company had inappropriately rounded up its EPS for more than a decade. ¶¶ 85-86.[39] *Fourth*, Defendants inexplicably ignore allegations that Defendants concealed the existence of the SEC investigation until the March 4, 2019 announcement. *See* Section III.A.3. There is unquestionably sufficient pleading of loss causation for those allegations given the direct revelation of the SEC investigation on March 4, 2019.

---

[37] *See also* Defendants' Ex. 1 (publication time-stamp of 5:48 p.m. Eastern time on March 22, 2017).

[38] While not specifically included within the Loss Causation section of the Complaint, the Monocle Report could rightly be considered an additional partial corrective disclosure. A full damage report will identify all curative disclosures after discovery.

[39] For loss causation purposes, a defendant's denial of misconduct may cause artificial inflation in a stock price. *See In re Tyco Int'l, Ltd.*, 2004 WL 2348315, at *14 (D.N.H. Oct. 14, 2004) (finding sufficient allegations of loss causation where the complaint alleged that the "stock price declined in part because investors concluded that they could no longer credit the company's denials of accounting misconduct").

*Fifth*, Defendants ignore the allegations of partial corrective disclosures in the quarterly earnings releases following the start of the SEC investigation in November 2017, which demonstrated that the Company had halted its improper EPS manipulation practices under the watchful eye of the SEC and began missing analyst EPS targets, resulting in declines in the Company's stock price. ¶¶ 337-42. *Finally*, any dispute regarding whether – and to what extent – the market reacted to news of fraud requires expert testimony, which is why loss causation is an issue for the trier of fact. *See De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *40 (D.N.J. Dec. 31, 2018) ("The Third Circuit has stated that loss causation is ordinarily an issue for the trier of fact."); *Urban Outfitters*, 103 F. Supp. 3d at 655 ("the issue of [loss] causation is usually reserved for the trier of fact") (citation and internal quotation marks omitted); *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 450 (D. Del. 2014) ("Third Circuit precedent instructs that loss causation is a fact intensive inquiry which is best resolved by the trier of fact").

### D.    The Complaint Sufficiently Alleges Control Person Liability

The Individual Defendants do not dispute that the Complaint adequately alleges that they are control persons of HCSG within the meaning of Section 20(a) of the Exchange Act. Instead, Defendants argue that Lead Plaintiff has not pled an underlying violation of Section 10(b). *See* Def. Br. at 35. As demonstrated above, Plaintiff has adequately alleged primary violations of Section 10(b), as well as sufficient allegations of each Individual Defendants' control over HCSG. Thus, this Court should sustain Plaintiff's control person liability claims. *See In re: Enzymotec Sec. Litig.*, 2015 WL 8784065, at *20 (D.N.J. Dec. 15, 2015).

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.[40]

---

[40] Should the Court grant Defendants' motion to dismiss in part or in whole, Plaintiff respectfully requests leave to amend. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) ("[I]n the event a complaint fails to state a claim, unless amendment would be futile, the District Court must give a plaintiff the opportunity to amend her complaint.").

49

DATED:  January 17, 2020

**SCHNADER HARRISON SEGAL & LEWIS LLP**

*/s/ Ira Neil Richards*

Ira Neil Richards
Arleigh P. Helfer III
1600 Market Street, Ste. 3600
Philadelphia, PA 19103
Telephone: (215) 751-2503
Facsimile: (215) 751-2205
Email: irichards@schnader.com
Email: ahelfer@schnader.com

*Counsel for Lead Plaintiff Utah Retirement Systems & Liaison Counsel for the Class*

and

**BERMAN TABACCO**

Nicole Lavallee (*Pro Hac Vice*)
Victor S. Elias (*Pro Hac Vice* to be submitted)
44 Montgomery Street, Suite 650
San Francisco, CA  94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email:  nlavallee@bermantabacco.com
        velias@bermantabacco.com

**BERMAN TABACCO**

Patrick T. Egan (*Pro Hac Vice*)
Steven J. Buttacavoli (*Pro Hac Vice*)
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
Email:  pegan@bermantabacco.com
        sbuttacavoli@bermantabacco.com

*Counsel for Lead Plaintiff Utah Retirement Systems & Lead Counsel for the Class*

50