**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UTAH RETIREMENT SYSTEMS, <br><br> Plaintiff, <br><br> v. <br><br> HEALTHCARE SERVICES GROUP, INC., DANIEL P. MCCARTNEY, THEODORE WAHL, JOHN C. SHEA, and MATTHEW J. MCKEE, <br><br> Defendants. | Case No. 2:19-cv-01227-ER <br><br> **ORAL ARGUMENT REQUESTED** |

**DEFENDANTS HEALTHCARE SERVICES GROUP, INC., DANIEL MCCARTNEY, THEODORE WAHL, JOHN SHEA, AND MATTHEW MCKEE'S REPLY IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT**

Robert L. Hickok (PA Bar No. 30101)
Jay A. Dubow (PA Bar No. 41741)
Joanna J. Cline (PA Bar No. 83195)
Daniel J. Boland (PA Bar No. 91263)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

*Attorneys for Defendants*
*Healthcare Services Group, Inc., Daniel P.*
*McCartney, Theodore Wahl, John C. Shea,*
*and Matthew J. McKee*

Dated:  March 2, 2020

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  LEGAL ARGUMENT ......................................................................................... 2

    A.   Lead Plaintiff's Case Is Built on an Alleged Scheme that Does Not Constitute Fraud. ........................................................................................ 2

    B.   Even Had Lead Plaintiff Sufficiently Alleged a Fraudulent Scheme, It Has Not Sufficiently Alleged an Actionable Material Misrepresentation or Omission. ................................................................................................... 4

        1.   The Statements Regarding EPS and Alleged "Management" of Labor Expenses Are Not Actionable. ......................................................... 5

            a.   The Company's EPS reporting did not contain material misstatements or omissions. .......................................................... 5

            b.   There are no material misstatements about the Company's management of labor expenses. ................................................... 10

        2.   The Alleged Omissions Regarding the SEC Investigation Are Not Actionable. ................................................................................... 11

            a.   There was no material misrepresentation or omission in the December 2018 Credit Agreement. ............................................ 11

            b.   There was no duty to disclose the SEC investigation earlier than the Company did. ............................................................... 14

    C.   The Amended Complaint's Allegations Do Not Give Rise to a Strong Inference of Scienter. ................................................................................ 20

        1.   Lead Plaintiff Does Not Sufficiently Plead Scienter as to Its EPS Rounding Allegations. ............................................................... 21

            a.   Lead Plaintiff's scienter allegations relate only to its theory of liability as to the alleged fraud, and do not support a strong inference of scienter. .......................................................... 21

            b.   Even when viewed collectively, Lead Plaintiff's allegations fail to meet the PSLRA's heightened standard for pleading scienter. ..................................................................................... 23

                (1)   Lead Plaintiff has failed to rebut Defendants' arguments regarding individual transaction histories. ......................................................................... 23

**Page**

(2)    Lead Plaintiff's other scienter allegations do not raise a strong inference of conscious or reckless behavior................................................................................ 24

2.    Lead Plaintiff Does Not Sufficiently Plead Scienter as to Its SEC Investigation Allegations. .......................................................... 29

D.    The Amended Complaint Does Not Adequately Plead Loss Causation. ............... 31

1.    Lead Plaintiff Does Not Adequately Plead Loss Causation with Respect to EPS Rounding and Expense Management. ............................ 31

2.    Lead Plaintiff Does Not Adequately Plead Loss Causation with Respect to the SEC Investigation. ............................................................. 34

E.    Lead Plaintiff Should Not Be Granted Leave to Amend. ..................................... 35

III.    CONCLUSION ............................................................................................................... 36

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999) ....................................................6, 24

*In re AFC Enters. Sec. Litig.*, 348 F. Supp. 2d 1363 (N.D. Ga. 2004) ....................................25, 28

*In re Amarin Corp. PLC Sec. Litig.*, No. 13-6663, 2016 U.S. Dist. LEXIS 55568 (D.N.J. Apr. 26, 2016) ................................................................................................................20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...............................................................................................2

*In re AXIS Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576 (S.D.N.Y. 2006) ...............................................................................................................................................2, 20

*In re Bank of Am. Corp. Secs., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260 (S.D.N.Y. 2010) ............................................................................................................................12

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)......................................................................................7

*In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323 (W.D.N.Y. 2008) ...........................32

*In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711 (S.D.N.Y. 2015).........................16, 17, 18, 19

*Bonanno v. Cellular Biomedicine Grp., Inc.*, No. 15-cv-01795-WHO, 2016 U.S. Dist. LEXIS 66841 (N.D. Cal. May 20, 2016) .........................................................................33

*In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148 (S.D.N.Y. 2008) ......................27

*Carpenters Pension Trust Fund for N. Cal. v. Allstate Corp.*, No. 16 C 10510, 2018 U.S. Dist. LEXIS 31195 (N.D. Ill. Feb. 27, 2018) ..........................................................24

*Channel Medsystems, Inc. v. Boston Sci. Corp.*, No. 2018-0673, 2019 Del. Ch. LEXIS 1394 (Del. Ch. Dec. 18, 2019)................................................................................12, 14

*City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159 (3d Cir. 2014)........................................13

*City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245 (10th Cir. 2001)........................................30

*In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005) ....................................................................25

*In re Discovery Labs. Sec. Litig.*, No. 06-1820, 2006 U.S. Dist. LEXIS 79823 (E.D. Pa. Nov. 1, 2006)..........................................................................................................................8

*Eng v. Edison Int'l*, No. 3:15-cv-01478, 2017 U.S. Dist. LEXIS 69196 (S.D. Cal. May 5, 2017)................................................................................................................................32

Page(s)

*Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655 (D.S.C. 2016) ....................................26

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)..........................................................21

*Espinoza v. Whiting*, 8 F. Supp. 3d 1142 (E.D. Mo. 2014) .............................................26

*Fain v. USA Techs., Inc.*, 707 Fed. App'x 91 (3d Cir. 2017) ..........................................28

*Fan v. StoneMor Partners LP*, 927 F.3d 710 (3d Cir. 2019).............................................7

*Feasby v. Industri-Matematik Int'l Corp.*, No. 99 Civ. 8761, 2003 U.S. Dist. LEXIS 22791 (S.D.N.Y. Dec. 19, 2003) ..................................................................20

*Fogel v. Vega*, 759 Fed. App'x 18 (2d Cir. 2018) ...............................................................6

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) ...........................................7

*Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008) ...................................8

*Garden City Emps. Ret. Sys. v. Psychiatric Sols., Inc.*, No. 3:09-00882, 2011 U.S. Dist. LEXIS 35661 (M.D. Tenn. Mar. 31, 2011)..........................................................24

*In re Goodyear Tire & Rubber Co. Sec. Litig.*, 436 F. Supp. 2d 873 (N.D. Ohio 2006) ..........................................................................................................................28

*Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999)...........................................26

*Gruber v. Gilbertson*, No. 16-cv-9727, 2018 U.S. Dist. LEXIS 45677 (S.D.N.Y. Mar. 20, 2018)........................................................................................................27

*In re Hertz Global Holdings, Inc.*, 905 F.3d 106 (3d Cir. 2018) ......................................30

*In re Hertz Global Holdings, Inc. Sec. Litig.*, No. 13-7050, 2017 U.S. Dist. LEXIS 65156 (D.N.J. Apr. 27, 2017) ...............................................................................27

*Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715 (Del. Ch. 2008)......................14

*In re IBP, Inc. S'holder Litig. (IBP v. Tyson Foods, Inc.)*, 789 A.2d 14 (Del. Ch. 2001) .............................................................................................................................14

*Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009)......................10

*In re Investment Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596 (S.D.N.Y. 2017) ........18, 19, 20

*Iron Workers Ben. & Pension Fund—Iron Workers Dist. Council Phila. & Vicinity & Anadarko Petro. Corp.*, 788 Fed. App'x 268 (5th Cir. 2019)..............................21

*In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1 (S.D.N.Y. 2016)...15, 16, 17, 18, 19, 20, 30

**Page(s)**

*Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014)..................................................34

*Martin v. GNC Holdings, Inc.*, 757 Fed. App'x 151 (3d Cir. 2018)................................25

*Martin v. GNC Holdings, Inc.*, No. 2:15-cv-01522, 2017 U.S. Dist. LEXIS
145530 (W.D. Pa. Sept. 8, 2017) ...................................................................31

*Menaldi v. Och-Ziff Capital Mgmt. Grp., LLC*, 164 F. Supp. 3d 568 (S.D.N.Y.
2016) ...........................................................................................................17, 27

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049 (9th Cir. 2008)............32

*Mild v. PPG*, No. 2:18-cv-04231-RGK-JEM, 2018 U.S. Dist. LEXIS 217529
(C.D. Cal. Dec. 21, 2018) ........................................................................8, 10, 11, 25

*In re Milestone Sci. Sec. Litig.*, 103 F. Supp. 2d 425 (D.N.J. 2000).............................26

*In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314 (3d Cir. 2002) .........................................35

*In re OCA, Inc.*, No. 05-2165, 2006 U.S. Dist. LEXIS 90854 (E.D. La. Dec. 14,
2006) ...............................................................................................................25

*In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621 (S.D.N.Y. 2008) ...............................8

*In re Plains All Am. Pipeline, LP*, 245 F. Supp. 3d 870 (S.D. Tex. 2017) ...................12

*Rabin v. Nasdaq OMX PHLX LLC*, 182 F. Supp. 3d 220 (E.D. Pa. 2016)....................22

*SEC v. DiMaria*, 207 F. Supp. 3d 343 (S.D.N.Y. 2016)...........................................8, 10

*SEC v. Espuelas*, 579 F. Supp. 2d 461 (S.D.N.Y. 2008) ..............................................11

*SEC v. Ustian*, 229 F. Supp. 3d 739 (N.D. Ill. 2017)....................................................15

*Strougo v. Lannett Co.*, No. 18-3635, 2019 U.S. Dist. LEXIS 40485 (E.D. Pa.
Mar. 13, 2019)....................................................................................................7

*Teamsters Local 617 Pension & Funds v. Apollo Grp., Inc.*, 633 F. Supp. 2d 763
(D. Ariz. 2009)..................................................................................................32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)...............................21

*Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029 (N.D. Cal.
2016) ................................................................................................................27

*Utesch v. Lannett Co.*, 385 F. Supp. 3d 408 (E.D. Pa. 2019) .......................................27

*White v. H&R Block, Inc.*, No. 02 Civ. 2289, 2004 U.S. Dist. LEXIS 14522
(S.D.N.Y. July 28, 2004) ..................................................................................11

**Page(s)**

*In re Zillow Grp., Inc. Sec. Litig.*, No. C17-1387, 2019 U.S. Dist. LEXIS 67197
(W.D. Wash. Apr. 19, 2019)................................................................................26

STATUTES

15 U.S.C. § 78u-4 ...........................................................................................................21, 32

OTHER AUTHORITIES

Ehsan H. Feroz et al., *The Financial and Market Effects of the SEC's Accounting
and Auditing Enforcement Releases*, 29 J. Acct. Res. 107 (1992)............................................34

*Stock Market News for March 24, 2017*, Nasdaq (Mar. 24, 2017) ..................................................32

## I.    INTRODUCTION

Lead Plaintiff's Opposition Brief not only fails to rebut the arguments that Defendants presented in their Opening Brief, but its circular logic further exposes fatal inconsistencies in Lead Plaintiff's theory of the case.

- Lead Plaintiff's Amended Complaint relies on the Monocle Report's conclusions for the very foundation of its case—including for the proposition that Defendants were knowingly committing a fraudulent EPS rounding scheme—but then Lead Plaintiff argues in its Opposition Brief that the Monocle Report was not sufficient to reveal the alleged fraud to the market because it did not go so far as to conclude there had been fraud.  The Monocle Report was itself based on publicly-available information, and did not contend that there was any material misstatement of the Healthcare Services Group, Inc.'s ("HCSG" or "the Company") reported EPS or that the alleged rounding of EPS was unlawful.

- Lead Plaintiff then fails to allege any facts sufficient to show that any alleged fraud actually occurred.  Though the Amended Complaint trumpets information mined from four alleged former-employee Confidential Witnesses, it fails to link that information to the alleged rounding scheme.  Lead Plaintiff is unable in its Opposition Brief to rebut the fact that the Confidential Witnesses had no role in the Company's accounting department, no basis to speak to the Company's EPS calculations, no ability to tie Lead Plaintiff's operational cost management allegations to accounting fraud, and no connection to the Monocle Report.

Despite the failure to allege any material misstatement of EPS or to tie the alleged EPS rounding to any fraudulent conduct, Lead Plaintiff then circularly argues that the Company's failure to disclose the alleged rounding scheme is further proof of fraud and scienter. But without alleging evidence sufficient to show that a scheme existed in the first place, its allegations concerning the non-disclosure of this scheme are meaningless.

Lead Plaintiff's position suffers from further inconsistencies and inadequacies. For instance, though the Amended Complaint alleges an efficient market closely watched by analysts (in order to get the benefit of the presumption of reliance), Lead Plaintiff argues in its Opposition Brief that the market was impervious to the publicly-available data in the Company's filings and in analyst commentary.  Moreover, Lead Plaintiff dodges the fact that the egregious

fact patterns that underlie the cases it cites—with insider stock transactions, restated financials, and governmental findings of wrongdoing—are not present here.  Lead Plaintiff's emphatic indignation and prolixity cannot obscure the reality that it fails to sufficiently plead an intentionally misleading material misstatement that caused any loss.

## II.    LEGAL ARGUMENT

### A.    Lead Plaintiff's Case Is Built on an Alleged Scheme that Does Not Constitute Fraud.

Lead Plaintiff's theory of the case is premised on an attempt to cobble together allegations of a course of conduct pursuant to which, according to Lead Plaintiff, Defendants: (a) took operational measures to manage labor costs (such as reducing staff hours worked at a few of the over three thousand healthcare facilities served by the Company); (b) during the quarter; (c) with the goal of increasing net income across the Company at the end of the quarter; (d) just slightly enough so that EPS calculations would result in a *tenth of a cent* that was 5 or greater; and (e) would therefore be rounded up to meet market analysts' consensus estimates. Even accepting these allegations as true, as Defendants must at the motion to dismiss stage,[1] Lead Plaintiff's allegations do not plead a fraudulent scheme, and its claims premised upon the non-disclosure of this scheme necessarily fail.  *See, e.g.*, *In re AXIS Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) ("In the present case, each of plaintiffs' nondisclosure claims are entirely dependent upon the predicate allegation that AXIS participated

---

[1] The Opposition Brief makes numerous references to "uncontested allegations," suggesting that HCSG's failure to contest a factual allegation is a concession.  Lead Plaintiff advertently ignores the fact that given the procedural posture of the case, Defendants are not permitted at this time to contest allegations of the Complaint and must accept them as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  So that Lead Plaintiff fully understands Defendants' position, they do in fact contest all of the material allegations of the Amended Complaint.

in an anticompetitive scheme to drive other insurance companies out of the market.  If the complaint fails to allege facts which would establish such an illegal scheme, then the securities law claims premised on the *nondisclosure* of the alleged scheme are fatally flawed.").

Lead Plaintiff's case is centered around the Monocle Report and the conclusions its authors draw about HCSG's EPS reporting based on publicly-reported data.  But Lead Plaintiff concedes that the Monocle Report on its own is insufficient to support a fraud claim, noting that "[w]hile the Monocle Report raised concerns that the Company's consistent meeting of EPS numbers was highly suspicious, the Report did not conclude that the Company's EPS results were the product of fraud and did not explain how the rounding up occurred.  The Report therefore does not constitute evidence of fraud." Opp. Br. at 17.  Defendants agree with Lead Plaintiff that the conduct described in the Monocle Report does not state a claim for fraud, and therefore the Amended Complaint does not state a claim either.

Recognizing this problem, Lead Plaintiff attempts to support its allegations of "fraudulent" EPS rounding with allegations of operational labor cost management.  Lead Plaintiff includes allegations from four Confidential Witnesses, some of whom purportedly provide information regarding the Company's management of labor costs.  The Confidential Witness statements, however, do nothing to help Lead Plaintiff satisfy the PSLRA's pleading requirement and, conversely, highlight the deficiencies in the Amended Complaint's allegations. Indeed, based on the Amended Complaint's allegations:

- None of the four Confidential Witnesses were in HCSG's accounting department;

- The four Confidential Witnesses had no knowledge of or role in HCSG's calculation of EPS and provide no facts connecting any of HCSG's alleged management of labor expenses to EPS calculations;

- The four Confidential Witnesses had no knowledge of HCSG's period-end closing procedures;

-3-

- Three of the Confidential Witnesses have nothing to say about HCSG's accounting for its labor expenses but, instead, comment only on HCSG's actual reduction of such expenses (*e.g.*, reducing headcount, cutting hours worked by hourly employees, *see* Am. Compl. ¶¶ 114–115). They provide no explanation as to how alleged operational changes in the middle of a quarter could have been a viable mechanism for manipulating EPS at quarter end;

- The only Confidential Witness who discusses the accrual for labor expenses admittedly did not understand the accrual process (Am. Compl. ¶ 122), did not state anything about how the accrual impacted EPS, and stated that the accruals reflected in the Monthly Operating Statements were "adjusted both downward *and upward*" (Am. Compl. ¶ 122 (emphasis added))—the latter of which would have *reduced* net income and EPS, contrary to Lead Plaintiff's theory of the case.

At bottom, the Confidential Witness statements do nothing to further Lead Plaintiff's allegations about improper rounding of EPS or any misrepresentation of HCSG's labor expenses to artificially increase EPS. Nor do they have any connection to the Monocle Report.

The failure of Lead Plaintiff's predicate allegations regarding improper conduct with respect to EPS rounding dooms Lead Plaintiff's claim that HCSG's reporting of EPS was fraudulent. The Amended Complaint should be dismissed with prejudice.

**B.    Even Had Lead Plaintiff Sufficiently Alleged a Fraudulent Scheme, It Has Not Sufficiently Alleged an Actionable Material Misrepresentation or Omission.**

The anchor of any 10b-5 claim is an alleged misrepresentation or omission. Lead Plaintiff here does not dispute that the allegations of the Amended Complaint boil down to three supposed misstatements or omissions: statements regarding EPS and net income and, relatedly, "management" of the Company's labor expenses; and statements involving the Company's alleged failure to disclose a pending SEC investigation.[2]

---

[2] Lead Plaintiff identifies statements regarding internal controls as another category of alleged misstatements (*see* Opp. Br. at 13), but claims regarding these alleged statements are

Moreover, Lead Plaintiff fails to rebut Defendants' arguments as to why each of these groups of statements is legally insufficient to be the basis for a claim:  As to the first and second categories, there were no misstatements or omissions—there is no allegation that the rounding of EPS or documentation of labor expenses was mathematically incorrect.  Indeed, facts regarding the Company's EPS practices and labor costs were available to what Lead Plaintiff concedes was an efficient market before the publication of the Monocle Report that is the foundation of Lead Plaintiff's Amended Complaint, and the market did not react adversely to the Monocle Report.[3]

As to the third category—the alleged failure to disclose an SEC investigation—the omissions are not actionable because the Company was under no duty to disclose this investigation, and the imposition of such a duty under the circumstances that Lead Plaintiff alleges would be a radical departure from existing case law.

### 1.    The Statements Regarding EPS and Alleged "Management" of Labor Expenses Are Not Actionable.

#### a.    The Company's EPS reporting did not contain material misstatements or omissions.

The first category of alleged misstatements/omissions relates to EPS rounding.[4] To the extent Lead Plaintiff's allegations suggest that the exercise of rounding the EPS quotient itself was a misstatement, that argument fails.  Even had Lead Plaintiff properly alleged some

dependent upon Lead Plaintiff's EPS allegations and fail for the same reasons those allegations fail.

[3] For a discussion of the lack of statistical significance of the fluctuation in stock price after the issuance of the Monocle Report, see *infra* Section II.D.1.

[4] Contrary to Lead Plaintiff's assertion, Defendants have not conceded the falsity of HCSG's reporting on EPS (*see* Opp. Br. at 14), but are constrained to accept Lead Plaintiff's allegations as true.

wrongdoing on the part of the Company, there is no allegation that the rounding of the tenths of a cent cited by Lead Plaintiff was mathematically unsound or inaccurate.  Without an allegation of inaccuracy, Lead Plaintiff has no claim for a misrepresentation.  *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999) ("Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b)."); *Fogel v. Vega*, 759 Fed. App'x 18, 24 (2d Cir. 2018) ("Accurately reported financial statements . . . cannot become actionable simply because companies do not simultaneously disclose some wrongdoing that may have contributed to the company's financial performance.").

To the extent Lead Plaintiff alleges that the Company's management of costs and revenue led to inaccurate reporting of net income, which in turn caused EPS calculations to always result in a tenth of a cent that was 5 or greater and would therefore be rounded up, that conduct was disclosed to the market in the Monocle Report published on March 22, 2017.  That date was over *two years* before the Company issued its 8-K disclosing both the pendency of the SEC investigation and the fact that there would be a delay in filing the Company's 10-K, and the Company's stock experienced the price drop that is at the center of Lead Plaintiff's allegations.[5] Given this long delay and the absence of any stock price reaction, the alleged misstatements and

---

[5] Lead Plaintiff erroneously contends that the 13.14% drop in HCSG's stock after disclosure of the SEC investigation was the largest one day stock price drop in HCSG's history. Opp. Br. at 10–11.  In fact, on April 16, 2008, the Company's stock price dropped approximately 24%, from its April 15, 2008 closing price of $13.60 to a closing price of $10.38; on May 2, 2000, the Company's stock dropped approximately 22%, from its May 1, 2000 closing price of $0.94 to a closing price of $0.73; on January 18, 2000, the Company's stock dropped approximately 14%, from its January 14, 2000 closing price of $1.80 to a closing price of $1.54; and on April 10, 2000, the Company's stock price dropped approximately 14%, from its April 7, 2000 closing price of $1.06 to a closing price of $0.91.  *See* Ex. 1, Compilation of Stock Charts. Lead Plaintiff makes no allegation that these price drops were the result of fraud.

omissions with regard to EPS reporting were not material as a matter of law under the Third

Circuit's 2019 decision in *StoneMor* and related cases.  *See* HCSG Opening Br. at 14–15.

Lead Plaintiff largely ignores *StoneMor*, addressing it only in a footnote, claiming

that the public disclosures as to HCSG in 2017 were published by the authors of the Monocle

Report rather than by the Company, such that *StoneMor*'s holding is inapposite.  This reasoning

ignores the fact that the Monocle Report is derived from publicly-available facts and information

*provided by the Company*, "clear[ly] and consistent[ly]" every quarter.  *See Fan v. StoneMor*

*Partners LP*, 927 F.3d 710, 717 (3d Cir. 2019).  Moreover, Lead Plaintiff's own "fraud on the

market" theory of reliance—a necessary element of its claim—assumes an efficient market that

rapidly incorporates information available to investors, even from sources other than the

Company itself.[6]

---

[6] Lead Plaintiff relies on the U.S. Supreme Court's holding in *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988), that because market prices incorporate all publicly-available information and therefore reflect the true value of publicly-traded stock, securities fraud class action plaintiffs are permitted a rebuttable presumption that they relied on defendant's alleged false statements and misrepresentations, even when unable to show direct reliance.  Am. Compl. ¶¶ 345–348.  Indeed, Lead Plaintiff concedes that analysts "immediately questioned the Company about it [sic] practices in light of the Monocle Report."  Opp. Br. at 23; *see also* Am. Compl. ¶ 346 ("Through the Class Period, the market consistently followed the Company, *including securities analysts and the business press*." (emphasis added)).

Lead Plaintiff's attempt to take refuge in *Strougo v. Lannett Co.*, No. 18-3635, 2019 U.S. Dist. LEXIS 40485 (E.D. Pa. Mar. 13, 2019) fails.  In *Strougo*, plaintiffs alleged that defendant Lannett, a seller of branded and generic pharmaceutical drugs, made material misstatements regarding its relationship with drug supplier JSP, suggesting that JSP was a significant shareholder of Lannett which was in fact not the case.  *Id.* at *18–19.  In response, Lannett argued that the market was aware of JSP's shareholder status at the time the alleged misstatements were made, in light of a single sentence from a single blog post stating "JSP does not show up as a holder."  *Id.* at *42.  The *Strougo* court found this single sentence insufficient to ground a truth on the market defense.  The Monocle Report, however, provides a significantly more detailed analysis, expressly notes that it raised its conclusions with the SEC, as discussed further in Section II.D.1, *infra*, and caused securities analysts to question the Company about its practices.  *Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000), another case relied on by Lead Plaintiff, is similarly distinguishable.  Although the *Ganino* court found the defendant's truth on the market defense unavailing, this finding was premised on the court's holding that the

Facing the dead end presented by *StoneMor*, Lead Plaintiff turns to cases that stand for the unremarkable propositions that under certain circumstances, stock drops after a disclosure can support a claim of materiality, and EPS may be material to investors. *See* Opp. Br. at 15–16. Defendants do not quibble with those concepts generally; but, those propositions do not help Lead Plaintiff here, where the alleged stock drop happened years after the disclosure, materiality is foreclosed by the truth on the market defense,[7] and there are no allegations of restatements of financials, as was the case in *Mild v. PPG*, No. 2:18-cv-04231-RGK-JEM, 2018 U.S. Dist. LEXIS 217529, at *11–12 (C.D. Cal. Dec. 21, 2018) and *SEC v. DiMaria*, 207 F. Supp. 3d 343, 350 (S.D.N.Y. 2016).

Lead Plaintiff next argues that the inclusion of the SEC investigation into EPS rounding in the 2018 10-K's list of Risk Factors is a concession of materiality as to the EPS

---

corrective statements cited by the defendants were themselves arguably misleading. *Id.* at 167–68. Lead Plaintiff here does not allege that the Monocle Report is misleading or misrepresents the alleged EPS rounding.

[7] Contrary to Lead Plaintiff's assertions, the truth on the market defense is appropriate on a motion to dismiss, particularly where, as here, allegations of public information are central to, and form the basis of, the allegations of the Amended Complaint. The relevant inquiry is not whether the truth was absorbed by the market, but whether it was available to the market. *See, e.g.*, *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 632 n.61 (S.D.N.Y. 2008) (granting motion to dismiss). The *Pfizer* court noted that plaintiffs, in their effort to identify allegedly omitted information, relied entirely on sources that were available publicly during the class period. "Indeed, *analysts' reports* acknowledged the *conflicting evidence* of [the efficacy of the drug at issue in the litigation]. According to plaintiffs, such reports were 'publicly available and entered the public marketplace.'" *Id.* at 633; *see also Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612 (S.D.N.Y. 2008) (granting motion to dismiss complaint with prejudice, and noting "Wilby's departure was already publicly reported in several news articles, including an article in Fortune Magazine on January 30, 2006, prior to the Secondary Offering. Defendants therefore had no duty under the securities laws to disclose Wilby's planned departure." (citation omitted)); *In re Discovery Labs. Sec. Litig.*, No. 06-1820, 2006 U.S. Dist. LEXIS 79823, at *34–36 (E.D. Pa. Nov. 1, 2006) (granting motion to dismiss based on public reports of facility problems and the widely known fact that the company would need to comply with FDA regulations to obtain approval for the drug, the court found that the alleged misstatements related to those issues were not actionable).

rounding itself. But the 10-K merely conveys that the ongoing SEC investigation into alleged EPS rounding has become a significant risk factor for the Company, in light of the potential for sanctions, distractions, and third-party claims.[8] It does not "concede[] the materiality of the alleged EPS misconduct" (Opp. Br. at 16), or in any way suggest that the Company had been engaging in fraud.

Finally, Lead Plaintiff takes aim at Defendant Wahl's short exchange with an analyst during an earnings call and attempts to contort it into a misstatement by Defendant Wahl and a failure to correct by Defendant McKee. Neither effort has legs. In response to an analyst's question about "some of the reports that came out about the company quarterly results being rounded up," Wahl merely stated that he was not sure which report the analyst meant by "some of the reports" and referred the analyst to the Company's track record over the prior 10 years with respect to various financial metrics. Lead Plaintiff's repeated mantra that Wahl "feigned ignorance" of the Monocle Report is belied by the very transcript passage that Lead Plaintiff

---

[8] The Company's 2018 10-K includes the following statement concerning the SEC investigation:

> Beginning in November 2017, the Company has been in dialogue with the SEC regarding EPS calculation, rounding and reporting practices and in March 2018 we learned that the SEC had opened a formal investigation into these matters. . . . [T]he SEC's investigation is ongoing and there can be no assurance that the SEC or another regulatory body will not make further regulatory inquiries or pursue further action that could result in significant costs and expenses including potential sanctions or penalties as well as distraction to management. In addition, the Company may be subject to litigation from third parties related to the matters under review by the SEC. Accordingly, the ongoing SEC investigation and/or any related litigation could adversely affect or cause variability in our financial results.

Ex. 2, FY 2018 Form 10-K, at 12.

cites.[9]  Relatedly, McKee had no obligation to make an affirmative correction because Wahl's statement was not inaccurate.  Lead Plaintiff relies on cases that involved the duty to correct a specific, provably false statement (*see* Opp. Br. at 21 n.13), but Lead Plaintiff has not alleged such a statement here.

**b.     There are no material misstatements about the Company's management of labor expenses.**

As noted in Defendants' Opening Brief, Lead Plaintiff attempts to bolster its allegations regarding EPS by implying that the alleged EPS rounding was done in concert with efforts by the Company to "manage" labor expenses.  Lead Plaintiff does not, however, allege that the Company inaccurately reported its labor expenses.  Rather, the conduct Lead Plaintiff alleges relates to operational decisions aimed at managing labor expenses, not manipulative accounting designed to misrepresent HCSG's actual labor expenses or to reverse engineer a particular result.  *See* HCSG Opening Br. at 23.  HCSG never concealed the fact that, like most companies, it maintained profitability through internal cost reduction strategies, noting in its SEC filings that "[o]ur business strategy focuses on growth and improving profitability through . . . maintaining internal cost reduction strategies at our various operational levels."  *See, e.g.*, Ex. 3, FY 2014 Form 10-K, at 14.  Lead Plaintiff cites no support for the proposition that a company may not operationally manage its labor costs.

The cases Lead Plaintiff does cite—*DiMaria* and *Mild*—involved egregious facts with *post hoc* accounting decisions designed to back into a certain result.  *See, e.g.*, *DiMaria*, 207 F. Supp. 3d at 357 ("DiMaria's alleged conduct crosses the line from corporate officers'

---

[9] Wahl did not make any statements similar to those made in *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 269–72 (3d Cir. 2009).  *Avaya* is distinguishable because in that case the defendant specifically denied any changes in pricing, when in fact unusual discounting was taking place.  Here, there are no such allegations.

'common practice' of taking 'affirmative action to meet revenue, earnings, or profit estimates,' to consciously, falsely creating the appearance that [the company] was meeting its targets when he knew that was not the case." (quoting *SEC v. Espuelas*, 579 F. Supp. 2d 461, 474 (S.D.N.Y. 2008))); *Mild*, 2018 U.S. Dist. LEXIS 217529, at *2–5 (alleging material misstatement of income from continuing operations and adjusted EPS, based on defendant's "improper reclassification of gains from income from discontinued operations to income from continuing operation" and "improper shifting of expenses," causing defendant to restate its financials).  The facts in those two cases are nothing like the operational cost management Lead Plaintiff alleges here.[10]

> **2.      The Alleged Omissions Regarding the SEC Investigation Are Not Actionable.**

> **a.      There was no material misrepresentation or omission in the December 2018 Credit Agreement.**

Lead Plaintiff states the December 2018 Credit Agreement "includes an express representation that the Company was not subject to any governmental investigations."  Opp. Br. at 27; *see also id.* at 28 ("This statement [in the Credit Agreement] is an unambiguous, express representation that there is no governmental investigation pending.").  ***That is just simply not true*** as the Credit Agreement expressly limited the parties' representations to investigations that "could reasonably be expected to result in any Material Adverse Change."  ECF No. 33-4 at 134;

---

[10] The alleged conduct regarding labor expenses was also publicly disclosed in several publicly-filed lawsuits from 2013 on, such that the market was already aware of the conduct Lead Plaintiff claims the Company should have disclosed.  *See* HCSG Opening Br. at 26 n.13; *White v. H&R Block, Inc.*, No. 02 Civ. 2289, 2004 U.S. Dist. LEXIS 14522, at *36–37 (S.D.N.Y. July 28, 2004) (granting motion to dismiss, and noting that "public lawsuits brought by public filings in public courts" rendered the defendant's alleged misrepresentations concerning the subject matter of those public lawsuits immaterial, as the defendant's allegedly improper conduct was not concealed from investors); *see also* Ex. 4, FY 2013 Form 10-K, at 15 (noting that HCSG was "involved in various . . . legal proceedings, including labor and employment").

*see In re Plains All Am. Pipeline, LP*, 245 F. Supp. 3d 870, 912 (S.D. Tex. 2017) (finding that a "material adverse effect" qualifier in the contract must be considered when assessing whether a statement was misleading at the time it was made).

The Amended Complaint has not pled, nor can it plead, that in December 2018, HCSG reasonably expected the SEC investigation to result in a "Material Adverse Change" as that term is defined in the Credit Agreement. *See* HCSG Opening Br. at 7 n.6. Instead, Lead Plaintiff argues that the alleged cessation of the practice of manipulating EPS and the filing of an 8-K proves that the investigation was "a material matter." Opp. Br. at 29. However, materiality and a material adverse effect as defined in the Credit Agreement are not synonymous. *See Channel Medsystems, Inc. v. Boston Sci. Corp.*, No. 2018-0673, 2019 Del. Ch. LEXIS 1394, at *61–62 (Del. Ch. Dec. 18, 2019) (declining to apply a disclosure-based standard of materiality in determining whether there had been a material adverse effect because the two concepts are analytically distinct). If Lead Plaintiff was correct that these two concepts were synonymous, every time a company filed an 8-K it could be in breach of its contractual representations in MAE clauses. The Amended Complaint does not plead any facts to connect its allegation that the investigations were material to the specific definition of a material adverse change. *See In re Plains*, 245 F. Supp. 3d at 912 (dismissing claim that the legal compliance statement in an underwriting agreement was misleading because plaintiffs failed "to identify with particularity . . . the specific reason that . . . regulatory violations would reasonably be expected to produce a material adverse effect when the statements were made"); *In re Bank of Am. Corp. Secs., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 308 (S.D.N.Y. 2010) (finding that plaintiffs failed to plead with specificity why and how defendants fraudulently failed to comply with a

-12-

contractual warranty against a material adverse effect). Instead, the Amended Complaint simply ignores the language containing the material adverse change provision.

In its Opposition Brief, Lead Plaintiff advances the argument that the concealment of the SEC investigation "*could* have a 'material adverse effect upon the validity or enforceability' of the Agreement" thereby giving the lender a basis for invalidating the Agreement. Opp. Br. at 29 (emphasis added). However, if there had been a material adverse event, such an event would have triggered a default under the Agreement. Notably, the Amended Complaint does not allege any such default. Nor has an event of default occurred, as evidenced by the absence of any public filing reporting such a default. Accordingly, the Amended Complaint fails to plead any material misrepresentation or omission with respect to HCSG's warranty in the Credit Agreement.

Further, any amendment of the Complaint would be futile because Lead Plaintiff cannot plead facts to support a finding that HCSG's representation in the Credit Agreement was misleading, for two reasons. First, the representation in the Credit Agreement, much like the representation in its Forms 10-K that HCSG "believes it is not a party to . . . any pending . . . governmental examination that would have a material adverse effect on the Company's consolidated financial condition or liquidity," is an opinion of HCSG. In the Third Circuit, opinions are only actionable under the securities laws if "they are not honestly believed and lack a reasonable basis." *See City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014). Lead Plaintiff has not pled facts that show that the Company did not honestly believe its representation that the pending SEC investigation was not expected to result in a material adverse change, or that it lacked a reasonable basis for this view.

-13-

Second, case law supports a finding that the Company would not expect a material adverse change to result from the SEC investigation.  Even if the SEC investigation ultimately were to result in penalties or other sanctions against the Company, courts interpreting material adverse change clauses require a "strong showing" that the effect "substantially threaten[ed] the overall earnings potential of the target in a durationally-significant manner."  *See In re IBP, Inc. S'holder Litig. (IBP v. Tyson Foods, Inc.)*, 789 A.2d 14, 68 (Del. Ch. 2001) ("A short-term hiccup in earnings should not suffice; rather the Material Adverse Effect should be material when viewed from the longer-term perspective . . . ."); *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 738 (Del. Ch. 2008) ("[For] a significant decline in earnings . . . . to constitute a material adverse effect, poor earnings results must be expected to persist significantly into the future.").  The mere risk of a material adverse effect does not suffice.  *See Channel Medsystems, Inc.*, 2019 Del. Ch. LEXIS 1394, at *63.  Here, Lead Plaintiff cannot allege anything that approaches a material adverse change as defined by the case law.  As such, this claim should be dismissed.

> **b.      There was no duty to disclose the SEC investigation earlier than the Company did.**

As noted in HCSG's Opening Brief, a government investigation, without more, does not trigger a generalized duty to disclose.[11]  *See* HCSG's Opening Br. at 18–22; *In re Lions*

---

[11] Lead Plaintiff cherry picks a single analyst report that stated that the announcement of the SEC investigation, and its timing, was "disappointing."  Opp. Br. at 11.  This analyst's opinion does not give rise to a legal duty to disclose.  That is particularly true here, where the weight of analyst commentary was unconcerned with the March 4, 2019 disclosure, and analysts noted that the underlying allegations of strategic rounding had been previously disclosed and the effects of the alleged strategic rounding were "immaterial."  Ex. 5, *Healthcare Services' Delayed 10-K Bad, Not Terrible News, Says Baird*, The Fly (Mar. 4, 2019) ("Baird analyst Andrew Wittmann notes that Healthcare Services' shares were under pressure tied to a delayed 10-K. However, the delay stems from SEC inquiry around EPS rounding, a known matter which the analyst has previously highlighted as odd but 'ultimately immaterial.'"); *see also* Ex. 6, Michael W. Gallo, *HCSG: 10-K Filing Delayed 15 Days; Relates to Rounding of Individual Quarters in*

*Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016).  Lead Plaintiff responds by arguing that regardless of any independent duty to disclose, when a company chooses to make a statement on a topic that is the subject matter of an investigation, the statement must not be misleading.  Opp. Br. at 24.  In furtherance of this argument, Lead Plaintiff takes issue with three disclosures:

- FY 2017 Form 10-K (filed on February 23, 2018), Item 1A, Risk Factors: "*Failure to maintain effective internal control over financial reporting could have a material adverse effect on our ability to report our financial results on a timely and accurate basis.*
  Failure to maintain appropriate and effective internal controls over our financial reporting could result in misstatements in our financial statements and potentially subject us to sanctions or investigations by the SEC or other regulatory authorities, and could cause us to delay the filing of required reports with the SEC and our reporting of financial results."

- Q1 2018 Form 10-Q (filed on April 27, 2018), Item 1A, Risk Factors:  "There have been no material changes in the risk factors set forth in Part I, Item 1A, 'Risk Factors' in the Company's Annual Report on Form 10-K for the year ended December 31, 2017."

- Q1 2018 Form 10-Q (filed on April 27, 2018), Note 15, Other Contingencies, Legal Proceedings:  "The Company is subject to various claims and legal actions in the ordinary course of business. Some of these matters include payroll and employee-related matters and examinations by governmental agencies. As the Company becomes aware of such claims and legal actions, the Company records accruals for any exposures that are probable and estimable. If adverse outcomes of such claims and legal actions are reasonably possible, Management assesses materiality and provides financial disclosure, as appropriate. The Company believes it is not a party to, nor are any of its properties the subject of, any pending legal proceeding or governmental examination that would have a material adverse effect on the Company's consolidated financial condition or liquidity."

*See* Opp. Br. at 22.

---

*Prior Years, but Unlikely to Change Go-Forward Story*, CL King & Assocs. (Mar. 4, 2019). Courts may take judicial notice of analyst reports when assessing the materiality of alleged misrepresentations.  *SEC v. Ustian*, 229 F. Supp. 3d 739, 761 (N.D. Ill. 2017) ("Courts routinely consider analyst reports during motions to dismiss securities fraud claims to resolve questions of materiality of alleged misrepresentations and omissions.").

Each of these statements, when read in its entirety in the context of the document in which it was written, is true.  There is no allegation that the Company believed that its internal controls were insufficient, or that the SEC investigation was a result of a control deficiency. There were no material changes to the Risk Factors in those filings.  The Company is indeed subject to claims and examinations by governmental agencies in the regular course of business.

Lead Plaintiff tries to contort these statements into something misleading, invoking *In re BioScrip, Inc. Securities Litigation*, 95 F. Supp. 3d 711 (S.D.N.Y. 2015)—a case that pre-dated *Lions Gate*.  In that case, the court granted a motion to dismiss in part and denied it in part, concluding that the plaintiffs had adequately alleged a misstatement by BioScrip where the company's disclosures specifically identified the pendency of a governmental investigation into the company's industry but suggested in hypothetical terms that from time to time the company responds to requests for information from the government, without disclosing that the company had in fact received a civil investigative demand ("CID").  *Id.* at 726–27.  Specifically, one of the challenged disclosures in *BioScrip* stated:

> Governmental entities have . . . commenced investigations against specialty pharmaceutical distribution companies having dealings with pharmaceutical manufacturers concerning retail distribution and sales and marketing practices of certain products and therapies. ***There can be no assurance*** that we will not receive subpoenas or be requested to produce documents in pending investigations or litigation from time to time.  In addition, we ***may be*** the target or subject of one or more such investigations or named parties in corresponding actions.

*Id.* at 726 (emphasis added).  This statement was made five months after the company had received a CID, requesting documents and informing the company that the government had reason to believe a violation of a false claims law had occurred.  *Id.*  The court found that the hypothetical "no assurance" language was misleading because by choosing to disclose the existence of a pending investigation into the pharmaceutical industry, the company created a

duty to ensure its statements about the investigation were accurate and complete.  Using

language that could be "reasonably read as assuring the investor that no such threat [of receiving

a subpoena] existed at that precise moment," when the company had already received a CID in

connection with the very governmental investigation mentioned in the disclosure, was

misleading.  *Id.* at 727.

Here, there is no *BioScrip*-type allegation that the Company made a specific

disclosure about the existence of the investigation into EPS rounding and then failed to disclose a

pending information request while simultaneously describing potential receipt of subpoenas in

hypothetical terms.  Indeed, only one of the three statements that Lead Plaintiff challenges

contains hypothetical language, and that statement was part of a disclosure issued *before* HCSG

had even received a subpoena from the SEC, in contrast to the statement made in *BioScrip* when

that company had the CID in hand for five months.  Moreover, the hypothetical language in the

disclosure cited by Lead Plaintiff here is tied to a deficiency in internal controls.  Because Lead

Plaintiff made no allegations that the Company agreed that there were deficiencies in its internal

controls, or that the SEC investigation was a result of any control deficiency, *BioScrip* is

inapplicable.[12]

---

[12] Lead Plaintiff also relies on *Menaldi v. Och-Ziff Capital Management Group, LLC*, 164 F. Supp. 3d 568, 583–84 (S.D.N.Y. 2016) to support its argument that HCSG had a duty to disclose the pending SEC inquiry.  This case is inapposite.  There, the court found statements in an SEC filing actionable where the defendant company first noted that "[w]e are not currently subject to any pending regulatory, administrative or arbitration proceedings that we expect to have a material impact on our results of operations or financial condition," and then issued a restated Form 10-K *revising* this statement to note that "an adverse outcome [of the SEC-DOJ Investigation] could have a material effect on our business, financial condition or results of our operations."  *Id.* at 583–84.  The *Menaldi* court relied heavily on this restatement to find that the company's previous statement that it was not facing any investigations that would have a material impact on its financial condition mischaracterized the threat the company was facing. *Id.*  Here, however, there has been no restatement of any of HCSG's past filings.

The facts of this case are more analogous to *Lions Gate* and *In re Investment Technology Group, Inc. Securities Litigation*, 251 F. Supp. 3d 596 (S.D.N.Y. 2017). As described in the Company's Opening Brief, the *Lions Gate* court held that there is no duty to disclose a government investigation, even after receipt of a Wells Notice. *See* HCSG's Opening Br. at 19–20. There, the court found that there was "nothing false or misleading" about statements acknowledging that the company is involved in proceedings "[f]rom time to time . . . in the normal course of business" but does not believe "based on current knowledge, that the outcome of any currently pending claims or legal proceedings" would have a material adverse effect on the company's financial statements. *Lions Gate*, 165 F. Supp. 3d at 16. The court concluded that such disclosures were not actionable because (1) the SEC filings accurately described generally that there were pending proceedings but stated that the company did not believe a material effect would arise from these proceedings, and (2) plaintiffs failed to plead how the company's opinion regarding the likely effect of the proceedings was not supported by, or in conflict with, the facts known to the company at the time. *Id.*

In *Investment Technology Group*, plaintiffs attempted to rely on *BioScrip* to argue that several statements made by the defendant in its SEC filings were misleading. 251 F. Supp. at 614–17. The SEC had begun investigating the defendant in the fall of 2013, and by May 2015 had informed the defendant that it "intended to bring serious charges." *Id.* at 614. The court found that the company's disclosures in filings between Q3 2013 and Q1 2015 that it was "regularly involved" in government investigations and "periodically involved" in proceedings relating to regulatory matters but did not believe "based on information currently available" that such investigations would have a material adverse effect was "neither false nor so incomplete as to mislead a reasonable investor." *Id.* at 615–16. The court reasoned that the disclosures

accurately "suggest[ed] that regulatory investigations were live and ongoing, rather than merely hypothetical or speculative possibilities." *Id.* at 617.   Because the statements were not misleading, the court rejected plaintiff's argument that more detailed disclosures were required. *Id.*

The court further rejected the plaintiff's claim that the company's representation in its Forms 10-Q that "[t]here has been no significant change to the risks or uncertainties" since the preceding Form 10-K was misleading in light of the ongoing SEC investigation. *Id.* at 617. The court found that plaintiff failed to plead a "significant change" had occurred that would render the statement misleading and noted that a company is not required to accuse itself of wrongdoing. *Id.*

The disclosures at issue in this case squarely align with the disclosures in *Lions Gate* and *Investment Technology Group*.  HCSG did not deny or mislead investors about the existence of current investigative activity.  To the contrary, HCSG's statements plainly acknowledged that the Company "is subject to various claims and legal actions . . . includ[ing] . . . examinations by governmental agencies," but qualified this statement by opining that the Company did not, at the time, believe that any "pending legal proceeding . . . would have a material adverse effect." Am. Compl. ¶ 258.  Unlike the defendant in *BioScrip* which specifically disclosed the existence of investigations of its industry involving the scheme at issue but wrongly implied that the company had not received a subpoena, HCSG did not selectively disclose specific information about the SEC investigation that rendered its statements misleading.  *See BioScrip*, 95 F. Supp. 3d at 727 ("Having chosen to speak about the potential investigations and document requests, BioScrip had an obligation to ensure its statements were 'both accurate and complete'…."); *see also Lions Gate*, 165 F. Supp. 3d at 16 (distinguishing the

-19-

facts of the case from cases "where the defendants selectively disclosed information and omitted known adverse facts that would undermine the truth of the disclosures"). And Lead Plaintiff has altogether failed to allege why HCSG's belief that the SEC investigation would not result in a material adverse effect was false or without a reasonable basis. These types of statements are not actionable.[13] *See Lions Gate*, 165 F. Supp. 3d at 16; *Inv. Tech. Grp.*, 251 F. Supp. 3d at 617.

### C.    The Amended Complaint's Allegations Do Not Give Rise to a Strong Inference of Scienter.

Lead Plaintiff's scienter arguments are similarly unavailing. Initially, to the extent Lead Plaintiff has failed to adequately allege a fraudulent scheme or misrepresentation, all of its scienter allegations must fail. *See AXIS Capital*, 456 F. Supp. 2d at 590 ("Where 'the facts alleged in the Complaint are insufficient to support Plaintiffs' belief that false or misleading statements were made, those facts cannot support an inference that Defendants knew or should have known their statements were false or misleading when Defendants made them.'" (quoting *Feasby v. Industri-Matematik Int'l Corp.*, No. 99 Civ. 8761, 2003 U.S. Dist. LEXIS 22791, at *5 (S.D.N.Y. Dec. 19, 2003))); *In re Amarin Corp. PLC Sec. Litig.*, No. 13-6663, 2016 U.S. Dist.

---

[13] Lead Plaintiff wrongly dismisses ASC 450-20 and ASC 250-10 as irrelevant to whether HCSG had a duty to disclose the SEC investigation earlier. Opp. Br. at 26, n.18. Contrary to Lead Plaintiff's contention that ASC 450-20 only addresses establishing accounting reserves for contingent financial losses and not disclosure of the SEC investigation itself, ASC 450-20 specifically addresses whether disclosure of unasserted claims is required, including an investigation by a governmental agency as an example. *See* ECF 33-11 at 14, ASC 450-20-55-14 and 450-20-55-15 (disclosure not required if "judgment is that assertion is not probable"). Similarly, although ASC 250-10 concerns technical changes to an accounting principle or estimate, it also applies to "error corrections." ECF 33-12 at 4, ASC 250-10-05-1. ASC 250-10 explicitly states that "correction of an error . . . is not an accounting change" (ECF 33-12 at 4, ASC 250-10-05-4) and, instead, defines an error as an "[a]n error in recognition, measurement, presentation, or *disclosure* in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared." ECF 33-12 at 6, ASC 250-10-20 (emphasis added).

LEXIS 55568, at *75 (D.N.J. Apr. 26, 2016), *aff'd*, No. 16-2640, 2017 U.S. App. LEXIS 8970

(3d Cir. May 23, 2017) (declining to address scienter allegations when plaintiff failed to

adequately plead a materially false or misleading statement).

But regardless of whether Lead Plaintiff adequately alleges fraudulent conduct, its

scienter allegations are insufficient to meet the PSLRA's heightened standard for pleading a

strong inference of scienter.

### 1.    Lead Plaintiff Does Not Sufficiently Plead Scienter as to Its EPS Rounding Allegations.

#### a.    Lead Plaintiff's scienter allegations relate only to its theory of liability as to the alleged fraud, and do not support a strong inference of scienter.

As discussed in Defendants' Opening Brief, to meet the high standard for

pleading scienter under the PSLRA and Rule 9(b), a plaintiff's allegations must support a strong

inference that a defendant acted with "a mental state embracing intent to deceive, manipulate, or

defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst*

*& Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)).  Securities fraud plaintiffs are required to

"state with particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind."  15 U.S.C. § 78u-4(b)(2).  Accordingly, merely alleging that the

Individual Defendants engaged in fraudulent conduct is not enough; Lead Plaintiff must "create a

strong inference that at the time the allegedly false statements were made, [the Individual

Defendants] were aware that [the Company] was, as a matter of law, in violation of Commission

rules." *Iron Workers Ben. & Pension Fund—Iron Workers Dist. Council Phila. & Vicinity &*

*Anadarko Petro. Corp.*, 788 Fed. App'x 268, 270 (5th Cir. 2019) (finding allegations that

"information was presented to [the defendants] that could have led them to conclude that [the

company's] Colorado operations weren't in compliance with Commission rules" insufficient to support an inference that defendants were aware that the company was violating the law).

Here, however, Lead Plaintiff's scienter allegations merely rehash its theory as to the alleged fraudulent conduct, and do not support an inference of scienter. Lead Plaintiff asks this Court to accept the syllogism that (a) the Individual Defendants intentionally engaged in EPS rounding, (b) this rounding was fraudulent, (c) the Individual Defendants failed to disclose this allegedly fraudulent rounding, and therefore (d) the Individual Defendants possessed the requisite mental state to commit fraud. *See Rabin v. Nasdaq OMX PHLX LLC*, 182 F. Supp. 3d 220, 247 (E.D. Pa. 2016). This argument "mischaracterizes the meaning of scienter by confusing intent with effect." *Id.* Indeed,

> [b]y Plaintiff's logic, merely intentionally engaging in conduct that turns out to be manipulative of the market would satisfy the scienter requirement. But fraudulent scienter requires more than intentional conduct; it requires willful intention to engage in wrongful conduct in the inception of the act. . . . It is not enough for Plaintiff to allege Defendants were engaging in [market manipulation]; Plaintiff must allege they intended to deceive him by [engaging in the alleged manipulation].

*Id.* None of Lead Plaintiff's allegations supports a strong inference that at the time the alleged misrepresentations were made, the Individual Defendants were aware that they were not in compliance with the law—in fact, there have been no findings or even government allegations suggesting that the Company's conduct was improper. Similarly, none of Lead Plaintiff's allegations create an inference that the Individual Defendants acted with the requisite intent to defraud the market.

b.    **Even when viewed collectively, Lead Plaintiff's allegations fail to meet the PSLRA's heightened standard for pleading scienter.**

(1)    *Lead Plaintiff has failed to rebut Defendants' arguments regarding individual transaction histories.*

Though Lead Plaintiff tries to rely on the Individual Defendants' stock sales to allege motive, it has not rebutted the arguments that the Company made in its Opening Brief regarding individual transaction histories and gifts. Lead Plaintiff does not even attempt to take on the Individual Defendants' transaction histories that undermine its theory, other than as to Defendant McCartney. And Lead Plaintiff's arguments as to McCartney's transaction history are inadequate.

Lead Plaintiff claims that McCartney's stock sales were suspicious in timing and amount, particularly the May 11, 2017 sale of 113,901 shares for gross proceeds of over $5.2 million.[14] Lead Plaintiff does not cite authority for this proposition, or attempt to distinguish the case law cited in Defendants' Opening Brief supporting the argument that the May 11 sale was not suspicious, as McCartney regularly made similar dispositions, and the May 11 disposition represented only a small portion—approximately 5.5%—of McCartney's holdings. *See* HCSG Opening Br. at 30–32.

Lead Plaintiff further claims that whether McCartney's May 11, 2017 stock sale represented a substantial portion of his holdings raises a factual issue not properly decided on a motion to dismiss. Its only support for this proposition is an unreported Northern District of

---

[14] Lead Plaintiff ignores that this sale occurred *before* the SEC commenced its inquiry into the Company's EPS practices in November 2017 and the SEC issued a formal subpoena in March 2018. *See* Am. Comp. ¶¶ 10–11. As such, the May 11, 2017 sale does not support an inference of scienter generally and certainly cannot establish scienter as to the alleged concealment of the SEC investigation.

Illinois case—*Carpenters Pension Trust Fund for Northern California v. Allstate Corp.*, No. 16 C 10510, 2018 U.S. Dist. LEXIS 31195 (N.D. Ill. Feb. 27, 2018)—which directly conflicts with Third Circuit precedent. Courts in this Circuit regularly look to publicly-available information, such as Forms 4, to evaluate the percentage of holdings sold at the motion to dismiss stage, finding that the disposition of only a small portion of a defendant's holdings cuts against an inference of scienter. *See, e.g.*, *Advanta*, 180 F.3d at 540–41. Lead Plaintiff has not met its burden for alleging motive as to any of the Individual Defendants.

> (2)    *Lead Plaintiff's other scienter allegations do not raise a strong inference of conscious or reckless behavior.*

Lead Plaintiff offers a kitchen-sink-style amalgamation of circumstantial allegations purportedly showing that the Individual Defendants were knowingly or recklessly deceptive as to the alleged EPS rounding scheme. But even when viewed collectively, these allegations fail to meet the PSLRA's heightened pleading burden.

- Lead Plaintiff maintains that Defendants Wahl and McKee's April 12, 2017 exchange with an analyst supports a strong inference of scienter, but as explained above, Lead Plaintiff misconstrues the earnings call; there was no denial of rounding. *See supra* Section II.B.1.a.

- Lead Plaintiff further claims that the Individual Defendants' alleged "management" of labor expenses gives rise to a strong inference of scienter. Putting aside the fact that Lead Plaintiff has failed to allege a causal nexus between the alleged labor management and the putative EPS rounding scheme, as discussed *supra* in Section II.A, managing labor expenses is not nefarious; it is good business. The case relied on by Lead Plaintiff to support its proposition that the "deliberate understaffing" of client facilities to meet financial projections supports an inference of scienter is far afield from the present matter, involving findings from six different state agencies of serious patient care issues arising from a defendant's alleged understaffing of hospital facilities, including sexual assaults, physical harm, and improper care leading to patient suicides. *See Garden City Emps. Ret. Sys. v. Psychiatric Sols., Inc.*, No. 3:09-00882, 2011 U.S. Dist. LEXIS 35661 (M.D. Tenn. Mar. 31, 2011). Lead Plaintiff cannot make similar allegations in this case.

- Though Lead Plaintiff attempts to buttress its labor management scienter claims with the allegations of its Confidential Witnesses, tellingly, none of the

Confidential Witnesses has offered specific facts showing that the Individual Defendants engaged in or learned of the alleged EPS rounding scheme. *See supra* Section II.A; *see also Martin v. GNC Holdings, Inc.*, 757 Fed. App'x 151, 154–55 (3d Cir. 2018) (noting that the court could not "divine scienter from the information provided by confidential witnesses," when the witnesses failed to "provide specific facts about [the individual defendants] learning of the [alleged misconduct] prior to making the actionable statements"). Further, Lead Plaintiff has failed to specifically allege any violation of GAAP or allegation of a restatement of financials. And though Lead Plaintiff insinuates that Defendant Shea's experience as a CFO supports an inference of scienter, all well-run companies endeavor to employ a competent, knowledgeable, and experienced CFO. Under the PSLRA, this bare allegation is insufficient unless tied to specific allegations of knowledge of impropriety, which again are absent here.[15]

---

[15] The cases Lead Plaintiff relies on to allege that Defendant Shea's accounting experience supports an inference of scienter offer specific allegations of engagement in accounting impropriety, which again are absent here. *See Mild*, 2018 U.S. Dist. LEXIS 217529, at \*2–5 (alleging findings of improper accounting adjustments); *In re AFC Enters. Sec. Litig.*, 348 F. Supp. 2d 1363, 1368 (N.D. Ga. 2004) (alleging accounting improprieties revealed by defendant's financial restatement). Lead Plaintiff further relies on *In re OCA, Inc.*, No. 05-2165, 2006 U.S. Dist. LEXIS 90854 (E.D. La. Dec. 14, 2006), to argue that the small size of HCSG's accounting department and Shea's control over that department support an inference of scienter. Unlike here, however, in *OCA* the plaintiff specifically alleged that the defendant, a provider of business services to orthodontic and pediatric dental practices, materially overstated its patient receivables such that the company had to restate its financial results for several quarters. *Id.* at \*43–44. Relying on Fifth Circuit precedent, the *OCA* court found that the small size of the company's accounting department and an individual defendant's role in developing the company's accounting systems could help support an inference of scienter, given "the ongoing problems with, and, ultimately, the falsity of, the company's patient receivable figures." *Id.* at \*63. Lead Plaintiff has not alleged a similarly material accounting misstatement in this case.

In a footnote, Lead Plaintiff further claims that its allegations of GAAP violations support an inference of scienter. Opp. Br. at 39 n.28. As an initial matter, Lead Plaintiff does not allege any GAAP violation and instead only cites FASB Concept Statements which are not authoritative GAAP. *See* ECF 33-17 at 3, ASC 105-10-05-3 ("Accounting and financial reporting practices not included in the Codification are nonauthoritative. Sources of nonauthoritative accounting guidance and literature include, for example, the following: . . . FASB Concept Statements . . . ."). Lead Plaintiff's reliance on *In re Daou Sys., Inc.*, is misplaced as, there, the court found allegations of GAAP violation (the premature recording of revenue not yet earned) and noted that the practice could also violate certain FASB Concept Statements, which the court distinguished as "other GAAP principles." 411 F.3d 1006, 1019 (9th Cir. 2005).

Notwithstanding Lead Plaintiff's failure to allege any actual GAAP violation, "the mere assertion that the Defendants violated various provisions of GAAP, without providing any specific factual support, cannot meet the pleading requirements under the PSLRA." *In re*

- Lead Plaintiff alleges that the "abrupt end" of EPS rounding supports a strong inference of scienter.  This argument is similarly flawed.  First, Lead Plaintiff's allegations do not support the notion that there was in fact an abrupt change in the Company's conduct.  Lead Plaintiff suggests that the fact that the Company missed consensus estimates starting with Q4 2017 is evidence that the Company "abruptly ended" the alleged rounding practice in response to the SEC investigation, which Lead Plaintiff argues supports an inference of scienter.  However, in Q1 2018, the first full quarter after the SEC first contacted HCSG, the Company missed consensus estimates by 33 cents due primarily to the corporate restructurings of two privately-held, multi-state operators as the Company outlined in its 8-K filing for such quarter.  *See* Bloomberg L.P, "HCSG EPS Data Q1 2018" (accessed Mar. 2, 2020); Ex. 7, Q1 2018 Form 8-K, at 1.  In the following quarter, Q2 2018, the Company missed by 3 cents.  *See* Am. Compl. ¶ 79.  Plaintiff does not explain how these misses by relatively wide margins in the first two quarters following the SEC's first contact with the Company demonstrate an "abrupt end" to the alleged fraudulent rounding scheme, which even according to Lead Plaintiff related to the manipulation of a tenth of a cent to meet consensus estimates.

  Moreover, and as explained in the previous section, even if there had been an abrupt change in conduct, it would suggest nothing about the Individual Defendants' knowledge of the alleged fraud.  *See Espinoza v. Whiting*, 8 F. Supp. 3d 1142, 1150 (E.D. Mo. 2014) (rejecting plaintiffs' argument that "the defendants' abrupt change in accounting methods coupled with 'warnings' by the SEC specifically show that defendants knew their accounting methods were improper at the time," explaining that these facts alone did not support a finding that defendants knew their accounting methods were improper when the alleged false statements were made).[16]

---

*Milestone Sci. Sec. Litig.*, 103 F. Supp. 2d 425, 472 (D.N.J. 2000) ("To support even a reasonable inference of scienter . . . the complaint must describe the violation with sufficient particularity; a general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation." (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203 (1st Cir. 1999))).  None of the GAAP violations alleged in Lead Plaintiff's Amended Complaint meet the PSLRA's pleading standard, and none of these allegations can support an inference of scienter.

[16] Lead Plaintiff also argues that the alleged end to the pattern of rounding is evidence that the disclosure of the investigation had a "material" adverse effect on the Company's financial condition and business operations (*see, e.g.*, Opp. Br. at 25, 28), but Lead Plaintiff does not explain its logic for that conclusory allegation, nor does it support it with any specific facts, which are required for reasons explained *supra*.

Further, the case law Lead Plaintiff cites to support its argument is again distinguishable.  Contrary to Lead Plaintiff's assertions, the courts in *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655 (D.S.C. 2016) and *In re Zillow Grp., Inc. Securities*

- Lead Plaintiff also alleges that the existence of an ongoing SEC investigation into the Company's EPS practices, and the alleged "deliberate concealment" of this investigation, support a strong inference of scienter.[17] But the mere allegation of an SEC investigation into purported fraudulent conduct—without any government allegations or findings of fraud—is insufficient to support a strong inference of scienter as to an alleged fraudulent scheme, *see In re Hertz Global Holdings, Inc. Sec. Litig.*, No. 13-7050, 2017 U.S. Dist. LEXIS 65156, at *53 n.6 (D.N.J. Apr. 27, 2017), *aff'd*, 905 F.3d 106 (3d Cir. 2018) (noting that "[a]n SEC investigation that has not resulted in charges or any finding of wrongdoing does not support an inference of scienter," and citing cases), and the cases relied on by Lead Plaintiff to support its argument are not analogous to the present matter.[18]

- Lead Plaintiff claims that Defendant McCartney's 2017 transition from Chairman of the Board to Chairman Emeritus supports an inference of scienter, but its only support for this allegation is the purportedly "suspicious" timing of McCartney's transition. *See* Opp. Br. at 43. The "suspicious" timing of an individual

---

*Litigation*, No. C17-1387, 2019 U.S. Dist. LEXIS 67197 (W.D. Wash. Apr. 19, 2019), did not conclude that corrective actions alone support an inference of scienter. Rather, these courts looked to a panoply of other facts more egregious than those pleaded here, including a specifically alleged GAAP violation, *Epstein*, 203 F. Supp. 3d at 670–71, and particularized allegations that individual defendants knew of instances in which a marketing program was being used to violate the law, made changes to the program which they failed to disclose to the public, and then affirmatively represented that the program had always been in compliance with the law, *Zillow*, 2019 U.S. Dist. LEXIS 67197, at *60.

[17] Lead Plaintiff cites to *Gruber v. Gilbertson*, No. 16-cv-9727, 2018 U.S. Dist. LEXIS 45677 (S.D.N.Y. Mar. 20, 2018), for the implied proposition that mere knowledge of an investigation into certain conduct is sufficient to establish scienter as to the impropriety of that conduct. That is not what the *Gruber* court held. There, "the revelations unearthed by the [defendant company's] internal investigation decisively [swung] the element of scienter in [plaintiff's] favor" because it proved that officer and director defendants were aware of an extensive scheme to fraudulently manipulate the company's stock prices. *Id.* at *40. Indeed, the company sent the results of this investigation to the SEC. There are no similar allegations here.

[18] The cases cited by Lead Plaintiff are readily distinguishable. *Gruber* involved an actual finding of illicit activity which the defendant itself discovered and acknowledged. *See supra* n.17. Similarly, in *In re Bristol Myers Squibb Co. Securities Litigation*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008), the defendant pled guilty to two felony charges of making false statements to a government agency. Two of the cases relied on by Lead Plaintiff, *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016) and *Menaldi*, 164 F. Supp. 3d at 575, involved restatements of financials, which plaintiffs have not alleged (and could not allege) occurred in this case. *Utesch v. Lannett Co.*, 385 F. Supp. 3d 408, 423 (E.D. Pa. 2019), involved allegations of state attorneys general levying criminal charges against defendant Lannett and its market competitors, with the court noting that so many different governmental entities investigating these criminal charges provided an inference of scienter.

-27-

defendant's retirement is, on its own, insufficient to support an inference of scienter. *See Fain v. USA Techs., Inc.*, 707 Fed. App'x 91, 97 (3d Cir. 2017) ("Resignations or terminations might form a 'piece to the scienter puzzle,' . . . if, for example, a relatively contemporaneous and public firing is accompanied by extreme corporate punishment measures such as the denial of previously accrued benefits."). Not only has Lead Plaintiff failed to allege any announcement of actual wrongdoing, it has failed to offer any evidence that McCartney's transition from Chairman to Chairman Emeritus resulted from knowledge of or participation in fraud. There were no corporate punishment measures; in fact, as noted in the Company's Opening Brief, McCartney has remained with the Company as Chairman Emeritus. Defendant McCartney's scienter concerning the alleged EPS rounding scheme cannot be inferred from the mere fact of his retirement.[19]

- Finally, Lead Plaintiff alleges that the existence of "ancillary" lawsuits supports an inference of scienter, but it fails to allege such an "ancillary" suit in this case. Lead Plaintiff is relying on allegations lodged against HCSG and McCartney in 1999, relating not to the EPS manipulation claimed in this case but rather to other alleged accounting violations.[20] These 20-year-old allegations are not ancillary to the present matter, and are insufficient to support an inference of scienter as to the alleged EPS rounding scheme, which Lead Plaintiff claims began on December 10, 2008. *In re Goodyear Tire & Rubber Co. Sec. Litig.*, 436 F. Supp. 2d 873,

---

[19] Lead Plaintiff also maintains that the "sheer improbability" of EPS rounding gives rise to a strong inference of scienter. Opp. Br. at 40. First, and as explained above, allegations concerning the "improbability" of the Company's EPS figures merely rehash Lead Plaintiff's theory as to the alleged fraud; they do not support an inference that the Defendants were aware of the putative scheme or made the alleged misrepresentations/omissions with an intent to defraud the market. *See supra* Section II.C.1.a. Second, Lead Plaintiff fails to cite a case in support of this proposition. The only case Lead Plaintiff does cite, *AFC Enterprises*, does not address a connection between improbability and scienter, and is inapposite in any event. *AFC* involved the defendant company's restatement of previously issued financial statements, which had overstated the company's income by 21% to 92%. 348 F. Supp. 2d at 1368. The *AFC* plaintiffs alleged that the restatements resulted from significant GAAP violations and accounting fraud—an argument that was supported by the fact that AFC and its auditor KPMG both pointed to several GAAP violations which resulted in the financial restatements. *Id.* at 1372–73. Here, Lead Plaintiff has offered no particularized allegations of accounting errors, financial restatement, or findings of wrongdoing; accordingly, its reliance on *AFC* is misplaced. Finally, the Monocle Report on which Lead Plaintiff so heavily relies acknowledges explicitly that the alleged practice of rounding is "not necessarily illegal" and "may simply reflect a full and creative—but ultimately permissible—use of the professional judgment that is permitted under GAAP." ECF No. 33-3 at 2, 9.

[20] To the extent Lead Plaintiff seeks to classify the labor lawsuits lodged against HCSG as "ancillary" suits (*see* Opp. Br. at 38), it has (as previously discussed) failed to adequately explain how the conduct alleged in these suits relates to the EPS rounding scheme alleged in the present matter.

901–02 (N.D. Ohio 2006) (finding plaintiff's argument that defendant Goodyear's knowledge of alleged accounting irregularities between 2001 and 2003 could be inferred from its discovery of apparent accounting irregularities in 1999 "illogical," and noting that "Goodyear's discovery of accounting improprieties in 1999 could not have put them on notice of events that, according to the allegations in the Amended Complaint, had not yet occurred").

In short, viewed either individually or collectively, none of Lead Plaintiff's allegations are sufficient to plead scienter as to the putative EPS rounding scheme.

### 2. Lead Plaintiff Does Not Sufficiently Plead Scienter as to Its SEC Investigation Allegations.

Lead Plaintiff's scienter allegations as to the alleged misrepresentations and omissions regarding the SEC investigation contained in the Credit Agreement and SEC filings are also insufficient.  As explained above, HCSG did not have a legal duty to disclose the SEC investigation, and no facts have been pled—let alone exist—to show that that the Company reasonably expected the SEC investigation to have a material adverse effect on HCSG's financials.  *See supra* Section II.B.2.b.  As such, Lead Plaintiff cannot plead scienter as to these statements or omissions.

Even if Lead Plaintiff could plead an actionable misrepresentation, it cannot plead facts sufficient to meet the PSLRA's heightened pleading standard, which requires stating with particularity facts supporting a strong inference that each defendant acted with the requisite intent (knowledge or recklessness) to deceive investors by concealing the existence of the SEC investigation.  The Amended Complaint falls woefully short of satisfying this standard.  With respect to Defendants McCartney and McKee, the Amended Complaint fails to allege that these individuals played any role whatsoever in deliberately concealing the SEC investigation.  Neither individual is alleged to have signed or approved the Credit Agreement or SEC filings which contain the alleged misrepresentations and omissions regarding the SEC investigation.  In fact, McCartney retired from his CEO position in May 2015, and his tenure as Chairman of the Board

-29-

ended in May 2017—six months before the SEC inquiry commenced. *See* Am. Compl. ¶ 26. With respect to Defendants Wahl and Shea, at best, the Amended Complaint alleges that these individuals were aware of the SEC inquiry but nevertheless signed the SOX certifications and were listed as "authorized officers" on the 2018 Credit Agreement. These allegations alone are insufficient to plead knowledge or recklessness. *See In re Hertz Global Holdings, Inc.*, 905 F.3d 106, 118 (3d Cir. 2018) ("An allegation that a defendant signed a SOX certification attesting to the accuracy of an SEC filing that turned out to be materially false does not add to the scienter puzzle in the absence of any allegation that the defendant knew he was signing a false SEC filing or recklessly disregarded inaccuracies contained in an SEC filing."); *Lions Gate*, 165 F. Supp. 3d at 24 ("[A]lleging that the disclosures in the securities filings were incomplete or that they omitted material information, is not enough to plead scienter based on conscious misbehavior or recklessness.").

For the scienter element to be met, "the important issue . . . is not whether Defendants knew the underlying facts, but whether Defendants knew that not disclosing the [underlying facts] posed substantial likelihood of misleading a reasonable investor." *See City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1264 (10th Cir. 2001). Lead Plaintiff cannot satisfy its burden by simply alleging that Defendants Wahl and Shea knew about the SEC investigation and therefore must have known or were reckless in not knowing that representations in the Credit Agreement and SEC filings relating to the SEC investigation would mislead investors. The Amended Complaint must allege with particularity facts to show that Defendants Wahl and Shea intended to mislead investors by deliberately misstating or omitting material facts regarding the SEC investigation. Yet, there is no allegation that Defendants Wahl and Shea did not genuinely believe in the statements about the lack of material adverse effect the

-30-

SEC investigation would have on HCSG's finances.  *See Lions Gate*, 165 F. Supp. 3d at 24.

Similarly, the Amended Complaint fails to allege that Defendants Wahl and Shea did not

genuinely believe that there had been no failure in the Company's internal controls.  Indeed,

there has never been a financial restatement, or a finding of internal control failure.

In the absence of such allegations, Lead Plaintiff fails to plead scienter as to the

statements and omissions concerning the existence and materiality of the SEC investigation.

### D.      The Amended Complaint Does Not Adequately Plead Loss Causation.

#### 1.      Lead Plaintiff Does Not Adequately Plead Loss Causation with Respect to EPS Rounding and Expense Management.

In order to prove loss causation, Lead Plaintiff must prove that the alleged decline

in stock price was caused by the market's discovery of the alleged fraud, typically through a

"corrective" disclosure, after the revelation of which a company's stock drops.  *See Martin v.*

*GNC Holdings, Inc.*, No. 2:15-cv-01522, 2017 U.S. Dist. LEXIS 145530, at *52–55 (W.D. Pa.

Sept. 8, 2017), *aff'd*, 757 Fed. App'x 151 (3d Cir. 2018).  As a threshold matter, because (for

reasons explained *supra* in Section II.A), Lead Plaintiff has not sufficiently alleged fraudulent

conduct with respect to EPS, it cannot allege that there were corrective disclosures.  There has

never been a corrective disclosure of EPS "manipulation" or internal control deficiencies because

there was nothing to correct—there has never been a finding of wrongdoing, and data regarding

the Company's EPS calculations was available to the market every quarter.

Even if Lead Plaintiff had sufficiently alleged that the Company's conduct led to

a misstatement because the publicly-available EPS data was not presented in a way that would

reveal the alleged rounding scheme to investors, the alleged scheme was revealed in the Monocle

Report—two years before the alleged 2019 stock drop on which Lead Plaintiff hangs its hat.

Lead Plaintiff distances itself from the Monocle Report when it comes to loss causation, arguing

that because the Report did not definitively conclude that fraud had in fact occurred, it was not sufficient to put the market on notice of the alleged misconduct.  But Lead Plaintiff relies on the Monocle Report for its scienter argument; it cannot disavow it for purposes of loss causation.

As Defendants explained in their Opening Brief, the market did not react materially to the Monocle Report.  The 1.84% decline in HCSG's stock price after publication of the Monocle Report is insufficient to plead loss causation.  *See* ECF 33-10 at 10, HCSG Stock Price Chart; *see also Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) (noting that, under *Dura Pharmaceuticals*, a "[securities fraud] complaint must allege that the defendant's 'share price fell significantly after the truth became known'"); *Teamsters Local 617 Pension & Funds v. Apollo Grp., Inc.*, 633 F. Supp. 2d 763, 820–21 (D. Ariz. 2009) (finding that "the modest 2.7 percent drop" alleged by plaintiffs was insufficient to plead loss causation); *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 347 (W.D.N.Y. 2008) (finding that plaintiff failed to adequately plead loss causation when stock dropped less than 1% after alleged corrective disclosure); *Eng v. Edison Int'l*, No. 3:15-cv-01478, 2017 U.S. Dist. LEXIS 69196, at *11 (S.D. Cal. May 5, 2017) ("[T]he Court finds Plaintiffs' [Second Amended Complaint] does not *plausibly* allege[] that the scanty .79% to 2.71% declines in stock price were 'statistically significant.'").[21]

---

[21] In any event, the stock price recovered and increased immediately thereafter; accordingly, Lead Plaintiff would be barred from recovering the alleged 2% decline under the PSLRA.  *See* 15 U.S.C. § 78u-4(e)(1) ("[T]he award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.").  Moreover, on March 23, 2017 (the effective trading date of the Monocle Report, given that the Report was published after-market hours on March 22, 2017), the major stock market indexes all finished in the red, following a delay in voting on a new healthcare law introduced by Republicans in the House of Representatives.  *See Stock Market News for March 24, 2017*, Nasdaq (Mar. 24, 2017),

As a fallback position, Lead Plaintiff concedes that the Monocle Report would have been a corrective disclosure were there anything to correct, but argues (based on *Bonanno v. Cellular Biomedicine Grp., Inc.*, No. 15-cv-01795-WHO, 2016 U.S. Dist. LEXIS 66841, at *17–19 (N.D. Cal. May 20, 2016)), that a short-seller report is not sufficient to reveal the truth to the market.  But the facts in *Bonanno* are distinguishable, involving an anonymous blogger making general reports as to the defendant's allegedly poor behavior generally.  Here, the Monocle Report was not anonymous, it was directed solely at revealing HCSG's alleged "strategic rounding" (as evidenced by the title of the Report: "Healthcare Services Group: A Decade of 'Strategic Rounding'"), the authors even noted that they were reporting their observations to the SEC, and as the Amended Complaint alleges, an analyst asked about the report during an earnings call.[22]

Lead Plaintiff also argues that Wahl's exchange with the analyst on April 12, 2017 was a "denial" of the Monocle Report's allegations that re-assured the market and prevented a stock drop.  Lead Plaintiff does not, however, allege with specificity that it was this "denial," rather than the many other items discussed during this earnings call, that caused HCSG's stock price to rise.  Further, and as noted above, Wahl did not deny anything.  Lead Plaintiff ignores that, although they knew about the Monocle Report (*see* Am. Compl. ¶ 84), the

---

https://www.nasdaq.com/articles/stock-market-news-march-24-2017-2017-03-24 (discussing market activity on March 23, 2017).

[22] Lead Plaintiff also posits an argument that the relevant corrective disclosures came out after the Monocle Report was published.  Specifically, Lead Plaintiff identifies as "partial corrective disclosures" the series of earnings releases from February 2018 until March 2019, each of which, Lead Plaintiff claims, "only partially revealed" the alleged fraud.  *See* Opp. Br. at 47.  But Lead Plaintiff has not alleged any details supporting its partial disclosure theory, including what new facts were disclosed, what the market reaction was to each new disclosure every quarter, or why the alleged quarterly market reactions were statistically significant.

research analysts covering the company did not focus on it. Indeed, during the earnings call Lead Plaintiff cites, analysts asked 14 questions, only one of which related to the rounding alleged in the Monocle Report. Moreover, of the analyst reports that were issued subsequent to the quarterly press release but prior to the conference call (*i.e.*, prior to any alleged reassurances by Wahl), Lead Plaintiff has pointed to none mentioning the Monocle Report or the EPS rounding issue.

### 2.   Lead Plaintiff Does Not Adequately Plead Loss Causation with Respect to the SEC Investigation.

With respect to the alleged failure to timely disclose the SEC investigation, Lead Plaintiff argues that it has sufficiently pled loss causation simply by pointing to the drop in the Company's stock price following the release of its 8-K on March 4, 2019. Initially, the March 4 8-K disclosed **both** the SEC investigation as well as the Company's delay in filing its FY 2018 10-K. Lead Plaintiff neither addresses this point, nor acknowledges that the stock drop could have been attributable to the Company's 10-K filing delay. In any event, Lead Plaintiff ignores that the mere disclosure of an SEC investigation can have an adverse effect on a company's stock price, regardless of the scope or subject of the investigation and regardless of whether or not it actually leads to an enforcement action. *See Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) ("While the disclosure of an investigation is certainly an ominous event, it simply puts investors on notice of a *potential* future disclosure of fraudulent conduct. Consequently, any decline in a corporation's share price following the announcement of an investigation can only be attributed to market speculation about whether fraud has occurred."). Academic literature finds that markets react negatively even when the conduct that is subject to a newly disclosed investigation was previously publicly known. *See* Ehsan H. Feroz et al., *The Financial and Market Effects of the SEC's Accounting and Auditing Enforcement Releases*, 29 J. Acct. Res.

107, 124 (1992) (noting, based on statistical analysis, that "the market reacts negatively to [an SEC] investigation, even with prior knowledge of the error").  In addition, academic authors attribute the market reaction to regulatory actions in part to potential collateral consequences, such as the diversion of management resources or related securities litigation.  *Id.* (finding that the "incremental market effect of investigations may be related to negative publicity and the impact of the SEC's position on future third-party lawsuits").

### E.    Lead Plaintiff Should Not Be Granted Leave to Amend.

In a footnote, Lead Plaintiff seeks leave to amend if the Amended Complaint is dismissed in whole or in part.  Opp. Br. at 49 n.40.  Lead Plaintiff does not, however, identify any new allegations it would include that would be sufficient to uphold its claims.  Dismissal of the Amended Complaint with prejudice is therefore warranted.  *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1333 (3d Cir. 2002) (affirming dismissal of securities fraud complaint with prejudice, where district court found "a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced which would, if true, cure the defects in the pleadings under the heightened requirements of the PSLRA").

## III.    CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the

Amended Complaint be dismissed in its entirety, with prejudice.

/s/ Robert L. Hickok

Robert L. Hickok (PA Bar No. 30101)
Jay A. Dubow (PA Bar No. 41741)
Joanna J. Cline (PA Bar No. 83195)
Daniel J. Boland (PA Bar No. 91263)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

*Attorneys for Defendants*
*Healthcare Services Group, Inc., Daniel P.*
*McCartney, Theodore Wahl, John C. Shea,*
*and Matthew J. McKee*

Dated:  March 2, 2020

## **CERTIFICATE OF SERVICE**

I certify that on the 2nd of March, 2020, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system which will send electronic notification of such filing to all counsel of record.

/s/ *Robert L. Hickok*
Robert L. Hickok

# EXHIBIT 1



Source: Bloomberg



Source: Bloomberg

HCSG US  $  ↑ 27.57  +0.03  Q27.55/27.58Q  52×12
At 16:30 d  Vol 885,680  O 27.74Q  H 27.96J  L 27.06Q  Val 24.352M
HCSG US Equity  95) Compare  96) Actions ▾  97) Edit ▾  Line Chart
01/01/2000 - 01/18/2000  Last Px  Local CCY ▾  ☐ Mov Avgs ✎  ☐ Key Events
1D  3D  1M  6M  YTD  1Y  5Y  Max  Daily ▼  📈  ⇅  ▾  Chart  «  📊 Chart Content  ⚙

| Date | Last Px | Volume | SMAVG (15) |
|---|---|---|---|
| Tu 01/18/2000 | 1.5432 | 85556 | 118.193k |
| Fr 01/14/2000 | 1.7963 | 136.181k | 145.8k |
| Th 01/13/2000 | 1.7222 | 35944 | 143.033k |
| We 01/12/2000 | 1.6296 | 26325 | 143.404k |
| Tu 01/11/2000 | 1.7346 | 53663 | 143.573k |
| Mo 01/10/2000 | 1.9136 | 202.5k | 146.374k |
| Fr 01/07/2000 | 1.7778 | 81506 | 142.155k |
| Th 01/06/2000 | 1.534 | 113.4k | 157.781k |
| We 01/05/2000 | 1.5062 | 123.525k | 151.774k |
| Tu 01/04/2000 | 1.4568 | 113.4k | 146.104k |
| Mo 01/03/2000 | 1.3827 | 145.8k | 139.016k |
| Fr 12/31/1999 | 1.3827 | 46069 | 130.343k |
| Th 12/30/1999 | 1.3086 | 16706 | |
| We 12/29/1999 | 1.358 | 177.188k | |
| Tu 12/28/1999 | 1.3704 | 415.125k | |
| Mo 12/27/1999 | 1.4568 | 499.669k | |
| Th 12/23/1999 | 1.4568 | 94669 | |
| We 12/22/1999 | 1.358 | 41513 | |

-14% = ($1.54 - $1.80) / ($1.80)

300) Edit Panel   301) Expand Panel
441 EDG 17:27 Monocle Acquisition Corp: 10-K 2019/12/31
440 EDG 17:27 Santander Drive Auto Receivables Llc: ABS-15G 2020/03/02
439 CNN 17:26 CNN: Lady Gaga announces new album
438 NS1 17:26 US News: After 2 Weeks of Pounding, Leaning Tower of Dallas Is Dow
Suggested Functions  |  HP Analyze a security's historical prices  |  ANR Get analyst recommendations & ratings

Source: Bloomberg

HCSG US $    ↑ 27.57    +0.03    Q27.55/27.58Q    52×12

At 16:30 d  Vol 885,680    O 27.74Q    H 27.96J    L 27.06Q    Val 24.352M

HCSG US Equity    95) Compare    96) Actions ▾    97) Edit ▾    Line Chart

04/01/2000 - 04/10/2000    Last Px    Local CCY  ▼    ☐ Mov Avgs ✎  ☐ Key Events

1D  3D  1M  6M  YTD  1Y  5Y  Max  Daily ▼  ⬚ ⇅  ▼    Chart    《    ⚞ Chart Content    ⚙

HCSG US Equity

| Date | Last Px | Volume | SMAVG (15) |
|---|---|---|---|
| Mo 04/10/2000 | .9136 | 379.181k | 302.67k |
| Fr 04/07/2000 | 1.0617 | 317.925k | 288.259k |
| Th 04/06/2000 | 1.0494 | 218.7k | 296.696k |
| We 04/05/2000 | 1.0617 | 60244 | 285.39k |
| Tu 04/04/2000 | 1.0741 | 2.304M | 304.324k |
| Mo 04/03/2000 | 1.0494 | 48094 | 156.465k |
| Fr 03/31/2000 | 1.0741 | 20250 | 155.891k |
| Th 03/30/2000 | 1.0494 | 12656 | |
| We 03/29/2000 | 1.0494 | 506 | |
| Tu 03/28/2000 | 1.0494 | 22275 | |
| Mo 03/27/2000 | .9877 | 40500 | |
| Fr 03/24/2000 | 1.1235 | 73913 | |
| Th 03/23/2000 | 1.0494 | 390.319k | |
| We 03/22/2000 | 1.0494 | 477.9k | |
| Tu 03/21/2000 | 1.0741 | 173.644k | |
| Mo 03/20/2000 | 1.1605 | 163.013k | |
| Fr 03/17/2000 | 1.1852 | 444.488k | |
| Th 03/16/2000 | 1.1975 | 49106 | |

-14% = ($0.91 - $1.06) / ($1.06)

300) Edit Panel    301) Expand Panel

464  BDR  17:28  The more Democratic voters have gotten to know Mike Bloomberg, the
463  NPW  17:28  HPV tied to miscarriages and preterm births
462  EDG  17:28  Mayville Engineering Company, Inc.: 10-K 2019/12/31
461  NPW  17:28  Penguins press 'reset' ahead of Senators' visit

Suggested Functions    HP  Analyze a security's historical prices    ANR  Get analyst recommendations & ratings

Source: Bloomberg

# EXHIBIT 2

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2018**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**
**Commission file number: 0-12015**

# HEALTHCARE SERVICES GROUP, INC.
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Pennsylvania** | **23-2018365** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3220 Tillman Drive, Suite 300, Bensalem, PA** | **19020** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:**
**(215) 639-4274**

**Securities registered pursuant to Section 12(b) of the 1934 Act:**

| | |
|---|---|
| **Common Stock ($.01 par value)** | **The NASDAQ Global Select Market** |
| *Title of each class* | *Name of each exchange on which registered* |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES ☑ NO ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. YES ☐ NO ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES ☑ NO ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). YES ☑ NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☑ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). YES ☐ NO ☑

The aggregate market value of the voting stock (Common Stock, $.01 par value) held by non-affiliates of the Registrant as of the close of business on June 30, 2018 was approximately $2.02 billion based on the closing sale price of the Common Stock on the NASDAQ Global Select Market on that date. The determination of affiliate status is not a determination for any other purpose. The Registrant does not have any non-voting common equity authorized or outstanding.

Indicate the number of shares outstanding of each of the registrant's classes of Common Stock (Common Stock, $.01 par value) as of the latest practicable date (March 14, 2019). 74,036,000

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the definitive Proxy Statement for the Registrant's Annual Meeting of Shareholders to be held on May 28, 2019 have been incorporated by reference into Parts II and III of this Annual Report on Form 10-K.

Table of Contents

**Item 1A. Risk Factors.**

You should carefully consider the risk factors we have described below, as well as other related information contained within this annual report on Form 10-K as these factors could materially and adversely affect our business, results of operations, financial condition and cash flows. We believe that the risks described below are our most significant risk factors but there may be risks and uncertainties that are not currently known to us or that we currently deem to be immaterial.

*We provide services to several clients which contribute significantly, on an individual as well as an aggregate basis, to our total revenues.*

We have several clients who individually contributed over 3%, with Genesis contributing 19.3% and 17.5%, of our total consolidated revenues for the years ended December 31, 2018 and 2017, respectively. Although we expect to continue the relationship with these clients, there can be no assurance thereof. The loss, individually or in aggregate, of such clients, or a significant reduction in the revenues we receive from such clients, could have a material adverse effect on the results of operations of our two operating segments and the Company. In addition, if any of these clients change or alter current payment terms it could increase our accounts receivable balance and have a material adverse effect on our cash flows.

*Our clients are concentrated in the healthcare industry, which is subject to changes in government regulation. Many of our clients rely on reimbursement from Medicare, Medicaid and other third-party payors. Rates from such payors may be altered or reduced, thus affecting our clients' results of operations and cash flows.*

We provide our services primarily to providers of long-term and post-acute care. We cannot predict what efforts, and to what extent, legislation and proposals to contain healthcare costs will ultimately impact our clients' revenues through reimbursement rate modifications. Congress has enacted a number of laws during the past decade that have significantly altered, and may continue to alter, overall government reimbursement for nursing home services. Because many of our clients' revenues are highly reliant on Medicare, Medicaid and other third-party payors' reimbursement funding rates and mechanisms, the overall effect of these laws and trends in the long-term care industry have affected and could adversely affect our clients' cash flows, resulting in their inability to make payments to us on agreed upon payment terms. These factors, in addition to delays in payments from clients have resulted in, and could continue to result in, significant additional bad debts in the future.

*Changes to federal healthcare legislation may adversely affect our operating costs and results of operations.*

Continued changes to the healthcare structure and regulations related to the health insurance industry in the United States could impact our operating costs. Any requirements to provide additional benefits to our employees or the payment of penalties if such benefits are not provided, would increase our expenses. If we are unable to pass-through these charges to our clients to cover these expenses, such increases could adversely impact our operating costs and our results of operations.

In addition, often new regulations result in additional reporting requirements for businesses. These and other requirements could result in increased costs, expanded liability exposure, and other changes in the way we provide healthcare insurance and other benefits to our employees.

*We have clients located in many states which have had and may continue to experience significant budget deficits and such deficits may result in reduction of reimbursements to nursing homes.*

Many states in which our clients are located have significant budget deficits as a result of lower than projected revenue collections and increased demand for the funding of entitlements. As a result of these and other adverse economic factors, state Medicaid programs have and may continue to revise reimbursement structures for nursing home services. Any disruption or delay in the distribution of Medicaid and related payments to our clients will adversely affect their cash flows and impact their ability to pay us as agreed upon for the services provided.

*The Company has substantial investment in the creditworthiness and financial condition of our customers.*

The largest current asset on our balance sheet is the accounts and notes receivable balance from our customers. We grant credit to substantially all of our customers. Deterioration in the financial condition of a significant component of our customer base could hinder our ability to collect amounts due from our customers. Potential causes of such declines include national or local economic downturns, customers' dependence on continued Medicare and Medicaid funding and the impact of additional regulatory actions.

8

Table of Contents

We have sometimes been required to extend the period of payment for certain clients beyond contractual terms. Such clients include those who have terminated service agreements and slow payers experiencing financial difficulties. In order to provide for such collection issues and the general risk associated with the granting of credit terms, we have recorded bad debt provisions (in an Allowance for Doubtful Accounts) of $51.4 million for the year ended December 31, 2018 as compared to $6.3 million and $4.6 million in the years ended December 31, 2017 and 2016, respectively. In making our credit evaluations, in addition to analyzing and anticipating, where possible, the specific cases described above, we consider the general collection risk associated with trends in the long-term care industry. We establish credit limits, perform ongoing credit evaluations and monitor accounts to minimize the risk of loss. Despite our efforts to minimize credit risk exposure, clients could be adversely affected if future industry trends change in such a manner as to negatively impact their cash flows. If our clients experience a negative impact on their cash flows, it could have a material adverse effect on our results of operations, financial condition and cash flows.

### *We have a Paid Loss Retrospective Insurance Plan for general liability and workers' compensation insurance.*

We carry a high deductible general liability and workers' compensation program and therefore retain a substantial portion of the risk associated with the possible losses under such programs. Under our insurance plans for general liability and workers' compensation, predetermined loss limits are arranged with our insurance company to limit both our per occurrence cash outlay and annual insurance plan cost. We regularly evaluate our claims pay-out experience and other factors related to the nature of specific claims in arriving at the basis for our accrued insurance claims estimate. Our evaluation is based primarily on current information derived from reviewing our claims experience and industry trends. In the event that our known claims experience and/or industry trends result in an unfavorable change in initial estimates of costs to settle such claims resulting from, among other factors, the severity levels of reported claims and medical cost inflation, it would have an adverse effect on our consolidated results of operations, financial condition and cash flows. Although we engage third-party experts to assist us in estimating appropriate reserves, the determination of the required reserves is dependent upon significant actuarial judgments. Changes in our insurance reserves as a result of our periodic evaluation of the related liabilities may cause significant fluctuations in our operating results.

### *Federal, state and local tax rules can adversely impact our results of operations and financial position.*

We are subject to federal, state and local taxes in the United States. Significant judgment is required in determining the provision for income taxes. We believe our income tax estimates are reasonable. Although, if the Internal Revenue Service or other taxing authority disagrees on a tax position we've taken and upon final adjudication we are required to change such position, we could incur additional tax liability, including interest and penalties. Such costs and expenses could have a material adverse impact on our results of operations, financial condition and cash flows. Additionally, the taxability of our services is subject to various interpretations within the taxing jurisdictions in which we operate. Consequently, in the ordinary course of business, a jurisdiction may contest our reporting positions with respect to the application of its tax code to our services. A conflicting position taken by a state or local taxation authority on the taxability of our services could result in additional tax liabilities and could negatively impact our competitive position in that jurisdiction. If we fail to comply with applicable tax laws and regulations, we could suffer civil or criminal penalties in addition to the delinquent tax assessment. In the taxing jurisdictions where our services have been determined to be subject to tax, the jurisdiction may increase the tax rate assessed on such services. We seek to pass-through to our clients such tax increases. In the event we are not able to pass-through any portion of the tax increase, our results of operations, financial condition and cash flows could be adversely impacted.

### *Our business and financial results could be adversely affected by unfavorable results of material litigation or governmental inquiries.*

We are currently involved in civil litigation and government inquiries which arise in the ordinary course of business. These matters relate to, among other things, general liability, payroll or employee-related matters. Legal actions could result in substantial monetary damages and expenses and may adversely affect our reputation and business status with our clients, whether or not we are ultimately determined to be liable. The outcome of litigation, particularly class action and collective action lawsuits and regulatory actions, is difficult to assess or quantify. The plaintiffs in these types of actions may seek recovery of very large or indeterminate amounts, and estimates may remain unknown for substantial periods of time.

Table of Contents

We assess contingencies to determine the degree of probability and range of possible loss for potential accrual in our financial statements. We would accrue an estimated loss contingency in our financial statements if it were probable that a liability had been incurred and the amount of the loss could be reasonably estimated. Due to the unpredictable nature of litigation, assessing contingencies is highly subjective and requires judgments about future events. The amount of actual losses may differ from our current assessment. As a result of the costs and expenses of defending ourselves against lawsuits or claims, and risks and consequences of legal actions, regardless of merit, our results of operations and financial position could be adversely affected or cause variability in our results compared to expectations.

***A significant majority of our customer base are multi-facility management groups and independent facility operators who lease the buildings in which they operate and may experience risks relating to their leases including termination, escalators, extensions and special charges.***

The credit worthiness of our existing clients, and potential clients, is impacted by their ability to maintain positive relationships with their respective landlords. Any loss or deterioration in the relationship between our clients and their respective landlords may adversely affect their financial condition and ability to make payments on their service agreement with us on agreed upon terms. Any failure by our clients to make rent payments or comply with the provisions of their lease terms could result in the termination of such lease agreements. In such cases, our clients may lose their ability to continue conducting operations and as a result terminate their service agreements with us.

***We primarily provide our services pursuant to agreements which have a one year term, cancelable by either party upon 30 to 90 days' notice after an initial 60 to 120 day service agreement period.***

We do not enter into long-term contractual agreements with our clients for the rendering of our services. Our agreements with clients typically provide for a renewable one year service term, cancelable by either party upon 30 to 90 days' notice after an initial period of 60 to 120 days. Consequently, our clients can unilaterally decrease the amount of services we provide or terminate all services pursuant to the terms of our service agreements. Any loss of a significant number of clients during the first year of providing services, for which we have incurred significant start-up costs or have invested in equipment installations, could in the aggregate materially adversely affect our consolidated results of operations and financial position.

***The Company's business success depends on the management experience of our key personnel.***

We manage and provide our services through a network of management personnel, from on-site facility managers to our executive officers. Therefore, we believe that our ability to recruit and sustain the internal development of managerial personnel is an important factor impacting future operating results and our ability to successfully execute projected growth strategies. Our professional management personnel are the key personnel in maintaining current and selling additional services to existing clients and obtaining new clients.

***Governmental regulations related to labor, employment, immigration and health and safety could adversely impact our results of operations and financial condition.***

Our business is subject to various federal, state, and local laws and regulations in areas such as labor, employment, immigration, and health and safety. These laws frequently evolve through case law, legislative changes and changes in regulatory interpretation, implementation and enforcement. Our policies and procedures and compliance programs are subject to adjustments in response to these changing regulatory and enforcement environments, which could increase our cost of services provided. Although we have contractual rights to pass cost increases we incur to our clients due to regulatory changes, our delay in, or inability to pass such costs through to our clients, could have a material adverse effect on our financial condition, results of operations and cash flows.

In addition, if we fail to comply with applicable laws, we may be subject to lawsuits, investigations, criminal sanctions or civil remedies, including fines, penalties, damages, reimbursement, or injunctions. Also, our clients' facilities are subject to periodic inspection by federal, state, and local authorities for compliance with state and local departments of health requirements. Expenses resulting from failed inspections of the departments that we service could result in our clients being fined and seeking recovery from us, which could also adversely impact our financial condition, results of operations and cash flows.

10

Table of Contents

***We may be adversely affected by inflationary or market fluctuations, including impact of tariffs, in the cost of products consumed in providing our services or our cost of labor. Additionally, we rely on certain vendors for housekeeping, laundry and dietary supplies.***

The prices we pay for the principal items we consume in performing our services are dependent primarily on current market prices. We have consolidated certain supply purchases with national vendors through agreements containing negotiated prospective pricing. In the event such vendors are not able to comply with their obligations under the agreements and we are required to seek alternative suppliers, we may incur increased costs of supplies.

Dietary supplies, to a much greater extent than Housekeeping supplies, are impacted by commodity pricing factors, including the impact of tariffs, which in many cases are unpredictable and outside of our control. We seek to pass on to clients such increased costs but sometimes we are unable to do so. Even when we are able to pass on such costs to our clients, from time to time, sporadic unanticipated increases in the costs of certain supply items due to market or economic conditions may result in a timing delay in passing on such increases to our clients. It is this type of spike in Dietary supplies costs that could most adversely affect Dietary's operating performance. The adverse effect would be realized if we delay in passing on such costs to our clients or in instances where we may not be able to pass such increase on to our clients until the time of our next scheduled service billing review. We seek to mitigate the impact of an unanticipated increase in such supplies' costs through consolidation of vendors, which increases our ability to obtain more favorable pricing.

Our cost of labor may be influenced by factors in certain market areas or changes in the respective collective bargaining agreements to which we are a party. A substantial number of our employees are hourly employees whose wage rates are affected by increases in the federal or state minimum wage rates, wage inflation or local job market adjustments. As collective bargaining agreements are renegotiated, we may need to increase the wages paid to bargaining unit employees covered by such collective bargaining agreements. Although we have contractual rights to pass such union and minimum wage increases through to our clients, our delay in, or inability to pass such wage increases through to our clients could have a material adverse effect on our financial condition, results of operations and cash flows.

***Any perceived or real health risks related to the food industry could adversely affect our Dietary segment.***

We are subject to risks affecting the food industry generally including food spoilage and food contamination. Our products are susceptible to contamination by disease-producing organisms, or pathogens, such as listeria monocytogenes, salmonella, campylobacter, hepatitis A, trichinosis and generic E. coli. Because these pathogens are generally found in the environment, there is a risk that these pathogens could be introduced to our products as a result of improper handling at the manufacturing, processing or food service level. Our suppliers' manufacturing facilities and products are subject to extensive laws and regulations relating to health, food preparation, sanitation and safety standards. Difficulties or failures by these companies in obtaining any required licenses or approvals or otherwise complying with such laws and regulations could disrupt their operations which could adversely affect our operations. Furthermore, there can be no assurance that compliance with governmental regulations by our suppliers will eliminate the risks related to food safety. To the extent there is an outbreak of food related illness in any of our client facilities, it could materially harm our business, results of operations and financial condition.

Additionally, the Company may be subject to liability if the consumption of our food products causes injury, illness or death. Even if a product liability claim is unsuccessful or is not fully pursued, the negative publicity surrounding any assertion that our products caused injury or illness could adversely affect our reputation.

***Changes in interest rates and changes in financial market conditions may result in fluctuating and even negative returns in our investments, and could increase the cost of the borrowings under our borrowing agreements.***

Although management believes we have a prudent investment policy, we are exposed to fluctuations in interest rates and in the market value of our investment portfolio which could adversely impact our financial condition and results of operations. Our marketable securities consist of municipal bonds. We believe that our investment criteria, which include diversification among issuers of bonds, requirements regarding credit ratings and monitoring of our investments' duration periods, reduce our exposure related to the financial distress and budget shortfalls that many state and local governments currently face. Increases in market interest rates could adversely affect our payment obligations with respect to our variable-rate borrowing agreements and adversely affect our liquidity and earnings.

Table of Contents

***Investor and market expectations regarding our financial performance are high and rely greatly on execution of our growth strategy and related increases in financial performance.***

Management believes the historical performance of our Common Stock reflect high market expectations for our future operating results. Our ability to attract new clients through organic growth or acquisitions, and retain existing clients, has enabled us to execute our growth strategy and increase market share historically, however there can be no guarantee that we will be able to do so in the future. Our business strategy focuses on growth and improving profitability through obtaining service agreements with new clients, providing new services to existing clients, obtaining modest price increases on service agreements with clients and maintaining internal cost reduction strategies at our various operational levels. With respect to providing new services to new or existing clients, our strategy is to achieve corresponding profit margins in each of our segments. If we are unable to continue either historical client revenue and profitability growth rates or projected improvement, our operating performance may be adversely affected and the high expectations for our market performance may not be met. Any failure to meet the market's high expectations for our revenue and operating results may have an adverse effect on the market price of our Common Stock.

***The SEC's investigation into our earnings per share ("EPS") calculation practices could result in potential sanctions or penalties, distraction to our management and result in litigation from third parties, each of which could adversely affect or cause variability in our financial results.***

Beginning in November 2017, the Company has been in dialogue with the SEC regarding EPS calculation, rounding and reporting practices and in March 2018 we learned that the SEC had opened a formal investigation into these matters. In response to the SEC's investigation, during the fourth quarter of 2018, the Company authorized its outside counsel to conduct an internal investigation, under the direction of the Company's Audit Committee regarding these matters. The internal investigation was completed in March 2019, prior to the filing of this Annual Report on Form 10-K.

Notwithstanding the completion of the internal investigation, the SEC's investigation is ongoing and there can be no assurance that the SEC or another regulatory body will not make further regulatory inquiries or pursue further action that could result in significant costs and expenses including potential sanctions or penalties as well as distraction to management. In addition, the Company may be subject to litigation from third parties related to the matters under review by the SEC. Accordingly, the ongoing SEC investigation and/or any related litigation could adversely affect or cause variability in our financial results.

***Failure to maintain effective internal control over financial reporting could have a material adverse effect on our ability to report our financial results on a timely and accurate basis.***

Failure to maintain appropriate and effective internal controls over our financial reporting could result in misstatements in our financial statements and potentially subject us to sanctions or investigations by the SEC or other regulatory authorities, and could cause us to delay the filing of required reports with the SEC and our reporting of financial results. Any of these events could result in a decline in the market price of our Common Stock. Although we have taken steps to maintain our internal control structure as required, we cannot guarantee that control deficiencies will not result in a misstatement in the future.

***Any decrease in or suspension of our dividend could cause our stock price to decline.***

We expect to continue to pay a regular quarterly cash dividend. However, our dividend policy and the payment of future cash dividends under the policy are subject to the final determination each quarter by our Board of Directors that (i) the dividend will be made in compliance with laws applicable to the declaration and payment of cash dividends, including Section 1551(b) of the Pennsylvania Business Corporation Law, and (ii) the policy remains in our best interests, which determination will be based on a number of factors, including the impact of changing laws and regulations, economic conditions, our results of operations and/or financial condition, capital resources, financial covenants under our credit facility and other factors considered relevant by the Board of Directors. While we have continually increased the amount of our dividends, given these considerations, there can be no assurance these increases will continue and our Board of Directors may increase or decrease the amount of the dividend at any time and may also decide to suspend or discontinue the payment of cash dividends in the future. Any decrease in the amount of the dividend, or suspension or discontinuance of payment of a dividend, could cause our stock price to decline.

Table of Contents

***Cyber-attacks and breaches could cause operational disruptions, fraud or theft of sensitive information.***

Aspects of our operations are reliant upon internet-based activities, such as ordering supplies and back-office functions such as accounting and transaction processing, making and accepting payments, processing payroll and other administrative functions, etc. A significant disruption or failure of our information technology systems may have a significant impact on our operations, potentially resulting in service interruptions, security violations, regulatory compliance failures and other operational difficulties. In addition, any attack perpetrated against our information systems including through a system failure, security breach or disruption by malware or other damage, could similarly impact our operations and result in loss or misuse of information, litigation and potential liability. Although we have taken steps intended to mitigate the risks presented by potential cyber incidents, it is not possible to protect against every potential power loss, telecommunications failure, cybersecurity attack or similar event that may arise. Moreover, the safeguards we use are subject to human implementation and maintenance and to other uncertainties. Any of these cyber incidents may result in a violation of applicable laws or regulations (including privacy and other laws), damage our reputation, cause a loss of customers and give rise to monetary fines and other penalties, which could be significant. Such events could have an adverse effect on our results of operations, financial condition and liquidity.

***There are risks related to the implementation of our new global enterprise resource planning system.***

We are currently engaged in a multi-year process of conforming our financial and accounting data onto a new enterprise resource planning system ("ERP"). The ERP is designed to improve the efficiency of our financial transaction processes, accurately maintain our books and records, and provide information important to the operation of the business to our management team. The implementation of the ERP will continue to require significant investment of human and financial resources, and we may experience delays and increased costs as a result. Any significant disruption or deficiency in the design and implementation of the ERP could have a material adverse effect on our ability to fulfill and invoice customer orders, apply cash receipts, place purchase orders with suppliers, and make cash disbursements, and could negatively impact data processing, which may have a material adverse effect on our business, consolidated financial condition or results of operations. While we have invested significant resources in planning and project management, significant implementation issues may arise.

**Item 1B. Unresolved Staff Comments.**

None.

**Item 2. Properties.**

We lease our corporate offices, located at 3220 Tillman Drive, Bensalem, Pennsylvania 19020. We also lease office space at other locations in Colorado, South Carolina, Connecticut, Georgia, California and New Jersey. The New Jersey office is the headquarters of our wholly-owned subsidiaries. The other locations serve as divisional or regional offices providing management and administrative services to both of our operating segments in their respective geographical areas.

We are also provided with office and storage space at each of our clients' facilities.

Management does not foresee any difficulties with regard to the continued utilization of these premises. We also believe that such properties are sufficient to support our current operations.

We own office furniture and equipment, housekeeping and laundry equipment, and vehicles. The office furniture and equipment and vehicles are primarily located at the corporate office, divisional and regional offices. We have housekeeping equipment at all client facilities where we provide services under a full service housekeeping agreement. Generally, the aggregate cost of housekeeping equipment located at each client facility is approximately $3,000. Additionally, we have laundry installations at certain client facilities. The cost of such laundry installations ranges between $5,000 and $100,000. We believe that such laundry equipment, office furniture and equipment, housekeeping equipment and vehicles are sufficient to support our current operations.

Table of Contents

**Item 3. Legal Proceedings.**

In the normal course of business, the Company is involved in various administrative and legal proceedings, including labor and employment, contractual, personal injury, workers compensation and insurance matters. We believe the Company is not a party to, nor are any of its properties the subject of, any pending legal proceeding or governmental examination that would have a material adverse effect on our consolidated financial condition or liquidity. However, in light of the uncertainties involved in such proceedings, the ultimate outcome of a particular matter could become material to our results of operations for a particular period depending on, among other factors, the size of the loss or liability imposed and the level of our operating income for that period.

**Item 4. Mine Safety Disclosures.**

Not applicable.

14

Table of Contents

**Legal Proceedings**

The Company is subject to various claims and legal actions in the ordinary course of business. Some of these matters include payroll and employee-related matters and examinations by governmental agencies. As the Company becomes aware of such claims and legal actions, the Company records accruals for any exposures that are probable and estimable. If adverse outcomes of such claims and legal actions are reasonably possible, management assesses materiality and provides financial disclosure, as appropriate. The Company believes it is not a party to, nor are any of its properties the subject of, any pending legal proceeding or governmental examination that would have a material adverse effect on the Company's consolidated financial condition or liquidity.

**Government Regulations**

The Company's clients are concentrated in the healthcare industry and are primarily providers of long-term care. The revenues of many of the Company's clients are highly reliant on Medicare, Medicaid and third party payors' reimbursement funding rates. New legislation or additional changes in existing regulations could directly impact the governmental reimbursement programs in which the clients participate. The full effect of any such programs would not be realized until these laws are fully implemented and government agencies issue applicable regulations or guidance.

**Note 18-Accrued Insurance Claims**

The Company currently has a Paid Loss Retrospective Insurance Plan for general liability and workers' compensation insurance, which comprise approximately 31.6% of the Company's liabilities at December 31, 2018. Under the Company's insurance plans for general liability and workers' compensation, predetermined loss limits are arranged with the Company's insurance company to limit both per occurrence cash outlay and annual insurance plan cost. The Company's accounting for this plan utilizes current valuations from a third party actuary, which include assumptions based on data such as historical claims, pay-out experience, demographic factors, industry trends, severity factors, and other actuarial calculations. In the event that the Company's claims experience and/or industry trends result in an unfavorable change in the assumptions or outcomes, it would have an adverse effect on the Company's results of operations and financial condition.

For general liability and workers' compensation, the Company records both a reserve for the estimated future cost of claims and related expenses that have been reported but not settled, as well as an estimate of claims incurred but not reported. Such reserves for claims incurred but not reported are developed by a third party actuary through review of the Company's historical data and open claims.

**Note 19-Subsequent Events**

The Company evaluated all subsequent events through the date of this Annual Report on Form 10-K. There were no events or transactions occurring during this subsequent reporting period which require recognition or additional disclosure in these financial statements.

Exhibit 23

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We have issued our reports dated March 18, 2019, with respect to the consolidated financial statements, schedule, and internal control over financial reporting included in the Annual Report of Healthcare Services Group, Inc. and Subsidiaries on Form 10-K for the year ended December 31, 2018. We consent to the incorporation by reference of said reports in the Registration Statements of Healthcare Services Group, Inc. on Forms S-3 (File No. 333-108182, effective August 22, 2003, and on Forms S-8 (File No. 333-92835, effective December 15, 1999, and File No. 333-184612, effective October 26, 2012).

/s/ GRANT THORNTON LLP

New York, New York
March 18, 2019

Exhibit 32.1

**Certification Pursuant to**
**18 U.S.C. Section 1350,**
**As Adopted Pursuant to**
**Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report on Form 10-K of Healthcare Services Group, Inc. (the "Company") for the year ended December 31, 2018 as filed with the Securities and Exchange commission on the date hereof (the "Report"), I, Theodore Wahl, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d), of the Securities Exchange Act of 1934; and

(2) That information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:    March 18, 2019

/s/ Theodore Wahl

Theodore Wahl

President & Chief Executive Officer

(Principal Executive Officer)

Exhibit 32.2

**Certification Pursuant to**
**18 U.S.C. Section 1350,**
**As Adopted Pursuant to**
**Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report on Form 10-K of Healthcare Services Group, Inc. (the "Company") for the year ended December 31, 2018 as filed with the Securities and Exchange commission on the date hereof (the "Report"), I, John C. Shea, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d), of the Securities Exchange Act of 1934; and

(2) That information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:    March 18, 2019                                          /s/ John C. Shea

                                                                 John C. Shea

                                                                 Chief Financial Officer

                                                                 (Principal Financial and Accounting Officer)

# EXHIBIT 3

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2014**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**
**Commission file number: 0-12015**

# HEALTHCARE SERVICES GROUP, INC.

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Pennsylvania** | **23-2018365** |
| *(State or other jurisdiction of incorporated or organization)* | *(IRS Employer Identification No.)* |
| **3220 Tillman Drive, Suite 300, Bensalem, PA** | **19020** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:**
**(215) 639-4274**

**Securities registered pursuant to Section 12(b) of the 1934 Act:**

| | |
|---|---|
| **Common Stock ($.01 par value)** | **The NASDAQ Global Select Market** |
| *Title of Class* | *Name of each exchange on which securities registered* |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES ☑ NO ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. YES ☐ NO ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES ☑ NO ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). YES ☑ NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Large accelerated filer | ☑ | Accelerated filer | ☐ | Non-accelerated filer | ☐ | Smaller reporting company | ☐ |

(Do not check if a smaller
reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). YES ☐ NO ☑

The aggregate market value of the voting stock (Common Stock, $.01 par value) held by non-affiliates of the Registrant as of the close of business on June 30, 2014 was approximately $1,327,280,000 based on closing sale price of the Common Stock on the NASDAQ National Global Select on that date. The determination of affiliate status is not a determination for any other purpose. The Registrant does not have any non-voting common equity authorized or outstanding.

Indicate the number of shares outstanding of each of the registrant's classes of common stock (Common Stock, $.01 par value) as of the latest practicable date (February 17, 2015). 71,261,000

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the definitive Proxy Statement for the Registrant's Annual Meeting of Shareholders to be held on May 26, 2015 have been incorporated by reference into Parts II and III of this Annual Report on Form 10-K.

1

Table of Contents

**Item 1A. Risk Factors.**

You should carefully consider the risk factors we have described below, as well as other related information contained within this annual report on Form 10-K because these factors could cause the actual results and our financial condition to differ materially from those projected in forward-looking statements. We believe that the risks described below are our most significant risk factors but there may be risks and uncertainties that are not currently known to us or that we currently deemed to be immaterial. Therefore, any such unknown or deemed immaterial risks and uncertainties, as well as those noted below could materially adversely affect our business, financial condition or results of operations and cash flows.

***We provide services to several clients which contribute significantly, on an individual, as well as aggregate basis, to our total revenues.***

We have several clients who each have made a contribution to our total consolidated revenues ranging from 3% to 6%. Although we expect to continue the relationship with these clients, there can be no assurance thereof. The loss, individually or in combination, of such clients, or a significant reduction in the revenues we receive from such clients, could have a material adverse effect on the results of operations of our two operating segments. In addition, if any of these clients change or alter current payment terms it could increase our accounts receivable balance and have a material adverse effect on our cash flows and cash and cash equivalents.

***Our clients are concentrated in the health care industry which is currently facing considerable legislative proposals to reform it. Many of our clients rely on reimbursement from Medicare, Medicaid and other third-party payors. Rates from such payors may be altered or reduced, thus affecting our Clients' results of operations and cash flows.***

We provide our services primarily to providers of long-term and post-acute care. In March 2010, the U.S. Congress enacted the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act of 2010 (together, the "Act"), and is considering further legislation to reform healthcare in the United States which could significantly impact our clients. In July 2011, CMS issued final rulings which, among other things, reduced, effective October 1, 2011, Medicare payments to nursing centers by 11.1% and changed the reimbursement for the provision of group rehabilitation therapy services to Medicare beneficiaries. In January 2013, the U.S. Congress enacted the American Taxpayer Relief Act of 2012, which delayed automatic spending cuts of $1.2 trillion, including reduced Medicare payments to plans and providers up to 2%. These discretionary spending caps were originally enacted under provisions in the Budget Control Act of 2011, an initiative to reduce the federal deficit through the year 2021, also known as "sequestration." The sequestration went into effect starting March 2013. In December 2013, the U.S. Congress enacted the Bipartisan Budget Act of 2013, which reduces the impact of the sequestration over the next two years. This began in fiscal year 2014 and extended the reduction in Medicare payments to plans and providers for two years through the year 2023. Some states have enacted or are considering enacting measures designed to reduce their Medicaid expenditures. We cannot predict what efforts, and to what extent, such legislation and proposals to contain healthcare costs will ultimately impact our clients' revenues through reimbursement rate modifications. Congress has enacted a number of major laws during the past decade that have significantly altered, or may alter, overall government reimbursement for nursing home services. Because our clients' revenues are generally highly reliant on Medicare, Medicaid and other third-party payors' reimbursement funding rates and mechanisms, the overall effect of these laws and trends in the long term care industry have affected and could adversely affect the liquidity of our clients, resulting in their inability to make payments to us on agreed upon payment terms. These factors, in addition to delays in payments from clients have resulted in, and could continue to result in, significant additional bad debts in the future.

***Federal health care reform legislation's eventual impact, including requiring most individuals to have health insurance and establish new regulation on health plans, may adversely affect our operating costs and results of operations.***

The Act includes a large number of health-related provisions that become effective over the next several years, including requiring most individuals to have health insurance and establishing new regulations on health plans. While much of the cost of the recent healthcare legislation enacted will begin in 2015 due to provisions of the legislation being phased in over time, changes to our healthcare cost structure could have an impact on our operating costs. Providing such additional health insurance benefits to our employees or the payment of penalties if such coverage is not provided, would increase our expense. If we are unable to pass-through these charges to our clients to cover this expense, such increases in expense could adversely impact our operating costs and results of operations.

In addition, under the Act, employers will have to file a significant amount of additional information with the Internal Revenue Service. These and other requirements related to compliance under the Act could result in increased costs, expanded liability exposure, and other changes in the ways we provide healthcare and other benefits to our employees.

11

Table of Contents

***We have clients located in many states which have had and may continue to experience significant budget deficits and such deficits may result in reduction of reimbursements to nursing homes.***

Many states, in which our clients are located, have significant budget deficits as a result of lower than projected revenue collections and increased demand for the funding of entitlements. As a result of these and other adverse economic factors, state Medicaid programs are reconsidering previously approved increases in nursing home reimbursement or are considering delaying those increases. Some states have over the past year indicated they may be unable to make entitlement payments, including Medicaid payments to nursing homes. Any disruption or delay in the distribution of Medicaid and related payments to our clients will adversely affect their liquidity and impact their ability to pay us as agreed upon for the services provided.

***The Company has substantial investment in the creditworthiness and financial condition of our customers.***

The largest current asset on our balance sheet is our accounts and notes receivable balances from our customers. We grant credit to substantially all of our customers. Deterioration in financial condition across a significant component of our customer base could hinder our ability to collect amounts from our customers. The potential causes of such decline include national or local economic downturns, customers' dependence on continued Medicare and Medicaid funding and the impact of additional regulatory actions. When contractual terms are not met, we generally encounter difficulty in collecting amounts due from certain of our clients. Therefore, we have sometimes been required to extend the period of payment for certain clients beyond contractual terms. These clients include those who have terminated service agreements and slow payers experiencing financial difficulties. In making our credit evaluations, in addition to analyzing and anticipating, where possible, the specific cases described above, we consider the general collection risk associated with trends in the long-term care industry. We also establish credit limits, perform ongoing credit evaluation and monitor accounts to minimize the risk of loss. Notwithstanding our efforts to minimize credit risk exposure, our clients could be adversely affected if future industry trends change in such a manner as to negatively impact their cash flows. If our clients experience a negative impact in their cash flows, it would have a material adverse effect on our consolidated results of operations, financial condition and cash flows.

***We have a Paid Loss Retrospective Insurance Plan for general liability and workers' compensation insurance.***

We self-insure or carry a high deductible, and therefore retain a substantial portion of the risk associated with the expected losses under our general liability and workers' compensation programs. Under our insurance plans for general liability and workers' compensation, predetermined loss limits are arranged with our insurance company to limit both our per occurrence cash outlay and annual insurance plan cost. We regularly evaluate our claims pay-out experience and other factors related to the nature of specific claims in arriving at the basis for our accrued insurance claims estimate. Our evaluation is based primarily on current information derived from reviewing our claims experience and industry trends. In the event that our known claims experience and/or industry trends result in an unfavorable change in initial estimates of costs to settle such claims resulting from, among other factors, the severity levels of reported claims and medical cost inflation, it would have an adverse effect on our consolidated results of operations, financial condition and cash flows. During 2014, the Company recorded a one-time, non-cash adjustment of $37,416,000 related to a change in estimate related to a change in reserve methodology through the utilization of a third party actuary. Although we engage third-party experts to assist us in estimating appropriate insurance accounting reserves, the determination of the required reserves is dependent upon significant actuarial judgments that have a material impact on our reserves. Changes in our insurance reserves as a result of our periodic evaluation of the related liabilities may cause significant volatility in our operating results.

***Federal, State and Local tax rules can adversely impact our results of operations and financial position.***

We are subject to Federal, State and Local taxes in the United States and Canada. Significant judgment is required in determining the provision of income taxes. We believe our income tax estimates are reasonable. Although, if the Internal Revenue Service or other taxing authority disagrees with a taken tax position and upon final adjudication we are unsuccessful, we could incur additional tax liability, including interest and penalty. Such costs and expenses could have a material adverse impact on our results of operations and financial position. Additionally, the taxability of our services is subject to various interpretations within the taxing jurisdictions of our markets. Consequently, in the ordinary course of business, a jurisdiction may contest our reporting positions with respect to the application of its tax code to our services. A jurisdiction's conflicting position on the taxability of our services could result in additional tax liabilities which we may not be able to pass on to our clients or could negatively impact our competitive position in the respective location. Additionally, if we fail to comply with applicable tax laws and regulations we could suffer civil or criminal penalties in addition to the delinquent tax assessment. In the taxing jurisdictions where our services have been determined to be subject to tax, the jurisdiction may increase the tax rate assessed on such services. We endeavor to pass-through to our clients such tax increases. In the event we are not able to pass-through any portion of the tax increase, our gross margin could be adversely impacted.

12

Table of Contents

***Our business and financial results could be adversely affected by unfavorable results of material litigation or governmental inquiries.***

We are currently involved in civil litigations and government inquiries which arise in the ordinary course of business. These matters relate to, among other things, general liability, payroll or employee-related matters, as well as inquiries from governmental agencies. Legal actions could result in substantial monetary damages as well as adversely affect our reputation and business status with our clients whether we are ultimately determined to be liable or not. The outcome of litigation, particularly class action and collective action lawsuits and regulatory actions, is difficult to assess or quantify. The plaintiffs in these types of actions may seek recovery of very large or indeterminate amounts, and such amounts may remain unknown for substantial periods of time.

We assess contingencies to determine the degree of probability and range of possible loss of potential accrual in our financial statements. We would accrue an estimated loss contingency in our financial statements if it were probable that a liability had been incurred and the amount of the loss could be reasonably estimated. Due to the unpredictable and unfavorable nature of litigation, assessing contingencies is highly subjective and requires judgments about future events. The amount of actual losses may differ from our current assessment. As a result of the costs and expenses of defending ourselves against lawsuits or claims, and risks and consequences of legal actions, regardless of merit, our results of operations and financial position could be adversely affected or cause variability in our results compared to expectations.

***We primarily provide our services pursuant to agreements which have a one year term, cancelable by either party upon 30 to 90 days' notice after the initial 90-day service agreement period.***

We do not enter into long-term contractual agreements with our clients for the rendering of our services. Consequently, our clients can unilaterally decrease the amount of services we provide or terminate all services pursuant to the terms of our service agreements. Any loss of a significant number of clients during the first year of providing services, for which we have incurred significant start-up costs or invested in an equipment installation, could in the aggregate materially adversely affect our consolidated results of operations and financial position.

***The Company's business success depends on the management experience of our key personnel.***

We manage and provide our services through a network of management personnel, from the on-site facility manager up to our executive officers. Therefore, we believe that our ability to recruit and sustain the internal development of managerial personnel is an important factor impacting future operating results and our ability to successfully execute projected growth strategies. Our professional management personnel are the key personnel in maintaining and selling additional services to current clients and obtaining new clients.

***We may be adversely affected by inflationary or market fluctuations in the cost of products consumed in providing our services or our cost of labor. Additionally, we rely on certain vendors for housekeeping, laundry and dietary supplies.***

The prices we pay for the principal items we consume in performing our services are dependent primarily on current market prices. We have consolidated certain supply purchases with national vendors through agreements containing negotiated prospective pricing. In the event such vendors are not able to comply with their obligations under the agreements and we are required to seek alternative suppliers, we may incur increased costs of supplies.

Dietary supplies, to a much greater extent than Housekeeping supplies, are impacted by commodity pricing factors, which in many cases are unpredictable and outside of our control. Although we endeavor to pass on to clients such increased costs, from time to time, sporadic unanticipated increases in the costs of certain supply items due to market economic conditions may result in a timing delay in passing on such increases to our clients. It is this type of spike in Dietary supplies' costs that could most adversely affect Dietary's operating performance. The adverse effect would be realized if we delay in passing on such costs to our clients or in instances where we may not be able to pass such increase on to our clients until the time of our next scheduled service billing review. We endeavor to mitigate the impact of unanticipated increase in such supplies' costs through consolidation of vendors, which increases our ability to obtain reduced pricing.

13

Table of Contents

Our cost of labor may be influenced by unanticipated factors in certain market areas or increases in the respective collective bargaining agreements of our clients, to which we assent. A substantial number of our employees are hourly employees whose wage rates are affected by increases in the federal or state minimum wage rate. We are subject to the Fair Labor Standards Act, which governs such matters as minimum wages, overtime and other working conditions. As collective bargaining agreements are renegotiated or minimum wage rates increase, which will occur in at least twenty states in 2015, we may need to increase the wages paid to employees. This may be applicable to not only minimum wage employees but also to employees at wage rates which are currently above the minimum wage. Although we have contractual rights to pass such wage increases through to our clients, our delay in, or inability to pass such wage increases through to our clients could have a material adverse effect on financial condition, results of operations and cash flows.

***Any perceived or real health risks related to the food industry could adversely affect our Dietary segment.***

We are subject to risks affecting the food industry generally, including food spoilage and food contamination. Our products are susceptible to contamination by disease-producing organisms, or pathogens, such as listeria monocytogenes, salmonella, campylobacter, hepatitis A, trichinosis and generic E. coli. Because these pathogens are generally found in the environment, there is a risk that these pathogens could be introduced to our products as a result of improper handling at the manufacturing, processing or food service level. Our suppliers' manufacturing facilities and products are subject to extensive laws and regulations relating to health, food preparation, sanitation and safety standards. Difficulties or failures by these companies in obtaining any required licenses or approvals or otherwise complying with such laws and regulations could adversely affect our revenue that is generated from these companies. Furthermore, there can be no assurance that compliance with governmental regulations by our suppliers will eliminate the risks related to food safety.

Additionally, the Company may be subject to liability if the consumption of our food products causes injury, illness or death. Even if a product liability claim is unsuccessful or is not fully pursued, the negative publicity surrounding any assertion that the Company's products caused injury or illness could adversely affect the Company's reputation.

Events reported in the media, such as incidents involving food-borne illnesses or food tampering, whether or not accurate, can cause damage to the reputation of our dietary segment. In addition, to the extent there is an outbreak of food related illness in any of our client facilities, it could materially harm our business, results of operations and financial condition.

***Our investments may be subject to fluctuating and even negative returns depending upon interest rate movements and financial market conditions.***

Although management believes we have a prudent investment policy, we are exposed to fluctuations in interest rates and in the market values of our investment portfolio which could adversely impact our financial condition and results of operations. Our marketable securities are primarily invested in municipal bonds. We believe that our investment criteria which includes reducing our exposure to individual states, requiring certain credit ratings and limiting our investments' duration period, reduces our exposure related to the financial duress and budget shortfalls that many state and local governments currently face.

***Market expectations are high and rely greatly on execution of our growth strategy and related increases in financial performance.***

Management believes the historical price increases of our Common Stock reflect high market expectations for our future operating results. In particular, our ability to attract new clients, through organic growth or acquisitions, has enabled us to execute our growth strategy and increase market share. Our business strategy focuses on growth and improving profitability through obtaining service agreements with new clients, providing new services to existing clients, obtaining modest price increases on service agreements with clients and maintaining internal cost reduction strategies at our various operational levels. In respect to providing new services to new or existing clients, our strategy is to achieve corresponding profit margins in each of our segments. If, in the event we are not able to continue either historical client revenue and profitability growth rates or projected improvement in such factors, our operating performance may be adversely affected and the high expectations for our market performance may not be met. Any failure to meet the market's high expectations for our revenue and operating results may have an adverse effect on the market price of our Common Stock.

14

Table of Contents

***Failure to maintain effective internal control over financial reporting could have a material adverse effect on our ability to report our financial results on a timely and accurate basis.***

We are required to maintain internal control over financial reporting pursuant to Rule 13a-15 under the Exchange Act. Failure to maintain such controls could result in misstatements in our financial statements and potentially subject us to sanctions or investigations by the SEC or other regulatory authorities or could cause us to delay the filing of required reports with the SEC and our reporting of financial results. Any of these events could result in a decline in the price of shares of our common stock. Although we have taken steps to maintain our internal control structure as required, we cannot assure you that control deficiencies will not result in a misstatement in the future.

***Recent government regulations may impact our ability to distribute dividends or the amount of such dividends to shareholders. Any decrease in or suspension of our dividend could cause our stock price to decline.***

We expect to continue to pay a regular quarterly cash dividend. However, our dividend policy and the payment of future cash dividends under the policy are subject to the final determination each quarter by our Board of Directors that (i) the dividend will be made in compliance with laws applicable to the declaration and payment of cash dividends, including Section 1551(b) of the Pennsylvania Business Corporation Law, and (ii) the policy remains in our best interests, which determination will be based on a number of factors, including the impact of changing laws and regulations, economic conditions, our results of operations and/or financial condition, capital resources, the ability to satisfy financial covenants and other factors considered relevant by the Board of Directors. While we have continually increased the amount of our dividends, given these considerations, there can be no assurance these increases will continue and our Board of Directors may increase or decrease the amount of the dividend at any time and may also decide to suspend or discontinue the payment of cash dividends in the future. Any decrease in the amount of the dividend, or suspension or discontinuance of payment of a dividend, could cause our stock price to decline.

***We may be unable to successfully integrate the operations of Platinum Health Services, LLC and Platinum Health Services PEO, LLC with our operations.***

We acquired the assets of Platinum Health Services, LLC and Platinum Health Services PEO, LLC (collectively "Platinum") on July 12, 2013. We have devoted significant management attention and resources to integrating the operations and business practices of Platinum with our existing operating and business practices. Potential difficulties we have encountered or may encounter as part of the integration process include the following:

- the ability to retain a substantial number of Platinum's existing clients;
- the unanticipated or excessive diversion of management's resources;
- the integration of new operations and personnel and the disruption of, or the loss of momentum in, ongoing operations;
- the failure to achieve expected financial results;
- the inability to implement effective internal controls, procedures and policies for Platinum as required by the Sarbanes-Oxley Act of 2002 within the time periods prescribed thereby;
- the inability to successfully integrate Platinum in a manner that permits us to achieve the full revenue and other benefits anticipated to result from our acquisition of its assets; and
- the potential unknown liabilities and unforeseen incurred expenses or delays associated with the acquisition.

These and other risks could affect our ability to achieve the anticipated benefits of our acquisition of Platinum. In addition, these and other risks related to our acquisition of Platinum could adversely affect our ability to maintain relationships with customers and employees and have a material adverse effect on our business, financial condition and results of operations. If we were unable to successfully address any of these risks, our overall business could be harmed.

***Our reorganization initiatives may not achieve the expected costs reductions.***

In fiscal year 2015, the Company expects to transition its workers' compensation and certain employee health & welfare insurance programs to HCSG Insurance Corp. ("HCSG Insurance" or the "Captive"), its wholly owned captive insurance subsidiary. HCSG Insurance currently provides general liability coverage to the Company. HCSG Insurance was formed in January 2014 to provide the Company with greater flexibility and cost efficiency in meeting its property & casualty and health & welfare needs. As part of this process, the Company recorded a non-cash adjustment of $37,416,000 to reflect estimated current and future insurance claims projected to be closed out over the next 15 to 17 years. Failure to achieve the expected costs reductions related to these reorganization initiatives could have a material adverse effect on our business and results of operations.

15

Exhibit 23

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We have issued our reports dated February 19, 2015, with respect to the consolidated financial statements, schedule, and internal control over financial reporting included in the Annual Report of Healthcare Services Group, Inc. and Subsidiaries on Form 10-K for the year ended December 31, 2014. We hereby consent to the incorporation by reference of said reports in the Registration Statements of Healthcare Services Group, Inc. on Forms S-3 (File No. 333-108182, effective August 22, 2003, File No. 333-137713, effective September 9, 2006, File No. 333-161553, effective August 26, 2009, File No. 333-189986, effective July 17, 2013, and File No.333-197900, effective August 6, 2014) and on Forms S-8 (File No. 333-92835, effective December 15, 1999, and File No. 333-184612, effective October 26, 2012).

/s/ GRANT THORNTON LLP

New York, New York
February 19, 2015

Exhibit 32.1

**Certification Pursuant to**
**18 U.S.C. Section 1350,**
**As Adopted Pursuant to**
**Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report on Form 10-K of Healthcare Services Group, Inc. (the "Company") for the year ended December 31, 2014 as filed with the Securities and Exchange commission on the date hereof (the "Report"), I, Daniel P. McCartney, Chief Executive Officer of the of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

   (1) The Report fully complies with the requirements of Section 13(a) or 15(d), of the Securities Exchange Act of 1934; and

   (2) That information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:   February 19, 2015

/s/ Daniel P. McCartney

Daniel P. McCartney

Chief Executive Officer

(Principal Executive Officer)

Exhibit 32.2

**Certification Pursuant to**
**18 U.S.C. Section 1350,**
**As Adopted Pursuant to**
**Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report on Form 10-K of Healthcare Services Group, Inc. (the "Company") for the year ended December 31, 2014 as filed with the Securities and Exchange commission on the date hereof (the "Report"), I, John C. Shea, Chief Financial Officer of the of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

  (1) The Report fully complies with the requirements of Section 13(a) or 15(d), of the Securities Exchange Act of 1934; and

  (2) That information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:   February 19, 2015

/s/ John C. Shea

John C. Shea

Chief Financial Officer

(Principal Financial and Accounting Officer)

# EXHIBIT 4

10-K 1 hcsg10kfy2013.htm FORM 10-K

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2013**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**
**Commission file number: 0-12015**

# HEALTHCARE SERVICES GROUP, INC.

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Pennsylvania** | **23-2018365** |
| *(State or other jurisdiction of incorporated or organization)* | *(IRS Employer Identification No.)* |
| **3220 Tillman Drive, Suite 300, Bensalem, PA** | **19020** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:**
**(215) 639-4274**

**Securities registered pursuant to Section 12(b) of the 1934 Act:**

| | |
|---|---|
| **Common Stock ($.01 par value)** | **The NASDAQ Global Select Market** |
| *Title of Class* | *Name of each exchange on which securities registered* |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES ☑   NO ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. YES ☐   NO ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES ☑   NO ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). YES ☑   NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Large accelerated filer | ☑ | Accelerated filer | ☐ | Non-accelerated filer | ☐ | Smaller reporting company | ☐ |

(Do not check if a smaller
reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). YES ☐   NO ☑

The aggregate market value of the voting stock (Common Stock, $.01 par value) held by non-affiliates of the Registrant as of the close of business on June 30, 2013 was approximately $1,183,606,000 based on closing sale price of the Common Stock on the NASDAQ National

Global Select on that date. The determination of affiliate status is not a determination for any other purpose. The Registrant does not have any non-voting common equity authorized or outstanding.

Indicate the number of shares outstanding of each of the registrant's classes of common stock (Common Stock, $.01 par value) as of the latest practicable date (February 19, 2014). 70,110,000

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the definitive Proxy Statement for the Registrant's Annual Meeting of Shareholders to be held on May 27, 2014 have been incorporated by reference into Parts II and III of this Annual Report on Form 10-K.

1

Table of Contents

**Item 1B.   Unresolved Staff Comments.**

None.

**Item 2.   Properties.**

We lease our corporate offices, located at 3220 Tillman Drive, Suite 300, Bensalem, Pennsylvania 19020. We also lease office space at other locations in Pennsylvania, Colorado, South Carolina, Connecticut, Georgia, Illinois, California and New Jersey. These locations serve as divisional or regional offices providing management and administrative services to both of our operating segments in their respective geographical areas.

We are also provided with office and storage space at each of our client facilities.

Management does not foresee any difficulties with regard to the continued utilization of all of the aforementioned premises. We also believe that such properties are sufficient for our current operations.

We presently own laundry equipment, office furniture and equipment, housekeeping equipment and vehicles. Such office furniture and equipment, and vehicles are primarily located at our corporate office, warehouse, and divisional and regional offices. We have housekeeping equipment at all client facilities where we provide services under a full service housekeeping agreement. Generally, the aggregate cost of housekeeping equipment located at each client facility is less than $2,500. Additionally, we have laundry installations at approximately 100 client facilities. Our cost of such laundry installations ranges between $5,000 and $100,000. We believe that such laundry equipment, office furniture and equipment, housekeeping equipment and vehicles are sufficient for our current operations.

**Item 3.   Legal Proceedings.**

In the normal course of business, the Company is involved in various administrative and legal proceedings, including labor and employment, contracts, personal injury, and insurance matters. The Company believes it is not a party to, nor are any of its properties the subject of, any pending legal proceeding or governmental examination that would have a material adverse effect on the Company's consolidated financial condition or liquidity. However, in light of the uncertainties involved in such proceedings, the ultimate outcome of a particular matter could become material to the Company's results of operations for a particular period depending on, among other factors, the size of the loss or liability imposed and the level of the Company's operating income for that period.

**Item 4.   Mine Safety Disclosures.**

Not applicable.

15

# EXHIBIT 5

**The Fly**

LOGIN

Forgot password
Remember me ☐

Get Free Trial

| HOME | NEWS & ANALYSIS | MY PORTFOLIOS | CALENDARS | ABOUT THE FLY | | Search |

## ⚡ BREAKING NEWS   Instant updates and real-time market news.

**HCSG**
**03/04**

### Healthcare Services' delayed 10-K bad, not terrible news, says Baird

Baird analyst Andrew Wittmann notes that Healthcare Services' shares were under pressure tied to a delayed 10-K. However, the delay stems from SEC inquiry around EPS rounding, a known matter which the analyst has previously highlighted as odd but "ultimately immaterial." Wittmann believes investors had braced for broader concerns, particularly as it relates to A/R, and does not think news ultimately justifies about $300M of value destruction. The analyst has a Neutral rating and $39 price target on the shares.

**HCSG**
Healthcare
Services

**$32.62**
**-5.13** (-13.59%)

| 12/10/18 | 12/14/18 | 02/01/19 | 03/04/19 |
| BNCH | JEFF | STFL | BARD |

## TODAY'S FREE FLY STORIES

**TWOU**
**15:34** β

**2U options imply 21.4% move in share price post-earnings »**
Pre-earnings options…

12 Nov

**AXAS**
**15:33** 🔥

**Abraxas Petroleum cancels Q3 earnings call scheduled for this afternoon »**
Abraxas Petroleum…

12 Nov

**Treasury Market Summary »**

| Why the Fly? | Get Free Trial | | Breaking News Pop-out ↗ | Fly Cast ↗ |

**SPX, SPY**
**15:20**

**POTUS advisers exploring 15% tax rate proposal for middle class, WP says »**
U.S. President Donald…
SPX  SPY

**HUYA**
**15:19** β

**HUYA options imply 14.0% move in share price post-earnings »**
Pre-earnings options…

12 Nov  09 Dec

**Milestone Scientific**

Milestone Scientific. They're a firm based out of Livingston, New Jersey and they're committed to adv...

### 📊 TRENDING TOPICS

Today's most popular companies and stories

| Most Clicked | Most Searched |

| **5 mins** | **1 Hour** | **Today** |
| DXC | SPX | AMRN |
| LPG | SPY | NVDA |
| MYGN | TWLO | DXC |
| SPX | TLRY | SLDB |
| SWKS | AMRN | TWLO |

**TWLO**
14:07

Twilio use said to be scaled back by largest customer, blog report claims

WhatsApp, which accounted for 6% of Twilio's revenue for the nine months…

1 of 5 Top Stories

◄          ►

Donate $250

Help provide 105 meals*

# EXHIBIT 6



# Healthcare Services Group (HCSG[a])

**Required disclosures at the end of this report**

March 4, 2019

# CL King Flash Message

**Michael W. Gallo, CFA**
**mwg@clking.com/(212) 421-9382**

Ticker: HCSG
Rating: Strong Buy
PT: $55.00
Last Close Price: $37.74
Last Close Date: 03/01/2019

### HCSG: 10-K Filing Delayed 15 Days; Relates to Rounding of Individual Quarters in Prior Years, but Unlikely to Change Go-Forward Story

Healthcare Services Group (HCSG) has determined that it is unable to file its Annual Report, or Form 10-K, for the year ended December 31, 2018, within the prescribed time period, and is requesting a two-week extension. It is expected to be reported within 15 days of the prescribed due date following the conclusion of the internal investigation on rounding of EPS in prior-year quarters. The company does not expect the Form 10-K to reflect any changes to its results of operations as previously reported in its most recent earnings release for the three months ended December 31, 2018 and for the year ended December 31, 2018.

HCSG first received a letter in November 2017 from the SEC regarding an inquiry that the SEC is conducting into EPS calculation practices and requesting that the company voluntarily provide certain information and documents relating to its EPS rounding and reporting practices. HCSG also received a subpoena in March 2018 from the SEC in connection with these matters. Our recollection is that this had been discussed, first on the 1Q17 conference call, and that it was related to rounding of quarters up or down, but was unlikely to have a material impact on aggregate EPS, although it might shift timing among different periods. Since the inception of the inquiry, HCSG has been providing information and documents to the SEC. Additionally, during 4Q18, the company authorized its outside counsel to conduct an internal investigation, under the direction of the company's audit committee, into matters related to the SEC subpoena. HCSG continues to cooperate with the SEC's investigation.

### *Valuation*

Our 12-month price target of $55.00 reflects a multiple of 33.3x our FY19 EPS estimate of $1.65, which is a modest discount to the average forward multiple over the last couple of years.

### *Risks to Achieving Our Price Target*

The chief concern, or risk, is that the government will make substantial Medicare/Medicaid cuts in order to cut growing budget deficits, which would put pressure on nursing homes and negatively impact HCSG's business.

Additional risks include credit and collection risks associated with this industry.

CL King & Associates
*Established 1972*

# DISCLOSURES:

## ANALYST CERTIFICATION

I, Michael W. Gallo, certify that all views expressed by me in this research report regarding the securities, as named herein, and its issuers accurately reflect my personal views. I further certify that I have not and will not receive compensation directly or indirectly related to any specific recommendations or views expressed in this research report.

*Risk Considerations and Ratings Charts for individual stocks can be found in the most recent research note.*

*Additional information available upon request.*
**Flash messages are designed to convey the quick thoughts of the analyst and as a result are unedited.**

a: CL King & Associates currently maintains a market in the equity securities of the subject company.

CL King & Associates, Inc. does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the Firm may have a conflict of interest that could affect the objectivity of this report. No portion of an analyst's compensation is based on a specific investment banking transaction; however, part of an analyst's compensation may be based upon overall firm revenue and profitability, of which investment banking is a component. The information contained herein was obtained from sources which we believe to be reliable, but we do not guarantee its accuracy or completeness. CL King & Associates, Inc., and/or one or more of its officers or employees may have positions in, and may, as principal or agent, buy or sell the securities mentioned herein, and may from time to time maintain a market in these securities. It can neither be guaranteed nor should it be assumed that future recommendations will equal the performance of past recommendations or be profitable. Member FINRA/SIPC. WBENC Certified.

This material is for your information only and does not constitute an offer to buy or sell, or the solicitation of any offer to buy or sell any securities. This material is intended solely for institutional investors and investors who CL King reasonably believes are institutional investors.

## RATINGS INFORMATION

### Rating and Price Target Change History



Source: CL King & Associates      Created by: Blue-Compass.net

*3 Year Rating Change History*

| Date | Rating | Closing Price ($) |
|------|--------|-------------------|
| 07/05/2016 | Strong Buy (SB) | 41.28 |

*3 Year Price Change History*

| Date | Target Price ($) | Closing Price ($) |
|------|------------------|-------------------|
| 07/05/2016 | 47.00 | 41.28 |
| 05/17/2017 | 56.00 | 45.81 |
| 10/18/2017 | 62.00 | 51.92 |
| 01/31/2018 | 70.00 | 55.18 |
| 04/18/2018 | 60.00 | 38.50 |
| 07/18/2018 | 55.00 | 38.50 |

Michael W. Gallo
mwg@clking.com/(212) 421-9382

# EXHIBIT 7

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D. C. 20549

**FORM 8-K**

**CURRENT REPORT**

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): April 17, 2018

**HEALTHCARE SERVICES GROUP, INC.**

(Exact name of registrant as specified in its charter)

Commission File Number: 0-12015

| Pennsylvania | 23-2018365 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification number) |

| 3220 Tillman Drive, Suite 300, Bensalem, Pennsylvania | 19020 |
|---|---|
| (Address of principal executive office) | (Zip code) |

Registrant's telephone number, including area code: 215-639-4274

Not Applicable
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

( ) Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

( ) Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)vi

( ) Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR240.14d-2(b))

( ) Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Exhibit 99.1

**HEALTHCARE SERVICES GROUP, INC. REPORTS RESULTS
FOR THE THREE MONTHS ENDED MARCH 31, 2018 AND
ANNOUNCES INCREASED FIRST QUARTER 2018 CASH DIVIDEND**

**Bensalem, PA - April 17, 2018 -**Healthcare Services Group, Inc. (NASDAQ:HCSG) (the "Company") reported that revenues for the three months ended March 31, 2018 increased to $501.8 million compared to $404.5 million for the same period in 2017.
Net income for the three months ended March 31, 2018 was $0.1 million, or $0.00 per basic and diluted common share. The decline from the prior three month period ended March 31, 2017 related to the Company's first quarter 2018 increase in its accounts receivable allowance, primarily related to corporate restructurings of two privately-held, multi-state operators, as discussed in the Company's press release on April 16, 2018.

In addition, our Board of Directors declared a quarterly cash dividend of $0.19250 per common share, payable on June 29, 2018 to shareholders of record at the close of business on May 25, 2018. This represents the 60th consecutive quarterly cash dividend payment, as well as the 59th consecutive increase since our initiation of quarterly cash dividend payments in 2003.

The Company will host a conference call on Wednesday, April 18, 2018 at 8:30 a.m. Eastern Time to discuss its results for the three months ended March 31, 2018. The call may be accessed via phone at 800-893-5360. The call will be simultaneously webcast under the "Events & Presentations" section of the investor relations page on our website, www.hcsg.com. A replay of the earnings call may be accessed through the phone number above through 10:00 p.m. Eastern Time on Wednesday, April 18, 2018. The webcast will also be available on our website for one year following the date of the earnings call.

The Company also announced that it will be attending the Bank of America Merrill Lynch Healthcare Conference on May 15, 2018, at Encore at the Wynn, Las Vegas, the UBS Global Healthcare Conference on May 23, 2018, the Baird 2018 Global Consumer, Technology & Services Conference on June 5, 2018, as well as the Jefferies Healthcare Conference on June 6, 2018, at the Grand Hyatt New York, New York.