**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| |
|---|
| UTAH RETIREMENT SYSTEMS, |
| Plaintiff, |
| v. |
| HEALTHCARE SERVICES GROUP, INC., DANIEL P. MCCARTNEY, THEODORE WAHL, JOHN C. SHEA, and MATTHEW J. MCKEE, |
| Defendants. |

Case No. 2:19-cv-01227-ER

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS' MOTION FOR RECONSIDERATION OF THE COURT'S APRIL 24, 2020 ORDER DENYING DEFENDANTS' MOTION TO DISMISS**

Pursuant to Local Rule of Civil Procedure 7.1(g), Defendants Healthcare Services Group, Inc., Daniel P. McCartney, Theodore Wahl, John C. Shea, and Matthew J. McKee ("Defendants"), by and through their attorneys, respectfully move this Court to reconsider its April 24, 2020 Order (Doc. 42) denying Defendants' Motion to Dismiss with prejudice the Amended Complaint of Lead Plaintiff Utah Retirement Systems, for the reasons set forth in the accompanying memorandum of law.

Defendants respectfully request that this Court allow oral argument—including by teleconference or videoconference if necessary—on the present Motion.

Respectfully submitted,


/s/ Robert L. Hickok
Robert L. Hickok (PA Bar No. 30101)
Jay A. Dubow (PA Bar No. 41741)
Joanna J. Cline (PA Bar No. 83195)
Daniel J. Boland (PA Bar No. 91263)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

*Attorneys for Defendants*
*Healthcare Services Group, Inc., Daniel P.*
*McCartney, Theodore Wahl, John C. Shea,*
*and Matthew J. McKee*

Dated:  May 8, 2020

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UTAH RETIREMENT SYSTEMS, <br><br> Plaintiff, <br><br> v. <br><br> HEALTHCARE SERVICES GROUP, INC., DANIEL P. MCCARTNEY, THEODORE WAHL, JOHN C. SHEA, and MATTHEW J. MCKEE, <br><br> Defendants. | Case No. 2:19-cv-01227-ER <br><br> **ORAL ARGUMENT REQUESTED** |

**ORDER**

AND NOW, this ___ day of _____, 2020, upon consideration of Defendants' Motion for Reconsideration of the Court's April 24, 2020 Order denying Defendants' Motion to Dismiss with prejudice the Amended Complaint of Lead Plaintiff Utah Retirement Systems, and any response thereto, it is hereby **ORDERED** that Defendants' Motion is **GRANTED**.

BY THE COURT:

_____
Eduardo C. Robreno, U.S.D.J.

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on the 8th of May, 2020, a true and correct copy of the foregoing Motion for Reconsideration, and the accompanying Memorandum of Law and exhibit, was filed with the Clerk of Court using the CM/ECF system which will send electronic notification of such filing to all counsel of record.

/s/ *Robert L. Hickok*
Robert L. Hickok (PA Bar No. 30101)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

UTAH RETIREMENT SYSTEMS,

        Plaintiff,

v.

HEALTHCARE SERVICES GROUP, INC.,
DANIEL P. MCCARTNEY, THEODORE
WAHL, JOHN C. SHEA, and MATTHEW
J. MCKEE,

        Defendants.

Case No. 2:19-cv-01227-ER

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR
RECONSIDERATION OF THE COURT'S APRIL 24, 2020 ORDER DENYING
<u>DEFENDANTS' MOTION TO DISMISS</u>**

Robert L. Hickok (PA Bar No. 30101)
Jay A. Dubow (PA Bar No. 41741)
Joanna J. Cline (PA Bar No. 83195)
Daniel J. Boland (PA Bar No. 91263)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

*Attorneys for Defendants*
*Healthcare Services Group, Inc., Daniel P.*
*McCartney, Theodore Wahl, John C. Shea,*
*and Matthew J. McKee*

Dated:  May 8, 2020

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ........................................................................................................... 1

II. PROCEDURAL HISTORY........................................................................................... 1

III. LEGAL ARGUMENT.................................................................................................... 2

    A. The Roles of the Confidential Witnesses................................................................. 3

    B. The Implausibility of the Scheme Supposedly Supported by the Confidential Witness Allegations. ........................................................................... 6

    C. The Absence of Support of Scienter from the Confidential Witness Allegations. ............................................................................................................. 6

IV. CONCLUSION............................................................................................................... 9

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551 (E.D. Pa. 2009) ...........................................7, 8

*In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999) .........................................................8

*Blue Mountain Mushroom Co. v. Monterey Mushroom, Inc.*, 246 F. Supp. 2d 394
(E.D. Pa. 2002).....................................................................................................................2

*Durham v. Whitney Info. Network, Inc.*, No. 06-cv-00687, 2009 U.S. Dist. LEXIS
113757 (M.D. Fla. Nov. 10, 2009) .....................................................................................5

*In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018)..................................................3

*In re Gentiva Sec. Litig.*, 971 F. Supp. 2d 305 (E.D.N.Y. 2013).......................................................8

*In re Innocoll Holdings Pub. Ltd. Sec. Litig.*, No. 17-341, 2018 U.S. Dist. LEXIS
150707 (E.D. Pa. Sept. 5, 2018) .........................................................................................8

*Jarzyna v. Home Props., L.P.*, No. 10-4191, 2015 U.S. Dist. LEXIS 184213 (E.D.
Pa. Aug. 13, 2015) (Robreno, J.) ........................................................................................3

*Max's Seafood Cafe by Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669 (3d Cir. 1999) .........................2

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517
(D.N.J. 2010).......................................................................................................................8

*OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481 (3d Cir. 2016).....................................5

*Teamsters Local 456 Pension Fund v. Universal Health Servs.*, 396 F. Supp. 3d
413 (E.D. Pa. 2019)..............................................................................................................8

*Teamsters Local 456 Pension Fund v. Universal Health Servs.*, No. 17-2817,
2020 U.S. Dist. LEXIS 75473 (E.D. Pa. Apr. 29, 2020) ..............................................3, 4, 7, 8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)..................................................8

*In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326 (S.D.N.Y. 2011) ......................................8

## I.    INTRODUCTION

Amid the State of Emergency caused by the COVID-19 pandemic, the Court entered an order on the papers denying Defendants' Motion to Dismiss without the benefit of oral argument. Defendants respectfully request that the Court reconsider its ruling in this complex securities fraud case, and, at a minimum, allow Defendants to present oral argument, particularly as to the sufficiency of the allegations attributed to the Confidential Witnesses described in the Amended Complaint.

## II.    PROCEDURAL HISTORY

Lead Plaintiff Utah Retirement Systems ("Lead Plaintiff") filed its Amended Complaint on September 17, 2019 (Doc. 31). The Amended Complaint alleges that Defendants made misstatements relating to Healthcare Services Group, Inc.'s ("HCSG" or "the Company") earnings per share ("EPS") to meet consensus estimates and concealed for a period of time the existence of an SEC investigation into the Company's EPS reporting.

Defendants moved to dismiss the Amended Complaint on November 18, 2019 (Doc. 33), arguing that the alleged misstatements—premised upon allegations of "earnings management" through operational measures designed to control labor expenses—do not constitute fraud. Defendants also argue that there was no duty to disclose the SEC investigation, and that the Amended Complaint fails to plead (1) any material misstatement or omission, (2) a strong inference of scienter, or (3) loss causation. Briefing on Defendants' Motion to Dismiss concluded on March 2, 2020 (Doc. 39).

Defendants requested oral argument on the Motion. The Court originally assented to Defendants' request and scheduled oral argument for January 17, 2020 (Doc. 35). On December 4, 2019, the Court continued oral argument until further notice, to allow the parties time to finish their briefing, the schedule for which extended into March by so-ordered

stipulation of the parties (Doc. 37).  In mid-March of 2020, businesses around the nation began shutting down to limit the spread of the novel coronavirus and COVID-19.  The Eastern District of Pennsylvania has since drastically limited its physical operations through a series of Standing Orders, temporarily shutting down the Courthouse, expanding the use of e-filing, and requesting that all court proceedings occur telephonically or by videoconference whenever possible.

The Court never rescheduled oral argument.  Instead, on April 24, 2020, this Court issued an Order denying Defendants' Motion to Dismiss on the papers (Doc. 42).  In its Order, the Court found that "Lead Plaintiff satisfies the pleading particularity requirements [of the Private Securities Litigation Reform Act of 1995 ("PSLRA")] via the statements of three Confidential Witnesses who held various different roles in the Company."  Specifically, the Court held that the

> Confidential Witnesses outlined the structure of the Company and
> the steps the Company would have taken to alter its quarterly EPS.
> Those allegations, when taken as true, establish the
> misrepresentations and scienter necessary for section 10(b).

(Doc. 42 at 3–4).

Defendants now respectfully move the Court to reconsider this decision, and, at a minimum, hold oral argument on Defendants' Motion.

## III.   LEGAL ARGUMENT

It is appropriate for a court to reconsider an earlier ruling in order to remedy a clear error of law or to prevent manifest injustice.  *Max's Seafood Cafe by Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).  Courts will grant motions for reconsideration when the moving party "show[s] that there were facts or legal issues properly presented but overlooked by the court in its decision."  *Blue Mountain Mushroom Co. v. Monterey Mushroom, Inc.*, 246 F. Supp. 2d 394, 398–99 (E.D. Pa. 2002) (granting motion for reconsideration as "'necessary to

correct a clear error of law,' and because [the] court overlooked other dispositive arguments presented by Defendant's counsel"); *In re Energy Future Holdings Corp.*, 904 F.3d 298, 316 (3d Cir. 2018) (finding reconsideration warranted when a court "fail[s] to discern a critical fact that profoundly alter[s] the underlying legal determination"); *Jarzyna v. Home Props., L.P.*, No. 10-4191, 2015 U.S. Dist. LEXIS 184213, at *1 n.2 (E.D. Pa. Aug. 13, 2015) (Robreno, J.) (granting in part Defendant's motion for reconsideration based on an error of law).

### A.       The Roles of the Confidential Witnesses.

Defendants respectfully suggest that the Court erred when it relied on the statements of Lead Plaintiff's Confidential Witnesses to deny Defendants' Motion to Dismiss. The Confidential Witnesses were field-based operational managers whose job functions had nothing to do with the alleged alteration of EPS.[1]  As described in further detail below, their roles were limited substantively and geographically, and they were in no position to acquire knowledge of facts relating to "the steps the Company would have taken to alter its quarterly EPS" (Doc. 42 at 4).   Manifest injustice will result if this suit is allowed to continue based on information supplied by these Confidential Witnesses.

Analysis of the roles of the confidential witnesses in *Teamsters Local 456 Pension Fund v. Universal Health Services*—a case decided on April 29 by Judge Slomsky—is instructive.  In *Teamsters*, plaintiffs alleged that a behavioral health services company made actionable misrepresentations as to an alleged scheme to commit insurance fraud by, among other things, improperly lengthening patient stays at company facilities and understaffing these facilities to maximize company profits.  *See* No. 17-2817, 2020 U.S. Dist. LEXIS 75473, at *5

---

[1] Any information attributed to the Confidential Witnesses that outlined the structure of the Company (*see* Doc. 42 at 4), is publicly available in the Company's SEC filings.  *See* Am. Compl. ¶¶ 44, 45 (outlining the structure of the Company based on public documents).

n.1 (E.D. Pa. Apr. 29, 2020). Plaintiffs' allegations were based in part on confidential witness statements alleging that the witnesses attended meetings where they were asked to improperly lengthen patient stays, meetings which were also attended by upper management, who would have reported to the company's President of the Behavioral Health Division, who would in turn have reported to the individual defendants. *Id.* at *16–17, *42. Judge Slomsky rejected the notion that such allegations were sufficient to withstand scrutiny under the PSLRA, even though the confidential witnesses in that case attended meetings at which the alleged misconduct was discussed:

> While [plaintiffs'] assertions attempt to connect [the individual defendants] to the alleged billing scheme, absent from the [second amended complaint] are any contentions that either Defendant was involved in any of the alleged misconduct. The tenuous connections of various employees to other employees, who then reported to Defendants, do not give rise to an inference that either [of the individual defendants] were aware of, or recklessly disregarded, the alleged facility-level wrongdoing.

*Id.* at *43.

Here, the Confidential Witnesses had a much more tenuous connection to the alleged misconduct than the witnesses in *Teamsters*; in fact, they had no connection at all. According to Lead Plaintiff's allegations and the Company's public filings:

- Regional Manager CW1 and Regional Director CW3 reported to a Divisional Manager (not to the Individual Defendants). *See* Ex. A, HCSG 2016 Form 10-K, at 5; (Am. Compl. ¶¶ 109, 124).

- District Manager CW2 reported to a Regional Manager (not to the Individual Defendants), who would in turn report to a Divisional Manager. *See* Ex. A, HCSG 2016 Form 10-K, at 5; (Am. Compl. ¶ 117).

- CW4—a Director of Food Services at a local facility—is an onsite Facility Manager who reports to a District Manager. *See* Ex. A, HCSG 2016 Form 10-K, at 5; (Am. Compl. ¶ 127).

None of Lead Plaintiff's Confidential Witnesses allege having had ***any*** contact with the Individual Defendants, which makes sense, as these individuals' positions in the Company would not have given them access to corporate headquarters.[2]

There is no allegation that any of the Confidential Witnesses here had any role in EPS calculations, nor any allegations that any of them even attended meetings at which EPS calculations, let alone alterations, were discussed.  Lead Plaintiff's allegations do not establish that any of these individuals was in a position to have knowledge of the Company's period-end closing procedures, nor do they provide an explanation of how the alleged expense reductions during the quarter could have resulted in a misstatement or alteration of EPS after the quarter was completed.  The whole of the allegations, taken as true, are no more than the supposition of former Company workers with no actual knowledge of the alleged misstatements or the accounting supporting them.  As such, they are insufficient to withstand scrutiny under the PSLRA.  *See OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 496 (3d Cir. 2016) (affirming dismissal of 10(b) complaint where confidential witness testimony was "not sufficiently on point" to meet the PSLRA's heightened pleading requirements and corroborate plaintiff's securities fraud allegations); *Durham v. Whitney Info. Network, Inc.*, No. 06-cv-00687, 2009 U.S. Dist. LEXIS 113757, at *47 (M.D. Fla. Nov. 10, 2009) (finding statements of a confidential witness insufficient to support a 10(b) claim, when "[t]here [were] no facts alleged

---

[2] In addition to occupying positions far-removed from corporate headquarters and the Individual Defendants, none of the Confidential Witnesses worked at the Company for the entire class period of April 8, 2014 to March 4, 2019, and no Confidential Witness worked at the Company for the last two years of the class period.  *See* Am. Compl. ¶ 109 (alleging that CW1 worked at the Company from January 2011 to March 2017); *id.* ¶ 117 (alleging that CW2 worked at the Company from prior to the class period to August 2015); *id.* ¶ 124 (alleging that CW3 worked at the Company from the mid-1990's to June 2015); *id.* at ¶ 127 (alleging that CW4 worked for the Company from April 2017 through October 2017).

to show that this member of the technical support team—who [was] not a part of the Company's executive, legal or accounting department—would have firsthand knowledge of the [alleged misconduct]").

**B.    The Implausibility of the Scheme Supposedly Supported by the Confidential Witness Allegations.**

Lead Plaintiff alleges that the Company took various measures to operationally manage labor costs during the quarter just enough so that weeks later, after the quarter was completed, the Company's EPS calculations would be rounded up by a tenth of a cent that was 5 or greater, and would therefore meet market analysts' consensus estimates.  However, none of the Confidential Witnesses provide an explanation as to how indeterminate alleged operational changes during a quarter would serve to manipulate a precise EPS calculation that would have occurred weeks after the quarter end close.  Again, none of the Confidential Witnesses are alleged to have had any role in the Company's accounting department and therefore would not have any knowledge or understanding of the Company's actual quarter-end GAAP accounting for labor expenses, net income, or EPS.  At bottom, even taken as true, the actions cited by the Confidential Witnesses—which at most describe managing labor costs that were incurred during the quarter at individual Company facilities—had no possible impact or effect on quarterly EPS calculation or rounding that would have occurred after the quarter was completed.

**C.    The Absence of Support of Scienter from the Confidential Witness Allegations.**

The statements of the Confidential Witnesses do not support the strong inference of scienter required by the PSLRA.  As noted, none of Lead Plaintiff's Confidential Witnesses allege any contact with the Individual Defendants, nor do they provide any specific facts suggesting that the Individual Defendants made material misrepresentations concerning the alleged EPS rounding scheme with the intent to defraud investors.  CW1 suggests nothing more

than that Defendant Wahl was allegedly "close and 'tight'" with Divisional Vice President David Hurlock, who allegedly ordered CW1 to reduce labor expenses (Am. Compl. ¶ 116). Even if such operational labor expense reduction allegedly ordered by Hurlock constituted fraud (and it does not), CW1's uncorroborated allegations do not come close to establishing any facts that would support a strong inference of scienter as to Defendant Wahl. CW2 states that the Company's Monthly Operating Statements were generated at corporate headquarters (Am. Compl. ¶ 120), but offers no explanation of the Individual Defendants' role in generating these statements. CW3 states that the Company's accounting function was "small and controlled" by Defendant Shea and other senior management (Am. Compl. ¶ 125), but can provide no specific information concerning Defendant Shea's role in or knowledge of the alleged improper EPS rounding. CW4 offers no testimony at all concerning the Individual Defendants' knowledge of the alleged EPS rounding.

In short, the Confidential Witness statements, "whether taken individually or together, fail[] to create the kind of detailed picture that is required to establish scienter under the PSLRA." *In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 575 (E.D. Pa. 2009). These Witnesses had no relationship with the Individual Defendants and were not in a position to assess the Defendants' knowledge of the alleged EPS rounding, let alone comment on whether the Individual Defendants intended to deceive investors by making the alleged misrepresentations concerning the Company's EPS calculations. Instead, the Witnesses offer only speculative, generalized statements suggesting that certain of the Individual Defendants must have known about the alleged misconduct.[3] As in *Teamsters*, these allegations cannot ground a securities

---

[3] The paragraphs of the Amended Complaint attributed to information from Confidential Witnesses do not even attempt any scienter allegations with respect to Defendants McCartney and McKee. These statements cannot, therefore, support an inference of scienter as to these

fraud action.  Because the Confidential Witnesses have not and cannot provide specific allegations tying the Individual Defendants to the alleged misconduct, they cannot support a finding of scienter.  *See Teamsters*, 2020 U.S. Dist. LEXIS 75473, at *43.[4]

These arguments are dispositive as to the insufficiency of Lead Plaintiff's Confidential Witness statements.  "Congress enacted the PSLRA as a 'check against abusive litigation by private parties' levied at 'companies and individuals whose conduct conforms to the law.'"  *In re Innocoll Holdings Pub. Ltd. Sec. Litig.*, No. 17-341, 2018 U.S. Dist. LEXIS 150707, at *13 (E.D. Pa. Sept. 5, 2018) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)).  Given the inadequacy of Lead Plaintiff's Confidential Witness statements, manifest injustice will result if this suit is permitted to continue, subjecting Defendants to costly and time-consuming discovery.  Accordingly, Defendants respectfully move the Court to reconsider its April 24 Order and, at minimum, allow Defendants an opportunity to present oral

---

Defendants.  *See Teamsters Local 456 Pension Fund v. Universal Health Servs.*, 396 F. Supp. 3d 413, 417 (E.D. Pa. 2019) (finding confidential witness statements insufficient to support an inference of scienter as to individual defendants, where the statements failed to even mention the names of the individual defendants).

[4] *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) ("Generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company."); *In re Gentiva Sec. Litig.*, 971 F. Supp. 2d 305, 324 (E.D.N.Y. 2013) ("[T]he 'Plaintiffs allege no direct contact between [the] CW[s] and Defendants,' rendering their scienter allegations insufficient as a matter of law." (quoting *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 358 (S.D.N.Y. 2011))); *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 555 (D.N.J. 2010) ("In sum, in over fifty paragraphs of statements made by confidential witnesses, not one witness claims to have met, emailed with, spoken to, or otherwise heard or read anything by, either of the Individual Defendants . . ., which would sufficiently raise a strong inference of scienter that Individual Defendants knew their public statements and disclosures were false."); *Adolor Corp.*, 616 F. Supp. 2d at 575 (finding confidential witness statements insufficient to support scienter, when "[t]he information provided by the confidential witnesses does not illuminate Defendants' states of mind in connection with the statements at issue").

argument as to why Lead Plaintiff has failed to meet the PSLRA's heightened requirements for

pleading securities fraud.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant

their Motion to Reconsider the Court's April 24, 2020 Order denying Defendants' Motion to

Dismiss.

Respectfully submitted,


*/s/ Robert L. Hickok*
Robert L. Hickok (PA Bar No. 30101)
Jay A. Dubow (PA Bar No. 41741)
Joanna J. Cline (PA Bar No. 83195)
Daniel J. Boland (PA Bar No. 91263)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

*Attorneys for Defendants*
*Healthcare Services Group, Inc., Daniel P.*
*McCartney, Theodore Wahl, John C. Shea,*
*and Matthew J. McKee*

Dated:  May 8, 2020

# Exhibit A

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2016**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**
**Commission file number: 0-12015**

# HEALTHCARE SERVICES GROUP, INC.

*(Exact name of registrant as specified in its charter)*

| **Pennsylvania** | **23-2018365** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3220 Tillman Drive, Suite 300, Bensalem, PA** | **19020** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:**
**(215) 639-4274**

**Securities registered pursuant to Section 12(b) of the 1934 Act:**

| **Common Stock ($.01 par value)** | **The NASDAQ Global Select Market** |
|---|---|
| *Title of each class* | *Name of each exchange on which registered* |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES ☑ NO ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. YES ☐ NO ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES ☑ NO ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). YES ☑ NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☑ | Accelerated filer | ☐ | Non-accelerated filer | ☐ | Smaller reporting company ☐ |
|---|---|---|---|---|---|---|
| | | | | (Do not check if a smaller reporting company) | | |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). YES ☐ NO ☑

The aggregate market value of the voting stock (Common Stock, $.01 par value) held by non-affiliates of the Registrant as of the close of business on June 30, 2016 was approximately $2.15 billion based on the closing sale price of the Common Stock on the NASDAQ Global Select Market on that date. The determination of affiliate status is not a determination for any other purpose. The Registrant does not have any non-voting common equity authorized or outstanding.

Indicate the number of shares outstanding of each of the registrant's classes of common stock (Common Stock, $.01 par value) as of the latest practicable date (February 21, 2017). 72,812,000

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the definitive Proxy Statement for the Registrant's Annual Meeting of Shareholders to be held on May 30, 2017 have been incorporated by reference into Parts II and III of this Annual Report on Form 10-K.

1

Table of Contents

governmental actions, anticipated staffing levels, and our use of labor may adversely impact these costs. Similarly, an increase in the costs of supplies, including linen costs, consumed in performing Housekeeping services may impact Housekeeping's operating performance. In 2016, the cost of Housekeeping supplies as a percentage of Housekeeping revenues was 7.8%. Generally, the cost of such supplies is dictated by specific product market conditions, which are subject to price fluctuations influenced by factors outside of our control. Where possible, we negotiate fixed pricing from vendors for an extended period of time on certain supplies to mitigate such price fluctuations.

*Dietary*

Dietary services represented approximately 38.7%, or $605.5 million, of consolidated revenues in 2016. Dietary consists of managing the client's dietary department which is principally responsible for food purchasing, meal preparation and professional dietitian services, which includes the development of menus that meet the dietary needs of residents. On-site management is responsible for all daily dietary department activities, with regular support being provided by a District Manager specializing in Dietary services, as well as a registered dietitian. We also offer clinical consulting services to facilities to assist them in cost containment and to promote improvement in their dietary department service operations.

Dietary operating performance is also impacted by price fluctuations in labor and supply costs resulting from similar factors discussed above in Housekeeping. In 2016, the costs of labor and food-related supplies represented approximately 53.8% and 38.0% of Dietary revenues, respectively.

**Operational Management Structure**

By applying our professional management techniques, we offer our clients the ability to manage certain housekeeping, laundry, linen, facility maintenance and dietary services and costs. We manage and provide our services through a network of management personnel, as illustrated below.



Facilities are managed by an on-site Facility Manager, and if necessary, additional supervisory personnel. Such facility-level management personnel are responsible for the management of staff, scheduling, procurement, customer service, quality control and overall day-to-day management of the Housekeeping or Dietary function.

Districts typically consist of eight to twelve facilities and District Managers oversee the operations of the facilities within their districts. Their responsibilities include oversight of Facility Managers through management of personnel, operational performance, quality control monitoring, customer satisfaction and adherence to our systems and budgets.

Districts are organized into regions, which are headed by Regional Managers who oversee approximately four to six districts. Regional Managers provide management support, training and personnel management, while ensuring operational performance consistent with our systems and budgets. Regional Directors are primarily responsible for marketing our services within their regions, which involves industry outreach, overseeing and participation in contract negotiation, and working closely with Regional Managers to ensure customer satisfaction and promote retention and growth.

Divisions generally consist of four to six regions and are overseen by Divisional Managers, who are ultimately responsible for all aspects of the operational, compliance and financial-based performance of their divisions.

We believe that our divisional, regional and district organizational structure facilitates our ability to best serve our clients, expand our service offerings to existing clients and obtain new clients.

Exhibit 32.1

**Certification Pursuant to**
**18 U.S.C. Section 1350,**
**As Adopted Pursuant to**
**Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report on Form 10-K of Healthcare Services Group, Inc. (the "Company") for the year ended December 31, 2016 as filed with the Securities and Exchange commission on the date hereof (the "Report"), I, Theodore Wahl, President and Chief Executive Officer of the of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

   (1) The Report fully complies with the requirements of Section 13(a) or 15(d), of the Securities Exchange Act of 1934; and

   (2) That information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Date:   February 24, 2017                                              /s/ Theodore Wahl
                                                                       Theodore Wahl
                                                                       President & Chief Executive Officer
                                                                       (Principal Executive Officer)

Exhibit 32.2

**Certification Pursuant to**
**18 U.S.C. Section 1350,**
**As Adopted Pursuant to**
**Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report on Form 10-K of Healthcare Services Group, Inc. (the "Company") for the year ended December 31, 2016 as filed with the Securities and Exchange commission on the date hereof (the "Report"), I, John C. Shea, Chief Financial Officer of the of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d), of the Securities Exchange Act of 1934; and

(2) That information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:    February 24, 2017

/s/ John C. Shea
John C. Shea
Chief Financial Officer
(Principal Financial and Accounting Officer)