**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UTAH RETIREMENT SYSTEMS,<br><br>Plaintiff,<br><br>v.<br><br>HEALTHCARE SERVICES GROUP, INC., DANIEL P. MCCARTNEY, THEODORE WAHL, JOHN C. SHEA, and MATTHEW J. MCKEE,<br><br>Defendants. | Case No. 2:19-cv-01227-ER |

**DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES**
**TO LEAD PLAINTIFF'S AMENDED COMPLAINT**

Defendants Healthcare Services Group, Inc. ("HCSG" or "the Company") and

Daniel P. McCartney, Theodore Wahl, John C. Shea, and Matthew J. McKee ("Individual

Defendants" and collectively with HCSG, "Defendants"), by their attorneys, hereby answer the

allegations of the Amended Complaint ("Complaint") of Lead Plaintiff Utah Retirement Systems

("Plaintiff"), and state as follows:

**PRELIMINARY STATEMENT**

All allegations in the Complaint are generally denied as to each of the Defendants.

Moreover, any factual averment that is admitted below is admitted only as to specific facts as

stated herein and not as to any conclusions, characterizations, implications or speculation in the

averment or the Complaint as a whole. To the extent the introductory paragraph of the

Complaint contains allegations to which a response may be required, Defendants deny each and

every averment thereof. Defendants further state that they are without knowledge or information

sufficient to form a belief as to the truth of the averments regarding the investigation allegedly

conducted by Plaintiff's counsel, and these averments are therefore denied.

1.      Lead Plaintiff brings this action on behalf of itself and all other similarly situated investors who purchased or otherwise acquired common stock of Healthcare Services Group, Inc. ("Healthcare Services," "HCSG," or the "Company") on the NASDAQ exchange and/or through transactions within the United States, during the Class Period from April 8, 2014 to March 4, 2019, inclusive (the "Class Period"), and were damaged thereby.  Lead Plaintiff asserts claims for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

**ANSWER:**  Defendants deny each and every averment of paragraph 1 of the Complaint, except they admit that Plaintiff purports to bring this action on behalf of purchasers of HCSG common stock between April 8, 2014 to March 4, 2019 ("putative Class Period"), and admit that Plaintiff purports to assert claims under the Securities Exchange Act of 1934 and SEC Rule 10b-5.

2.      Healthcare Services provides outsourced housekeeping and dining services to long-term and post-acute care healthcare facilities in the United States.  The Company's customers include over three thousand facilities, such as nursing homes, assisted living facilities, skilled nursing facilities, rehabilitation centers and psychiatric hospitals.

**ANSWER:**  Defendants admit the averments of paragraph 2 of the Complaint.

3.      Healthcare Services was founded in 1976 by Defendant Daniel McCartney ("McCartney") and, during the relevant period, was a tightly controlled, family-run business, centered on McCartney and his son-in-law/successor Defendant Theodore Wahl ("Wahl"), his son-in-law Defendant Matthew J. McKee ("McKee") and close McCartney family friend Defendant John C. Shea ("Shea"), all of whom held senior positions with the Company and otherwise controlled its management throughout the Class Period.

**ANSWER:**  Defendants deny each and every averment of paragraph 3 of the Complaint, except admit that Defendant McCartney founded HCSG in 1976, Defendant Wahl is the current President and Chief Executive Officer (CEO) of HCSG and son-in-law of Defendant McCartney, Defendant McKee is the current Chief Communications Officer and son-in-law of Defendant McCartney, and Defendant Shea is the current Chief Financial Officer (CFO).

4.      Prior to and during the Class Period, Defendants engaged in a long-term pattern of misleading investors into believing that the Company legitimately met or beat Wall Street

analysts' consensus estimates for the Company's earnings per share ("EPS"), a key financial metric relied upon by investors as an indicator of a company's profitability. In reality, Defendants spent over a decade manipulating net income and EPS to ensure the Company consistently met analyst expectations and portrayed an appearance of consistency in a volatile market. Then, once Defendants' conduct drew the attention of the SEC, Defendants abruptly ceased its illicit EPS practice, but continued to hide from investors its past conduct and an ongoing SEC investigation. Defendants went so far as to affirmatively mislead investors that there were "no" pending investigations, at a time when the SEC was conducting a formal investigation that posed a material risk to the Company.

ANSWER: Defendants deny the averments of paragraph 4 of the Complaint.

5.      For more than a decade, Defendants falsely portrayed steady performance at the Company by reporting EPS that overwhelmingly matched or beat analyst expectations. Quarter after quarter, Defendants trumpeted the Company's EPS in its press releases, investor conference calls and SEC filings. And, in turn, securities analysts focused on the Company's EPS while analyzing Healthcare Services' durability and long-term outlook and responded favorably to the Company's purportedly consistent performance.

ANSWER: Defendants deny each and every averment of paragraph 5 of the Complaint, except admit that Defendants referenced the Company's EPS, among other indicators relating to the Company's performance, in its press releases, investor conference calls and SEC filings. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of the third sentence of paragraph 5, and these averments are therefore denied.

6.      EPS is calculated by taking a company's net income for the relevant period (quarterly or annually) and dividing that amount by the total number of outstanding common shares. In performing the calculation, companies will round the EPS figure to the nearest penny. The odds of a company's EPS rounding up to the nearest penny are statistically the same as rounding down. Yet, improbably, Defendants consistently rounded up the Company's reported EPS results over the course of 45 consecutive quarters, a pattern that began shortly after McCartney's sons-in-law joined the Company. This is the statistical equivalent of flipping heads on a coin toss 45 straight times, a highly improbable feat.

ANSWER: Defendants deny each and every averment of paragraph 6 of the Complaint, except admit that the paragraph correctly states the formula for calculating EPS and that in calculating EPS, when HCSG rounded up its EPS, it did so appropriately.

7.      As a result of Defendants' machinations, Defendants issued several categories of false statements throughout the Class Period, including misstatements about the Company's quarterly EPS (and the net income used to calculate EPS), misstatements about the computations used to calculate EPS (which omitted the fact that Defendants manipulated the Company's net income to ensure that quarterly EPS would be rounded up to the next penny) and misstatements about the adequacy of Company's controls.

**ANSWER:**  Defendants deny the averments of paragraph 7 of the Complaint.

8.      In March 2017, investment analyst Monocle Accounting Research ("Monocle") issued a report on the financial website Seeking Alpha entitled "Healthcare Services Group: A Decade of Strategic Rounding" (the "Monocle Report"), first noting the Company's EPS pattern. According to the Monocle Report, "strong evidence" suggested that the Company engaged in "earnings management," as revealed by a pattern of "strategic rounding" of its reported quarterly EPS that caused EPS to "round up" and meet consensus estimates to the penny.  The Monocle Report concluded that, at a minimum, the Company was engaging in an "aggressive approach to accounting that increases exposure to restatement risk, enforcement proceedings and securities fraud claims." The Monocle Report noted that the odds of Healthcare Services' history of EPS being rounded up consistently for the past eleven years "are roughly **1 in 600 quadrillion**" (emphasis in original).

**ANSWER:**  Defendants deny each and every averment of paragraph 8 of the Complaint,

except admit that this paragraph purports to summarize and contains partial excerpts from a

March 22, 2017 report issued by Monocle Accounting Research (the "March 2017 Monocle

Report").  Defendants refer to the March 2017 Monocle Report for a complete and accurate

statement of its contents and deny any characterization or interpretation of the March 2017

Monocle Report that would be inaccurate if read in the context of the entire March 2017

Monocle Report.  Defendants expressly deny any allegations of wrongdoing or misconduct by

the Defendants that are stated or implied in the March 2017 Monocle Report.

9.      Despite the Monocle Report's suggestion of potential fraud at the highest levels of the Company's management, and the fact that Monocle had contacted Defendants McCartney, Wahl and McKee for a comment, Defendants essentially ignored the report and allegations, and instead touted the Company's purported track record.  When asked to comment on reports about the Company's rounding practices during an April 2017 earnings conference call, Defendant Wahl stated: "I think our track record of performance over the past 10 years really stands on its own."  Defendant McKee, present to speak on behalf of the Company, said nothing.  The market

breathed a sigh of relief, as HCSG's stock price rose by nearly 8% (rising by $3.37 per share to close at $45.55 per share).

**ANSWER:** Defendants deny each and every averment of paragraph 9 of the Complaint, except admit that the paragraph purports to summarize and contains partial excerpts from an April 2017 earnings conference call. Defendants refer to the April 2017 earnings conference call transcript for a complete and accurate statement of its contents and deny any characterization or interpretation of the call that would be inaccurate if read in the context of the entire April 2017 earnings conference call transcript. Defendants further admit that HCSG's stock price closed at $45.55 on April 12, 2017, up from the closing price of $42.18 on April 11, which was a $3.37 increase (nearly 8%). Defendants expressly deny that the stock price rose or that the "market breathed a sigh of relief" in response to the answer provided by Defendant Wahl to the question raised during the April 2017 earnings conference call relating to HCSG's rounding practices.

10. Soon thereafter, however, Healthcare Services' EPS manipulation came to an abrupt halt after the SEC commenced an inquiry into the Company's EPS practices. In November 2017, the SEC launched an initial-stage investigation, or a "Matter Under Inquiry" ("MUI"), into the Company' EPS practices and sent a request for information to the Company.

**ANSWER:** Defendants deny each and every averment of paragraph 10 of the Complaint, except admit that in November 2017, the SEC advised HCSG it was conducting an inquiry into HCSG's EPS calculation practices and sent a request for information to the Company.

11. Then, in March 2018, just five months after commencing its MUI, the SEC escalated its investigation to a "Formal Order of Investigation" and issued a formal subpoena to the Company, a signal that the SEC was not satisfied that the Company had not violated the federal securities laws and, in fact, had determined that there was a sufficient basis for the investigation to continue its examination of potentially volatile conduct.

**ANSWER:**  Defendants deny each and every averment of paragraph 11 of the Complaint, except admit that in March 2018, the SEC commenced a formal investigation into HCSG and issued a subpoena requesting documents.

12.    Under the SEC's spotlight, Healthcare Services' decade-long pattern of consistently "rounding up" its EPS to avoid falling short of the consensus EPS estimate came to rapid end and, as a result, the Company began consistently missing consensus estimates and suffering stock price declines as a result.  Indeed, in all but one quarter since November 2017, Healthcare Services has missed analysts' EPS targets.

**ANSWER:**  Defendants deny the averments of paragraph 12 of the Complaint.

13.    Throughout the latter portion of the Class Period, Defendants concealed the existence of the SEC investigation from the public.  In fact, Defendants directly misled investors by publicly asserting that there was "no" pending investigation into the Company or its practices.  On December 31, 2018, the Company filed a Form 8-K with the SEC attaching a document that affirmatively represented that: "[t]here are ***no actions, suits, proceedings or investigations pending"*** against the Company.[1]  This statement was knowingly false as Defendants unquestionably knew of the SEC's formal investigation.  In fact, Defendants also knew, but did not disclose, that in the fourth quarter of 2018, the Company had authorized its outside counsel to conduct an internal investigation into the matters related to the SEC subpoena, under the direction of the Company's Audit Committee.

**ANSWER:**  Defendants deny each and every averment of paragraph 13 of the Complaint, except admit that the paragraph purports to summarize and contains partial excerpts, with emphasis supplied by Plaintiff, from a Form 8-K HCSG filed on December 31, 2018.  Defendants note that the excerpts in paragraph 13 are incomplete and mischaracterize the provision cited in the Credit Agreement attached to this Form 8-K.  Defendants refer to the Company's December 31, 2018 Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the entire Form 8-K.

---

[1]Unless otherwise noted, all emphasis is added herein.

14.    Finally, on March 4, 2019, almost two years after the Monocle Report first suggested EPS manipulation by the Company, Healthcare Services revealed that the SEC had been investigating the Company's EPS calculations and practices for approximately sixteen months.  The Company further disclosed that, during the fourth quarter of 2018, it had authorized "outside counsel" to conduct an internal investigation under the direction of the Company's Audit Committee into matters related to the SEC's March 2018 subpoena.  The Company also disclosed that, due to the pending results of its internal investigation, Healthcare Services would delay the filing of its Annual Report on Form 10-K.

**ANSWER:**  Defendants deny each and every averment of paragraph 14 of the

Complaint, except admit that the paragraph purports to summarize and contains partial excerpts

from a Form 8-K HCSG filed on March 4, 2019.  Defendants refer to the Company's March 4,

2019 Form 8-K for a complete and accurate statement of its contents and deny any

characterization or interpretation of the Form 8-K that would be inaccurate if read in the context

of the entire Form 8-K.  Defendants further admit that HCSG disclosed in its March 4, 2019

Form 8-K that the SEC was investigating its EPS calculation practices, the Company had

retained outside counsel to conduct an internal investigation, and that the Company would delay

the filing of its annual Form 10-K.  By way of further response, the Company timely filed its

annual Form 10-K report with the SEC on March 18, 2019, within the extended time allowed by

SEC rule.

15.    The revelation of the SEC's investigation sent Healthcare Services stock plummeting.  The price of Healthcare Services' stock fell by $4.96 per share on March 4, 2019, closing at a price of $32.78 per share, down 13.14% from the prior day's closing price of $37.74 per share.  As a relatively low-volatility stock, this was the largest single percentage decline in the Company's 39-year trading history.  The Company's stock price has not recovered and has continued to fall, with a share price at just above $25.00 per share as of the date of this filing, far from the Class Period high of $56.01 per share.

**ANSWER:**  Defendants deny each and every averment of paragraph 15 of the

Complaint, except admit that HCSG's stock price dropped by $4.96 per share on March 4, 2019,

closing at a price of $32.78 per share, down 13.14% from the prior day's closing price of $37.74

per share, and that the Company's stock price was around $25.00 per share on September 17,

2019, the date the Amended Complaint was filed. Defendants further admit that HCSG's stock

price was $56.01 on January 26, 2018. By way of further response, the March 4, 2019 stock

price drop was not the largest single percentage decline in the Company's trading history. On

April 16, 2008, the Company's stock price dropped approximately 24%, from its April 15, 2008

closing price of $13.60 to a closing price of $10.38; on May 2, 2000, the Company's stock price

dropped approximately 22%, from its May 1, 2000 closing price of $0.94 to a closing price of

$0.73; on January 18, 2000, the Company's stock price dropped approximately 14%, from its

January 14, 2000 closing price of $1.80 to a closing price of $1.54; and on April 10, 2000, the

Company's stock price dropped approximately 14%, from its April 7, 2000 closing price of

$1.06 to a closing price of $0.91.



16. The SEC's investigation of Healthcare Services remains ongoing and, to date, the Company has not revealed the findings of its "internal investigation."

**ANSWER:** Defendants deny each and every averment of paragraph 16 of the

Complaint, except admit that the SEC investigation remains ongoing.

17. After the close of the Class Period, the Company finally acknowledged that the ongoing SEC investigation, which had already cost the Company millions of dollars in legal expenses and fees to a "Big Four" auditing firm for forensic accounting services, "could result in

potential sanctions or penalties," and "could adversely affect or cause variability in our financial results."

**ANSWER:** Defendants deny each and every averment of paragraph 17 of the Complaint, except admit that the paragraph purports to summarize and contains partial excerpts from a Form 10-K HCSG filed on March 18, 2019 (the "2018 Form 10-K"). Defendants refer to the Company's 2018 Form 10-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 10-K that would be inaccurate if read in the context of the entire Form 10-K.

18. Lead Plaintiff's investigation has revealed a top-down scheme, run by the Individual Defendants (defined below) and a tightly-knit group of individuals with familial and close personal connections, to subtly manipulate the financial figures underlying the Company's reported EPS in a manner that would have the effect of increasing the Company's EPS by tenths of a penny during the Class Period.

**ANSWER:** Defendants deny the averments of paragraph 18 of the Complaint.

19. Defendants achieved these results in at least one broad manner: by strategically manipulating expenses related to the Company's hourly employees - housekeeping and food service personnel who often are paid at or near the minimum wage - at the financial and operational level. Lead Plaintiff's investigation found that, during the Class Period, the Company would exploit its hourly workforce by, *inter alia*, terminating or limiting the number of hours worked by the hourly employees that served the Company's customers and the vulnerable patients and senior citizens whose quality of life depended on the Company's services, and also by withholding paychecks from hourly employees for weeks at a time and manipulating the accounting accruals related to those unpaid wages. These employment practices appear to have had no operational justification (and indeed undermined the quality of service provided to the Company's customers) and were often timed to coincide with the end of financial reporting periods. Among other things, Confidential Witnesses (described below) provide a window into this tightly-controlled Company and reveal a number of improper practices, including: (i) routine non-payment of hourly employees' wages; (ii) corporate directives to facility managers to send hourly employees home for weeks at a time, particularly at year end; and (iii) corporate manipulation of monthly operating reports, including modification of payroll accruals and other expenses.

**ANSWER:** Defendants deny the averments of paragraph 19 of the Complaint.

-9-

20.      As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's securities, Lead Plaintiff and other Class members (defined below) suffered significant losses and damages.

**ANSWER:** The averments of paragraph 20 of the Complaint purport to state a legal conclusion to which no response is required, and therefore are denied.  To the extent these averments are deemed to be factual in nature, they are denied.

21.      The claims asserted in this action arise under §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and § 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5)).  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

**ANSWER:** The averments of the first sentence of paragraph 21 of the Complaint purport to state a legal conclusion to which no response is required, and therefore are denied.  To the extent these averments are deemed to be factual in nature, they are denied.  Defendants admit the averments of the second sentence of paragraph 21.

22.      Venue is proper in this District under Section 27 of the Exchange Act.  The Company's corporate headquarters are located within this District, the Company conducts substantial business in this District and many of the Company's acts and practices complained of herein occurred in substantial part in this District.

**ANSWER:** Defendants admit the averments of the first sentence of paragraph 22 of the Complaint and that the Company's headquarters is located within this District and the Company conducts substantial business in this District.  Defendants deny the remaining averments of paragraph 22 of the Complaint..

23.      In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the national securities markets.

**ANSWER:** Defendants deny each and every averment of paragraph 23 of the Complaint, except admit that HCSG uses the United States mail and interstate telephone communications, and that its common stock is traded on a national securities market.

24.     Lead Plaintiff Utah Retirement Systems ("URS") is a large public pension fund that provides retirement and insurance benefits for Utah public employees, serving more than 200,000 members and about 470 public employers, including the State of Utah, its local governments, school districts and higher education. As set forth in the certification attached hereto, URS purchased Healthcare Services common stock at artificially inflated prices during the Class Period and has been damaged thereby.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of the first sentence of paragraph 24, and these averments are therefore denied. Defendants deny the averments of the second sentence of paragraph 24 of the Complaint.

25.     Defendant Healthcare Services Group, Inc. is a Pennsylvania corporation headquartered at 3220 Tillman Drive, Suite 300, Bensalem, Pennsylvania 19020. The Company's common stock is listed and traded on the NASDAQ Global Select Market under the ticker symbol "HCSG."

**ANSWER:** Defendants admit the averments of paragraph 25 of the Complaint.

26.     Defendant Daniel P. McCartney ("McCartney") founded the Company in 1976 and served as the Company's Chairman of the Board of Directors (the "Board") prior to and during the Class Period. Defendant McCartney served as Chief Executive Officer ("CEO") of Healthcare Services until May 2015, when he was succeeded by his son-in-law, Defendant Theodore Wahl. On April 11, 2017, Defendant McCartney informed the Company's Board that he would not stand for re-election to the Board. While McCartney's official tenure as Chairman of the Board ended on May 31, 2017, he continues to maintain an unofficial leadership role at the Company, serving as the "Chairman Emeritus" of Healthcare Services. During the course of the manipulation of Healthcare Services' EPS alleged herein, from December 10, 2008 to May 11, 2017, information in SEC Form 4 filings indicate that Defendant McCartney sold or gifted more than 2.8 million shares of the Company's stock at artificially inflated prices for gross proceeds of nearly $71.3 million, more than $35 million of which occurred during the Class Period. Defendant McCartney's last reported sale of Healthcare Services stock was a sale of 113,901 shares for gross proceeds of more than $5.2 million on May 11, 2017, which was between the dates of the Monocle Report and McCartney's departure as Chairman. Following the end of McCartney's tenure as the Company's Chairman on May 31, 2017, McCartney likely was no

-11-

longer deemed an "insider" for purposes of SEC reporting requirements, meaning that any further stock sales by McCartney would not need to be disclosed to investors. During the Class Period, Defendant McCartney signed certain Healthcare Services SEC filings, participated on earnings conference calls, made other public statements that are alleged herein to have been knowingly or recklessly false and misleading when made, was listed as a "Company Contact" on earnings press releases and/or had the ability to control statements made by or on behalf of the Company.

**ANSWER:** Defendants admit the averments of the first through third sentences of paragraph 26 of the Complaint. Defendants further admit that Defendant McCartney's tenure as Chairman of the Board ended on May 31, 2017 and he continues to maintain the title Chairman Emeritus; however, Defendants deny that Defendant McCartney has an active role "serving" as Chairman Emeritus. Defendants further admit that the fifth and sixth sentences of paragraph 26 of the Complaint purport to summarize SEC Form 4 filings. Defendants refer to the Company's SEC Form 4 filings for a complete and accurate statement of their contents and deny any characterization or interpretation of HCSG's Form 4 filings that would be inaccurate if read in the context of all SEC Form 4 filings relating to changes in Defendant McCartney's ownership of HCSG securities. The averments of the seventh and eighth sentences of paragraph 26 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied. Defendants further admit that Defendant McCartney signed certain HCSG SEC filings, participated on some of the Company's earnings conference calls, at times made public statements on behalf of HCSG and was listed as a "Company Contact" on certain earnings press releases. Defendants deny the remaining averments of paragraph 26 of the Complaint.

27.     Defendant Theodore Wahl ("Wahl") has served as the Company's President and CEO since May 2015. Defendant Wahl is Defendant McCartney's son-in-law. Wahl joined the Company in 2004. Defendant Wahl served as HCSG's President and Chief Operating Officer ("COO") from April 2012 through April 2015. Defendant Wahl has held other positions with the Company including Executive Vice President & COO, Vice President of Finance, Regional Manager, Regional Sales Director, District Manager and Facility Manager. Prior to joining the

Company, Wahl was a senior manager with the Transaction Advisory Group at Ernst & Young LLP. Healthcare Services' public filings tout Defendant Wahl's "financial expertise," which enables him to "provide guidance with respect to [the Company's] operations." During the Class Period, Defendant Wahl signed certain Healthcare Services SEC filings, made other public statements that are alleged herein to have been knowingly or recklessly false and misleading when made, participated on earnings conference calls, and was listed as a "Company Contact" on earnings press releases and/or had the ability to control statements made by or on behalf of the Company.

ANSWER: Defendants admit the averments of the first through sixth sentences of paragraph 27 of the Complaint. Defendants admit that the seventh sentence of paragraph 27 of the Complaint purports to summarize HCSG's public filings. Defendants refer to HCSG's public filings for a complete and accurate statement of their contents and deny any characterization or interpretation of HCSG's public filings that would be inaccurate if read in the context of all HCSG's public filings. Defendants further admit that Defendant Wahl signed certain HCSG SEC filings, and was listed as a "Company Contact" on certain earnings press releases. The remaining averments of the eighth sentence of paragraph 27 of the Complaint purport to state a legal conclusion to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied. Defendants deny the remaining averments of paragraph 27 of the Complaint.

28.    Defendant John C. Shea, MBA, CPA ("Shea"), has served as the Company's Executive Vice President and Chief Financial Officer ("CFO") since April 2012. Shea joined the Company in 2009 as the Director of Regulatory Reporting and, prior to his appointment as CFO, served in various positions with the Company including Secretary, Vice President of Finance & Chief Accounting Officer. Prior to joining the Company, Shea was a senior manager with the Transaction Advisory Group at Ernst & Young LLP. During the Class Period, Defendant Shea signed certain Healthcare Services SEC filings, made other public statements that are alleged herein to have been knowingly or recklessly false and misleading when made and/or had the ability to control statements made by or on behalf of the Company. Defendant Shea, through his position as CFO, served as a point-of-contact between the Company and the SEC and/or otherwise knew or should have known about the SEC's investigation of the Company as shown by, *inter alia*, Shea being the recipient and author of publicly filed correspondence between the Company and the SEC during the Class Period, and Shea's signature on the March 4, 2019 SEC filings that revealed the SEC investigation. According to CW3 (described herein), Defendant Shea is a personal friend of the McCartney family.

**ANSWER:** Defendants admit the averments of the first, second, and third sentences of paragraph 28 of the Complaint. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of the sixth sentence of paragraph 28 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witnesses, and these averments are therefore denied. Defendants further admit that Defendant Shea signed certain HCSG SEC filings, including the March 4, 2019 Form 8-K, and at times corresponded with the SEC. The remaining averments of the fourth sentence of paragraph 28 of the Complaint purport to state a legal conclusion to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied. Defendants deny the remaining averments of paragraph 28 of the Complaint.

29. Defendant Matthew J. McKee, MBA ("McKee") joined the Company in 2004 and was employed as the Chief Communications Officer. During the Class Period, McKee participated in the Company's earnings conference calls at which he spoke on behalf of the Company or otherwise had the opportunity and ability to speak on behalf of the Company, including to correct any material misrepresentations or omissions of material fact. Defendant McKee was listed as a "Company Contact" on earnings press releases. Defendant McKee is the son-in-law of Defendant McCartney and the brother-in-law of Defendant Wahl.

**ANSWER:** Defendants admit that Defendant McKee joined HCSG in 2004 and became Chief Communications Officer in 2018. Defendants further admit the averments of the third and fourth sentences of paragraph 29 of the Complaint. Defendants further admit that Defendant McKee participated in some of the Company's earnings conference calls. Defendants deny the remaining averments of paragraph 29 of the Complaint.

30. Defendants McCartney, Wahl, Shea and McKee are collectively referred to as the "Individual Defendants."

-14-

ANSWER: Paragraph 30 of the Complaint contains no allegations to which a response is required.

31.    Because of the Individual Defendants' positions at the highest levels of corporate management of HCSG, they had access to the adverse undisclosed information about the Company's financial results, business, operations and practices, via access to internal corporate records and documents, conversations and contact with other corporate officers and employees, attendance at meetings and via reports and other information provided to them in the ordinary course of business. Each of the Individual Defendants, by virtue of his high-level position, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential information concerning the Company and its business, operations and practices, including matters related to the EPS-related misstatements alleged herein and matters concerning the SEC's investigation of the Company. Their positions of control and authority as officers enabled the Individual Defendants to control the content of the SEC filings, press releases and other public statements of the Company during the Class Period. Moreover, because of their familial and other close personal relationships with key Company employees with access to and/or control over the Company's business information and operations, the Individual Defendants had further channels to obtain information and direct action in addition to and/or outside of ordinary means. Furthermore, during the Class Period, Defendants McCartney, Wahl and Shea signed Sarbanes-Oxley Act ("SOX") certifications attesting to the accuracy of the Company's financial reports and the sufficiency of the Company's internal controls over financial reporting.

ANSWER: Defendants admit only that Defendants McCartney, Wahl and Shea signed certain Sarbanes-Oxley Act ("SOX") certifications during the putative Class Period and that Individual Defendants held the positions referenced in paragraphs 26-29 of the Complaint. The remaining averments of paragraph 31 of the Complaint purport to state a legal conclusion to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

32.    Accordingly, each of the Individual Defendants bears responsibility for the accuracy of the public reports of financial information and the Company's press releases detailed herein and are primarily liable for the misrepresentations and omissions contained therein. Moreover, the Individual Defendants had continuous and systematic contacts with the United States and Pennsylvania through the Company's conduct of its business and its Bensalem, Pennsylvania corporate headquarters. During the Class Period, each of the Individual Defendants personally made, signed and substantially participated in the preparation of the Company's false statements (including participation on investor conference calls) and/or

engaged in conduct that made it necessary or inevitable that material misrepresentations that would be made to investors on the basis of that conduct.

ANSWER: The averments of paragraph 32 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

33.    Healthcare Services purports to be a leading provider of outsourced housekeeping and laundry management services to long-term and post-acute care healthcare facilities in the United States.

ANSWER: Defendants admit that HCSG is a leading provider of outsourced housekeeping and laundry management services to long-term and post-acute care healthcare facilities in the United States. Defendants deny the remaining averments of paragraph 33 of the Complaint.

34.    The Company provides management, administrative and operating services to nursing homes, retirement complexes, skilled nursing facilities, assisted living facilities, rehabilitation centers and hospitals that are typically described as long-term and post-acute care facilities. These services include housekeeping, laundry, linen, facility maintenance and dietary services. The Company claims to provide services to more than 3,000 facilities throughout the continental United States.

ANSWER: Defendants admit the averments of paragraph 34 of the Complaint.

35.    The Company provides its services to clients primarily under "full-service agreements," under which the Company is responsible for the day-to-day management of the employees who perform services for the Company at its clients' facilities.

ANSWER: Defendants admit the averments of paragraph 35 of the Complaint.

36.    The Company operated through two principal business segments: Housekeeping and Dietary. The Housekeeping segment includes managing clients' housekeeping departments, which are responsible the cleaning, disinfecting and sanitizing of resident rooms and common areas at client facilities. Housekeeping departments are also responsible for laundering and processing bed linens, uniforms and resident personal clothing used at client facilities. When beginning service with a client facility, the Company typically assigns an on-site manager to supervise and train the Company's front-line personnel and coordinate housekeeping services.

-16-

Such management personnel also oversee the execution of various cost-control procedures.  The Company provides housekeeping services to virtually all of its client facilities.

**ANSWER:**  Defendants admit the averments of paragraph 36 of the Complaint.

37.    The Company's second segment is Dietary services.  Dietary consists of managing clients' dietary or food services departments, which are responsible for food purchasing, meal preparation and professional dietitian services at particular healthcare facilities.

**ANSWER:**  Defendants admit the averments of paragraph 37 of the Complaint.

38.    The number of facilities serviced by the Dietary segment currently is smaller than the number of facilities serviced by Housekeeping, with approximately 1,500 Dining facilities, compared to more than 3,500 for Housekeeping.  In prior years, including early in the Class Period, Housekeeping accounted for the majority of the Company's revenues - as high as 66% of total revenues as reported in the Company's fiscal year ("FY") 2013 Form 10-K filed with the SEC on February 21, 2014.  More recently, however, Dietary has accounted for a larger proportion of the Company's revenues and currently makes up slightly more than half of total revenues.

**ANSWER:**  Defendants admit that paragraph 38 purports to summarize and analyze information in the Company's Form 10-K filings and accurately describes the Company's operations at certain points in time.  Defendants refer to the Company's Form 10-K filings for a complete and accurate statement of their contents and deny any characterization or interpretation of the Form 10-K filings that would be inaccurate if read in the context of the entire Form 10-K or other HCSG Form 10-K filings.

39.    During the Class Period, the Company's purported growth and profit strategy focused on obtaining service agreements with new clients, providing new services to existing clients, obtaining modest price increases on client service agreements and maintaining internal cost reduction strategies.  In addition, it was important that the Company provide a sufficient quality of services to its customers so that current customers would renew expiring contacts and otherwise refrain from terminating them.  The Company's contracts with customers typically have one-year terms and contain liberal cancellation terms in which either party may terminate the agreement with 30 to 90 days' notice after an initial 60- to 120-day service agreement period.

**ANSWER:**  Defendants admit the averments of the first and second sentences of paragraph 39 of the Complaint and that HCSG's contracts with clients typically provide for a

renewable one-year service term, cancelable by either party upon 30 to 90 days' notice after an

initial period of 60 to 120 days.  Defendants further admit that paragraph 39 purports to

characterize the termination provisions in HCSG's contracts with clients.  Defendants refer to

HCSG's contracts with clients for a complete and accurate statement of their contents and deny

any characterization or interpretation of any of these contracts that would be inaccurate if read in

the context of the entire contract.

40.      Healthcare Services has stated, with respect to areas of potential growth, that the "primary economic factor in acquiring new clients [was the Company's] ability to demonstrate the cost-effectiveness of our services, because many of our clients' revenues are generally highly reliant on Medicare and Medicaid reimbursements." 2017 Form 10-K (defined below).

**ANSWER:**  Defendants admit that paragraph 40 purports to summarize and contains

partial excerpts from a Form 10-K HCSG filed on February 23, 2018 (the "2017 Form 10-K").

Defendants refer to the Company's 2017 Form 10-K for a complete and accurate statement of its

contents and deny any characterization or interpretation of the 2017 Form 10-K that would be

inaccurate if read in the context of the entire 2017 Form 10-K or other HCSG Form 10-K filings.

41.      Defendants had considerably more opportunity to control matters related to the Company's expenses, particularly labor costs and supply costs.  For the Housekeeping segment, operating performance was significantly - indeed overwhelmingly - impacted by labor costs, which management analyzed as a percentage of revenues in order to normalize and evaluate such costs to reflect changes in the Company's growth.  Labor costs accounted for approximately 81% of Housekeeping revenues in FY 2014, 80% of Housekeeping revenues in FY 2015, 80.2% of Housekeeping revenues in FY 2016, 80.1% of Housekeeping revenues in FY 2017 and 78.8% of Housekeeping revenues in FY 2018.  While labor costs comprise a smaller proportion of expenses for the Dietary segment, they are still materially significant, accounting for 51% of Dietary revenues in FY 2014, 53% of Dietary revenues in FY 2015, 53.8% of Dietary revenues in FY 2016, 56.6% of Dietary revenues in FY 2017 and 57.2% of Dietary revenues in FY 2018.

**ANSWER:**  Defendants deny the averments of the first sentence of paragraph 41 of the

Complaint.  Defendants admit that the remaining averments of paragraph 41 purport to

summarize information contained in the Company's Form 10-K filings.  Defendants refer to the

Company's Form 10-K filings for a complete and accurate statement of their contents and deny

any characterization or interpretation of the Form 10-K filings that would be inaccurate if read in

the context of the entire Form 10-K or other HCSG Form 10-K filings.

42.    Among other things, Defendants were able to achieve materially significant changes to the Company's reported EPS - in fractions of pennies - through manipulation of the primary driver of the Company's expenses: labor costs.  While minimizing expenses to increase profitability is, of course, a goal of any business, manipulating the expense side by, among other things, failing to include actual labor costs to project additional profitability, is not.

**ANSWER:**  Defendants deny the averments of paragraph 42 of the Complaint.

43.    Given that the Company has historically been a relatively middle-to-low margin business, Defendants touted the Company's quarterly EPS to investors and sought to project consistency with respect to meeting analysts' EPS targets.  As noted in the Monocle Report, a reduction in the Company's net income by modest amounts could have material effects on EPS. For example, for Q4 2016, a reduction of net income of just $62,000 in one quarter would have had the effect of shaving eight one-hundredths of a cent off its EPS, resulting in a rounding down of reported EPS and causing the Company to miss analysts' EPS target by a penny.  To put that in perspective, the difference between meeting and missing analysts' EPS target could be achieved by manufacturing a way to "reduce" labor costs by an average of *less than $21* at each of the 3,000 of the Company's customer facilities at the end of the fiscal quarter.  Alternatively, meeting the EPS target might be achieved by directing a single regional manager with 500 hourly employees to send each employee home for a day and a half without pay.  As alleged herein, the Company engaged in such, and likely other, machinations in order to achieve the extreme "improbability" of its consistent EPS performance throughout the Class Period.

**ANSWER:**  Defendants deny each and every averment of paragraph 43 of the

Complaint, except admit that this paragraph purports to summarize the March 2017 Monocle

Report.  Defendants refer to the March 2017 Monocle Report for a complete and accurate

statement of its contents and deny any characterization or interpretation of the March 2017

Monocle Report that would be inaccurate if read in the context of the entire March 2017

Monocle Report.  Defendants expressly deny any allegations of wrongdoing or misconduct by

the Defendants that are stated or implied in the March 2017 Monocle Report or through the

"examples" provided in paragraph 43 of the Complaint.

44.     Healthcare Services has an operational and reporting system in which individual facility-level operations are managed at a "district" level (with approximately 8-12 facilities in each district), which then reports up to "regional" and "divisional" levels that, in turn, report up to the main "corporate" level at the Company's headquarters in Bensalem, Pennsylvania.  The Company's "divisional" management of its Divisional Vice Presidents is a crucial interface with the Company's senior management, including the Individual Defendants and other headquarters personnel who report to or otherwise act on behalf of the Individual Defendants.  The Company's 2016 Form 10-K (defined below) provided the following diagram of the Company's "Operational Management Structure," noting that the purpose of this structure was to "contain or control certain housekeeping, laundry, linen, facility maintenance and dietary service costs on a continuing basis":

**Operational Management Structure**

By applying our professional management techniques, we generally contain or control certain housekeeping, laundry, linen, facility maintenance and dietary service costs on a continuing basis. We manage and provide our services through a network of management personnel, as illustrated below.



This schematic was modified starting with the 2017 Form 10-K (defined below), which was filed on February 23, 2018, after the Monocle Report and after the start of the SEC's investigation of the Company.  Notably, the roles of "President and CEO" (Defendant Wahl) and "Executive Vice President & Senior Vice President" (Defendant Shea and Defendant McCartney's brother, Bryan McCartney, held the title "Executive Vice President") were eliminated from the hierarchy shown on the chart, with the highest level shown being a "Vice President of Operations." Moreover, references to the Company's management structure focusing on containing or controlling its costs were revised to refer to "offer[ing] *clients* the ability to manage certain . . .

costs," further attempting to conceal the Individual Defendants' involvement in expense management.

**ANSWER:** Defendants deny each and every averment of paragraph 44 of the Complaint, except admit that paragraph 44 purports to summarize and contains partial excerpts and a schematic from a Form 10-K HCSG filed on February 19, 2016 (the "2015 Form 10-K"), although paragraph 44 incorrectly references the Company's 2016 Form 10-K. Defendants expressly deny that the schematic referenced in paragraph 44 was modified starting with the 2017 Form 10-K. To the contrary, the schematic was completely modified in the Form 10-K HCSG filed on February 24, 2017 (the "2016 Form 10-K"). The 2016 Form 10-K was filed before the March 2017 Monocle Report was issued and before the SEC commenced its inquiry into the Company's EPS calculation practices. Defendants refer to the 2015 Form 10-K and the 2016 Form 10-K for a complete and accurate statement of their contents and deny any characterization or interpretation of these Form 10-K filings that would be inaccurate if read in the context of the entire Form 10-K or other HCSG Form 10-K filings.

45.    The Company's revised public operational structure - which does not show the link to the Company's top management - is also shown in the following diagram provided in a recent HCSG investor presentation, which is substantially similar to the operational structure presented in the Company's post-2016 Form 10-K filings (and which appears to overstate the number of facilities serviced by the Company):



ANSWER:  Defendants admit that paragraph 45 purports to summarize and contains a

diagram from HCSG investor presentations.  Defendants refer to the investor presentations for a

complete and accurate statement of their contents and deny any characterization or interpretation

of any investor presentation that would be inaccurate if read in the context of the entire investor

presentation.  Defendants deny the remaining averments of paragraph 45 of the Complaint.

46.    During the Class Period, family members of Defendants McCartney, Wahl and McKee (who are themselves related to each other) held senior-level positions as Divisional Vice Presidents at the Company, including:  Kevin P. McCartney, the brother of Defendant McCartney, who joined the Company in 1998; Stephen Newns, the brother-in-law of Defendant McCartney and Bryan McCartney, who joined the Company in 1995; and James R. Bleming, the brother-in-law of Bryan McCartney, who joined the Company in 1992.  Given these familial connections, Defendants McCartney, Wahl and McKee had a further channel of access to

information at the Company's divisional level and below, and an enhanced degree of control over the financial and functional affairs of the relatively lower-level operations of the Company.

**ANSWER:** Defendants admit that Defendants McCartney, Wahl and McKee are related by marriage and held the positions referenced in paragraphs 26, 27 and 29 of the Complaint. Defendants further admit that the first sentence of paragraph 46 of the Complaint accurately summarizes information disclosed to shareholders in HCSG's definitive proxy statements. Defendants refer to the proxy statements for a complete and accurate statement of their contents and deny any characterization or interpretation of the proxy statements that would be inaccurate if read in the context of the entire proxy statement. The averments of the second sentence of paragraph 46 of the Complaint purport to state a legal conclusion to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied. Defendants deny the remaining averments of paragraph 46 of the Complaint.

47. Indeed, CW1 (defined below) described how Divisional Vice Presidents (a group that includes several McCartney family members) exerted control over multiple significant financial and operational matters.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 47 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied. To the extent the averments of paragraph 47 of the Complaint purport to state a legal conclusion, no response is required, and the averments are therefore denied. Defendants deny the remaining averments of paragraph 47 of the Complaint.

48. Financial and operational matters for all regions and operating segments of the Company are ultimately consolidated and centrally controlled at the "Corporate" level at the Company's headquarters, where the Individual Defendants are located. As stated in the Company's FY 2018 10-K filing, "[o]ur corporate headquarters provides centralized financial

-23-

management and support, legal services, human resources management, and other administrative services to the Housekeeping and Dietary business segments." The corporate nerve center at Healthcare Services' headquarters, which is run by the Individual Defendants, therefore exerts substantial control over the financial and management operations of all levels of the Company.

**ANSWER:** Defendants admit that paragraph 48 of the Complaint purports to summarize and contains partial excerpts from the 2018 Form 10-K. Defendants refer to the 2018 Form 10-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the 2018 Form 10-K that would be inaccurate if read in the context of the entire 2018 Form 10-K. To the extent the averments of paragraph 48 of the Complaint purport to state a legal conclusion, no response is required, and the averments are therefore denied. Defendants deny the remaining averments of paragraph 48 of the Complaint.

49.    As an example of the degree of control that the Company's highest levels of management had over lower levels of the Company, CW2 (defined below), a district manager, describes how corporate headquarters made changes to the financial information submitted from district managers in Monthly Projections reports, including accruals for labor expenses, without a valid business basis from the district or regional management's perspective.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 49 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied. To the extent the averments of paragraph 49 of the Complaint purport to state a legal conclusion, no response is required, and the averments are therefore denied. Defendants deny the remaining averments of paragraph 49 of the Complaint.

50.    The key financial and operational personnel at the "Corporate" level at the Company's headquarters include the Individual Defendants and other individuals who are related to or otherwise closely associated with Defendant McCartney and his extended family. CW3 (defined below) described the Company's financial and accounting functions as "small and controlled" by senior management, including Defendant Shea. CW1 described how the Company's senior leadership is comprised of a tightly-knit "good old boys' club" that "takes care of each other" and includes the Company's senior management at the corporate headquarters.

**ANSWER:** Defendants admit only that Individual Defendants held the positions referenced in paragraphs 26-29 of the Complaint and that certain relationships were disclosed to shareholders as described in paragraph 46 of the Complaint. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 50 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witnesses, and these averments are therefore denied. To the extent the averments of paragraph 50 of the Complaint purport to state a legal conclusion, no response is required, and the averments are therefore denied. Defendants deny the remaining averments of paragraph 50 of the Complaint.

51.    EPS is one of the most important financial metrics relied upon by investors and securities analysts. EPS "contains all the information required for evaluating an investment in a company's shares, compressed (aggregated) into a single number that purports to represent how much the company earned per share of stock issued." Israel Klein, *A Change in Accounting, A Change in Law,* 42 Del. J. Corp. L., 51, 56 (2017). The metric reflects the portion of a company's "profits" that are allocated to each common share. At its most basic, EPS is calculated by taking the company's net income for the relevant period (quarterly or annually) and dividing that amount by the total number of outstanding common shares. Generally speaking, a higher reported EPS is attractive to investors since it reflects greater profitability.

**ANSWER:** Defendants admit that paragraph 51 of the Complaint purports to summarize and contains partial excerpts from an article authored by Israel Klein, *A Change in Accounting, A Change in Law*, 42 Del. J. Corp. L., 51, 56 (2017). Defendants refer to this article for a complete and accurate statement of its contents and deny any characterization or interpretation of the article that would be inaccurate if read in the context of the entire article. Defendants further admit that the paragraph correctly states the formula for calculating EPS. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 51 of the Complaint with respect to the most important financial metrics relied upon

by any given investor and securities analyst or the attractiveness of any reported EPS to an

investor, and these averments are therefore denied.

52.     As described below, Healthcare Services touted its EPS results prominently in all its statements regarding its financial results during the Class Period.

**ANSWER:**  Defendants deny each and every averment of paragraph 52 of the

Complaint, except admit that HCSG referenced the Company's EPS, among other indicators

relating to the Company's performance, in its statements regarding its financial results during the

putative Class Period.

53.     Investment analysts that research and follow publicly traded companies often include, as part of their analysis, estimates of companies' anticipated EPS in coming fiscal quarters and/or on an annual basis.  These estimates are based on the analysts' assessments of various factors that include, as a significant component of the estimate, the company's reported financial results from prior periods and its public statements.  Analysts EPS estimates are then also based on financial modeling and analyses of various industry-specific and market information.  Analysts' EPS estimates are intended to provide guidance to investors about a company's expected earnings and profitability.  Since EPS estimates may vary from analyst to analyst due to variances in proprietary modeling, markets look to "consensus" EPS estimates, which are essentially the average of multiple analysts' EPS estimates.  Consensus EPS estimates are widely reported financial information that is published in the financial press, online and on financial industry platforms like Bloomberg.

**ANSWER:**  Defendants admit only that certain analysts may estimate a company's

anticipated EPS, EPS estimates can vary from analyst to analyst, and consensus EPS estimates

are published for certain companies in the financial press and on platforms like Bloomberg.

Defendants are without knowledge or information sufficient to form a belief as to the truth of the

remaining averments of paragraph 53, and they are therefore denied.

54.     In the case of Healthcare Services, analysts' reliance on company-provided financial data and public statements also included more than a decade's worth of manipulated and overstated EPS results.  Analysts likely considered the Company's consistent and manipulated EPS performance when determining their EPS estimates, infecting those targets with the false and misleading information provided by the Company.

**ANSWER:** Defendants deny the averments of paragraph 54 of the Complaint.

55.     Whether or not a company meets, exceeds or fails to meet consensus EPS estimates is a material consideration for investors.  An earnings "miss" in a particular quarter that is not tied to some extraordinary event *(e.g.,* due to the occurrence of a large, one-time corporate expense) can have a major negative impact on a company's stock price.

**ANSWER:** Defendants deny the averments of the first sentence of paragraph 55 of the Complaint.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining averments of paragraph 55 given that a variety of factors can impact a company's stock price.

56.     Indeed, a reported EPS that falls short of consensus estimates by as little as a penny can have - and, for numerous companies has had - a major negative impact on a company's stock price.  In his oft-cited 1998 speech titled *The Numbers Game,* former SEC chairman Arthur Levitt observed, "I recently read of one major U.S. company, that failed to meet its so-called 'numbers' by one penny, and lost more than six percent of its stock value in one day." Arthur Levitt, *The Numbers Game*, speech delivered to the NYU Center for Law and Business (Sept. 28, 1998), https://www.sec.gov/news/speech/speecharchive/1998/spch220.txt.

**ANSWER:** Defendants admit that paragraph 56 of the Complaint purports to summarize and contains partial excerpts from remarks made by Chairman Arthur Levitt on September 28, 1998 and these remarks are available at

https://www.sec.gov/news/speech/speecharchive/1998/spch220.txt.  Defendants refer to these remarks for a complete and accurate statement of their contents and deny any characterization or interpretation of the remarks that would be inaccurate if read in the context of the entire remarks made by Chairman Levitt.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining averments of paragraph 56 of the Complaint, and they are therefore denied.

57.     Former SEC Chairman Levitt's observation of the connection between EPS misses of as little as a single cent and major negative stock price reaction has been echoed by others.  *See* Matthew S. Mokwa, *Enron, Sarbanes-Oxley, and the End of Earnings Management*,

Tex. J. Bus. L., Fall 2003 ("Mokwa"), at 325, 335-36 ("If management . . . miss the consensus estimates by as little as one cent per share, the market capitalization of the company may decline precipitously in response."). *See also* George W. Dent, Jr., *The Essential Unity of Shareholders and the Myth of Investor Short-Termism*, 35 Del. J. Corp. L. 97, 123 (2010) (an "[announcement that a company has fallen (or expects to fall) short of analysts' forecasts typically causes its stock price to fall more than would be predicted by a mere problem with one quarter's earnings").

**ANSWER:** Defendants admit that paragraph 57 of the Complaint purports to summarize and contains partial excerpts from law journal articles. Defendants refer to these articles for a complete and accurate statement of their contents and deny any characterization or interpretation of either of these articles that would be inaccurate if read in the context of the entire article. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining averments of paragraph 57 of the Complaint, and they are therefore denied.

58.     While there may be one-time events that impact whether a company meets earnings projections, the investing public's reaction to earnings misses is often the result of the market's perception of a company's financial stability and credibility. Indeed, because analyst "projections are based in part on information provided by the companies themselves, meeting them not only speaks to the value of the company's shares, but the company's credibility as well." Deborah M. House, *Lessons Learned the Hard Way*, 24 No. 10 ACC Docket 28, 34.

**ANSWER:** Defendants admit that paragraph 58 of the Complaint purports to summarize and contains partial excerpts from a 2006 ACC Docket magazine article authored by Deborah M. House, titled "Lessons Learned the Hard Way: Ten Flags of Possible Financial Mismanagement and Fraud." Defendants refer to this article for a complete and accurate statement of its contents and deny any characterization or interpretation of this article that would be inaccurate if read in the context of the entire article. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining averments of paragraph 58 of the Complaint, and they are therefore denied.

59.     Wall Street's earnings estimates "are based almost exclusively on information released by management in various corporate disclosures," it follows that "management is

capable of exercising tremendous influence over its stock price by manipulating the information it discloses in its financial statements." Mokwa, at 335.

ANSWER: Defendants admit that paragraph 59 of the Complaint purports to summarize and contains partial excerpts from a law journal article. Defendants refer to this article for a complete and accurate statement of its contents and deny any characterization or interpretation of this article that would be inaccurate if read in the context of the entire article. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining averments of paragraph 59 of the Complaint, and they are therefore denied.

60.    Throughout the Class Period, when reporting the Company's quarterly financial performance to investors, the Company regularly prioritized its EPS results in an apparent reflection of the market's focus on the metric. For example, in the Company's April 11, 2017 press release, the Company noted, "[n]et income for the three months ended March 31, 2017 was $22.0 million, or *$0.30 per basic and diluted common share*, compared to the three months ended March 31, 2016 net income of $18.6 million, or *$0.26 per basic and diluted common share.*" The Company did not bury this metric at the bottom of its press releases. Rather, the Company consistently emphasized its EPS results at the beginning of its announcements, in the first few sentences.

ANSWER: Defendants deny each and every averment of paragraph 60 of the Complaint, except admit that HCSG referenced the Company's EPS, among other indicators relating to the Company's performance, when reporting HCSG's quarterly financial performance to investors. Defendants further admit that paragraph 60 of the Complaint purports to summarize and contains partial excerpts, with emphasis supplied by Plaintiff, from an April 11, 2017 press release. Defendants refer to this press release for a complete and accurate statement of its contents and deny any characterization or interpretation of this press release that would be inaccurate if read in the context of the entire press release.

61.    Likewise, on a conference call to discuss results for the first quarter ("Q1") of 2017 with investors and investment analysts, the Company began by noting that "[n]et income for the quarter increased to $22 million or $0.30 per share, and both net income and *earnings per*

-29-

*share for the quarter were company records.*"'"  As detailed further below, Defendants stressed on numerous occasions that the Company's reported EPS were record results for the Company.

**ANSWER:**  Defendants deny each and every averment of paragraph 61 of the Complaint, except admit that the paragraph purports to summarize and contains partial excerpts, with emphasis supplied by Plaintiff, from an HCSG earnings call held on April 12, 2017. Defendants refer to the call transcript for a complete and accurate statement of its contents and deny any characterization or interpretation of the earnings call that would be inaccurate if read in the context of the entire transcript of the call.  Defendants expressly deny that Defendants "stressed" EPS on numerous occasions.

62.    In response to the Company's focus on its EPS results, analysts focused on the Company's EPS in assessing its reported performance, as well as the fact that the Company's EPS met or beat analyst estimates for this metric.  For example, in April 2014, a William Blair analyst noted that the Company's results were *"exactly in line with the consensus forecast; earnings per share were $0.21."*"  On July 11, 2017, a William Blair analyst noted that the Company reported "solid second quarter 2017 results," with EPS of $0.30 being just above the Street's $0.29 target.  Similarly, on July 11, 2017, in a report titled *A Strong 2Q17 Driven by Upside on Both Revenue & Rollout Timing on New Service Agreements*, a UBS securities analyst noted that "HCSG reported 2Q2017 adjusted EPS of $0.30, $0.02/$0.01 ahead of UBSe/cons."  Likewise, on October 17, 2017, in a report titled *3Q17 EPS in line; Fine-tuning estimates,* a Credit Suisse analyst noted in the beginning of the report that "3Q17 EPS meets consensus ($0.31)."

**ANSWER:**  Defendants deny each and every averment of paragraph 62 of the Complaint, except admit that the paragraph purports to summarize and contains partial excerpts, with emphasis supplied by Plaintiff, from select analyst reports.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 62 with respect to the contents of these reports and whether the paragraph accurately summarizes and quotes their contents.  Defendants refer to these analyst reports for a complete and accurate statement of their contents and deny any characterization or interpretation of any of these reports that would be inaccurate if read in the context of the entire report.

63.    The Company's EPS results, and the consistency with which it met or beat analyst estimates prior to and during the Class Period, helped Defendants to position Healthcare Services as a relative bastion of financial stability in an otherwise volatile market.  On February 7, 2017, in a report titled *First Look at Largely In-Line Fourth Quarter Results*, a William Blair securities analyst noted that the Company reported "relatively in-line fourth quarter 2016 results" and that "GAAP EPS were equal to the $0.28 consensus forecast."  The analyst concluded that "we continue to view Healthcare Services Group as a high-quality long-term holding - one that offers healthcare investors a safe haven investment (and income) opportunity in volatile markets."

**ANSWER:**  Defendants deny each and every averment of paragraph 63 of the Complaint, except admit that the paragraph purports to summarize and contains partial excerpts from a February 7, 2017 analyst report.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 63 with respect to the contents of this report and whether the paragraph accurately summarizes and quotes its contents.  Defendants refer to this analyst report for a complete and accurate statement of its contents and deny any characterization or interpretation of this report that would be inaccurate if read in the context of the entire report.

64.    The Individual Defendants, through their close control over Healthcare Services' financial management and through their connections to McCartney family members and friends throughout key positions in the Company, were able to engage in earnings manipulation in subtle and likely otherwise undetectable manners in order to report recurring quarterly EPS successes, burnish the Company's reputation with securities analysts and achieve a staggeringly improbable run of meeting analysts' EPS estimates quarter after quarter.

**ANSWER:**  Defendants deny the averments of paragraph 64 of the Complaint.

65.    Beginning more than a decade ago, Defendants manipulated and overstated the Company's quarterly EPS results to encourage investors to view the Company as having a sustained track record for consistent and predictable results.  Defendants manipulated the Company's net income and related calculations, so that the Company could round up the third digit after the decimal point (representing tenths of a cent) for its reported EPS to ensure that the Company would avoid falling short of analysts' EPS targets.  This manipulation allowed the Company to meet or beat analyst estimates over the course of more than forty consecutive quarters, with the exception of three quarters in which "extraordinary" matters required the Company's reported EPS to fall short of analysts' expectations.  Indeed, the Company repeatedly met consensus EPS estimates precisely to the penny.

**ANSWER:** Defendants deny each and every averment of paragraph 65 of the Complaint, except admit that HCSG sometimes met consensus estimates. By way of further response, Defendants aver that HCSG sometimes missed and sometimes exceeded EPS consensus estimates.

66. On March 22, 2017, Monocle published the Monocle Report, which described the uncanny, and highly statistically improbable, manner in which Healthcare Services regularly met consensus EPS targets for more than a decade (and touted its success in achieving related company records). The Monocle Report summarized its findings in four bullet points:

- "A review of a decade's worth of earnings reports reveals an odd and concerning pattern, that of 'strategic rounding' of quarterly earnings per share."

- "Strong evidence suggests earnings management over the long term is likely at least partially responsible for HCSG's steadily increasing valuation to the current nosebleed level."

- "While earnings management is not necessarily illegal, at the very least, it signals an aggressive approach to accounting that increases exposure to restatement risk, enforcement proceedings and securities fraud claims."

- "All this while the founder and [then-] chairman has disposed of tens of millions of dollars worth of stock."

**ANSWER:** Defendants deny each and every averment of paragraph 66 of the Complaint, except admit that this paragraph purports to summarize and contains partial excerpts from the March 2017 Monocle Report. Defendants refer to the March 2017 Monocle Report for a complete and accurate statement of its contents and deny any characterization or interpretation of the March 2017 Monocle Report that would be inaccurate if read in the context of the entire March 2017 Monocle Report. Defendants expressly deny any allegations of wrongdoing or misconduct by the Defendants that are stated or implied in the March 2017 Monocle Report.

67. The Monocle Report noted that "[i]f a company is not actively manipulating [its results]," then a company's EPS in any given quarter should have an equal chance of rounding down to the nearest penny as rounding up to the nearest penny. Monocle further noted that an analysis of all stocks in the S&P 500 over the last number of years shows this to be the case, with

companies' quarterly EPS figures rounding down to the nearest penny roughly the same number of times that they round up.

**ANSWER:** Defendants deny each and every averment of paragraph 67 of the Complaint, except admit that this paragraph purports to summarize and contains partial excerpts from the March 2017 Monocle Report. Defendants refer to the March 2017 Monocle Report for a complete and accurate statement of its contents and deny any characterization or interpretation of the March 2017 Monocle Report that would be inaccurate if read in the context of the entire March 2017 Monocle Report. Defendants expressly deny any allegations of wrongdoing or misconduct by the Defendants that are stated or implied in the March 2017 Monocle Report.

68.    However, in the case of Healthcare Services, Monocle noted that "every single quarter over the past 11 years has seen [the Company's] quarterly earnings per share round up rather than round down to the nearest penny."

**ANSWER:** Defendants deny each and every averment of paragraph 68 of the Complaint, except admit that this paragraph purports to summarize and contains partial excerpts from the March 2017 Monocle Report. Defendants refer to the March 2017 Monocle Report for a complete and accurate statement of its contents and deny any characterization or interpretation of the March 2017 Monocle Report that would be inaccurate if read in the context of the entire March 2017 Monocle Report. Defendants expressly deny any allegations of wrongdoing or misconduct by the Defendants that are stated or implied in the March 2017 Monocle Report.

69.    The Monocle Report noted that the Company, which "peddl[es] a boring suite of essential services to an important part of the healthcare industry," had seen stock price growth that "has been anything but boring, having climbed 250% split-adjusted over the past 10 years." The Monocle Report suggested that a significant factor driving the price of the Company's stock was its steady EPS growth, which "while modest, is nonetheless commendable in today's economic environment." The Monocle Report also noted that Healthcare Services' stock was trading an increasing multiple to its EPS, which was attributable, in part, due to "the almost uncanny manner in which HCSG regularly meets quarterly consensus sell-side EPS expectations." The Monocle Report included the following graph of the Company's actual EPS compared to analysts' EPS estimates:



HCSG - Actual Reported EPS compared to Mean Sell-Side Estimates

Source: Thomson Reuters

■ Mean Estimate  ■ Actual

**ANSWER:** Defendants deny each and every averment of paragraph 69 of the Complaint, except admit that this paragraph purports to summarize and contains partial excerpts and a graph from the March 2017 Monocle Report. Defendants refer to the March 2017 Monocle Report for a complete and accurate statement of its contents and deny any characterization or interpretation of the March 2017 Monocle Report that would be inaccurate if read in the context of the entire March 2017 Monocle Report. Defendants expressly deny any allegations of wrongdoing or misconduct by the Defendants that are stated or implied in the March 2017 Monocle Report.

70.    According to the Monocle Report, Healthcare Services' consistent EPS results were highly suspicious in light of the uncertainties that all businesses encounter, stating:

> Whenever analyzing the equities of the various companies in
> which we have interest, we always keep in mind the axiom that
> "business is messy." In other words, even the best-run business is

-34-

subject to the vagaries of its customers, vendors, competitors and/or industry.  Considering that axiom, it is strange indeed that HCSG's quarterly EPS has matched, to the penny, the consensus EPS expectations more often than not over the last five, 10, and even 20 years.

In contrast to the results of an analysis of stocks in the S&P 500 index, which showed EPS results that "rounded down" to the nearest penny roughly as often as they "rounded up," Healthcare Services' EPS showed a pattern of consistently rounding up to meet analysts' consensus EPS estimates.  The Monocle Report concluded, "[w]e believe the reason this has occurred is simple - **HCSG appears to have actively and aggressively managed its quarterly EPS for over a decade.**" (emphasis in original).

**ANSWER:**  Defendants deny each and every averment of paragraph 70 of the Complaint, except admit that this paragraph purports to summarize and contains partial excerpts from the March 2017 Monocle Report.  Defendants refer to the March 2017 Monocle Report for a complete and accurate statement of its contents and deny any characterization or interpretation of the March 2017 Monocle Report that would be inaccurate if read in the context of the entire March 2017 Monocle Report.  Defendants expressly deny any allegations of wrongdoing or misconduct by the Defendants that are stated or implied in the March 2017 Monocle Report.

71.    To illustrate the subtle manner in which the Company was able to achieve its EPS consistency, the Monocle Report specifically pointed to an example of the Company's Q4 2016 results (announced on February 7, 2017), where the Company's reported quarterly net income of $20,299,000 yielded an EPS calculation of $0.2758, which rounded up to an EPS of $0.28 - which was the consensus EPS estimate.  The Monocle Report stated the significance of this 58 hundredths of a cent to the Company: "had HCSG's net income been a mere $62,000 less, then HSCG's diluted EPS would have been less than $0.2750, and would have, therefore, rounded down to $0.27, giving investors the disappointment of a $0.01 EPS miss."

**ANSWER:**  Defendants deny each and every averment of paragraph 71 of the Complaint, except admit that this paragraph purports to summarize and contains partial excerpts from the March 2017 Monocle Report.  Defendants refer to the March 2017 Monocle Report for a complete and accurate statement of its contents and deny any characterization or interpretation of the March 2017 Monocle Report that would be inaccurate if read in the context of the entire

March 2017 Monocle Report.  Defendants expressly deny any allegations of wrongdoing or

misconduct by the Defendants that are stated or implied in the March 2017 Monocle Report.

72.     Included in the Monocle Report was the following table that showed EPS calculations for 44 quarters, from Q1 2006 through Q4 2016, indicating that, "every single quarter over the past 11 years has seen HCSG's quarterly earnings per share round up rather than round down to the nearest penny" (as confirmed by the undersigned counsel's investigation):

| | Net income | Diluted weighted average shares | Earnings per share (A) | Rounded EPS (B) | B-A |
|---|---|---|---|---|---|
| Q416 | 20299000 | 73590000 | 0.2758 | 0.28 | 0.0042 |
| Q316 | 19711000 | 73592000 | 0.2678 | 0.27 | 0.0022 |
| Q216 | 18760000 | 73316000 | 0.2559 | 0.26 | 0.0041 |
| Q116 | 18626000 | 73014000 | 0.2551 | 0.26 | 0.0049 |
| Q415 | 9134000 | 72903000 | 0.1253 | 0.13 | 0.0047 |
| Q315 | 17086000 | 72691000 | 0.2350 | 0.24 | 0.0050 |
| Q215 | 16288000 | 72286000 | 0.2253 | 0.23 | 0.0047 |
| Q115 | 15516000 | 72159000 | 0.2150 | 0.22 | 0.0050 |
| Q414 | 15472000 | 71722000 | 0.2157 | 0.22 | 0.0043 |
| Q314 | -22182000 | 70671000 | -0.3139 | -0.31 | 0.0039 |
| Q214 | 13921000 | 71206000 | 0.1955 | 0.20 | 0.0045 |
| Q114 | 14639000 | 71072000 | 0.2060 | 0.21 | 0.0040 |
| Q413 | 5452000 | 70898000 | 0.0769 | 0.08 | 0.0031 |
| Q313 | 13790000 | 70531000 | 0.1955 | 0.20 | 0.0045 |
| Q213 | 12933000 | 69370000 | 0.1864 | 0.19 | 0.0036 |
| Q113 | 14954000 | 69361000 | 0.2156 | 0.22 | 0.0044 |
| Q412 | 12798000 | 68988000 | 0.1855 | 0.19 | 0.0045 |
| Q312 | 11517000 | 68635000 | 0.1678 | 0.17 | 0.0022 |
| Q212 | 11320000 | 68228000 | 0.1659 | 0.17 | 0.0041 |
| Q112 | 8578000 | 68085000 | 0.1260 | 0.13 | 0.0040 |
| Q411 | 10565000 | 67705000 | 0.1560 | 0.16 | 0.0040 |
| Q311 | 9996000 | 67530000 | 0.1480 | 0.15 | 0.0020 |
| Q211 | 9828000 | 67545000 | 0.1455 | 0.15 | 0.0045 |
| Q111 | 7767000 | 67454000 | 0.1151 | 0.12 | 0.0049 |
| Q410 | 9123000 | 67232000 | 0.1357 | 0.14 | 0.0043 |
| Q310 | 9169000 | 44719000 | 0.2050 | 0.21 | 0.0050 |
| Q210 | 8721000 | 44652000 | 0.1953 | 0.20 | 0.0047 |
| Q110 | 7428000 | 44659000 | 0.1663 | 0.17 | 0.0037 |
| Q409 | 6566000 | 66705000 | 0.0984 | 0.10 | 0.0016 |
| Q309 | 8225000 | 44334000 | 0.1855 | 0.19 | 0.0045 |
| Q209 | 7815000 | 44262000 | 0.1766 | 0.18 | 0.0034 |
| Q109 | 7736000 | 44073000 | 0.1755 | 0.18 | 0.0045 |
| Q408 | 7283000 | 43948000 | 0.1657 | 0.17 | 0.0043 |
| Q308 | 5522000 | 43980000 | 0.1256 | 0.13 | 0.0044 |
| Q208 | 6953000 | 43962000 | 0.1582 | 0.16 | 0.0018 |
| Q108 | 6857000 | 44213000 | 0.1551 | 0.16 | 0.0049 |
| Q407 | 7305000 | 44033000 | 0.1659 | 0.17 | 0.0041 |
| Q307 | 7299000 | 43969000 | 0.1660 | 0.17 | 0.0040 |
| Q207 | 7524000 | 29140000 | 0.2582 | 0.26 | 0.0018 |
| Q107 | 7450000 | 29108000 | 0.2559 | 0.26 | 0.0041 |
| Q406 | 7227000 | 28986000 | 0.2493 | 0.25 | 0.0007 |
| Q306 | 6564000 | 28760000 | 0.2282 | 0.23 | 0.0018 |
| Q206 | 6203000 | 28691000 | 0.2162 | 0.22 | 0.0038 |
| Q106 | 5676000 | 28620000 | 0.1983 | 0.20 | 0.0017 |

**ANSWER:**  Defendants deny each and every averment of paragraph 72 of the Complaint, except admit that this paragraph purports to summarize and contains partial excerpts and a table from the March 2017 Monocle Report.  Defendants refer to the March 2017 Monocle Report for a complete and accurate statement of its contents and deny any characterization or interpretation of the March 2017 Monocle Report that would be inaccurate if read in the context of the entire March 2017 Monocle Report.  Defendants expressly deny any allegations of wrongdoing or misconduct by the Defendants that are stated or implied in the March 2017 Monocle Report.  Defendants further state that they are without knowledge or information sufficient to form a belief as to the truth of the averments regarding the investigation allegedly conducted by Plaintiff's counsel, and these averments are therefore denied.

73.    According to the Monocle Report, it was "improbab[le] that this is the result of anything but the active management of the company's EPS."  The Monocle Report noted that, since the odds of rounding up EPS are theoretically the same as rounding down EPS, the results are the equivalent of flipping a coin and coming up with heads 44 times in a row, "the odds of which are a staggering **1 in 17.6 trillion**" (emphasis in original).  Further demonstrating the remote probability of these results, including how "more times than not, HCSG's quarterly diluted EPS rounded up by more than 0.4 cents," the Monocle Report noted that "[i]f HCSG's quarterly diluted EPS figures were, in fact, randomly derived over the past 11 years, then the odds of this occurring are roughly **1 in 600 quadrillion**" (emphasis in original).

**ANSWER:**  Defendants deny each and every averment of paragraph 73 of the Complaint, except admit that this paragraph purports to summarize and contains partial excerpts from the March 2017 Monocle Report.  Defendants refer to the March 2017 Monocle Report for a complete and accurate statement of its contents and deny any characterization or interpretation of the March 2017 Monocle Report that would be inaccurate if read in the context of the entire March 2017 Monocle Report.  Defendants expressly deny any allegations of wrongdoing or misconduct by the Defendants that are stated or implied in the March 2017 Monocle Report.

74.    To put further context to the highly unusual and improbable string of EPS results reported by the Company, the Monocle Report stated:

> It is worth noting though that we have spoken with the CFOs of multiple publicly-traded companies about what would be necessary to achieve a string of 44 straight EPS results that rounded up to the nearest penny, and ***the feedback that we have received is that it would be a fairly difficult thing to accomplish through legitimate accounting practices***, considering the multitude of accounting entries that a company is faced with in any given quarter.

**ANSWER:** Defendants deny each and every averment of paragraph 74 of the Complaint, except admit that this paragraph purports to summarize and contains partial excerpts, with emphasis supplied by Plaintiff, from the March 2017 Monocle Report. Defendants refer to the March 2017 Monocle Report for a complete and accurate statement of its contents and deny any characterization or interpretation of the March 2017 Monocle Report that would be inaccurate if read in the context of the entire March 2017 Monocle Report. Defendants expressly deny any allegations of wrongdoing or misconduct by the Defendants that are stated or implied in the March 2017 Monocle Report.

75.    The Monocle Report connected the suspicious rounding of EPS results to Defendants Wahl and McKee: "[c]oincidentally, this strange pattern began just a few quarters after McCartney's two sons-in-law joined the company." The Monocle Report suspected that driving higher valuation multiples would have benefitted anyone selling the stock, including Defendant McCartney, who was then the Company's Chairman and (according to the Monocle Report) had sold $23.4 million in stock since July 2015 and gifted another $4.2 million worth of stock during that period.

**ANSWER:** Defendants deny each and every averment of paragraph 75 of the Complaint, except admit that this paragraph purports to summarize and contains partial excerpts from the March 2017 Monocle Report. Defendants refer to the March 2017 Monocle Report for a complete and accurate statement of its contents and deny any characterization or interpretation of the March 2017 Monocle Report that would be inaccurate if read in the context of the entire

March 2017 Monocle Report.  Defendants expressly deny any allegations of wrongdoing or misconduct by the Defendants that are stated or implied in the March 2017 Monocle Report.

76.    Monocle noted that, "[w]e reached out to Daniel McCartney, Ted Wahl and Matt McKee to ask for an explanation of this unusual pattern, but have yet to receive a response."

**ANSWER:**  Defendants deny each and every averment of paragraph 76 of the Complaint, except admit that this paragraph purports to summarize and contains partial excerpts from the March 2017 Monocle Report.  Defendants refer to the March 2017 Monocle Report for a complete and accurate statement of its contents and deny any characterization or interpretation of the March 2017 Monocle Report that would be inaccurate if read in the context of the entire March 2017 Monocle Report.  Defendants expressly deny any allegations of wrongdoing or misconduct by the Defendants that are stated or implied in the March 2017 Monocle Report.

77.    The Monocle Report also stated that its findings had been reported to the SEC.

**ANSWER:**  Defendants deny each and every averment of paragraph 77 of the Complaint, except admit that the paragraph purports to summarize information in the March 2017 Monocle Report.  Defendants refer to the March 2017 Monocle Report for a complete and accurate statement of its contents and deny any characterization or interpretation of the March 2017 Monocle Report that would be inaccurate if read in the context of the entire March 2017 Monocle Report.  Defendants expressly deny any allegations of wrongdoing or misconduct by the Defendants that are stated or implied in the March 2017 Monocle Report.

78.    On the date that the Monocle Report was published, the price of Healthcare Services' stock fell by $0.79 per share to close at $42.16 per share on March 23, 2017, a decline of 1.84%, on above-average volume.  As discussed further herein, the Company's stock later rebounded to $45.55 per share after Defendants dismissed analyst questions about the findings of the Monocle Report on an earnings call.

**ANSWER:**  Defendants admit the averments of the first sentence of the paragraph and that HCSG's stock price closed at $45.55 per share on April 12, 2017.  Defendants deny the remaining averments of paragraph 78 of the Complaint.

79.    The Company's EPS rounding manipulation continued into the Class Period.  The Company consistently reported EPS that, barring unusual circumstances, met or exceeded analyst expectations for years, up until around the time that the SEC commenced its MUI into the Company's EPS practices in November 2017.  A table showing consensus EPS estimates for Healthcare Services (obtained from Bloomberg) (the "Consensus Estimate") compared to the Company's reported EPS results reported by the Company for that metric ("EPS Reported") is set forth below:

| Earnings Date | Consensus Estimate | EPS Reported | EPS Result |
|---|---|---|---|
| Q1 2014 | 0.21 | 0.21 | Meet |
| Q2 2014 | 0.21 | 0.20 | Miss |
| Q3 2014 | 0.22 | -0.31 | Miss |
| Q4 2014 | 0.22 | 0.22 | Meet |
| Q1 2015 | 0.22 | 0.22 | Meet |
| Q2 2015 | 0.23 | 0.23 | Meet |
| Q3 2015 | 0.24 | 0.24 | Meet |
| Q4 2015 | 0.26 | 0.13 | Miss |
| Q1 2016 | 0.26 | 0.26 | Meet |
| Q2 2016 | 0.26 | 0.26 | Meet |
| Q3 2016 | 0.27 | 0.27 | Meet |
| Earnings Date | Consensus Estimate | EPS Reported | EPS Result |
| Q4 2016 | 0.28 | 0.28 | Meet |
| Q1 2017 | 0.29 | 0.30 | Exceed |
| Q2 2017 | 0.29 | 0.30 | Exceed |
| Q3 2017 | 0.31 | 0.31 | Meet |
| November 2017 SEC Request for Information from HCSG | | | |

| Q4 2017 | 0.29 | 0.27 | Miss |
|---------|------|------|------|
| Q12018 | 0.38 | 0.00 | Miss |
| Q2 2018 | 0.38 | 0.35 | Miss |
| Q3 2018 | 0.37 | 0.35 | Miss |
| Q4 2018 | 0.37 | 0.42 | Exceed[2] |
| Close of Class Period | | | |
| Q1 2019 | 0.36 | 0.12 | Miss |
| Q2 2019 | 0.35 | 0.24 | Miss |

**ANSWER:** Defendants deny each and every averment of paragraph 79 and footnote 2 of the Complaint, except admit that the paragraph includes excerpts of information purportedly pulled from Bloomberg and appears to reflect information relating to the Company's diluted EPS figures. Defendants note that earnings per basic and per diluted common share were not always the same during the putative Class Period. Defendants further note that consensus estimates vary across time, and the table does not indicate the date at which the consensus estimates are intended to reflect.

Defendants further admit that HCSG issued a press release on February 5, 2019 relating to the Company's performance in the fourth quarter of 2018, which reported the Company's EPS among other indicators relating to the Company's performance. Defendants refer to the February 5, 2019 press release for a complete and accurate statement of its contents and deny any characterization or interpretation of this press release that would be inaccurate if read in the

---

[2]As noted previously, the Company's Q4 2018 EPS, announced on February 5, 2019, exceeded consensus estimates by $0.05 per share. However, eliminating millions of dollars in extraordinary items that resulted in unusually high net income in the quarter, the Company's EPS would have *missed* consensus estimates by somewhere between two and seven cents.

context of the entire press release.  Defendants further admit that footnote 2 purports to

summarize excerpts from a February 5, 2019 report authored by a Stephens Inc. analyst.

Defendants refer to this analyst report for a complete and accurate statement of its contents and

deny any characterization or interpretation of this analyst report that would be inaccurate if read

in the context of the entire report or in light of other analysts' reports.

80.    During the Class Period and over the course of 15 quarters, the Company missed
EPS estimates just three times before receiving the SEC's request for information about its EPS
practice in November 2017.  In each instance, the EPS miss was related to extraordinary or
unusual circumstances in that particular quarter.  The first EPS miss, by a penny, occurred in the
second quarter ("Q2") of 2014.  There, securities analysts noted that the Company had missed
earnings targets due, in part, to a higher-than-expected tax rate.  The second EPS miss occurred
in the third quarter ("Q3") of 2014, when the Company reported a $0.31 *loss* per basic and per
diluted common share that was attributed to extraordinary expenses related to a corporate
reorganization.  The third EPS miss occurred in Q4 2015.  Then, the Company's EPS fell short
of the consensus estimate by $0.13 due to a one-time expense related to the settlement of labor
and employment litigation.  Even with the substantial miss due to the extraordinary litigation-
related expense, a UBS securities analyst noted, in a February 3, 2016 report, that if the
extraordinary charge were excluded, the Company would have beat the consensus EPS estimate
by a penny.

**ANSWER:**  Defendants deny each and every averment of paragraph 80 of the

Complaint, except admit that between the first quarter of 2014 and the third quarter of 2017,

HCSG missed the analysts' consensus EPS estimates three times, during:  the second quarter of

2014, the third quarter of 2014, and the fourth quarter of 2015.  Defendants further admit that the

paragraph purports to summarize reports and/or statements issued by securities analysts.

Defendants are without knowledge or information sufficient to form a belief as to the truth of the

averments of paragraph 80 with respect to the contents of these reports and/or statements and

whether the paragraph accurately summarizes their contents.  Defendants refer to these reports

and/or statements for a complete and accurate statement of their contents and deny any

characterization or interpretation of these reports and/or statements that would be inaccurate if

read in the context of the entire report or statement.

81.    As noted in the table in ¶ 79, *supra*, after the SEC initiated its inquiry of the Company's EPS practices in November 2017, the Company missed analyst estimates for four consecutive quarters starting with Q4 2017, and continued to miss analyst estimates through the first six months of 2019.

**ANSWER:**  Defendants deny each and every averment of paragraph 81 of the Complaint, except admit that between the fourth quarter of 2017 and the second quarter of 2019, HCSG missed analysts' consensus EPS estimates during the fourth quarter of 2017; the first, second, and third quarters of 2018; and the first and second quarters of 2019.

82.    In the one quarter in which the Company reported EPS that exceeded analysts' consensus estimates, Q4 2018 (announced in a press release dated February 5, 2019), was driven by extraordinary items that temporarily increased net income in the quarter.  The Company's reported EPS of $0.42 per diluted share for Q4 2018 beat consensus estimates by $0.05 per share.  However, according to a February 5, 2019 report by analyst Jacob Johnson of Stephens, Inc., after backing out the extraordinary items (which included a $15 million beneficial change in workers' compensation expenses, a $6 million accounts receivable reserve adjustment and a $4.1 million change to deferred compensation), "EPS would have been 35 cents (30 cents assuming 22% tax rate."  Thus, absent the extraordinary events of Q4 2018, the Company would have missed consensus EPS estimates for all seven consecutive quarters since the start of the SEC investigation.

**ANSWER:**  Defendants deny each and every averment of paragraph 82 of the Complaint, except admit that HCSG issued a press release on February 5, 2019 relating to the Company's performance in the fourth quarter of 2018, which reported the Company's EPS of $0.42 per diluted common share, among other indicators relating to the Company's performance. Defendants admit that HCSG's reported EPS beat analysts' consensus estimates by $0.05 per share in the fourth quarter of 2018.  Defendants further admit that the paragraph purports to summarize and contains partial excerpts from a February 5, 2019 report by analyst Jacob Johnson of Stephens Inc.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 82 with respect to the contents of this report and whether the paragraph accurately summarizes and quotes its contents.  Defendants refer to this analyst report for a complete and accurate statement of its contents and deny any

characterization or interpretation of this analyst report that would be inaccurate if read in the

context of the entire report.

83.    Despite the Monocle Report's suggestion of potential fraud at the highest levels of the Company's management, and the fact that the Monocle Report expressly stated that the Company's leadership - specifically Defendants McCartney, Wahl and McKee - had been contacted about its EPS practices, the Company dismissed the report by touting its actual performance (increased revenues and profits) without providing any specific answer refuting the Monocle Report's finding and analysis.

ANSWER:  Defendants deny the averments of paragraph 83 of the Complaint.

84.    On April 12, 2017, at 8:30 a.m. Eastern time, the Company held an earnings conference call to discuss its quarterly results (the "April 12, 2017 Call").  Defendants Wahl and McKee participated on behalf of the Company.  During the portion of the April 12, 2017 Call dedicated to questions from securities analysts, an analyst asked Defendant Wahl about the Monocle Report and whether Wahl would comment on the reported EPS rounding practices.  Specifically, Robert W. Baird analyst Andrew John Wittmann asked:

> My last question here is just on some of the reports that came out
> about the company quarterly results being rounded up for a long
> period of time on the quarter.  The annual results clearly don't
> round up, but I think just given that this has gotten some attention,
> it'd be worth having you guys comment on that and just give us
> your thoughts on that.

ANSWER:  Defendants admit the averments of the first and second sentences of

paragraph 84 of the Complaint.  Defendants further admit that the paragraph purports to

summarize and contains partial excerpts from the transcript of the April 12, 2017 earnings call.

Defendants refer to the call transcript for a complete and accurate statement of its contents and

deny any characterization or interpretation of the earnings call that would be inaccurate if read in

the context of the entire transcript of the call.  Defendants deny the remaining averments of

paragraph 84 of the Complaint.

85.    Defendant Wahl responded to this question evasively and defensively, while feigning ignorance of the Monocle Report:

> I can tell you - ***without knowing exactly what article or more
> specifically what iteration of articles you 're referring to***, I can
> tell you we believe our best efforts are spent actually running the
> company and delivering outcomes for our customers, our
> employees and all our shareholders, ***not the latest and greatest
> investor sentiment with third-party articles and blogs***.  And I
> would say regardless of bias, Andy, whether they're positive or
> negative, God knows there's plenty of both out there.  And when
> you look at ***over the past 10 or so years*** that you have mentioned,
> our track record really speaks for itself.  We've tripled the size of
> the company, customers, employees, revenues, and profits.  We've
> paid out more than $400 million in dividends during that
> timeframe.  And most importantly, we position the company today
> to surpass that performance and deliver for all of our stakeholders
> over the next decade.  So again, I think our track record of
> ***performance over the past 10 years*** really stands on its own.

Defendant McKee, who was present to speak on behalf of the Company, said nothing in response
to analyst Wittmann's question.

    **ANSWER:**  Defendants deny each and every averment of paragraph 85 of the

Complaint, except admit that the paragraph purports to summarize and contains partial excerpts,

with emphasis supplied by Plaintiff, from the transcript of the April 12, 2017 earnings call.

Defendants refer to the call transcript for a complete and accurate statement of its contents and

deny any characterization or interpretation of the earnings call that would be inaccurate if read in

the context of the entire transcript of the call.  Defendants expressly deny that Defendant Wahl's

response was evasive and/or defensive, or that he feigned ignorance of the March 2017 Monocle

Report.  To the contrary, in response to an analyst's question about "some of the reports that

came out about the company quarterly results being rounded up," Defendant Wahl merely stated

that he was not sure which report the analyst meant by "some of the reports" and referred the

analyst to the Company's track record over the prior 10 years with respect to various financial

metrics.

    86.    The market took comfort in Defendant Wahl's dismissal of the Monocle Report's
conclusions and assurances regarding the Company's track record of performance over the past

decade.  In response, on April 12, 2017, Healthcare Services' stock price rose by $3.37 per share to close at $45.55 per share, a gain of nearly 8%.

**ANSWER:**  Defendants deny each and every averment of paragraph 86 of the

Complaint, except admit that HCSG's stock price closed at $45.55 on April 12, 2017, up from

the closing price of $42.18 on April 11, which was a $3.37 increase (nearly 8%).

87.     Oddly, in his response, Defendant Wahl's denial of any knowledge about the Monocle Report's findings actually demonstrates that he, in fact, knew exactly what "reports" to which analyst Wittmann was referring.  In his question, Wittmann did not mention the Monocle Report by name or otherwise indicate that the "reports" about the Company's EPS rounding were presented online in a "blog" format published on the Seeking Alpha website, nor did Wittmann mention that the thesis (or title) of the Monocle Report was that the Company's EPS practices involved "a decade of strategic rounding."  Nonetheless, Defendant Wahl responded with a reference to "third party articles and blogs," and two references to the Company's performance in the past 10 years - neither of which would make any sense other than to reveal Defendant Wahl's knowledge of the Monocle Report and its analysis.

**ANSWER:**  Defendants deny the averments of paragraph 87 of the Complaint and

incorporate herein their response to paragraph 85.

88.     Approximately three weeks after the Monocle Report was published, and one day before the April 12, 2017 Call, Defendant McCartney, the Company's founder and Chairman since its inception, informed the Company's Board that he would not stand for re-election as Chairman.  McCartney's term as Chairman ended on May 31, 2017.

**ANSWER:**  Defendants admit the averments of paragraph 88 of the Complaint.

89.     Monocle issued a follow-up report on April 17, 2017 titled *Healthcare Services Group: More "Strategic Rounding" and Other Shenanigans*.  In this follow-up report, Monocle noted that, despite having alerted the Company's management to its finding in March (before releasing the Monocle Report), the Company's most recent EPS also rounded up (from $0.2977 to $0.30), allowing the Company to beat consensus estimates by a penny, "mark[ing] the 45th time in a row that HCSG's EPS rounded up instead of down," extending the coin-flip analogy to call the Company's 45 consecutive quarters of EPS rounding up a one in 35.2 trillion occurrence. Monocle's follow-up report also referenced the question-and-answer exchange with analyst Wittmann during the April 12, 2017 Call and noted that "Mr. Wahl's claim to not know to which article Mr. Wittmann was referring was fairly unbelievable, as we both alerted HCSG's management to our upcoming article and sought comment from management about the conclusion we drew from the company's pattern of EPS rounding through the years."  Monocle also found Wahl's response to Wittmann's question to have been "completely nonresponsive."

**ANSWER:** Defendants deny each and every averment of paragraph 89 of the Complaint, except admit that the paragraph purports to summarize and contains partial excerpts from a report issued by Monocle Accounting Research on April 17, 2017 (the "April 2017 Monocle Report"). Defendants note that the excerpts cited in paragraph 89 contain a minor typographical error. Defendants refer to the April 2017 Monocle Report for a complete and accurate statement of its contents and deny any characterization or interpretation of the April 2017 Monocle Report that would be inaccurate if read in the context of the entire April 2017 Monocle Report. Defendants expressly deny any allegations of wrongdoing or misconduct by the Defendants that are stated or implied in the April 2017 Monocle Report.

90.     On or before November 2017, the SEC launched an initial-stage investigation, or a "Matter Under Inquiry" ("MUI") in SEC administrative parlance, into the Company's EPS practices and sent a request for information to the Company.

**ANSWER:** Defendants admit the averments in paragraph 90 of the Complaint.

91.     The SEC's inquiry escalated to a formal investigation no later than March 2018, when the Company received a subpoena from the SEC. Under the SEC's rules, the SEC cannot issue a subpoena until its staff members have been "designated as officers in a formal order of investigation." SEC Division of Enforcement, Enforcement Manual (Nov. 28, 2017), at § 3.2.6. The Company, as the target of the subpoena, had the right to request or view the SEC's formal order, which details the nature of the investigation and explained the potential securities law violations under investigation. *See id.* at § 2.3.4.2 (Requests for a Copy of the Formal Order).

**ANSWER:** Defendants admit the first sentence of paragraph 91 of the Complaint. The remaining averments of paragraph 91 of the Complaint purport to state a legal conclusion to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

92.     During Q4 2018, Healthcare Services authorized an "internal investigation" conducted by "outside counsel" in connection with the subject matter of the SEC investigation. The internal investigation was sufficiently extensive and complex that it had not been completed

-48-

as of March 4, 2019 and, in connection with the SEC's investigation, had cost the Company at least $8 million to date.

**ANSWER:** Defendants admit the averments of the first sentence of paragraph 92 of the Complaint and that the internal investigation was not completed as of March 4, 2019. Defendants deny the remaining averments of paragraph 92 of the Complaint. By way of further response, the internal investigation was completed in March 2019.

93.     For sixteen months, Healthcare Services concealed an SEC inquiry and investigation into its EPS practices.

**ANSWER:** Defendants deny the averments of paragraph 93 of the Complaint.

94.     At no point prior to March 4, 2019 did the Company disclose the pendency of the SEC investigation, including the SEC's November 2017 request for information or the March 2018 formal investigation and subpoena to the Company. To the contrary, Defendants affirmatively concealed the existence of the SEC investigation from investors.

**ANSWER:** Defendants admit the first sentence of paragraph 94 of the Complaint. Defendants deny the remaining averments of paragraph 94 of the Complaint. By way of further response, the law does not impose a per se duty upon a company to disclose the pendency of an SEC investigation, and the Company had no duty to disclose the investigation any earlier than it did.

95.     As of December 31, 2017, Healthcare Services had a $300 million bank line of credit on which to draw for general corporate purposes. The line of credit was set to expire on December 18, 2018.

**ANSWER:** Defendants deny each and every averment of paragraph 95 of the Complaint, except admit that HCSG had a $300 million bank line of credit that was in effect on December 31, 2017 and was originally set to expire on December 18, 2018.

96.     On December 21, 2018, the Company entered into a new $475 million credit facility, which replaced the $300 million line of credit (the "New Credit Facility"). The New Credit Facility was documented by a Credit Agreement (the "Credit Agreement"), which was

-49-

filed with the SEC as an Exhibit to a Form 8-K, signed by Defendant Shea, after markets closed on December 31, 2018.  The version of the Credit Agreement filed with the SEC does not include a signature or the name of the person who signed on behalf of the Company, but on information and belief, such an agreement would be authorized by Defendants.  In fact, pursuant to the Credit Agreement, only a limited number of individuals could serve as an "Authorized Officer" for the Company under the Credit Agreement, including Defendant Wahl (as CEO and President) and Defendant Shea (as CFO).

**ANSWER:**  Defendants admit the averments of the first and second sentences of paragraph 96 of the Complaint, except clarify that the Form 8-K was filed after the New York Stock Exchange ("NYSE") closed.  Defendants deny the remaining averments of paragraph 96 of the Complaint, except admit that the paragraph purports to summarize and contains partial excerpts from an HCSG Credit Agreement dated December 21, 2018 (the "Credit Agreement").  Defendants refer to the Credit Agreement for a complete and accurate statement of its contents and deny any characterization or interpretation of the Credit Agreement that would be inaccurate if read in the context of the entire Credit Agreement.

97.    According to the Credit Agreement, the Company falsely represented that there were no investigations pending against it.  Specifically, the Credit Agreement stated, at Section 6.1.5:  "There are no actions, suits, proceedings, or investigations pending or, to the knowledge of any Loan Party, threatened against such Loan Party or any Subsidiary of such Loan Party at law or in equity before any Official Body which individually or in the aggregate could reasonably be expected to result in any Material Adverse change."  In the Credit Agreement, an "Official Body" was defined to include the United States Government and governmental agencies that would include the SEC.

**ANSWER:**  Defendants deny each and every averment of paragraph 97 of the Complaint, except admit that the paragraph purports to summarize and contains partial excerpts from the Credit Agreement.  Defendants refer to the Credit Agreement for a complete and accurate statement of its contents and deny any characterization or interpretation of the Credit Agreement that would be inaccurate if read in the context of the entire Credit Agreement.  Defendants expressly deny that in December 2018, there were any investigations pending against

HCSG that to its knowledge could reasonably be expected to result in a Material Adverse

Change.

98.      Notwithstanding this clear representation in the Credit Agreement of no pending investigations, prior to HSCG's entry into the New Credit Facility and the filing of the Credit Agreement in late December 2018, the SEC had launched an investigation into the Company's EPS practices, including through the 2017 request for information concerning the Company's EPS practices and the March 2018 formal investigation and subpoena.  In addition, the Company had authorized an "internal investigation" conducted by "outside counsel" in connection with the subject matter of the SEC investigation.  Moreover, as the Company has since acknowledged, these investigations were material, exposed the Company to considerable potential liability, and cost the Company millions of dollars in expenses.

ANSWER:  Defendants deny each and every averment of paragraph 98 of the

Complaint, except admit that the SEC commenced an inquiry into the Company's EPS practices

and sent a request for information in November 2017; thereafter, the SEC commenced a formal

investigation, and the SEC served a subpoena on the Company in March 2018; the Company

retained outside counsel to conduct an internal investigation in connection with the subject

matter of the SEC investigation; and the Company stated in its Form 10-K filed on February 21,

2020 ("2019 Form 10-K") that "[t]he SEC's investigation into [the Company's EPS] calculation

practices could result in potential sanctions or penalties, distraction to our management and result

in litigation from third parties, each of which could adversely affect or cause variability in our

financial results."  Defendants expressly deny that in December 2018, there were any

investigations pending against HCSG that to its knowledge could reasonably be expected to

result in a Material Adverse Change.

99.      Given the Defendants' positions, and the manner in which the Defendants closely held control of the Company, Defendants would have known about the SEC's investigation and been a part of any response to the SEC.  Defendant Shea likely knew or should have known of the SEC investigation due to his role as the point-of-contact between the SEC and the Company during the Class Period.  Moreover, Defendant Wahl, due to his position on the Board would have known about the SEC's Investigation no later than some time in Q4 2018 when the

Company's internal investigation was convened, which would have been prior to December 31, 2018 when the Credit Agreement was publicly filed.

**ANSWER:** Defendants deny each and every averment of paragraph 99 of the

Complaint, except admit that Defendants knew about the SEC investigation in Q4 2018.

100. On March 4, 2019, Healthcare Services announced, for the first time, that it was the subject of an SEC investigation into the Company's EPS rounding and reporting practices. In a Form 8-K filed with the SEC, the Company stated:

> Healthcare Services Group, Inc. (the "Company") received a letter in November 2017 from the Securities and Exchange Commission (the "SEC") regarding an inquiry that the SEC is conducting into earnings per share ("EPS") calculation practices and requesting that the Company voluntarily provide certain information and documents relating to its EPS rounding and reporting practices. The Company also received a subpoena in March 2018 from the SEC in connection with these matters.
>
> Since the inception of the inquiry, the Company has been providing information and documents to the SEC. Additionally, during the fourth quarter of 2018, the Company authorized its outside counsel to conduct an internal investigation, under the direction of the Company's Audit Committee, into matters related to the SEC subpoena. The Company continues to cooperate with the SEC's investigation.

**ANSWER:** Defendants admit that HCSG first publicly disclosed the SEC investigation

into the Company's EPS rounding and reporting practices on March 4, 2019. Defendants further

admit that paragraph 100 of the Complaint purports to summarize and contains partial excerpts

from the Form 8-K filed by HCSG on March 4, 2019. Defendants refer to this Form 8-K for a

complete and accurate statement of its contents and deny any characterization or interpretation of

the Form 8-K that would be inaccurate if read in the context of the entire Form 8-K.

101. The Company separately announced that it would delay the filing of its Annual Report because its "internal investigation" remained incomplete. Specifically, the Company stated, "[t]he Company and its outside counsel continue to work expeditiously to conclude the internal investigation and have determined to delay the filing of the Form 10-K until the Audit Committee determines that the internal investigation is complete. The Company currently

expects to complete the internal investigation and file the Form 10-K with the SEC on or before the fifteenth calendar day following the prescribed due date."

**ANSWER:** Defendants admit that paragraph 101 of the Complaint purports to summarize and contains partial excerpts from the Form 12b-25 filed by HCSG on March 4, 2019. Defendants refer to this Form 12b-25 for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 12b-25 that would be inaccurate if read in the context of the entire Form 12b-25.

102. The same day, on March 4, 2019, a Credit Suisse securities analyst commented that the "revelation of the SEC inquiry [was] disappointing, and we would have liked to have seen earlier disclosure of the SEC subpoena."

**ANSWER:** Defendants admit that paragraph 102 of the Complaint purports to summarize and contains partial excerpts from a March 4, 2019 analyst report. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 102 with respect to the contents of this report and whether the paragraph accurately summarizes and quotes its contents. Defendants refer to this analyst report for a complete and accurate statement of its contents and deny any characterization or interpretation of the report that would be inaccurate if read in the context of the entire report.

103. In response to these revelations, the price of Healthcare Services' stock fell sharply, declining by $4.96 per share, from $37.74 per share, to close at $32.78 per share, a drop of 13.14%. The stock price decline on this date translated to a loss of $367 million in shareholder value.

**ANSWER:** Defendants deny each and every averment of paragraph 103 of the Complaint, except admit that HCSG's stock price closed at $32.78 on March 4, 2019, down from the closing price of $37.74 on March 3, 2019, which was a $4.96 decrease (13.4%).

104. The Company's March 4, 2019 announcements came approximately sixteen months after the Company first received notice that the SEC was investigating its EPS practices

-53-

in November 2017, approximately a year after the SEC's subpoena, and somewhere between two and a half and five months after the Company launched its "internal investigation" in Q4 2018. Moreover, these announcements came nearly two years after Monocle informed Defendants McCartney, Wahl and McKee about Monocle's EPS allegations, reported its findings to the SEC and published the Monocle Report.

**ANSWER:** Defendants admit the averments of the first sentence of paragraph 104 of the Complaint and that HCSG's March 4, 2019 SEC filings were filed approximately two years after the March 2017 Monocle Report was published. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of the paragraph with respect to actions taken by Monocle. Defendants deny the remaining averments of paragraph 104 of the Complaint.

105.     Nearly two weeks later, in its late-filed Annual Report on Form 10-K that was filed with the SEC on March 18, 2019, the Company confirmed the materiality of the SEC's investigation, disclosing that the SEC investigation into its EPS calculation practices could *"result in potential sanctions or penalties ... which could adversely affect or cause variability in [its] financial results."*

**ANSWER:** Defendants admit that paragraph 105 of the Complaint purports to summarize and contains partial excerpts from the 2018 Form 10-K. Defendants refer to the 2018 Form 10-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the 2018 Form 10-K that would be inaccurate if read in the context of the entire 2018 Form 10-K. Defendants further admit that the Company timely filed its annual Form 10-K report with the SEC on March 18, 2019, within the extended time allowed by SEC rule. Defendants deny the remaining averments of paragraph 105 of the Complaint.

106.     Months later, in the Company's Form 10-Q filed on May 3, 2019, the Company reiterated the materiality of the SEC's investigation, noting that "the ongoing SEC investigation" could result in "substantial costs" to the Company.

**ANSWER:** Defendants admit that paragraph 106 of the Complaint purports to summarize and contains partial excerpts from HCSG's Form 10-Q filed on May 3, 2019.

Defendants refer to this Form 10-Q for a complete and accurate statement of its contents and

deny any characterization or interpretation of this Form 10-Q that would be inaccurate if read in

the context of the entire Form 10-Q.  Defendants deny the remaining averments of paragraph 106

of the Complaint.

107.    On March 4, 2019, Monocle issued a new report reacting to the Company's March 4 disclosures and noting that the Company appeared to have changed its EPS practices in recent quarters.  Monocle stated: "[w]e suspected that something was afoot, because shortly after we published our [March 2017] article and informed the company, the company's sell-side analysts, and the SEC of our findings, HCSG appeared to dramatically amend its practice of managing its quarterly earnings per share."  Monocle included the following graph showing changes to the Company's EPS rounding after the launch of the SEC investigation in November 2017:



-55-

**ANSWER:** Defendants deny each and every averment of paragraph 107 of the Complaint, except admit that the paragraph purports to summarize and contains partial excerpts and a graph from a report issued by Monocle Accounting Research on March 4, 2019 (the "March 2019 Monocle Report"). Defendants refer to the March 2019 Monocle Report for a complete and accurate statement of its contents and deny any characterization or interpretation of the March 2019 Monocle Report that would be inaccurate if read in the context of the entire March 2019 Monocle Report. Defendants expressly deny any allegations of wrongdoing or misconduct by the Defendants that are stated or implied in the March 2019 Monocle Report.

108. Monocle further stated:

> It is difficult to conclude with any certainty what will become of the SEC's investigation and HCSG's internal investigation into this matter. However, we can state with absolute certainty that investors have not heard the last of this. We would not be at all surprised if senior executives at the company lose their jobs and if the company and its executives eventually enter into settlement agreements with the SEC that result in meaningful financial payments to the government. As well, the legal costs that the company ends up incurring will most certainly be meaningful.

**ANSWER:** Defendants deny each and every averment of paragraph 108 of the Complaint, except admit that the paragraph purports to summarize and contains partial excerpts from the March 2019 Monocle Report. Defendants refer to the March 2019 Monocle Report for a complete and accurate statement of its contents and deny any characterization or interpretation of the March 2019 Monocle Report that would be inaccurate if read in the context of the entire March 2019 Monocle Report. Defendants expressly deny any allegations of wrongdoing or misconduct by the Defendants that are stated or implied in the March 2019 Monocle Report.

109. Confidential Witness 1 ("CW1") worked as a Regional Manager for the Company from January 2011 to March 2017, when CW1 voluntarily resigned. CW1 was responsible for a

territory of over 50 facilities at which the Company was providing housekeeping services, with ten to twelve employees working at each facility.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 109 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

110.    According to CW1, the Company tracked each facility's monthly financial performance.  Based on CWl's position with the Company, CW1 was aware that the Company's headquarters, and the Vice President of Operations to whom CW1 reported, set the annual budget for each facility.  CW1 recalls that the budget numbers did not change much year to year. Each facility incurred expenses for labor, supplies, payroll and insurance.  Budget variables included labor, overtime pay, wage increases and equipment repairs.  According to CW1, labor costs were, by far, the most significant expense item for the Company.  CW1 recalls that the corporate headquarters was particularly interested in reducing payroll expenses since they were the "most expensive" cost component.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the averments of paragraph 110 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

111.    CW1 explained that facility managers prepared monthly "Profit and Loss Statements" for each facility.  These line-item reports contained the actual monthly results, year-to-date results and budgeted amounts.  The reports also included variances between actual results and budgeted amounts.  CW1 prepared Profit and Loss Statements for each of the facilities that he managed and "rolled" them up into one report that he sent to the Vice President of Operations. The Vice President of Operations consolidated the Profit and Loss Statements with those of other facilities in the Vice President's territory.  The Vice President of Operations then sent the consolidated results to the Company's corporate headquarters.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 111 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

112.    CW1 recalls that the corporate headquarters returned a report to CW1 and other regional managers called a Monthly Operating Statement, which CW1 likened to a profit and loss statement.  Monthly Operating Statements include line-by-line financial details on a regional and facility basis, including eight categories of payroll expenses.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 112 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

113.    CW1 explained that the Monthly Operating Statements contain information about the wages for each facility's hourly workers who performed laundry and housekeeping services. The Monthly Operating Statements also include payroll expenses for management, overtime, vacation and sick time, payroll taxes, insurance and a category for "Payroll - Accrued."  CW1 recalls that the accrued payroll category generally relates to hourly employee wages that have been earned but not paid as of the date of the report, due to the timing of pay periods that do not coincide with month end.  In the Monthly Operating Statements, actual amounts for each revenue and expense item are compared to budgeted amounts, with indication of the amount that each item is over or under budget.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 113 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

114.    CW1 states that the actual amounts paid to the Company's hourly workers shown in the Monthly Operating Statements were typically less than the budgeted amounts.  According to CW1, the Company intentionally understaffed facilities to keep labor expenses below budgeted amounts to meet financial goals, while the quality of service and patient care suffered as a consequence.  The cost reduction was achieved, in part, by simply cutting, without apparent operational justification - and, in fact, contrary to the interest of the Company's clients and the vulnerable populations they serve - the number of hours worked by hourly employees who CW1 recalls were paid at or near the minimum wage.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 114 of the Complaint with respect to the identity of,

and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied. Defendants deny the remaining averments of paragraph 114.

115. For example, CW1 received orders from the Vice President of Operations to "send people home" for at least the last two weeks of the year so that the Company did not have to pay those employees' wages or overtime. This practice occurred every year that CW1 worked for the Company, from January 2011 to March 2017. Orders to reduce the hourly workforce would start coming around Thanksgiving of each year. It is CW1's understanding that, in ordering this action, the Vice President of Operations was acting at the direction of leadership at the corporate level of the Company. CW1 knew that, at a minimum, the end-of-year eliminations of hourly personnel applied to Texas-based employees and the plans were communicated on conference calls in which CW1 participated, along with all Texas Regional Managers, a Divisional Vice President and a Human Resources Manager. To make up the staffing shortfall caused by the reduction of the hourly workforce, salaried managers and directors filled in for the hourly employees. As an example of how this might work, CW1 noted that, instead of four hourly employees completing certain cleaning services, two (salaried) managers would perform those cleaning services. This practice of relying on salaried "managers" to perform lower-level work temporarily lowered variable labor costs - since the "managers" salaries were, in essence, a fixed cost, compared to the variable costs associated with the hourly workforce - and also resulted in a lower quality of care. According to CW1, as a result of these staffing moves, the Company was not providing the services that it agreed to do in its contracts.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 115 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied. Defendants deny the remaining averments of paragraph 115.

116. CW1 last reported to a Vice President of Operations, David Hurlock ("Hurlock"). CW1 knew of Hurlock through CW1's position at the Company and had contact with him, including on monthly and quarterly conference calls. CW1 understood that Hurlock was CWl's region's connection to the Company's corporate headquarters in Bensalem, Pennsylvania. CW1 understood, through CW1's position at the Company, that Hurlock and the Company's Divisional Vice Presidents were part of a tightly-knit "good old boys' club" that take "care of each other" and includes the Company's senior management at the corporate headquarters. While CW1 does not believe that Hurlock is related to the McCartney family by marriage or otherwise, CW1 is aware that Hurlock was close and "tight" with the Company's senior corporate leadership, including Defendant Wahl. Confirming CW1's understating of the close relationship between Hurlock and Defendant Wahl, in July 2017, Hurlock was promoted to the position of Executive Vice President and COO at the Company, a position once held by Defendant Wahl. (On July 23, 2019, however, the Company announced that Hurlock was

leaving the Company by the end of July.  No explanation was provided for Hurlock's departure.) On Hurlock's personal profile page on the professional networking website, Linkedin.com, Hurlock touts his experience as COO in several areas, including: "[s]pearheaded the implementation of operations excellence efficiencies through labor models that ultimately increased profits," and "[w]orked with Executive team to understand and anticipate hiring and development needs against the capabilities needed to deliver business objectives; prepared updated workforce plans and forecasts that supported overall business goals."

**ANSWER:**  Defendants admit that David Hurlock was an HCSG Senior Vice President from January 2013 through June 2017; in July 2017, Mr. Hurlock was promoted to Chief Operating Officer/Executive Vice President, a position once held by Defendant Wahl; and on July 23, 2019, the Company announced that Mr. Hurlock was leaving the Company by the end of July.  Defendants further admit that the paragraph purports to summarize and contains partial excerpts from Mr. Hurlock's Linkedin.com profile and a Form 8-K filed by HCSG on July 23, 2019.  Defendants refer to Mr. Hurlock's Linkedin.com profile and this Form 8-K for a complete and accurate statement of their contents and deny any characterization or interpretation of this profile or Form 8-K that would be inaccurate if read in the context of the entire profile or Form 8-K.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 116 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.  Defendants deny the remaining averments of paragraph 116.

117.    Confidential Witness No. 2 ("CW2") worked in the Northeast and Midwest as a District Manager for the Company's dietary segment from prior to the Class Period to August 2015, when CW2 voluntarily left the Company.  While CW2 primarily reported to a Regional Manager who, in turn, reported to a Divisional Vice President, CW2 communicated directly with the Divisional Vice President about various matters.  CW2 understood that the Divisional Vice President reported to the Company's corporate headquarters.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 117 of the Complaint with respect to the identity of,

and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

118.    Each month, CW2 prepared a report called "Monthly Projections" for CW2's district and two other districts.  The Monthly Projections reports contained various financial data from the facilities under CW2's management, including earned revenue, accrued revenue, accrued payroll expenses, and other expense information.  CW2 sent these Monthly Projections reports to the Regional Manager who, in turn, sent the Monthly Projections to the Divisional Vice President for transmittal to the Company's corporate headquarters.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 118 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

119.    In preparing the Monthly Projections report, CW2 used payroll information to calculate an amount of accrued payroll or labor expenses from the particular month.  According to CW2, the monthly accrued labor expense was not simply a basic dollar amount of unpaid wages owed as of month end.  Rather, the amount of the accrued labor expense was calculated pursuant to a formula required by the corporate headquarters.  CW2 understood that the formula was intended to, among other things, account for the timing of employee pay periods that might span two monthly reporting periods.  CW2 believes that the amounts of accrued labor expenses that CW2 reported in Monthly Projections reports (as well as all other information provided in each Monthly Projections report) were accurate based on the information that CW2 had from the facilities under CW2's management and under the Company's formula for reporting that information.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 119 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

120.    CW2 recalls that, every month, following the submission of the Monthly Projections reports, District Managers, including CW2, received a report back called the "Monthly Operating Statement."  CW2 believes that the Monthly Operating Statements were generated at the Company's headquarters.  According to CW2, the Monthly Operating Statement was the final monthly accounting for each division.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 120 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

121.    According to CW2, "consistent and significant" differences routinely existed between the Monthly Projections reports and the Monthly Operating Statements sent back by corporate headquarters.  CW2 explained that, for all of the approximately ten years that CW2 was employed at the Company, differences existed every month between the Monthly Projections and the Monthly Operating Statements.  Among other things, CW2 recalls that the Monthly Operating Statements included payroll accruals that differed significantly from those that CW2 had previously submitted in the Monthly Projections reports.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 121 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

122.    According to CW2, the different accrued payroll expenses in the Monthly Operating Reports "never made any type of sense" and bore no relationship to the actual circumstances of the accrued labor expenses that CW2 saw at the facilities in CW2's district.  CW2 recalls that, for CW2's facilities, payroll accruals in the Monthly Operating Statements could be adjusted both downward and upward from the amounts that CW2 had reported, with "no rhyme or reason" to those changes apparent to CW2 at the time.  CW2 recalls frequently discussing the disconnect between the Monthly Operating Statements and the Monthly Projections with colleagues, including two other district managers in the dietary segment.  According to CW2, CW2 and the other two district managers would examine every line item in the Monthly Operating reports and would discuss the differences between Monthly Projections reports and the Monthly Operating Reports, including but not limited to changes to the payroll accruals.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 122 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

123.    In addition to CW2's informal discussions with other district managers, according to CW2, there were three or four conference calls held per month to discuss the differences between the Monthly Projections reports and the Monthly Operating Statements.  CW2 explained that participants on the calls included District Managers, Regional Managers and Divisional Vice Presidents.  Each conference call included approximately 15 to 20 District Managers.  On these calls, CW2 and other District Managers discussed the numbers that they submitted in Monthly Projections reports.  According to CW2, the discussions on these conference calls included issues related to changes made to the Monthly Projections reports that had been submitted by other District Managers throughout the Company.  CW2 also recalls raising concerns about the discrepancies between Monthly Projections reports with regional Managers and with the Divisional Vice President with whom CW2 occasionally communicated.  CW2 does not recall ever receiving an explanation for the discrepancies.

ANSWER:  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 123 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

124.    Confidential Witness 3 ("CW3") worked for the Company from the mid-1990's to June 2015.  CW3 worked as a Regional Director in the Midwest at the time of his departure.

ANSWER:  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 124 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

125.    According to CW3, CW3 understood from nearly twenty years of experience with the Company, including through attendance at quarterly meetings in Philadelphia and on periodic conference calls, that the Company's accounting function was "small and controlled" by the Company's senior management at the Bensalem, Pennsylvania headquarters, including the Company's CFO (Defendant Shea) and the corporate Controller.  According to CW3, Defendant Shea is a family friend of the McCartney family.

ANSWER:  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 125 of the Complaint with respect to the identity of,

and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

126.    CW3 also believes, based on having worked for nearly two decades at Healthcare Services, that the divisional-level at the Company was "incestuous" given that McCartney's brothers and a son-in-law worked in divisional management.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 126 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

127.    Confidential Witness 4 ("CW4") worked as a Director of Food Services at a Genesis Healthcare-owned facility in Pennsylvania from 2012 through October 2017.  Genesis Healthcare operates a chain of long-term care facilities and is one of the Company's most significant customers.  CW4 was initially a Genesis Healthcare employee but became a Healthcare Services employee in April 2017, as part of a contract whereby Genesis Healthcare outsourced its dietary services to the Company.

**ANSWER:**  Defendants admit that Genesis Healthcare operates facilities that provide long-term care services and is a significant HCSG customer.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining averments of paragraph 127 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

128.    CW4 was responsible for managing approximately twelve employees.  At the same time that CW4 became a Healthcare Services employee, the twelve employees who reported to CW4 also became employees of the Company.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 128 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

129.    According to CW4, starting immediately after the transition to management under Healthcare Services, CW4 learned that significant portions of the hourly employees under CW4's supervision would periodically not be paid by the Company for extended periods of time. CW4 heard of this from hourly employees who complained about not receiving anticipated paychecks. Initially, these complaints came from younger part-time workers, including working students who did not receive their paychecks on time. The next personnel affected were the two highest-paid line cooks on CW4's staff. Eventually, CW4 recalls that the practice was extended to all of the employees under CW4's supervision.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 129 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

130.    CW4 recalls that about half of the employees would be paid as scheduled while the others would not and then, after approximately three to four payroll cycles, the situation would be reversed: the employees who had not been paid were paid, and the employees that had been paid were not paid. Employees who had not been paid for several weeks would, when their pay resumed, receive an initial large check, ostensibly to make up for the prior wages owed to them (although it was not clear whether the larger checks, in fact, accurately reflected the full amounts owed to the employees who may have been owed additional amounts reflective of overtime or holiday hours at higher hourly pay rates). CW4 described this practice as occurring in "spurts" or "start and stop" for hourly employees throughout the entire time that CW4 was a Healthcare Services' employee.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 130 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

131.    CW4 states that non-payment or late payment of employees' wages never occurred during the time that CW4 was employed by Genesis Healthcare. The practice only occurred after CW4 and the hourly employees became employees of Healthcare Services.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 131 of the Complaint with respect to the identity of,

and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

132. According to CW4, CW4 understands that certain employees whose pay was withheld by the Company filed complaints with the state's department of labor, but CW4 does not know the outcome of those complaints.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 132 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

133. CW4 reported the non-payment of wages issue to CW4's supervisor at the Company. CW4 was told by the supervisor that the issue was reported up to the Company's headquarters in Bensalem, but that no one from the corporate office called back to discuss the issue with the supervisor. Frustrated with the lack of response and concerned about the financial well-being of CW4's employees, CW4 directly called the human resources and accounting departments at the Company's headquarters in Bensalem to report the issue and ask for an explanation. CW4 never received an explanation from anyone at the Company.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 133 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

134. CW4 understands from conversations with colleagues who held similar dining services manager positions at other of the Company's facilities that the same wage withholding practices occurred at these other facilities.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 134 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

135.    CW4's descriptions of the unusual manner in which hourly employees' wages were withheld at the Company are further corroborated by former Healthcare Services employees who have posted on Company-specific message boards on Indeed.com, a job search website which includes Company reviews by current and former employees.  There are at least seven reviews from current or former Healthcare Services employees on Indeed.com dated during the Class Period, from a period spanning from November 2017 to January 2019, that describe similar conduct at facilities throughout the Country.  A former cook from Leominster, Massachusetts wrote on November 2, 2017:  "They don't pay right.  Managements would tell me to 'suck it up' when I'll be missing over $300 from my paychecks.  This happened multiple times."  A former employee for the Company's dietary segment from Charleston, West Virginia noted on January 20, 2018:  "Paychecks are almost always short and holiday pay is time and a half but they include it in your hourly pay and add the 'half separate."  A floor technician based in Bensalem, Pennsylvania wrote, on August 4, 2018: "hardly get paid on time. [M]y last 2 pay checks wasn't paid on time. [T]ook a month to receive my last pay."  On August 13, 2018, a former account manager/environmental director based in Allen, Texas, wrote:  "I actually had to go file with the labor board because they didn't pay me my check.  And come to find out they have over 10 cases against them for the same thing.  Not paying their employees."  On October 16, 2018, a former account manager based in Vermont wrote that, "employees [are] regularly short-changed in their paychecks."  On January 2, 2019, a former dietary aide from Illinois wrote, "my paycheck and hours were continuously cut."  A former dietary cook based in Phoenix, Arizona, wrote, on January 29, 2019:  "I was there for 3 months and never got paid for all my hours worked.  They still owe me for hours I worked."  The same former dietary cook continued, "[t]he management would always try to change your hours would not pay you for all hours worked [ . . .]."  Combined with the allegations by confidential witnesses and former Healthcare Services employees in ¶¶ 109-135, the reviews from former employees on Indeed.com further demonstrate that the Company engaged in aggressive and potentially unlawful practices with respect to labor expenses in conjunction with the Company's efforts to manipulate its reported EPS.

ANSWER:  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 135 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witnesses, and these averments are therefore denied.  Defendants admit that the paragraph purports to summarize and contains partial excerpts from various postings on Indeed.com.  Defendants refer to Indeed.com for a complete and accurate statement of its contents and deny any characterization or interpretation of these postings that would be inaccurate if read in the context of all postings on Indeed.com relating to HCSG.  Defendants deny the remaining averments of paragraph 135 of the Complaint.

136.    Lead Plaintiff's investigation indicates that the Company engaged in extensive and aggressive manipulation of labor-related expenses to boost net income that, in turn, allowed the Company to consistently meet or beat analysts' consensus quarterly EPS estimates for more than a decade.

**ANSWER:** Defendants deny the averments of paragraph 136 of the Complaint.

137.    During the Class Period, the Company's labor costs regularly accounted for the vast majority of its costs of services, particularly for the housekeeping segment.  Indeed, in its public filings, the Company regularly attributed increasing costs of services to labor and labor related costs.  For example, in the Company's Q1 2017 Form 10-Q (defined below), the Company reported that "Consolidated costs of services increased 4.7% to $345.6 million in the first quarter 2017 compared to $330.0 million in the first quarter 2016."  The Company added that "[t]he increase during 2017 compared to 2016 relates primarily to labor and other labor related costs.  Historically, labor and other labor related costs, as well as self insurance costs, accounted for approximately 96% to 98% of consolidated costs of services."  A table showing the Company's labor and labor related costs as a percentage of the Company's revenue for its Housekeeping and Dietary Segments, is below:

**Healthcare Services Costs**
(As Reported in 2014-2018 Form 10-Qs and Form 10-Ks)

| Quarter | Housekeeping costs of services | Housekeeping revenue | Housekeeping labor and other labor costs as % of housekeeping revenue | Dietary costs of services | Dietary revenue | Dietary labor and other labor costs as % of dietary revenue |
|---|---|---|---|---|---|---|
| Q12014 | $185,989,000 | $204,741,000 | 80.3% | $100,644,000 | $107,424,000 | 50.4% |
| Q2 2014 | $193,474,000 | $211,357,000 | 80.8% | $101,420,000 | $107,938,000 | 50.2% |
| Q3 2014 | $195,963,000 | $211,552,000 | 81.9% | $102,899,000 | $108,547,000 | 51.9% |
| FY 2014 | $776,220,000 | $846,610,000 | 81.0% | $420,230,000 | $446,573,000 | 51.0% |
| Q12015 | $205,964,000 | $226,581,000 | 78.9% | $119,760,000 | $128,665,000 | 51.8% |
| Q2 2015 | $205,213,000 | $226,965,000 | 78.5% | $120,527,000 | $128,391,000 | 53.0% |
| Q3 2015 | $205,990,000 | $227,760,000 | 80.2% | $124,166,000 | $132,405,000 | 53.7% |
| FY 2015 | $825,238,000 | $909,709,000 | 79.4% | $495,528,000 | $527,140,000 | 52.9% |

| Quarter | Housekeeping costs of services | Housekeeping revenue | Housekeeping labor and other labor costs as % of housekeeping revenue | Dietary costs of services | Dietary revenue | Dietary labor and other labor costs as % of dietary revenue |
|---|---|---|---|---|---|---|
| Q12016 | $215,779,000 | $238,279,000 | 79.5% | $137,380,000 | $146,528,000 | 52.8% |
| Q2 2016 | $215,470,000 | $238,291,000 | 79.5% | $139,194,000 | $148,265,000 | 53.1% |
| Q3 2016 | $215,939,000 | $239,584,000 | 81.0% | $145,266,000 | $153,150,000 | 54.5% |
| FY 2016 | $866,392,000 | $957,148,000 | 80.2% | $570,873,000 | $605,514,000 | 53.8% |
| Q12017 | $220,221,000 | $243,423,000 | 80.1% | $150,842,000 | $161,067,000 | 54.3% |
| Q2 2017 | $221,445,000 | $242,919,000 | 80.3% | $214,815,000 | $227,957,000 | 54.6% |
| Q3 2017 | $220,547,000 | $247,395,000 | 79.6% | $232,594,000 | $243,960,000 | 58.0% |
| FY 2017 | $884,105,000 | $979,610,000 | 80.1% | $840,513,000 | $886,521,000 | 56.6% |
| Q12018 | $217,472,000 | $246,409,000 | 78.4% | $240,671,000 | $255,401,000 | 56.3% |
| Q2 2018 | $216,469,000 | $245,547,000 | 78.2% | $242,614,000 | $258,185,000 | 57.8% |

**ANSWER:** Defendants deny the averments of the first sentence of paragraph 137 of the Complaint. Defendants admit that the remaining averments of the paragraph summarize and compile information from HCSG's Form-10-Q and Form 10-K filings, and also purport to summarize and contain partial excerpts from HCSG's Form 10-Q for the first quarter of 2017. Defendants refer to these SEC filings for a complete and accurate statement of their contents and deny any characterization or interpretation of any of these SEC filings that would be inaccurate if read in the context of the entire SEC filing or any other HCSG SEC filing.

138.    Not surprisingly, the Company has an interest in controlling labor costs, which constitute the bulk of the Company's expenses and account for substantial portions of the revenues generated by the Company. To achieve those savings, however, Healthcare Services has a history of aggressively underpaying employees through illegal conduct.

**ANSWER:** Defendants deny each and every averment of paragraph 138 of the Complaint, except admit that, like all companies, HCSG has an interest in controlling labor costs.

139.    One example of the Company's aggressive labor cost practices involved designating lower-level employees as "managers" so that they could be put on a fixed salary that would not require the payment of overtime.  By fixing the expenses associated with those employees, the Company could extract more hours of labor from each employee, including hours above the typical 40-hour overtime threshold, without incurring additional variable costs.  More than five years ago, the Company found itself the defendant in multiple class action lawsuits brought on behalf of such employees who were designated as "managerial" employees and paid a fixed salary (rather than on an hourly basis) and were made to work beyond 40 hours per week at tasks that typically are performed by hourly employees that would be entitled to overtime pay. These employment-related "misclassification" class actions were filed in multiple states (Colorado, Ohio and Texas) and ultimately settled for millions of dollars.  One of these cases was a nationwide class action brought on behalf of over 800 employees styled as *Kelly v. Healthcare Services Group, Inc.*, Civil Action No. 2:13-cv-00441-JRG (E.D. Texas) ("*Kelly*"). In *Kelly*, former housekeeping managers employed by the Company alleged that they were misclassified as exempt from overtime requirements of the Fair Labor Standards Act.  The *Kelly* plaintiffs alleged, in part, that they were underpaid pursuant to the Company's unlawful rounding timesheet practices and policy.  Under this policy, employees were not permitted to punch in, sign in or begin work seven (7) or more minutes after the end of their scheduled shift, without the prior approval of a supervisor.  An internal memorandum circulated to the Company's Senior Vice Presidents, Divisional Vice-Presidents, Regional Vice-Presidents/Managers/Directors and District Managers, demonstrated that the rounding policy was put in place partly to avoid the obligation to pay "an additional quarter hour of wages."  The class actions filed in Colorado and Ohio alleged substantially similar violations and have since settled.

**ANSWER:** Defendants admit that the following class actions were filed against HCSG:

*Kelly v. Healthcare Services Group, Inc.*, Civil Action No. 2:13-cv-00441-JRG (E.D. Tex.);

*Acosta v. Healthcare Services Group, Inc.*, No. 1:13-cv-03429 (D. Colo.); *Bowman v. Healthcare Services Group, Inc.*, No. 3:13-cv-1924 (N.D. Ohio); and *Cox v. Healthcare Services Group, Inc.*, No. 3:13-cv-00293 (N.D. Ohio).  Defendants further admit that the paragraph purports to summarize these cases and contains partial excerpts from the Complaint in *Kelly v. Healthcare Services Group, Inc.*  Defendants refer to the pleadings in these cases for a complete and accurate statement of their contents and deny any characterization or interpretation of any of these cases that would be inaccurate if read in the context of the entire case docket.  Defendants

admit that these cases settled in the aggregate for millions of dollars. Defendants further aver that each settlement agreement expressly stated that the fact of settlement shall not be "construed as an admission of liability, wrongdoing, impropriety, responsibility, or fault whatsoever" on the part of HCSG or HCSG's agents. Defendants deny the remaining averments of paragraph 139 of the Complaint.

140.    As indicated by the Confidential Witnesses described herein, the Company also engaged in other exploitative employment-related practices in an improper attempt to squeeze labor costs.

**ANSWER:** Defendants deny the averments of paragraph 140 of the Complaint.

141.    During the Class Period, Defendants made several categories of materially false and misleading statements and material omissions of facts that artificially inflated the price of Healthcare Services' stock. First, Defendants misled investors about the calculation and presentation of the Company's quarterly EPS results and net income. Defendants did so by affirmatively misstating of the Company's financials and by failing to disclose that, for more than a decade, including during the Class Period, Healthcare Services manipulated its EPS calculations through earnings manipulation that involved adjusting net income in order to increase the third digit of its calculated EPS (representing tenths of a cent) so that the Company's reported EPS would round up to avoid falling short of analysts' consensus EPS estimates. Second, Defendants misled investors by making material omissions about its EPS practices. That is, Defendants omitted the fact that Defendants consistently manipulated the Company's net income to ensure that quarterly EPS would be rounded up to the next penny. Third, Defendants affirmatively misrepresented the existence of the SEC's investigation in connection with its New Credit Facility, falsely stating therein that the Company was not subject to an active and material SEC investigation. Fourth, Defendants made material omissions by failing to disclose the existence of the SEC's investigation of the Company's EPS practices since as early as November 2017. Fifth, Defendants misrepresented that the Company's internal controls over financial reporting were adequate when, in reality, the Company's lack of internal controls allowed for the serial manipulation of the Company's net income to drive EPS to avoid falling short of consensus expectations.

**ANSWER:** The averments of paragraph 141 of the Complaint purport to state a legal conclusion to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

142.    The Class Period begins on April 8, 2014.  On that date, Healthcare Services announced its financial results for the three months ended March 31, 2014 ("Q1 2014").  The results included the following misleading statements and omissions.

**ANSWER:**  Defendants deny each and every averment of paragraph 142 of the Complaint, except admit that the putative Class Period purports to commence on April 8, 2014 and that HCSG issued a press release on April 8, 2014 relating to the Company's performance in the first quarter of 2014.

143.    On April 8, 2014, the Company issued a press release to announce its quarterly results for Q1 2014.  The press release stated, "[n]et income for the three months ended March 31, 2014 was $14,639,000 or $0.21 per basic and per diluted common share, compared to the three months ended March 31, 2013 net income of $14,954,000 or $0.22 per basic and per diluted common share."  The press release included Consolidated Statements of Income, which also reported basic and diluted EPS of $0.21.  Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release.  The press release listed Defendants McCartney and Wahl as "Company Contacts."

**ANSWER:**  Defendants admit that HCSG filed a Form 8-K on April 8, 2014 signed by Defendant Shea.  Defendants further admit that the Form 8-K attached a press release dated April 8, 2014 relating to the Company's performance in the first quarter of 2014 and that Defendants McCartney and Wahl were listed as "Company Contacts" on this press release.  Defendants further admit that paragraph 143 of the Complaint purports to summarize and contains partial excerpts from this Form 8-K.  Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the entire Form 8-K.

144.    Describing the Company's Q1 2014 results the same day, in a research report titled *Quarterly Results Exactly in Line with Expectations; Sales Growth Accelerates to Low Teens*, a William Blair securities analyst noted that the Company's results were "***exactly in line with the consensus forecast; earnings per share were $0.21.***"

**ANSWER:**  Defendants admit that paragraph 144 of the Complaint purports to summarize and contains partial excerpts, with emphasis supplied by Plaintiff, from a research

report authored by a William Blair analyst.  Defendants are without knowledge or information

sufficient to form a belief as to the truth of the averments of paragraph 144 with respect to the

contents of this report and whether the paragraph accurately summarizes and quotes its contents.

Defendants refer to this report for a complete and accurate statement of its contents and deny any

characterization or interpretation of this report that would be inaccurate if read in the context of

the entire report.

145.    The following day, on April 9, 2014, the Company hosted an earnings call to discuss its Q1 2014 results.  Defendants McCartney, Wahl and McKee participated on behalf of the Company.  Defendant Wahl noted that "[n]et income came in at $14.6 million, or $0.21 per share, compared to $14.9 million, or $0.22 per share, for the first quarter of 2013."

**ANSWER:**  Defendants admit that the Company held an earnings call on April 9, 2014

on which Defendants McCartney, Wahl and McKee participated on behalf of HCSG and that

paragraph 145 of the Complaint purports to summarize and contains partial excerpts from this

call.  Defendants refer to the April 2014 earnings conference call transcript for a complete and

accurate statement of its contents and deny any characterization or interpretation of the call that

would be inaccurate if read in the context of the entire April 2014 earnings conference call

transcript.

146.    On April 24, 2014, the Company filed its quarterly report on Form 10-Q for Q1 2014 with the SEC ("Q1 2014 Form 10-Q").  Defendants McCartney and Shea signed the Q1 2014 Form 10-Q.  With respect to EPS, the Company reiterated its previously reported net income for Q1 2014 and reported earnings per basic and per diluted common share of $0.21. With respect to how the Company calculated its EPS, Defendants noted, "[b]asic earnings per common share are computed by dividing income available to common shareholders by the weighted-average common shares outstanding for the period.  Diluted earnings per common share reflect the weighted-average common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options."  Defendants further explained that "[b]asic net earnings per share are computed using the weighted-average number of common shares outstanding.  The dilutive effect of potential common shares outstanding is included in diluted net earnings per share."

**ANSWER:** Defendants admit that HCSG filed a Form 10-Q for the first quarter of 2014 on April 24, 2014 signed by Defendants McCartney and Shea (the "Q1 2014 Form 10-Q"). Defendants further admit that paragraph 146 of the Complaint purports to summarize and contains partial excerpts from the Q1 2014 Form 10-Q. Defendants refer to the Q1 2014 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q1 2014 Form 10-Q that would be inaccurate if read in the context of the entire Q1 2014 Form 10-Q.

147.    With respect to "Disclosure Controls and Procedures," Defendants McCartney and Shea noted that, "[b]ased on their evaluation as of March 31, 2014, pursuant to Exchange Act Rule 13a-15(b), our management, including our Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e) are effective."

**ANSWER:** Defendants admit that paragraph 147 of the Complaint purports to summarize and contains partial excerpts from the Q1 2014 Form 10-Q. Defendants refer to the Q1 2014 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q1 2014 Form 10-Q that would be inaccurate if read in the context of the entire Q1 2014 Form 10-Q.

148.    The Q1 2014 Form 10-Q included a SOX Certification signed by Defendants McCartney and Shea. The SOX Certifications stated, in part, the following:

> 2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors:

   a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

**ANSWER:** Defendants admit that the Q1 2014 Form 10-Q included a SOX Certification signed by Defendants McCartney and Shea. Defendants admit that paragraph 148 of the Complaint purports to summarize and contains partial excerpts from the Q1 2014 Form 10-Q. Defendants refer to the Q1 2014 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q1 2014 Form 10-Q that would be inaccurate if read in the context of the entire Q1 2014 Form 10-Q.

149.    On July 8, 2014, the Company issued a press release to announce its quarterly results for the three months ended June 30, 2014 ("Q2 2014"). The Company noted that "[n]et income for the three months ended June 30, 2014 was $13,921,000 or $0.20 per basic and per diluted common share, compared to the three months ended June 30, 2013 net income of $12,933,000 or $0.19 per basic and per diluted common share." The press release included Consolidated Statements of Income, which also reported that basic and diluted EPS of $0.20. Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release. The press release listed Defendants McCartney and Wahl as "Company Contacts."

**ANSWER:** Defendants admit that HCSG filed a Form 8-K on July 8, 2014 signed by Defendant Shea. Defendants further admit that the Form 8-K attached a press release dated July 8, 2014 relating to the Company's performance in the second quarter of 2014 and that Defendants McCartney and Wahl were listed as "Company Contacts" on this press release. Defendants further admit that paragraph 149 of the Complaint purports to summarize and contains partial excerpts from this Form 8-K. Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the entire Form 8-K.

150.    The Company's Q2 2014 EPS results missed analyst estimates, but analysts viewed this miss as a "transitory" issue. In a July 8, 2014 research report, a William Blair analyst noted that the miss was a "transitory issue," that was "driven by higher-than-expected labor costs on new contract starts (a temporary issue that already appears to be resolved)."

**ANSWER:** Defendants admit that paragraph 150 of the Complaint purports to summarize and contains partial excerpts from a research report authored by a William Blair

analyst.  Defendants are without knowledge or information sufficient to form a belief as to the

truth of the averments of paragraph 150 with respect to the contents of this report and whether

the paragraph accurately summarizes and quotes its contents.  Defendants refer to this report for

a complete and accurate statement of its contents and deny any characterization or interpretation

of this report that would be inaccurate if read in the context of the entire report.

151.    On July 9, 2014, the Company held an earnings call to discuss its Q2 2014 results. Defendants McCartney, Wahl and McKee participated on behalf of the Company.  Defendant Wahl touted the Company's Q2 2014 EPS, noting that "[n]et income for the quarter came in at $13.9 million, or $0.20 per share, compared to $12.9 million or $0.19 per share for the prior year's corresponding quarter."

ANSWER:  Defendants admit that the Company held an earnings call on July 9, 2014 on

which Defendants McCartney, Wahl and McKee participated on behalf of HCSG and that

paragraph 151 of the Complaint purports to summarize and contains partial excerpts from this

call.  Defendants refer to the July 2014 earnings conference call transcript for a complete and

accurate statement of its contents and deny any characterization or interpretation of the call that

would be inaccurate if read in the context of the entire July 2014 earnings conference call

transcript.  Defendants further admit that on the July 9, 2014 earnings call Defendant Wahl

referenced the Company's EPS, among other indicators relating to the Company's performance.

Defendants expressly deny that Defendant Wahl "touted" HCSG's EPS.

152.    On July 24, 2014, the Company filed its Q2 2014 quarterly results on Form 10-Q with the SEC ("Q2 2014 Form 10-Q").  Defendants McCartney and Shea signed the Q2 2014 Form 10-Q.  The Q2 2014 Form 10-Q contained Consolidated Statements of Comprehensive Income, which reiterated the Company's previously reported net income and reported basic and diluted EPS of $0.20 for the three months ended June 30, 2014.  With respect to EPS calculations, the Form 10-Q also noted that "[b]asic earnings per common share are computed by dividing income available to common shareholders by the weighted-average common shares outstanding for the period.  Diluted earnings per common share reflect the weighted-average common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options."  The Q2 2014 Form 10-Q further noted that "[b]asic net earnings per share are

computed using the weighted-average number of common shares outstanding.  The dilutive effect of potential common shares outstanding is included in diluted net earnings per share."

ANSWER:  Defendants admit that HCSG filed a Form 10-Q for the second quarter of 2014 on July 24, 2014 signed by Defendants McCartney and Shea (the "Q2 2014 Form 10-Q"). Defendants further admit that paragraph 152 of the Complaint purports to summarize and contains partial excerpts from the Q2 2014 Form 10-Q.  Defendants refer to the Q2 2014 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q2 2014 Form 10-Q that would be inaccurate if read in the context of the entire Q2 2014 Form 10-Q.

153.    With respect to their "Evaluation of Disclosure Controls and Procedures," Defendants McCartney and Shea noted that, "[b]ased on their evaluation as of June 30, 2014, pursuant to Exchange Act Rule 13a-15(b), our management, including our Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e) are effective."

ANSWER:  Defendants admit that paragraph 153 of the Complaint purports to summarize and contains partial excerpts from the Q2 2014 Form 10-Q.  Defendants refer to the Q2 2014 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q2 2014 Form 10-Q that would be inaccurate if read in the context of the entire Q2 2014 Form 10-Q.

154.    The Q2 2014 Form 10-Q included a SOX Certification signed by Defendants that was substantially the same as the SOX Certification alleged above in ¶ 148.

ANSWER:  Defendants admit that the Q2 2014 Form 10-Q included a SOX Certification signed by Defendants McCartney and Shea.  Defendants admit that paragraph 154 of the Complaint purports to summarize and refers to partial excerpts from the Q2 2014 Form 10-Q. Defendants refer to the Q2 2014 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q2 2014 Form 10-Q that would be

inaccurate if read in the context of the entire Q2 2014 Form 10-Q.  Defendants deny the

remaining averments of paragraph 154 of the Complaint.

155.    On October 14, 2014, the Company announced its earnings results for the three months ended September 30, 2014 ("Q3 2014").  The Company reported a net loss for the three months ended September 30, 2014 of $22,182,000 or a $0.31 loss per basic and per diluted common share.

ANSWER:  Defendants admit that HCSG issued a press release dated October 14, 2014

relating to the Company's performance in the third quarter of 2014.  Defendants further admit

that paragraph 155 of the Complaint purports to summarize the October 14, 2014 press release.

Defendants refer to this press release for a complete and accurate statement of its contents and

deny any characterization or interpretation of the press release that would be inaccurate if read in

the context of the entire press release.

156.    Analysts viewed the loss and EPS miss as the result of one-time expenses and, that in the absence of such expenses, the Company's EPS results would have fallen in-line with expectations.  On October 14, 2014, a UBS analyst noted that Q3 2014 results reported in the Form 10-Q were in-line with UBS estimates after adjustments made.  In a report section titled *3Q EPS In-Line with UBSe after Adjusting Taxes for WOTC Delay*, the UBS analyst noted that "HCSG reported 3Q14 adj ESP of $0.21, up from $0.20 a year ago.  Reported EPS was $0.02 below UBS and a penny below cons.  HCSG absorbed a negative $0.02 in EPS because its tax rate was higher than expected due to Congress' failure, thus far, to extend the Workers' Opportunity Tax Credit (WOTC)."

ANSWER:  Defendants admit that paragraph 156 of the Complaint purports to

summarize analysts' views and contains partial excerpts from a research report authored by a

UBS analyst.  Defendants are without knowledge or information sufficient to form a belief as to

the truth of the averments of paragraph 156 with respect to the contents of this report and

whether the paragraph accurately summarizes and quotes its contents.  Defendants refer to these

reports for a complete and accurate statement of their contents and deny any characterization or

interpretation of any of these reports that would be inaccurate if read in the context of the entire report.

157. The same date, on October 14, 2014, a William Blair analyst noted that while the Company "proactively decided to move its healthcare and workers' compensation insurance plans into a captive insurance subsidiary," and that, as part of this process, "the [C]ompany was required to project current/future claims out over the next 15 to 17 years, and was required to record a roughly $37 million noncash charge (along with some one-time restructuring expenses) to establish the captive entity," the Company's "[m]anagement commented that operating expenses and SG&A expense would have fallen in line with expectations in the absence of the above-mentioned transaction, which would yield a $0.22 in estimated pro forma EPS (in line with Street estimates and a penny ahead of our model)."

**ANSWER:** Defendants admit that paragraph 157 of the Complaint purports to summarize and contains partial excerpts from a research report authored by a William Blair analyst. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 157 with respect to the contents of this report and whether the paragraph accurately summarizes and quotes its contents. Defendants refer to this report for a complete and accurate statement of its contents and deny any characterization or interpretation of the report that would be inaccurate if read in the context of the entire report.

158. On October 15, 2014, the Company held an earnings call to discuss its Q3 2014 results. Defendants McCartney, Wahl and McKee participated on behalf of the Company. Defendant Wahl touted the Company's Q3 2014 EPS, noting that "[b]oth quarterly and year-to-date September revenues were company records. Excluding the one-time charges [associated with the above-noted events], net income would have been over $15 million or $0.21 to $0.22 per share assuming an effective tax rate of 35% to 38% compared to the $13.8 million or $0.20 per share in the third quarter of last year." Notwithstanding the results and miss, these statements were false and misleading because Defendants rounded the Company's EPS calculations to avoid having a larger negative result and wider EPS miss.

**ANSWER:** Defendants admit that the Company held an earnings call on October 15, 2014 on which Defendants McCartney, Wahl and McKee participated on behalf of HCSG and that paragraph 158 of the Complaint purports to summarize and contains partial excerpts from this call. Defendants refer to the October 2014 earnings conference call transcript for a complete

and accurate statement of its contents and deny any characterization or interpretation of the call that would be inaccurate if read in the context of the entire October 2014 earnings conference call transcript. Defendants further admit that on the October 15, 2014 earnings call Defendant Wahl referenced the Company's EPS, among other indicators relating to the Company's performance. Defendants expressly deny that Defendant Wahl "touted" HCSG's EPS. Defendants deny the averments of the last sentence of paragraph 158 of the Complaint.

159.    On October 30, 2014, the Company filed its Q3 2014 quarterly results on Form 10-Q with the SEC ("Q3 2014 Form 10-Q"). Defendants McCartney and Shea signed the Q3 2014 Form 10-Q. The Q3 2014 Form 10-Q contained Consolidated Statements of Comprehensive Income, which reported a $22,182,000 net income loss and the $0.31 basic and diluted EPS loss for the three months ended September 30, 2014. With respect to EPS calculations, the Form 10-Q also noted that "[b]asic earnings per common share are computed by dividing income available to common shareholders by the weighted-average common shares outstanding for the period. Diluted earnings per common share reflect the weighted-average common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options." The Q3 2014 Form 10-Q further noted that "[b]asic net earnings per share are computed using the weighted-average number of common shares outstanding. The dilutive effect of potential common shares outstanding is included in diluted net earnings per share."

ANSWER:  Defendants admit that HCSG filed a Form 10-Q for the third quarter of 2014 on October 30, 2014 signed by Defendants McCartney and Shea (the "Q3 2014 Form 10-Q"). Defendants further admit that paragraph 159 of the Complaint purports to summarize and contains partial excerpts from the Q3 2014 Form 10-Q. Defendants refer to the Q3 2014 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q3 2014 Form 10-Q that would be inaccurate if read in the context of the entire Q3 2014 Form 10-Q.

160.    With respect to their "Evaluation of Disclosure Controls and Procedures," the Q3 2014 Form 10-Q noted that, "[b]ased on their evaluation as of September 30, 2014, pursuant to Exchange Act Rule 13a-15(b), our management, including our Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e) are effective."

**ANSWER:** Defendants admit that paragraph 160 of the Complaint purports to summarize and contains partial excerpts from the Q3 2014 Form 10-Q. Defendants refer to the Q3 2014 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q3 2014 Form 10-Q that would be inaccurate if read in the context of the entire Q3 2014 Form 10-Q.

161.    The Q3 2014 Form 10-Q included a SOX Certification signed by Defendants that was substantially the same as the SOX Certification alleged above in ¶ 148.

**ANSWER:** Defendants admit that the Q3 2014 Form 10-Q included a SOX Certification signed by Defendants McCartney and Shea. Defendants admit that paragraph 161 of the Complaint purports to summarize and refers to partial excerpts from the Q3 2014 Form 10-Q. Defendants refer to the Q3 2014 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q3 2014 Form 10-Q that would be inaccurate if read in the context of the entire Q3 2014 Form 10-Q. Defendants deny the remaining averments of paragraph 161 of the Complaint.

162.    On February 3, 2015, the Company issued a press release to announce its quarterly results for the three months ended December 31, 2014 ("Q4 2014"), as well as for the FY 2014. The Company reported net income of $15,472,000 or $0.22 per basic and diluted common share for Q4 2014. The press release included Consolidated Statements of Income, which also reported basic and diluted earnings per common share of $0.22 for Q4 2014. Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release. The press release listed Defendants McCartney, Wahl and McKee as "Company Contacts."

**ANSWER:** Defendants admit that HCSG filed a Form 8-K on February 3, 2015 signed by Defendant Shea. Defendants further admit that the Form 8-K attached a press release dated February 3, 2015 relating to the Company's performance in the fourth quarter of 2014 and the year ended December 31, 2014 and that Defendants McCartney, Wahl and McKee were listed as "Company Contacts" on this press release. Defendants further admit that paragraph 162 of the

Complaint purports to summarize information in this Form 8-K. Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the entire Form 8-K.

163.    On the following day, February 4, 2015, the Company held an earnings call to discuss its Q4 2014 and FY 2014 results. Defendants McCartney, Wahl and McKee participated on behalf of the Company. Defendant McKee reported that net income for Q4 2014 was $15.4 million or $0.22 per share.

ANSWER:  Defendants admit that the Company held an earnings call on February 4, 2015 on which Defendants McCartney, Wahl and McKee participated on behalf of HCSG and that paragraph 163 of the Complaint purports to summarize information from this call. Defendants refer to the February 2015 earnings conference call transcript for a complete and accurate statement of its contents and deny any characterization or interpretation of the call that would be inaccurate if read in the context of the entire February 2015 earnings conference call transcript.

164.    Describing these results on February 3, 2015, a UBS securities analyst noted that the Company's reported EPS was "in-line" with consensus EPS (but missed UBS's own estimate). The same day, a William Blair analyst noted that the Company's reported EPS of $0.22 was *"equal to consensus but one cent ahead of our forecast!"*

ANSWER:  Defendants admit that paragraph 164 of the Complaint purports to summarize and contains partial excerpts from research reports authored by analysts from UBS and William Blair. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 164 with respect to the contents of these reports and whether the paragraph accurately summarizes and quotes their contents. Defendants refer to these reports for a complete and accurate statement of their contents and deny any

characterization or interpretation of either of these reports that would be inaccurate if read in the context of the entire report.

165.    On February 19, 2015, the Company filed its Annual Report for FY 2014 on Form 10-K with the SEC ("2014 Form 10-K"). In a summary of quarterly financial data, the 2014 Form 10-K reiterated that, for Q4 2014, net income was $15,472,000 and that basic and diluted EPS were $0.22. Defendants McCartney, Shea and Wahl signed the 2014 Form 10-K.

ANSWER: Defendants admit that HCSG filed a Form 10-K for the fiscal year ended December 31, 2014 on February 19, 2015 signed by Defendants McCartney, Shea and Wahl (the "2014 Form 10-K"). Defendants further admit that paragraph 165 of the Complaint purports to summarize information from the 2014 Form 10-K. Defendants refer to the 2014 Form 10-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the 2014 Form 10-K that would be inaccurate if read in the context of the entire 2014 Form 10-K.

166.    With respect to "Disclosure Controls and Procedures," the 2014 Form 10-K noted that, "[i]n accordance with Exchange Act Rules 13a-15 and 15a-15, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of December 31, 2014."

ANSWER: Defendants admit that paragraph 166 of the Complaint purports to summarize and contains partial excerpts from the 2014 Form 10-K. Defendants refer to the 2014 Form 10-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the 2014 Form 10-K that would be inaccurate if read in the context of the entire 2014 Form 10-K.

167.    The 2014 Form 10-K included a SOX Certification signed by Defendants McCartney and Shea that was substantially the same as the SOX Certification alleged above in ¶149.

**ANSWER:** Defendants admit that the 2014 Form 10-K included a SOX Certification signed by Defendants McCartney and Shea. Defendants deny the remaining averments of paragraph 167 of the Complaint.

168. The statements made in ¶¶ 142-143, 144-146, (regarding Q1 2014 net income and EPS ("Financials")); ¶¶ 149, 151-152 (regarding Q2 2014 Financials); ¶¶ 155, 158-159 (regarding Q3 2014 Financials); and ¶¶ 163, 164, 166 (regarding Q4 2014 and FY 2014 Financials) were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose adverse facts. In particular:

a.      Starting prior to the Class Period and continuing throughout FY 2014, Defendants made the Company falsely appear to meet or beat analysts' targets for quarterly EPS consistently. As alleged at ¶¶ 65-82 herein, Defendants overstated the Company's quarterly EPS in Q1 2014, Q2 2014, and Q3 2014 by continually manipulating net income to generate EPS results that would have a third digit (representing tenths of a cent) that would permit the rounding up of reported EPS to artificially avoid falling short of analysts' consensus EPS target for the Company, and in Q3 2014, rounded EPS to minimize the amount of its earnings miss. Defendants therefore knowingly or recklessly overstated the Company's EPS to meet analyst estimates and falsely perpetuate the Company's reputation for stable and consistent financial performance.

b.      As a result, Defendants' statements about the Company's net income and EPS, including the reported quarterly results and the manner in which the Company calculated basic and diluted EPS, were materially false and misleading and/or lacked a reasonable basis at all relevant times. Among other things, Defendants concealed from investors that the Company's reported net income and EPS was a contrivance engineered to, absent extraordinary circumstances, avoid falling short of analyst's consensus EPS estimates.

c.      As a result, the Company's financial statements and results for each quarter and FY 2014 materially overstated or otherwise misrepresented the Company's EPS.

**ANSWER:** The averments of paragraph 168 of the Complaint, including subparagraphs (a)-(c), purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

169. The statements made in ¶¶ 147-148 (regarding Q1 2014 internal controls); ¶¶ 153-154 (regarding Q2 2014 internal controls); ¶¶ 160-161 (regarding Q3 2014 internal controls); and ¶¶ 166-167 (regarding Q4 2014 and FY 2014 internal controls) were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading,

because the statements failed to disclose adverse facts.  In particular, Defendants McCartney and Shea knowingly or recklessly failed to disclose that, prior to the Class Period and at all times in FY 2014, the Company lacked sufficient internal controls to prevent the Company from manipulating its net income and reporting EPS to artificially achieve EPS results that met or exceeded analysts' consensus EPS estimates.

**ANSWER:**  The averments of paragraph 169 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied.  To the extent these averments are deemed to be factual in nature, they are denied.

170.    On April 14, 2015, the Company issued a press release announcing its quarterly results for the three months ended March 31, 2015 ("Q1 2015").  The Company reported that "[n]et income for the three months ended Mach 31, 2015 was $15,516,000 or $0.22 per basic and diluted common share, compared to the three months ended March 31, 2014 net income of $14,639,000 or $0.21 per basic and per diluted common share."  The press release included Consolidated Statements of Income for Q1 2015, which also reported $0.22 basic and diluted EPS.  Defendant Shea signed the Form 8-K filed with the SEC to which the press release was attached.  The press release listed Defendants McCartney, Wahl and McKee as "Company Contacts."

**ANSWER:**  Defendants admit that HCSG filed a Form 8-K on April 14, 2015 signed by Defendant Shea.  Defendants further admit that the Form 8-K attached a press release dated April 14, 2015 relating to the Company's performance in the first quarter of 2015 and that Defendants McCartney, Wahl and McKee were listed as "Company Contacts" on this press release.  Defendants further admit that paragraph 170 of the Complaint purports to summarize and contains partial excerpts from this Form 8-K.  Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the entire Form 8-K.

171.    On April 15, 2015, the Company held an earnings call to discuss its Q1 2015 earnings.  Defendants McCartney, McKee and Wahl participated on behalf of the Company. Defendant McKee noted that "[n]et income for the quarter was $15.5 million or $0.22 per share compared to $14.6 million or $0.21 per share in the first quarter of 2014, both net income and earnings per share were new company records."

**ANSWER:** Defendants admit that the Company held an earnings call on April 15, 2015 on which Defendants McCartney, McKee, and Wahl participated on behalf of HCSG and that paragraph 171 of the Complaint purports to summarize and contains partial excerpts from this call. Defendants refer to the April 2015 earnings conference call transcript for a complete and accurate statement of its contents and deny any characterization or interpretation of the call that would be inaccurate if read in the context of the entire April 2015 earnings conference call transcript.

172. Describing these results on April 14, 2015, a UBS securities analyst noted in the introduction of a research report that that "*[r]eported EPS was a penny above UBSe but in-line with consensus.*"

**ANSWER:** Defendants admit that paragraph 172 of the Complaint purports to summarize and contains partial excerpts, with emphasis supplied by Plaintiff, from a research report authored by a UBS analyst. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 172 with respect to the contents of this report and whether the paragraph accurately summarizes and quotes its contents. Defendants refer to this report for a complete and accurate statement of its contents and deny any characterization or interpretation of this report that would be inaccurate if read in the context of the entire report.

173. On April 23, 2015, the Company filed its related quarterly report on Form 10-Q for Q1 2015 with the SEC ("Q1 2015 Form 10-Q"). Defendants McCartney and Shea signed the Q1 2015 Form 10-Q. In Consolidated Statements of Comprehensive Income, the Company repeated the net income results and basic and diluted EPS results for Q1 2015 of $0.22. The Q1 2015 Form 10-Q also noted, with respect to the Company's EPS computations, that "[b]asic net earnings per share are computed using the weighted-average number of common shares outstanding. The dilutive effect of potential common shares outstanding is included in diluted net earnings per share."

**ANSWER:**  Defendants admit that HCSG filed a Form 10-Q for the first quarter of 2015 on April 23, 2015 signed by Defendants McCartney and Shea (the "Q1 2015 Form 10-Q"). Defendants further admit that paragraph 173 of the Complaint purports to summarize and contains partial excerpts from the Q1 2015 Form 10-Q.  Defendants refer to the Q1 2015 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q1 2015 Form 10-Q that would be inaccurate if read in the context of the entire Q1 2015 Form 10-Q.

174.    With respect to the Company's "Disclosure Controls and Procedures," Defendants noted that, "[b]ased on their evaluation as of March 31, 2015, pursuant to Exchange Act Rule 13a-15(b), our management, including our Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e) (sic) are effective."

**ANSWER:**  Defendants admit that paragraph 174 of the Complaint purports to summarize and contains partial excerpts from the Q1 2015 Form 10-Q.  Defendants refer to the Q1 2015 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q1 2015 Form 10-Q that would be inaccurate if read in the context of the entire Q1 2015 Form 10-Q.

175.    The Q1 2015 Form 10-Q included a SOX Certification signed by Defendants McCartney and Shea that was substantially the same as the SOX Certification alleged above in ¶149.

**ANSWER:**  Defendants admit that the Q1 2015 Form 10-Q included a SOX Certification signed by Defendants McCartney and Shea.  Defendants deny the remaining averments of paragraph 175 of the Complaint.

176.    On July 14, 2015, the Company issued a press release to announce its earnings for the three months ended June 30, 2015 ("Q2 2015").  The press release stated that "[n]et income for the three months ended June 30, 2015 was $16,288,000 or $.023 per basic and per diluted common share, compared to the three months ended June 30, 2014 net income of $13,921,000 or

$0.20 per basic and per diluted common share." The press release included Consolidated Statements of Income, which noted that basic and diluted earnings per common share in Q2 2015 amounted to $0.23. Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release as an exhibit. The press release listed Defendants McCartney, Wahl and McKee as "Company Contacts."

**ANSWER:** Defendants admit that HCSG filed a Form 8-K on July 14, 2015 signed by Defendant Shea. Defendants further admit that the Form 8-K attached a press release dated July 14, 2015 relating to the Company's performance in the second quarter of 2015 and that Defendants McCartney, Wahl and McKee were listed as "Company Contacts" on this press release. Defendants further admit that paragraph 176 of the Complaint purports to summarize and contains partial excerpts from this Form 8-K. Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the entire Form 8-K.

177.    On July 15, 2015, the Company held an earnings call to discuss its Q2 2015 results, including its quarterly net income and EPS, which Defendant Wahl touted as "company records." Defendants McCartney, Wahl, and McKee participated on the call on behalf of the Company. Defendant McKee reported "[n]et income for the quarter increased to $16.3 million or $0.23 per share, compared to $13.9 million or $0.20 per share in the second quarter of 2014. Both net income and earnings per share were company records." Defendant Wahl added, "I think in the near term, we continue to plan for double-digit revenue growth for the balance of the year." Again touting the Company's historic performance, Defendant Wahl further noted that "[t]he Q4 and Q1 expansion efforts do provide us with a good platform for the back half of the year to not only maintain our growth rate, but also the margin improvement that we've demonstrated during the first half of 2015."

**ANSWER:** Defendants admit that the Company held an earnings call on July 15, 2015 on which Defendants McCartney, Wahl and McKee participated on behalf of HCSG and that paragraph 177 of the Complaint purports to summarize and contains partial excerpts from this call. Defendants refer to the July 2015 earnings conference call transcript for a complete and accurate statement of its contents and deny any characterization or interpretation of the call that would be inaccurate if read in the context of the entire July 2015 earnings conference call

transcript. Defendants deny that on the July 15, 2015 earnings call Defendant Wahl referenced

EPS or "touted" EPS as a company record.

178.    On July 22, 2015, the Company filed its Q2 2015 quarterly results on Form 10-Q with the SEC ("Q2 2015 Form 10-Q"). Defendants Wahl and Shea signed the Q2 2015 Form 10-Q. The Company reiterated its previously reported net income and basic and diluted EPS amounting to $0.23. With respect to computing EPS, the Company reported, "[b]asic net earnings per share are computed using the weighted-average number of common shares outstanding. The dilutive effect of potential common shares outstanding is included in diluted net earnings per share."

**ANSWER:** Defendants admit that HCSG filed a Form 10-Q for the second quarter of

2014 on July 22, 2015 signed by Defendants Wahl and Shea (the "Q2 2015 Form 10-Q").

Defendants further admit that paragraph 178 of the Complaint purports to summarize and

contains partial excerpts from the Q2 2015 Form 10-Q. Defendants refer to the Q2 2015 Form

10-Q for a complete and accurate statement of its contents and deny any characterization or

interpretation of the Q2 2015 Form 10-Q that would be inaccurate if read in the context of the

entire Q2 2015 Form 10-Q.

179.    With respect to the Company's "Disclosure Controls and Procedures," the Q2 2015 Form 10-Q noted, "[b]ased on their evaluation as of June 30, 2015, pursuant to Exchange Act Rule 13a-15(b), our management, including our Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e) are effective."

**ANSWER:** Defendants admit that paragraph 179 of the Complaint purports to

summarize and contains partial excerpts from the Q2 2015 Form 10-Q. Defendants refer to the

Q2 2015 Form 10-Q for a complete and accurate statement of its contents and deny any

characterization or interpretation of the Q2 2015 Form 10-Q that would be inaccurate if read in

the context of the entire Q2 2015 Form 10-Q.

180.    The Q2 2015 Form 10-Q included a SOX Certification signed by Defendants Wahl and Shea that was substantially the same as the SOX Certification alleged above in ¶ 148.

**ANSWER:** Defendants admit that the Q2 2015 Form 10-Q included a SOX Certification signed by Defendants Wahl and Shea. Defendants further admit that paragraph 180 of the Complaint purports to summarize and refers to partial excerpts from the Q2 2015 Form 10-Q. Defendants refer to the Q2 2015 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q2 2015 Form 10-Q that would be inaccurate if read in the context of the entire Q2 2015 Form 10-Q.

181. On October 13, 2015, the Company issued a press release to announce its quarterly results for the three months ended September 30, 2015 ("Q3 2015"). The Company reported that net income for the three months ended September 30, 2015 was $17,086,000 or $0.24 per basic and per diluted EPS. The press release also contained Consolidated Statements of Income reporting that basic and diluted EPS amounted to $0.24 for Q3 2015. Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release.

**ANSWER:** Defendants admit that HCSG filed a Form 8-K on October 13, 2015 signed by Defendant Shea. Defendants further admit that the Form 8-K attached a press release dated October 13, 2015 relating to the Company's performance in the third quarter of 2015. Defendants further admit that paragraph 181 of the Complaint purports to summarize information from this Form 8-K. Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the entire Form 8-K.

182. On October 14, 2015, the Company held an earnings call to discuss its Q3 2015 results. Defendant Wahl again touted the quarter's EPS results as a "company record." Defendants McCartney, Wahl and McKee participated on the call on behalf of the Company. Defendant McKee noted that "[n]et income for the quarter increased to $17.1 million or $0.24 per share." Defendant McKee explained in his introductory remarks that "[b]oth net income and earnings per share for the quarter and year-to-date are company records."

**ANSWER:** Defendants admit that the Company held an earnings call on October 14, 2015 on which Defendants McCartney, Wahl and McKee participated on behalf of HCSG and that paragraph 182 of the Complaint purports to summarize and contains partial excerpts from

this call.  Defendants refer to the October 2015 earnings conference call transcript for a complete

and accurate statement of its contents and deny any characterization or interpretation of the call

that would be inaccurate if read in the context of the entire October 2015 earnings conference

call transcript.  Defendants admit that Defendant McKee referenced the Company's EPS, among

other indicators relating to the Company's performance.  Defendants deny that on the October

14, 2015 earnings call Defendant Wahl referenced EPS or "touted" EPS as a company record.

183.    Describing the Company's Q3 2015 results on October 13, 2015, a UBS analyst noted that "HCSG reported 3Q15 adjusted EPS of $0.24, up $11 from $0.21 a year ago. *Reported EPS was in-line with consensus* but a penny below UBSe." Likewise, on the same day, a William Blair analyst noted that "Healthcare Services Group (HCSG) reported relatively in-line third quarter 2015 results" and that "*earnings per share of $0.24 were equal to the Street's target.'*"

ANSWER:  Defendants admit that paragraph 183 of the Complaint purports to

summarize and contains partial excerpts, with emphasis added by Plaintiff, from research reports

authored by analysts from UBS and William Blair.  Defendants are without knowledge or

information sufficient to form a belief as to the truth of the averments of paragraph 183 with

respect to the contents of these reports and whether the paragraph accurately summarizes and

quotes their contents.  Defendants refer to these reports for a complete and accurate statement of

their contents and deny any characterization or interpretation of either of these reports that would

be inaccurate if read in the context of the entire report.

184.    On October 23, 2015, the Company filed its Q3 2015 results on Form 10-Q with the SEC ("Q3 2015 Form 10-Q").  The Q3 2015 Form 10-Q included Consolidated Statements of Comprehensive Income that reiterated the previously reported net income for the quarter and reported basic and diluted earnings per common share of $0.24.  With respect to EPS computations, the 10-Q reported for EPS that "[b]asic net earnings per share are computed using the weighted-average number of common shares outstanding.  The dilutive effect of potential common shares outstanding is included in diluted net earnings per share."  The Q3 2015 Form 10-Q further noted with respect to computations that "[b]asic earnings (loss) per common share are computed by dividing income (loss) available to common shareholders by the weighted-average common shares outstanding for the period.  Diluted earnings (loss) per common share

reflect the weighted-average common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options."

**ANSWER:** Defendants admit that HCSG filed a Form 10-Q for the third quarter of 2015 on October 23, 2015 (the "Q3 2015 Form 10-Q"). Defendants further admit that paragraph 184 of the Complaint purports to summarize and contains partial excerpts from the Q3 2015 Form 10-Q. Defendants refer to the Q3 2015 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q3 2015 Form 10-Q that would be inaccurate if read in the context of the entire Q3 2015 Form 10-Q.

185.    With respect to the Company's "Disclosure Controls and Procedures," the Q3 2015 Form 10-Q noted that "[b]ased on their evaluation as of September 30, 2015, pursuant to Exchange Act Rule 13a-15(b), our management, including our Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e) are effective."

**ANSWER:** Defendants admit that paragraph 185 of the Complaint purports to summarize and contains partial excerpts from the Q3 2015 Form 10-Q. Defendants refer to the Q3 2015 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q3 2015 Form 10-Q that would be inaccurate if read in the context of the entire Q3 2015 Form 10-Q.

186.    The Q3 2015 Form 10-Q included a SOX Certification signed by Defendants Wahl and Shea that was substantially the same as the SOX Certification alleged above in ¶ 148.

**ANSWER:** Defendants admit that the Q3 2015 Form 10-Q included a SOX Certification signed by Defendants Wahl and Shea. Defendants further admit that paragraph 186 of the Complaint purports to summarize and refers to partial excerpts from the Q3 2015 Form 10-Q. Defendants refer to the Q3 2015 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q3 2015 Form 10-Q that would be inaccurate if read in the context of the entire Q3 2015 Form 10-Q.

187.    On February 2, 2016, the Company issued a press release on Form 8-K announcing its results for the three quarters ended December 31, 2015 ("Q4 2015"), as well as for FY 2015.  The Company reported that "[i]nclusive of the previously announced settlement costs, net income for the three months ended December 31, 2015 was $9,134,000 or $0.13 per basic and per diluted common share." The press release contained Consolidated Statements of Income, which reiterated, for the three months ended December 31, 2015, net income of $9,134,000 and basic and diluted EPS of $0.13.  Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release.  The press release listed Defendants McCartney, Wahl and McKee as "Company Contacts."

ANSWER:  Defendants admit that HCSG filed a Form 8-K on February 2, 2016 signed by Defendant Shea.  Defendants further admit that the Form 8-K attached a press release dated February 2, 2016 relating to the Company's performance in the fourth quarter of 2015 and the year ended December 31, 2015, and that Defendants McCartney, Wahl and McKee were listed as "Company Contacts" on this press release.  Defendants further admit that paragraph 187 of the Complaint purports to summarize information in this Form 8-K.  Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the entire Form 8-K.  Defendants deny the remaining averments of paragraph 187.

188.    Analyzing these results, on February 2, 2016, analysts noted that EPS would have fallen in-line with estimates, excluding a one-time expense associated with the settlement of a labor and employment matter.  On February 2, 2016, a William Blair analyst noted that "GAAP EPS were $0.13, as the company was negatively affected by one-time costs associated with a previously announced labor and employment settlement (which management indicated would be a roughly $0.14 hit via a late-January 2016 press release).  Excluding this charge, we estimate adjusted EPS of $0.27; moreover, after accounting for legal costs and an estimated $0.02 benefit from the extension of the Work Opportunity Tax Credit (WOTC) in December 2015, we estimate EPS were about a penny shy of the consensus target."

ANSWER:  Defendants admit that paragraph 188 of the Complaint purports to summarize analysts' reports and contains partial excerpts from a research report authored by a William Blair analyst.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 188 with respect to the contents of this report

and whether the paragraph accurately summarizes and quotes its contents.  Defendants refer to this report for a complete and accurate statement of its contents and deny any characterization or interpretation of this report that would be inaccurate if read in the context of the entire report.

189.    Likewise, a UBS analyst commented on February 3, 2016, that the Company's adjusted EPS for Q4 2015 was a penny ahead of consensus estimates and in-line with UBS estimates.  Specifically, the UBS analyst noted, "HCSG reported 4Q15 adj EPS of $0.27, a penny ahead of consensus and in-line with UBSe. 4Q15 adjusted EPS excluded $0.14 related to settlement costs disclosed in late January."

ANSWER:  Defendants admit that paragraph 189 of the Complaint purports to summarize and contains partial excerpts from a research report authored by a UBS analyst. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 189 with respect to the contents of this report and whether the paragraph accurately summarizes and quotes its contents.  Defendants refer to this report for a complete and accurate statement of its contents and deny any characterization or interpretation of this report that would be inaccurate if read in the context of the entire report.

190.    On February 3, 2016, the Company held an earnings call to discuss its Q4 2015 and FY 2015 results.  Defendants McCartney, Wahl and McKee participated on the call. Defendant McKee reported that "[i]ncluding settlement-related costs, net income was $9.1 million or $0.13 per share for the quarter and $58 million or $0.80 per share for the year."

ANSWER:  Defendants admit that the Company held an earnings call on February 3, 2016 on which Defendants McCartney, Wahl and McKee participated on behalf of HCSG and that paragraph 190 of the Complaint purports to summarize information from this call. Defendants refer to the February 2016 earnings conference call transcript for a complete and accurate statement of its contents and deny any characterization or interpretation of the call that would be inaccurate if read in the context of the entire February 2016 earnings conference call transcript.

191.    On February 19, 2016, the Company filed its Annual Report for FY 2015 on Form 10K with the SEC ("2015 Form 10-K").  Therein, the Company reiterated that, for 4Q 2015, net income was $9,134,000 and that basic and diluted EPS were $0.13.  With respect to EPS computations, the Company noted that "[b]asic earnings per common share are computed by dividing income available to common shareholders by the weighted-average common shares outstanding for the period.  Diluted earnings per common share reflect the weighted-average common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options." Defendants Wahl, Shea and McCartney signed the 2015 Form 10-K.

ANSWER:  Defendants admit that HCSG filed a Form 10-K for the fiscal year ended December 31, 2015 on February 19, 2016 signed by Defendants Wahl, Shea and McCartney (the "2015 Form 10-K").  Defendants further admit that paragraph 191 of the Complaint purports to summarize information from the 2015 Form 10-K.  Defendants refer to the 2015 Form 10-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the 2015 Form 10-K that would be inaccurate if read in the context of the entire 2015 Form 10-K.

192.    With respect to "Disclosure Controls and Procedures," the 2015 Form 10-K noted that "[i]n accordance with Exchange Act Rules 13a-15 and 15a-15, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report."

ANSWER:  Defendants admit that paragraph 192 of the Complaint purports to summarize and contains partial excerpts from the 2015 Form 10-K.  Defendants refer to the 2015 Form 10-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the 2015 Form 10-K that would be inaccurate if read in the context of the entire 2015 Form 10-K.

193.    The 2015 Form 10-K included a SOX Certification signed by Defendants Wahl and Shea that was substantially the same as the SOX Certification alleged above in ¶149.

**ANSWER:**  Defendants admit that the 2015 Form 10-K included a SOX Certification signed by Defendants Wahl and Shea.  Defendants deny the remaining averments of paragraph 193 of the Complaint.

194.    The statements made in ¶¶ 170, 171, 173, (regarding Q1 2015 Financials); ¶¶ 176, 177, 178 (regarding Q2 2015 Financials); ¶¶ 181, 182, 184 (regarding Q3 2015 Financials); and ¶¶ 187, 190, 191 (regarding Q4 2015 and FY 2015 Financials) were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose adverse facts.  In particular:

a.    Starting prior to the Class Period and continuing throughout FY 2015, Defendants made the Company falsely appear to meet or beat analysts' targets for quarterly EPS consistently.  As alleged at ¶¶ 65-82 herein, Defendants overstated the Company's quarterly EPS by continually manipulating net income to generate EPS results that would have a third digit (representing tenths of a cent) that would permit the rounding up of reported EPS to artificially avoid falling short of analysts' consensus EPS target for the Company.  Defendants therefore knowingly or recklessly overstated the Company's EPS to meet analyst estimates and falsely perpetuate the Company's reputation for stable and consistent financial performance.

b.    As a result, Defendants' statements about the Company's net income and EPS, including the reported quarterly results and the manner in which the Company calculated basic and diluted EPS, were materially false and misleading and/or lacked a reasonable basis at all relevant times.  Among other things, Defendants concealed from investors that the Company's reported net income and EPS was a contrivance engineered to, absent extraordinary circumstances, avoid falling short of analyst's consensus EPS estimates.

c.    As a result, the Company's financial statements and results for the quarter materially overstated or otherwise misrepresented the Company's EPS.

**ANSWER:**  The averments of paragraph 194 of the Complaint, including subparagraphs (a)-(c), purport to state legal conclusions to which no response is required, and therefore are denied.  To the extent these averments are deemed to be factual in nature, they are denied.

195.    The statements made in ¶¶ 174-175 (regarding Q1 2015 internal controls); ¶¶ 179-180 (regarding Q2 2015 internal controls); ¶¶ 185-186 (regarding Q3 2015 internal controls); and ¶¶ 192-193 (regarding Q4 2015 and FY 2015 internal controls) were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose adverse facts.  In particular, Defendants McCartney and Shea knowingly or recklessly failed to disclose that, prior to the Class Period and at all times in FY 2015, the Company lacked sufficient internal controls to prevent the Company from

-97-

manipulating its net income and reporting EPS to artificially achieve EPS results that met or exceeded analysts' consensus EPS estimates.

ANSWER:  The averments of paragraph 195 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied.  To the extent these averments are deemed to be factual in nature, they are denied.

196.    On April 12, 2016, the Company issued a press release to announce its quarterly results for the three months ended March 31, 2016 ("Q1 2016").  The press release announced that "[n]et income for the three months ended March 31, 2016 was $18,626,000 or $0.26 per basic and per diluted common share, compared to the three months ended March 31, 2015 net income of $15,516,000 or $0.22 per basic and per diluted common share."  The press release also contained Consolidated Statements of Income, which noted that basic and diluted earnings per common share were $0.26 for Q1 2016.  Defendant Shea signed the Form 8-K to which the press release was attached.  The press release listed Defendants McCartney, Wahl and McKee as "Company Contacts."

ANSWER:  Defendants admit that HCSG filed a Form 8-K on April 12, 2016 signed by Defendant Shea.  Defendants further admit that the Form 8-K attached a press release dated April 12, 2016 relating to the Company's performance in the first quarter of 2016 and that Defendants McCartney, Wahl and McKee were listed as "Company Contacts" on this press release.  Defendants further admit that paragraph 196 of the Complaint purports to summarize and contains partial excerpts from this Form 8-K.  Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the entire Form 8-K.

197.    Reporting on the Company's Q1 2016 results on the same day, a William Blair analyst began a report on HCSG by noting that "GAAP EPS were $0.26, exactly in line with the consensus target."  The analyst concluded the research report by noting that "we continue to view Healthcare Services Group as a high-quality growth story - one that offers healthcare services investors a safe-haven investment opportunity in volatile markets."

ANSWER:  Defendants admit that paragraph 197 of the Complaint purports to summarize and contains partial excerpts from a research report authored by a William Blair

analyst.  Defendants are without knowledge or information sufficient to form a belief as to the

truth of the averments of paragraph 197 with respect to the contents of this report and whether

the paragraph accurately summarizes and quotes its contents.  Defendants refer to this report for

a complete and accurate statement of its contents and deny any characterization or interpretation

of this report that would be inaccurate if read in the context of the entire report.

198.    On April 13, 2016, the Company hosted an earnings call to discuss its results for Q1 2016.  During the call, Defendant McKee again stressed that the Company's net income and EPS were records for the quarter.  Defendants McCartney, Wahl and McKee participated on behalf of the Company.  McKee stated, "net income for the quarter increased to $18.6 million or $0.26 per share, compared to $15.5 million or $0.22 per share in Q1 of 2015.  Both net income and earnings per share were company records for the quarter."

ANSWER:  Defendants admit that the Company held an earnings call on April 13, 2016

on which Defendants McCartney, Wahl and McKee participated on behalf of HCSG and that

paragraph 198 of the Complaint purports to summarize and contains partial excerpts from this

call.  Defendants refer to the April 2016 earnings conference call transcript for a complete and

accurate statement of its contents and deny any characterization or interpretation of the call that

would be inaccurate if read in the context of the entire April 2016 earnings conference call

transcript.  Defendants expressly deny that Defendant McKee "stressed" HCSG's EPS.

199.    On April 22, 2016, the Company filed its quarterly report on Form 10-Q for Q1 2016 with the SEC ("Q1 2016 Form 10-Q").  Defendants Wahl and Shea signed the Q1 2016 Form 10-Q.  With respect to EPS, the Company reiterated its previously reported net income for Q1 2016 and reported earnings per basic and per diluted common share of $0.26.  With respect to how the Company calculated its EPS, the Q1 2016 Form 10-Q noted that "[b]asic earnings per common share are computed by dividing income available to common shareholders by the weighted-average number of common shares outstanding for the period.  Diluted earnings per common share are calculating using the weighted-average number of common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options."  The Q1 2016 Form 10-Q further noted that "[b]asic earnings per share are computed using the weighted-average number of common shares outstanding.  The dilutive effect of potential common shares outstanding is included in diluted earnings per share."

**ANSWER:** Defendants admit that HCSG filed a Form 10-Q for the first quarter of 2016 on April 22, 2016 signed by Defendants Wahl and Shea (the "Q1 2016 Form 10-Q"). Defendants further admit that paragraph 199 of the Complaint purports to summarize and contains partial excerpts from the Q1 2016 Form 10-Q. Defendants refer to the Q1 2016 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q1 2016 Form 10-Q that would be inaccurate if read in the context of the entire Q1 2016 Form 10-Q.

200.    With respect to internal controls, the Q1 2016 Form 10-Q noted that "[b]ased on their evaluation as of March 31, 2016, pursuant to Exchange Act Rule 13a-15(b), our management, including our Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e) are effective."

**ANSWER:** Defendants admit that paragraph 200 of the Complaint purports to summarize and contains partial excerpts from the Q1 2016 Form 10-Q. Defendants refer to the Q1 2016 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q1 2016 Form 10-Q that would be inaccurate if read in the context of the entire Q1 2016 Form 10-Q.

201.    The Q1 2016 Form 10-Q included a SOX Certification signed by Defendants Wahl and Shea that was substantially the same as the SOX Certification alleged in ¶ 148.

**ANSWER:** Defendants admit that the Q1 2016 Form 10-Q included a SOX Certification signed by Defendants Wahl and Shea. Defendants further admit that paragraph 201 of the Complaint purports to summarize and refers to partial excerpts from the Q1 2016 Form 10-Q. Defendants refer to the Q1 2016 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q1 2016 Form 10-Q that would be inaccurate if read in the context of the entire Q1 2016 Form 10-Q.

202.    On July 12, 2016, the Company issued a press release to announce its quarterly results for the three months ended June 30, 2016 ("Q2 2016").  The press release reported "[n]et income for the three months ended June 30, 2016 was $18,670,000 or $0.26 per basic and per diluted common share, compared to the three months ended June 30, 2015 net income of $16,288,000 or $0.23 per basic and per diluted common share."  The press release included Consolidated Statements of Income, which reiterated that per basic and per diluted EPS were $0.26 for Q2 2016.  Defendant Shea signed the Form 8-K to which the press release was attached.  The press release listed Defendants McCartney, Wahl and McKee as "Company Contacts."

**ANSWER:**  Defendants admit that HCSG filed a Form 8-K on July 12, 2016 signed by Defendant Shea.  Defendants further admit that the Form 8-K attached a press release dated July 12, 2016 relating to the Company's performance in the second quarter of 2016 and that Defendants McCartney, Wahl and McKee were listed as "Company Contacts" on this press release.  Defendants further admit that paragraph 202 of the Complaint purports to summarize and contains partial excerpts from this Form 8-K.  Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the entire Form 8-K.

203.    Describing the Company's Q2 2016 results on the same day, July 12, 2016, a Williams Blair analyst noted that "GAAP EPS were $0.26, exactly in line with the consensus target."  Likewise, a UBS analyst began its July 12, 2016 report on the Company's results by noting that the Company met consensus estimates:  "HCSG reported 2Q16 adj. EPS of $0.26, in-line with both UBSe/cons."

**ANSWER:**  Defendants admit that paragraph 203 of the Complaint purports to summarize and contains partial excerpts from research reports authored by analysts from William Blair and UBS.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 203 with respect to the contents of these reports and whether the paragraph accurately summarizes and quotes their contents.  Defendants refer to these reports for a complete and accurate statement of their contents and deny any

characterization or interpretation of either of these reports that would be inaccurate if read in the

context of the entire report.

204.    On July 13, 2016, the Company held an earnings call to discuss its results for Q2 2016.  Defendants Wahl and McKee participated on behalf of the Company.  Defendant McKee again touted the EPS results as a company record.  During the call, Defendant McKee stated that "[n]et income for the quarter increased to $18.7 million or $0.26 per share, and that compares to $16.2 million or $0.23 per share in the second quarter of 2015.  Both net income and earnings per share were company records."

**ANSWER:**  Defendants admit that the Company held an earnings call on July 13, 2016

on which Defendants Wahl and McKee participated on behalf of HCSG and that paragraph 204

of the Complaint purports to summarize and contains partial excerpts from this call.  Defendants

refer to the July 2016 earnings conference call transcript for a complete and accurate statement

of its contents and deny any characterization or interpretation of the call that would be inaccurate

if read in the context of the entire July 2016 earnings conference call transcript.  Defendants

admit that Defendant McKee referenced the Company's EPS, among other indicators relating to

the Company's performance.  Defendants deny that on the July 13, 2016 earnings call Defendant

McKee "touted" the EPS results.

205.    On July 22, 2016, the Company filed its quarterly results for Q2 2016 on Form 10-Q with the SEC ("Q2 2016 Form 10-Q").  Defendants Wahl and Shea signed the Q2 2016 Form 10-Q.  The Q2 2016 Form 10-Q contained Consolidated Statements of Comprehensive Income which reiterated the Company's previously reported net income and reported that earnings per basic and per diluted common share were $0.26.  With respect to EPS calculations, the Q2 2016 Form 10-Q noted that "[b]asic earnings per common share are computed by dividing income available to common shareholders by the weighted-average number of common shares outstanding for the period.  Diluted earnings per common share are calculating using the weighted-average number of common share outstanding and dilutive common shares, such as those issuable upon exercise of stock options."  The Q2 2016 Form 10-Q also noted with respect to EPS computation that "[b]asic and diluted earnings per common share are computed by dividing net income by the weighted-average number of basic and diluted common shares outstanding, respectively.  The weighted-average number of diluted common shares includes the impact of dilutive securities, including unvested, unexercised stock options and unvested restricted stock."

**ANSWER:** Defendants admit that HCSG filed a Form 10-Q for the second quarter of 2016 on July 22, 2016 signed by Defendants Wahl and Shea (the "Q2 2016 Form 10-Q"). Defendants further admit that paragraph 205 of the Complaint purports to summarize and contains partial excerpts from the Q2 2016 Form 10-Q. Defendants note that the excerpts cited in paragraph 205 contain a minor typographical error. Defendants refer to the Q2 2016 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q2 2016 Form 10-Q that would be inaccurate if read in the context of the entire Q2 2016 Form 10-Q.

206.    With respect to internal controls, the Q2 Form 10-Q noted that "[b]ased on their evaluation as of June 30, 2016, pursuant to Exchange Act Rule 13a-15(b), our management, including our Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e)) are effective."

**ANSWER:** Defendants admit that paragraph 206 of the Complaint purports to summarize and contains partial excerpts from the Q2 2016 Form 10-Q. Defendants refer to the Q2 2016 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q2 2016 Form 10-Q that would be inaccurate if read in the context of the entire Q2 2016 Form 10-Q.

207.    The Q2 2016 Form 10-Q included a SOX Certification signed by Defendants Wahl and Shea that was substantially the same as the SOX Certification alleged in ¶ 148.

**ANSWER:** Defendants admit that the Q2 2016 Form 10-Q included a SOX Certification signed by Defendants Wahl and Shea. Defendants further admit that paragraph 207 of the Complaint purports to summarize and refers to partial excerpts from the Q2 2016 Form 10-Q. Defendants refer to the Q2 2016 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q2 2016 Form 10-Q that would be inaccurate if read in the context of the entire Q2 2016 Form 10-Q.

208.    On October 11, 2016, the Company issued a press release to announce its results for the three months ended September 30, 2016 ("Q3 2016").  The Company reported that the "[n]et income for the three months ended September 30, 2016 was $19,711,000 or $0.27 per basic and per diluted common share, compared to the three months ended September 30, 2015 net income of $17,086,000 or $0.24 per basic and per diluted common share."  The press release included Consolidated Statements of Income, which noted that basic and diluted earnings per common share totaled $0.27 for Q3 2016.  Defendant Shea signed the Form 8-K filed with the SEC to which the press release was attached.  The press release listed Defendants McCartney, Wahl and McKee as "Company Contacts."

**ANSWER:**  Defendants admit that HCSG filed a Form 8-K on October 11, 2016 signed by Defendant Shea.  Defendants further admit that the Form 8-K attached a press release dated October 11, 2016 relating to the Company's performance in the third quarter of 2016 and that Defendants McCartney, Wahl and McKee were listed as "Company Contacts" on this press release.  Defendants further admit that paragraph 208 of the Complaint purports to summarize and contains partial excerpts from this Form 8-K.  Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the entire Form 8-K.

209.    On October 12, 2016, the Company held an earnings call to discuss its quarterly results for Q3 2016.  Defendants Wahl and McKee participated on behalf of the Company. Defendant McKee again emphasized that the EPS results were a company record, noting that "[n]et income for the quarter increased to $19.7 million or $0.27 per share and that compare[d] to $17.1 million or $0.24 per share for the third quarter of 2015.  Both net income and earnings per share were company records."

**ANSWER:**  Defendants admit that the Company held an earnings call on October 12, 2016 on which Defendants Wahl and McKee participated on behalf of HCSG and that paragraph 209 of the Complaint purports to summarize and contains partial excerpts from this call. Defendants refer to the October 2016 earnings conference call transcript for a complete and accurate statement of its contents and deny any characterization or interpretation of the call that would be inaccurate if read in the context of the entire October 2016 earnings conference call transcript.  Defendants admit that Defendant McKee referenced the Company's EPS, among

other indicators relating to the Company's performance.  Defendants deny that on the October 12, 2016 earnings call Defendant McKee "emphasized" the EPS results.

210.    Describing the Company's Q3 2016 results on October 11, 2016, a Williams Blair analyst noted that "GAAP EPS were $0.27, exactly in line with the $0.27 consensus target."  The same analyst report reiterated its view of the Company as a safe haven investment in volatile markets during an election year:  "[W]e also continue to view Healthcare Services group as a high-quality long-term holdings - one that offers healthcare investors a safe haven investment (and income) opportunity in volatile markets during an election year."

**ANSWER:**  Defendants admit that paragraph 210 of the Complaint purports to summarize and contains partial excerpts from a research report authored by a William Blair analyst.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 210 with respect to the contents of this report and whether the paragraph accurately summarizes and quotes its contents.  Defendants refer to this report for a complete and accurate statement of its contents and deny any characterization or interpretation of this report that would be inaccurate if read in the context of the entire report.

211.    On October 28, 2016, the Company issued its quarterly report on Form 10-Q for Q3 2016 with the SEC ("Q3 2016 Form 10-Q").  Defendants Wahl and Shea signed the Q3 2016 Form 10-Q.  The Q3 2016 Form 10-Q contained Consolidated Statements of Comprehensive Income, which reiterated the previously reported net income for Q3 2016 and noted that basic and diluted earnings per common share were $0.27.  With respect to how the Company calculated its reported EPS, the Q3 2016 Form 10-Q noted that "[b]asic earnings per common share are computed by dividing income available to common shareholders by the weighted-average number of common shares outstanding for the period.  Diluted earnings per common share are calculated using the weighted-average number of common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options."  The Q3 2016 Form 10-Q further noted that "[b]asic and diluted earnings per common share are computed by dividing net income by the weighted-average number of basic and diluted common shares outstanding, respectively.  The weighted-average number of diluted common shares includes the impact of dilutive securities, including unvested, unexercised stock options and unvested restricted stock."

**ANSWER:**  Defendants admit that HCSG filed a Form 10-Q for the third quarter of 2016 on October 28, 2016, signed by Defendants Wahl and Shea (the "Q3 2016 Form 10-Q").

Defendants further admit that paragraph 211 of the Complaint purports to summarize and

contains partial excerpts from the Q3 2016 Form 10-Q.  Defendants refer to the Q3 2016 Form

10-Q for a complete and accurate statement of its contents and deny any characterization or

interpretation of the Q3 2016 Form 10-Q that would be inaccurate if read in the context of the

entire Q3 2016 Form 10-Q.

212.     With respect to internal controls and procedures, the Q3 2016 Form 10-Q noted that "[b]ased on their evaluation as of September 30, 2016, pursuant to Exchange Act Rule 13a-15(b), our management, including our Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e)) are effective."

**ANSWER:**  Defendants admit that paragraph 212 of the Complaint purports to

summarize and contains partial excerpts from the Q3 2016 Form 10-Q.  Defendants refer to the

Q3 2016 Form 10-Q for a complete and accurate statement of its contents and deny any

characterization or interpretation of the Q3 2016 Form 10-Q that would be inaccurate if read in

the context of the entire Q3 2016 Form 10-Q.

213.     The Q3 2016 Form 10-Q included a SOX Certification signed by Defendants Wahl and Shea that was substantially the same as the SOX Certification alleged in ¶ 148.

**ANSWER:**  Defendants admit that the Q3 2016 Form 10-Q included a SOX Certification

signed by Defendants Wahl and Shea.  Defendants further admit that paragraph 213 of the

Complaint purports to summarize and refers to partial excerpts from the Q3 2016 Form 10-Q.

Defendants refer to the Q3 2016 Form 10-Q for a complete and accurate statement of its contents

and deny any characterization or interpretation of the Q3 2016 Form 10-Q that would be

inaccurate if read in the context of the entire Q3 2016 Form 10-Q.

214.     On February 7, 2017, the Company issued a press release to announce its results for the three months ended December 31, 2016 ("Q4 2016") and the FY 2016.  In its press release, the Company reported "[n]et income for the three months ended December 31, 2016 was

$20.3 million, or $0.28 per basic and diluted common share." The press release contained Consolidated Statements of Income, which noted that basic and diluted earnings per common share were $0.28 for Q4 2016. Defendant Shea signed the Form 8-K filed with the SEC to which the press release was attached. The press release listed Defendants McCartney, Wahl and McKee as "Company Contacts."

**ANSWER:** Defendants admit that HCSG filed a Form 8-K on February 7, 2017 signed by Defendant Shea. Defendants further admit that the Form 8-K attached a press release dated February 7, 2017 relating to the Company's performance in the fourth quarter of 2016 and the year ended December 31, 2016 and that Defendants McCartney, Wahl and McKee were listed as "Company Contacts" on this press release. Defendants further admit that paragraph 214 of the Complaint purports to summarize and contains partial excerpts from this Form 8-K. Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the entire Form 8-K.

215.    Describing the Company's Q4 2016 and FY 2016 results on the same day, February 7, 2017, a UBS analyst noted that the Company's EPS results tracked expectations, adding that "HCSG reported 4Q16 adjusted EPS of $0.28, in-line with both UBSe/consensus." Likewise, a William Blair analyst noted on the same day that "GAAP EPS were equal to the $0.28 consensus forecast."

**ANSWER:** Defendants admit that paragraph 215 of the Complaint purports to summarize and contains partial excerpts from research reports authored by analysts from UBS and William Blair. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 215 with respect to the contents of these reports and whether the paragraph accurately summarizes and quotes their contents. Defendants refer to these reports for a complete and accurate statement of their contents and deny any characterization or interpretation of either of these reports that would be inaccurate if read in the context of the entire report.

216.    On February 8, 2017, the Company held an earnings call to discuss its Q4 2016 and FY 2016 results.  Defendants Wahl and McKee participated on behalf of the Company. Defendant McKee again touted the Company's EPS results as a record.  During the call, McKee noted that "net income for the quarter increased to $20.3 million or $0.28 per share, and for the year it was $77.4 million or $1.05 per share.  Both net income and earnings per share for the quarter and year were company records."

ANSWER:  Defendants admit that the Company held an earnings call on February 8, 2017 on which Defendants Wahl and McKee participated on behalf of HCSG and that paragraph 216 of the Complaint purports to summarize and contains partial excerpts from this call. Defendants refer to the February 2017 earnings conference call transcript for a complete and accurate statement of its contents and deny any characterization or interpretation of the call that would be inaccurate if read in the context of the entire February 2017 earnings conference call transcript.  Defendants admit that Defendant McKee referenced the Company's EPS, among other indicators relating to the Company's performance.  Defendants deny that on the February 8, 2017 earnings call Defendant McKee "touted" the EPS results.

217.    On February 24, 2017, the Company filed its Annual Report FY 2016 on Form 10-K with the SEC ("2016 Form 10-K").  Defendants Wahl, Shea and McCartney signed the 2016 Form 10-K.  The 2016 Form 10-K reiterated the previously reported net income for Q4 2016 and basic and diluted earnings per common share amounted to $0.28.  With respect to how the Company calculated its EPS, the 2016 Form 10-K noted that "[b]asic earnings per common share are computed by dividing income available to common shareholders by the weighted-average common shares outstanding for the period.  Diluted earnings per common share reflect the weighted-average common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options and upon the vesting of restricted stock."

ANSWER:  Defendants admit that HCSG filed a Form 10-K for the fiscal year ended December 31, 2016 on February 24, 2017 signed by Defendants Wahl, Shea and McCartney (the "2016 Form 10-K").  Defendants further admit that paragraph 217 of the Complaint purports to summarize and contains partial excerpts from the 2016 Form 10-K.  Defendants refer to the 2016 Form 10-K for a complete and accurate statement of its contents and deny any characterization

or interpretation of the 2016 Form 10-K that would be inaccurate if read in the context of the

entire 2016 Form 10-K.

218.    With respect to internal controls, the 2016 Form 10-K noted that, "[i]n accordance with Exchange Act Rules 13a-15 and 15a-15, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report.  Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of December 31, 2016."

**ANSWER:**  Defendants admit that paragraph 218 of the Complaint purports to

summarize and contains partial excerpts from the 2016 Form 10-K.  Defendants refer to the 2016

Form 10-K for a complete and accurate statement of its contents and deny any characterization

or interpretation of the 2016 Form 10-K that would be inaccurate if read in the context of the

entire 2016 Form 10-K.

219.    The 2016 Form 10-K included a SOX Certification signed by Defendants Wahl and Shea that was substantially the same as the SOX Certification alleged in ¶ 148.

**ANSWER:**  Defendants admit that the 2016 Form 10-K included a SOX Certification

signed by Defendants Wahl and Shea.  Defendants further admit that paragraph 219 of the

Complaint purports to summarize and refers to partial excerpts from the 2016 Form 10-K.

Defendants refer to the 2016 Form 10-K for a complete and accurate statement of its contents

and deny any characterization or interpretation of the 2016 Form 10-K that would be inaccurate

if read in the context of the entire 2016 Form 10-K.

220.    The statements made in ¶¶196, 198-199 (regarding Q1 2016 Financials); ¶¶ 202, 204-205 (regarding Q2 2016 Financials); ¶¶ 208-209, 211 (regarding Q3 2016 Financials); and ¶¶ 214, 216-217 (regarding Q4 2016 and FY 2016 Financials) were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose adverse facts.  In particular:

a.    Starting prior to the Class Period and continuing throughout FY 2016, Defendants made the Company falsely appear to meet or beat analysts' targets for quarterly EPS consistently.  As alleged at ¶¶ 65-82 herein, Defendants overstated the Company's quarterly EPS by continually manipulating net income to generate EPS results that would have a third digit (representing tenths of a cent) that would permit the rounding up of reported EPS to artificially avoid falling short of analysts' consensus EPS target for the Company.  Defendants therefore knowingly or recklessly overstated the Company's EPS to meet analyst estimates and falsely perpetuate the Company's reputation for stable and consistent financial performance.

b.    As a result, Defendants' statements about the Company's net income and EPS, including the reported quarterly results and the manner in which the Company calculated basic and diluted EPS, were materially false and misleading and/or lacked a reasonable basis at all relevant times.  Among other things, Defendants concealed from investors that the Company's reported EPS was a contrivance engineered to, absent extraordinary circumstances, avoid falling short of analyst's consensus EPS estimates.

c.    As a result, the Company's financial statements and results for the quarter materially overstated or otherwise misrepresented the Company's EPS.

**ANSWER:**  The averments of paragraph 220 of the Complaint, including subparagraphs

(a)-(c), purport to state legal conclusions to which no response is required, and therefore are

denied.  To the extent these averments are deemed to be factual in nature, they are denied.


221.    The statements made in ¶¶ 200-201 (regarding Q1 2016 internal controls); ¶¶206-207 (regarding Q2 2016 internal controls); ¶¶ 212-213 (regarding Q3 2016 internal controls); and ¶¶ 218-219 (regarding Q4 2016 and FY 2016 internal controls) were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose adverse facts.  In particular, Defendants Wahl and Shea knowingly or recklessly failed to disclose that, prior to the Class Period and at all times in FY 2016, the Company lacked sufficient internal controls to prevent the Company from manipulating its net income and reporting EPS to artificially achieve EPS results that met or exceeded analysts' consensus EPS estimates.

**ANSWER:**  The averments of paragraph 221 of the Complaint purport to state legal

conclusions to which no response is required, and therefore are denied.  To the extent these

averments are deemed to be factual in nature, they are denied.


222.    On April 12, 2017, the Company issued a press release to announce its quarterly results for the three months ended March 31, 2017 ("Q1 2017").  The Company reported that "[n]et income for the three months ended March 31, 2017 was $22.0 million, or $0.30 per basic and diluted common share, compared to the three months ended March 31, 2016 net income of

-110-

$18.6 million, or $0.26 per basic and diluted common share." Defendant Shea signed the Form 8-K filed with the SEC to which the press release was attached. The press release listed Defendants McCartney, Wahl and McKee as "Company Contacts."

**ANSWER:** Defendants admit that HCSG filed a Form 8-K on April 12, 2017 signed by Defendant Shea. Defendants further admit that the Form 8-K attached a press release dated April 12, 2017 relating to the Company's performance in the first quarter of 2017 and that Defendants McCartney, Wahl and McKee were listed as "Company Contacts" on this press release. Defendants further admit that paragraph 222 of the Complaint purports to summarize and contains partial excerpts from this Form 8-K. Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the entire Form 8-K.

223.    On April 12, 2017, the Company held an earnings call to discuss its Q1 2017 results. Defendants Wahl and McKee participated on behalf of the Company. This was the first quarterly earnings call after publication of the Monocle Report. Defendant McKee touted the quarter's results as Company records, noting that "[n]et income for the quarter increased to $22 million or $0.30 per share, and both net income and earnings per share for the quarter were company records."

**ANSWER:** Defendants admit that the Company held an earnings call on April 12, 2017 on which Defendants Wahl and McKee participated on behalf of HCSG and that this earnings call was held after the publication of the March 2017 Monocle Report. Defendants further admit that paragraph 223 of the Complaint purports to summarize and contains partial excerpts from this call. Defendants refer to the April 2017 earnings conference call transcript for a complete and accurate statement of its contents and deny any characterization or interpretation of the call that would be inaccurate if read in the context of the entire April 2017 earnings conference call transcript. Defendants expressly deny that Defendant McKee "touted" HCSG's EPS on the April 12, 2017 earnings call.

-111-

224.    During the question-and-answer portion of the call, Andrew Wittmann, a securities analyst from Robert W. Baird, asked Defendant Wahl for comments on reports that Healthcare Services rounded up its quarterly results.  The analyst asked, "[m]y last question here is just on some of the reports that came out about the company quarterly results being rounded up for a long period of time on the quarter.  The annual results clearly don't round up, but I think just given that this has gotten some attention, it'd be worth having you guys comment on that and just give us your thoughts on that."  In response, Defendant Wahl dismissed the question and downplayed the significance of the rounding issue.  Wahl stated, "I can tell you - *without knowing what article or more specifically what iteration of articles you're referring to*, I can tell you we believe our best efforts are spent actually running the company and delivering outcomes for our customers, our employees and all of our shareholders, not the latest and greatest investor sentiment with third-party articles and blogs."  Wahl added, "*And when you look at over the past 10 or so years that you mentioned, our track record really speaks for itself.*  We've tripled the size of the company, customers, employees, revenues, profits.  We've paid out more than $400 million in dividends during that timeframe.  And most importantly, we position the company today to surpass that performance and deliver for all of our stakeholders over the next decade.  *So again, I think our track record of performance over the past 10 years really stands on its own*."

ANSWER:  Defendants deny each and every averment of paragraph 224 of the

Complaint, except admit that the paragraph purports to summarize and contains partial excerpts,

with emphasis supplied by Plaintiff, from the transcript of the April 12, 2017 earnings call.

Defendants refer to the call transcript for a complete and accurate statement of its contents and

deny any characterization or interpretation of the earnings call that would be inaccurate if read in

the context of the entire transcript of the call.  Defendants expressly deny that Defendant Wahl

dismissed the question and downplayed the significance of the rounding issue.  To the contrary,

in response to an analyst's question about "some of the reports that came out about the company

quarterly results being rounded up," Defendant Wahl merely stated that he was not sure which

report the analyst meant by "some of the reports" and referred the analyst to the Company's track

record over the prior 10 years with respect to various financial metrics.

225.    On April 28, 2017, Healthcare Services filed its quarterly report for Q1 2017 on Form 10-Q with the SEC ("Q1 2017 Form 10-Q").  Defendants Wahl and Shea signed the Q1 2017 Form 10-Q.  The Q1 2017 Form 10-Q reiterated the Company's previously reported net income and reported $0.30 basic and diluted earnings per common share for Q1 2017.  With respect to how the Company calculated its EPS results, the Q1 2017 Form 10-Q noted that

"[b]asic earnings per common share are computed by dividing income available to common shareholders by the weighted-average number of common shares outstanding for the period. Diluted earnings per common share are calculated using the weighted-average number of common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options and upon the vesting of restricted stock and restricted stock units."  The Q1 2017 Form 10-Q also similarly stated, "[b]asic and diluted earnings per common share are computed by dividing net income by the weighted-average number of basic and diluted common shares outstanding, respectively.  The weighted-average number of diluted common shares includes the impact of dilutive securities, including unvested, unexercised stock options and unvested restricted stock and restricted stock units."

**ANSWER:**  Defendants admit that HCSG filed a Form 10-Q for the first quarter of 2017 on April 28, 2017 signed by Defendants Wahl and Shea (the "Q1 2017 Form 10-Q"). Defendants further admit that paragraph 225 of the Complaint purports to summarize and contains partial excerpts from the Q1 2017 Form 10-Q.  Defendants refer to the Q1 2017 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q1 2017 Form 10-Q that would be inaccurate if read in the context of the entire Q1 2017 Form 10-Q.

226.    With respect to "Disclosure Controls and Procedures," the Q1 2017 Form 10-Q stated that "[b]ased on their evaluation as of March 31, 2017, pursuant to Exchange Act Rule 13a-15(b), our management, including our Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e)) are effective."

**ANSWER:**  Defendants admit that paragraph 226 of the Complaint purports to summarize and contains partial excerpts from the Q1 2017 Form 10-Q.  Defendants refer to the Q1 2017 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q1 2017 Form 10-Q that would be inaccurate if read in the context of the entire Q1 2017 Form 10-Q.

227.    The Q1 2017 Form 10-Q included a SOX Certification signed by Defendants Wahl and Shea that was substantially the same as the SOX Certification alleged above in ¶ 148.

**ANSWER:** Defendants admit that the Q1 2017 Form 10-Q included a SOX Certification signed by Defendants Wahl and Shea. Defendants further admit that paragraph 227 of the Complaint purports to summarize and refers to partial excerpts from the Q1 2017 Form 10-Q. Defendants refer to the Q1 2017 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q1 2017 Form 10-Q that would be inaccurate if read in the context of the entire Q1 2017 Form 10-Q.

228.    On July 11, 2017, the Company issued a press release to announce its quarterly results for the three months ended June 30, 2017 ("Q2 2017"). The press release stated that "[n]et income for the three months ended June 30, 2017 was $22.6 million, or $0.31 per basic and $0.30 per diluted common share, compared to the three months ended June 30, 2016 net income of $18.8 million, or $0.26 per basic and diluted common share." The press release included Consolidated Statements of Income, which also reported net income of $22,551,000 and basic EPS of $0.31 and diluted EPS of $0.30. Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release. The press release listed Defendants Wahl and McKee as "Company Contacts."

**ANSWER:** Defendants admit that HCSG filed a Form 8-K on July 11, 2017 signed by Defendant Shea. Defendants further admit that the Form 8-K attached a press release dated July 11, 2017 relating to the Company's performance in the second quarter of 2017 and that Defendants Wahl and McKee were listed as "Company Contacts" on this press release. Defendants further admit that paragraph 228 of the Complaint purports to summarize and contains partial excerpts from this Form 8-K. Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the entire Form 8-K.

229.    Describing the Company's Q2 2017 results the same day, July 11, 2017, a UBS securities analyst noted that the EPS results beat consensus estimates by one cent: "HCSG reported 2Q17 adjusted EPS of $0.30, $0.02/$0.02 ahead of UBSe/cons." Likewise, a Williams Blair analyst observed that "EPS of $0.30 were just above the Street's $0.29 target, but benefited (sic) from a lower-than-anticipated tax rate (of 32% versus management's 34% to 35% target)."

**ANSWER:**  Defendants admit that paragraph 229 of the Complaint purports to summarize and contains partial excerpts from research reports authored by analysts from UBS and William Blair.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 229 with respect to the contents of these reports and whether the paragraph accurately summarizes and quotes their contents.  Defendants refer to these reports for a complete and accurate statement of their contents and deny any characterization or interpretation of either of these reports that would be inaccurate if read in the context of the entire report.

230.    The following day, on July 12, 2017, the Company hosted an earnings call to discuss its Q2 2017 results.  On behalf of the Company, Defendants Wahl and McKee participated on the call.  Defendant McKee echoed the Company's earnings results for the quarter, that "[n]et income for the quarter increased to $22.6 million or $0.30 per share."

**ANSWER:**  Defendants admit that the Company held an earnings call on July 12, 2017 on which Defendants Wahl and McKee participated on behalf of HCSG and that paragraph 230 of the Complaint purports to summarize and contains partial excerpts from this call.  Defendants refer to the July 2017 earnings conference call transcript for a complete and accurate statement of its contents and deny any characterization or interpretation of the call that would be inaccurate if read in the context of the entire July 2017 earnings conference call transcript.

231.    On July 28, 2017, the Company filed its quarterly report on Form 10-Q for Q2 2017 with the SEC ("Q2 2017 Form 10-Q").  Defendants Wahl and Shea signed the Q2 2017 Form 10-Q.  The Q2 2017 Form 10-Q contained Consolidated Statements of Comprehensive Income, which reiterated the Company's previously reported net income of $22.6 million and basic EPS of $0.31 and diluted EPS of $0.30.  With respect to EPS calculations, the Q2 2017 Form 10-Q stated, "[b]asic earnings per common share is computed by dividing income available to common shareholders by the weighted-average number of common shares outstanding for the period.  Diluted earnings per common share is calculated using the weighted-average number of common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options and upon the vesting of restricted stock and restricted stock units."  Moreover, the Q2 2017 Form 10-Q stated, "[b]asic and diluted earnings per common share are computed by dividing net income by the weighted-average number of basic and diluted common shares

-115-

outstanding, respectively.  The weighted-average number of diluted common shares includes the impact of dilutive securities, including outstanding stock options and unvested restricted stock and restricted stock units."

ANSWER:  Defendants admit that HCSG filed a Form 10-Q for the second quarter of 2017 on July 28, 2017 signed by Defendants Wahl and Shea (the "Q2 2017 Form 10-Q"). Defendants further admit that paragraph 231 of the Complaint purports to summarize and contains partial excerpts from the Q2 2017 Form 10-Q.  Defendants refer to the Q2 2017 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q2 2017 Form 10-Q that would be inaccurate if read in the context of the entire Q2 2017 Form 10-Q.

232.    With respect to "Disclosure Controls and Procedures," the Q2 2017 Form 10-Q noted that "[b]ased on their evaluation as of June 30, 2017, pursuant to Exchange Act Rule 13a-15(b), our management, including our President and Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e)) are effective."

ANSWER:  Defendants admit that paragraph 232 of the Complaint purports to summarize and contains partial excerpts from the Q2 2017 Form 10-Q.  Defendants refer to the Q2 2017 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q2 2017 Form 10-Q that would be inaccurate if read in the context of the entire Q2 2017 Form 10-Q.

233.    The Q2 2017 Form 10-Q contained a SOX Certification signed by Defendants Wahl and Shea that was substantially the same as the SOX Certification alleged above in ¶ 148.

ANSWER:  Defendants admit that the Q2 2017 Form 10-Q included a SOX Certification signed by Defendants Wahl and Shea.  Defendants further admit that paragraph 233 of the Complaint purports to summarize and refers to partial excerpts from the Q2 2017 Form 10-Q. Defendants refer to the Q2 2017 Form 10-Q for a complete and accurate statement of its contents

and deny any characterization or interpretation of the Q2 2017 Form 10-Q that would be inaccurate if read in the context of the entire Q2 2017 Form 10-Q.

234.    On October 17, 2017, the Company issued a press release to announce its quarterly results for the three months ended September 30, 2017 ("Q3 2017").  The press release stated that "[n]et income for the three months ended September 30, 2017 was $23.5 million, or $0.32 per basic common share and $0.31 per diluted common share, compared to the three months ended September 30, 2016 net income of $19.7 million, or $0.27 per basic and diluted common share."  The press release included Consolidated Statements of Income, which reported, for Q3 2017, a net income of $23,472,000 and basic EPS of $0.32 and diluted EPS of $0.31. Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release.  The press release listed Defendants Wahl and McKee as "Company Contacts."

**ANSWER:**  Defendants admit that HCSG filed a Form 8-K on October 17, 2017 signed by Defendant Shea.  Defendants further admit that the Form 8-K attached a press release dated October 17, 2017 relating to the Company's performance in the third quarter of 2017 and that Defendants Wahl and McKee were listed as "Company Contacts" on this press release. Defendants further admit that paragraph 234 of the Complaint purports to summarize and contains partial excerpts from this Form 8-K.  Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the entire Form 8-K.

235.    Describing the Company's Q3 2017 results the same day, October 17, 2017, a Credit Suisse analyst noted that *"3Q17 EPS meets consensus ($0.31)."*  Likewise, also on October 17, 2019, a William Blair analyst observed that "[o]n Tuesday, October 17, after the markets closed, *Healthcare Services Group (HCSG) reported third quarter 2017 EPS that were in line with expectations*, as higher-than-expected revenue and a lower-than-expected tax rate more than offset a surprise 130-basis-point decline in gross margin."

**ANSWER:**  Defendants admit that paragraph 235 of the Complaint purports to summarize and contains partial excerpts from research reports authored by analysts from Credit Suisse and William Blair.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 235 with respect to the contents of these

reports and whether the paragraph accurately summarizes and quotes their contents.  Defendants

refer to these reports for a complete and accurate statement of their contents and deny any

characterization or interpretation of either of these reports that would be inaccurate if read in the

context of the entire report.

236.    The following day, on October 18, 2017, the Company hosted an earnings call to discuss the Company's Q3 2017 results.  On behalf of the Company, Defendants Wahl and McKee participated on the call.  Defendant McKee again touted the EPS results as a company record, nothing that "[n]et income for the quarter increased to $23.5 million or $0.31 per share, both net income and earnings per share for the quarter were company records."

**ANSWER:**  Defendants admit that the Company held an earnings call on October 18,

2017 on which Defendants Wahl and McKee participated on behalf of HCSG and that paragraph

236 of the Complaint purports to summarize and contains partial excerpts from this call.

Defendants refer to the October 2017 earnings conference call transcript for a complete and

accurate statement of its contents and deny any characterization or interpretation of the call that

would be inaccurate if read in the context of the entire October 2017 earnings conference call

transcript.  Defendants admit that Defendant McKee referenced the Company's EPS, among

other indicators relating to the Company's performance.  Defendants deny that on the October

18, 2017 earnings call Defendant McKee "touted" the EPS results.

237.    Weeks later, on October 27, 2017, the Company filed its quarterly report on Form 10-Q for Q3 2017 with the SEC ("Q3 2017 Form 10-Q").  Defendants Wahl and Shea signed the Q3 2017 Form 10-Q.  With respect to EPS, Defendants reiterated its previously reported net income of 23,472,000 for Q3 2017, and reported basic EPS of $0.32 and diluted EPS of $0.31.  With respect to EPS computing, the Q3 2017 Form 10-Q stated, "[b]asic earnings per common share is computed by dividing income available to common shareholders by the weighted-average number of common shares outstanding for the period.  Diluted earnings per common share is calculated using the weighted-average number of common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options and upon the vesting of restricted stock and restricted stock units."

**ANSWER:** Defendants admit that HCSG filed a Form 10-Q for the third quarter of 2017 on October 27, 2017, signed by Defendants Wahl and Shea (the "Q3 2017 Form 10-Q"). Defendants further admit that paragraph 237 of the Complaint purports to summarize and contains partial excerpts from the Q3 2017 Form 10-Q. Defendants refer to the Q3 2017 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q3 2017 Form 10-Q that would be inaccurate if read in the context of the entire Q3 2017 Form 10-Q.

238.    With respect to "Disclosure Controls and Procedures," the Q3 2017 Form 10-Q noted that "[b]ased on their evaluation as of September 30, 2017, pursuant to Exchange Act Rule 13a-15(b), our Management, including our President and Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e)) are effective."

**ANSWER:** Defendants admit that paragraph 238 of the Complaint purports to summarize and contains partial excerpts from the Q3 2017 Form 10-Q. Defendants refer to the Q3 2017 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q3 2017 Form 10-Q that would be inaccurate if read in the context of the entire Q3 2017 Form 10-Q.

239.    The Q3 2017 Form 10-Q included a SOX Certification signed by Defendants Wahl and Shea that was substantially the same as the SOX Certification alleged above in ¶ 148.

**ANSWER:** Defendants admit that the Q3 2017 Form 10-Q included a SOX Certification signed by Defendants Wahl and Shea. Defendants further admit that paragraph 239 of the Complaint purports to summarize and refers to partial excerpts from the Q3 2017 Form 10-Q. Defendants refer to the Q3 2017 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q3 2017 Form 10-Q that would be inaccurate if read in the context of the entire Q3 2017 Form 10-Q.

240.    On February 6, 2018, the Company issued a press release to announce its quarterly results for the three months ended December 31, 2017 ("Q4 2017") and for FY 2017. The press release stated that "[n]et income for the three months ended December 31, 2017 was $20.2 million, or $0.27 per basic and diluted common share." The press release included Consolidated Statements of Income, which reported, for Q4 2017, a net income of $20,186,000 and basic and diluted EPS of $0.27. Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release. The press release listed Defendants Wahl and McKee as "Company Contacts."

ANSWER: Defendants admit that HCSG filed a Form 8-K on February 6, 2018 signed by Defendant Shea. Defendants further admit that the Form 8-K attached a press release dated February 6, 2018 relating to the Company's performance in the fourth quarter of 2017 and the year ended December 31, 2017 and that Defendants Wahl and McKee were listed as "Company Contacts" on this press release. Defendants further admit that paragraph 240 of the Complaint purports to summarize and contains partial excerpts from this Form 8-K. Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the entire Form 8-K.

241.    On February 7, 2018, the Company hosted an earnings call to discuss its Q4 2017 and FY 2017 results. On behalf of the Company, Defendants Wahl and McKee participated on the call. Defendant McKee noted that "[n]et income came in at $20 million or $0.27 per share for the quarter, and $88 million or $1.19 per share for the year."

ANSWER: Defendants admit that the Company held an earnings call on February 7, 2018 on which Defendants Wahl and McKee participated on behalf of HCSG and that paragraph 241 of the Complaint purports to summarize and contains partial excerpts from this call. Defendants refer to the February 2018 earnings conference call transcript for a complete and accurate statement of its contents and deny any characterization or interpretation of the call that would be inaccurate if read in the context of the entire February 2018 earnings conference call transcript.

242.    On February 23, 2018, the Company filed its Annual Report for FY 2017 on Form 10-K with the SEC (the "2017 Form 10-K"). Defendants Wahl and Shea signed the 2017 Form 10-K. With respect to quarterly net income and EPS, the Company reiterated its previously reported net income of $20,186,000 for Q4 2017 and basic and diluted EPS of $0.27. With respect to how the Company calculated its EPS, Defendants noted, "[b]asic earnings per common share is computed by dividing income available to common shareholders by the weighted-average number of common shares outstanding for the period. Diluted earnings per common share is calculated using the weighted-average number of common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options and upon the vesting of restricted stock and restricted stock units." Defendants further explained that "[b]asic and diluted earnings per common share are computed by dividing net income by the weighted-average number of basic and diluted common shares outstanding, respectively. The weighted-average number of diluted common shares includes the impact of dilutive securities, including outstanding stock options and unvested restricted stock and restricted stock units."

ANSWER:  Defendants admit that HCSG filed a Form 10-K for the fiscal year ended December 31, 2017 on February 23, 2018 signed by Defendants Wahl and Shea (the "2017 Form 10-K"). Defendants further admit that paragraph 242 of the Complaint purports to summarize and contains partial excerpts from the 2017 Form 10-K. Defendants refer to the 2017 Form 10-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the 2017 Form 10-K that would be inaccurate if read in the context of the entire 2017 Form 10-K.

243.    With respect to "Disclosure Controls and Procedures," the 2017 Form 10-K noted that, "[i]n accordance with Securities Exchange Act Rules 13a-15 and 15a-15, the Company carried out an evaluation, under the supervision and with the participation of management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of December 31, 2017."

ANSWER:  Defendants admit that paragraph 243 of the Complaint purports to summarize and contains partial excerpts from the 2017 Form 10-K. Defendants refer to the 2017 Form 10-K for a complete and accurate statement of its contents and deny any characterization

or interpretation of the 2017 Form 10-K that would be inaccurate if read in the context of the entire 2017 Form 10-K.

244. The 2017 Form 10-K included a SOX Certification signed by Defendants Wahl and Shea that was substantially the same as the SOX Certification alleged above in ¶ 148.

**ANSWER:** Defendants admit that the 2017 Form 10-K included a SOX Certification signed by Defendants Wahl and Shea. Defendants further admit that paragraph 244 of the Complaint purports to summarize and refers to partial excerpts from the 2017 Form 10-K. Defendants refer to the 2017 Form 10-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the 2017 Form 10-K that would be inaccurate if read in the context of the entire 2017 Form 10-K.

245. The 2017 Form 10-K also contained additional misstatements and material omissions as a consequence of the Company's failure to disclose the existence of the SEC's investigation into the Company's EPS practices. The 2017 Form 10-K omitted to disclose any information about the SEC's investigation of the Company's EPS practices, which had been proceeding since approximately November 2017.

**ANSWER:** Defendants deny each and every averment of paragraph 245, except admit that the 2017 Form 10-K does not disclose that in November 2017, the SEC advised HCSG it was conducting an inquiry into HCSG's EPS calculation practices and sent a request for information to the Company. By way of further response, the law does not impose a per se duty upon a company to disclose the pendency of an SEC investigation, and the Company had no duty to disclose the investigation any earlier than it did.

246. The 2017 Form 10-K contained further material omissions regarding the SEC's investigation into the Company's EPS practices. The 2017 Form 10-K stated, in its Item 1A Risk Disclosures:

> **Failure to maintain effective internal control over financial reporting could have a material adverse effect on our ability to**

**report our financial results on a timely and accurate basis.**
(Emphasis in original.)

Failure to maintain appropriate and effective internal controls over our financial reporting could result in misstatements in our financial statements and potentially subject us to sanctions or ***investigations by the SEC*** or other regulatory authorities, and ***could cause us to delay the filing of required reports with the SEC and our reporting of financial results***.  Any of these events could result in a decline in the market price of our Common Stock. Although we have taken steps to maintain our internal control structure as required, we cannot guarantee that control deficiencies will not result in a misstatement in the future.

ANSWER:  Defendants deny each and every averment of paragraph 246 of the

Complaint, except admit only that the paragraph purports to summarize and contains partial

excerpts, with emphasis supplied by Plaintiff, from the 2017 Form 10-K.  Defendants refer to the

2017 Form 10-K for a complete and accurate statement of its contents and deny any

characterization or interpretation of the 2017 Form 10-K that would be inaccurate if read in the

context of the entire 2017 Form 10-K.

247.    The statements made in ¶¶ 222-225 (regarding Q1 2017 Financials); ¶¶ 228, 230-231 (regarding Q2 2017 Financials); ¶¶ 234, 236-237 (regarding Q3 2017 Financials); and ¶¶ 240-242 (regarding Q4 2017 and FY 2017 Financials) were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose adverse facts.  In particular:

a.    Starting prior to the Class Period and continuing throughout the first three quarters of FY 2017, Defendants made the Company falsely appear to meet or beat analysts' targets for quarterly EPS consistently.  As alleged at ¶¶ 65-82 herein, Defendants overstated the Company's quarterly EPS by continually manipulating net income to generate EPS results that would have a third digit (representing tenths of a cent) that would permit the rounding up of reported EPS to artificially avoid falling short of analysts' consensus EPS target for the Company.  Defendants therefore knowingly or recklessly overstated the Company's EPS in the first three quarters of FY 2017 to avoid falling short of analysts' EPS estimates and falsely perpetuate the Company's reputation for stable and consistent financial performance.

b.    In Q4 2017, a quarter in which the Company reported net income and EPS that missed analysts' consensus EPS estimate for the first time in eight quarters, the Company failed to disclose that the SEC had contacted Healthcare Services in November 2017 as part of an investigation into the Company's EPS practices.  Defendants knew or were reckless

-123-

in not knowing that the SEC's investigation into the Company's EPS practices was a material issue for investors in approximately March or April 2017 due to: (a) Monocle's outreach to Defendants McCartney, Wahl and McKee prior to the March 23, 2017 publication of the Monocle Report; and/or (b) Defendant Wahl's April 12, 2017 response to an analyst question about the subject of the Monocle Report.

        c.     As a result, Defendants' statements about the Company's net income and EPS in the first three quarters of 2017, ¶¶ 222-225, 228, 230-231, 234, 236-237, including the reported quarterly results and the manner in which the Company calculated basic and diluted EPS, were materially false and misleading and/or lacked a reasonable basis at all relevant times. Among other things, Defendants concealed from investors that the Company's reported EPS was a contrivance engineered to, absent extraordinary circumstances, avoid falling short of analyst's consensus EPS estimates.

        d.     As a result, the Company's financial statements and results for each quarter materially overstated for the first three quarters of 2017, or otherwise failed to disclose that the Company's EPS, in Q4 2017, was the subject of an SEC investigation.

        **ANSWER:** The averments of paragraph 247 of the Complaint, including subparagraphs

(a)-(d), purport to state legal conclusions to which no response is required, and therefore are

denied. To the extent these averments are deemed to be factual in nature, they are denied.

        248.     The statements made by Defendant Wahl in response to an analyst's question about the substance of the Monocle Report in ¶ 85 were materially false and misleading because Monocle had informed Defendant Wahl of the Monocle Report's conclusions before publication of the Monocle Report. Moreover, as alleged in ¶¶ 87-88 herein, Defendant Wahl's responses to analyst Wittmann reveal that Wahl, in fact, knew about the Monocle Report and its conclusions about the Company's EPS practices. Additionally, Defendant Wahl's response was false and misleading because it concealed that the analysis and conclusions in the Monocle Report were true and accurate.

        **ANSWER:** The averments of paragraph 248 of the Complaint purport to state legal

conclusions to which no response is required, and therefore are denied. To the extent these

averments are deemed to be factual in nature, they are denied, and Defendants incorporate herein

their response to paragraph 85.

        249.     The statements made in ¶¶ 226-227 (regarding Q1 2017 internal controls); ¶¶ 232-233 (regarding Q2 2017 internal controls); ¶¶ 238-239 (regarding Q3 2017 internal controls); and ¶¶ 243-244 (regarding Q4 2017 and FY 2014 internal controls) were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading,

-124-

because the statements failed to disclose adverse facts.  In particular, Defendants Wahl and Shea knowingly or recklessly failed to disclose that, prior to the Class Period and at all times in FY 2017, the Company lacked sufficient internal controls to prevent the Company from manipulating its net income and reporting EPS to artificially achieve EPS results that met or exceeded analysts' consensus EPS estimates.

**ANSWER:**  The averments of paragraph 249 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied.  To the extent these averments are deemed to be factual in nature, they are denied.

250.    The statements made in ¶¶ 240-242 regarding the Company's Q4 2017 EPS results and practices were also materially false and misleading because they omitted to disclose the fact that the Company was the subject of an ongoing SEC MUI examination into the Company's EPS rounding and reporting practices.

**ANSWER:**  The averments of paragraph 250 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied.  To the extent these averments are deemed to be factual in nature, they are denied.

251.    The statements made in the 2017 Form 10-K Item 1A risk disclosure (¶ 246), regarding generalized risks of an SEC investigation, omitted to disclose the material fact that, in November 2017, the Company learned that it was the subject of an SEC inquiry into the Company's EPS practices.  The EPS practices that were the subject of the SEC's investigation were known to Defendants to be a material issue for investors in approximately March or April 2017 due to: (a) Monocle's outreach to Defendants McCartney, Wahl and McKee prior to the March 23, 2017 publication of the Monocle Report; (b) Defendant Wahl's April 12, 2017 response an analyst question about the subject of the Monocle Report; and/or (c) Defendants' concession that the ongoing investigation could have a "substantial" impact on the Company's expenses and financials results.

**ANSWER:**  The averments of paragraph 251 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied.  To the extent these averments are deemed to be factual in nature, they are denied.

252.    In April 2018, the Company announced results and revealed information showing that it missed analysts' consensus EPS estimates.

**ANSWER:** Defendants admit that in April 2018 the Company announced results relating to the Company's performance in the first quarter of 2018. Defendants deny the remaining averments of paragraph 252 of the Complaint.

253.    On April 17, 2018, the Company issued a press release to announce its quarterly results for the three months ended March 31, 2018 ("Q1 2018"). The press release stated that "[n]et income for the three months ended March 31, 2018 was $0.1 million, or $0.00 per basic and diluted common share." Purporting to explain these results, the press release added: "The decline from the prior three month period ended March 31, 2017 related to the Company's first quarter 2018 increase in its accounts receivable allowance, primarily related to corporate restructurings of two privately-held, multi-state operations, as discussed in the Company's press releases on April 16, 2018." The press release included Consolidated Statements of Income, which also reported, for Q1 2018, net income of $72,000 and basic and diluted EPS of $0.00. Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release. The press release listed Defendants Wahl and McKee as "Company Contacts."

**ANSWER:** Defendants admit that HCSG filed a Form 8-K on April 17, 2018 signed by Defendant Shea. Defendants further admit that the Form 8-K attached a press release dated April 17, 2018 relating to the Company's performance in the first quarter of 2018 and that Defendants Wahl and McKee were listed as "Company Contacts" on this press release. Defendants further admit that paragraph 253 of the Complaint purports to summarize and contains partial excerpts from this Form 8-K. Defendants note that the excerpts cited in paragraph 253 contain a minor typographical error. Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the entire Form 8-K.

254.    The following day, on April 18, 2018, the Company hosted an earnings call to discuss its Q1 2018 results. Defendants Wahl and McKee participated on behalf of the Company. Defendant McKee noted that "[n]et income for the quarter was around $72,000, but after adjusting for that $35 million reserve that [Defendant Wahl] addressed in his opening comments, earnings per share would have been around $0.35 per share."

**ANSWER:** Defendants admit that the Company held an earnings call on April 18, 2018 on which Defendants Wahl and McKee participated on behalf of HCSG and that paragraph 254

of the Complaint purports to summarize and contains partial excerpts from this call.  Defendants

refer to the April 2018 earnings conference call transcript for a complete and accurate statement

of its contents and deny any characterization or interpretation of the call that would be inaccurate

if read in the context of the entire April 2018 earnings conference call transcript.

255.    On April 27, 2018, the Company filed its quarterly report on Form 10-Q for Q1
2018 with the SEC ("Q1 2018 Form 10-Q").  Defendants Wahl and Shea signed the Q1 2018
Form 10-Q.  With respect to EPS, the Company reported net income of $72,000 for Q1 2018 and
reported earnings per basic and per diluted common share of $0.00.  With respect to how the
Company calculated its EPS, Defendants noted, "[b]asic earnings per common share is computed
by dividing income available to common shareholders by the weighted-average number of
common shares outstanding for the period.  Diluted earnings per common share is calculated
using the weighted-average number of common shares outstanding and dilutive common shares,
such as those issuable upon exercise of stock options and upon the vesting of restricted stock and
restricted stock units."  Defendants further added, "[b]asic and diluted earnings per common
share are computed by dividing net income by the weighted-average number of basic and diluted
common shares outstanding, respectively.  The weighted-average number of diluted common
shares includes the impact of dilutive securities, including outstanding stock options and
unvested restricted stock and restricted stock units."

ANSWER:  Defendants admit that HCSG filed a Form 10-Q for the first quarter of 2018

on April 27, 2018 signed by Defendants Wahl and Shea (the "Q1 2018 Form 10-Q").

Defendants further admit that paragraph 255 of the Complaint purports to summarize and

contains partial excerpts from the Q1 2018 Form 10-Q.  Defendants refer to the Q1 2018 Form

10-Q for a complete and accurate statement of its contents and deny any characterization or

interpretation of the Q1 2018 Form 10-Q that would be inaccurate if read in the context of the

entire Q1 2018 Form 10-Q.

256.    With respect to "Disclosure Controls and Procedures," the Q1 2018 Form 10-Q
that, "[b]ased on their evaluation as of March 31, 2018, pursuant to Exchange Act Rule 13a-
15(b), our Management, including our President and Chief Executive Officer and Chief Financial
Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e))
are effective."

**ANSWER:** Defendants admit that paragraph 256 of the Complaint purports to summarize and contains partial excerpts from the Q1 2018 Form 10-Q. Defendants refer to the Q1 2018 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q1 2018 Form 10-Q that would be inaccurate if read in the context of the entire Q1 2018 Form 10-Q.

257.    The Q1 2018 Form 10-Q included a SOX Certification signed by Defendants Wahl and Shea that was substantially the same as the SOX Certification alleged above in ¶ 148.

**ANSWER:** Defendants admit that the Q1 2018 Form 10-Q included a SOX Certification signed by Defendants Wahl and Shea. Defendants further admit that paragraph 257 of the Complaint purports to summarize and refers to partial excerpts from the Q1 2018 Form 10-Q. Defendants refer to the Q1 2018 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q1 2018 Form 10-Q that would be inaccurate if read in the context of the entire Q1 2018 Form 10-Q.

258.    The Q1 2018 Form 10-Q contained misstatements about the SEC's inquiry. The Q1 2018 Form 10-Q stated, "[t]he Company is subject to various claims and legal actions in the ordinary course of business. Some of these matters include payroll and employee-related matters and examinations by government agencies." The Q1 2018 Form 10-Q added, "[i]f adverse outcomes of such claims and legal actions are reasonably possible, Management assesses materiality and provides financial disclosure, as appropriate." The Q1 2018 Form 10-Q continued, "[t]he Company believes it is not a party to, nor are any of its properties the subject of, any pending legal proceeding or governmental examination that would a material adverse effect on the Company's consolidated financial condition or liquidity."

**ANSWER:** Defendants deny the averments of the first sentence of paragraph 258 of the Complaint. Defendants admit that the remaining averments of the paragraph purport to summarize and contain partial excerpts from the Q1 2018 Form 10-Q. Defendants refer to the Q1 2018 Form 10-Q for a complete and accurate statement of its contents and deny any

-128-

characterization or interpretation of the Q1 2018 Form 10-Q that would be inaccurate if read in the context of the entire Q1 2018 Form 10-Q.

259.    The Q1 2018 Form 10-Q omitted to disclose material information about the SEC's investigation. The Q1 2018 Form 10-Q reaffirmed its Item 1A risk disclosures from the 2017 Form 10-K, including with respect to SEC investigations (*see* ¶ 247, *supra*) and stated: "There have been no material changes in the risk factors set forth in Part I, Item 1A, "Risk Factors" in the Company's Annual Report on Form 10-K for the year ended December 31, 2017."

**ANSWER:** Defendants deny each and every averment of paragraph 259, except admit that the paragraph purports to summarize and refers to partial excerpts from the Q1 2018 Form 10-Q. Defendants refer to the Q1 2018 Form 10-Q, as well as the 2017 Form 10-K, for a complete and accurate statement of their contents and deny any characterization or interpretation of either of these SEC filings that would be inaccurate if read in the context of the entire SEC filing. Defendants further admit that the Q1 2018 Form 10-Q does not disclose specific details regarding the SEC's investigation into the Company's EPS practices.

260.    In July 2018, Healthcare Services announced results showing that it again missed EPS analyst estimates. On July 17, 2018, the Company issued a press release to announce its quarterly results for the three months ended June 30, 2018 ("Q2 2018"). The press release stated, "[n]et income for the three months ended June 30, 2018 was $25.8 million, or $0.35 per basic and diluted common share." The press release included Consolidated Statements of Income, which also reported, for Q2 018, net income of $25,814,000 and basic and diluted EPS of $0.35. Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release. The press release listed Defendants Wahl and McKee as "Company Contacts."

**ANSWER:** Defendants admit that HCSG filed a Form 8-K on July 17, 2018 signed by Defendant Shea. Defendants further admit that the Form 8-K attached a press release dated July 17, 2018 relating to the Company's performance in the second quarter of 2018 and that Defendants Wahl and McKee were listed as "Company Contacts" on this press release. Defendants further admit that paragraph 260 of the Complaint purports to summarize and contains partial excerpts from this Form 8-K. Defendants refer to this Form 8-K for a complete

and accurate statement of its contents and deny any characterization or interpretation of the Form

8-K that would be inaccurate if read in the context of the entire Form 8-K.  Defendants deny that

the July 17, 2018 Form 8-K states that the Company missed analysts' consensus EPS estimates.

261.    On July 18, 2018, the Company hosted an earnings call to discuss its Q2 2018 results.  Defendants Wahl and McKee participated on behalf of the Company.  Defendant McKee noted that "[n]et income for the quarter was $25.8 million, and earnings per share came in at $0.35 per share."

ANSWER:  Defendants admit that the Company held an earnings call on July 18, 2018

on which Defendants Wahl and McKee participated on behalf of HCSG and that paragraph 261

of the Complaint purports to summarize and contains partial excerpts from this call.  Defendants

refer to the July 2018 earnings conference call transcript for a complete and accurate statement

of its contents and deny any characterization or interpretation of the call that would be inaccurate

if read in the context of the entire July 2018 earnings conference call transcript.

262.    On July 27, 2018, the Company filed its quarterly report on Form 10-Q for Q2 2018 with the SEC ("Q2 2018 Form 10-Q").  Defendants Wahl and Shea signed the Q2 2018 Form 10-Q.  With respect to EPS, the Company reiterated its previously reported net income of $25,814,000 for Q2 2018 and reported basic and diluted EPS of $0.35.  With respect to how the Company calculated its EPS, the Q2 2018 Form 10-Q noted, "[b]asic earnings per common share is computed by dividing income available to common shareholders by the weighted-average number of common shares outstanding for the period.  Diluted earnings per common share is calculated using the weighted-average common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options and upon the vesting of restricted stock and restricted stock units."  The Q2 2018 Form 10-Q further explained that "[b]asic and diluted earnings per common share are computed by dividing net income by the weighted-average number of basic and diluted common shares outstanding, respectively.  The weighted-average number of diluted common shares includes the impact of dilutive securities, including outstanding stock options and unvested restricted stock and restricted stock units."

ANSWER:  Defendants admit that HCSG filed a Form 10-Q for the second quarter of

2018 on July 27, 2018 signed by Defendants Wahl and Shea (the "Q2 2018 Form 10-Q").

Defendants further admit that paragraph 262 of the Complaint purports to summarize and

contains partial excerpts from the Q2 2018 Form 10-Q.  Defendants refer to the Q2 2018 Form

10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q2 2018 Form 10-Q that would be inaccurate if read in the context of the entire Q2 2018 Form 10-Q.

263.    With respect to "Disclosure Controls and Procedures," The Q2 2018 Form 10-Q noted that, "[b]ased on their evaluation as of June 30, 2018, pursuant to Exchange Act Rule 13a-15(b), our Management, including our President and Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e)) are effective."

**ANSWER:**  Defendants admit that paragraph 263 of the Complaint purports to summarize and contains partial excerpts from the Q2 2018 Form 10-Q.  Defendants refer to the Q2 2018 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q2 2018 Form 10-Q that would be inaccurate if read in the context of the entire Q2 2018 Form 10-Q.

264.    The Q2 2018 Form 10-Q included a SOX Certification signed by Defendants Wahl and Shea that was substantially the same as the SOX Certification alleged above in ¶ 148.

**ANSWER:**  Defendants admit that the Q2 2018 Form 10-Q included a SOX Certification signed by Defendants Wahl and Shea.  Defendants further admit that paragraph 264 of the Complaint purports to summarize and refers to partial excerpts from the Q2 2018 Form 10-Q. Defendants refer to the Q2 2018 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q2 2018 Form 10-Q that would be inaccurate if read in the context of the entire Q2 2018 Form 10-Q.

265.    The Q2 2018 Form 10-Q also omitted to disclose material information about the SEC's investigation.  The Q2 2018 Form 10-Q reaffirmed its Item 1A risk disclosures from the 2017 Form 10-K, including with respect to SEC investigations (*see* ¶ 246, *supra*) and stated: "There have been no material changes in the risk factors set forth in Part I, Item 1A, "Risk Factors" in the Company's Annual Report on Form 10-K for the year ended December 31, 2017."

**ANSWER:** Defendants deny each and every averment of paragraph 265, except admit that the paragraph purports to summarize and refers to partial excerpts from the Q2 2018 Form 10-Q. Defendants refer to the Q2 2018 Form 10-Q, as well as the 2017 Form 10-K, for a complete and accurate statement of their contents and deny any characterization or interpretation of either of these SEC filings that would be inaccurate if read in the context of the entire SEC filing. Defendants further admit that the Q2 2018 Form 10-Q does not disclose specific details regarding the SEC's investigation into the Company's EPS practices.

266.     In October 2018, the Company announced results for three months ended September 30, 2018 ("Q3 2018") revealing that the Company again missed analysts' consensus EPS estimates. On October 16, 2018, the Company issued an earnings release (the "Q3 2018 Earnings Release") that reported that "[f]or the three months ended September 30, 2018, net income was $26.1 million, or $0.35 per basic and diluted common share, segment margins in housekeeping & laundry and dining & nutrition services are estimated at 11.3% and 6.2%, respectively and cash flow from operations was $47 million, inclusive of the $25 million change in accrued payroll."

**ANSWER:** Defendants admit that HCSG issued a press release on October 16, 2018 relating to the Company's performance in the third quarter of 2018. Defendants further admit that paragraph 266 of the Complaint purports to summarize and contains partial excerpts from this press release. Defendants refer to the October 16, 2018 press release for a complete and accurate statement of its contents and deny any characterization or interpretation of this press release that would be inaccurate if read in the context of the entire press release. Defendants deny that the October 16, 2018 press release states that the Company missed analysts' consensus EPS estimates.

267.     The Q3 2018 Earnings Release included Consolidated Statements of Income, which also reported, for Q3 2018, net income of $26,086,000 and basic and diluted EPS of $0.35. Defendant Shea signed the Form 8-K filed with the SEC, to which a copy of the Q3 2018 Earnings Release was attached. The Q3 2018 Earnings Release listed Defendants Wahl and McKee as "Company Contacts."

**ANSWER:**  Defendants admit that HCSG filed a Form 8-K on October 16, 2018 signed by Defendant Shea.  Defendants further admit that the Form 8-K attached a press release dated October 16, 2018 relating to the Company's performance in the third quarter of 2018 and that Defendants Wahl and McKee were listed as "Company Contacts" on this press release.  Defendants further admit that paragraph 267 of the Complaint purports to summarize information in this Form 8-K.  Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the entire Form 8-K.

268.    The following day, on October 17, 2018, the Company hosted an earnings call to discuss its Q3 2018 results.  Defendants Wahl and McKee participated on the call on behalf of the Company.  Defendant McKee noted that "[n]et income for the quarter was $26.1 million, and earnings per share came in at $0.35 per share."

**ANSWER:**  Defendants admit that the Company held an earnings call on October 17, 2018 on which Defendants Wahl and McKee participated on behalf of HCSG and that paragraph 268 of the Complaint purports to summarize and contains partial excerpts from this call.  Defendants refer to the October 2018 earnings conference call transcript for a complete and accurate statement of its contents and deny any characterization or interpretation of the call that would be inaccurate if read in the context of the entire October 2018 earnings conference call transcript.

269.    On October 19, 2018, the Company filed its quarterly report for Q3 2018 on Form 10-Q with the SEC ("Q3 2018 Form 10-Q").  Defendants Wahl and Shea signed Q3 2018 Form 10-Q.  With respect to EPS, the Company reported, for Q3 2018, net income of $26,086,000 and reported basic and diluted EPS of $0.35.  With respect to how the Company calculated its EPS, the Q3 2018 Form 10-Q noted, "[b]asic earnings per common share is computed by dividing income available to common shareholders by the weighted-average number of common shares outstanding for the period.  Diluted earnings per common share is calculated using the weighted-average number of common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options and upon the vesting of restricted stock and restricted stock units."  The Q3 2018 Form 10-Q further explained that "[b]asic and diluted earnings per

common share are computed by dividing net income by the weighted-average number of basic and diluted common shares outstanding, respectively. The weighted-average number of diluted common shares includes the impact of dilutive securities, including outstanding stock options and unvested restricted stock and restricted stock units."

**ANSWER:** Defendants admit that HCSG filed a Form 10-Q for the third quarter of 2018 on October 19, 2018, signed by Defendants Wahl and Shea (the "Q3 2018 Form 10-Q"). Defendants further admit that paragraph 269 of the Complaint purports to summarize and contains partial excerpts from the Q3 2018 Form 10-Q. Defendants refer to the Q3 2018 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q3 2018 Form 10-Q that would be inaccurate if read in the context of the entire Q3 2018 Form 10-Q.

270. With respect to "Disclosure Controls and Procedures," the Q3 2018 Form 10-Q noted that, "[b]ased on their evaluation as of September 30, 2018, pursuant to Exchange Act Rule 13a-15(b), our Management, including our President and Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e)) are effective."

**ANSWER:** Defendants admit that paragraph 270 of the Complaint purports to summarize and contains partial excerpts from the Q3 2018 Form 10-Q. Defendants refer to the Q3 2018 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q3 2018 Form 10-Q that would be inaccurate if read in the context of the entire Q3 2018 Form 10-Q.

271. The Q3 2018 Form 10-Q included a SOX Certification signed by Defendants Wahl and Shea that was substantially the same as the SOX Certification alleged above in ¶ 148.

**ANSWER:** Defendants admit that the Q3 2018 Form 10-Q included a SOX Certification signed by Defendants Wahl and Shea. Defendants further admit that paragraph 271 of the Complaint purports to summarize and refers to partial excerpts from the Q3 2018 Form 10-Q. Defendants refer to the Q3 2018 Form 10-Q for a complete and accurate statement of its contents

and deny any characterization or interpretation of the Q3 2018 Form 10-Q that would be inaccurate if read in the context of the entire Q3 2018 Form 10-Q.

272.    The Q3 2018 Form 10-Q omitted to disclose material information about the SEC's investigation.  The Q3 2018 Form 10-Q reaffirmed its Item 1A risk disclosures from the 2017 Form 10-K, including with respect to SEC investigations (*see* ¶ 246, *supra*) and stated: "There have been no material changes in the risk factors set forth in Part I, Item 1A, "Risk Factors" in the Company's Annual Report on Form 10-K for the year ended December 31, 2017."

**ANSWER:**  Defendants deny each and every averment of paragraph 272, except admit that the paragraph purports to summarize and refers to partial excerpts from the Q3 2018 Form 10-Q.  Defendants refer to the Q3 2018 Form 10-Q, as well as the 2017 Form 10-K, for a complete and accurate statement of their contents and deny any characterization or interpretation of either of these SEC filings that would be inaccurate if read in the context of the entire SEC filing.  Defendants further admit that the Q3 2018 Form 10-Q does not disclose specific details regarding the SEC's investigation into the Company's EPS practices.  However, the law does not impose a per se duty upon a company to disclose the pendency of an SEC investigation, and the Company had no duty to disclose the investigation any earlier than it did.

273.    On February 5, 2019, the Company issued a press release to announce its quarterly results for the three months ended December 31, 2018 ("Q4 2018") as well as for FY 2018 (the "Q4 2018 Earnings Release").  The press release stated, "[n]et income for the quarter was $32 million, or $0.43 per basic and $0.42 per diluted common share, and segment margins in housekeeping & laundry and dining & nutrition services are estimated at 9.5% and 5.4%, respectively."  The press release included Consolidated Statements of Income, which also reported, for the three months ended December 31, 2018, net income of $31,552,000 and basic EPS of $0.43 and diluted EPS of $0.42.  Defendant Shea signed the Form 8-K filed with the SEC, which accompanied the press release.  The press release listed Defendants Wahl and McKee as "Company Contacts."

**ANSWER:**  Defendants admit that HCSG filed a Form 8-K on February 5, 2019 signed by Defendant Shea.  Defendants further admit that the Form 8-K attached a press release dated February 5, 2019 relating to the Company's performance in the fourth quarter of 2018 and the

year ended December 31, 2018 and that Defendants Wahl and McKee were listed as "Company

Contacts" on this press release.  Defendants further admit that paragraph 273 of the Complaint

purports to summarize and contains partial excerpts from this Form 8-K.  Defendants refer to this

Form 8-K for a complete and accurate statement of its contents and deny any characterization or

interpretation of the Form 8-K that would be inaccurate if read in the context of the entire Form

8-K.

274.    On February 6, 2019, the Company hosted an earnings call to discuss its Q4 2018 results.  Defendants Wahl and McKee participated on behalf of the Company.  Defendant McKee noted that "[n]et income for the quarter came in at $32 million, and earnings per share was $0.42 per share."

**ANSWER:**  Defendants admit that the Company held an earnings call on February 6,

2019 on which Defendants Wahl and McKee participated on behalf of HCSG and that paragraph

274 of the Complaint purports to summarize and contains partial excerpts from this call.

Defendants refer to the February 2019 earnings conference call transcript for a complete and

accurate statement of its contents and deny any characterization or interpretation of the call that

would be inaccurate if read in the context of the entire February 2019 earnings conference call

transcript.

275.    The statements made in ¶¶ 253-259 (regarding Q1 2018 Financials and risk disclosures); ¶¶ 260-265 (regarding Q2 2018 Financials and risk disclosures); ¶¶ 266-272 (regarding Q3 2018 Financials and risk disclosures); and ¶¶ 273-274 (regarding Q4 2018 and FY 2018 Financials and risk disclosures) were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose adverse facts, including:

a.    that the Company was the subject of an SEC inquiry as early as November 2017 in connection with an investigation of the Company's EPS practices, which Defendants knew or were reckless in not knowing was a material issue for investors in approximately March or April 2017 due to: (a) Monocle's outreach to Defendants McCartney, Wahl and McKee prior to the March 23, 2017 publication of the Monocle Report; and/or (b) Defendant Wahl's April 12, 2017 response to an analyst question about the subject of the Monocle Report.

b.      That within months, and no later than March 2018, the SEC escalated its MUI to a "formal order of investigation" and served a formal subpoena on the Company.

c.      That as a result, Defendants' statements about the Company's EPS, including the reported quarterly results and the manner in which the Company calculated basic and diluted EPS, were materially false and misleading and/or lacked a reasonable basis at all relevant times.  Among other things, Defendants concealed from investors that the Company's EPS practices were the subject of an ongoing SEC investigation.

d.      As a result, the Company's financial statements and results for the quarter materially misrepresented the Company's reported quarterly EPS; and

e.      That ongoing investigations had generated significant expenses and could have a "substantial" impact on the Company's expenses and financials results.

**ANSWER:**  The averments of paragraph 275 of the Complaint, including subparagraphs

(a)-(e), purport to state legal conclusions to which no response is required, and therefore are

denied.  To the extent these averments are deemed to be factual in nature, they are denied.


276.    The statements made in ¶¶ 256-257 (regarding Q1 2018 internal controls); ¶¶ 263-264 (regarding Q2 2018 internal controls); and ¶¶ 270-271 (regarding Q3 2018 internal controls) were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose adverse facts.  In particular, Defendants Wahl and Shea knowingly or recklessly failed to disclose that, prior to the Class Period and at all times in FY 2018, the Company lacked sufficient internal controls to prevent the Company from manipulating its net income and reporting EPS to artificially achieve EPS results that met or exceeded analysts' consensus EPS estimates.  The statements concerning the adequacy internal controls in were also materially false and misleading and omitted to disclose material information given that the statements failed to disclose the pendency of the SEC's investigation of the Company's EPS practices that were the product of insufficient internal controls over financial reporting.

**ANSWER:**  The averments of paragraph 276 of the Complaint purport to state legal

conclusions to which no response is required, and therefore are denied.  To the extent these

averments are deemed to be factual in nature, they are denied.


277.    On December 31, 2018, the Company made material misstatements and omissions in the New Credit Facility Agreement described at ¶¶ 97-99 herein.  In the Agreement, which was dated December 21, 2018 and filed with the SEC on December 31, 2018 as an attachment to a Form 8-K signed by Defendant Shea, the Company represented that there were no

investigations pending against it.  Specifically, Section 6.1.5 of the Credit Agreement states: "There are no actions, suits, proceedings, or investigations pending or, to the knowledge of any Loan Party, threatened against such Loan Party or any Subsidiary of such Loan Party at law or in equity before any Official Body which individually or in the aggregate could reasonably be expected to result in any Material Adverse change."

**ANSWER:**  Defendants deny each and every averment of paragraph 277 of the Complaint, except admit that the paragraph purports to summarize and contains partial excerpts from the Credit Agreement that was attached to the Form 8-K signed by Defendant Shea that HCSG filed on December 31, 2018.  Defendants refer to the Credit Agreement for a complete and accurate statement of its contents and deny any characterization or interpretation of the Credit Agreement that would be inaccurate if read in the context of the entire Credit Agreement. Defendants expressly deny that in December 2018, there were any investigations pending against HCSG that to its knowledge could reasonably be expected to result in a Material Adverse Change, and therefore, deny that the Company made material misstatements or omissions in the Credit Agreement.

278.    The Credit Agreement defined an "Official Body" to include the United States government or a governmental agency, which would include the SEC.  Specifically, the Credit Agreement states:  "<u>Official Body</u> shall mean the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government . . . and any group or body charged with setting financial or regulatory capital rules or standards (including the Financial Accounting Standards Board, the Bank of International Settlements of the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing)." (Emphasis in original).

**ANSWER:**  Defendants admit that paragraph 278 of the Complaint purports to summarize and contains partial excerpts from the Credit Agreement.  Defendants note that the excerpts cited in paragraph 278 contain minor typographical errors.  Defendants refer to the Credit Agreement for a complete and accurate statement of its contents and deny any

characterization or interpretation of the Credit Agreement that would be inaccurate if read in the

context of the entire Credit Agreement.

279.    The statements and/or omissions in the Company's New Credit Facility Agreement filed as an attachment to a December 31, 2018 Form 8-K denying the existence of a material investigation of the Company were materially false and misleading because they omitted to disclose the material facts about the SEC's investigation of the Company, including that: (a) in November 2017, the SEC commenced a MUI into the Company's EPS practices; (b) the SEC's investigation into the Company's EPS practices escalated to a formal investigation and, in March 2018, the Company received a subpoena from the SEC; and (c) as alleged at ¶¶ 284, 305 herein, during Q4 2018, the Company launched a costly internal investigation into the matters being investigated by the SEC, purportedly conducted by "a nationally renowned law firm and supported by a Big Four accounting firm's forensic practice.".  Moreover, Defendants knew or were reckless in not knowing that the SEC's investigation into the Company's EPS practices was a material issue for investors as of at least approximately March or April 2017 due to: (a) Monocle's outreach to Defendants McCartney, Wahl and McKee prior to the March 23, 2017 publication of the Monocle Report; (b) Defendant Wahl's April 12, 2017 response to an analyst question about the subject of the Monocle Report; and/or (c) Defendants' concession that the ongoing investigation could have a "substantial" impact on the Company's expenses and financials results.

ANSWER:  The averments of paragraph 279 of the Complaint purport to state legal

conclusions to which no response is required, and therefore are denied.  To the extent these

averments are deemed to be factual in nature, they are denied.

280.    On March 4, 2019, the Company announced that it received a letter from the SEC in November 2017 regarding an inquiry into the Company's EPS calculation practices, and then in March 2018, received a formal subpoena from the SEC in connection with the same practices. Also on that date, the Company announced that was unable to file its Annual Report on Form 10-K for the year ended December 31, 2018 due to the pendency of an internal investigation into the practices that were the subject of the SEC's investigation.  The Company's stock price fell by more than 13% on this news, to close at a price of $32.78 per share.

ANSWER:  Defendants deny each and every averment of paragraph 280 of the

Complaint, except admit that HCSG's stock price dropped by approximately 13% on March 4,

2019, to close at a price of $32.78 per share.  Defendants further admit that HCSG filed a Form

8-K and a Form 12b-25 on March 4, 2019 and that the paragraph purports to summarize

information in these SEC filings.  Defendants refer to these SEC filings for a complete and

accurate statement of their contents and deny any characterization or interpretation of either SEC

filing that would be inaccurate if read in the context of the entire SEC filing.

281.    The Company's stock price has failed to recover after the March 4, 2019 announcement of the SEC investigation. Having abandoned its long-standing misleading practice of strategic EPS rounding, the Company has continued missing analyst estimates in 2019. Further, Defendants have admitted that the SEC's investigation has and could continue to adversely impact the Company's financial results and that its own internal investigation adversely impacted its results.

**ANSWER:** Defendants deny each and every averment of paragraph 281 of the

Complaint, except admit that the Company missed certain analysts' consensus estimates in 2019

and that the Company stated in its 2019 Form 10-K that "[t]he ongoing SEC investigation and/or

any related litigation could adversely affect or cause variability in our financial results."

282.    On April 30, 2019 the Company issued a press release to announce its results for the three months ended March 31, 2019 ("Q1 2019"). For Q1 2019, the Company reported net income of $9.2 million or $0.12 per basic and diluted common share, a miss of $0.24. Reacting to these results, a Stephens securities analyst noted on April 30, 2019, "[t]he quarter will likely do little to shake bears . . . consensus estimates will come down." In response to the April 30, 2019 news of the Company's Q1 2019 results, the price of the Company's stock fell from $33.85 to $31.96 on the next trading day, a decline of 5.58%.

**ANSWER:** Defendants admit that HCSG issued a press release on April 30, 2019

relating to the Company's performance in the first quarter of 2019. Defendants further admit

that paragraph 282 of the Complaint purports to summarize and contains partial excerpts from

this press release. Defendants refer to the April 30, 2019 press release for a complete and

accurate statement of its contents and deny any characterization or interpretation of this press

release that would be inaccurate if read in the context of the entire press release. Defendants

admit that the Company missed analysts' consensus EPS estimates but deny that this information

was included in the April 30, 2019 press release.

Defendants further admit that paragraph 282 of the Complaint purports to summarize and contains partial excerpts from an April 30, 2019 research report authored by a Stephens Inc. securities analyst.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 282 with respect to the contents of this report and whether the paragraph accurately summarizes and quotes its contents.  Defendants refer to this report for a complete and accurate statement of its contents and deny any characterization or interpretation of this report that would be inaccurate if read in the context of the entire report.

283.    On May 1, 2019, the Company held an earnings call to discuss its Q1 2019 results.  On behalf of the Company, Defendants Wahl and McKee participated on the call.  Before the call began, the operator, speaking for the Company, noted that "*[t]he ongoing SEC investigation and or any related litigation could adversely affect or cause variability in our financial results*."

**ANSWER:**  Defendants admit that the Company held an earnings call on May 1, 2019 on which Defendants Wahl and McKee participated on behalf of HCSG and that paragraph 283 of the Complaint purports to summarize and contains partial excerpts, with emphasis supplied by Plaintiff, from this call.  Defendants refer to the May 2019 earnings conference call transcript for a complete and accurate statement of its contents and deny any characterization or interpretation of the call that would be inaccurate if read in the context of the entire May 2019 earnings conference call transcript.

284.    On the same May 1, 2019 earnings call, Defendant McKee noted, "[n]ow SG&A was also impacted by about $6 million of legal and professional fees related to the SEC matter, the majority of which related to the internal investigation that was completed in mid-March."

**ANSWER:**  Defendants admit that the Company held an earnings call on May 1, 2019 and that paragraph 284 of the Complaint purports to summarize and contains partial excerpts from this call.  Defendants refer to the May 2019 earnings conference call transcript for a complete and accurate statement of its contents and deny any characterization or interpretation of

-141-

the call that would be inaccurate if read in the context of the entire May 2019 earnings conference call transcript.

285.    During the same May 1, 2019 call, securities analyst Sean Dodge asked, "[y]ou said you can't really comment on the SEC matter, but I know you guys were working to be proactive and get a chance to present the findings of your internal review to them.  Can you tell us if that's happened?  Or is that still expected to happen?"

**ANSWER:**  Defendants admit that the Company held an earnings call on May 1, 2019 and that paragraph 285 of the Complaint purports to summarize and contains partial excerpts from this call.  Defendants refer to the May 2019 earnings conference call transcript for a complete and accurate statement of its contents and deny any characterization or interpretation of the call that would be inaccurate if read in the context of the entire May 2019 earnings conference call transcript.

286.    In response, on the same May 1, 2019 call, Defendant Wahl noted, "[y]eah, I think to your point we can't really get into much detail, other than to say, which we've talked about in the past.  We are fully cooperating and obviously we're hopeful for a swift and successful outcome.  And yes we did successfully complete the internal investigation in mid-March.  But the conversations, the dialogue with the SEC is active and ongoing, and will continue to be, but it's one of those things when we're asked about a timetable or potential evolution of the matter, it's really - there's not a straight line, right there's stops and starts, and we're ready willing and able to continue to move as quickly or as slowly as the staff would like us to and again continuing to fully cooperate."

**ANSWER:**  Defendants admit that the Company held an earnings call on May 1, 2019 and that paragraph 286 of the Complaint purports to summarize and contains partial excerpts from this call.  Defendants refer to the May 2019 earnings conference call transcript for a complete and accurate statement of its contents and deny any characterization or interpretation of the call that would be inaccurate if read in the context of the entire May 2019 earnings conference call transcript.

287.    On May 3, 2019, the Company filed its quarterly report for Q1 2019 on Form 10-Q with the SEC ("Q1 2019 Form 10-Q").  The Company noted that its expenses increased by more than $4 million for Q1 2019, stating that "[t]he increase was primarily a resulted of increased legal and other professional fees incurred during the first quarter of 2019 in connection with the Company's internal investigation related to the Securities and Exchange Commission's inquiry regarding the Company's earnings per share calculation practices."

ANSWER:  Defendants admit that HCSG filed a Form 10-Q for the first quarter of 2019 on May 3, 2019 (the "Q1 2019 Form 10-Q") and that paragraph 287 of the Complaint purports to summarize and contains partial excerpts from the Q1 2019 Form 10-Q.  Defendants note that the excerpts cited in paragraph 287 contain a minor typographical error.  Defendants refer to the Q1 2019 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q1 2019 Form 10-Q that would be inaccurate if read in the context of the entire Q1 2019 Form 10-Q.

288.    On July 23, 2019, the Company issued a press release to announce its results for the three months ended June 30, 2019 ("Q2 2019").  For Q2 2019, the Company reported net income of $18.2 million or $0.24 basic and diluted earnings per common share.  On July 23, 2019, a William Blair analyst noted that the Company's Q2 2019 results were "***below Street expectations—once again largely*** . . . because of issues in the company's skilled nursing facility (SNF) client base."  The William Blair analyst continued, "EPS were $0.24, which came in below the $0.35 consensus forecast and $0.35 in adjusted EPS in the prior-year period."

ANSWER:  Defendants admit that HCSG issued a press release on July 23, 2019 relating to the Company's performance in the second quarter of 2019.  Defendants further admit that paragraph 288 of the Complaint purports to summarize information from this press release.  Defendants refer to the July 23, 2019 press release for a complete and accurate statement of its contents and deny any characterization or interpretation of this press release that would be inaccurate if read in the context of the entire press release.  Defendants further admit that paragraph 288 of the Complaint purports to summarize and contains partial excerpts from a July 23, 2019 research report authored by a William Blair analyst.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 288 with

respect to the contents of this report and whether the paragraph accurately summarizes and

quotes its contents.  Defendants refer to this report for a complete and accurate statement of its

contents and deny any characterization or interpretation of this report that would be inaccurate if

read in the context of the entire report.

289.     On July 24, 2019, the Company hosted an earnings call to discuss its Q2 2019 results.  On behalf of the Company, Defendants Wahl and McKee participated on the call. During the call, securities analyst Ryan Daniels noted, "[j]ust a couple of quick follow-ups at this point in regards to the $2 million in SG&A costs related to the SEC investigation, how should we think about that trended forward?  Is that something that's just going to be a continuing cost until it's closed or because that accelerate decelerate?  Just trying to get a better feel on the SG&A numbers for a model."

**ANSWER:**  Defendants admit that the Company held an earnings call on July 24, 2019

on which Defendants Wahl and McKee participated on behalf of HCSG and that paragraph 289

of the Complaint purports to summarize and contains partial excerpts from this call.  Defendants

refer to the July 2019 earnings conference call transcript for a complete and accurate statement

of its contents and deny any characterization or interpretation of the call that would be inaccurate

if read in the context of the entire July 2019 earnings conference call transcript.

290.     In response, Defendant Wahl noted, "Yes, Ryan.  I would say going for what we do expect some level of elevated cost and will certainly call that out.  As it's incurred each quarter over the back half of the year sitting here today just looking at, the fact that there's no real updates to share it's been fairly quiet.  We continue to remain cooperative but there's not any really know how noteworthy updates.  We would expect it to be somewhat less than what it was this past quarter where - there was some carryover from the internal review from Q1, difficult to project out.  There will be elevated cost back after the year we'd expect it to be less than what we incurred this quarter, but again that's difficult to forecast depending on whether or not we need to utilize more man-hours from a professional or legal perspective."

**ANSWER:**  Defendants admit that the Company held an earnings call on July 24, 2019

on which Defendants Wahl and McKee participated on behalf of HCSG and that paragraph 290

of the Complaint purports to summarize and contains partial excerpts from this call.  Defendants

note that the excerpts cited in paragraph 290 appear to contain transcription and/or typographical

errors.  Defendants refer to the July 2019 earnings conference call transcript for a complete and accurate statement of its contents and deny any characterization or interpretation of the call that would be inaccurate if read in the context of the entire July 2019 earnings conference call transcript.

291.    On July 26, 2019, the Company filed its quarterly report for Q2 2019 on Form 10-Q with the SEC ("Q2 2019 Form 10-Q").  Defendants Wahl and Shea signed the Q2 2019 Form 10-Q.  The Q2 2019 Form 10-Q explained that "consolidated selling, general and administrative expense increased $3.9 million or 11.6%, to 8.0% of consolidated revenues, for three months ended June 30, 2019 compared to the corresponding period of 2018.  The increase was primarily a result of increased legal and other professional fees incurred in connection with the Company's internal investigation related to the Securities and Exchange Commission's inquiry regarding the Company's earnings per share calculation practices."

ANSWER:  Defendants admit that HCSG filed a Form 10-Q for the second quarter of 2019 on July 26, 2019, signed by Defendants Wahl and Shea (the "Q2 2019 Form 10-Q") and that paragraph 291 of the Complaint purports to summarize and contains partial excerpts from the Q2 2019 Form 10-Q.  Defendants refer to the Q2 2019 Form 10-Q for a complete and accurate statement of its contents and deny any characterization or interpretation of the Q2 2019 Form 10-Q that would be inaccurate if read in the context of the entire Q2 2019 Form 10-Q.

292.    Analysts relied on the Company's reported quarterly EPS results to assess the Company's financial performance.  Accordingly, it was critical that Defendants ensure the accuracy of the Company's reported financial results and other corporate financial information with respect to the Company's EPS.  Defendants failed to do so.

ANSWER:  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 292 of the Complaint with respect to the financial metrics relied upon by any given analyst to assess HCSG's financial performance, and these averments are therefore denied.  Defendants deny the remaining averments of paragraph 292.

293.    The SEC has the statutory authority for promulgation of U.S. Generally Accepted Accounting Principles ("GAAP") for public companies and has delegated that authority to the

Financial Accounting Standards Board ("FASB") and the American Institute of Certified Public Accountants.  GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time.  SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

ANSWER:  Defendants admit that the Financial Accounting Standards Board ("FASB") is recognized by the SEC as the designated accounting standard setter for public companies, and FASB standards are also recognized as authoritative by the American Institute of Certified Public Accountants.  Defendants further admit that FASB establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow Generally Accepted Accounting Principles ("GAAP").  Defendants further admit that GAAP encompass the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  To the extent the averments of paragraph 293 of the Complaint purport to state a legal conclusion, no response is required, and the averments are therefore denied.  To the extent the remaining averments are deemed to be factual in nature, they are denied.

294.    Given Defendants' above-noted accounting irregularities specified in ¶¶ 19, 66, 70, 71-75, 79, 114, 115, 121, 122, 129-130, 135, the Company announced financial results in violation of GAAP and the following principles:

a.    The principle that "financial reporting should provide information that is useful to present [to] potential investors and creditors and other users in making rational investment, credit, and similar decisions[.]" (FASB Statement of Concepts No. 1, ¶ 34);

b.    The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, . . . and effects of transactions, events, and circumstances that change resources and claims to those resources[.]" (FASB Statement of Concepts No. 1, ¶ 40);

c.    The principle that "financial reporting should provide information about an enterprise's financial performance during a period" (FASB Statement of Concepts No. 1, ¶ 42);

d.    The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it[.]" (FASB Statement of Concepts No. 1, ¶ 50);

e.    The principle that financial reporting should be reliable in that it "represents what it purports to represent[.]" (FASB Statement of Concepts No. 2, ¶¶ 58-59);

f.    The principle that completeness means "that nothing material is left out of the information that may be necessary to insure that it validly represents underlying events and conditions[.]" (FASB Statement of Concepts No. 2, ¶ 79); and

g.    The principle that conservatism be used as a "prudent reaction to uncertainty to try and ensure that uncertainties and risks inherent in business situations are adequately considered[.]" (FASB Statement of Concepts, No. 2, ¶ 95).

**ANSWER:** The averments of paragraph 294 of the Complaint, including subparagraphs (a)-(g), purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

295.    Whether small or large, quantitative misstatements made in the course of financial reporting may be material if they are made for the purpose of masking changes in earning trends or hiding a failure to meet analysts' consensus estimates. In September 1998, former SEC Chairman Arthur Levitt gave a speech entitled *The Numbers Game*, addressing the problem of earnings management: "companies try to meet or beat Wall Street earnings projections in order to grow market capitalization and increase the value of stock options. Their ability to do this depends on achieving the earnings expectations of analysts." Noting that "[t]rickery is employed to obscure actual financial volatility," the former Chair slammed the "misuse [of] the concept of materiality," noting that some companies "intentionally record errors within a defined percentage ceiling" and then "try to excuse that fib by arguing that the effect to the bottom line is too small to matter." The former Chair added, "[i]n markets where missing an earnings projection by a penny can result in a loss of millions of dollars in market capitalization, I have a hard time accepting the same of these so-called non-events simply don't matter." Following the former Chairman's comments, in August 1999, the SEC issued a staff accounting bulletin to address earnings management problems, including Staff Accounting Bulletin No. 99 ("SAB 99").

**ANSWER:** Defendants admit that paragraph 295 of the Complaint purports to summarize and contains partial excerpts from remarks made by Chairman Arthur Levitt on September 28, 1998. Defendants refer to these remarks for a complete and accurate statement of their contents and deny any characterization or interpretation of the remarks that would be

inaccurate if read in the context of the entire remarks made by Chairman Levitt. Defendants admit that the SEC issued Staff Accounting Bulletin No. 99 ("SAB 99") on August 12, 1999 to provide guidance in applying materiality thresholds to the preparation of financial statements and the performance of audits of financial statements. To the extent the averments of paragraph 295 of the Complaint purport to state a legal conclusion, no response is required, and the averments are therefore denied. Defendants deny the remaining averments of paragraph 295.

296.    SAB 99 states that misstatements of a financial statement item for the purpose of managing earnings to "mask a change in earnings or other tends" or to hide a "failure to meet analysts' consensus expectations for the enterprise" could be material under GAAP. SAB 99. Indeed, "[i]t is unlikely that it is ever 'reasonable' for registrants to record misstatements or not to correct known misstatements - even immaterial ones - as a part of an ongoing effort directed by or known to senior management for the purposes of 'managing' earnings." *Id.*

**ANSWER:** Defendants admit that paragraph 296 of the Complaint purports to summarize and contains parts from SAB 99. Defendants refer to SAB 99 for a complete and accurate statement of its contents and deny any characterization or interpretation of SAB 99 that would be inaccurate if read in the context of the entire SAB 99 or other SEC rules, regulations, or guidance and case law interpreting such rules, regulations or guidance.

297.    SEC rules and regulations govern the preparation and content of disclosures made by public companies in SEC filings. In failing to disclose material information about the SEC investigation and related risks, Defendants violated these rules and regulations.

**ANSWER:** The averments of paragraph 297 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent the remaining averments are deemed to be factual in nature, Defendants admit only that certain SEC rules and regulations govern the preparation and content of disclosures made by public companies in SEC filings.

298.    SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. § 229.303.

**ANSWER:**  The averments of paragraph 298 of the Complaint purport to state a legal

conclusion to which no response is required, and therefore are denied.

299.    Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's periodic filings with the SEC, among other things:

> i.  Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected.  In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.
>
> ii.  Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

**ANSWER:**  Defendants admit that paragraph 299 of the Complaint purports to

summarize and contains partial excerpts from Item 303 of Regulation S-K (17 CFR § 229.303).

Defendants refer to Item 303 of Regulation S-K for a complete and accurate statement of its

contents and deny any characterization or interpretation of Item 303 that would be inaccurate if

read in the context of the entire Regulation S-K or other SEC rules, regulations, or guidance and

case law interpreting such rules, regulations or guidance.

300.    Instruction No. 3 to Section 303(a) provides:  "The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.  This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B)

matters that have had an impact on reported operations and are not expected to have an impact upon future operations."

**ANSWER:** Defendants admit that paragraph 300 of the Complaint purports to summarize and contains partial excerpts from Item 303 of Regulation S-K (17 CFR § 229.303). Defendants refer to Item 303 of Regulation S-K for a complete and accurate statement of its contents and deny any characterization or interpretation of Item 303 that would be inaccurate if read in the context of the entire Regulation S-K or other SEC rules, regulations, or guidance and case law interpreting such rules, regulations or guidance.

301.    Item 103 of Regulation S-K, 17 C.F.R. § 229.103, governing the disclosure of legal proceedings, requires an issuer to disclose in its periodic SEC filings "proceedings known to be contemplated by governmental authorities," as follows:

> Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject.  Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought.  Include similar information as to any such proceedings known to be contemplated by governmental authorities.

**ANSWER:** Defendants admit that paragraph 301 of the Complaint purports to summarize and contains partial excerpts from Item 103 of Regulation S-K (17 CFR § 229.103). Defendants refer to Item 103 of Regulation S-K for a complete and accurate statement of its contents and deny any characterization or interpretation of Item 103 that would be inaccurate if read in the context of the entire Regulation S-K or other SEC rules, regulations, or guidance and case law interpreting such rules, regulations or guidance.  The remaining averments of paragraph 301 of the Complaint purport to state a legal conclusion to which no response is required, and therefore are denied.  To the extent these averments are deemed to be factual in nature, they are denied.

302.    Item 503(c) of Regulation S-K, 17 C.F.R. § 229.503(c), which governs disclosure of risk factors, requires an issuer to "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the [securities] speculative or risky."  Item 503(c) requires the issuer to "[e]xplain how the risk affects the issuer or the securities" and to "[s]et forth each risk factor under a subcaption that adequately describes the risk."  Item 1A to Part I of the General Instruction instructs issuers about disclosing the risk factors in Forms 10-K, while Item 1A to Part II, which apply to Forms 10-Q, similarly requires the issuer to "[s]et forth any material changes from risk factors as previously disclosed in the registrant's Form 10-K (§ 249.310) in response to Items 1A. to Part [I] of Form 10-K."

ANSWER:  Defendants admit that paragraph 302 of the Complaint purports to summarize and contains partial excerpts from a prior version of Item 503 of Regulation S-K (17 CFR § 229.503).  Section 229.503 was amended on April 2, 2019, effective May 2, 2019, to remove and reserve paragraph (c), and as such, Defendants deny that the current version of Item 503 contains the language quoted in paragraph 302.  Defendants refer to the prior version of Item 503 of Regulation S-K for a complete and accurate statement of its contents and deny any characterization or interpretation of this prior version of Item 503 that would be inaccurate if read in the context of the entire Regulation S-K or other SEC rules, regulations, or guidance and case law interpreting such rules, regulations or guidance.

Defendants further admit that paragraph 302 purports to summarize and contains excerpts from the General Instructions for Form 10-K and Form 10-Q.  Defendants refer to these General Instructions for a complete and accurate statement of their contents and deny any characterization or interpretation of these instructions that would be inaccurate if read in the context of the entire instructions.  The remaining averments of paragraph 302 purport to state a legal conclusion to which no response is required, and therefore are denied.  To the extent these averments are deemed to be factual in nature, they are denied.

303.    Defendants violated the affirmative disclosure duties imposed by Items 303, 103 and 503(c) by failing to disclose, among other things, the following material information in the Company's Forms 10-Q and 10-K filed during the Class Period:  (i) that as of November 2017, the SEC had opened an inquiry into the Company's EPS rounding and reporting practices and

that, as of March 2018, the SEC escalated their inquiry to a formal investigation; (ii) that, as a result of the investigation, Healthcare Services was exposed to risks and/or uncertainty that the investigation could result in the SEC or other regulatory bodies taking further inquiries and/or pursuing further actions that could result in significant costs and expenses, including potential sanctions, penalties or reputational damage; and (iii) that the ongoing investigation could adversely affect the Company's financial results. None of the post-November 2017 Forms 10-Q or 10-K issued during the Class Period disclosed the risks associated with the SEC investigation and potential harm resulting therefrom, including penalties, costs or reputational injury. Indeed, the Company falsely denied the existence of any SEC investigation in December 2018. The failure to disclosure this material information, therefore, violated the disclosure obligations imposed by Items 303, 503 and 103. Defendants falsely led investors to believe that the Company was not exposed to any risk other than those already disclosed.

**ANSWER:** The averments of paragraph 303 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

304.    The Individual Defendants' scienter is established by: (a) the fact that the SEC investigation remains ongoing; (b) Defendants' deliberate concealment of the SEC's investigation in December 2018, when the Company entered into a New Credit Facility after previously learning about the SEC's investigation; (c) Defendants' deliberate concealment of their knowledge of the Monocle Report when asked by a securities analyst to comment on the Company's EPS rounding practices addressed in the Monocle Report; (d) the fact that Defendant McCartney's family members and close friends controlled the Company's top management and financial reporting team; (e) the improbability that, over the course of several years, the Company's EPS results would be consistently rounded up without intentional manipulation (as noted in ¶¶ 6, 73, 321); (f) Defendant McCartney's sales and gifts of millions of shares of the Company's stock at artificially inflated prices for gross proceeds of nearly $71.3 million, and the sudden decision of Defendant McCartney not to seek re-election as Chairman of the Board less than a month after Monocle contacted him (and Defendants Wahl and McKee) with a description of the Monocle Report's conclusions before it published the Monocle Report; (g) the statements by Confidential Witnesses of accounting manipulations, including those related to revenue and labor costs during the Class Period; (h) the above-noted GAAP violations noted in ¶¶ 292-296; (i) the above-noted violations of Items 303, 103 and 503 of SEC Regulation S-K in ¶¶ 297-303; and (j) the Company's prior history with labor lawsuits and accounting fraud.

**ANSWER:** The averments of paragraph 304 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

305.    The SEC's inquiry commenced on or about November 2017, and escalated to a formal order of investigation on or before March 2018.  That investigation remains ongoing, costing the Company $8 million, including $6 million reported in the Q1 2019 from legal and professional fees related the Company's internal investigation and $2 million reported in the Q2 2019 in related to the SEC's investigation.  The ongoing legal fees and newly disclosed risk of the investigation underscored the significance of the investigation.

**ANSWER:**  Defendants deny each and every averment of paragraph 305 of the

Complaint, except admit that the SEC advised HCSG it was conducting an inquiry into HCSG's

EPS calculation practices in November 2017, the SEC commenced a formal investigation into

HCSG in March 2018, and the SEC investigation remains ongoing.  Defendants further admit

that paragraph 305 seems to refer to information discussed in the Company's earnings calls held

on May 1, 2019 and July 24, 2019.  Defendants refer to the transcripts from these earnings calls

for a complete and accurate statement of what was discussed in those calls and deny any

characterization or interpretation of either call that would be inaccurate if read in the context of

the entire call transcript.

306.    In March 2019, the market moved on the initial report of the SEC's investigation. On March 4, 2019, the stock fell on this news by more than 13%, falling $4.96 per share and closing at a price of $32.78, down from the prior day's closing price of $37.74 per share.

**ANSWER:**  Defendants deny each and every averment of paragraph 306 of the

Complaint, except admit that HCSG's stock price dropped by $4.96 per share on March 4, 2019,

closing at a price of $32.78 per share, down 13.14% from the prior day's closing price of $37.74

per share.

307.    In a research report titled *Management Addresses 10-K Delay and SEC Inquiry*, a Credit Suisse analyst explained that "HCSG traded down more than 15% this afternoon following the company's release that it will delay the filing of its 10-K pending the completion of an internal audit review which is expected to conclude in the next 2 weeks."  The analyst added, "[t]he internal review, which began 4Q18, stems from an SEC preliminary inquiry received in November 2017 which was followed by a subpoena in March 2018."  The analyst added, "[t]he revelation of the SEC inquiry is disappointing, and we would have liked to have seen earlier disclosure of the SEC subpoena."

**ANSWER:** Defendants admit that paragraph 307 of the Complaint purports to summarize and contains partial excerpts from a Credit Suisse analyst report. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 307 with respect to the contents of this report and whether the paragraph accurately summarizes and quotes its contents. Defendants refer to this analyst report for a complete and accurate statement of its contents and deny any characterization or interpretation of the report that would be inaccurate if read in the context of the entire report.

308. On March 4, 2019, a Bloomberg article titled *Healthcare Services Falls After Delaying 10-K Over SEC Inquiry*, noted: "Healthcare Services Group sank as much as 14%, its biggest drop in a decade, after saying it is working with outside counsel to conclude the internal investigation based on the SEC's inquiry about EPS calculation practices dating back to November 2017."

**ANSWER:** Defendants admit that paragraph 308 of the Complaint purports to summarize and contains partial excerpts from a Bloomberg article. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 308 with respect to the contents of this article and whether the paragraph accurately summarizes and quotes its contents. Defendants refer to this article for a complete and accurate statement of its contents and deny any characterization or interpretation of the article that would be inaccurate if read in the context of the entire article.

309. While the investigation remains pending, the Company has noted, most recently in its July 26, 2019 Form 10-Q, that "[t]he SEC's investigation into our earnings per share ("EPS") calculation practices could result in potential sanctions or penalties, distraction to our management and result in further litigation from third parties, each of which could adversely affect or cause variability in our financial results."

**ANSWER:** Defendants admit that paragraph 309 of the Complaint purports to summarize and contains partial excerpts from the Q2 2019 Form 10-Q filed on July 26, 2019. Defendants refer to the Q2 2019 Form 10-Q for a complete and accurate statement of its contents

and deny any characterization or interpretation of the Q2 2019 Form 10-Q that would be

inaccurate if read in the context of the entire Q2 2019 Form 10-Q.

310.    Defendants, given their role and responsibilities, would have learned of the SEC inquiry in November of 2017, and the formal order of investigation in March 2018.  Further, the Company, as the target of the SEC subpoena, had the right to request or view the SEC's formal order, which details the nature of the investigation and explains the potential securities law violations under investigation.  *See* SEC Division of Enforcement, Enforcement Manual, at § 2.3.4.2 (Requests for a Copy of the Formal Order).  Based on information and belief, it would be routine for Defendants to obtain a copy of the SEC's formal order at the time the Company received the SEC subpoena and, if not, certainly by the time the Company commenced its own investigation in Q4 2018.

**ANSWER:**  Defendants deny each and every averment of paragraph 310 of the

Complaint, except admit that as of Q4 2018, Defendants were made aware of the SEC inquiry

and the formal investigation into HCSG's EPS calculation practices.  The remaining averments

of paragraph 310 of the Complaint purport to state a legal conclusion to which no response is

required, and therefore are denied.  To the extent these averments are deemed to be factual in

nature, they are denied.

311.    In late 2018, Defendants concealed the SEC investigation not just from investors, but also from counter parties in a contract.  The fact that the Company concealed the SEC's ongoing investigation in an agreement for its New Credit Facility also supports a strong inference of scienter.

**ANSWER:**  To the extent the averments of paragraph 311 of the Complaint purport to

state a legal conclusion, no response is required, and the averments are therefore denied.

Defendants deny the remaining averments of paragraph 311 of the Complaint.  By way of further

response, the law does not impose a per se duty upon a company to disclose the pendency of an

SEC investigation, and the Company had no duty to disclose the investigation any earlier than it

did.

312.    Specifically, on December 21, 2018, the Company entered into a new $475 million credit facility.  This new credit facility replaced an expiring $300 million line of credit.

**ANSWER:**  Defendants admit that on December 21, 2018, HCSG entered into a new $475 million credit facility and this new credit facility replaced an expiring $300 million line of credit.  Defendants deny the remaining averments of paragraph 312 of the Complaint.

313.    According to the Credit Agreement executed on December 21, 2018 for the New Credit Facility, the Company represented that there were no investigations.  In a section titled "6.1.5 Litigation," the Company stated that "[t]here are no actions, suits, proceedings, or investigations pending or, to the knowledge of [Healthcare Services], threatened against such Loan Party or any Subsidiary of [Healthcare Services] at law or in equity before any Official Body which individually or in the aggregate could reasonably be expected to result in any Material Adverse change."

**ANSWER:**  Defendants deny each and every averment of paragraph 313 of the Complaint, except admit that the paragraph purports to summarize and contains partial excerpts from the Credit Agreement.  Defendants refer to the Credit Agreement for a complete and accurate statement of its contents and deny any characterization or interpretation of the Credit Agreement that would be inaccurate if read in the context of the entire Credit Agreement.  Defendants expressly deny that in December 2018, there were any investigations pending against HCSG that to its knowledge could reasonably be expected to result in a Material Adverse Change.

314.    But at this time in December 2018, Defendants knew that the SEC had opened its formal investigation into the Company's earnings rounding and reporting practices.  Yet, in an effort to secure a new line of credit, Defendants misrepresented that it was not the subject of an investigation.  The representation was a material provision of the contract, meaning Defendants could not obtain the line of credit without it.  Defendants concealed the truth of the investigation, further establishing their intent to deceive.

**ANSWER:**  Defendants admit only that the Defendants knew about the SEC investigation in Q4 2018.  To the extent the averments of paragraph 314 of the Complaint

-156-

purport to state a legal conclusion, no response is required, and the averments are therefore

denied.  Defendants deny the remaining averments of paragraph 314 of the Complaint.

315.    In the Form 8-K filing on December 31, 2018, the Company publicly filed the Credit Facility Agreement that knowingly misrepresented that there was no pending investigation.  Defendant Shea signed a Form 8-K.

**ANSWER:**  Defendants deny each and every averment of paragraph 315 of the

Complaint, except admit that Defendant Shea signed the Form 8-K filed on December 31, 2018.

316.    The Company concealed the investigation, not just to investors, but also to the counter parties to the credit facility in order to obtain the line of credit.

**ANSWER:**  Defendants deny the averments of paragraph 316 of the Complaint.  By way

of further response, the law does not impose a per se duty upon a company to disclose the

pendency of an SEC investigation, and the Company had no duty to disclose the investigation

any earlier than it did.

317.    The fact that Defendants concealed their knowledge of the Monocle Report also supports a strong inference of scienter.  In March 2017, the Monocle Report explained that "[w]e reached out to Daniel McCartney, Ted Wahl and Matt McKee to ask for an explanation of this unusual pattern [concerning its quarterly EPS results], but have yet to receive a response."  Yet during the Company's April 12, 2017 earnings call, in response to an analyst question concerning reports of the Company's rounding practices, Defendant Wahl dismissed an analyst's concerns regarding reports of the Company's rounding practices and denied knowledge about the report to which the analyst referred, while Defendant McKee remained silent.  Moreover, as alleged at ¶ 87 herein, Defendant Wahl's response during the April 12, 2017 Call demonstrates that he was, in fact, aware of the Monocle report and its conclusions.

**ANSWER:**  The averments of the first sentence of paragraph 317 of the Complaint

purport to state a legal conclusion to which no response is required, and therefore are denied.  To

the extent these averments are deemed to be factual in nature, they are denied.  Defendants admit

that paragraph 317 purports to summarize and contains partial excerpts from the March 2017

Monocle Report and the April 12, 2017 earnings call.  Defendants refer to the March 2017

Monocle Report and the April 12, 2017 call transcript for a complete and accurate statement of their contents and deny any characterization or interpretation of the March 2017 Monocle Report or the earnings call that would be inaccurate if read in the context of the entire March 2017 Monocle Report or the entire call transcript.  Defendants deny that Defendant Wahl dismissed an analyst's concerns or denied knowledge about the March 2017 Monocle Report and incorporate herein their response to paragraph 85 of the Complaint.  Defendants deny the remaining averments of paragraph 317 of the Complaint.

318.    The fact that the Company's highest levels of management were closely controlled by Defendant McCartney's family and family friends also supports a strong inference of scienter.

**ANSWER:**  The averments of paragraph 318 of the Complaint purport to state a legal conclusion to which no response is required, and therefore are denied.  To the extent these averments are deemed to be factual in nature, they are denied.

319.    Defendant McCartney's son-in-law, Defendant Wahl, succeeded McCartney as the Company's CEO in 2015.  Another McCartney son-in-law, Defendant McKee, serves as the Company's Chief Communications Officer and frequently represents the Company on investor conference calls.  Defendant Shea, the CFO, is a McCartney family friend.  Further, as alleged at ¶46 herein, other McCartney family members held key positions within upper echelons of the Company's management.

**ANSWER:**  Defendants deny each and every averment of paragraph 319 of the Complaint, except admit that Defendants McCartney, Wahl and McKee are related by marriage; Defendant Wahl became HCSG's CEO in 2015; Defendant McKee is HCSG's Chief Communications Officer and has participated on investor conference calls on behalf of the Company; and Defendant Shea is HCSG's Chief Financial Officer.  Defendants incorporate herein their response to paragraph 46 of the Complaint.

-158-

320.    Moreover, Confidential Witnesses have confirmed that the Company's management was closely controlled by McCartney family and friends.  CW3, a Regional Director for the Company from 1996 until June 2015, stated that the accounting function at the Company was "small and controlled by management," including Defendant Shea.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 320 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witnesses, and these averments are therefore denied.

321.    Over the course of a decade, Defendants consistently defied statistical odds quarter after quarter, year after year.  As the Monocle Report noted, "every single quarter over the past 11 years has seen HCSG's quarterly earnings per share round up rather than round down to the nearest penny."  As Monocle further added, "[t]o put the magnitude of the improbability that this is the result of anything but the active management of the company's EPS, consider this: since the odds of a company's EPS rounding up to the nearest penny are theoretically the same as rounding down, HCSG's history of EPS rounding up is tantamount to HCSG flipping heads on a coin toss 44 straight times, the odds of which are a staggering **1 in 17.6 trillion**."

**ANSWER:**  Defendants deny each and every averment of paragraph 321 of the Complaint, except admit that this paragraph purports to summarize and contains partial excerpts from the March 2017 Monocle Report.  Defendants refer to the March 2017 Monocle Report for a complete and accurate statement of its contents and deny any characterization or interpretation of the March 2017 Monocle Report that would be inaccurate if read in the context of the entire March 2017 Monocle Report.  Defendants expressly deny any allegations of wrongdoing or misconduct by the Defendants that are stated or implied in the March 2017 Monocle Report.

322.    For the reasons stated in the above-noted paragraphs ¶¶ 6, 73, 321, the probability that the Company's EPS calculations were rounded up over the course of several years without manipulation is not credible.

**ANSWER:**  Defendants deny the averments of paragraph 322 of the Complaint.

323.    Moreover, the fact that the Company's accounting practices abruptly changed once the Company's EPS reporting was placed under scrutiny, further supports a strong

inference of scienter.  After more than a decade of consistently "rounding up" to avoid EPS misses, the Company quickly changed its practice following the launch of the SEC investigation. In fact, from the fourth quarter of 2017 to the present (second quarter of 2019), the Company has "rounded down" its EPS for five of seven quarters.[3]

**ANSWER:**  Defendants admit only that HCSG "rounded up" or "rounded down" its EPS as appropriate.  To the extent the averments of paragraph 323 of the Complaint purport to state a legal conclusion, no response is required, and the averments are therefore denied.  Defendants deny the remaining averments of paragraph 323 and footnote 3 of the Complaint.

324.    As alleged at ¶¶ 76, 317 herein, the Monocle Report stated that, before publishing its conclusions about the Company's EPS practices, Monocle "reached out to Daniel McCartney, Ted Wahl and Matt McKee to ask for an explanation of this unusual pattern, but have yet to receive a response."  Moreover, as alleged at ¶ 87 herein, Defendant Wahl's response to an analyst question during the April 12, 2017 Call indicated that he, if not others at the Company, were aware of the Monocle Report at the time.

**ANSWER:**  Defendants deny each and every averment of paragraph 324 of the Complaint, except admit that the paragraph purports to summarize and contains partial excerpts from the March 2017 Monocle Report and the April 12, 2017 earnings call.  Defendants refer to the March 2017 Monocle Report and the April 12, 2017 call transcript for a complete and accurate statement of their contents and deny any characterization or interpretation of the March 2017 Monocle Report or the earnings call that would be inaccurate if read in the context of the entire March 2017 Monocle Report or the entire call transcript.  Defendants incorporate herein their response to paragraph 85 of the Complaint.

325.    Approximately three weeks after publication of the Monocle Report, Defendant McCartney, the Company's founder and Chairman since the Company's inception, abruptly informed the Company's Board that he would not seek re-election as Chairman.  McCartney

---

[3]The second quarter of 2017 was the first quarter that broke the Company's 45-quarter streak of consistently "rounding up." That was the first reported quarter after the Monocle Report and a rare quarter where the Company exceeded analyst EPS estimates by two cents, alleviating the need for the Company round up its EPS to "avoid the miss."

served until May 31, 2017, at which time he ceased to have a public leadership role with the Company.

**ANSWER:** Defendants deny each and every averment of paragraph 325 of the Complaint, except admit that Defendant McCartney founded HCSG and served as Chairman of the Board until May 31, 2017, when he transitioned to "Chairman Emeritus."

326.    Between the time that Defendant McCartney informed the Board of his intent to leave the Company and the time that his tenure as Chairman ended, on May 11, 2019, McCartney sold 113,901 shares of Healthcare Services stock for gross proceeds of more than $5.2 million.  This sale was larger than any sale of Healthcare Services' stock made by McCartney in over a year and occurred at a time that McCartney was aware of the Monocle Report, the SEC's investigation of the Company and the Company's internal investigation into matters being investigated by the SEC.

**ANSWER:** Defendants deny the averments of paragraph 326 of the Complaint.  By way of further response, Defendants refer to the Company's SEC Form 4 filings for a complete and accurate statement of changes in Defendant McCartney's ownership of HCSG securities.

327.    The sudden and previously unannounced departure of McCartney, within weeks of learning of the Monocle Report and the likely risk to the Company, provides a strong inference of Defendants' scienter, as does the suspicious timing of his sale of more than $5 million in Healthcare Services stock prior to his departure from the Company, which was a part of over $35 million in Class Period sales of the Company's stock.

**ANSWER:** To the extent the averments of paragraph 327 of the Complaint purport to state a legal conclusion, no response is required, and the averments are therefore denied.

Defendants deny the remaining averments of paragraph 327 of the Complaint.

328.    Confidential Witnesses indicate that the Company, with the likely participation, knowledge or approval of the Individual Defendants and/or individuals with familial or other ties to them, engaged in manipulation and machinations with respect to accrued labor expenses related to the Company's hourly employee wages.  These allegations further support a strong inference of scienter.

**ANSWER:** To the extent the averments of paragraph 328 of the Complaint purport to state a legal conclusion, no response is required, and the averments are therefore denied.

Defendants are without knowledge or information sufficient to form a belief as to the truth of the

remaining averments of paragraph 328 of the Complaint with respect to the identity of, and the

information supposedly conveyed by, the unidentified "confidential" witnesses, and these

averments are therefore denied.

329.    As alleged herein at ¶¶ 117-123, CW2, a former District Manager described the manner in which financial information was compiled by, and then manipulated at, the highest levels of the Company's management.  CW2 and other district managers prepared "Monthly Projections" reports containing amounts of accrued payroll expenses - using the particular methodology for calculating that expense mandated by the corporate headquarters - from the facilities under CW2's responsibility, among other financial data.  According to CW2, these reports were ultimately sent up through a management structure rife with "incestuous" links to the Individual Defendants to the Company's headquarters office, where, as CW3 explained (*see* ¶¶ 125-126), the Company's accounting function was "small and controlled" by senior management that included Defendant Shea.  When financial information flowed back down to the divisional level in the form of "Monthly Operating Statements" prepared at the corporate level, CW2 recalls that "consistent and significant" differences existed between the official corporate payroll accrual numbers (and other data) in the Monthly Operating Statements and what had been reported at the operational/facility level by CW2 and other district managers.  According to CW2, the Monthly Operating Statements for CW2's district always contained numbers different from the numbers that CW2 submitted, and included payroll accrual numbers that "never made any type of sense" based on what CW2 knew as a result of CW2's position at the Company.  CW2 further explained that substantially similar changes were also made to the numbers reported in Monthly Projections reports prepared by other District Managers.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief

as to the truth of the averments of paragraph 329 of the Complaint with respect to the identity of,

and the information supposedly conveyed by, the unidentified "confidential" witnesses, and

these averments are therefore denied.

330.    As alleged at ¶¶ 109-116, CW1, a former Regional Manager, explained that the Company's Facility Managers prepared monthly "Profit and Loss Statements" for each facility that CW1 managed.  These Profit and Loss Statements contained actual monthly results, year-to-date results, budgeted amounts and any variances between actual results and budgeted amounts.  According to CW1, the actual amounts paid to hourly workers were consistently less than budgeted amounts.  This was because CW1 was aware that the Company intentionally understaffed facilities - by instructing hourly employees to stay home for at least two weeks at year end and/or otherwise relying on salaried "managers" or "directors" to perform basic-level

-162-

tasks typically performed by hourly employees to minimize expenses, resulting in a lower quality of care to the Company's customers and the patients and residents they serve.

ANSWER: Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 330 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witness, and these averments are therefore denied.

331.    As detailed in ¶¶ 292-296, the Company announced financial results that violated GAAP. Defendants failed to ensure the accuracy of the Company's reported financial results and other corporate financial information with respect to the Company's EPS, all while Defendants knew that analysts relied on the Company's reported quarterly EPS results to assess the Company's financial performance. These violations further support an inference of scienter.

ANSWER: The averments of paragraph 331 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

332.    As detailed in ¶¶ 297-303, Defendants failed to disclose material information about the SEC investigation and related risk, thereby violating the affirmative disclosure duties of Item 303, 103 and 503 of Regulation S-K. These failures and the resulting violations further support an inference of scienter.

ANSWER: The averments of paragraph 332 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied. By way of further response, the law does not impose a per se duty upon a company to disclose the pendency of an SEC investigation, and the Company had no duty to disclose the investigation any earlier than it did.

333.    These practices described by CW1 echoed allegations made in employment-related class actions filed against the Company styled as *Acosta v. Healthcare Services Group, Inc.* Case No. 1:13-cv-03429 (D. Colo.) (alleging that managers in Colorado were improperly misclassified as exempt from overtime laws), *Bowman v. Healthcare Services Group, Inc.* Case No. 3:13-cv-1924 (N.D. Ohio) (alleging misclassification of managers in training, *Cox v. Healthcare Services Group, Inc.* Case No. 3:13-cv-00293 (N.D. Ohio) (alleging misclassification

of managers in training, and *Kelly v. Healthcare Services Group, Inc.*, Civil Action No. 2:13-cv-00441-JRG (E.D. Texas) (alleging misclassification and underpayment of a class of former housekeeping managers employed by the Company; the case was settled for $8 million in 2015). The *Acosta, Bowman* and *Cox* cases were settled together in 2014 for $1.35 million, and the *Kelly* case was settled in 2015 for $8 million; the Company denied wrongdoing in connection with the settlements.

**ANSWER:** Defendants deny each and every averment of paragraph 333 of the Complaint, except admit that the following class actions were filed against HCSG: *Kelly v. Healthcare Services Group, Inc.*, Civil Action No. 2:13-cv-00441-JRG (E.D. Tex.); *Acosta v. Healthcare Services Group, Inc.*, No. 1:13-cv-03429 (D. Colo.); *Bowman v. Healthcare Services Group, Inc.*, No. 3:13-cv-1924 (N.D. Ohio); and *Cox v. Healthcare Services Group, Inc.*, No. 3:13-cv-00293 (N.D. Ohio). Defendants further admit that the paragraph purports to summarize these cases. Defendants refer to the pleadings in these cases for a complete and accurate statement of their contents and deny any characterization or interpretation of any of these cases that would be inaccurate if read in the context of the entire case docket. Defendants further admit that the *Acosta*, *Bowman,* and *Cox* cases settled in 2014 for $1.35 million and the *Kelly* case settled in 2015 for a maximum of $8 million. Defendants further aver that each settlement agreement expressly stated that the fact of settlement shall not be "construed as an admission of liability, wrongdoing, impropriety, responsibility, or fault whatsoever" on the part of HCSG or HCSG's agents. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining averments of paragraph 333 of the Complaint with respect to the identity of, and the information supposedly conveyed by, the unidentified "confidential" witnesses, and these averments are therefore denied.

334. Moreover, the scienter of Defendant McCartney and the Company can be inferred from the fact that Defendant McCartney has previously confronted securities fraud allegations arising from improper accounting and financial reporting at Healthcare Services. In 1996, the SEC alleged, *inter alia*, that the Company and McCartney engaged in securities fraud by (a) concealing from investors (prior to a public offering) that a substantial number of the Company's

partners had submitted written notices of cancellation to the Company; (b) improperly accounting for cancellation fees which inflated income from $1.16 to $2.18 million in a quarterly filing in violation of GAAP; (c) inflated the value of accounts receivables by failing to determine an adequate allowance for aged receivables where collectability was uncertain in violation of GAAP; and (d) that the Company had made "$400,000 in payments to certain third parties for no valid business reason." In October 1996, Healthcare Services and McCartney settled the matter with the SEC. The Company paid a $650,000 penalty and Defendant McCartney paid a $100,000 penalty to resolve the SEC's claims. For these reasons, it can be inferred that Defendants acted with scienter in that they knew or were reckless in not knowing that the public statements that they made and the documents and statements issued or disseminated in the name of the Company described herein were materially false and misleading; knew or were reckless in not knowing that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

ANSWER: Defendants admit only that the SEC filed a complaint against HCSG, Defendant McCartney and others on September 24, 1996 in *SEC v. Healthcare Services Group, Inc.*, Civil Action No. 2:96-cv-6464, and that this paragraph purports to summarize this case and/or Litigation Release No. 15068. Defendants refer to the pleadings in this case and/or Litigation Release No. 15068 for a complete and accurate statement of their contents and deny any characterization or interpretation of these documents that would be inaccurate if read in the context of the entire case docket. The remaining averments of paragraph 334 of the Complaint purport to state a legal conclusion, to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

335. Moreover, the Individual Defendants' scienter can be inferred by virtue of their access to and/or receipt of information reflecting the true facts regarding the Company, including through channels controlled by their family members or associates, as well as their control over, and/or receipt and/or modification of, or other ability to correct the alleged materially false and misleading statements or material omissions through their associations with the Company, which made them privy to confidential proprietary information concerning Healthcare Services.

ANSWER: The averments of paragraph 335 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

-165-

336.    During the Class Period Defendants engaged in earnings manipulation to deceive the market and engage in a course of conduct that artificially inflated the price of Healthcare Services' stock and operated as a fraud or deceit on the acquirers of the Company's stock. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.  Throughout the Class Period, the market price of Healthcare Services' stock was artificially inflated as a direct result of Defendants' materially false and misleading statements and material omissions.  Those statements were materially false and misleading because they failed to disclose the true and accurate picture of the Company's reported EPS and the manner in which EPS was calculated, failed to disclose material weaknesses in the Company's internal controls that allowed for the EPS manipulation alleged herein, and concealed the existence of a material SEC investigation into the Company's EPS practices.  Lead Plaintiff and other members of the Class purchased Healthcare Services stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

ANSWER:  The averments of paragraph 336 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied.  To the extent these averments are deemed to be factual in nature, they are denied.

337.    As detailed above, as the earnings manipulation was revealed, the price of the Company's stock declined as the prior artificial inflation came out of the stock price.  The decline in Healthcare Services' stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the stock price decline negates any inference that the loss suffered by Lead Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by the Lead Plaintiff and other Class members was a direct result of Defendants' earnings manipulation and artificial inflation of the Company's stock price and the subsequent significant decline in the value of the Company's stock when the Defendants' prior misrepresentations, omissions and other fraudulent conduct was revealed.

ANSWER:  The averments of paragraph 337 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied.  To the extent these averments are deemed to be factual in nature, they are denied.

338.    Defendants' earnings manipulation was revealed to the market in a series of partial corrective disclosures.  Each disclosure only partially revealed the earnings manipulation and Defendants continued to misrepresent and/or conceal the Company's true EPS practices, internal control deficiencies and the existence of the SEC's investigation until the end of the Class Period.

**ANSWER:** The averments of paragraph 338 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

339.    On February 6, 2018, after markets closed, the Company issued an earnings release in which Healthcare Services reported Q4 2017 EPS of $0.27, falling short of the consensus EPS estimate of approximately $0.31. In response to this news, on February 7, 2018, the price of the Company's stock fell by $1.44 per share to close at $49.57 per share, a decline of 2.82%, on very high volume.

**ANSWER:** Defendants admit that HCSG filed a Form 8-K on February 6, 2018 after the NYSE closed. Defendants further admit that the Form 8-K attached a press release dated February 6, 2018 relating to the Company's performance in the fourth quarter of 2017 and the year ended December 31, 2017, and that the paragraph purports to summarize information in this Form 8-K. Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the Form 8-K. Defendants expressly deny that the Form 8-K states that the Company missed analysts' consensus EPS estimates, but admit that the analysts' consensus estimate was approximately $0.31. Defendants note that Plaintiff's table in paragraph 79 states a different analysts' consensus estimate. Defendants further admit that HCSG's stock price closed at $49.57 on February 7, 2018, down from the closing price of $51.01 on February 6, 2018, which was a $1.44 per share decrease (2.82%). Defendants deny the remaining averments of paragraph 339 of the Complaint.

340.    On April 17, 2018, after markets closed, the Company issued an earnings release in which Healthcare Services reported Q1 2018 EPS of $0.00, falling short of the consensus estimate of approximately $0.38. In response to this news, the price of the Company's stock fell by $2.10 per share on the next trading day, April 18, 2018, to close at $38.50 per share, a decline of 5.17%, on very high volume. While the earnings miss was substantially attributed to an unusual expense item, a substantial restructuring-related charge that had been announced by the Company the prior day (April 16, 2017), at least one securities analyst, Ryan Daniels at William

Blair, issued a report on April 17, 2018 noting that after excluding the extraordinary restricting charge, the Company still would have missed EPS consensus by a penny.  As the April 16, 2018 restructuring announcement resulted in a 4.15% stock drop, the market had already reacted to the news of the restructuring charge; the negative reaction on April 18, 2017 was attributable to the news that, backing out the effect of the restructuring charge, the Company would have missed the consensus EPS estimate by one penny.

**ANSWER:**  Defendants admit that HCSG filed a Form 8-K on April 17, 2018 after the NYSE closed.  Defendants further admit that the Form 8-K attached a press release dated April 17, 2018 relating to the Company's performance in the first quarter of 2018 and that the paragraph purports to summarize information in this Form 8-K.  Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the Form 8-K.  Defendants deny that the Form 8-K states that the Company missed analysts' consensus EPS estimates and that the consensus estimate was approximately $0.38.  Defendants further admit that HCSG's stock price closed at $38.50 on April 18, 2018, down from the closing price of $40.60 on April 17, 2018, which was a 5.17% decline.

Defendants further admit that the paragraph purports to summarize excerpts from a report authored by a William Blair analyst.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 340 with respect to the contents of this report and whether the paragraph accurately summarizes and quotes its contents.  Defendants refer to this report for a complete and accurate statement of its contents and deny any characterization or interpretation of this report that would be inaccurate if read in the context of the entire report.  Defendants deny the remaining averments of paragraph 340 of the Complaint.

341.    On July 17, 2018, after markets closed, the Company issued an earnings release in which Healthcare Services reported Q2 2018 EPS of $0.35, falling short of the consensus estimate of approximately $0.38.  In response to this news, the price of the Company's stock fell by $3.88 per share to close at $38.50 per share, a decline of 9.16%, on very high volume.

**ANSWER:** Defendants admit that HCSG filed a Form 8-K on July 17, 2018 after the NYSE closed. Defendants further admit that the Form 8-K attached a press release dated July 17, 2018 relating to the Company's performance in the second quarter of 2018, and that the paragraph purports to summarize information in this Form 8-K. Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the Form 8-K. Defendants expressly deny that the Form 8-K states that the Company missed analysts' consensus EPS estimates, but admit that the consensus estimate was approximately $0.38. Defendants further admit that HCSG's stock price closed at $38.50 on July 18, 2018, down from the closing price of $42.38 on July 17, 2018, which was a $3.88 per share decrease (9.16%). Defendants deny the remaining averments of paragraph 341 of the Complaint.

342.    On February 5, 2019, after markets closed, the Company issued an earnings release in which Healthcare Services reported Q4 2018 EPS of $0.43 per basic and $0.42 per diluted common shares. While this result beat the consensus estimate by five cents, analysts attributed the earnings beat to extraordinary items that increased net income in Q4 2018 and noted that, after backing out those extraordinary items, the Company's EPS would have fallen a penny short of the consensus estimate. In response to this news, the price of the Company's stock fell by $3.17 per share to close at $39.00 per share, a decline of 7.52% on very high volume.

**ANSWER:** Defendants admit that HCSG filed a Form 8-K on February 5, 2019 after the NYSE closed. Defendants further admit that the Form 8-K attached a press release dated February 5, 2019 relating to the Company's performance in the fourth quarter of 2018, and that the paragraph purports to summarize information in this Form 8-K. Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the Form 8-K. Defendants expressly deny that the Form 8-K refers to analysts' consensus EPS estimates.

Defendants further admit that paragraph 342 of the Complaint purports to summarize analysts' statements or reports. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 342 with respect to the contents of these statements or reports and whether the paragraph accurately summarizes and quotes their contents. Defendants refer to these statements or reports for a complete and accurate statement of their contents and deny any characterization or interpretation of any of these statements or reports that would be inaccurate if read in the context of the entire statement or report.

Defendants further admit that HCSG's stock price closed at $39.00 on February 6, 2019, down from the closing price of $42.17 on February 5, 2019, which was a $3.17 per share decrease (7.52%). Defendants deny the remaining averments of paragraph 342 of the Complaint.

343.    On March 4, 2019, the Company filed an 8-K with the SEC revealing the SEC's investigation into the Company's EPS practices for the first time. On this news, the Company's stock price fell from $37.74 per share to $32.78 per share, a decline of $4.96, on heavy trading volume. The drop represented a decline of more than 13% of the Company's stock value from the prior day's price.

**ANSWER:** Defendants admit that HCSG filed a Form 8-K on March 4, 2019 and that the paragraph purports to summarize information in this Form 8-K. Defendants refer to this Form 8-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the Form 8-K that would be inaccurate if read in the context of the entire Form 8-K. Defendants further admit that HCSG first publicly disclosed that the SEC was investigating its EPS calculation practices in this March 4, 2019 Form 8-K. Defendants further admit that HCSG's stock price closed at $32.78 on March 4, 2019, down from the closing price of $37.74 on March 3, 2019, which was a $4.96 decrease (13.4%). Defendants deny the remaining averments of paragraph 343 of the Complaint.

344.    The decline in Healthcare Services common stock price was a direct result of the nature and extent of Defendants' false and misleading statements and omissions being revealed to the market. The adverse consequences of these disclosures were entirely foreseeable to Defendants at all times. There was no other direct intervening or independent cause of the stock price decline. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Lead Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' reckless conduct. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct result of Defendants' artificial inflation of the Company's common stock price and the subsequent significant decline in the value of the Company's common stock when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

**ANSWER:** The averments of paragraph 344 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

345.    Plaintiffs are entitled to a presumption of reliance under the fraud on the market doctrine. The market for the Company's securities was, at all times, an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities. Throughout the Class Period:

1.    The Company's stock was actively traded on the NASDAQ;

2.    The market price of the Company's stock reacted promptly to the dissemination of public information regarding the Company;

3.    The Company's stock was followed by numerous financial analysts, including those cited herein. Thus, the Company's stock reflected the effect of information disseminated into the market;

4.    The average weekly trading volume for the Company's stock during the Class Period was approximately 2,323,495 of shares; and

5.    The Company's market capitalization was in excess of 2,419,098,400 on the end of the Class Period and the Company had 73,798,000 of shares outstanding as of the end of the Class Period.

**ANSWER:** Defendants deny each and every averment of paragraph 345 of the Complaint, including subparagraphs (1)-(5), except admit that HCSG's stock was traded on NASDAQ, certain analysts followed HCSG, and HCSG's market capitalization was in excess of

2,419,098,400 on the end of the putative Class Period.  The remaining averments of paragraph 345 of the Complaint, including subparagraphs (1)-(5), purport to state legal conclusions to which no response is required, and therefore are denied.  To the extent the remaining averments are deemed to be factual in nature, they are denied.

346.    Through the Class Period, the market consistently followed the Company, including securities analysts and the business press.  The market relied on the Company's financial results and management to accurately present the Company's financial results.  During this period, the Defendants continued to pump materially false information into the marketplace regarding the Company's earnings per share, as well as the facts of the SEC's inquiry and investigation.  Analysts promptly reviewed and analyzed this information and assimilated the information into the price of the Company's securities.

ANSWER:  Defendants admit only that certain securities analysts followed HCSG during the putative Class Period.  The remaining averments of paragraph 346 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied.  To the extent the remaining averments are deemed to be factual in nature, they are denied.

347.    As a result of Defendants' misconduct (including the misstatements and omissions), the market for the Healthcare Services common stock was artificially inflated.  Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies.  Thus, Class members are presumed to have indirectly relied on the misrepresentations and omissions for which Defendants are each responsible.

ANSWER:  The averments of paragraph 347 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied.  To the extent these averments are deemed to be factual in nature, they are denied.

348.    Lead Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Healthcare Services common stock at artificially inflated prices and the subsequent decline in the price of those securities when Defendants' earnings manipulation was disclosed.

-172-

**ANSWER:** The averments of paragraph 348 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

349.     Lead Plaintiff and other Class Members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because claims asserted herein against Defendants are predicated on omissions of material fact which there was a duty to disclose.

**ANSWER:** The averments of paragraph 349 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

350.     Had Lead Plaintiff and other members of the Class known of the material adverse information not disclosed by Defendants or been aware of the manipulation behind Defendants' material misstatements, it would not have purchased Healthcare Services common stock at artificially inflated prices.

**ANSWER:** The averments of paragraph 350 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

351.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements plead in this Complaint. None of the specific statements alleged herein are forward looking. Many of the specific statements alleged herein were not identified as "forward-looking statements" when made.

**ANSWER:** The averments of paragraph 351 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied

352.     To the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Moreover, to the extent that the statutory safe harbor does apply to any forward-looking statement, these

statements were actionable because, at the time any forward-looking statement was made, the particular speaker knew that the particular forward-looking statement was false or the forward-looking statement was authorized or approved by an executive officer of Healthcare Services who knew that those statements were false when made.

**ANSWER:** The averments of paragraph 352 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

353. Lead Plaintiff brings this action as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased or otherwise acquired Healthcare Services stock during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are: (a) Defendants; (b) members of the immediate families of the Defendants; (c) the subsidiaries and affiliates of Defendants; (d) any person who is an officer, director, or controlling person of Healthcare Services; (e) any entity in which any Defendant has a controlling interest; (f) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representatives, heirs, successors or assigns of any such excluded party.

**ANSWER:** Defendants deny each and every averment of paragraph 353 of the Complaint, except admit that Plaintiff purports to bring this action on behalf of an alleged class of persons and entities who purchased HCSG stock during the putative Class Period. Defendants further aver that this action is not properly maintainable as a class action because plaintiffs cannot meet the requirements for the maintenance of a class action set forth in Federal Rule of Civil Procedure 23.

354. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members of the Class at a minimum.

**ANSWER:** The averments of paragraph 354 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 354 of the Complaint with respect to the number of members of the alleged class. Defendants

further aver that this action is not properly maintainable as a class action because plaintiffs cannot meet the requirements for the maintenance of a class action set forth in Federal Rule of Civil Procedure 23.

355.    As of March 14, 2019, Healthcare Services had 74.0 million shares of common stock outstanding and 400 record holders of common stock.  As of the same date, the Company believed that it had approximately 8,000 beneficial owners of its common stock.

**ANSWER:**  Defendants admit that paragraph 355 purports to summarize information in HCSG's 2018 Form 10-K.  Defendants refer to the 2018 Form 10-K for a complete and accurate statement of its contents and deny any characterization or interpretation of the 2018 Form 10-K that would be inaccurate if read in the context of the entire 2018 Form 10-K.  Specifically, Defendants note that the Form 10-K reports that there were "approximately" 74.0 million shares of HCSG's Common Stock outstanding as of March 14, 2019, HCSG had "approximately" 400 holders of record of its Common Stock as of March 14, 2019, and HCSG believed that it "may have approximately" 8,000 beneficial owners of its Common Stock.

356.    Members of the Class may be identified from records maintained by Healthcare Services or its transfer agent, and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

**ANSWER:**  The averments of paragraph 356 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied.  To the extent these averments are deemed to be factual in nature, Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of the paragraph with respect to records maintained by HCSG's transfer agent.  Defendants deny the remaining averments of paragraph 356 of the Complaint.

357.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.

**ANSWER:** The averments of paragraph 357 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied. Defendants further aver that this action is not properly maintainable as a class action because plaintiffs cannot meet the requirements for the maintenance of a class action set forth in Federal Rule of Civil Procedure 23.

358.    Lead Plaintiff's claims are typical of the claims of other members of the Class and the other members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

**ANSWER:** The averments of paragraph 358 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied. Defendants further aver that this action is not properly maintainable as a class action because plaintiffs cannot meet the requirements for the maintenance of a class action set forth in Federal Rule of Civil Procedure 23.

359.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Lead Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

**ANSWER:** The averments of paragraph 359 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied. Defendants further aver that this action is not properly maintainable as a class action because plaintiffs cannot meet the requirements for the maintenance of a class action set forth in Federal Rule of Civil Procedure 23.

360.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relativity small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**ANSWER:**  The averments of paragraph 360 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied.  To the extent these averments are deemed to be factual in nature, they are denied.  Defendants further aver that this action is not properly maintainable as a class action because plaintiffs cannot meet the requirements for the maintenance of a class action set forth in Federal Rule of Civil Procedure 23.

361.    Lead Plaintiff will rely, at least in part, on the presumption of reliance established by the fraud-on-the-market doctrine.  All purchasers of Healthcare Services securities during the Class Period suffered similar injuries, including injury through their purchase of the securities at artificially inflated prices.  A presumption of reliance therefore applies.

**ANSWER:**  The averments of paragraph 361 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied.  To the extent these averments are deemed to be factual in nature, they are denied.

362.    Lead Plaintiff and the putative Class are also entitled to the *Affiliated Ute* presumption of reliance due to the Defendants' material omission as alleged above, which information Lead Plaintiff would have wanted to know and which would have caused investors to have avoided purchasing shares of Healthcare Services common stock at the price they traded at during the Class Period.

**ANSWER:**  The averments of paragraph 362 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied.  To the extent these averments are deemed to be factual in nature, they are denied.

363.    Defendants failed to disclose the true nature of the Company's EPS reporting practices, and the material risks of those practices, throughout the Class Period.  In fact,

-177-

Defendants took steps to conceal these practices, including when they were directly confronted about the Monocle Reporting's findings on April 12, 2017.

**ANSWER:** Defendants deny the averments of paragraph 363 of the Complaint.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

364.  Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

**ANSWER:** Defendants repeat and reallege their responses to the averments contained in

the foregoing paragraphs as if fully set forth herein.

365.  Throughout the Class Period, Defendants, directly or indirectly, by the use of means or instrumentalities of interstate commerce, the United States mails, interstate telephone communications and a national securities exchange, employed a device, scheme or artifice to defraud, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices and a course of business that operated as a fraud and deceit upon Lead Plaintiff and other members of the Class in connection with their purchase of the common stock of Healthcare Services during the Class Period, all in violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

**ANSWER:** The averments of paragraph 365 of the Complaint purport to state legal

conclusions to which no response is required, and therefore are denied.  To the extent these

averments are deemed to be factual in nature, they are denied.

366.  The Company, Defendant McCartney and the Individual Defendants, as the senior officers of Healthcare Services during the Class Period, are liable as direct participants in all of the wrongs complained of herein through the date that they left the Company.  As detailed above, Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them.

**ANSWER:** The averments of paragraph 366 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

367.    Lead Plaintiff and other members of the Class relied upon the Defendants' statements and/or on the integrity of the market in purchasing shares of Healthcare Services' common stock during the Class Period.

**ANSWER:** The averments of paragraph 367 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

368.    As a direct and proximate cause of the wrongful conduct described herein, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of Healthcare Services common stock at artificially inflated prices during the Class Period. Had Lead Plaintiff and the other members of the Class known of the material adverse information not disclosed by the Defendants, or been aware of the earnings manipulation behind the Defendants' material misstatements, they would not have purchased Healthcare Services' common stock at artificially inflated prices during the Class Period.

**ANSWER:** The averments of paragraph 368 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

369.    In addition to the duties of full disclosure imposed on Defendants, as a result of their responsibility for the Company's financial statements and making affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including accurate and truthful information with respect to the Company's earnings results so that the market price of the Company's securities would be based on truthful, complete and accurate information.

**ANSWER:** The averments of paragraph 369 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

370.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder and are liable to Lead Plaintiff and the members of the Class who have been damaged as a result of such violations.

**ANSWER:**  The averments of paragraph 370 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied.  To the extent these averments are deemed to be factual in nature, they are denied.

## COUNT II

**Violations of Section 20(a) of the Exchange Act (Against the Individual Defendants)**

371.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

**ANSWER:**  Defendants repeat and reallege their responses to the averments contained in the foregoing paragraphs as if fully set forth herein.

372.    The Individual Defendants acted as controlling persons of Healthcare Services within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency and their ownership and contractual rights, participation in and/or awareness of Healthcare Service's operations and/or intimate knowledge of the false statements filed by Healthcare Services with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Healthcare Services, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

**ANSWER:**  The averments of paragraph 372 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied.  To the extent these averments are deemed to be factual in nature, they are denied.

373.    In particular, each Officer Defendant had direct and supervisory involvement in the day-to-date operations of Healthcare Services and therefore is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

**ANSWER:** The averments of paragraph 373 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

374.   As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

**ANSWER:** The averments of paragraph 374 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

375.   By reason of the conduct of Healthcare Services as alleged in this Complaint, and by virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Officers Defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their purchases of Healthcare Services common stock during the Class Period.

**ANSWER:** The averments of paragraph 375 of the Complaint purport to state legal conclusions to which no response is required, and therefore are denied. To the extent these averments are deemed to be factual in nature, they are denied.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a.   Determining that this action is a proper class action, certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiff's Counsel as Class Counsel;

b.   Awarding compensatory and/or rescissionary damages in favor of Lead Plaintiff and other members of the Class against Defendants for all damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

c.   Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.      Awarding such other and further relief as the Court may deem just and proper.

ANSWER:  To the extent the wherefore clause contains allegations to which a response may be required, Defendants admit only that Lead Plaintiff seeks relief as alleged in the wherefore clause.  Defendants deny that Plaintiff is entitled to such relief.

## AFFIRMATIVE DEFENSES

Defendants assert the following affirmative defenses.  In stating these affirmative defenses, Defendants do not concede that they have the burden of proof for any issues to which applicable law places the burden on Plaintiff and do not make any admissions as to liability, which they dispute.

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's and members of the putative Class' claims against Defendants are barred, in whole or in part, because Plaintiff and members of the putative Class lack standing to assert their claims against Defendants.

### SECOND AFFIRMATIVE DEFENSE

The Complaint, including each Count and claim contained therein, is barred, in whole or in part, by the applicable statute of limitations and other applicable periods of repose.

### THIRD AFFIRMATIVE DEFENSE

The Complaint, including each Count and claim contained therein, fails to state a claim upon which relief can be granted.

### FOURTH AFFIRMATIVE DEFENSE

The Complaint, including each Count and claim contained therein, is barred, in whole or in part, because the Complaint fails to comply with the pleading requirements of the

Federal Rules of Civil Procedure and/or the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4.

### FIFTH AFFIRMATIVE DEFENSE

There was no misstatement or omission of a material fact with respect to HCSG's public filings or statements during the putative Class Period as to which Defendants could be charged with liability under Section 10 of the Securities Exchange Act.

### SIXTH AFFIRMATIVE DEFENSE

The alleged misrepresentations and omissions set forth in the Complaint were not material.

### SEVENTH AFFIRMATIVE DEFENSE

The Complaint, including each Count and claim contained therein, is barred, in whole or in part, because Defendants had no duty to disclose any facts allegedly not disclosed.

### EIGHTH AFFIRMATIVE DEFENSE

The Complaint, including each Count and claim contained therein, is barred, in whole or in part, because notwithstanding the alleged misrepresentations or omissions, Defendants lacked fraudulent intent and/or acted in good faith.

### NINTH AFFIRMATIVE DEFENSE

To the extent the Complaint is based upon any forward-looking statements, Defendants are not liable because Plaintiff and members of the putative Class are barred from recovery in whole or in part by the safe harbor provisions of the Private Securities Litigation Reform Act of 1995, as codified at 15 U.S.C. § 78u-5 and 15 U.S.C. § 77z–2.

## TENTH AFFIRMATIVE DEFENSE

The Complaint, including each Count and claim contained therein, is barred, in whole or in part, because the statements alleged in the Complaint bespoke caution about the risks of investing in HCSG, and/or were corporate puffery.

## ELEVENTH AFFIRMATIVE DEFENSE

The Complaint, including each Count and claim contained therein, is barred, in whole or in part, because, and to the extent that, the alleged misrepresentations contain expressions of belief or opinion, including expressions of opinions that Plaintiff has not alleged and cannot prove were not truly held.

## TWELFTH AFFIRMATIVE DEFENSE

Defendants fully complied with industry practice and all then-existing rules and regulations of the SEC and other regulators.

## THIRTEENTH AFFIRMATIVE DEFENSE

Defendants are not liable because some or all of the matters now claimed by Plaintiff to be the subject of misrepresentations or omissions were publicly disclosed or were in the public domain and, as such, were available to Plaintiff and members of the putative Class and were at all times reflected in the price of the relevant securities.

## FOURTEENTH AFFIRMATIVE DEFENSE

At the time they purchased HCSG common stock, Plaintiff and each member of the putative Class had actual or constructive knowledge of some or all of the alleged facts upon which Defendants' alleged liability is premised; therefore, each such plaintiff assumed the risk that the value of HCSG common stock could decline.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff and the putative Class were expressly advised in the challenged public statements of the material facts and risks to HCSG that the Complaint alleges were the cause of Plaintiff's and the putative Class' purported damages.

## SIXTEENTH AFFIRMATIVE DEFENSE

If there were any misrepresentations or omissions in Defendants' public statements as alleged (which allegations are specifically denied), Plaintiff and each member of the putative Class did not reasonably rely on such alleged misrepresentation or omission, or on any alleged superior expertise and knowledge of Defendants, or on the integrity of the market, in purchasing or acquiring HCSG common stock.

## SEVENTEENTH AFFIRMATIVE DEFENSE

The putative Class does not satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure, and, therefore, this action is not properly maintainable as a class action.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff and each member of the putative Class would have acquired HCSG common stock even if they had known, at the time they acquired the stock, of the allegedly untrue statements of material fact, omissions of material fact, misleading statements or other allegedly wrongful conduct (none being admitted) upon which Defendants' purported liability rests.

### NINETEENTH AFFIRMATIVE DEFENSE

Any depreciation in the market price of the securities purchased by Plaintiff and members of the putative Class resulted from factors other than the alleged misrepresentations and omissions set forth in the Complaint.

### TWENTIETH AFFIRMATIVE DEFENSE

The alleged misrepresentations and omissions set forth in the Complaint were not the legal cause or the cause in fact of any of the alleged harm, and Plaintiff and members of the putative Class have suffered no legally cognizable damages.

### TWENTY-FIRST AFFIRMATIVE DEFENSE

The Complaint, including each Count and claim contained therein, is barred, in whole or in part, because any damages incurred by Plaintiff or a member of the putative Class were sustained as a direct and proximate result of intervening and superseding acts and/or omissions of persons or entities, other than Defendants, that were outside the control of Defendants, and/or by intervening and superseding events that were beyond the control of, and could not have been foreseen by, Defendants.

### TWENTY-SECOND AFFIRMATIVE DEFENSE

To the extent Plaintiff and members of the putative Class have suffered any damages, they have failed to mitigate those damages.

### TWENTY-THIRD AFFIRMATIVE DEFENSE

Any damages recovery by Plaintiff or a member of the putative Class is subject to an offset for the amount of tax benefits actually received by that plaintiff through its investments.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

The Complaint, including each Count and claim contained therein, is barred, in whole or in part, because any alleged damages to Plaintiff or a member of the putative Class were caused by that plaintiff's own negligence in failing to conduct a reasonably diligent investigation of the risks associated with its investment.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

The alleged damages of Plaintiff and members of the putative Class are speculative and, therefore, not recoverable.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

The Complaint, including each Count and claim contained therein, is barred, in whole or in part, by the doctrines of waiver, estoppel, ratification, unclean hands, laches and/or other related doctrines and principles.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

The Complaint, including each Count and claim contained therein, is barred, in whole or in part, because awarding Plaintiff's and members of the putative Class' requested damages would result in unjust enrichment to Plaintiff and members of the putative Class.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

Any damage, loss or liability sustained by Plaintiff and members of the putative Class must be reduced, diminished, and/or barred in proportion to the wrongful or negligent conduct of persons or entities other than Defendants under the principles of equitable allocation, recoupment, set-off, proportionate responsibility, and comparative fault.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

Defendants did not commit or make any intentional misrepresentation or omission with the requisite degree of scienter necessary to impose liability under Section 10(b) of the Exchange Act or Rule 10b-5 promulgated thereunder.

## THIRTIETH AFFIRMATIVE DEFENSE

Because neither Plaintiff nor any member of the putative Class can establish the primary liability necessary to support their claims for "control person" liability under Section 20(a) of the Exchange Act, such claims are barred.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

The claim under Section 20(a) of the Exchange Act is barred in whole or in part because certain Defendants were not "controlling persons" during some or all of the putative Class Period.

## THIRTY-SECOND AFFIRMATIVE DEFENSE

Defendants acted in good faith and did not directly or indirectly induce the act or acts constituting the alleged violation(s) or cause(s) of action.

## THIRTY-THIRD AFFIRMATIVE DEFENSE

Plaintiff and members of the putative Class are precluded from recovering attorneys' fees from Defendants under applicable provisions of law.

## THIRTY-FOURTH AFFIRMATIVE DEFENSE

Defendants reserve the right to amend the above answer and affirmative defenses consistent with further discovery and evidence throughout the pendency of this action.

WHEREFORE, Defendants respectfully request that this Court enter judgment in favor of Defendants and award Defendants their costs, attorneys' fees, and such other relief as may be just and proper.

Dated:  June 22, 2020                              Respectfully submitted,

/s/  *Robert L. Hickok*
Robert L. Hickok (PA Bar No. 30101)
Jay A. Dubow (PA Bar No. 41741)
Joanna J. Cline (PA Bar No. 83195)
Daniel J. Boland (PA Bar No. 91263)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

*Attorneys for Defendants*
*Healthcare Services Group, Inc., Daniel P.*
*McCartney, Theodore Wahl, John C. Shea,*
*and Matthew J. McKee*

## <u>CERTIFICATE OF SERVICE</u>

I, Joanna J. Cline, hereby certify that on June 22, 2020, a true and correct copy of the foregoing Answer and Affirmative Defenses to Lead Plaintiff's Amended Complaint was filed with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

/s/ *Joanna J. Cline*
Joanna J. Cline