**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UTAH RETIREMENT SYSTEMS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HEALTHCARE SERVICES GROUP, INC., DANIEL P. MCCARTNEY, THEODORE WAHL, JOHN C. SHEA, and MATTHEW J. MCKEE,<br><br>Defendants. | Case No. 2:19-cv-01227-ER<br><br>**ORAL ARGUMENT REQUESTED** |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF**
<u>**CLASS REPRESENTATIVE AND CLASS COUNSEL**</u>

Ira Neil Richards (PA Bar No. 50879)
Arleigh P. Helfer III (PA Bar No. 84427)
1600 Market Street, Ste. 3600
**SCHNADER HARRISON SEGAL & LEWIS LLP**
Philadelphia, PA 19103
Telephone: (215) 751-2503

*Counsel for Lead Plaintiff Utah Retirement Systems & Liaison Counsel for the Class*

| | |
|---|---|
| Nicole Lavallee (*Pro Hac Vice*)<br>Jeffrey Rocha (*Pro Hac Vice*)<br>**BERMAN TABACCO**<br>44 Montgomery Street, Suite 650<br>San Francisco, CA  94104<br>Telephone: (415) 433-3200 | Patrick T. Egan (*Pro Hac Vice*)<br>Steven J. Buttacavoli (*Pro Hac Vice*)<br>**BERMAN TABACCO**<br>One Liberty Square<br>Boston, MA 02109<br>Telephone: (617) 542-8300 |

*Counsel for Lead Plaintiff Utah Retirement Systems & Lead Counsel for the Class*

Dated:  November 13, 2020

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND ..............................................................................3

ARGUMENT .......................................................................................................5

I.    Class Certification Standards ...................................................................5

II.   This Action Satisfies All Requirements of Rule 23(a) ...........................6

    A.  The Proposed Class Is Numerous ......................................................6

    B.  The Proposed Class Shares Common Questions Of Law And Fact ...................7

    C.  Lead Plaintiff's Claims Are Typical Of The Class ............................8

    D.  The Proposed Class Representative And Class Counsel Are Adequate Under Rule 23(a)...................................................................9

        1.  Lead Plaintiff's Interests Are Not Adverse To The Class ..........10

        2.  Proposed Class Counsel Will Adequately Represent The Class ...............11

III.  The Predominance And Superiority Requirements Of Rule 23(b)(3) Are Satisfied..................................................................................................12

    A.  Common Questions Of Law And Fact Predominate .......................13

        1.  Lead Plaintiff And The Class Are Entitled To A Presumption Of Reliance Because HCSG Common Stock Traded In An Efficient Market ....................................................................16

            a.  HCSG's Shares Were Listed And Traded On The NASDAQ, A Presumptively Efficient Market.............................................16

            b.  The *Cammer/Krogman* Factors Demonstrate That HCSG Common Stock Traded In An Efficient Market .................................17

                i.   *Cammer* Factor One:  HCSG's Large Weekly Trading Volume Indicates The Presence Of An Efficient Market ...........18

i

ii.    *Cammer* Factor Two:  A Significant Number Of Securities Analysts Followed HCSG, Demonstrating Market Efficiency ................................................................................18

iii.    *Cammer* Factor Three:  The High Number Of Market Makers And Arbitrageurs Trading HCSG's Stock Demonstrates Market Efficiency ................................................19

iv.    *Cammer* Factor Four:  HCSG's Form S-3 Status Weighs In Favor Of Market Efficiency ..........................................................21

v.    *Cammer* Factor Five:  HCSG's Stock Price Reacted To Information Disclosed To The Market, Illustrating Market Efficiency ................................................................................21

vi.    *Krogman* Factor One:  HCSG's Large Market Capitalization Indicates An Efficient Market .........................................................23

vii.    *Krogman* Factor Two:  HCSG's Small Bid-Ask Spread Illustrates An Efficient Market ......................................................24

viii.    *Krogman* Factor Three:  HCSG's Large Public Float Supports Market Efficiency ..........................................................25

2.    The Class Is Also Entitled To A Presumption Of Reliance Under *Affiliated Ute* ................................................................................25

3.    Damages Are Measurable Using A Common Methodology .....................26

B.    Class Treatment Is Superior To Other Methods Of Adjudication ...................28

IV.    The Proposed Class Is Ascertainable ....................................................................30

V.    Proposed Class Counsel Satisfy Rule 23(g) ..........................................................31

CONCLUSION ..................................................................................................................32

# TABLE OF AUTHORITIES

**Cases**

*Affiliated Ute Citizens v. United States*,
    406 U.S. 128 (1972)................................................................................ 25, 26, 27

*Amchem Prod., Inc. v. Windsor*,
    521 U.S. 591 (1997).......................................................................................... 13

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)......................................................................... 6, 13, 14, 15

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)................................................................................. passim

*Boyle v. Progressive Specialty Ins. Co.*,
    326 F.R.D. 69 (E.D. Pa. 2018)........................................................................ 31

*Byrd v. Aaron's Inc.*,
    784 F.3d 154 (3d Cir. 2015), as amended (Apr. 28, 2015)........................... 30, 31

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ................................................................. passim

*Cheney v. Cyberguard Corp.*,
    213 F.R.D. 484 (S.D. Fla. 2003)............................................................. 20, 24, 25

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*,
    322 F. Supp. 3d 676 (D. Md. 2018) .................................................................. 27

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*,
    No. 12-5275, 2015 WL 5097883 (D.N.J. Aug. 31, 2015) ............................. passim

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)..................................................................................... 26, 28

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    296 F.R.D. 261 (S.D.N.Y. 2014) ...................................................................... 25

*Erica P. John Fund, Inc. v. Halliburton Co. (Halliburton I)*,
    563 U.S. 804 (2011)...................................................................................... 2, 14

*Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II)*,
    573 U.S. 258 (2014)..................................................................................... 15, 17

*Hayes v. MagnaChip Semiconductor Corp.*,
    No. 14-cv-01160-JST, 2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) ............... 22

*In re Banc of Cal. Sec. Litig.*,
   326 F.R.D. 640 (C.D. Cal. 2018) ................................................................................ 22

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001)....................................................................................... 10

*In re Centocor, Inc. Sec. Litig. III*,
   No. Civ.A. 98-260, 1999 WL 54530 (E.D. Pa. Jan. 27, 1999) ............................... 9

*In re CIGNA Corp. Sec. Litig.*,
   No. 02-cv-8088, 2006 WL 2433779 (E.D. Pa. Aug. 18, 2006) ................................. 6, 26, 29

*In re Corel Corp. Inc. Sec. Litig.*,
   206 F.R.D. 533 (E.D. Pa. 2002)................................................................................. 9

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014) .................................................................................... 26

*In re Deutsche Bank AG Sec. Litig.*,
   328 F.R.D. 71 (S.D.N.Y. 2018), *leave to appeal denied*,
   No. 18-3036, 2019 WL 1612904 (2d Cir. Feb. 20, 2019) ...................................... 31

*In re DVI Inc. Sec. Litig. (DVI I)*,
   249 F.R.D. 196 (E.D. Pa. 2008), *aff'd*, 639 F.3d 623 (3d Cir. 2011) ........................... passim

*In re DVI, Inc. Sec. Litig. (DVI II)*,
   639 F.3d 623 (3d Cir. 2011), *abrogated on other ground by*
   *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013).................................... 16

*In re Heckmann Corp. Sec. Litig.*,
   No. 10-cv-378-LPS-MPT, 2013 WL 2456104 (D. Del. June 6, 2013)........................... 6, 22

*In re Herley Indus. Inc. Sec. Litig.*,
   No. Civ.A. 06-2596, 2009 WL 3169888 (E.D. Pa. Sept. 30, 2009) ............................... 29, 30

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
   MDL No. 1658 SRC, 2013 WL 396117 (D.N.J. Jan. 30, 2013).................................... passim

*In re Merck & Co., Inc., Vytorin/Zetia Sec. Litig.*,
   Civ.A. No. 08-2177 (DMC) (JAD), 2012 WL 4482041 (D.N.J. Sept. 25, 2012) ..... 8, 21, 29

*In re Nat'l Football League Players Concussion Injury Litig.*,
   821 F.3d 410 (3d Cir. 2016), as amended (May 2, 2016)................................................. 11

*In re Novo Nordisk Sec. Litig.*,
   No 3:17-cv-209-BRM-LHG, 2020 WL 502176 (D.N.J. Jan. 31, 2020)....................... 8, 9, 26

*In re Petrobras Sec. Litig.*,
  862 F.3d 250 (2d Cir. 2017)..................................................................................... 23

*In re Plastics Additives Antitrust Litig.*,
  No. Civ.A. No. 03-2038, 2006 WL 6172035 (E.D. Pa. Aug. 31, 2006)............................. 30

*In re Schering Plough ERISA Litig.*,
  589 F.3d 585 (3d Cir. 2009)..................................................................................... 9

*In re Schering-Plough Corp./ENHANCE Sec. Litig.*,
  No. Civ.A. 8-397 DMC/JAD, 2012 WL 4482032 (D.N.J. Sept. 25, 2012)........................ 10

*In re Urban Outfitters, Inc. Sec. Litig.*,
  No. 13-5978, 2016 WL 1043014 (E.D. Pa. Feb. 29, 2014) ................................................. 31

*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004)..................................................................................... 8

*Johnston v. HBO Film Mgmt., Inc.*,
  265 F.3d 178 (3d Cir. 2001).................................................................................... 25

*Kalish v. Karp & Kalamotousakis, LLP*,
  246 F.R.D. 461 (S.D.N.Y. 2007) ......................................................................... 31

*Karinski v. Stamps.com, Inc.*,
  No. CV 19-1828-MWF (SKx), 2020 WL 6572660  (C.D. Cal. Nov. 9, 2020) .................. 22

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) .................................................................. 17, 23, 24, 25

*Li v. Aeterna Zentaris, Inc.*,
  No. 14-cv-7081 (PGS) (TJB), 2018 WL 1143174 (D.N.J. Feb. 28, 2018)......................... 26

*Marcus v. BMW of N. Am., LLC*,
  687 F.3d 583 (3d Cir. 2012)..................................................................................... 6

*Marsden v. Select Med. Corp.*,
  246 F.R.D. 480 (E.D. Pa. 2007)............................................................................ 10, 12

*McIntyre v. RealPage, Inc.*,
  No. Civ.A. No. 18-3934, 2020 WL 5017612 (E.D. Pa. Aug. 25, 2020)............................. 30

Neale v. Volvo Cars of N. Am., LLC,
  794 F.3d 353 (3d Cir. 2015)............................................................................... 13, 26, 28

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  259 F.3d 154 (3d Cir. 2001).................................................................................... 8, 14

*Pirnik v. Fiat Chrysler Automobiles, N.V.,*
    327 F.R.D. 38 (S.D.N.Y. 2018) ................................................................ 18

*Reyes v. Netdeposit, LLC,*
    802 F.3d 469 (3d Cir. 2015)..................................................................... 7

*Roofer's Pension Fund v. Papa,*
    333 F.R.D. 66 (D.N.J. 2019)........................................................... passim

*Rosen v. Fid. Fixed Income Trust,*
    169 F.R.D. 295 (E.D. Pa. 1995)............................................................. 29

*SEB Inv. Mgmt. AB v. Symantec Corp.,*
    335 F.R.D. 276 (N.D. Cal. 2020)........................................................... 27

*Seidman v. Am. Mobile Sys., Inc.,*
    157 F.R.D. 354 (E.D. Pa. 1994).............................................................. 27

*Sharp v. Coopers & Lybrand,*
    83 F.R.D. 343 (E.D. Pa. 1979)................................................................ 27

*Skeway v. China Natural Gas, Inc.,*
    304 F.R.D. 467 (D. Del. 2014) .......................................................... 12, 25

*Strougo v. Barclays PLC,*
    312 F.R.D. 307 (S.D.N.Y. 2016), *aff'd sub nom.,*
    *Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017) ................................ 14, 26

*Sullivan v. DB Invs., Inc.,*
    667 F.3d 273 (3d Cir. 2011)...................................................................... 8

*Thomas v. Duralite Co., Inc.,*
    524 F.2d 577 (3d Cir. 1975)..................................................................... 27

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.,*
    No. CV 13-6731, 2016 WL 4138613 (E.D. Pa. Aug. 4, 2016)....................... passim

*Waggoner v. Barclays PLC,*
    875 F.3d 79 (2d Cir. 2017)...................................................................... 15

*Williams v. Jani-King of Phila. Inc.,*
    837 F.3d 314 (3d Cir. 2016)...................................................................... 6

*Wilson v. LSB Indus., Inc.,*
    No. 15CIV7614, 2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018) ................... 24, 25

**Statutes**

15 U.S.C. § 78u–4(e) ...................................................................... 27

## Other Authorities

*Reproposal of Comprehensive Revision to System for Registration of Securities Offerings*,
  SEC Release No. 6331, 46 Fed. Reg. 41,902 (Aug. 13, 1981) ............................................ 21

## Rules

Fed. R. Civ. P. 23(a)(1) ............................................................................................................ 6
Fed. R. Civ. P. 23(a)(2) ............................................................................................................ 7
Fed. R. Civ. P. 23(a)(3) ............................................................................................................ 8
Fed. R. Civ. P. 23(a)(4) ....................................................................................................... 9, 12
Fed. R. Civ. P. 23(b)(3) ...................................................................................................... 12, 28
Fed. R. Civ. P. 23(g)(1)(a) ..................................................................................................... 31

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Lead Plaintiff Utah Retirement Systems ("Utah" or "Lead Plaintiff") respectfully requests that the Court: (1) certify the Class (defined below); (2) appoint Lead Plaintiff as Class Representative; and (3) appoint Berman Tabacco as Class Counsel and Schnader Harrison Segal & Lewis LLP as Class Liaison Counsel.

## INTRODUCTION

"[I]t is well-settled that the class action is a particularly appropriate vehicle for adjudication of federal securities cases." *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, No. 12-5275, 2015 WL 5097883, at *13 (D.N.J. Aug. 31, 2015).  This case is no exception.  Lead Plaintiff asserts claims pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") alleging that Defendants[1] made materially false and misleading statements and omissions concerning: (i) the reported net income and earnings per share, or EPS, of Healthcare Services Group, Inc. ("HCSG" or the "Company"); (ii) the existence and extent of a U.S. Securities and Exchange Commission ("SEC") investigation – and related internal investigation – into HCSG's EPS calculation and reporting policies; and (iii) the effectiveness of the HCSG's internal controls.

Pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, Lead Plaintiff now seeks certification of the following class ("Class"):

> All persons and entities who purchased or otherwise acquired the common stock of HCSG from April 8, 2014 through March 4, 2019, inclusive (the "Class Period") and were damaged thereby.  Excluded from the Class are: (i) Defendants

---

[1]   Defendants are Healthcare Services Group, Inc. and the "Individual Defendants" Daniel P. McCartney, Theodore Wahl, John C. Shea, and Matthew J. McKee.  Unless otherwise specified herein, capitalized terms have the same meanings as defined in Lead Plaintiff's Amended Complaint for Violations of the Federal Securities Laws (the "Complaint"), ECF No. 31.  Stand-alone references to "¶ _ " are to the paragraphs in the Complaint.

1

and any affiliates or subsidiaries of HCSG; (ii) present or former officer, director, or controlling persons of HCSG, its subsidiaries, or its affiliates, and their immediate family members; (iii) Defendants' directors' and officers' liability carriers and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant has or has had a controlling interest; and (v) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding categories.

This action thoroughly satisfies the requirements of Rule 23.

*First*, Rule 23(a) prerequisites of numerosity, commonality, typicality, and adequacy are easily satisfied. The proposed Class consists of thousands of shareholders, and joinder would be impracticable, satisfying numerosity. Further, this action presents many common questions of law and fact, including as to Defendants' misrepresentations and omissions, materiality, scienter, and damages, thereby satisfying commonality. Similarly, typicality and adequacy are easily satisfied. Utah is a typical Class member, the quintessential institutional investor lead plaintiff contemplated under the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Utah was injured by the same wrongful conduct as other proposed Class members and has demonstrated its commitment to the vigorous prosecution of this action. Moreover, Utah selected proposed Class Counsel and Class Liaison Counsel with significant experience prosecuting federal securities class actions and who will zealously prosecute this action, satisfying adequacy.

*Second*, Rule 23(b)(3)'s predominance and superiority requirements are readily met. Questions common to all Class members predominate over any potential questions affecting only individual Class members. In a securities class action asserting claims under Section 10(b) of the Exchange Act, to satisfy the predominance requirement, a plaintiff must establish the element of reliance. Where securities trade in an efficient market, as here, the fraud-on-the-market doctrine establishes reliance on a class-wide basis. *See Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988); *see also Erica P. John Fund, Inc. v. Halliburton Co.* (*Halliburton I*), 563 U.S. 804, 809 (2011)

2

(individual questions of reliance do not predominate where plaintiffs properly invoke the fraud-on-the-market theory). Overwhelming evidence, discussed in the accompanying Expert Report of Zachary Nye, Ph.D. of Stanford Consulting Group, Inc. (the "Nye Report"),[2] confirms that HCSG shares traded in an efficient market during the Class Period. Moreover, the Nye Report further establishes that damages can be measured using a common methodology for all Class members. Proceeding as a class action is also superior to other available methods for fairly and efficiently adjudicating Class members' claims.

*Finally*, the proposed Class is readily ascertainable based on objective criteria. Accordingly, this motion should be granted in its entirety.

### FACTUAL BACKGROUND

HCSG provides housekeeping and dining services to more than 3,000 healthcare facilities throughout the U.S. ¶¶ 2, 33-34. The Company provides these services under "full-service agreements" whereby the Company is responsible for the day-to-day management of employees who perform services at the client's facilities. ¶ 35. During the Class Period, labor costs accounted for the majority of the Company's expenses and thus were a key factor affecting the Company's profitability. ¶¶ 41, 137.

As alleged, HCSG and its tightly-knit extended family of senior management, led by the Individual Defendants, artificially inflated and/or maintained the price of the Company's stock by engaging in a pattern of covert manipulation of the Company's financial results to engineer false and misleading quarterly earnings per share ("EPS"). ¶¶ 50, 125, 320. Through serial manipulation of the Company's net income, largely by relatively modest and essentially

---

[2] The Nye Report is attached as Exhibit C to the Declaration of Patrick T. Egan In Support of Lead Plaintiffs' Motion For Class Certification and Appointment of Class Representative and Class Counsel ("Egan Decl." or "Egan Declaration"), filed herewith.

undetectable rigging of the Company's labor expenses and related accounting accruals, Defendants produced quarterly EPS results ending with a third digit – representing tenths of a cent – of five or greater, which allowed the Company's EPS to be "rounded up" to avoid missing analysts' consensus targets.  ¶¶ 6-8, 70-74, 109-39, 295-96.  Analysts and the market relied closely on Defendants' reported net income and EPS results and pointed to the Company's impressive EPS track record quarter after quarter.  ¶¶ 51-58.[3]  Thus, Defendants' alleged misleading statements and omissions caused and/or maintained artificial inflation in the price of HCSG's common stock through the Class Period, until the facts were revealed to the market.

This alleged EPS manipulation only stopped – and did so immediately – after the SEC launched an investigation into the Company's EPS practices in November 2017 – an inquiry that was escalated to a formal investigation by March 2018 and remains ongoing more than three years later.  ¶¶ 12, 79-81, 107.  But while the Company ceased its EPS manipulations under SEC scrutiny, Defendants continued to mislead investors by concealing its past EPS practices, its false EPS results, and the ongoing SEC investigation.  Far from remaining silent, Defendants affirmatively misrepresented that there were no pending investigations at times when Defendants

---

[3]  On March 22, 2017, Monocle Accounting Research ("Monocle") issued a report entitled "Healthcare Services Group: A Decade of Strategic Rounding" (the "Monocle Report" or "Report").  ¶¶ 8, 66.  The Report identified an "odd and concerning pattern" of apparent "strategic rounding" of HCSG's reported quarterly EPS (¶ 66), but did not conclude that the Company's EPS results were the product of fraud and did not explain how the rounding up occurred.  One month later, on April 12, 2017, Defendants were asked during an earnings call about "reports that came out about the company quarterly results being rounded up for a long period of time on the quarter."  ¶ 84.  Defendant Wahl responded by feigning ignorance of the Report and implicitly denied any impropriety in the Company's practices, stating: "when you look at over the past 10 or so years that you have mentioned, our track record really speaks for itself."  ¶ 85.  The market reacted favorably to Wahl's reassurances, sending HCSG's  stock price up by nearly 8%. ¶ 86.

knew of the SEC investigation into its EPS practices and the Company's own internal investigation into those matters, which were costing millions of dollars. ¶¶ 252-79.

On March 4, 2019, Defendants finally revealed the existence of the long-pending SEC investigation and the Company's internal investigation into the Company's EPS practices. ¶ 100. In response to this news, the price of HCSG's stock plummeted more than 13%, resulting in a loss of more than $367 million in shareholder value, and has never recovered. ¶¶ 15, 103, 343.

The proposed Class representative is Lead Plaintiff Utah Retirement Systems. Lead Plaintiff is a large, public pension fund that provides retirement and insurance benefits for Utah public employees, serving more than 235,000 members and about 470 public employers, including the State of Utah, its local governments, school districts, and higher education institutions.[4] On June 17, 2019, this Court appointed Utah has Lead Plaintiff. Utah Decl. ¶ 5; ECF No. 24. Since that time, Lead Plaintiff has vigorously pursued the proposed Class's claims, reviewing and authorizing the filing of the Complaint, defeating Defendants' motion to dismiss and motion for reconsideration, and engaging in discovery. *See* Utah Decl. ¶ 6. Lead Plaintiff fully understands the role and obligations of representing a class and is committed to protecting the interests of the entire Class. *See id.* at ¶¶ 4-5, 7, 9.

**ARGUMENT**

**I.      Class Certification Standards**

An action may be certified as a class action if the four prerequisites of Rule 23(a) (numerosity, commonality, typicality, and adequacy) are met, and the action qualifies under one

---

[4] Declaration of Daniel Andersen ("Utah Decl."), which is attached as Exhibit D to the Egan Declaration, at ¶ 3; *About Utah Retirement Systems*, https://www.urs.org/general/AboutURS (last visited November 12, 2020).

5

of Rule 23(b)'s subdivisions (here, Rule 23(b)(3)).  Class certification is "especially appropriate in securities fraud cases wherein there are many individual plaintiffs who suffer damages too small to justify a suit against a large corporate defendant."  *In re Heckmann Corp. Sec. Litig.*, No. 10-cv-378-LPS-MPT, 2013 WL 2456104, at *13-14 (D. Del. June 6, 2013) (citations omitted) ("This circuit favors allowing class certification in securities fraud cases").

While Rule 23 must be satisfied by a preponderance of the evidence,[5] the Supreme Court has cautioned that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

## II.    This Action Satisfies All Requirements Of Rule 23(a)

### A.    The Proposed Class Is Numerous

Under Rule 23(a), numerosity requires that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  While "[t]here is no minimum number of members needed for a suit to proceed as a class action," the Third Circuit has held that where the "potential number of plaintiffs exceeds 40," numerosity is generally satisfied.  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 595 (3d Cir. 2012).  In securities actions, "courts have recognized a presumption that the numerosity requirement is satisfied when a class action involves a nationally traded security."  *In re CIGNA Corp. Sec. Litig.*, No. 02-cv-8088, 2006 WL 2433779, at *2 (E.D. Pa. Aug. 18, 2006) (citation and internal quotation marks omitted).  Courts also look to the volume of shares outstanding and average weekly trading volume to establish numerosity

---

[5]  *Williams v. Jani-King of Phila. Inc.*, 837 F.3d 314, 319 (3d Cir. 2016).

in actions under the federal securities laws. *See, e.g., Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 74 (D.N.J. 2019).

Lead Plaintiff easily establishes numerosity, as the proposed Class consists of thousands of members. During the Class Period, HCSG had between 70.2 million and 73.8 million ordinary shares outstanding. Nye Report ¶ 25. Moreover, HCSG common stock was actively traded, with an average weekly trading volume of more than 2,324,809 million shares. *Id.* Thus, joinder of these thousands of HCSG investors would be impractical.[6]

### B. The Proposed Class Shares Common Questions Of Law And Fact

Under Rule 23(a)(2), commonality requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Courts have found this commonality requirement "not particularly demanding." *Prudential*, 2015 WL 5097883, at *8. To meet the commonality requirement, the proposed class representative must share "at least one question of fact or law with the grievances of the prospective class." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015) (citation omitted). In assessing commonality, "[c]ourts in this [C]ircuit … have recognized that securities fraud cases often present a paradigmatic common question of law or fact of whether a company omitted material information or made misrepresentations that inflated the price of its stock." *Roofer's Pension Fund*, 333 F.R.D. at 74-75 (alteration in original) (citation omitted).

Here, Lead Plaintiff has no difficulty establishing commonality. Common questions abound, including: (i) whether Defendants violated the federal securities laws; (ii) whether Defendants' public statements during the Class Period misrepresented or omitted material facts;

---

[6] *See, e.g., W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. CV 13-6731, 2016 WL 4138613, at *7 (E.D. Pa. Aug. 4, 2016) (numerosity satisfied where "stock traded on the NASDAQ" and "there were millions of shares of stock outstanding").

(iii) whether Defendants acted with scienter in issuing false and misleading statements; (iv) whether and to what extent the price of HCSG common stock was artificially inflated by Defendants' false and misleading statements or omissions; (v) whether the members of the putative Class suffered damages and what the appropriate measure of those damages is; and (vi) whether the Individual Defendants were controlling persons of the Company under Section 20(a) of the Exchange Act.  The presence of these common questions of law and fact firmly establishes commonality.  *See, e.g.*, *In re Novo Nordisk Sec. Litig.*, No 3:17-cv-209-BRM-LHG, 2020 WL 502176, at *5 (D.N.J. Jan. 31, 2020) (commonality established where "[c]omplaint alleges a common course of conduct arising from materially false and misleading statements and omissions Defendants made to the investing public") (internal quotation marks omitted). Further, these common questions will "generate common answers apt to drive the resolution of the litigation." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 299 (3d Cir. 2011) (citation and internal quotation marks omitted); *see also In re Merck & Co., Inc., Vytorin/Zetia Sec. Litig.*, Civ.A. No. 08-2177 (DMC) (JAD), 2012 WL 4482041, at *4 (D.N.J. Sept. 25, 2012) ("questions of misrepresentation, materiality and scienter are the paradigmatic common question[s] of law or fact …,") (alteration in original) (citation omitted).  For these reasons, the proposed Class satisfies commonality.

### C. Lead Plaintiff's Claims Are Typical Of The Class

To establish typicality under Rule 23(a), a plaintiff must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  However, typicality "does not require that the putative class members all share *identical* claims."  *Roofer's Pension Fund*, 333 F.R.D. at 75 (emphasis added) (citing *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531-32 (3d Cir. 2004)).  Instead, "[t]he standard

8

for demonstrating typicality is undemanding and requires that 'the claims of the named plaintiffs and putative class members involve the same conduct by the defendant.'" *Id*. at 75 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001)).

The proposed Class satisfies the typicality requirement. Lead Plaintiff and putative Class members all purchased HCSG common stock and assert the same claims under Section 10(b), based on the same misstatements and omissions by Defendants, and the same claim under Section 20(a), based on liability of the Individual Defendants as "controlling persons" of the Company. Nor are there any unique defenses to which Lead Plaintiff is subject, and certainly none that are "both inapplicable to many members of the class and likely to become a major focus of the litigation." *In re Schering Plough ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009). Lead Plaintiff's "claims arise from the very same alleged Exchange Act violations as those that give rise to the claims of the absent class members," abundantly satisfying typicality. *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, MDL No. 1658 SRC, 2013 WL 396117, at *5 (D.N.J. Jan. 30, 2013).[7]

> **D.      The Proposed Class Representative And Class Counsel Are Adequate Under Rule 23(a)**

Rule 23(a)(4)'s adequacy requirement seeks to ensure that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy requires only that the class representative (i) "not have any conflict that might prevent them from representing the interests of the class," and (ii) "that their counsel is qualified to represent all

---

[7]   *See also Novo Nordisk*, 2020 WL502176, at *6 ("[T]ypicality is clearly satisfied because Plaintiffs' claims arise from the same course of conduct that gave rise to the claims of all other Class members and are based on the same legal theory."); *Prudential*, 2015 WL 5097883, at *9 (typicality satisfied where "[t]he factual and legal predicates of [the proposed class representative's] claims are the same as those for the class members").

plaintiffs." *In re Corel Corp. Inc. Sec. Litig.*, 206 F.R.D. 533, 542 (E.D. Pa. 2002); *see also DFC Glob. Corp.*, 2016 WL 4138613, at *9 ("This requirement touches on whether the interests of the class representatives conflict with the interests of class members and whether class counsel is able to adequately represent the class"). The adequacy "components are designed to ensure that absentee class members' interests are fully pursued." *In re Centocor, Inc. Sec. Litig. III*, No. Civ.A. 98-260, 1999 WL 54530, at *3 (E.D. Pa. Jan. 27, 1999).

As set forth below, both Lead Plaintiff, as the proposed Class representative, and Berman Tabacco, as Lead Plaintiff's proposed Class Counsel, satisfy the adequacy requirement to fulfill their important roles on behalf of the proposed Class in this action.

### 1. Lead Plaintiff's Interests Are Not Adverse To The Class

Lead Plaintiff and the putative Class members share the same interest in holding Defendants accountable for their misconduct, as Lead Plaintiff and the putative Class members purchased HCSG stock and were injured by the same materially false and misleading statements and omissions. This identical interest satisfies Rule 23's adequacy requirement.[8] Moreover, Lead Plaintiff is not subject to any unique defenses that would create a conflict with the interests of the Class.[9]

---

[8] *See In re Schering-Plough Corp./ENHANCE Sec. Litig.*, No. Civ.A. 8-397 DMC/JAD, 2012 WL 4482032, at *6 (D.N.J. Sept. 25, 2012) (finding adequacy where "Lead Plaintiffs' claims are identical to those of the Class: they claim that they purchased Schering securities during the Class Period and have been injured by the allegedly wrongful course of conduct at issue"); *Marsden v. Select Med. Corp.*, 246 F.R.D. 480, 485 (E.D. Pa. 2007) (finding adequacy where lead plaintiff "like other members of the class, bought their shares at an allegedly-inflated price and thus did not receive the same value upon sale of the stock as they would have otherwise").

[9] *Marsden*, 246 F.R.D. at 485-86 (finding absence of unique defenses demonstrates adequacy and noting that "the burden is on the defendant to show that such a unique defense will play a significant role at trial") (citation and internal quotation marks omitted).

10

As the Court has already determined, Utah is qualified and appropriate to act as Lead Plaintiff in representing the proposed Class.  ECF No. 24; *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 273 (3d Cir. 2001) ("the purpose of the [PSLRA] was to encourage institutional investors to serve as lead plaintiff").  Lead Plaintiff understands the role and obligations of representing a class and is committed to protecting the interests of the entire Class.  *See* Utah Decl. ¶¶ 5, 9.  Lead Plaintiff has vigorously pursued the proposed Class's claims since the inception of the case, reviewing and authorizing the filing of the Complaint, defeating Defendants' motion to dismiss and motion for reconsideration, and participating in discovery, propounding numerous document requests and interrogatories, reviewing documents and responding to discovery.  *Id.* at ¶ 6.  Lead Plaintiff continues to be fully committed to actively prosecuting the action in the best interest of the Class.  *Id.* at ¶¶ 7, 9.  Moreover, Lead Plaintiff has demonstrated its commitment to monitor and supervise the prosecution of this Action on behalf of the Class, which is "all that is required."  *DFC Glob. Corp.*, 2016 WL 4138613, at *10.  Specifically, Lead Plaintiff has participated in numerous meetings with Lead Counsel, reviewed pleadings, provided documents to Lead Counsel to be produced in discovery, and monitored this litigation throughout all stages of the action to date.  Utah Decl. ¶¶ 6-7, 9.  Thus, Lead Plaintiff is an adequate class representative.[10]

### 2. Proposed Class Counsel Will Adequately Represent The Class

---

[10]  *See In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 430 (3d Cir. 2016), as amended (May 2, 2016) (finding "a minimal degree of knowledge about the litigation adequate") (citation and internal quotation marks omitted); *DFC Glob. Corp.*, 2016 WL 4138613, at *10 (basic understanding of facts, communication with counsel, review of pleadings, and assisting in discovery "is all that is required" to be an adequate class representative); *Roofer's Pension Fund*, 333 F.R.D. at 77 (finding adequacy where "Lead Plaintiff … demonstrated the required minimal degree of knowledge about this litigation") (internal quotation marks omitted).

Proposed Class Counsel, Berman Tabacco, and proposed Class Liaison Counsel, Schnader Harrison Segal & Lewis LLP ("Schnader"), are well-qualified to represent all Class members. Berman Tabacco is highly experienced in securities litigation and has successfully prosecuted numerous matters on behalf of investors, as detailed in the firm's resume. *See* Egan Decl. Ex. A. Further, Berman Tabacco is one of the country's premier class action law firms, with more than 30 years of experience prosecuting securities class actions. *Id.* The firm has been ranked as a *Top Ten Plaintiffs' Firm* by *Benchmark Litigation* and is listed as one of the firms with the most settlements on the *Top 100 U.S. Class Action Settlements of All Time (as of 12/31/2019)* issued by Institutional Shareholder Services' Securities Class Action Services. *Id.* Since the passage of the PSLRA, Berman Tabacco has held leadership positions in more than 100 federal securities class actions, recovering billions of dollars on behalf of defrauded investors.[11] Schnader is also highly experienced in litigating complex commercial matters and class actions, including securities class actions. *See* Egan Decl. Ex. B.[12] Moreover, Berman Tabacco and Schnader's adequacy is further evidenced by the substantial amount of work they

---

[11] Berman Tabacco's representative securities class actions include: *In re BP PLC Sec. Litig.*, No. 10-md-2185 (S.D. Tex.) (as co-lead counsel representing the Ohio Public Employees Retirement System, the firm reached a $175 million settlement, which resulted in class claimants receiving over 100% of their recognized losses); *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-cv-04583-LAK (S.D.N.Y.) (as sole lead counsel representing the Wyoming State Treasurer and the Wyoming Retirement System, the firm reached settlements worth $346 million); *In re 2008 Fannie Mae Sec. Litig.*, No. 08-civ-07831-PAC (S.D.N.Y.) (as co-lead counsel representing the Massachusetts Pension Reserves Investment Management Board, the firm achieved a $170 million settlement); *In re Bear Stearns Cos. Inc. Sec., Deriv., & ERISA Litig.*, Master File No. 08-MDL No. 1963 / 08 Civ. 2793 (S.D.N.Y.) (firm served as co-lead counsel representing the State of Michigan Retirement Systems, case settled in 2012 for $294.9 million). *See* Egan Decl. Ex. A.

[12] *See Marsden*, 246 F.R.D. at 487 (finding adequacy where class counsel had "significant experience pursuing securities-related claims in various federal courts"); *Skeway v. China Natural Gas, Inc.*, 304 F.R.D. 467, 475 (D. Del. 2014) (finding adequacy where "Lead Counsel and Liaison Counsel are experienced in both complex class litigation and securities actions").

12

put into investigating this action and litigating it past the motion-to-dismiss stage and into discovery. Thus, Berman Tabacco and Schnader have demonstrated that they have, and will continue to, "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

### III.    The Predominance And Superiority Requirements Of Rule 23(b)(3) Are Satisfied

Lead Plaintiff seeks class certification pursuant to Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Both the predominance and superiority requirements are met here.

#### A.    Common Questions Of Law And Fact Predominate

Rule 23(b)(3) requires that common questions of law and fact predominate over questions affecting individual class members. Where common questions of law or fact outnumber those affecting only individual class members, predominance is satisfied. *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 371 (3d Cir. 2015); *see also Amgen*, 568 U.S. at 459 ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."). Actions brought pursuant to the federal securities laws are particularly well suited to a finding of predominance, alleging a common harm from a common course of conduct, leading the Supreme Court to state that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

"[T]he predominance inquiry turns on whether the evidence necessary to prove the essential elements of the underlying claims will vary from class member to class member, causing the Court to engage in individual treatment of the issues." *Roofer's Pension Fund*, 333

13

F.R.D. at 78-79.  Here, the elements of a Section 10(b) claim Lead Plaintiff must establish are: "(1) a material misrepresentation or omission by the defendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[13]  *Amgen*, 568 U.S. at 460-61.  Significantly, the Supreme Court has held that because falsity, scienter, materiality, and loss causation are common merits issues in a securities fraud class action, proof of those elements is not a prerequisite to class certification.  *See id.* at 467 ("materiality is a 'common questio[n]' for purposes of Rule 23(b)(3)" and not a prerequisite to class certification) (alteration in original); *id.* at 475 ("loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified"); *see also Halliburton I*, 563 U.S. at 813 (plaintiff need not prove loss causation at class certification as "loss causation has no logical connection to the facts necessary to establish the efficient market predicate to the fraud-on-the-market theory"); *Merck*, 2013 WL 396117, at *12 ("Defendants' state of mind" was common issue).

Thus, "whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance."  *Halliburton I*, 563 U.S. at 810; *see also Strougo v. Barclays PLC*, 312 F.R.D. 307, 312 n.17 (S.D.N.Y. 2016) ("Reliance is typically the only ground on which to challenge predominance because section 10(b) claims will almost always arise from a common nucleus of facts surrounding the fraudulent misrepresentation of material facts and the causal relationship between the correction of that misrepresentation and the price of the security."), *aff'd sub nom.*, *Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017).  Here, Lead

---

[13] Lead Plaintiff's "control person" claim under Section 20(a) of the Exchange Act also raises common issues that are subject to class-wide proof. *See, e.g.*, *Merck*, 2013 WL 396117, at *13.

Plaintiff will demonstrate class-wide reliance under the fraud-on-the-market presumption of reliance, which dispenses with the requirement that each Class member prove individual reliance upon Defendants' alleged misstatements and/or omissions.

Under the fraud-on-the-market theory, "[r]eliance may be presumed when a fraudulent misrepresentation or omission impairs the value of a security traded in an efficient market." *Newton*, 259 F.3d at 175 (citing *Basic*, 485 U.S. at 241-42). The premise underlying the fraud-on-the-market theory is that, "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Basic*, 485 U.S. at 241-42 (alteration in original) (citation and internal quotation marks omitted); *see also Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*), 573 U.S. 258, 270 (2014) ("the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations") (quoting *Basic*, 485 U.S. at 246); *Amgen*, 568 U.S. at 466 ("in an efficient market, all publicly available information is rapidly incorporated into, and thus transmitted to investors through, the market price"). As a result, "reliance on any public material misrepresentations . . . may be ***presumed*** for purposes of a Rule 10b-5 action." *Halliburton II*, 573 U.S. at 268 (alteration in original) (quoting *Basic*, 485 U.S. at 246-47).

Under *Basic* and *Halliburton II*, Lead Plaintiff may invoke the presumption of reliance by showing: (i) the alleged misrepresentations were publicly known; (ii) the plaintiff traded in the stock between the making of those misrepresentations and the alleged revelation of the truth; and (iii) the stock at issue traded in an efficient market. *Halliburton II*, 573 U.S. at 277-78. With respect to the required showing of an efficient market, "the Supreme Court has suggested that the

15

burden required to establish market efficiency is not an onerous one." *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017) (citation and internal quotation marks omitted).

Here, Lead Plaintiff can establish each prerequisite to invoke the fraud-on-the-market presumption. *First*, Defendants' alleged misrepresentations and omissions were made in public statements to the market at large.[14]  *Second*, Plaintiff and all other members of the Class purchased HCSG stock during the Class Period, between the date of the first alleged misrepresentation and the alleged revelation of Defendants' fraudulent conduct. *Third*, as discussed below and in the Nye Report, HCSG common stock traded in an efficient market during the Class Period.

### 1. Lead Plaintiff And The Class Are Entitled To A Presumption Of Reliance Because HCSG Common Stock Traded In An Efficient Market

#### a. HCSG's Shares Were Listed And Traded On The NASDAQ, A Presumptively Efficient Market

By all measures, HCSG stock traded in an efficient market. "[T]he listing of a security on a major exchange such as . . . the NASDAQ weighs in favor of a finding of market

---

[14]  The Complaint details the Defendants' five years of alleged publicly made false and misleading statements, including: (i) Defendants' materially false and misleading net income and EPS numbers, which were manipulated to meet analysts' quarterly EPS consensus targets, including through Defendants' violations of certain accounting standards and SEC regulations (¶¶ 142-69, 170-71, 173, 176-78, 181-82, 184-187, 190-94, 196, 198-99, 202, 204-05, 208-09, 211, 214, 216-17, 220, 222-24, 228, 230-31, 234, 236-37, 240-42, 247, 253-59, 260-65, 266-72, 273-74, 292-95); (ii) Defendants Wahl's and McKee's materially false and misleading statements regarding the Monocle Report's concerns about EPS manipulation (¶¶ 223-24, 248; *see also* ¶¶ 84-87); (iii) Defendants' materially false and misleading statements and omissions regarding the lack of any SEC investigation throughout the Class Period, including that Defendants violated SEC regulations regarding financial reporting (¶¶ 245-46, 247(b), 247(d), 250-51, 258-59, 265, 272, 275(a)-(c), 276, 279, 297-303); (iv) Defendants' materially false and misleading statements and omissions in the Company's New Credit Facility denying the existence of the then-pending SEC investigation (¶¶ 277-79); and (v) Defendants' materially false and misleading statements regarding HCSG's internal controls (¶¶ 147-48, 153-54, 160-61, 166-67, 174-75, 179-80, 185-86, 192-93, 200-01, 206-07, 212-13, 218-19, 226-27, 232-33, 238-39, 243-44, 256-57, 263-64, 270-71).

efficiency." *In re DVI, Inc. Sec. Litig. (DVI II)*, 639 F.3d 623, 634 (3d Cir. 2011), *abrogated on other ground by Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013).  Throughout the Class Period, HCSG common stock was listed and traded on the Nasdaq Global Select Market, which is the highest tier of the broader Nasdaq Stock Market ("NASDAQ").  Nye Report ¶¶ 18-22.  HCSG's NASDAQ listing alone strongly supports a finding of market efficiency.  *See Merck*, 2013 WL 396117, at *11 (trading on the New York Stock Exchange would "more than suffice to meet Plaintiffs' burden…of demonstrating market efficiency").

### b. The *Cammer/Krogman* Factors Demonstrate That HCSG Common Stock Traded In An Efficient Market

In addition to an exchange listing, when analyzing market efficiency, courts within the Third Circuit routinely consider the non-exhaustive factors outlined by *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989).[15]  The *Cammer* factors are: (1) whether the security trades at a large weekly volume; (2) whether analysts follow and report on the security; (3) whether the security has market makers and whether there is a potential for arbitrage activity; (4) whether the company is eligible to file an SEC Form S-3; and (5) whether empirical facts show a cause-and-effect relationship between the release of new, material information about the company in question and a response in the security's price.  *Cammer*, 711 F. Supp. at 1285-87.  Courts in this Circuit also consider the factors delineated in *Krogman v. Sterritt*: (1) the company's market capitalization; (2) the bid-ask spread on transactions in the security; and (3) the security's public float.  202 F.R.D. 467, 474 (N.D. Tex. 2001); *see also In re DVI Inc. Sec. Litig. (DVI I)*, 249 F.R.D. 196, 208 (E.D. Pa. 2008), *aff'd*, 639 F.3d 623 (3d Cir. 2011).

---

[15]  *See, e.g.*, *DFC Glob. Corp.*, 2016 WL 4138613, at *12; *Prudential*, 2015 WL 5097883, at *6; *Merck*, 2013 WL 396117, at *11.

As demonstrated by Dr. Nye, the *Cammer* and *Krogman* factors establish that HCSG's ordinary shares traded in an efficient market throughout the Class Period.  Nye Report ¶¶ 23-57. Thus, Lead Plaintiff is entitled to a presumption of reliance.  *Halliburton II*, 573 U.S. at 279 ("if a plaintiff shows that the defendant's misrepresentation was public and material and that the stock traded in a generally efficient market, he is entitled to a presumption that the misrepresentation affected the stock price").[16]

### i. *Cammer* Factor One: HCSG's Large Weekly Trading Volume Indicates The Presence Of An Efficient Market

A high weekly trading volume supports a finding of market efficiency because "many investors are executing trades on the basis of newly available or disseminated corporate information."  *DVI I,* 249 F.R.D. at 208.  Moreover, an average weekly trading volume of approximately "two percent or more … justif[ies] a strong presumption that the market for the security is an efficient one [and] one percent would justify a substantial presumption." *Cammer*, 711 F. Supp. at 1286.

HCSG's shares easily meet this standard, as its average weekly trading volume during the Class Period was 3.2%, in excess of *Cammer*'s 2% threshold, indicative of an efficient market. Nye Report ¶ 25; *see also DVI I,* 249 F.R.D. at 209 (average weekly trading volume of 1.70% created "at a minimum, a substantial presumption that the market for DVI's common stock was efficient"); *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 44 (S.D.N.Y. 2018) (average weekly trading volume of 2.5% established a "strong presumption of efficiency").

---

[16]  *Halliburton II* further held that "plaintiffs need not directly prove price impact to invoke the *Basic* presumption."  573 U.S. at 279.  Instead, "it is incumbent upon the defendant to show the absence of price impact."  *Id.* at 284 (Ginsburg, Breyer, and Sotomayor, JJ., concurring). Defendants will not be able to prove a lack of price impact here.  Nye Report ¶ 60.

18

ii. *Cammer* **Factor Two: A Significant Number Of Securities Analysts Followed HCSG, Demonstrating Market Efficiency**

"Significant securities analyst coverage of a company's stock is 'persuasive' evidence of market efficiency." *Roofer's Pension Fund*, 333 F.R.D. at 82; *see also Cammer*, 711 F. Supp. at 1286 ("it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period").

HCSG was widely followed by analysts. During the Class Period, over 900 analyst reports pertaining to HCSG were issued by well-known investment firms. Nye Report ¶ 29. Moreover, over 490 articles concerning HCSG appeared in major domestic and international news media during the Class Period. *Id.* at ¶ 30. In addition, information relating to the financial status of HCSG was publicly available online through the Company's website and the SEC's website. *Id.* at ¶ 31. The widespread coverage of HCSG by securities analysts and the amount of public reporting on HCSG illustrates that HCSG's stock traded in an efficient market. *See Roofer's Pension Fund*, 333 F.R.D. at 82 (holding that "over 600 analyst reports" weighed in favor of market efficiency); *DVI I,* 249 F.R.D. at 210 (coverage by three analysts and over 80 analyst reports "was sufficient to favor a finding of market efficiency").

iii. *Cammer* **Factor Three: The High Number Of Market Makers And Arbitrageurs Trading HCSG's Stock Demonstrates Market Efficiency**

"A market-maker is one who helps establish a market for securities by reporting bid-and-asked quotations ... and who stands ready to buy or sell these publicly quoted prices." *Roofer's Pension Fund*, 333 F.R.D. at 83 (alteration in original) (citations omitted). The existence of market makers weighs in favor of market efficiency because they "ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *See Cammer*,

19

711 F. Supp. at 1286-87; *see also Roofer's Pension Fund*, 333 F.R.D. at 83 ("A higher number of market makers for a given security suggests that the security is liquid, and therefore, that the market for the security is efficient").

Hundreds of market makers traded HCSG's stock. During the Class Period, HCSG stock was traded on the NASDAQ. "NASDAQ market participants are made up of market makers, order-entry firms and electronic communications networks (ECNs) that utilize NASDAQ's trading services." Nye Report ¶ 34 (internal quotation omitted). "Market makers help to ensure a liquid market for a particular stock; a market in which willing buyers can readily find willing sellers, and vice versa." *Id.* Market makers "are obligated to engage in a course of dealings for its own account to assist in the maintenance, insofar as reasonably practicable, of fair and orderly markets." *Id.* (internal quotations omitted). During the Class Period, HCSG stock was traded by 194 market makers, many of which handled a sizeable volume of shares. Nye Report ¶ 35. The significant number of market makers trading HCSG stock further demonstrates market efficiency. *See Roofer's Pension Fund*, 333 F.R.D. at 83-84 ("at least seventeen market makers" weighed in favor of market efficiency); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 500 (S.D. Fla. 2003) ("15-19 market makers" supported a finding of market efficiency).

Additionally, HCSG's stock was followed by arbitrageurs who partook in arbitrage activity. An arbitrageur is a sophisticated investor who can act rapidly to take advantage of security pricing discrepancies. Nye Report ¶ 36. "Arbitrageurs ensure that market prices reflect public information—the fundamental hallmark of market efficiency." *Id.* Here, Dr. Nye found a high level of short interest in HCSG's stock. *Id.* at ¶¶ 37-38 (discussing ability to short stock as indicia of arbitrage activity and noting that HCSG stock short interest was more than 10%, higher than the average short interest of 3.9% of the float for the total U.S. market). In addition,

20

Dr. Nye found a large number of institutional investors holding HCSG stock. *Id.* at ¶¶ 39-40 (discussing institutional ownership as indicator of arbitrage activity and noting that HCSG's quarter-end holdings indicated that "institutions held at least 93.6% of the shares available, and between 270 and 400 institutional investors held HCSG stock during the Class Period") (footnotes omitted). Finally, the tightness of HCSG's bid/ask spreads indicates that arbitrage activity for HCSG's stock was widespread during the Class period. *Id.* at ¶¶ 41-42 (discussing relationship between arbitrage and bid/ask spread noting that HCSG's stock median bid/ask spreads were lower than stocks randomly sampled). Taken together, this activity illustrates that the Company's stock was traded in an efficient market.

### iv. *Cammer* Factor Four: HCSG's Form S-3 Status Weighs In Favor Of Market Efficiency

"[T]he existence of Form S-3 status is an important factor weighing in favor of a finding that a market is efficient." *Cammer*, 711 F. Supp. at 1285. This is because the filing of a Form S-3 "is predicated on the Commission's belief that the market operates efficiently" for the company. *Id.* at 1284 (quoting *Reproposal of Comprehensive Revision to System for Registration of Securities Offerings*, SEC Release No. 6331, 46 Fed. Reg. 41,902 (Aug. 13, 1981)). Prior to and during the Class Period, HCSG filed Form S-3s, which strongly supports market efficiency. Nye Report ¶ 46; *Roofer's Pension Fund,* 333 F.R.D. at 84 (Form S-3 filing shortly before class period weighed in favor of market efficiency); *Merck & Co., Vytorin/Zetia*, 2012 WL 4482041, at *5 (eligibility to file a Form S-3 supported market efficiency).

### v. *Cammer* Factor Five: HCSG's Stock Price Reacted To Information Disclosed To The Market, Illustrating Market Efficiency

Under *Cammer*, "one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures

and resulting movements in stock price." 711 F. Supp. at 1291. However, this factor is not dispositive as "[c]ourts have rejected the idea that the fifth *Cammer* factor is necessary to establish market efficiency." *DFC Glob. Corp.*, 2016 WL 4138613, at *12-13 ("As noted previously, some courts have not performed a *Cammer* analysis when the security was traded on a public exchange such as the NASDAQ. Other courts have performed the *Cammer* analysis, but have pointed out that the absence of a cause-and-effect relationship does not foreclose the possibility of an efficient-market finding.").

Lead Plaintiff easily satisfies this factor. Dr. Nye's event study[17] uses a widely accepted methodology and concludes the existence of a cause-and-effect relationship between HCSG's disclosures and movements in the Company's stock price. Nye Report ¶¶ 49-53, Appendix A, Exs. 11-12. An event study examines whether securities prices respond to new material information. Nye Report ¶ 48. "An event study includes regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Prudential*, 2015 WL 5097883, at *6 (citation and internal quotation marks omitted). Event studies are "widely accepted in the academic community and in the courts" to establish the fifth *Cammer* factor. *Id.* at *6.

---

[17]    Dr. Nye's opinions regarding market efficiency have been widely accepted by courts, including courts within the Third Circuit. *See e.g. Karinski v. Stamps.com, Inc.*, No. CV 19-1828-MWF (SKx), 2020 WL 6572660, at *6 (C.D. Cal. Nov. 9, 2020) (describing Dr. Nye's event study as "robust"); *In re Banc of Cal. Sec. Litig.*, 326 F.R.D. 640, 648 (C.D. Cal. 2018) (describing Dr. Nye's report as "key evidence"); *Hayes v. MagnaChip Semiconductor Corp.*, No. 14-cv-01160-JST, 2016 WL 7406418, at *7 n.3 (N.D. Cal. Dec. 22, 2016) ("the fact that Nye faithfully followed the *Cammer* factors weakens any argument that his analysis was subjective and therefore unreliable"); *Heckmann Corp.*, 2013 WL 2456104, at *13 ("Dr. Nye[] uses a methodology established in [the Third] circuit"). *See also Roofer's Pension Fund*, 333 F.R.D. at 80 n.8 (noting that "Defendants do not challenge the reliability of Dr. Nye's report [establishing each *Cammer* factor for the U.S. purchaser class] or the market efficiency concerning Perrigo stock on the NYSE").

Dr. Nye's event study examined dates during the Class Period on which HCSG released quarterly or year-end financial results. *Id.* at ¶ 50. These "earnings-related announcements are an objective set of events to examine, which has been shown in the academic finance literature to impact securities' prices," and these announcements are routinely used for event studies. *Id.*; *see, e.g., Roofer's Pension Fund*, 333 F.R.D. at 84 (event study examined dates of earnings-related announcements); *Prudential*, 2015 WL 5097883, at *7 (event study analyzed dates of "earnings announcements or changes in earnings guidance"). Dr. Nye's event study revealed that "[o]ut of the 20 events examined, 15 (*i.e.*, 75%) are associated with a statistically significant Company-specific return at or above the 95% confidence level." Nye Report ¶ 51, Exs. 11-12. Dr. Nye's study shows that HCSG's earnings-related announcements "contains 15 times[18] as many statistically significant dates as should be expected from a randomly selected 20-day sample (at or above the 95% confidence level)." Nye Report ¶ 51.

Moreover, although not required, Dr. Nye's report also shows that "the direction of the Company-specific return observed on each event date was consistent with that expected in an efficient market for HCSG stock, thereby providing additional evidence of efficiency." Nye Report ¶ 52; *see also In re Petrobras Sec. Litig.*, 862 F.3d 250, 277 (2d Cir. 2017) (accepting district court finding that directionality was not required at class certification stage). Specifically, Dr. Nye's report shows that HCSG's stock price rose and fell with positive and negative Company-specific news, and that for event dates with statistically insignificant returns, "the Company's financial results were generally in line with expectations, and/or conveyed a mix

---

[18] "At the 95% level of confidence, a statistically significant return is expected to occur 5% of the time." Nye Report ¶ 51. "Thus, one should expect a random sample of 20 days to contain one day with a return that is statistically significant at the 95% confidence level." *Id.*

of offsetting positive and negative new information, such that the insignificant price reaction is consistent with that expected in an efficient market." Nye Report ¶ 52.

### vi. *Krogman* Factor One: HCSG's Large Market Capitalization Indicates An Efficient Market

Large market capitalization may be an indicator of market efficiency because "there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478; *see also DVI I*, 249 F.R.D. at 212 (quoting *Krogman*, 202 F.R.D. at 478). During the Class Period, the market capitalization of HCSG ranged between $1.81 billion (August 1, 2014) and $4.10 billion (January 26, 2018). Nye Report ¶ 54. By comparison, at the end of the Class Period, the median market capitalization of companies listed on the NYSE was approximately $2.46 billion, and the median market capitalization of companies listed on the NASDAQ was approximately $365.24 million. *Id.* at ¶ 55. As of March 4, 2019 (*i.e.*, the end of the Class Period), HCSG's market capitalization was greater than 49.8% and 81.5% of NYSE-listed and NASDAQ-listed stocks, respectively. *Id.* HCSG's high market capitalization weighs in favor of market efficiency. *See DVI I*, 249 F.R.D. at 212 (market capitalization between "$300 million to $12 million" supported market efficiency because it was above the median for other publicly traded companies).

### vii. *Krogman* Factor Two: HCSG's Small Bid-Ask Spread Illustrates An Efficient Market

A small bid/ask spread illustrates that a stock is trading in an efficient market. *Cf. Krogman*, 202 F.R.D. at 478 ("A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade"). During the Class Period, the average bid-ask spread for HCSG stock was 0.04% and the median spread was 0.03%, while a randomly selected sample of 100 NASDAQ stocks had an average spread of 0.18% and a median

24

spread of 0.13%.  Nye Report ¶¶ 41, 56, Ex. 10.  Thus, HCSG's bid-ask spread was smaller than the random NASDAQ sample, which demonstrates that HCSG's stock was traded in an efficient market.[19]

### viii.  *Krogman* Factor Three: HCSG's Large Public Float Supports Market Efficiency

"In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders," which is known as the public float.  *Krogman*, 202 F.R.D. at 478. During the Class Period, the public float of HCSG stock was, on average, 96.2%.  Nye Report ¶ 57.  HCSG's large public float supports a finding that HCSG stock traded in an efficient market.[20]

### 2.  The Class Is Also Entitled To A Presumption Of Reliance Under *Affiliated Ute*

In addition to the fraud-on-the-market presumption, the Class is also entitled to a presumption of reliance because Utah's claims are premised on the omission of material information from Defendants' disclosures in violation of established SEC Rules, including Regulation S-K.  *See* ¶¶ 297-303; *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972); *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 192 (3d Cir. 2001).  In such cases, "positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material[.]"  *Affiliated Ute*, 406 U.S. at 153.  If the Court finds, as Lead Plaintiff

---

[19]  *See Wilson v. LSB Indus., Inc.*, No. 15CIV7614, 2018 WL 3913115, at *15 (S.D.N.Y. Aug. 13, 2018) ("relatively narrow" bid-ask spread of 0.07% weighed in favor of efficiency); *Cheney*, 213 F.R.D. at 501 (bid-ask spread of 2.44% weighed in favor of market efficiency); *cf. Krogman*, 202 F.R.D. at 478 (bid-ask spread of 5.6% weighed against efficiency).

[20]  *See Wilson*, 2018 WL 3913115, at *15 (average public float of 82.41% "exceeds amounts other courts have deemed sufficient to suggest a finding of market efficiency"); *Cheney*, 213 F.R.D. at 502 (public float of 95% is indicative of an efficient market).

25

submits it should, that reliance is presumed under the fraud-on-the-market theory, then the Court does not need to reach this issue.  However, reliance can also be presumed under *Affiliated Ute* because Lead Plaintiff's allegations are premised on Defendants' failure to disclose material facts to investors concerning the SEC investigation.  *See* ¶¶ 245-46, 247(b), 247(d), 250-51, 258-59, 265, 272, 275(a)-(c), 276, 279, 297-303.[21]  Because all Class members are entitled to a presumption of reliance under both *Basic* and *Affiliated Ute*, reliance presents yet another common issue that predominates.

### 3.  Damages Are Measurable Using A Common Methodology

The "law in the Third Circuit" is that "the need to perform individual damages calculations does not foreclose class certification under Rule 23(b)(3)."  *DFC Glob. Corp.*, 2016 WL 4138613, at \*14 (citing *Neale*, 794 F.3d at 374-75).  Thus, Lead Plaintiff is not required to prove at class certification that damages can be calculated Class-wide.  *See Prudential*, 2015 WL 5097883, at \*13.[22]  Nonetheless, as in most securities class actions,

---

[21]  *See Skeway*, 304 F.R.D. at 475 (applying *Affiliated Ute* where securities claims "involve[d] primarily a failure to disclose"); *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 269-70 (S.D.N.Y. 2014) (same).

[22]  Moreover, according to the Third Circuit, it is "a misreading of [the Supreme Court's decision in] *Comcast* [*Corp. v. Behrend*, 569 U.S. 27, 42 (2013)] to interpret it as preclud[ing] certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement."  *Neale*, 794 F.3d at 375 (citing *In re Deepwater Horizon*, 739 F.3d 790, 815 & n.104 (5th Cir. 2014)); *see also id.* at 374 ("*Comcast* is inapposite to the case before us. *Comcast* held that an antitrust litigation class could not be certified because the plaintiffs' damages model did not demonstrate the theory of antitrust impact that the district court accepted for class-action treatment. . . . A close reading of the text . . . makes it clear that the predominance analysis was specific to the antitrust claim at issue."); *Roofer's Pension Fund*, 333 F.R.D. at 88 ("The Court is not required to assess the validity of Plaintiff's damages model[s] to determine whether class certification is warranted") (alteration in original) (citation and internal quotation marks omitted); *Novo Nordisk*, 2020 WL 502176, at \*9 (certifying class and noting that the court "need not assess the validity of Plaintiffs' damages model at this stage"); *Li v. Aeterna Zentaris, Inc.*, No. 14-cv-7081 (PGS) (TJB), 2018 WL

26

damages here can "be determined by a formula or other means," and the "mere fact that individual members of the class may be entitled to different amounts of money damages does not mean that individual questions predominate." *CIGNA*, 2006 WL 2433779, at *5; *see also Strougo*, 312 F.R.D. at 313 ("Issues and facts surrounding damages have rarely been an obstacle to establishing predominance in section 10(b) cases.").

Here, Lead Plaintiff and its expert have put forth a widely accepted methodology for the measurement of per-share damages on a common, class-wide basis. This methodology directly relates to Lead Plaintiff's class-wide theory of liability, such that common issues regarding damages will predominate. Specifically, Lead Plaintiff alleges that it and other members of the putative Class were damaged when they purchased HCSG common stock at prices that were artificially inflated by Defendants' material misrepresentations and omissions concerning its EPS practices.

In his report, Dr. Nye explains that for any member of the Class, damages due to the artificial inflation in HCSG's common stock price during the Class Period can be determined by applying the widely accepted "out-of-pocket" measure of damages. Nye Report ¶¶ 58-62.[23] As

---

1143174, at *2 (D.N.J. Feb. 28, 2018) (at the class certification stage, "Plaintiffs are not required to produce a detailed damages model").

[23] *See City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*, 322 F. Supp. 3d 676, 692 (D. Md. 2018) ("out-of-pocket damages calculations through an event study analysis as outlined in [plaintiffs' expert's] Report have been recognized by courts as an accepted method for the evaluation of damages in securities fraud cases based on allegations similar to those made in this case"); *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 288 (N.D. Cal. 2020) (same); *see also Seidman v. Am. Mobile Sys., Inc.*, 157 F.R.D. 354, 365 n.19 (E.D. Pa. 1994) ("In the Third Circuit, damages in securities fraud cases are measured by the out-of-pocket method which focuses on a defrauded buyer's damages at the date of purchase and allows him to recover the difference between the price he paid for his investment and what it was actually worth at the time of purchase"); *Sharp v. Coopers & Lybrand*, 83 F.R.D. 343, 347 (E.D. Pa. 1979) ("[t]he out-of-pocket method is in fact the traditional method employed in securities

27

set forth in the Nye Report, damages can be calculated by determining the inflation in HCSG's common stock based on the price reaction to the alleged corrective disclosures. *Id*. at ¶¶ 59-60. For an individual Class member, damages can then be determined by calculating the amount of inflation HCSG's stock price at the time of that Class member's stock purchase and subtracting the inflation in HCSG's stock price at the time of that Class member's stock sale, along with any other necessary adjustments, including the 90-day lookback period adjustment set forth in the PSLRA. *Id*. at ¶¶ 61-62; 15 U.S.C. § 78u–4(e). The amount of damages sustained will differ depending on each Class member's transactions in HCSG common stock, but as the Third Circuit has recognized, "individual damages calculations do not preclude class certification under Rule 23(b)(3)." *Neale*, 794 F.3d at 374-75 (quoting *Comcast*, 569 U.S. at 42 (Ginsburg, J. & Breyer, J., dissenting)). Thus, while the results of the calculation will differ for each Class member based on the timing of their HCSG stock purchases and sales, the share price inflation is the same for all shares of HCSG stock, and damages are calculated the same way for all Class members. Nye Report ¶¶ 59-62. Along with the invocation of the presumption of reliance, questions of damages are common questions to all putative Class members, and these common questions are susceptible of common answers and predominate over any issues unique to individual members of the putative Class.

**B.    Class Treatment Is Superior To Other Methods Of Adjudication**

Rule 23(b)(3) requires that the Court determine that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) provides four factors to guide this analysis: "(A) the class members'

---

fraud cases for calculating damages") (citing *Affiliated Ute*, 406 U.S. 128; *Thomas v. Duralite Co., Inc.*, 524 F.2d 577 (3d Cir. 1975)).

interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed R. Civ. P. 23(b)(3). Examination of each factor demonstrates that litigating this case as a class action is the superior method.

First, the proposed Class consists of "securities purchasers who are geographically dispersed and whose individual damages may well be small enough to render individual litigation prohibitively expensive." *Merck & Co., Inc., Vytorin/Zetia*, 2012 WL 4482041, at *8.[24] Thus, Class members are unlikely to litigate on an individual basis.

Second, Lead Plaintiff is not aware of any other related individual actions. *In re Herley Indus. Inc. Sec. Litig.*, No. Civ.A. 06-2596, 2009 WL 3169888, at *14 (E.D. Pa. Sept. 30, 2009) (finding superiority where "[t]here is no other ongoing litigation surrounding the decline of Herley stock based on its alleged misrepresentations").

Third, concentrating the litigation of this action in this forum is desirable to avoid wasting judicial resources litigating actions based on the same operative facts. *CIGNA*, 2006 WL 2433779, at *5 (finding superiority because "[t]he need for efficient use of judicial resources dictates the propriety and desirability of resolving common issues in one action"). This Court

---

[24]   *See also CIGNA*, 2006 WL 2433779, at *5 ("the prohibitive expense of maintaining individual actions would likely prevent many individuals from asserting their claims against the Defendants-a clear departure from the underlying rationale and operation of the federal securities laws"); *Rosen v. Fid. Fixed Income Trust*, 169 F.R.D. 295, 301 (E.D. Pa. 1995) ("class certification remains a desirable method of seeking redress under the securities laws, particularly where, as here, a large number of individuals [allegedly] have been injured, although no one person may have been damaged to a degree which would have induced him to institute litigation solely on his own behalf") (alteration in original) (citation and internal quotation marks omitted).

has already expended judicial resources in overseeing this action through the motion-to-dismiss stage and into discovery. Additionally, litigating this case as a class action will eliminate the possibility of inconsistent rulings across several jurisdictions. *See Merck & Co., Inc., Vytorin/Zetia*, 2012 WL 4482041, at *8 ("Further, given the amount of Class members, individually litigating these matters could certainly raise the possibility of conflicting outcomes").

Fourth, there will be no difficulties in managing this case as a class action. Federal securities class actions are routinely certified and raise no unusual manageability issues and this case is no different. As discussed in Section II(D)(2), Class Counsel and Class Liaison Counsel are well versed in litigating securities class actions. Moreover, this case is a straightforward securities action, and cases of this nature are routinely certified as class actions. *Herley Indus. Inc.*, 2009 WL 3169888, at *14 (finding superiority because "[t]his case is, at its core, a straightforward securities class action that does not raise any concerns about management difficulties"). Thus, there is no reason to expect that counsel cannot manage this litigation.[25]

## IV.    The Proposed Class Is Ascertainable

While not an explicit requirement under Rule 23, "the Third Circuit recognizes that an essential prerequisite of a class action, at least with respect to actions [proceeding] under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on objective criteria." *McIntyre v. RealPage, Inc.*, No. Civ.A. No. 18-3934, 2020 WL 5017612, at *8 (E.D. Pa. Aug. 25, 2020) (alteration in original) (citation and internal quotation marks omitted). To demonstrate ascertainability at class certification, a plaintiff need only show that: "(1) the class is defined

---

[25] Denying class certification based upon manageability is "disfavored." *See In re Plastics Additives Antitrust Litig.*, No. Civ.A. No. 03-2038, 2006 WL 6172035, at *13 (E.D. Pa. Aug. 31, 2006) (citation and internal quotation marks omitted).

with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015), as amended (Apr. 28, 2015) (citation and internal quotation marks omitted). Importantly, this does not require "that a plaintiff must be able to identify all class members at class certification—instead, a plaintiff need only show that class members *can* be identified." *Id.* (citation and internal quotation marks omitted).

The proposed Class consists of all persons and entities who purchased or otherwise acquired HCSG common stock during the Class Period and were damaged thereby. Members of the Class will be identified utilizing shareholder records maintained by HCSG and its agents, which satisfies Rule 23's ascertainability requirement.[26] Accordingly, the prosed Class is readily ascertainable.

## V.    <u>Proposed Class Counsel Satisfy Rule 23(g)</u>

Rule 23(g)(1)(a) provides that "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1)(a). "In appointing class counsel, the court must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." *Id.*

---

[26] *See Byrd*, 784 F.3d at 169 (where "[t]here are 'objective records' that can 'readily identify' … class members," the ascertainability requirement is satisfied); *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71, 85 (S.D.N.Y. 2018) (holding that membership in securities classes is "easily ascertained by objective documentation"), *leave to appeal denied*, No. 18-3036, 2019 WL 1612904 (2d Cir. Feb. 20, 2019); *In re Urban Outfitters, Inc. Sec. Litig.*, No. 13-5978, 2016 WL 1043014, at *4 (E.D. Pa. Feb. 29, 2014) ("[A]s the identity of the Class Members can be determined through their registered shares, the Class members are readily ascertainable.")

31

Berman Tabacco has extensive experience litigating securities class actions and Schnader has extensive experience litigating complex commercial matters.  Additionally, both firms have demonstrated a willingness to commit substantial resources to the successful prosecution of this action.  For these reasons and the reasons discussed in Section II(D)(2), Berman Tabacco and Schnader meet Rule 23(a)(4)'s adequacy requirements and should be appointed under Rule 23(g) to serve as Class Counsel and Class Liaison Counsel.[27]

## CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court: (i) certify this Action as a class action pursuant to Rule 23(a) and (b)(3); (ii) appoint Lead Plaintiff as Class Representative pursuant to Rule 23(a) and (b)(3); and (iii) appoint Berman Tabacco as Class Counsel and Schnader Harrison Segal & Lewis LLP as Class Liaison Counsel pursuant to Rule 23(g).

DATED:  November 13, 2020

**SCHNADER HARRISON SEGAL & LEWIS LLP**

*/s/ Ira Neil Richards*
Ira Neil Richards
Arleigh P. Helfer III
1600 Market Street, Ste. 3600
Philadelphia, PA 19103
Telephone: (215) 751-2503
Facsimile: (215) 751-2205
Email: irichards@schnader.com
          ahelfer@schnader.com

*Counsel for Lead Plaintiff Utah Retirement Systems & Liaison Counsel for the Class*
and

**BERMAN TABACCO**

---

[27]  *See Boyle v. Progressive Specialty Ins. Co.*, 326 F.R.D. 69, 80 (E.D. Pa. 2018) (appointing class counsel and noting that "Rule 23(g) governs the [adequacy of counsel] analysis"); *Kalish v. Karp & Kalamotousakis, LLP*, 246 F.R.D. 461, 463 (S.D.N.Y. 2007) (analysis determining adequacy is similar to that required by Rule 23(g)).

32

Nicole Lavallee (*Pro Hac Vice*)
Jeffrey Rocha (*Pro Hac Vice*)
44 Montgomery Street, Suite 650
San Francisco, CA  94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email:  nlavallee@bermantabacco.com
        jrocha@bermantabacco.com

**BERMAN TABACCO**
Patrick T. Egan (*Pro Hac Vice*)
Steven J. Buttacavoli (*Pro Hac Vice*)
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
Email:  pegan@bermantabacco.com
        sbuttacavoli@bermantabacco.com

*Counsel for Lead Plaintiff Utah Retirement Systems
& Lead Counsel for the Class*

33