## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

UTAH RETIREMENT SYSTEMS,

        Plaintiff,

v.

HEALTHCARE SERVICES GROUP, INC.,
DANIEL P. MCCARTNEY, THEODORE
WAHL, JOHN C. SHEA, and
MATTHEW  J. MCKEE,

        Defendants.

Case No. 2:19-cv-01227-ER

**ORAL ARGUMENT (BY VIDEO
TELECONFERENCE) REQUESTED**

## DEFENDANT HEALTHCARE SERVICES GROUP, INC., DANIEL MCCARTNEY, THEODORE WAHL, JOHN SHEA, AND MATTHEW MCKEE'S MEMORANDUM OF LAW IN OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Robert L. Hickok (PA Bar No. 30101)
Jay A. Dubow (PA Bar No. 41741)
Joanna J. Cline (PA Bar No. 83195)
Daniel J. Boland (PA Bar No. 91263)
TROUTMAN PEPPER HAMILTON SANDERS LLP
3000 Two Logan Square, Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

Whitney R. Redding (PA Bar No. 308893)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Union Trust Building
501 Grant Street, Suite 300
Pittsburgh, PA  15219-4429
412-454-5000

*Attorneys for Defendants*
*Healthcare Services Group, Inc., Daniel P.*
*McCartney, Theodore Wahl, John C. Shea, and*
*Matthew J. McKee*

Dated:  January 27, 2021

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................... 4

     A.    HCSG ....................................................................................................... 4

     B.    Plaintiff Alleges Two Theories of Liability And, Effectively, Two Separate Class Periods ........................................................................... 5

          1.    Alleged Misconduct Relating to EPS (2014-2017)................................. 5

          2.    Alleged Misconduct Relating to the SEC Investigation (2018-2019) ..................................................................................................... 7

     C.    Plaintiff's Transactions in HCSG Stock................................................. 8

          1.    The Callan Transfer .................................................................... 9

          2.    The Wasatch Purchases and Sales............................................11

III.   LEGAL STANDARD .......................................................................................15

     A.    Rule 23(a) .............................................................................................15

     B.    Rule 23(b)(3) ........................................................................................16

IV.   ARGUMENT ...................................................................................................17

     A.    Plaintiff Cannot Satisfy The Requirements Of Rule 23(b)(3)..............17

          1.    Plaintiffs Have Not Shown a Model for Calculating Damages That is Consistent With Their Two Theories of Liability ..............................17

          2.    Defendants have rebutted the *Basic* presumption of reliance because the alleged misrepresentations and omissions were irrelevant to Plaintiff.................................................................26

          3.    Plaintiff Cannot Invoke the *Affiliated Ute* Presumption.........................31

     B.    Plaintiff Cannot Meet The Requirements Of Rule 23(a) ....................33

          1.    Plaintiff Is Neither Typical Nor Adequate Because Plaintiff Is Subject to Unique Defenses ...................................................33

          2.    Conflicts that Exist between Plaintiff and Class Members Render Plaintiff an Inadequate Representative ....................................40

     C.    In The Alternative, The Overly-Broad Class Period Should Be Modified To Reflect Plaintiff's Two Different Liability Theories ....................................43

          1.    A Class Period Relating to the EPS Allegations Should End on March 22, 2017 ......................................................................43

-ii-

2.    A Class Period Relating to the SEC Investigation Should Commence No Earlier than February 23, 2018 .......................................47

V.    CONCLUSION ................................................................................................48

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Adelphia Communs. Corp. Sec. & Derivative Litig.*, 398 F. Supp. 2d 244
(S.D.N.Y. 2005) ...................................................................................................35. 36

*Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972)........................................ 31, 32, 33

*Alaska Elec. Pension Fund v. Pharmacia Corp.*, Civ. No. 03-1519, 2007 WL
276150 (D.N.J. Jan. 25, 2007) .......................................................................................43

*In re Allstate Corp. Secs. Litig.*, 966 F.3d 595 (7th Cir. 2020) ....................................................16

*In re Am. Italian Pasta Co. Sec. Litig.*, No. 05-0725, 2007 WL 927745 (W.D. Mo.
Mar. 26, 2007)..................................................................................................................44

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) .......................................................................34

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013)............................ 17, 37

*Baby Neal v. Casey*, 43 F.3d 48 (3d Cir. 1994) ..........................................................................15

*Ballan v. Upjohn Co.*, 159 F.R.D. 473 (W.D. Mich. 1994) ........................................................38

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ...................................................................... passim

*Battle v. Pennsylvania*, 629 F.2d 269. (3d Cir. 1980).................................................................43

*Beck v. Maximus, Inc.*, 457 F.3d 291 (3d Cir. 2006) ............................................................ 33, 34

*Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331 (D.N.J. 2018)...............................................27

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975)..................................................35

*In re BP P.L.C. Sec. Litig.*, 2014 WL 2112823 (S.D. Tex. May 20, 2014) ................................19

*In re BP P.L.C. Securities Litigation*, 10-MD-2185, 2013 WL 6388408 (S.D. Tex.
Dec. 6, 2013)............................................................................................................. 20, 40

*Chudner v. TransUnion Interactive, Inc.*, No. 09-433-ER, 2010 WL 5662966 (D.
Del. Dec. 15, 2010) (Robreno, J.) ........................................................................ 18, 19, 26

*In re Cmty. Bank of N. Va.*, 622 F.3d 275 ..................................................................................16

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) .........................................................................17

*In re ConAgra Foods, Inc.*, 302 F.R.D. 537 (C.D. Cal. 2014) ............................................ 18, 19

*Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012)......................................40

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ................................................................21

*Epstein v. Am. Reserve Corp.*, No. 79 C 4767, 1988 WL 40500 (N.D. Ill. Apr. 21, 1988)....................................................................................................................................37

*Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I")*, 563 U.S. 804 (2011) ...................................................................................................................................17

*In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407 (D.N.J. 2005)...................................47

*In re Fannie Mae Sec., Deriv. & "ERISA" Litig.*, 247 F.R.D. 32 (D.D.C. 2008).......................44

*Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.,* 301 F.R.D. 116, 141-42 (S.D.N.Y. 2014) .............................................................................. 18, 24

*Gamco Inv'rs, Inc. v. Vivendi, S.A.*, 927 F. Supp. 2d 88 (S.D.N.Y. 2013), aff'd, 838 F.3d 214 (2d Cir. 2016) ........................................................................................29

*George v. China Automotive Systems, Inc.*, 2013 WL 3357170 (S.D.N.Y. 2013) .......................38

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement Sys.*, No. 20-222....................17, 27

*Gordon v. Sonar Capital Mgmt. LLC*, 92 F. Supp. 3d 193 (S.D.N.Y. 2015).............................37

*Greenspan v. Brassler*, 78 F.R.D. 130 (S.D.N.Y. 1978)..............................................................39

*Gruber v. Price Waterhouse*, 776 F. Supp. 1044 (E.D. Pa. 1991)..............................................31

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014)................................. 15, 26, 27

*In re Hebron Tech. Co., Ltd. Sec. Litig.*, No. 20 CIV. 4420, 2020 WL 5548856 (S.D.N.Y. Sept. 16, 2020)....................................................................................................37

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008) ...............................passim

*IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*, 818 F.3d 775 (8th Cir. 2016) ....................28

*Int'l Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir. 1974)......................................................35

*Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531 (7th Cir. 1998)....................................................35

*Johnston v. HBO Film Mgmt.*, 265 F.3d 178 (3d Cir. 2001)...................................................31, 32

*Lerch v. Citizens First Bancorp, Inc.*, 144 F.R.D. 247 (D.N.J. 1992) ...................................43, 44

*In re Merck & Co. Sec. Litig.*, 432 F.3d 261 (3d Cir. 2005) .......................................................44

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416 (S.D.N.Y. 2003) ................................................................................47

*Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353 (3d Cir. 2015) ............................................17

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001) ................................................................................................ passim

*In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) ............................................................17

*Peil v. Nat'l Semiconductor Corp.*, 86 F.R.D. 357 (E.D. Pa. 1980) ....................................46, 47

*In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618 (S.D.N.Y. 2015) ............................................39

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F. Supp. 584 (D.N.J. 1996) ................................................................................................................32

*Quezada v. Loan Ctr. of California, Inc.*, No. CIV. 2:0800177, 2009 WL 5113506 (E.D. Cal. Dec. 18, 2009) ............................................................................40

*Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08CV0160, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ..........................................................................18, 20

*Reyes v. Netdeposit, LLC*, 802 F.3d 469 (3d Cir. 2015) ......................................................16, 43

*In re Ribozyme Pharm., Inc. Sec. Litig.*, 205 F.R.D. 572 (D. Colo. 2001) ............................43, 44

*Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131 (S.D.N.Y. 2007)...........................................38, 39

*In re Safeguard Scientifics*, 216 F.R.D. 577 (E.D. Pa. 2003)................................................ passim

*In re Safeguard Scis.*, 220 F.R.D. 43 (E.D. Pa. 2004) .................................................................4

*SEC v. Nat'l Sec., Inc.*, 393 U.S. 453 (1969).............................................................................35

*Sharp v. Coopers & Lybrand*, 649 F.2d 175 (3d Cir. 1981)......................................................31

*Sherin v. Gould*, 115 F.R.D. 171 (E.D. Pa. 1987) .........................................................43, 44, 45

*Sicav v. Wang*, No. 12-6682, 2015 WL 268855 (S.D.N.Y. Jan. 21, 2015)...........................17, 19

*Stevelman v. Alias Research, Inc.*, No. 5:91-CV-682, 2000 WL 888385 (D. Conn. June 22, 2000)...........................................................................................47

*In re SunEdison Inc. Secs. Litig.*, 329 F.R.D. 124 (S.D.N.Y. 2019)......................................44, 45

*In re Vivendi Universal, S.A. Sec. Litigation*, 123 F. Supp. 3d 424 (S.D.N.Y. 2015)................................................................................................................8, 31

*Wal-Mart Stores v. Dukes*, 564 U.S. 338 (2011) ..........................................................................15

*Wendt v. Handler, Thayer & Duggan, LLC*, 613 F. Supp. 2d 1021 (N.D. Ill. 2009) ...................29

*Winer Family Tr. v. Queen*, 503 F.3d 319 (3d Cir. 2007)............................................................36

*Zlotnick v. Tie Commc'ns*, 836 F.2d 818 (3d Cir. 1988)..............................................................27

**STATUTES**

15 U.S.C. § 78(a)(13).....................................................................................................................35

15 U.S.C. § 78j..............................................................................................................................35

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23..........................................................................................................................15

Fed. R. Civ. P. 23(a)................................................................................................................ 15, 33

Fed. R. Civ. P. 23(a)(3) ........................................................................................................... 33, 40

Fed. R. Civ. P. 23(a)(4) .................................................................................................................40

Fed. R. Civ. P. 23(b)(3)................................................................................................... 16, 17, 26

Defendants Healthcare Services Group, Inc. ("HCSG" or the "Company"), Daniel McCartney, Theodore Wahl, John C. Shea, and Matthew J. McKee (collectively, "Defendants") submit this memorandum of law and accompanying exhibits in opposition to the Motion for Class Certification and Appointment of Class Representative and Class Counsel (the "Motion") filed by Lead Plaintiff Utah Retirement Systems ("Plaintiff" or "URS"), ECF No. 61. Defendants respectfully request that the Court deny Plaintiff's Motion.

## I.    INTRODUCTION

This securities class action is unique in four important respects that make class certification inappropriate or at a minimum require a fundamentally different class structure than Plaintiff has sought.

***First***, unlike most cases which present a single theory of liability that applies through the alleged class period, this case presents two separate theories of liability that apply at different times during an excessively long proposed class period.  Plaintiff bases its first theory of liability on HCSG's alleged manipulation of the Company's quarterly earnings per share ("EPS") by consistently rounding up to the nearest penny in order to meet analysts' consensus estimates of EPS.  This practice allegedly began before the start of the class period on April 8, 2014.  As Plaintiff's own expert, Dr. Zachary Nye, admits, the rounding of EPS was disclosed to the market when an article by Monocle Accounting Research was published on the Seeking Alpha website on March 22, 2017 (the "March 2017 Monocle Report," attached as Exhibit A). Thus, any class period addressing this issue would have to end on March 22, 2017, when the information was disclosed to the efficient market.

Plaintiff bases its second theory of liability on HCSG's alleged failure timely to disclose that it was the subject of an investigation by the Securities and Exchange Commission ("SEC").  HCSG received an inquiry letter from the SEC in November 2017 and a subpoena

from the SEC in March 2018.  HCSG disclosed the existence of the SEC investigation in a press

release and Form 8-K on March 4, 2019.  *See* Exhibit B, Mar. 4, 2019 Form 8-K.  Because

Plaintiff alleges that the Company first began making misstatements and material omissions

regarding the existence of the SEC investigation in its Form 10-K filed on February 23, 2018,

any class period addressing this issue could not begin prior to February 23, 2018 and would end

on March 4, 2019.

   ***Second***, this class action is also unique because Plaintiff was not a decision maker

with respect to the HCSG securities that it acquired and/or purchased.  Plaintiff acquired

approximately 5,000 shares of HCSG stock from Callan Associates, Inc. ("Callan") in May 2014

as part of an in-kind transfer from an investment fund established under a group trust.  Because

Plaintiff did not exercise any discretion in selecting the HCSG shares, this acquisition did not

constitute a "purchase" within the meaning of the Securities Exchange Act of 1934.  All of

Plaintiff's subsequent transactions in HCSG stock occurred after Monocle Accounting Research

published the March 2017 Monocle Report that disclosed to the market that HCSG was engaged

in EPS rounding, and as a result, Plaintiff cannot be a typical or adequate representative of a

class seeking to assert the EPS rounding issue.  With respect to its purchases, the actual decision

maker, Wasatch Global Investors a/k/a Wasatch Advisors, Inc. ("Wasatch"), has testified that the

issues raised by Plaintiff were not in fact relevant or material to its investment decisions in

acquiring HCSG securities for the account of Plaintiff.  Because Wasatch did not consider the

issues raised by Plaintiff to be relevant or material to its purchases, the *Basic* presumption of

reliance has been conclusively rebutted as to Plaintiff, and Plaintiff cannot therefore be a typical

or adequate class representative.

***Third***, because the EPS rounding and SEC disclosure issues alleged by Plaintiff occurred at different times during the inordinately long class period alleged, it means the class proposed by Plaintiff is riddled with intra-class conflicts.  Since Plaintiff did not purchase shares during each of these time periods, these intra-class conflicts mean that Plaintiff is not an adequate representative of all segments of the proposed class.

***Fourth***, the mix of information regarding the EPS rounding and SEC disclosure issues was different and constantly changing throughout the class period, which means Plaintiff will not be able to reliably establish or calculate classwide damages consistent with its two theories of liability.  In most cases, a plaintiff will present a damages methodology in which price declines following corrective disclosures are used to estimate inflation that is carried back throughout the class period; however, that methodology is not applicable in this case.  The SEC investigation began (as an inquiry) on November 2017 and was not knowable or subject to disclosure on April 8, 2014 (the first day of the alleged class period).  As such, this issue could not have affected stock price inflation prior to November 2017.  Similarly, the EPS rounding issue was disclosed on March 22, 2017, and could not have affected stock price inflation after that date.  Further, as expert Dr. Stephen Choi explains in his report (attached as Exhibit C and hereinafter "Choi Report"), Plaintiff cannot offer any valid reason for using the partial corrective disclosure dates of February 6, 2018, April 17, 2018, July 17, 2018, and February 5, 2019 to measure inflation relating to the EPS rounding issue because this issue was fully disclosed to the market by no later than March 22, 2017 and the event study analysis proffered by Plaintiff's expert, Dr. Nye, identifies other factors, unrelated to the allegations, that explain the Company's stock price movements on those dates.  Any "inflation band" would have to be adjusted on a daily or weekly basis to take into account constantly changing information about the two distinct

issues Plaintiff has alleged.  Lead Plaintiff, and its expert, have not identified or proposed any reliable, generally acceptable method to do this.  It would be based on subjective guesses as to the impact of changing information, and it would cause individualized damages issues to predominate over common issues.

Because of the unique characteristics of this case, it is not a proper case for class certification.  Certification would do more harm than good to the interests of class members that Plaintiff seeks to represent, and would unfairly prejudice the Defendants in defending the claims that have been asserted.  Class certification should therefore be denied.  In the alternative, if the Court were to consider certifying a class, Plaintiff URS is atypical and not an adequate representative and therefore should be precluded from acting as class representative.  Further, if the Court were to consider certifying a class, the Court should exercise its discretion to modify the overly broad class definition to (a) a class that addresses the EPS rounding issue and that runs from April 8, 2014 to March 22, 2017 and (b) a class that addresses the SEC disclosure issue that runs from February 23, 2018 to March 4, 2019.

## II.    FACTUAL BACKGROUND

### A.    HCSG

Founded in 1976 and headquartered in Bensalem, Pennsylvania, HCSG delivers housekeeping, laundry, dining, and nutrition services to healthcare facilities throughout the United States.  *See* Am. Compl. ¶¶ 3, 25; 2017 Form 10-K at 3, excerpts attached as Exhibit D. The Company's customers include over 3,000 facilities, including nursing homes, retirement complexes, rehabilitation centers, and hospitals.  Am. Compl. ¶¶ 2, 34.  HCSG's common stock is listed on the Nasdaq under the ticker symbol "HCSG."  *Id*. ¶ 25.

**B.      Plaintiff Alleges Two Theories of Liability And, Effectively, Two Separate Class Periods**

In this action, Plaintiff alleges two separate and distinct categories of misconduct: (1) allegations of misconduct relating to the reported net income and EPS of HCSG, and (2) allegations of misconduct relating the SEC investigation into HCSG's EPS calculation and reporting policies.  Lead Pl.'s Mem. Supp. Mot. for Class Certification ("Pl.'s Mem.") at 1, ECF No. 61-2.[1]  Although Plaintiff seeks to certify a class period that spans almost 5 years, the alleged misconduct falls into two separate and narrower timeframes.

**1.      Alleged Misconduct Relating to EPS (2014-2017)**

The putative class period commences on ***April 8, 2014*** – a date on which HCSG announced its financial results for the first quarter of 2014 and reported EPS that met analysts' consensus estimates.  Am. Compl. ¶¶ 79, 142-44.  Plaintiff alleges that statements relating to EPS were false and misleading because "Defendants overstated the Company's quarterly EPS . . . by . . . manipulating net income to generate EPS results that would have a third digit (representing tenths of a cent) that would permit the rounding up of reported EPS to artificially avoid falling short of analysts' consensus EPS target for the Company . . . ."  *Id.* ¶ 168.a. Plaintiff alleges that HCSG continued to manipulate its EPS results for the following 14 quarters. *Id.* ¶¶ 79-80 (discussing alleged EPS manipulations for a 15 quarter period between Q1 2014 and Q3 2017).

---

[1] Plaintiff also alleges that Defendants misrepresented the effectiveness of HCSG's internal controls, which enabled the alleged misconduct relating to the reported net income and EPS of HCSG.  Am. Compl. ¶ 141; Pl.'s Mem. at 1.

On *March 22, 2017*, Monocle Accounting Research published an article on Seeking Alpha[2] entitled "Healthcare Services Group: A Decade of Strategic Rounding" (the "March 2017 Monocle Report"). Am. Compl. ¶ 8; Ex. A, March 2017 Monocle Report. The March 2017 Monocle Report examined HSCG's earnings reports for the period between the first quarter of 2006 and the fourth quarter of 2016 and found that these reports revealed "a pattern of 'strategic rounding' of [the Company's] reported quarterly EPS." Am. Compl. ¶ 8. Based on its examination of this publicly available data[3], Monocle Accounting Research reported that the Company rounded up its quarterly EPS calculations for 44 quarters in a row. Am. Compl. ¶ 73; Ex. A, March 2017 Monocle Report. The odds of such a result were "1 in 17.6 trillion." *Id.* Monocle Accounting Research concluded that the Company was engaging in an "aggressive approach to accounting that increases exposure to restatement risk, enforcement proceedings and securities fraud claims." Am. Compl. ¶ 8. The author of the March 2017 Monocle Report noted that "we have alerted" the SEC to the "extreme outlier nature of HCSG's reported EPS history" and "will let that agency determine if HCSG's accounting practices require a deeper dive." Ex. A, March 2017 Monocle Report at 8; *see* Am. Compl. ¶ 77. The Amended Complaint discusses at length the March 2017 Monocle Report and the information it disclosed to the market relating to the Company's rounding of EPS. *See, e.g.*, Am. Compl. ¶¶ 66-77.

---

[2] According to Plaintiff's expert, Seeking Alpha is a "an important source of information regarding various companies and their valuations" that discloses "material information … to the market." Dec. 10, 2020 Deposition of Zachary Nye, Ph.D. (hereinafter referred to as "Nye Dep.") (excerpts attached exhibit O), 114:19-115:16; *see also* Choi Report ¶ 44 (noting that in 2017 the Seeking Alpha website received 40 million monthly visits).

[3] Plaintiff's expert conceded that the information analyzed and discussed in the March 2017 Monocle Report was publicly available. Nye Dep. 121:4-19. Indeed, there are variety of analytical tools that sophisticated investors use to monitor company behavior including behavior relating to earnings manipulation. Choi Report at 17 n.52.

On April 17, 2017, Monocle Accounting Research published a second report entitled "Healthcare Services Group: More 'Strategic Rounding' And Other Shenanigans" (the "April 2017 Monocle Report"). The April 2017 Monocle Report reiterated the contents of its "widely-read" prior report. *See* Exhibit E, April 2017 Monocle Report at 1; Am. Compl. ¶ 89. The April 2017 Monocle Report noted that at least one analyst raised a question at the Company's April 12, 2017 earning management call regarding "quarterly results being rounded up." Ex. E, April 2017 Monocle Report at 1-2.

Plaintiff alleges that HCSG's practice of EPS rounding continued through the third quarter of 2017 and then "abruptly ceased." Am. Compl. ¶¶ 4, 10, 12, 79. According to Plaintiff, "the alleged EPS manipulation only stopped – and did so immediately – after the SEC launched an investigation into the Company's EPS practices in November 2017. . . ." Pl.'s Mem. at 4.

### 2. Alleged Misconduct Relating to the SEC Investigation (2018-2019)

In November 2017, HCSG received a letter from the SEC regarding an inquiry the SEC was conducting into EPS calculation practices. Several inquiry letters were sent to a number of public companies around this time in connection with the Division of Enforcement's EPS Initiative. *See* Dave Michaels, "SEC Probes Whether Companies Rounded Up Earnings Per Share," Wall Street Journal, June 22, 2018, available at https://www.wsj.com/articles/sec-probes-whether-companies-rounded-up-earnings-1529699702 (hereinafter, "WSJ Article," attached as Exhibit F); *see also* SEC Press Release, "SEC Charges Companies, Former Executives as Part of Risk-Based Initiative, Sept. 28, 2020, available at https://www.sec.gov/news/press-release/2020-226 (attached as Exhibit G).

Five months later – in March of 2018 – the SEC commenced a formal investigation and issued a subpoena requesting documents.  A nationally renowned law firm was retained to conduct an internal investigation into the matters related to the SEC investigation. *See* Ex. B, Mar. 4, 2019 Form 8-K; May 1, 2019 Earnings Call Tr. at 3, attached as Exhibit H. The law firm worked under the direction of the HCSG's audit committee and with the support of a Big-4 accounting firm's forensic practice.  *See id*.  HCSG disclosed the inquiry letter, the SEC formal investigation, and the internal investigation on ***March 4, 2019***, which marks the end of the putative class period.  After the internal investigation concluded, the Company filed its Form 10-K with an unqualified opinion from its external auditors.  *See id*.

Plaintiff concedes, as it must, that its allegations relating to the alleged failure to disclose the SEC investigation could not have been disclosed prior to November 2017, the date on which the SEC sent HCSG an inquiry letter.  *See* Am. Compl. ¶ 93 (referencing a "sixteen month[]" period, i.e. November 2017 through March 2019, in which HCSG allegedly concealed the investigation).  As such, Plaintiff alleges that *after* November 2017 Defendants made false and misleading statements and/or omissions with respect to the SEC investigation.  *See* Am. Compl. ¶¶ 245-46.  According to Plaintiff, the first such alleged misrepresentation or omission occurred on ***February 23, 2018*** when HCSG filed its Form 10-K.  *See id*. at ¶¶ 242, 245-46.

Accordingly, Plaintiff's pleadings on their face allege an approximate one year timeframe in which the Defendants purportedly made misrepresentations and omissions relating to the SEC investigation.  Notably, this timeframe begins on February 23, 2018 – weeks before the SEC commenced its formal investigation into HCSG in March 2018.

C.    **Plaintiff's Transactions in HCSG Stock**

The HCSG stock that Plaintiff held during the putative class period falls into two categories: (1) stocks acquired as part of an in-kind asset transfer when redeeming amounts from

a trust managed by Callan, and (2) stocks purchased on Plaintiff's behalf by its financial advisor Wasatch.  Plaintiff had no involvement in selecting HCSG stock as part of the in-kind transfer from Callan because the redemption process was governed by a trust agreement.  ████████████

████████████████████████████████████████████████████████████████

████████████ *See* Dec. 4, 2020 Rule 30(b)(6) Deposition of Utah Retirement Systems, Through its Corporate Representative Kevin Catlett (hereinafter referred to as "Catlett Dep.") (excerpts attached as Exhibit I), 115:12-17, 117:2-5; Nov. 23, 2020 Rule 30(b)(6) Deposition of Wasatch Global Investors a/k/a Wasatch Advisors, Inc., Through its Corporate Representative, Ryan Snow (hereinafter referred to as "Snow Dep.") (excerpts attached as Exhibit J), 33:17-20. As such, Plaintiff did not make any investment decisions relating to HCSG stock during the putative class period.

### 1.    The Callan Transfer

Plaintiff apparently seeks to recover damages in this action for approximately 5,174 shares of HCSG common stock that it acquired in May 2014 as part of an in-kind transfer from the Diversified Alpha Group Trust ("DAGT"), and immediately sold for a profit.  *See* Pl.'s Mot. Class Certification at Ex. D, ¶ 3, ECF No. 61-8 (hereinafter, "Plaintiff's Declaration"); Pl.'s Decl. at Ex. A. ████████████████████████████████████

████████ Catlett Dep. 110:13-15. ████████████████████████████████

████████ Catlett Dep. 111:8-11; 153:5-13; Declaration of Minho Hyun (hereinafter, "Callan Declaration" and attached as Exhibit K), ¶ 4. ████████████████████████████

████████ Catlett Dep. 134:6-16.

████████████████████████████████████████████████████

████████████████████ Catlett Dep. 153:5-13. ████████████████████

████████ *see* Catlett Dep. 113:23-114:2, ████████████████████████

-9-



*See* Catlett Dep. 110:18-23

Catlett Dep. 142:12-15

Ex. K, Callan Decl. ¶ 5

("URS had no involvement in any investment decisions made on behalf of DAGT.").

Ex. K, Callan Decl. at Ex. 1, § 6.01.

*See* Catlett Dep. 111:21-112:3; Ex. K, Callan Decl. at Ex. 1, § 6.01(c).

Catlett Dep. 112:13-113:17; Ex. K, Callan Decl. at Ex. 1, § 6.01(c)

In April 2014, Plaintiff directed Callan to redeem 4,100,000 shares (approximately $75 million) from the DAGT for an in-kind asset transfer to Plaintiff's custodian, Northern Trust. *See* Ex. K, Callan Decl. ¶ 6. At this time, the DAGT included shares of HCSG common stock that had been purchased *prior* to the putative class period. Ex. K, Callan Decl. ¶ 8. "Pursuant to the redemption request, on or around May 6, 2014, Callan transferred approximately $75 million of securities, including approximately 5,174 shares of HCSG common stock, to [Plaintiff] from the DAGT (the 'May 2014 In-Kind Transfer')." *See* Ex. K, Callan Decl. ¶ 7; Pl.'s Decl. at Ex. A (listing the "acquisition" of 5,174 shares on May 6, 2014).



Catlett Dep. 113:9-17; *see also* Catlett Dep. 112:13-15

Catlett Dep. 154:16-155:21

. Plaintiff acquired the HCSG shares at the per share price of $29.0600 and

sold the shares at $29.2006. *See* Pl.'s Decl. at Ex. A.

### 2.    The Wasatch Purchases and Sales



Catlett Dep. 116:9-117:5.

*Id.;* Snow Dep.

33:17-20.  Wasatch viewed its investment process as long term and sought to invest in "high-

quality long-duration growth companies."  Snow Dep. 117:24-118:7; *see also* Snow Dep.

156:22-157:4 (explaining that Wasatch typically likes to invest in securities for five years or

longer).  Plaintiff had no involvement in the securities that Wasatch purchased or sold on its

behalf. *See* Snow Dep. 36:18-23 (Plaintiff never directed Wasatch to purchase or sell a

particular security).

In September 2017 – five months after the publication of the March 2017

Monocle Report – Wasatch made the decision to invest in HCSG and purchased approximately

70,107 shares of HCSG common stock for Plaintiff's account. *See* Pl.'s Decl. at Ex. A.  Wasatch

believed HCSG was a promising long-term investment based on its thesis that HCSG "would be

able to grow in a rate somewhere in the high single digits to low double digits at they continued

to penetrate their existing market." Snow Dep. 203:15-20; 156:12-21.  According to Wasatch it reached this conclusion using fundamental research that analyzed "all aspects of the business, from the products and services that the company provides, the management team, the business model, what [it] perceive[d] as the growth of the company, as well as the valuation." Snow Dep. 20:20-21:7. ████████████████████████████████████████████████████████

██████████████████████████ Snow Dep. 131:9-25 (explaining that labor issues, including a settlement in a wage and hour lawsuit with managers, was a risk that Wasatch considered when deciding whether to invest in HCSG); Exhibit L, Nov. 14, 2017 Email exchange between Wasatch and R.W. Baird (Exhibit 27 to Snow Dep.) ████████████████████████████

████████████████████████████████████████

Wasatch made clear that the rounding of quarterly earnings was neither "important" nor "material" to its decision to purchase HCSG stock for Plaintiff's account.  Snow Dep. 44:13-45:6; 229:3-8.  The fact that HCSG was above or below the analyst's consensus estimates at any given point in time had no impact whatsoever on Wasatch's decision to purchase, hold or sell HCSG securities.  Snow Dep. 170:12-171:10.  For this reason, during his deposition, Wasatch's corporate designee dismissed the allegations in the Monocle Report as irrelevant.  *See* Snow Dep. 146:11-147:17 (agreeing with an analyst's assessment that HCSG's EPS rounding practice "doesn't matter" and is "largely a superficial issue").

████████████████████████████████████████████████████████

██████████████████████████ Snow Dep. 226:2-18; Snow Dep. 219:20-24.  Wasatch reasoned that an SEC investigation into EPS rounding "has nothing to do with the long-term prospects" of HCSG.  Snow Dep. 229:18-24.  Wasatch's corporate designee elaborated:

-12-

Q.…·You said earlier, you testified that you learned about the --
that the SEC was investigating whether Healthcare Services Group
rounded its EPS; correct?

A.· Yes, that's correct….

… Q.· When you heard about that rounding, did you have a view
as to whether that so-called rounding affected the company's value
one way or the other?

… A.· I did have a view, and it was my opinion that it did not
impact the company.

Q.· It did not what?

A.· It did not impact the company.

Q.· And why not?

A.· It's probably due to how we view investing in that we view
investing for the long term, and we are trying to identify
companies that are going to be significantly larger in the future.
And so, ***to have a quarter that is rounded one way or the other is
not a material impact, in our view.***

Snow Dep. 145:13-146:10 (emphasis added) (objections omitted).

Plaintiff's purchases confirm that Plaintiff was not affected by reported EPS or the disclosure of the SEC investigation.  Wasatch purchased on Plaintiff's behalf approximately 9,434 shares of HCSG stock in March 2018 and 23,452 more shares of HCSG stock in September 2018.  *See* Pl.'s Decl. at Ex. A.  These purchases took place *after* the alleged partial corrective disclosure dates of February 6, 2018, April 17, 2018, and July 17, 2018, and at times when HCSG was alleged to have missed EPS consensus estimates.[4]  Am. Compl. ¶¶ 339-41.

---

[4] Plaintiff alleges that the Company missed consensus EPS estimate by four cents in the fourth quarter of 2017, by thirty-eight cents in the first quarter of 2018 (or an adjusted EPS miss of three cents, according to Dr. Nye), and by three cents in the second quarter of 2018.  Am. Compl. ¶¶ 339-341; Exhibit 12 to Nov. 13, 2020 Expert Report of Zachary Nye, Ph.D. at 240, ECF No. 61-7, Exhibit C to Pl.'s Mem.  Plaintiff alleges that although the Company beat the consensus estimate by five cents in the fourth quarter of 2018, "analysts attributed the earnings beat to extraordinary items" and when excluding those extraordinary items, the Company's EPS would have missed the consensus estimate by a penny.  Am. Compl. ¶ 342.

Nevertheless, Wasatch continued to believe its long-term thesis – which did not take into account EPS – remained on track. *See* Snow Dep. 203:2-20; 205:15-206:20 (explaining that in September 2018 Wasatch believed that HCSG would be "able to manage through their recent troubles and revert back to their historical execution levels"). Even after the Company's March 4, 2019 disclosure of the SEC investigation, Wasatch continued to purchase HCSG stock on Plaintiff's behalf. Snow Dep. 239:10-24 (noting that the SEC investigation created an attractive discount on the stock price because "some investors [were] selling the stock because of the SEC investigation," but to Wasatch the investigation was "not material to the long-term prospects of the company"). ████████████████████████████████████████

████████████████████████████████████████████ Nov. 23, 2020 Rule 30(b)(6) Deposition of Wasatch Global Investors a/k/a Wasatch Advisors, Inc., Through its Corporate Representative, Catherine (Kitty) Swenson (hereinafter referred to as "Swenson Dep.") (excerpts attached as Exhibit M), 11:3-12:7, 20:23-21:11. ██████████

██████████████████████████████████████████████

████████████ See Exhibit N, Plaintiff's Transactions in HCSG's Securities (Exhibit 25 to Catlett Dep.).

Wasatch sold shares of HCSG stock on Plaintiff's behalf on only two occasions.

████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████ Snow Dep. 76:6-21. ██████████████████████████████████

████████████████████████ Ex. N, Plaintiff's Transactions. ██████████

████████████████████████████████████████

-14-

████████████████████████ *See* Snow Dep. 83:3-10 ████████████████

██████████████████████████████████████████████████

████████████████ .

## III. LEGAL STANDARD

### A. Rule 23(a)

A party seeking class certification must "affirmatively demonstrate" its compliance with the four requirements for certification within Rule 23(a) of numerosity, commonality, typicality, and adequate representation. *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 350 (2011); *see Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) ("*Halliburton II*") ("[P]laintiffs wishing to proceed through a class action must actually *prove*— not simply plead—that their proposed class satisfies each requirement of Rule 23 . . . ." (emphasis in original)). Class certification requires a finding that each of the requirements of Rule 23 has been established by a preponderance of the evidence. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008). Because "[t]he class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," to come within the exception, a class representative "must possess the same interest and suffer the same injury as the class members." *Wal-Mart Stores*, 564 U.S. at 348-49 (citations and internal quotation marks omitted). These requirements are "meant to assure both that class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances." *Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994).

Class certification is proper only when the court conducts a "rigorous analysis" to determine that the prerequisites of Rule 23 are met. *In re Hydrogen Peroxide*, 552 F.3d at 309 (quoting *Gen. Tel. Co. of Sw. Falcon*, 457 U.S. 147, 161 (1982)); *see id.* at 321 ("[P]roper analysis under Rule 23 requires rigorous consideration of all the evidence and arguments offered

by the parties.").  A "preliminary inquiry into the merits" may be necessary to determine whether requirements for class certification are satisfied.  *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 168 (3d Cir. 2001).  This means that courts "cannot be bashful" at the class certification stage in resolving the factual and legal issues relevant to class certification, even if they happen to overlap with the merits.  *See Reyes v. Netdeposit, LLC*, 802 F.3d 469, 484 (3d Cir. 2015); *see also In re Allstate Corp. Secs. Litig.*, 966 F.3d 595, 608 (7th Cir. 2020) (explaining that at the class certification stage in a Rule 10b-5 action the court must consider evidence even if it is "likely to have obvious implications for the off-limits merits issues of materiality and loss causation" and "may not use the overlap to refuse to consider the evidence").[5]

### B.      Rule 23(b)(3)

Because Plaintiff claims damages, Plaintiff must additionally satisfy the requirements of Rule 23(b)(3), which requires that Plaintiff show that "(i) common questions of law or fact predominate (predominance), and (ii) the class action is the superior method for adjudication (superiority)."  *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010) (citing Fed. R. Civ. P. 23(b)(3)).  "Predominance measures whether the class is sufficiently cohesive to warrant certification."  *Newton*, 259 F.3d at 187.  In determining whether predominance exists, a court must examine the underlying cause of action.  *Id.* at 172; *see also Reyes*, 802 F.3d at 489.  Here, Plaintiff alleges a 10b-5 securities fraud claim and must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

---

[5] *See also Reyes*, 802 F.3d at 485 (when addressing a motion to certify a class, the district court must: "(1) conduct rigorous analysis, (2) review all avenues of inquiry in which it may have doubts (even if it requires reviewing the merits) in order to (3) be satisfied and (4) make a definitive determination on the requirements of Rule 23, or even (5) require that a plaintiff demonstrate actual, not presumed conformance with Rule 23").

misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[6]  *Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I")*, 563 U.S. 804, 807 (2011).  "Unlike commonality, predominance is significantly more demanding, requiring more than a common claim." *Newton*, 259 F.3d at 187.

## IV.  ARGUMENT

### A.  Plaintiff Cannot Satisfy The Requirements Of Rule 23(b)(3)

#### 1.  Plaintiffs Have Not Shown a Model for Calculating Damages That is Consistent With Their Two Theories of Liability

In order to obtain class certification, a plaintiff must set forth a damages model that is consistent with the plaintiff's theory of liability.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013); s*ee also Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374 n.10 (3d Cir. 2015) ("[A]t class certification, the damages calculation must reflect the liability theory." (quoting *In re Nexium Antitrust Litig.*, 777 F.3d 9, 23 (1st Cir. 2015)).  In *Comcast*, the Supreme Court rejected the notion that "at the class-certification stage *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be."  *Comcast,* 569 U.S. at 35-36.  As such, in order to evaluate the predominance requirement, "the Court must understand, concretely, how plaintiffs propose to reliably establish damages."  *Sicav v. Wang*, No. 12-6682, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015).  "[T]o pass a rigorous analysis examination a Plaintiff must do more than state a formula that could be used to calculate class-

---

[6] In recent decisions, the Supreme Court has held that a securities fraud plaintiff does not need to prove either the materiality of the misrepresentations or the element of loss causation at the class certification stage. *Halliburton I*, 563 U.S. at 807; *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).  To the extent the rulings of *Halliburton I* or *Amgen* are modified or overturned by the Supreme Court in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement Sys.*, No. 20-222, Dec. 11, 2020 (hereinafter "*Goldman Sachs*"), Defendants preserve these issues for purposes of any class certification ruling.

wide damages." *Chudner v. TransUnion Interactive, Inc.*, No. 09-433-ER, 2010 WL 5662966, at

*1 (D. Del. Dec. 15, 2010) (Robreno, J.); *see, e.g.*, *Hydrogen Peroxide*, 552 F.3d at 318 ("The

evidence and arguments a district court considers in the class certification decision call for

rigorous analysis. A party's assurance to the court that it intends or plans to meet the

requirements is insufficient."); *Newton*, 259 F.3d at 187-88 (rejecting the plaintiffs' attempt "to

gloss over" the predominance requirement based on their claim that a formula *could* be devised

to measure damages).

"When a class plaintiff presents a damages model that is vague, indefinite, and

unspecific, or simply asserts … that there are unspecified 'tools' available to measure damages,

the model amounts to 'no damages model at all,' and the class cannot be certified." *Ohio Pub.*

*Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08CV0160, 2018 WL 3861840, at *19

(N.D. Ohio Aug. 14, 2018) (quoting *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal.

2014).  In *Ohio Public Employees Retirement Systems v. Federal Home Loan Mortgage Corp.*,

the district court denied class certification in a securities case because the plaintiff presented a

"general and vague" damages approach that failed to account for its theories of liability.  *Id.*

There, the plaintiff's expert asserted that he could calculate out-of-pocket damages based on

inflation, claiming there was nothing unusual about the case, but he did not have specifics on

which model to use.  *Id.*  The court found that merely referencing "unspecified 'valuation tools'"

was insufficient to establish that damages could be measured on a class-wide basis.  *Id.* at *19-

20.  Similarly, in *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, the

court rejected the plaintiffs' assertion that damages could be calculated in a formulaic manner

because their expert had not created a model or explained with specificity the methodology he

would employ.  301 F.R.D. 116, 141-42 (S.D.N.Y. 2014).  While the court acknowledged that

-18-

the plaintiffs did not need to perform calculations at the class certification stage, the court concluded that the plaintiffs had to present a precise enough "specification of the damages calculation method … to assure that the model is in fact linked with the theory of liability." *Id.* ("[W]ithout assurance beyond [plaintiffs' expert's] say-so, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis.").[7]

Courts have found that merely invoking an event study methodology in a securities case will not satisfy the predominance requirement without details of how that event study will relate to the various theories of liability alleged. In *In re BP P.L.C. Securities Litigation*, 10-MD-2185, 2013 WL 6388408, at *15 (S.D. Tex. Dec. 6, 2013), the plaintiffs contended that the class members' damages would be calculated by use of an event study. The case involved two theories of liability: pre-explosion and post-explosion. *Id.* at *11. The defendants argued that the event study was inconsistent with plaintiffs' theories of liabilities because (1) although certain misrepresentations understated a known risk, the "constant dollar" approach overcompensated investors for the full value of stock price drop from the materialization of that risk, and (2) the amount of inflation remained constant over the class period even though certain statements were repeated. *Id.* at *16-17. Plaintiffs offered no plans to address these criticisms. *Id.* at *17.

---

[7] *See also Sicav*, 2015 WL 268855, at *6 (denying class certification in securities case because "plaintiffs have not shown or explained, concretely, how damages would be calculated"); *In re ConAgra Foods, Inc.*, 302 F.R.D. at 577-78 (same; "Although the methodologies he describes may very well be capable of calculating damages in this action, [plaintiff's expert] has made no showing that is the case."); *Chudner*, 2010 WL 5662966, at *1 n.1 ("Plaintiff's damages methodology cannot withstand a rigorous analysis because Plaintiff fails to provide the Court any explanation as to how objective values will be calculated.").

The court concluded that the plaintiffs failed to meet their burden of showing that damages can be measured in a manner consistent with their theories of liability. *Id.* The court reasoned:

> [S]imply invoking the event study methodology . . . does not assuage the Court that the class-wide damages methodology proposed will track Plaintiffs' theories of liability . . . . ***Without a more complete explication of how Plaintiffs propose to use an event study to calculate class members' damages, and how that event study will incorporate—and, if necessary, respond to—the <u>various theories of liability</u>, the Court cannot certify this litigation for class action treatment.***

*Id.* (emphasis added).[8]

Here, Plaintiff has not presented a model that satisfies its burden of showing that damages can be calculated on a classwide basis consistent with its two theories of liability. Indeed, Plaintiff has not presented any model whatsoever. Plaintiff relies exclusively on Dr. Nye's report, and Dr. Nye effectively concedes that his damages section is cut and pasted from prior reports. *See* Dec. 10, 2020 Deposition of Zachary Nye, Ph.D (hereinafter "Nye Dep.") (excerpts attached as Exhibit O) 184:14-19 (agreeing that "other reports that [he has] issued[] would . . . have very similar language with respect to damages methodology"). Such a vague and generic damages approach amounts to "no damages model at all." *See Ohio Pub. Emps.' Ret. Sys.*, 2018 WL 3861840, at *19.

---

[8] *See also In re BP P.L.C. Sec. Litig.*, 2014 WL 2112823, at *12 (S.D. Tex. May 20, 2014) (denying the plaintiffs' renewed motion for class certification of a pre-explosion class because plaintiffs' alternative reliance on an "out-of-pocket" measurement failed to "give[] the Court any information about how the alternative calculation would be performed" and therefore did not satisfy plaintiffs' burden of proving that damages can be calculated on a classwide basis consistent with their theory of liability).

The mere reference to an event study methodology, without showing or explaining, concretely, how it will be tailored to address the Plaintiff's two theories of liability and reliably measure damages is insufficient for at least six reasons.[9]

*First,* Dr. Nye's proposed damages approach does not explain how he would account for alleged corrective information that could not have been disclosed at the beginning of the putative class period. Dr. Nye indicates that he would utilize the stock price declines in response to alleged corrective disclosures to estimate inflation for each day during the putative class period. Nov. 13, 2020 Expert Report of Zachary Nye, Ph.D (hereinafter "Nye Report"), ¶ 60, ECF No. 61-6, Exhibit C to Pl.'s Mem. Dr. Nye does not – and cannot – address why the price decline following the disclosure of the SEC investigation in March 2019 is relevant to determining inflation for share purchases prior to February 23, 2018 (the earliest date identified in the Amended Complaint of an alleged misstatement or omission regarding the SEC investigation). Choi Report ¶ 33. There is no credible basis for finding that HCSG should have disclosed an SEC investigation *before* it commenced. As a result, any damage methodology that uses the price decline on March 4, 2019 to estimate inflation and carries that inflation back to the beginning of the putative class period is not reliable and would overstate damages. Choi Report ¶ 34.

*Second*, Plaintiff cannot claim damages from the materialization of the allegedly concealed risk of an SEC investigation. As an initial matter, the facts do not support a finding that the risk of a potential SEC investigation was concealed from the market. Dr. Nye conceded

---

[9] Damages arising from a Rule 10b-5 violation are calculated as the price inflation caused by the company's alleged misrepresentations at the time an investor purchased shares, less "inflation" remaining in the stock at the time the investor sold those shares, with "inflation" being the price of the stock less what the price of the stock would have been if the company had not misled the market. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

that, for any public company, "there's always risk of regulatory action."  Nye Dep. 127:8-9.

HCSG repeatedly disclosed the potential risk of "sanctions or investigations by the SEC or other

regulatory authorities."  *See, e.g.*, Ex. D, 2017 Form 10-K at 11.  The market was also expressly

made aware of the potential risk of an SEC investigation into the Company's EPS rounding

practices.  The March 2017 Monocle Report disclosed to the market that Monocle Accounting

Research had contacted the SEC to let the agency do a "deeper dive" into the EPS rounding

issue.  *See* Ex. A, March 2017 Monocle Report at 8.  A subsequent Wall Street Journal article

further advised the market that that the SEC had sent queries to at least ten companies regarding

EPS rounding practices.  *See* Ex. F, WSJ Article.  In an efficient market, market participants

would have incorporated this information into their expectations about how any potential

regulatory action would affect the value of HCSG stock.

Even assuming Plaintiff could articulate a factual basis for its damages theory

(which it cannot), Dr. Nye's proposed event study is not capable of "disentang[ling] the portion

of the price reaction on March 4, 2019 due to dissipation of inflation in the stock price as a result

of the revelation of the allegedly concealed risk itself from the portion due to the materialization

of this concealed risk."  Choi Report ¶ 39.  Because only the price decline due to the revelation

of a concealed risk is relevant to measure inflation, Dr. Nye's proposed methodology is

unreliable and would result in an overstatement of damages.  Choi Report ¶ 40.

*Third*, Dr. Nye's model fails to address how the price declines on the alleged

partial corrective disclosure dates could be used to measure inflation associated with EPS

rounding.  Dr. Nye conceded that information relating to the Company's EPS calculations was

publicly available throughout the class period.  Nye Dep. 121:13-19.  Relying on this publicly

available information, the March 2017 Monocle Report disclosed the improbability of HCSG's

EPS rounding practices for the period between the first quarter of 2006 and the fourth quarter of 2016. As Dr. Choi concludes, "even if the market was not fully aware of HCSG's alleged EPS rounding practices prior to the issuance of the Monocle Report, the publication of the report in March 2017 would have informed the market about HCSG's alleged EPS rounding practices." Choi Report ¶ 45. Dr. Nye's report supports this conclusion – finding a statistically significant stock price decline (at the 95% confidence level) following the publication of the March 2017 Monocle Report. Given that curative information was disclosed to the market by no later than March 22, 2017, Dr. Nye does not have any basis to rely upon subsequent quarterly earnings releases published on February 6, 2018, April 17, 2018, July 17, 2018, and February 5, 2019 to measure inflation associated with the alleged EPS rounding issue.

*Fourth*, Plaintiff has not shown and cannot show a damages methodology that takes into consideration the time-varying nature of the alleged inflation. Dr. Nye's damages approach, which purports to use price declines following alleged corrective disclosures to measure inflation, has been accepted by some courts in cases where inflation based on price declines following corrective disclosures can be cast backward to the beginning of the class period. Simply using inflation based on price declines following alleged corrective disclosures and back-casting that inflation to the beginning of the class period cannot be applied here. This is not, and cannot be, a constant inflation band case. As such, Dr. Nye would have to show a methodology that would determine alleged inflation, based on a changing total mix of information, at least quarterly during the class period (if not every day). Dr. Nye has not said how he would do that in his report. In his deposition, he essentially said it would be based on his

subjective judgments about the total mix of information available at different times during the class period and how that affected inflation.[10]

Dr. Nye's assurances to this Court than he can measure inflation in this case on a classwide basis consistent with the two different theories of liability alleged are insufficient. *Fort Worth Empls.' Ret. Fund*, 301 F.R.D. at 141-42 ("[W]ithout assurance beyond [plaintiffs' expert's] say-so, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis."). Plaintiff's allegations of EPS rounding are based on the March 2017 Monocle Report, which Plaintiff concedes disclosed to the market a pattern of "strategic rounding" of EPS *for more than a decade*. The alleged misconduct relating to EPS rounding, thus, began over eight (8) years prior to the start of the class period. If the efficient market was aware of the Company's rounding of EPS (which Dr. Nye concedes was publicly available information), then there can be no inflation during the putative class period relating to the EPS rounding issue. Choi Report ¶ 47. Even assuming the market were unaware of the alleged rounding on April 8, 2014, Dr. Nye does not address the impact of new information that entered the market each and every time the Company allegedly continued to round-up its EPS figures. Choi Report ¶ 48. Under Plaintiff's theory, each quarterly announcement of EPS increased the statistical probability that the Company was engaged in EPS rounding; yet, Dr. Nye

---

[10] Dr. Nye stated in his deposition that he has no opinion on price inflation and does not know whether a constant inflation band would apply. Nye Dep. 168:6-22 ("I haven't done this analysis, so I have no opinion."); *id.* 187:16-23. When asked how he would calculate price inflation, he responded: "[I]t depends on the nature of the case and the facts as they're presented, and also the allegations. . . . [S]ometimes it's easy enough to take the full price declines that are fraud related and to measure those on a constant basis[.] . . . And then there's also cases in which sometimes you need to go in and there will be time varying considerations, but that's really a context-specific endeavor." Nye Dep. 186:24-187:15. Dr. Nye could not provide any concrete details on how he would reliably establish damages. Nye 192:19-21 ("If there are considerations that require a time-varying inflation band, these adjustments will be made."); 193:1-12 (explaining that if a case were to "require some kind of gradation of the inflation band over time . . . it's really subject to the expert's discretion . . ."); 193:13-19 ("Q: So how would you go about determining when it's appropriate in terms of time frame to make an adjustment in the inflation band?. . . A: . . . It depends . . . ").

-24-

does not offer any methodology to account for the varying inflation across time.  Choi Report ¶¶ 48-49.

*Fifth*, Dr. Nye cannot articulate a damages theory that is consistent with the partial corrective disclosure dates alleged.  Dr. Nye asserts that he will use the price declines in response to the alleged partial corrective disclosure dates to measure inflation in HCSG's stock.  Plaintiff alleges four partial corrective disclosures occurring on February 6, 2018, April 17, 2018, July 17, 2018, and February 5, 2019.  All of these "disclosures" reflect dates on which HCSG announced quarterly earnings that missed EPS consensus estimates.  But EPS misses can be caused by several potential factors.  Choi Report ¶ 53.  There are no disclosures on these dates tying the misses to the "primary driver" of the alleged fraud – HCSG's *manipulation* of labor costs.  Choi Report ¶ 54.  Further, neither Plaintiff nor Dr. Nye articulate why the mere fact of an EPS miss is relevant to the Plaintiff's EPS rounding theory.  On both July 17, 2018 and April 17, 2018, EPS misses were more than one cent which means rounding up would not have changed the fact that the Company missed EPS estimates.  Choi Report ¶ 52.  And on February 6, 2018, HCSG did not even miss consensus EPS estimate when excluding one-time items.  Choi Report ¶ 58.  Dr. Nye does not present any evidence of any information related to EPS rounding that was disclosed to the market on any of these partial corrective disclosure dates.  Choi Report ¶ 55.

Moreover, Dr. Nye completely fails to offer a method for separating the stock price declines caused by the alleged partial corrective disclosures from declines caused by unrelated confounding information.  Choi Report. ¶ 55.  A review of the analysts' reports following the alleged partial corrective disclosures indicates confounding information unrelated to the alleged fraud, such as lower gross margins, the potential bankruptcy of HCSG customers, and higher than expected tax rate and insurance costs.  Choi Report ¶¶ 69, 71, 78, 86.  Dr. Nye's

event study notes each of these negatives, and notably is silent on what specific information on these dates related to HCSG's alleged rounding practices or labor cost manipulation in explaining the price decline.  Choi Report ¶¶ 65, 73, 82, 88.

*Sixth*, as discussed in Section IV(B)(2), Dr. Nye's damages approach altogether ignores the potential conflicts among class members that arise from the two different theories of liability alleged.

For all of these reasons, Plaintiff's generic damages approach, and unsupported assurances that "a price maintenance style inflation case . . . is perfectly amenable to the event study methodology," Nye Dep. 145:2-20, do not pass muster under the "rigorous analysis" required by *Newton* and *Hydrogen Peroxide*.[11]

> **2.    Defendants have rebutted the *Basic* presumption of reliance because the alleged misrepresentations and omissions were irrelevant to Plaintiff**

A class wide presumption of reliance through the fraud on the market theory is essentially a prerequisite for class certification.  *Halliburton II*, 573 U.S. at 268 ("If every plaintiff had to prove direct reliance on the defendant's misrepresentation, 'individual issues then would . . . overwhelm[] the common ones,' making certification under Rule 23(b)(3) inappropriate."  (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988)).  In *Basic Inc. v. Levinson*, the Supreme Court held that a plaintiff may satisfy the reliance element of a Rule 10b-5 action by invoking a presumption of reliance based upon the fraud-on-the-market theory.  485 U.S. at 247 ("Because most publicly available information is reflected in the market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for

---

[11] *Chudner*, 2010 WL 5662966, at *1 n.1  ("Plaintiff's assurance of presenting expert testimony at trial, and his discussion of losses are not enough to withstand rigorous analysis under *Newton* and *Hydrogen Peroxide*.").

purposes of a Rule 10b-5 action."). To invoke the *Basic* presumption of reliance, Plaintiff must demonstrate that: (1) the alleged misrepresentations were publicly known; (2) they were material; (3) the stock traded in an efficient market; and (4) the plaintiff traded the stock between when the misrepresentations were made and the truth was revealed.[12] *Halliburton II*, 573 U.S. at 268.

The *Basic* presumption is rebuttable. "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption." *Basic*, 485 U.S. at 248. The Supreme Court has expressly embraced "individualized rebuttal[s]" and the notion that a defendant may "pick off the occasional class member" who did not in fact rely on the alleged misrepresentations or omissions. *Halliburton II*, 573 U.S. at 276. Indeed, since *Basic*, the rule has been that the presumption of reliance can be rebutted with a showing that an individual plaintiff "would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud." *Id.* at 269 (citing *Basic*, 485 U.S. at 248-49); *Zlotnick v. Tie Commc'ns*, 836 F.2d 818, 822 (3d Cir. 1988) ("[A] defendant may rebut this presumption by showing that the plaintiff would have purchased even if he had known about the misrepresentation.").[13]

---

[12] Defendants respectfully submit that that *Basic Inc. v. Levinson* was wrongly decided. To the extent the rebuttable presumption is modified or overturned by the Supreme Court in *Goldman Sachs*, Defendants preserve the issue for purposes of any class certification ruling.

[13] The Third Circuit has not squarely addressed the issue of whether a defendant seeking to rebut the *Basic* presumption has only a burden of production or also the ultimate burden of persuasion. This issue is currently being considered by the Supreme Court in *Goldman Sachs*. Defendants submit that under Federal Rule of Evidence 301, the burden of persuasion should remain with the plaintiff to prove reliance. *See IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*, 818 F.3d 775, 782 (8th Cir. 2016) (citing Rule 301 for the proposition that a defendant only has "the burden to come forward with evidence showing a lack of price impact"); *Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 343-44 (D.N.J. 2018) (citing Rule 301 for proposition that the defendant bears only the burden of production to rebut the *Basic* presumption and noting that a defendant can meet this burden by producing enough evidence to withstand

Courts have found that a defendant successfully rebuts the *Basic* presumption if it can show that the alleged misrepresentations did not have an impact on the investment decisions made by an individual plaintiff.  In *In re Safeguard Scientifics*, 216 F.R.D. 577, 578-79 (E.D. Pa. 2003), the plaintiffs alleged that the defendants misled investors because they failed to disclose facts relating to the CEO's margin trading activity and margin loans issued to the CEO.  The defendants opposed class certification in part because an individual plaintiff testified that when he purchased stock, he did not rely upon or even consider the CEO's margin trading.  *Id.* at 583 (testifying that he "wasn't concerned, aware, cared or anything about or was even aware what [the CEO] was doing and . . . wasn't focused on it").  The Court found that defendants had rebutted the presumption of reliance with respect to this plaintiff.  *Id.*  The Court reasoned that the evidence of non-reliance placed the individual plaintiff "in an antagonistic position from the class" and the plaintiff's testimony could "seriously derail the issues of materiality and reliance . . . which would adversely impact the interests of the proposed class." *Id.*

Similarly, in *In re Vivendi Universal, S.A. Sec. Litigation*, an individual plaintiff testified that he was not misled by the alleged misrepresentations regarding Vivendi's liquidity position and had the truth relating to the company's short-term liquidity issues been known it would not have mattered to plaintiff.  123 F. Supp. 3d 424, 435, 436 n.103 (S.D.N.Y. 2015). There, the plaintiff was a sophisticated investor who purchased stocks based on his own proprietary valuations with the intent to hold the stock for a five-year period.  *Id.* at 428.  Indeed, the plaintiff continued to purchase Vivendi's stock through the end of the class period and beyond.  *Id.*  The court found that defendant had rebutted the fraud on the market presumption of reliance because the undisputed facts showed that the plaintiff "was indifferent to the fraud." *Id.*

---

a motion for summary judgment), *aff'd sub nom. Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51 (3d Cir. 2019).

at 438; *see also Gamco Inv'rs, Inc. v. Vivendi, S.A.*, 927 F. Supp. 2d 88, 97, 101 (S.D.N.Y. 2013), *aff'd*, 838 F.3d 214, 217 (2d Cir. 2016) (concluding that the *Basic* presumption had been rebutted because the alleged fraud was "irrelevant" to the plaintiffs' decision to purchase the defendant's securities).

The undisputed evidence shows that the alleged misrepresentations concerning EPS and the SEC investigation were "not material" to the decisions made by Wasatch to purchase HCSG stock on behalf of Plaintiff.[14]  Snow Dep. 229:7-8.  Wasatch repeatedly testified that its investment strategy sought long-term growth companies, in which Wasatch could invest "for at least the next 5 years and hopefully 5 or 10 years beyond that."  Snow Dep. 44:24-45:3. Against this backdrop, the issue of whether the Company rounded up or down during a given quarter or met or fell short of analyst's consensus estimates was irrelevant to Wasatch because it did not have an impact on the long-term prospects of HCSG.  *See* Snow Dep. 229:3-8 ("Because again, we are looking for companies that can . . . double in five years and then double again five years after that, so we are looking for companies that can be significantly larger than what they are today.  So a rounding around a quarterly earnings is not material to our analysis."); *id.* at 146:4-10 (explaining that because Wasatch views "investing for the long term . . . to have a quarter that is rounded one way or the other is not a material impact, in our view"); *id.* at 170:12-171:10 (stating that Wasatch did not pay attention to the issue of whether HCSG met EPS consensus expectations and this fact did not "impact [its] decision to buy, sell, or hold Healthcare

---

[14] For reasons discussed in Section II(C)(1) and Section IV(B)(1)(a), Plaintiff was also completely indifferent to the fraud when it acquired HCSG shares from Callan in May 2014 because neither Callan, Plaintiff, nor their agents exercised any discretion in including these stocks in the in-kind asset transfer. To the extent, the sub-manager(s) of the DAGT relied on the alleged fraud when initially purchasing the shares is of no moment because the shares were purchased prior to the class period. *See* Ex. K, Callan Decl ¶ 8.  Further, Plaintiff would lack standing to assert claims based on purchases made on behalf of the DAGT investment fund. *See Wendt v. Handler, Thayer & Duggan, LLC*, 613 F. Supp. 2d 1021, 1029 (N.D. Ill. 2009).

Services Group securities"). Indeed, Wasatch testified that the revelation of the SEC investigation into the Company's EPS rounding practices was irrelevant to its assessment of the value of HCSG. Snow Dep. 145:13-146:10; *see also id.* at 226:2-12 ("In my opinion, [the SEC investigation is] not going to mean much at all . . . [b]ecause our long-term view of the company doesn't revolve around the rounding of quarterly earnings reports."); *id.* at 229:21-24 ("[T]he SEC investigation around . . . rounding of a quarterly earnings number, in our opinion, has nothing to do with the long-term prospects of that business."). If anything, Wasatch felt the SEC investigation was creating an "attractive discount" to the HCSG stock price which made the stock even more desirable. Snow Dep. 239:10-24.

Plaintiff's purchases confirm that the truth relating to EPS rounding and the disclosure of the SEC investigation did not matter to Plaintiff. *All* of Wasatch's purchases of HCSG stock on Plaintiff's behalf during the class period took place *after* Monocle Accounting Research disclosed to the market the EPS rounding issue.[15] And *approximately 15%* of the HCSG stock Plaintiff held during the class period was purchased *after* the partial corrective disclosure dates alleged by Plaintiff. Moreover, like the plaintiff in *In re Vivendi Universal*, Wasatch purchased additional HCSG securities on Plaintiff's behalf *after* the end of the class period, accumulating an additional 104,025 shares of HCSG stock during the timeframe of March 18, 2019 through June 19, 2019 (or approximately 38% of its holdings at this time).

This evidence conclusively demonstrates that Plaintiff was "indifferent to the fraud" because the truth relating to EPS rounding was immaterial to its investment decisions and Plaintiff would have purchased – and did in fact purchase – HCSG securities even after it learned

---

[15] Although Wasatch claims it did not read the March 2017 Monocle Report at the time, during his deposition, Mr. Snow agreed with an analyst's assessment that allegations in the report relating HCSG's EPS rounding practice did not matter and this was "largely a superficial issue." Snow Dep. 147:5-17.

about the alleged misrepresentations relating to EPS and the SEC investigation.  *In re Vivendi Universal*, 123 F. Supp. 3d at 438.  Accordingly, Defendants have rebutted the *Basic* presumption with respect to Plaintiff URS.

### 3.    Plaintiff Cannot Invoke the *Affiliated Ute* Presumption

In addition to the fraud on the market theory, Plaintiff also attempts to rely on the *Affiliated Ute* presumption with respect to the "failure to disclose material facts to investors concerning the SEC investigation."  Pl.'s Mem. at 26.  In *Affiliated Ute*, the Supreme Court created a presumption of reliance in cases involving "***primarily*** a failure to disclose."  *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972) (emphasis added).  However, the *Affiliated Ute* presumption is limited in its application and does not apply where the plaintiff's claims are premised on misrepresentations or in cases where there are both misrepresentations and omissions, but misrepresentations predominate.  *Johnston v. HBO Film Mgmt.*, 265 F.3d 178, 192 (3d Cir. 2001) ("[I]n cases involving both omissions and misrepresentations, the 'proper approach to the problem of reliance is to analyze the plaintiff's allegations, in light of the likely proof at trial, and determine the most reasonable placement of the burden of proof of reliance.' Otherwise, to maintain in these cases an omission-misrepresentation dichotomy 'would require the trial judge to instruct the jury to presume reliance with regard to omitted facts, and not to presume reliance with regard to the misrepresented facts.'" (quoting *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 187 (3d Cir. 1981)).

In assessing whether claims are omissions entitled to the *Affiliated Ute* presumption, or misrepresentations that are not, courts look to the crux of plaintiff's allegations, and not the plaintiff's characterization of them.  *See id.* at 192 ("[T]he court can decide, on a case by case basis, whether the offenses can be characterized primarily as omissions or misrepresentations . . . ."); *Gruber v. Price Waterhouse*, 776 F. Supp. 1044, 1051 (E.D. Pa. 1991)

-31-

("While the complaint uses language to suggest an omission or failure to disclose in at least seven counts . . . , the crux of the plaintiffs' allegations is that [Defendant's] materials did not accurately portray [the company's] financial health. . . . [C]ommon sense dictates this is a misrepresentation case."). Courts have "repeatedly rejected plaintiffs' attempts to bring their claims under the presumption of reliance set forth in [*Affiliated Ute*], by alleging omissions that were really only the converse of affirmative misrepresentations." *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F. Supp. 584, 606 n.18 (D.N.J. 1996) (collecting cases); *see also Johnston*, 265 F.3d at 193 (courts should not allow the mere fact of concealment to transform misrepresentations into omissions because in doing so the *Affiliated Ute* presumption would swallow the reliance requirement).

Here, Plaintiff cannot—and does not even try to in its briefing—characterize its allegations of misconduct relating to the reported net income and EPS as omissions. Plaintiff repeatedly alleges that Defendants "materially overstated" or otherwise "misrepresented" the Company's EPS. Am. Compl. ¶¶ 168, 194, 220, 275. These statements are clearly framed as affirmative misrepresentations and should be construed by this Court as such. To the extent that Plaintiff is arguing that Defendant made an omission when it failed to disclose that its EPS estimates were misleading or untrue, the Third Circuit is clear: A claim that defendants misrepresented a fact "should not be transformed into an omission simply because the defendants failed to disclose that the allegedly misleading fact was untrue." *Johnston*, 265 F.3d at 193.

With regard to the failure to disclose the SEC investigation, Plaintiff cites several paragraphs in support of its position that its allegations "are premised on Defendants' failure to disclose material facts to investors concerning the SEC investigation." Pl.'s Mem. at 26. However, a review of the cited paragraphs indicates that Plaintiff's Amended Complaint is based

primarily on various *affirmative statements*. The very paragraphs Plaintiff cites allege that Defendants "stated," or "reaffirmed" statements, that Defendant's SEC forms contained "misstatements," or that "statements made . . . were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading." Am. Compl. ¶¶ 246, 265, 247, 258, and 276. Plaintiff likely will argue that its allegation that Defendants violated SEC rules by failing to disclose the SEC investigation should be characterized by the Court as omissions. At best, this establishes only that Plaintiff has pled offenses that are based on a mix of misrepresentations and omissions. The alleged offenses, taken as a whole, cannot "primarily" be characterized as omissions. Indeed, Plaintiff itself has previously characterized its allegations regarding the SEC investigation as statements rather than omissions in its opposition to Defendant's motion to dismiss: "These **statements** were false and misleading because they omitted to disclose material information. . . . A reasonable investor would have interpreted these **statements** . . . ." Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss at 22 (emphasis added).

Because Plaintiff's allegations involve primarily misstatements, Plaintiff is not entitled to the *Affiliated Ute* presumption of reliance.

B.    **Plaintiff Cannot Meet The Requirements Of Rule 23(a)**

1.    **Plaintiff Is Neither Typical Nor Adequate Because Plaintiff Is Subject to Unique Defenses**

The typicality inquiry under Rule 23(a)(3) ensures that the class representatives are sufficiently similar to the rest of the class – in terms of their legal claims, factual circumstances, and stake in the litigation – such that certifying those individuals to represent the class will be fair to the rest of the proposed class. *See, e.g., Newton*, 259 F.3d at 183-84; *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006). "The adequacy inquiry under Rule 23(a)(4)

serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997).  The Supreme Court has held that the typicality and adequacy requirements "tend to merge" because both look to "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* at 626 n.20 (citation omitted).  Given the similarities of the two inquiries, the issue of whether a unique defense should defeat class certification is relevant to both.  *Beck*, 457 F.3d at 301.

In this Circuit, "[a] proposed class representative is neither typical nor adequate if the representative is subject to a unique defense that is likely to become a major focus of the litigation." *Id.*  This principle is grounded in concerns that unique defenses could create situations in which the "representative's interests might not be aligned with those of the class, and the representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class." *Id.* at 297.  Here, several unique defenses exist that undoubtedly will become a "major focus" of the litigation if the class is certified, and therefore render certification inappropriate.[16]

### a.     Unique defense relating to the Callan transfer.

Plaintiff is atypical and not an adequate representative because it is subject to a unique defense regarding the issue of whether its receipt of HCSG shares from Callan in May 2014 as part of an in-kind asset transfer constituted a "purchase" within the meaning of the

---

[16] Defendants respectfully submit that if URS is found to be an atypical or inadequate representative, it would be inappropriate to appoint a substitute lead plaintiff at this stage of the proceedings.  *See In re Safeguard Scis.*, 220 F.R.D. 43, 49 (E.D. Pa. 2004) (denying motion of class members to intervene as lead plaintiff because it would require "additional class discovery and the filing of a second class certification motion thus inflicting potentially significant additional delays, costs and expense on the existing parties").  If the Court nevertheless decides to re-open the process for appointment of lead plaintiff, Defendants request the opportunity to submit briefing on the proper way to proceed.

Securities Exchange Act of 1934.  To state a claim under Section 10(b), a plaintiff must establish a material misstatement or omission "in connection with the purchase or sale of any security." 15 U.S.C. § 78j.  Only persons who actually purchased or sold securities may bring suit; the private right of action does not extend to mere holders.  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749 (1975).

The definition of "purchase" in the 1934 Act is "for the most part unhelpful." *SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 466 (1969) (noting that the definitions "only declare generally that the terms 'purchase' and 'sale' shall include contracts to purchase or sell); *see also* 15 U.S.C. § 78(a)(13) ("The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire.").  Thus, to assess whether a transaction constitutes a purchase within the meaning of the Act, courts should determine whether the defendants' "alleged conduct is the type of fraudulent behavior which was meant to be forbidden by the statute and the rule." *Nat'l Sec., Inc.*, 393 U.S. at 467.  Courts also have emphasized that in order to qualify as a purchase, a transaction must involve decision-making.  *See Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531, 534 (7th Cir. 1998) (finding that because the securities laws "presuppose[] . . . a choice distorted by the fraud," they do not protect individuals that "made no investment decision").

In *In re Adelphia Communications Corporation Securities and Derivative Litig*ation, 398 F. Supp. 2d 244, 260 (S.D.N.Y. 2005), the court held that plaintiff shareholders who passively received the defendant's stock as a dividend did not engage in purchases within the scope of Section 10(b).  The court reasoned that these plaintiffs did not make "any sort of investment decisions" given that they "made no election whether or not to receive [the defendant's] stock (instead of a cash dividend) nor had any choice as to how much [of the] stock to receive in the dividend." *Id.*  The court further held that the dividend transaction at issue was

not the type of transaction meant to be protected by securities laws.  *Id.*  Put simply: "if the purpose of 10(b) is to make an informed investment decision, the opportunity to make a decision is a prerequisite to this protection."  *Id.* at 259-260 (citing *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1345 (2d Cir. 1974)); *see also Isquith*, 136 F.3d at 534 (holding that the exchange of one stock for another during the spinoff of a company's subsidiary did not constitute a purchase because the plaintiffs made no "investment decision" and "therefore cannot have been induced by the alleged fraud").

██████████████████████████████████████████████████████

████████████████████████████████████████████████ *See* Catlett Dep. 110:18-23; Ex. K, Callan Decl. ¶ 5.████████████████████████████████

████████████████████████████ Catlett Dep. 113:9-17; 112:15.  Like the dividend in *Adelphia*, Plaintiff made no election whatsoever to receive HCSG stock in the May 2014 In-Kind Transfer and had no control over the amount of HCSG stock transferred.  These facts clearly demonstrate that Plaintiff was not induced by the alleged fraud to buy HCSG stock. As such, Plaintiff's passive receipt of stocks which were promptly sold for cash cannot constitute a "purchase" within the meaning of the Act.

This issue has the potential to become a major focus of the litigation because its resolution impacts several other important issues in the case.

*First*, this issue implicates Plaintiff's standing to assert claims in the April 2014 through March 2017 timeframe.  If the Court narrows the class period or creates a class that covers only the period prior to issuance of the March 2017 Monocle Report, Plaintiff will lack standing to bring claims relating to the EPS rounding issue.  *See Winer Family Tr. v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007) ("[Plaintiff] must be a purchaser or seller to pursue its Rule 10b-5

claims . . . ."); 1 McLaughlin on Class Actions § 4:18 (14th ed.) (Westlaw 2017) ("[A] purported representative who lacks standing is not a member of the putative class and thus cannot satisfy the typicality or adequate representation requirements"); *cf. Amgen Inc. v. Connecticut Ret. Plans and Tr. Funds*, 568 U.S. 455, 472-73 (2013) (noting that "a plaintiff whose relevant transactions were not executed between the time the misrepresentation was made and the truth was revealed" is neither typical nor adequate).

Second, as discussed in Section IV(B)(2) *infra*, this issue also calls into question the ability of Plaintiff to fairly and adequately represent the interest of absent class members who purchased HCSG stock prior to the issuance of the Monocle Report.

Third, even if the Court were to assume that these shares were "purchased" or "otherwise acquired" within the class period, URS does not have any damages because it immediately sold the shares for a profit. *Gordon v. Sonar Capital Mgmt. LLC*, 92 F. Supp. 3d 193, 201 (S.D.N.Y. 2015) (holding that a plaintiff was subject to a unique defense that he suffered no economic loss when taking into account the plaintiff's purchases and sales of the securities during the class period).

### a.    *Unique defenses relating to the timing of Plaintiff's purchases.*

Numerous courts have held that "a person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative." *In re Hebron Tech. Co., Ltd. Sec. Litig.*, No. 20 CIV. 4420, 2020 WL 5548856, at *7 (S.D.N.Y. Sept. 16, 2020) (collecting cases). Indeed, continuing to purchase securities after disclosure of allegedly fraudulent behavior "is commonly held to create a unique defense vitiating typicality." *Epstein v. Am. Reserve Corp.*, No. 79 C 4767, 1988 WL 40500, at *4 (N.D. Ill. Apr. 21, 1988) (rejecting two class members as

class representatives on typicality grounds because they continued to trade in the defendant's stock "after the alleged fraudulent information had become known").

In *In re Safeguard Scientifics*, 216 F.R.D. at 582-83, the Court denied the motion for class certification, finding lead plaintiff, a day trader who increased his holdings in Safeguard stock even after public disclosure of the alleged fraud, was subject to unique defenses relating to reliance. *See also Ballan v. Upjohn Co.*, 159 F.R.D. 473, 481 (W.D. Mich. 1994) (denying plaintiff's motion for certification where plaintiff failed to demonstrate that he met the typicality requirement because plaintiff purchased a significant number of shares after the curative disclosure); *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) ("[A] person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative.") (citation omitted); *George v. China Auto. Sys., Inc.*, 2013 WL 3357170, *6-7 (S.D.N.Y. 2013) (finding that the class representatives' continued purchasing after a curative press release subjected them to unique defenses rendering them inadequate and atypical).

In this case, all of the purchases of HCSG stock on Plaintiff's behalf during the putative class period took place after Monocle Accounting Research disclosed to the market the EPS rounding issue, and approximately 15% of the HCSG stock Plaintiff held during the Class Period was purchased after the partial corrective disclosure dates alleged by Plaintiff. In addition, Plaintiff purchased and/or acquired shares of HCSG stock following the end of the class period on three occasions. ███████████████████████████████

████████████████████████████████████████████

████████████████████ [17] *See* Exhibit P, March 19, 2019 Email from Wasatch to URS

---

[17] ███████████████████████████████████████ *ee* Catlett Dep. 145:9-146:5. ████████

(Exhibit 23 to Catlett Dep.).

Ex. N, Plaintiff's Transitions.

Ex. N, Plaintiff's Transitions.  Because of these post-

disclosure purchases, Plaintiff is subject to a unique defense that precludes it from serving as a

class representative.

### a.    *Unique defenses regarding reliance and materiality.*

A plaintiff that does not rely on the alleged fraud is subject to a unique defense.

*See Rocco*, 245 F.R.D. at 136 (recognizing that a named plaintiff who is subject to a unique

defense of non-reliance is atypical of the class under Rule 23(a)(3)); *see also In re Petrobras*

*Sec. Litig.*, 104 F. Supp. 3d 618, 623 (S.D.N.Y. 2015) (declining to appoint as lead plaintiff an

investor that was subject to unique defenses regarding whether it relied on the alleged

misrepresentations and omissions)*; In re Safeguard Scientifics*, 216 F.R.D. at 582 (finding that

plaintiffs were atypical because one "admitted to not relying on the market price of Safeguard

stock because his broker recommended the purchase" and another testified that he did not care

about the alleged fraudulent conduct when purchasing stock); *Greenspan v. Brassler*, 78 F.R.D.

130, 132 (S.D.N.Y. 1978) (a plaintiff's "possible reliance on another's expertise is sufficient to

vitiate the typicality of their claims").  Plaintiff has admitted to giving full discretion to Wasatch

to make its investment decisions on its behalf and therefore will face the unique defense relating

to *its* reliance.  Further, as discussed in Section IV(A)(2), Wasatch did not rely on the alleged

misrepresentations because quarterly earnings and EPS calculations were not material to its

---

*See*

Swenson Dep. 11:3-12:11.

investment advisor's decision to purchase HCSG stock during the class period.  These facts

conclusively demonstrate that the *Basic* presumption of reliance has been rebutted as to Plaintiff.

This same set of facts also subjects Plaintiff to unique defenses regarding reliance and materiality

that make Plaintiff atypical of the class under Rule 23(a)(3).  *Cf. Quezada v. Loan Ctr. of

California, Inc.,* No. CIV. 2:0800177, 2009 WL 5113506, at *6 (E.D. Cal. Dec. 18, 2009) ("As

defendants have rebutted any presumption of reliance that plaintiff may be entitled to, plaintiff's

fraud claim fails to meet the typicality requirement because plaintiff's claim is subject to a

unique defense that threatens to dominate the proceedings.").

### 2.      Conflicts that Exist between Plaintiff and Class Members Render Plaintiff an Inadequate Representative

Plaintiff cannot satisfy Rule 23(a)(4)'s requirement that "the representative parties

will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "[T]he

linchpin of the adequacy requirement is the alignment of interests and incentives between the

representative plaintiffs and the rest of the class."  *Dewey v. Volkswagen Aktiengesellschaft*, 681

F.3d 170, 183 (3d Cir. 2012).  A conflict of interest will defeat class certification if the conflict is

"fundamental."  *Id.* at 184.  A fundamental conflict exists where certain class members have

benefited from harm caused to other members of the class, or where the conflict relates to an

allocation of remedies amongst class members with competing interests.  *Id.*

In the securities context, a conflict of interest can arise due to the timing of trades.

For example, in *In re BP P.L.C. Securities Litigation*, the plaintiffs alleged two different theories

of liability that occurred in two different timeframes:  pre-explosion and post-explosion.  *See*

2013 WL 6388408, at *10-12 (S.D. Tex. Dec. 6, 2013).  In a case that is factually similar to this

one, the court in *BP* found that a conflict existed between the class members and the absent class

members because in creating a damages model the class members who purchased shares during

-40-

the pre-explosion timeframe "may very well have interests different from, and possibly competing with" class members who purchased in the post-explosion timeframe.  *Id.* at *11.  The court created subclasses to address this issue but held that class representatives which purchased the stock exclusively in one timeframe were inadequate to represent the interests of class members that purchased in the other timeframe.  *Id.* at *11-12.

In this case, fundamental intra-class conflicts exist based on whether putative class members purchased shares before the publication of the Monocle Report or after publication of the Monocle Report and before the start of the SEC investigation.  Plaintiff tries to gloss over these conflicts by arguing that the allegations about the EPS rounding practices and the failure to disclose the SEC investigation are connected, and that information related to both sets of allegations would potentially have been revealed with the March 4, 2019 alleged corrective disclosure when HSCS disclosed the SEC investigation related to the EPS rounding practices.  But this argument merely exposes the conflicts among class members.  These conflicts are illustrated in the diagram below, which reflects the different mix of information available at different times during the proposed class period.



*See* Choi Report, Ex. 1.

Consider one type of investor, Type A, who buys HCSG stock early in the proposed class period prior to the release of the Monocle Report in March 2017 and does not sell the stock until after the end of the proposed class period, i.e., after March 4, 2019. Consider another type of investor, Type B, who purchases HCSG stock after February 23, 2018, and does not sell the stock until after the end of the Proposed Class Period, i.e., after March 4, 2019. These two types of investors will have sharply different interests in attempting to attribute the stock price decline on March 4, 2019. *See* Choi Report ¶¶ 92-93. Type A investors may benefit from arguing that all of the price decline on March 4, 2019 is attributable to the disclosure about the rounding of EPS. *Id.* In contrast, Type B investors may benefit from arguing that all of the price decline on March 4, 2019 is attributable to the disclosure about the SEC investigation and that the Company's rounding of EPS was fully disclosed to the market when the Monocle Report

was published in March 2017.  *Id.*  Dr. Nye's damage approach fails to consider such acute conflicts among class members.  In fact, there is no damages methodology that could reconcile these fundamental conflicts.

In light of these fundamental intra-class conflicts, a class should not be certified.

**C.     In The Alternative, The Overly-Broad Class Period Should Be Modified To Reflect Plaintiff's Two Different Liability Theories**

"The definition of the class is a matter within the broad discretion of the district court."  *Battle v. Pennsylvania*, 629 F.2d 269, 271 n.1. (3d Cir. 1980); *see Reyes*, 802 F.3d at 494 (district courts may "exercise discretion in defining the parameters of the class definition and deciding when subclasses are necessary, often acting independently of any proposals made by the parties" (citations and internal quotation marks omitted)).  Although courts may not inquire into the merits of the case to determine the adequacy of the proposed class period, courts may consider whether the proposed period bears a relationship to the gravamen of the complaint and provides a reasonable basis on which the market would rely on the alleged fraud.  *Lerch v. Citizens First Bancorp, Inc.*, 144 F.R.D. 247, 253 (D.N.J. 1992).

To the extent the Court certifies a class, it should be modified to reflect the curative disclosure that entered the efficient market on March 22, 2017 and the fact that Plaintiff's own pleadings reveal that any alleged misrepresentation relating to the SEC investigation did not – and could not – occur until February 23, 2018.

**1.     A Class Period Relating to the EPS Allegations Should End on March 22, 2017**

In securities class actions, the class period "should not extend past the date upon which curative information becomes available."  *Alaska Elec. Pension Fund v. Pharmacia Corp.*, Civ. No. 03-1519, 2007 WL 276150, at *3 (D.N.J. Jan. 25, 2007); *Sherin v. Gould*, 115 F.R.D. 171, 174 (E.D. Pa. 1987); *see also In re Ribozyme Pharm., Inc. Sec. Litig.*, 205 F.R.D. 572, 579

-43-

(D. Colo. 2001) (collecting cases). This is because when curative information enters the market and investors are put on inquiry notice of the truth, any further reliance on the alleged fraud becomes unreasonable. *See Alaska Elec. Pension Fund*, 2007 WL 276150 at *4. In such circumstances, "subsequent purchasers are charged with knowledge of the true state of business affairs" and thus "[c]ommon questions of law or fact arising from the misrepresentations or omissions do not predominate as to those subsequent purchasers, who are therefore excluded from the class." *Sherin*, 115 F.R.D. at 174; *In re Ribozyme*, 205 F.R.D. at 579 (same). Courts routinely shorten class periods to reflect the date curative information is publicly announced or otherwise disseminated. *See, e.g., In re SunEdison Inc. Secs. Litig.*, 329 F.R.D. 124, 135 (S.D.N.Y. 2019); *In re Fannie Mae Sec., Deriv. & "ERISA" Litig.*, 247 F.R.D. 32, 40-41 (D.D.C. 2008); *In re Am. Italian Pasta Co. Sec. Litig.*, No. 05-0725, 2007 WL 927745, at *4 (W.D. Mo. Mar. 26, 2007); *Lerch*, 144 F.R.D. at 254.

In an efficient market (which Plaintiff alleges and which is the premise for its class certification motion), information is absorbed into a firm's stock price "immediately following disclosure" of such information. *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 269 (3d Cir. 2005). Here, Seeking Alpha published a report on March 22, 2017 which disclosed to the market facts relating to the rounding of EPS. *See* Am. Compl. ¶¶ 66-77. This was not just any analyst report. Seeking Alpha is considered "an important source of information" for investors, and Plaintiff's expert acknowledged that the website discloses "material information . . . to the market." Nye Dep. 114:19-115:16. Around this time, the Seeking Alpha website received approximately 40 million monthly visits and 7 million unique monthly visitors. *See* Choi Report ¶ 44. Plaintiff alleges that the price of HCSG stock fell by $0.79 per share following the publication of the March 2017 Monocle Report. Am. Compl. ¶ 78. Plaintiff's expert opines

-44-

with a 95% level of confidence that the market reacted to the information disclosed in the March 2017 Monocle Report. *See* Nye Dep. 124:9-19.

Plaintiff undoubtedly will argue that the March 2017 Monocle Report did not "cure" the alleged misrepresentations regarding EPS rounding. This argument fails for three reasons. *First*, the March 2017 Monocle Report disclosed **all** material facts relating to the rounding of EPS. Indeed, the entire gravamen of Plaintiff's Complaint relating to the EPS rounding is based on the allegations made in the March 2017 Monocle Report, which is featured prominently throughout the Amended Complaint. Am. Compl. ¶¶ 66-77, 321-322 (explaining that the Monocle Report disclosed a pattern of "strategic rounding" of EPS for more than a decade, the odds of which were 1 in 17.6 trillion). Courts have held that modification of the class definition is appropriate at the class certification stage "when the record warrants." *See In re SunEdison Inc. Secs. Litig.*, 329 F.R.D. at 134 (finding it critical that the "Complaint itself alleges that the 10-Q 'disclosed' and 'revealed' the putatively omitted and misstated information . . . ").

*Second*, there can be no "substantial question of fact" as to whether the March 2017 Monocle Report cured the alleged misstatements. *See Sherin*, 115 F.R.D. at 174. This is not a case where subsequent disclosures revealed additional information regarding the Company's alleged rounding practices, suggesting that the earlier disclosure did not completely cure the alleged fraud. *Id.* at 175. The alleged partial corrective disclosures do not even mention the Company's EPS rounding practices. *See* Exhibit Q, Feb. 6, 2018 Earnings Release for HCSG; Exhibit R, Apr. 17, 2018 Earnings Release for HCSG; Exhibit S, July 17, 2018 Earnings Release for HCSG; Exhibit T, Feb. 5, 2019 Earnings Release for HCSG. Similarly, the disclosure of the SEC investigation in March 2019 did not reveal anything new to the market

-45-

regarding HCSG's rounding practices, particularly because the rounding practices were alleged to have ceased in November 2017.  Pl.'s Mem. at 4.

The March 2017 Monocle Report thoroughly examined the EPS rounding issue and clearly and unambiguously disclosed to the market the Company's rounding practices for the past 44 quarters, describing the odds of such a result to be 1 in 17.6 trillion.  To the extent the market was not aware of the Company's rounding practices prior to this date (which Defendants dispute but reserve for the merits), the disclosures in the March 2017 Monocle Report "sufficiently dissipated" the effects of any alleged fraud based on EPS manipulations.  *See Peil v. Nat'l Semiconductor Corp.*, 86 F.R.D. 357, 369 n.12 (E.D. Pa. 1980) (modifying the end of the class period to the date on which a news release retracted the company's earlier projections, concluding that "the effect of the [allegedly fraudulent] initial statements was sufficiently dissipated to warrant the designation of this date as the end of the class period").

*Third*, Plaintiff cannot avoid inquiry notice of the alleged rounding scheme by pointing to the April 12, 2017 earnings call.  According to Plaintiff, Defendants "dismissed" the March 2017 Monocle Report on this call, and in response the "market took comfort" in these assurances from HCSG's management.  Am. Compl. ¶¶ 83, 86.  That is not what happened. Plaintiff's own Complaint reveals that, during this call, an analyst asked a question about "some of the reports" regarding EPS rounding.  *Id.* ¶ 84.  Defendant Wahl responded by noting that he did not know "exactly what article or more specifically what iteration of articles you're referring to;" regardless, he asserted that the Company's "track record of performance over the past 10 years really stands on its own."  *Id.* ¶ 85.  This hardly can be described as an express denial or cover-up of the Company's ***publicly-available*** EPS results.

Even if the Defendants had denied the allegations set forth in the March 2017 Monocle Report (which is not what the exchange on the April 12, 2017 call reveals), such a denial would not permit Plaintiff to ignore the alleged fraud disclosed on March 22, 2017. "[P]laintiffs in a securities fraud action may not simply rely on reassurances by management particularly where there are direct contradictions between the defendants' representations and the other materials available to plaintiffs regarding the possibility of fraud." *In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 418 (D.N.J. 2005); *see also In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 425 (S.D.N.Y. 2003) ("[A] plaintiff's duty to inquire is not dissipated merely because of a defendant's later refusal to acknowledge or own up to the alleged fraud."). Because Plaintiff was on inquiry notice of the Company's EPS rounding practices on March 22, 2017, any class relating to EPS rounding should end on this date.

### 2. A Class Period Relating to the SEC Investigation Should Commence No Earlier than February 23, 2018

To the extent the Court certifies a class relating to the SEC investigation, such a class should commence no earlier than February 23, 2018 – the date on which Plaintiff first alleges "misstatements and material omissions as a consequence of the Company's failure to disclose the existence of the SEC's investigation into the Company's EPS practices." Am. Compl. ¶ 245. "No class period may commence prior to the earliest date on which plaintiff can properly allege all the elements of his prima facie case. Prior to that time, plaintiff as a matter of law has no cognizable cause of action." *Stevelman v. Alias Research, Inc.*, No. 5:91-CV-682, 2000 WL 888385, at *5 (D. Conn. June 22, 2000). As such, class periods should be tailored to reflect the timeframe in which the fraud is alleged to have occurred. *See Peil*, 86 F.R.D. at 370 n.13 (modifying the commencement date for the class period to reflect the date of the first alleged misrepresentation). Here, Plaintiff alleges that HCSG received an inquiry letter from the

-47-

SEC in November 2017.  This is the first date on which HCSG became aware of the SEC inquiry.  Based on this undisputed fact, any misrepresentations or omissions regarding the existence of the SEC investigation could not possibly have occurred prior to November 2017. Plaintiff does not allege that Defendants had an immediate duty to disclose the existence of the inquiry letter from the SEC.  Rather, Plaintiff alleges that when disclosing risks in its 2017 Form 10-K, which the Company filed on February 23, 2018, the Company made material omissions or misrepresentations regarding the existence of the inquiry letter.  Thus, Plaintiff's claim relating to the SEC investigation does not and cannot possibly begin prior to February 23, 2018.

## V.    CONCLUSION

For all the foregoing reasons, the Court should deny Plaintiff's Motion for Class Certification, or in the alternative, find that Plaintiff URS is precluded from acting as class representative.  To the extent a class is certified, the Court should exercise its discretion to modify the overly broad class definition to reflect two separate class periods that run from April 8, 2014 through March 22, 2017 and February 23, 2018 through March 4, 2019.  Defendants respectfully request oral argument (by video-teleconference) on this Motion.

January 27, 2021

/s/ Robert L. Hickok
Robert L. Hickok (PA Bar No. 30101)
Jay A. Dubow (PA Bar No. 41741)
Joanna J. Cline (PA Bar No. 83195)
Daniel J. Boland (PA Bar No. 91263)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

Whitney R. Redding (PA Bar No. 308893)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
Union Trust Building

-48-

501 Grant Street, Suite 300
Pittsburgh, PA  15219-4429
412-454-5000

*Attorneys for Defendants*
*Healthcare Services Group, Inc., Daniel P.*
*McCartney, Theodore Wahl, John C. Shea, and*
*Matthew J. McKee*

## CERTIFICATE OF SERVICE

I certify that on the 27th of January, 2021, a true and correct copy of the redacted version of the foregoing Memorandum of Law in Opposition to Lead Plaintiff's Motion for Class Certification along with non-confidential exhibits was filed with the Clerk of Court using the CM/ECF system which will send electronic notification of such filing to all counsel of record.  I further certify that the unredacted version of the foregoing Memorandum of Law in Opposition to Lead Plaintiff's Motion for Class Certification along with confidential exhibits was filed under seal pursuant to the Protective Order, and served by e-mail on all counsel of record.

/s/ *Robert L. Hickok*
Robert L. Hickok