# EXHIBIT O

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

UTAH RETIREMENT SYSTEMS,

          Plaintiff,

vs.                              Case No. 2:19-cv-01227-ER

HEALTHCARE SERVICES GROUP,

INC., DANIEL P. MCCARTNEY,

THEODORE WAHL, JOHN C. SHEA,

and MATTHEW J. MCKEE,

          Defendants.

---------------------------/

REMOTE DEPOSITION OF ZACHARY NYE, Ph.D.

Thursday, December 10, 2020

Reported Remotely and Stenographically by:

JANIS JENNINGS, CSR No. 3942, CLR, CCRR

Job No. 187343

A.    I do not know.

Q.    Do you know what information, if any, Utah Retirement Systems considered with respect to the acquisition of Healthcare Services Group stock?

A.    No.

Q.    Do you know who Wasatch Advisors is?

A.    I think you asked this question earlier, and I do not know.

Q.    Do you know if they have any relationship to Utah Retirement Systems?

A.    I don't know.  I'm assuming they're a money manager.

Q.    Okay.  But that's simply an assumption on your part?

A.    Yes.

Q.    Are you familiar with a website called Seeking Alpha?

A.    Yes.

Q.    What -- what's your understanding of what that website is or does?

A.    Lately it's become an important source of information regarding various companies and their valuations.  I don't know if you'd call it a blog or not, or it's a website that seems to allow its own contributors to provide valuation information and

disseminate news; and also it -- I think it allows third parties to post analysis on there as well.

Q.   To your knowledge, is it a significant site for information used by investors in securities?

MR. EGAN:  Objection to form.

THE WITNESS:  Yes.  It has definitely become to be an important source of information.

BY MR. HICKOK:

Q.   When you say "has become to be," over what time period are you talking?

A.   Just generally speaking, I would say over the past five years or so, maybe ten.  I've definitely seen them more and more become the vehicle, if you will, by which material information or at least economically material information is disclosed to the market.

Q.   Is it a website that you yourself visit?

A.   I think I have a Pro subscription.

Q.   And what type of -- strike that.

What type of information do you receive with respect to that type of subscription?

A.   The info- -- I mean, it's become a -- in a few of my cases, it's -- that I've worked on it's, you know, at least as alleged, conveyed materially economically -- materially -- sorry.  Let me start

of calculations to that effect.  But it's not proof of wrongdoing, but it suggests something's going on in their opinion.

Q.    And is it also your understanding that Monocle did those calculations based on publicly available information about the company's quarterly revenues and the company's diluted shares outstanding?

A.    I don't -- I don't think it says the source, but I think it's available -- it obviously was available to them.  So I don't know for sure whether it was publicly available, but it typically is.

Q.    I mean, to your understanding, companies publish their revenue on a quarterly basis; is that correct?

A.    Yes.

Q.    And they publish their fully diluted shares outstanding on a quarterly basis; is that correct?

A.    Typically, yes.

Q.    This Exhibit does not have page numbers on it, but if you go to page 9, up at the top it's got in the very upper left-hand corner it's got the number $37.64.  So can you go to page 9 of the exhibit and find that.

A.    It's page 8 for me in the PDF, but it -- I

Page 124

the public?

A.   Yes.   It -- as you can see from my event study, HCSG definitely reported their quarterly financials, which included the revenues and revenue per share.

Q.   If you look at the first page of Exhibit 7, it says that this article was published on March 22, 2017 at 5:48 p.m. on Seeking Alpha.

Do you know if the stock market, if the market for Healthcare Services Group shares reacted to the information that was made available to the market in this Seeking Alpha article?

A.   I don't recall, but I have an event study, so I can check.   Yeah, it looks to me -- this is after market close on March 22nd, so the impact of this disclosure we felt the next trading day, which was March 23rd.   It looks like there is a statistically significant at the 95 percent level, at least company-specific decline on this day.

Q.   So in other words, the company stock price declined in reaction to the information made available in this article; is that correct?

MR. EGAN:   Objection to form.

THE WITNESS:   I don't know for sure.   It's not part of my event study for market efficiency, so

BY MR. HICKOK:

Q.   And you agree, don't you, that the market was aware of at least the risk of an SEC investigation into Healthcare Services Group's accounting practices as a result of Monocle alerting the SEC to the complaints set forth in its article?

MR. EGAN:  Objection.

THE WITNESS:  Well, I mean, there's always a risk of regulatory action regardless of this article or anything.  It's just there's always the risk of the SEC is going to investigate you for something, and that's embedded into the price, in an efficient price at least.

Here I think that the question is, at least from plaintiff's perspective and their allegations, whether the risk was fully conveyed during the class period.  I think they clearly allege that by the time they announce -- the defendants here announced the SEC investigation, and it was, the risk of it had been fully conveyed.  But prior to that, not -- not fully.

BY MR. HICKOK:

Q.   The Monocle article says in essence, hey, the company's engaged in strategic rounding and we're going to go make a complaint to the SEC about

BY MR. HICKOK:

Q.   Wouldn't you have to take a look at that in order to determine if there is a damage methodology consistent with plaintiff's theory of liability that can be applied uniformly to all class members?

A.   No.

MR. EGAN:  Objection.

BY MR. HICKOK:

Q.   Why not?

A.   That would entail a loss causation analysis, and my understanding is that that's not appropriate at this stage.  More generally, I've read the allegations in the complaint.  It is clearly a price maintenance style inflation case in which there's information concealed from the market that inflates the price or maintains the price of inflation that is removed from the market price over the course of corrective events.  And that theory, that type of theory is perfectly amenable to the event study methodology.

The event study methodology itself then as carried out would look at these types of issues when analyzing loss causation and attempt to draw a causal connection.  And if there is one, then that would be, you know, evidence of, you know,

three months ended December 31, 2018 and the year

ended December 31, 2018 issued on February 5, 2019?

          MR. EGAN:  Objection.

          THE WITNESS:  No.

BY MR. HICKOK:

    Q.   Are you offering any opinion at this time as

to whether the company's stock price was inflated

based on its failure to disclose the SEC inquiry

letter or the SEC subpoena prior to March 4, 2019?

    A.   I have no opinion on loss causation damages,

and in turn, price inflation, period, to date.

    Q.   Do you agree that there could be no

inflation in Healthcare Services Group's stock price

based upon failure to disclose the SEC inquiry

letter prior to November 2017 when it first received

the letter?

          MR. EGAN:  Objection.

          THE WITNESS:  I haven't done this analysis,

so I have no opinion.  I have encountered cases,

though, where there's this type of issue and there

had been evidence of price inflation prior to these

type of dates, so I'm not ruling that out.

BY MR. HICKOK:

    Q.   How can there be price inflation based on

the receipt of an SEC inquiry letter earlier in time

template that you use for your reports, and we talked about it in conjunction with really the Cammer factors and the Krogman factors. Section 7 of your report has to do with a damages methodology that can be used. Is this section also part of the template that you use for your reports?

MR. EGAN: Objection to form.

THE WITNESS: It's -- it's -- I mean, it's the product of years of work. So it's a template in a sense but it's also, you know, strongly my opinion on -- on the applicability of this methodology to the -- to the case here.

BY MR. HICKOK:

Q. If we looked at other reports that you have issued, would it have very similar language with respect to damages methodology that's contained in this report?

A. It would and it's been upheld a number of times.

Q. In paragraph 60, you say in the third sentence here:

"An event study can be used to isolate Company-specific price movement caused by the revelation of true facts related to the alleged fraud from price movement

any of those tools with respect to an analysis of

Healthcare Services Group stock price movement on

any given day; is that correct?

MR. EGAN:  Objection.

THE WITNESS:  It's not required under my

market efficiency analysis, which is concerned again

with the total mix of company-specific information

disclosed on a given day.  And I have not conducted

a loss causation or damages analysis to date, nor

have I been asked to.  So I have not gone in there

and checked whether there's other information.  I

haven't analyzed the -- all of the corrective events

to date at all, so -- and I haven't -- the ones I

have, the earnings related dates, I wasn't asked to

do so.

BY MR. HICKOK:

Q.   So you say at the end of paragraph 60:

"After isolating the price impact of the

alleged misstatements and omissions, one

can estimate the price inflation due to

the alleged fraud for each day during

the Class Period, and on a Class-wide

basis for each member of the Class."

How would you go about calculating the price

inflation on each day of the class period?

Page 187

A.   It's -- it depends on the nature of the case and the facts as they're presented, and also the allegations.  So it's -- sometimes it's easy enough to take the full price declines that are fraud related and to measure those on a constant basis, you know, adjusting them depending on whether there's other partial correctives or inflationary events in the class period.

But, you know, a constant form of inflation, at least constant with respect to the actual losses incurred on the alleged corrective events, that's one way to do it.  And then there's also cases in which sometimes you need to go in and there will be time varying considerations, but that's really a context-specific endeavor.

Q.   Is it your opinion that a constant inflation band would apply with respect to the allegations in this case?

MR. EGAN:  Objection.

THE WITNESS:  I don't know.  I haven't analyzed loss causation or damages, and as a result, I haven't estimated price inflation on a daily basis to the class period.

BY MR. HICKOK:

Q.   Is it your understanding that one of the

opinion right now.

BY MR. HICKOK:

Q.    Is it your opinion that it's highly unlikely that the company's stock would have been inflated by $4.65 on the first day of the class period?

MR. EGAN:  Objection.

THE WITNESS:  No, that's not my opinion either.  I haven't analyzed price inflation, damages and loss causation.

BY MR. HICKOK:

Q.    Are you able to say at all what type of methodology you would use to determine the amount of inflation on each day of the class period?

A.    Yes.

MR. EGAN:  Objection.

THE WITNESS:  The event study, also known as out-of-pocket damages estimation methodology, which I've employed before many times, is perfectly capable of answering this question.  If there are considerations that require a time-varying inflation band, those adjustments will be made.  But if there isn't, then it would be constant, which it has been in many cases.

Q.    What types of methods do you use to adjust for a time-varying inflation band?

A.   The primary example I'm aware of is when there's certain issues with the allegations that imply a -- a change in knowledge within the company that would require some kind of graduation of the inflation band over time.  So if a given problem became more severe or without, you know -- and it wasn't known at the time in the beginning, then the full drop is effectively graduated downward to reflect that -- that different context.

But not always.  And in those cases it's really subject to the expert's discretion and reliably demonstrating that their estimate holds.

Q.   So how would you go about determining when it's appropriate in terms of time frame to make an adjustment in the inflation band?  In other words, how do you figure out it should be this inflation band during this time period and this other inflation band during this other time period?

A.   Yeah.  It depends on the nature of the misrepresentations.  I -- the example, again, I'm thinking of is from a case in which there was earnings manipulation in the sense that it was, you know, hiding the truth about the company's long-range prospects and overstatements of earnings when, in fact, it was much lower.  And the -- you