**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| UTAH RETIREMENT SYSTEMS, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>HEALTHCARE SERVICES GROUP, INC., DANIEL P. MCCARTNEY, THEODORE WAHL, JOHN C. SHEA, and MATTHEW J. MCKEE,<br><br>　　　　　　Defendants. | Case 2:19-cv-01227-ER |

**MEMORANDUM OF LAW IN SUPPORT OF
LEAD PLAINTIFF'S COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES,
REIMBURSEMENT OF LITIGATION EXPENSES, AND
AWARD TO LEAD PLAINTIFF PURSUANT TO 15 U.S.C. § 78u-4(A)(4)**

Ira Neil Richards (PA Bar No. 50879)
Arleigh P. Helfer III (PA Bar No. 84427)
1600 Market Street, Ste. 3600
**SCHNADER HARRISON SEGAL & LEWIS LLP**
Philadelphia, PA 19103
Telephone: (215) 751-2503

*Counsel for Lead Plaintiff Utah Retirement Systems & Liaison Counsel for the Class*

| | |
|---|---|
| Nicole Lavallee (*Pro Hac Vice*) | Patrick T. Egan (*Pro Hac Vice*) |
| Jeffrey Rocha (*Pro Hac Vice*) | Steven J. Buttacavoli (*Pro Hac Vice*) |
| **BERMAN TABACCO** | **BERMAN TABACCO** |
| 44 Montgomery Street, Suite 650 | One Liberty Square |
| San Francisco, CA  94104 | Boston, MA 02109 |
| Telephone: (415) 433-3200 | Telephone: (617) 542-8300 |

*Counsel for Lead Plaintiff Utah Retirement Systems & Lead Counsel for the Class*

Dated:  December 3, 2021

**TABLE OF CONTENTS**

**Page**

I.     PRELIMINARY STATEMENT ....................................................................... 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ........................................ 4

III.   THE REQUESTED FEE AWARD IS REASONABLE AND SHOULD BE
       APPROVED ................................................................................................ 5

       A.     Lead Plaintiff's Counsel Is Entitled To An Award Of Attorneys' Fees From
              The Common Fund ............................................................................... 5

       B.     Lead Plaintiff's Counsel's Fees Should Be Calculated Based Upon a
              Percentage of the Common Fund ........................................................... 6

       C.     Lead Plaintiff's Counsel's Fee Request is Entitled to a Presumption of
              Reasonableness Because it Has Been Approved by the Court-Approved
              Lead Plaintiff ....................................................................................... 7

       D.     The Requested 25% Fee is Fair and Reasonable Under Third Circuit's
              *Gunter/Prudential* Factors ................................................................... 8

              1.     The Size of the Fund Created and the Number of Persons Benefited
                     Supports The Requested Fee .................................................... 10

              2.     The Absence of Objections by Settlement Class Members to Date
                     Supports The Requested Fee .................................................... 11

              3.     The Skill And Efficiency Of Attorneys Involved Supports The
                     Requested Fee ........................................................................ 12

              4.     The Complexity and Duration of the Litigation Supports the
                     Requested Fee ........................................................................ 14

              5.     The Risk of Nonpayment Supports the Requested Fee .............. 17

              6.     The Amount of Time Devoted to the Action By Lead Plaintiff's
                     Counsel Supports the Requested ............................................. 18

              7.     The Requested Fee is Consistent with Awards in Similar Cases ......... 19

              8.     First Additional *Prudential Consideration*: The $16.8 Million
                     Recovery Here is Directly Attributable to the Efforts of Lead
                     Plaintiff's Counsel .................................................................. 21

              9.     Second Additional *Prudential Consideration*: The Requested Fee
                     Percentage is Consistent With Contingent Fee Arrangements

Negotiated in Non-Class Litigation ........................................................... 22

10.    Third Additional *Prudential Consideration*: The Absence of
Innovative Terms Does Adversely Affect the Fee Request........................ 23

E.    The "Lodestar Cross-Check" Supports the Requested Fee................................. 24

IV.    LEAD PLAINTIFF'S COUNSEL'S LITIGATION EXPENSES ARE
REASONABLE AND SHOULD BE REIMBURSED.................................................... 26

V.    LEAD PLAINTIFF URS SHOULD BE REIMBURSED FOR ITS REASONABLE
COSTS AND EXPENSES UNDER 15 U.S.C. § 78u-4(a)(4) ......................................... 28

VI.    CONCLUSION .......................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ................................................................................................... 6

*Andavarapu v. iBio, Inc. et al.*,
  14-cv-1434-RGA (D. Del. April 21, 2016) ................................................................ 29

*Arbuthnot v. Pierson*,
  607 F. App'x 73 (2d Cir. 2015) ................................................................................. 16

*Beckman v. KeyBank, N.A.*,
  293 F.R.D. 467 (S.D.N.Y. 2013) ............................................................................... 27

*Blofstein v. Michael's Fam. Rest., Inc.*,
  No. CV 17-5578, 2019 WL 3288048 (E.D. Pa. July 19, 2019) ................................. 26

*Blum v. Stenson*,
  465 U.S. 886 (1984) .................................................................................................. 23

*Bodnar v. Bank of Am. N.A.*,
  No. CV 14-3224, 2016 WL 4582084 (E.D. Pa. Aug. 4, 2016) ........................... passim

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) .................................................................................................... 5

*Bradburn Parent Teacher Store, Inc. v. 3M*,
  513 F. Supp. 2d 322 (E.D. Pa. 2007) ........................................................................ 23

*Chemi v. Champion Mortg.*,
  No. 2:05-CV-1238(WHW), 2009 WL 1470429 (D.N.J. May 26, 2009) .................... 12

*City of Providence v. Aeropostale, Inc.*,
  No. 11 CIV. 7132 CM GWG, 2014 WL 1883494 (S.D.N.Y. May 9, 2014) .............. 16

*Elkin v. Walter Inv. Mgmt. Corp.*,
  No. 2:17-CV-02025-JCJ, 2018 WL 8951073 (E.D. Pa. Dec. 18, 2018) .................... 29

*Fogarazzo v. Lehman Bros., Inc.*,
  No. 03 CIV. 5194 SAS, 2011 WL 671745 (S.D.N.Y. Feb. 23, 2011) ....................... 14

*Gunter v. Ridgewood Energy Corp.*,
  223 F.3d 190 (3d Cir. 2000) ............................................................................... passim

*Hall v. AT&T Mobility LLC*,
No. CIV.A. 07-5325 JLL, 2010 WL 4053547 (D.N.J. Oct. 13, 2010) ............................... 12, 13

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) .................................................................................................... 10

*Hicks v. Morgan Stanley*,
No. 01 CIV. 10071 (RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ..................................... 6

*Hubbard v. BankAtlantic Bancorp, Inc.*,
688 F.3d 713 (11th Cir. 2012) .................................................................................... 17

*In re Aetna Inc. Sec. Litig.*,
No. CIV. A. MDL 1219, 2001 WL 20928 (E.D. Pa. Jan. 4, 2001) ............................................ 20

*In re Amgen Inc. Sec. Litig.*,
No. CV 7-2536 (PLAX), 2016 WL 10571773 (C.D. Cal. Oct. 25, 2016) .................................... 17

*In re AremisSoft Corp. Sec. Litig.*,
210 F.R.D. 109 (D.N.J. 2002) ..................................................................................... 13

*In re AT&T Corp. Sec. Litig.*,
455 F.3d 160 (3d Cir. 2006) .................................................................................. passim

*In re ATI Techs., Inc. Sec. Litig.*,
No. CIV.A. 01-2541, 2003 WL 1962400 (E.D. Pa. Apr. 28, 2003) .......................................... 20

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
909 F. Supp. 2d 259 (S.D.N.Y. 2012) ........................................................................... 8

*In re Cendant Corp. Litig.* (*Cendant I*),
264 F.3d 201 (3d Cir. 2001) ................................................................... 6, 8, 12, 16

*In re Cendant Corp. Sec. Litig* (*Cendant II*),
404 F.3d 173 (3d Cir. 2005) .......................................................................... 5, 7

*In re Cendant Corp., Deriv. Action Litig.*,
232 F. Supp. 2d 327 (D.N.J. 2002) ............................................................................... 27

*In re Cent. European Dist. Corp. Secs. Litig.*,
No. 11-CV-06247-JBS-KMW, 2014 WL 12608150 (D.N.J. Nov. 14, 2014) ........................... 20

*In re Corel Corp. Inc. Sec. Litig.*,
293 F. Supp. 2d 484 (E.D. Pa. 2003) ............................................................................ 14

*In re Datatec Sys., Inc. Sec. Litig.*,
2007 WL 4225828 (D.N.J. Nov. 28, 2007) ...................................................................... 14

iv

*In re Flonase Antitrust Litig.*,
291 F.R.D. 93 (E.D. Pa. 2013) ........................................................................... 17

*In re Flonase Antitrust Litig.*,
951 F. Supp. 2d 739 (E.D. Pa. 2013) .................................................................. 22

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995)............................................................................... 7, 20

*In re Genta Secs. Litig.*,
No. Civ. A. 04-2123 JAG, 2008 WL 2229843 (D.N.J. May 28, 2008) ............... 14, 20

*In re Hi-Crush Partners L.P. Sec. Litig.*,
No. 12-CIV-8557 CM, 2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ................... 16

*In re Ikon Office Sols., Inc. Sec. Litig.*,
194 F.R.D. 166 (E.D. Pa. 2000) ...................................................................... 20, 22

*In re Linerboard Antitrust Litig.*,
No. CIV.A 98-5055, 2004 WL 1221350 (E.D. Pa. June 2, 2004) ........................ 11

*In re Lucent Techs. Inc. Sec. Litig.*,
327 F. Supp. 2d 426 (D.N.J. 2004) ...................................................................... 8

*In re Marsh ERISA Litig.*,
265 F.R.D. 128 (S.D.N.Y. 2010).......................................................................... 14

*In re Merck & Co., Inc. Vytorin ERISA Litig.*,
No. 08-CV-285-DMC, 2010 WL 547613 (D.N.J. Feb. 9, 2010) ............................ 6

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
176 F.R.D. 158 (E.D. Pa. 1997) .......................................................................... 12

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
No. 1014, 2000 WL 1622741 (E.D. Pa. Oct. 23, 2000) ...................................... 23

*In re Par Pharm. Sec. Litig.*,
No. Civ.A. 06-03226 ES, 2013 WL 3930091 (D.N.J. July 29, 2013).............. 5, 14, 29

*In re Prudential Ins. Co., Am. Sales Practice Litig. Agent Actions*,
148 F.3d 283 (3d Cir. 1998)........................................................................ passim

*In re Ravisent Techs., Inc. Sec. Litig.*,
No. CIV.A. 00-CV-1014, 2005 WL 906361 (E.D. Pa. Apr. 18, 2005).................... 20

*In re Rent-Way Sec. Litig.*,
305 F. Supp. 2d 491 (W.D. Pa. 2003) .................................................................. 17

v

*In re Rite Aid Corp. Sec. Litig.*
  396 F.3d 294 (3d Cir. 2005) ................................................................... 6, 7, 24, 25

*In re Rite Aid Corp. Sec. Litig.*,
  362 F. Supp. 2d 587 (E.D. Pa. 2005) ................................................................ 26

*In re RJR Nabisco, Inc. Sec. Litig.*,
  No. 818 (MBM), 1992 WL 210138 (S.D.N.Y. Aug. 24, 1992) ............................ 22

*In re Schering-Plough Corp. Enhance ERISA Litig.*,
  No. CIV.A. 08-1432 DMC, 2012 WL 1964451 (D.N.J May 31, 2012) .................... 17

*In re Veritas Software Corp.. Sec. Litig.*,
  No. 1:04-cv-00831-SLR (D. Del. Aug. 5, 2008) ........................................... 29

*In re Viropharma Inc. Sec. Litig.*,
  No. CV 12-2714, 2016 WL 312108 (E.D. Pa. Jan. 25, 2016) ........................... 10, 26

*In re Wilmington Tr. Sec. Litig.*,
  No. 10-CV-0990-ER, 2018 WL 6046452 (D. Del. Nov. 19, 2018) .......... 10, 20, 26, 29

*In re WorldCom, Inc. Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005) ................................................................ 6

*La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*,
  No. CIVA 03-CV-4372 DMC, 2009 WL 4730185 (D.N.J. Dec. 4, 2009) ................ 20

*Martin v. Foster Wheeler Energy Corp.*,
  No. 3:06-CV-0878, 2008 WL 906472 (M.D. Pa. Mar. 31, 2008) .......................... 25

*Meijer, Inc. v. 3M*,
  No. CIV.A. 04-5871, 2006 WL 2382718 (E.D. Pa. Aug. 14, 2006) ....................... 26

*Schuler v. The Meds. Co.*,
  No. CV 14-1149 (CCC), 2016 WL 3457218 (D.N.J. June 24, 2016) ............ 9, 20, 24

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
  No. Civ.A. 03-4578, 2005 WL 1213926 (E.D. Pa. May 19, 2005) ....................... 26

*Sullivan v. DB Invs., Inc.*,
  667 F.3d 273 (3d Cir. 2011) .......................................................................... 6, 7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ....................................................................................... 6

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
  No. CV 13-6731, 2017 WL 4167440 (E.D. Pa. Sept. 20, 2017) ................... 7, 23, 27

**Statutes**

15 U.S.C. § 78u-4(a)(4) ....................................................................................................... 28

15 U.S.C. § 78u-4(a)(6) ......................................................................................................... 7

**Other Authorities**

H.R. Rep. No. 104-369, at 32 (1995)........................................................................................ 8

U.S. Securities and Exchange Commission,
  *SEC Charges Healthcare Services Company and CEO for Failing to Accurately Report*
  *Loss Contingencies as part of Continuing EPS Initiative* ......................................................... 21

**Rules**

Fed. R. Civ. P. 23 ................................................................................................................. 1

Fed. R. Civ. P. 54 ................................................................................................................. 1

vii

Pursuant to Federal Rules of Civil Procedure 23(h) and 54(d), Court-appointed Lead Counsel Berman Tabacco ("Berman Tabacco" or "Lead Counsel") and Court-appointed Liaison Counsel Schnader Harrison Segal & Lewis LLP ("Schnader" or "Liaison Counsel," collectively with Lead Counsel, "Lead Plaintiff's Counsel") respectfully submit this Memorandum of Law in Support of their Motion for an Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Award to Lead Plaintiff Pursuant to 15 U.S.C. § 78u-4(A)(4) (the "Fee & Expense Motion"). Lead Plaintiff's Counsel seeks approval of attorneys' fees in the amount of 25% of the $16,800,000 Settlement Fund.[1] Lead Plaintiff's Counsel also seeks reimbursement of $485,493.28 in litigation expenses that were reasonably and necessarily incurred by Lead Plaintiff's Counsel in prosecuting and resolving this action and reimbursement of $12,500 for the reasonable costs and expenses of Lead Plaintiff Utah Retirement Systems ("URS" or "Lead Plaintiff") that were directly related to URS's representation of the Settlement Class.

## I.    PRELIMINARY STATEMENT

After more than two and a half years of hard-fought litigation, Lead Counsel has successfully negotiated a proposed Settlement of this Action with Defendants.[2] If approved by the Court, the Settlement will resolve this Action in its entirely in exchange for of $16,800,000 in cash for the

---

[1] All capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Stipulation and Agreement of Settlement (including attachments thereto), dated June 29, 2021 and filed on June 30, 2021 ("Stipulation") (ECF No. 70-4), or in the Declaration of Patrick T. Egan in Support in Support of (1) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and Certification of Settlement Class, and (2) Lead Plaintiff's Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses and Award to Lead Plaintiff Pursuant To 15 U.S.C. § 78u-4(A)(4) ("Egan Declaration" or "Egan Decl."), filed contemporaneously herewith. Unless otherwise indicated, all emphasis is added and all alterations, internal quotation marks and citations are omitted.

[2] "Defendants" are Healthcare Services Group, Inc. ("HCSG" or the "Company"), Daniel P. McCartney ("McCartney"), Theodore Wahl ("Wahl"), John C. Shea ("Shea"), and Matthew J. McKee ("McKee").

1

benefit of the Settlement Class.  As discussed below and in the accompanying Egan Declaration, the Settlement represents an excellent outcome for the Settlement Class and provides meaningful relief to Settlement Class Members while avoiding the substantial risks and delays of continued litigation, including many significant remaining hurdles that Lead Plaintiff would have had to overcome to prevail in this complex securities class action that may have resulted in the Class recovering less than the Settlement amount, or nothing at all, if the case had proceeded through trial.  *See* Egan Decl. at ¶¶ 45-52.  The proposed Settlement here would exceed benchmark median recoveries in securities class actions, providing for approximately 6.4% of the Settlement Class's estimated *maximum* total alleged damages, which is greater than the Third Circuit's median recovery of 5.2% of estimated damages in securities class actions and in line with, if not above, median values for securities fraud class actions generally.  *See id*. at ¶ 51 and Ex. 5 thereto.

Lead Plaintiff's Counsel has worked on a contingent basis, without any compensation, to achieve this excellent result.  With no guarantee of recovery at the inception of this Action, and faced with vigorous opposition by highly skilled defense counsel, Lead Plaintiff's Counsel devoted the necessary resources—in terms of time and money—to achieve a strong result for the Settlement Class.  As detailed in the Egan Declaration, Lead Plaintiff's Counsel has vigorously pursued this litigation and was fully prepared to continue litigating had the Parties not reached the Settlement. These efforts included, *inter alia*: (i) conducting a thorough investigation of Defendants' alleged fraudulent misrepresentations that included, *inter alia*, reviewing news articles, analyst reports, and other publicly available information concerning HCSG and the allegations at issue in this Action, interviewing a number of former HCSG employees who provided information as detailed in the Amended Complaint, and other research and analysis of potential claims; (ii) drafting the Amended Complaint, which was filed on September 17, 2019; (iii) researching and drafting in connection with

the successful opposition to Defendants' motion to dismiss, which the Court denied in its entirety on April 24, 2020 (ECF No. 42); (iv) research and drafting in connection with the successful opposition to Defendants' motion for reconsideration, which the Court denied on July 13, 2020 (ECF. No. 51); (v) research, drafting, and consultation with an expert in connection with a Motion for Class Certification filed on November 13, 2020 (ECF No. 61); and (vi) conducting significant and meaningful discovery, including a review of over 450,000 pages of documents produced by Defendants and five depositions. *See* Egan Decl. at ¶¶ 6, 18-32. Lead Counsel also engaged in hard-fought settlement negotiations with Defendants' counsel, including a formal, arm's-length mediation overseen by Robert A. Meyer, a national-recognized mediator with vast experience in mediating actions brought under the Private Securities Litigation Reform Act of 1995 ("PSLRA") and negotiated and prepared the Stipulation and other Settlement-related documents, including the Plan of Allocation and the Notice provided to the Settlement Class. *See id.* at ¶¶ 33-37. Moreover, if the Settlement is approved by the Court, Lead Plaintiff's Counsel will continue to invest significant time and resources into implementing and overseeing the administration of the Settlement.

For the reasons discussed herein, the requested 25% fee is eminently fair and reasonable, particularly in light of the significant risks undertaken by Lead Plaintiff's Counsel and the favorable recovery obtained for the Settlement Class. Through October 31, 2021, Lead Plaintiff's Counsel have devoted over 8,406.10 hours, with a resulting lodestar of $4,746,493.50, to the investigation, prosecution, and resolution of the Action. Egan Decl. at ¶¶ 60-64. If approved, Lead Plaintiff's Counsel's fee request would result in a lodestar multiplier of 0.88, which is in line with multipliers routinely awarded by courts in this Circuit. *See In re Prudential Ins. Co., Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 341 (3d Cir. 1998) ("*Prudential*") ("[m]ultiples ranging from one to four are frequently awarded in common fund cases") (alteration in original); *see also*, *e.g.*, *Bodnar*

3

*v. Bank of Am. N.A.*, No. CV 14-3224, 2016 WL 4582084, at \*6 (E.D. Pa. Aug. 4, 2016) (finding 4.69 multiplier "appropriate and reasonable").    Moreover, Lead Plaintiff—a sophisticated institutional investor that actively supervised the litigation and settlement of this Action—fully supports Lead Plaintiff's Counsel's request.[3]

In addition, Lead Plaintiff's Counsel also respectfully submits that the expenses for which they seek reimbursement, including expenses for research, mediation, and consultants, were reasonable and necessary for the successful prosecution of the Action.    Lead Plaintiff's Counsel also respectfully submits that the expenses of Lead Plaintiff URS were reasonable and necessary to URS's representation of the Settlement Class.    The proposed Settlement represents an immediate and significant recovery for the Settlement Class.    After a vigorous notice plan approved by the Court, to date, no Settlement Class Member has objected to the requests for attorneys' fees, litigation expenses, or reimbursement of Lead Plaintiff's expenses.[4]    Egan Decl. at ¶¶ 71, 80.

Accordingly, Lead Plaintiff's Counsel respectfully submits that the Fee & Expense Motion should be granted in full.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The Egan Declaration, which accompanies this memorandum and is an integral part of this submission, details the factual and procedural background of this case and the events that led to the instant Settlement, as does the Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and Certification of Settlement Class

---

[3] *See* Declaration of Kevin Catlett on Behalf of Utah Retirement Systems in Support of Motion for Final Approval of Class Action Settlement and Award of Attorneys' Fees and Expenses ("Catlett Decl."), which is attached as Exhibit 4 to the Egan Declaration; *see also* Section V, *infra*.

[4] The deadline for Settlement Class Members to file and serve objections is December 17, 2021. *See* ECF No.72 at 8.  Should any objections to the fee or expense application be filed after the date of this submission, Lead Counsel will address them on reply.

(the "Final Approval Brief").  The Court is respectfully referred to the Final Approval Brief and the Egan Declaration for a description of, *inter alia*: the history of the litigation (*see* Egan Decl. at ¶¶ 16-32); the efforts involved in the drafting and defending of the Amended Complaint (*id.* at ¶¶ 6, 16-19); the nature of the claims asserted (*id.* at ¶¶ 13-14); the negotiations leading to the Settlement (*id.* at ¶¶ 33-37); the risks and uncertainties of continued litigation (*id.* at ¶¶ 45-52); and a description of the services Lead Plaintiff's Counsel provided for the benefit of the Class (*id.* at ¶¶ 6, 18-37, 53, 68).

## III. THE REQUESTED FEE AWARD IS REASONABLE AND SHOULD BE APPROVED

### A. Lead Plaintiff's Counsel Is Entitled To An Award Of Attorneys' Fees From The Common Fund

It is well-settled that an attorney who pursues a lawsuit that succeeds in the creation of a common fund for the benefit of a class is entitled to receive attorneys' fees from the common fund. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"); *see also In re Cendant Corp. Sec. Litig* (*Cendant II*), 404 F.3d 173, 197 and 205 (3d Cir. 2005) ("attorneys whose efforts create, discover, increase, or preserve a common fund are entitled to compensation"); *In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 164 (3d Cir. 2006); *In re Par Pharm. Sec. Litig.*, No. Civ.A. 06-03226 ES, 2013 WL 3930091, at *9 (D.N.J. July 29, 2013) ("[W]e agree with the long line of common fund cases that hold that attorneys whose efforts create, discover, increase, or preserve a common fund are entitled to compensation.") (alteration in original).

Courts have further recognized that, in addition to providing just compensation, awards of reasonable attorneys' fees from a common fund should ensure that "competent counsel continue[s] to be willing to undertake risky, complex, and novel litigation." *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 198 (3d Cir. 2000); *see also In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319,

5

359 (S.D.N.Y. 2005) ("In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives."). Compensating plaintiffs' counsel for the risks they face is crucial, because "[s]uch actions could not be sustained if plaintiffs' counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class." *Hicks v. Morgan Stanley*, No. 01 CIV. 10071 (RJH), 2005 WL 2757792, at \*9 (S.D.N.Y. Oct. 24, 2005). Moreover, the Supreme Court has emphasized that "meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions.…" *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 478 (2013); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

Here, Lead Plaintiff's Counsel's efforts have resulted in the creation of an $16.8 million common fund for the benefit of the Settlement Class. Paying Lead Plaintiff's Counsel's reasonable fees from that common fund properly compensates counsel for bringing and pursuing the claims in this case and furthers an essential purpose of the federal securities laws.

**B.      Lead Plaintiff's Counsel's Fees Should Be Calculated Based Upon a Percentage of the Common Fund**

While an award of attorneys' fees and the method used to determine that award are "within the discretion of the court," *In re Merck & Co., Inc. Vytorin ERISA Litig.*, No. 08-CV-285-DMC, 2010 WL 547613, at \*6 (D.N.J. Feb. 9, 2010), the Third Circuit has consistently held that "[t]he percentage-of-recovery method is generally favored in common fund cases because it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'" *In re Rite Aid Corp. Sec. Litig.* 396 F.3d 294, 300 (3d Cir. 2005) (quoting *Prudential*, 148 F.3d at 333); *see also Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 330 (3d Cir. 2011) (quoting *Rite Aid*, 396 F.3d at 300); *In re Cendant Corp. Litig.* (*Cendant I*), 264 F.3d 201, 220 (3d Cir. 2001) ("For the

past decade, counsel fees in securities litigation have generally been fixed on a percentage basis rather than by the so-called lodestar method."). Thus, the percentage-of-recovery method is typically used to determine attorneys' fees in common fund cases like this because it most closely aligns the interests of class counsel and the class. *See Rite Aid*, 396 F.3d at 300; *Prudential*, 148 F.3d at 333.

The percentage-of-the-recovery method is particularly appropriate in PSLRA cases given that it comports with the express language of the statute. *See* 15 U.S.C. § 78u-4(a)(6) ("Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class."). *See also Cendant II*, 404 F.3d at 188 n.7 ("the PSLRA has made percentage-of-recovery the standard for determining whether attorneys' fees are reasonable").[5] Accordingly, this Court should use the percentage-of-recovery method to determine the reasonableness of Lead Counsel's fee request here.

### C. Lead Plaintiff's Counsel's Fee Request is Entitled to a Presumption of Reasonableness Because it Has Been Approved by the Court-Approved Lead Plaintiff

The Third Circuit has stated that "courts should accord a *presumption of reasonableness* to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel." *Cendant II*, 404 F. 3d at

---

[5] The alternative method for assessing the reasonableness of attorneys' fees, the "lodestar method," is not typically used in common fund cases like this one. *See*, *e.g.*, *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 821 (3d Cir. 1995) (noting that the lodestar method is "de-coupled from the class recovery" and therefore may be typically more appropriate in cases that involve statutory fee-shifting). Nonetheless, the Third Circuit has endorsed the use of a lodestar "cross-check" by district courts when considering the reasonableness of a percentage-of-recovery fee award. *See Sullivan*, 667 F.3d at 330*; W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. CV 13-6731, 2017 WL 4167440, at * 7 (E.D. Pa. Sept. 20, 2017). However, "The lodestar cross-check, while useful, should not displace a district court's primary reliance on the percentage-of-recovery method." *AT&T*, 455 F.3d at 164. In any event, as discussed in the Section III.E, *infra*, the lodestar methodology equally supports approval of the requested fee and expense reimbursement.

199 (emphasis added) (quoting *Cendant I*, 264 F.3d at 282). The goal of this presumption is consistent with the principle of giving "the lead plaintiff, not the court, authority over class counsel." *Id*. The 25% fee requested here comports with URS's retainer with Lead Counsel that was entered into at the outset of Lead Plaintiff's participation in this Action. *See* Catlett Decl. at ¶ 7. Lead Plaintiff—a sophisticated institutional investor—is precisely the type of fiduciary that Congress envisioned when it enacted the PSLRA.[6] Here, Lead Plaintiff has reviewed and approved the requested fee as part of its diligent involvement acting as a fiduciary for the Settlement Class in the Action. *See id*. This is a fact that should be given significant weight. *See In re Lucent Techs. Inc. Sec. Litig.*, 327 F. Supp. 2d 426, 442 (D.N.J. 2004) ("Significantly, the Lead Plaintiffs, both of whom are institutional investors with great financial stakes in the outcome of the litigation, have reviewed and approved Lead Counsel's fees and expenses request."); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 272 (S.D.N.Y. 2012) ("[W]hen class counsel in a securities lawsuit have negotiated an arm's-length agreement with a sophisticated lead plaintiff possessing a large stake in the litigation, and when that lead plaintiff endorses the application following close supervision of the litigation, the court should give the terms of that agreement great weight.").

    **D.**    **The Requested 25% Fee is Fair and Reasonable Under Third Circuit's *Gunter/Prudential* Factors**

Under the law of this Circuit, district courts have considerable discretion in determining the appropriate percentage-of-the-recovery fee in common fund cases. *See Gunter*, 223 F.3d at

---

[6] Congress enacted the PSLRA in large part to encourage investors with a significant financial stake in the outcome of a securities class action to assume control of the litigation and "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." *See* H.R. Rep. No. 104-369, at 32 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 731.

195.  The Third Circuit has noted that district courts should look to seven non-exclusive factors, frequently referred to as the "*Gunter* factors," when determining the reasonableness of a fee award in a common fund case.

> Among other things, these factors include: (1) the size of the fund created and the number of persons benefited; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Gunter*, 223 F.3d at 195 n.1.  These factors "need not be applied in a formulaic way," and certain factors may outweigh others from case to case.  *Id.*  Each of these factors support the reasonableness of Lead Plaintiff's Counsel's requested fee.

As further guidance to the district courts, the Third Circuit has also suggested three other factors—the "*Prudential* factors"—that "may be relevant" to the Court's examination of whether requested attorneys' fees are reasonable:

> (1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations . . . ; (2) the percentage fee that would have been negotiated had the case been subject to a private [non-class] contingent fee agreement at the time counsel was retained . . . ; and (3) any "innovative" terms of settlement.

*AT&T*, 455 F.3d at 165 (citing *Prudential*, 148 F.3d at 338-40).[7]  These additional factors, where relevant, also tend to support the reasonableness of Lead Plaintiff's Counsel's fee request.

---

[7] The fee award reasonableness factors "need not be applied in a formulaic way…and in certain cases, one factor may outweigh the rest."  *Gunter*, 223 F.3d at 195 n.1; *see also AT&T*, 455 F.3d at 166; *Schuler v. The Meds. Co.*, No. CV 14-1149 (CCC), 2016 WL 3457218, at *9 (D.N.J. June 24, 2016).  "What is important is that the district court evaluate what class counsel actually did and how it benefitted the class."  *Prudential*, 148 F.3d at 342.

### 1.    The Size of the Fund Created and the Number of Persons Benefited Supports The Requested Fee

Courts have consistently recognized that the result achieved is the primary factor to be considered in awarding attorneys' fees. *See Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("the most critical factor is the degree of success obtained"); *In re Viropharma Inc. Sec. Litig.*, No. CV 12-2714, 2016 WL 312108, at *16 (E.D. Pa. Jan. 25, 2016).  Here, Lead Counsel has secured a Settlement that will provide a certain payment of $16.8 million, which represents approximately 6.4% of the *maximum* estimated alleged damages in this Action, which more than satisfies the fair, reasonable and adequate standard.  *See* Egan Decl. at ¶ 50 (noting that Lead Plaintiff's expert estimated total maximum alleged damages during the Settlement Class Period of approximately $263.0 million).  Indeed, this compares favorably to similar settlements.  Cornerstone Research estimates that, since 2011, the overall median recovery in securities class action settlements in the Third Circuit is 5.2% of estimated damages. *See id.* at ¶ 51 and Ex. 5 at 20. *See also In re Wilmington Tr. Sec. Litig.*, No. 10-CV-0990-ER, 2018 WL 6046452, at *8 (D. Del. Nov. 19, 2018) (noting the "Third Circuit median recovery of 5% of damages in class action securities litigation").  Further, Cornerstone Research found that, since 2011, settlements as a percentage of "simplified tiered damages"[8] in Rule 10b-5 cases (*i.e.*, asserting claims like those alleged here) ranged between 3.9% and 8.9% when estimated damages were between $150 million and $500 million.[9]  Cornerstone Research further estimates that the median settlement amount for all securities fraud cases from 2016

---

[8] Cornerstone Research defines "simplified tiered damages" as a measure of potential shareholder losses "that allows for consistency across a large volume of cases, thus enabling the identification and analysis of potential trends." *See* Egan Decl. Ex. 5 (Learni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements: 2020 Review and Analysis*, Cornerstone Research (2021) (the "Cornerstone Report")) at 5, also available at https://www.cornerstone.com/Publications/Reports/Securities-Class-Action-Settlements-2020-Review-and-Analysis).

[9] Cornerstone Report at 6.

to 2020 that settled following rulings on motions to dismiss, but before rulings on class certification, was $6.1 million.[10]  Moreover, if Defendants prevailed on their argument that the fraud was fully revealed on March 22, 2017, Lead Plaintiff's expert estimated that total classwide damages would be approximately $285,000, far less that the Settlement Amount. *See* Egan Decl. at ¶ 48.

With respect to the number of persons that will benefit from the Settlement, the Claims Administrator, A.B. Data, Ltd. ("A.B. Data"), provided 159,546 copies of the Notice and Claim Form to prospective Settlement Class Members (*see* Declaration of Adam D. Walter of A.B. Data , Ltd. Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date (the "A.B. Data Decl."), attached as Exhibit 1, to the Egan Declaration, at ¶¶ 3-8) evidencing the potentially large number of HCSG investors that will benefit from the Settlement. *See In re Linerboard Antitrust Litig.*, No. CIV.A 98-5055, 2004 WL 1221350, at *5 (E.D. Pa. June 2, 2004) (size of benefitted population "is best estimated by the number of entities that were sent the notice describing the final partial settlement[]"), *amended*, 2004 WL 1240775 (E.D. Pa. June 4, 2004).  The first *Gunter* factor therefore favors approval of the fee request.

### 2. The Absence of Objections by Settlement Class Members to Date Supports The Requested Fee

The Court-approved Notice, which was mailed and distributed to potential Settlement Class Members pursuant to the Preliminary Approval Order and posted on the Settlement Website, www.hcsgsecuritieslitigation.com, expressly provides that Lead Plaintiff's Counsel would apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund.  *See* ECF

---

[10] Cornerstone Report at 14.

No. 72 at Ex. A-1; A.B. Data Decl. at Ex. A.[11]  The Notice also advises Settlement Class Members that they can object to Lead Plaintiff's Counsel's fee request and explains the procedures for doing so. *See id.*  While the deadline to file and serve objections has not yet passed, to date, no objections have been received.  *See* Egan Decl. at ¶ 71.  This factor weighs in favor of approval of Lead Plaintiff's Counsel's fee request. *See Cendant I*, 264 F.3d at 235 ("[t]he vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement"); *Chemi v. Champion Mortg.*, No. 2:05-CV-1238(WHW), 2009 WL 1470429, at *4 (D.N.J. May 26, 2009) (lack of objections and single opt-out weighed strongly in favor of settlement); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158, 185 (E.D. Pa. 1997) (holding that "relatively low objection rate 'militates strongly in favor of approval of the settlement'").[12]

### 3. The Skill And Efficiency Of Attorneys Involved Supports The Requested Fee

The third *Gunter* factor, which looks to the skill and efficiency of counsel, weighs heavily in favor of Lead Plaintiff's Counsel's requested fee.  Counsel's skill and efficiency is "measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *Hall v. AT&T Mobility LLC*, No. CIV.A. 07-5325 JLL, 2010 WL 4053547, at *19 (D.N.J. Oct. 13, 2010).  This

---

[11] The Court-approved Summary Notice, published via *Investor's Business Daily* and *PR Newswire*, directed potential Settlement Class Members to the Settlement Website and provided contact information for the Claims Administrator where potential Settlement Class Members could obtain a copy of the full Notice.  *See* ECF No. 72 at Ex. A-3; A.B. Data Decl. at Exs. B and C.

[12] The deadline for submitting objections is December 17, 2021. If any objections are received, Lead Plaintiff will address them in a submission to be filed with the Court no later than January 3, 2022 pursuant to the Preliminary Approval Order.

factor is particularly important, as this Circuit recognizes "the stated goal in percentage fee-award cases of ensuring that competent counsel continue to be willing to undertake risky, complex and novel litigation." *Gunter*, 223 F.3d at 198.

The Settlement—which will provide a substantial benefit to the Settlement Class—required significant skill to obtain and demonstrates the ability of Lead Plaintiff's Counsel. *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 132 (D.N.J. 2002) ("[t]he single clearest factor reflecting the quality of class counsels' services to the class are the results obtained") (alteration in original); *see also Bodnar*, 2016 WL 4582084, at *5. Lead Counsel, who has national standing and extensive experience in litigating securities and other complex class actions, has recouped billions of dollars for investors in securities class actions since the enactment of the PSLRA. *See* Egan Decl. Ex. 2. In addition, Liaison Counsel have significant experience with complex litigation in this district. *See Id*. Ex. 3 at Ex. A thereto. Lead Plaintiff's Counsel prosecuted the case vigorously, provided high quality legal services, and achieved a great result for the Settlement Class. Moreover, the effort and skill of Lead Counsel in investigating the claims asserted in the Action, drafting the Amended Complaint, opposing Defendants' motion to dismiss and motion for reconsideration, drafting an opening brief in support of Lead Plaintiff's motion for class certification, and presenting a strong case throughout settlement discussions was essential to achieving a meaningful resolution of the Action. *See id*. at ¶¶ 6, 18-37.

The quality of opposing counsel is also important in evaluating the services rendered by Lead Counsel. *See Hall*, 2010 WL 4053547, at *19. Defendants were represented by very skilled attorneys in this Action from the law firm Troutman Pepper Hamilton Sanders LLP, one of Philadelphia's and the country's preeminent law firms. *See id*. at ¶ 75. Lead Plaintiff's Counsel's ability to achieve a favorable result for the Settlement Class in the face of such formidable legal

13

opposition is a consideration that weighs in favor of Lead Plaintiff's Counsel's fee request. *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010) ("The high quality of defense counsel opposing Plaintiffs' efforts further proves the caliber of representation that was necessary to achieve the Settlement."); *In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 496 (E.D. Pa. 2003) (obtaining such a favorable settlement "in the face of formidable legal opposition further evidences the quality of [class counsel's] work").

### 4.    The Complexity and Duration of the Litigation Supports the Requested Fee

The fourth *Gunter* factor—the complexity and duration of the litigation—supports Lead Plaintiff's Counsel's fee request.  As numerous courts have recognized, securities litigation is inherently complex, expensive, and lengthy, usually requiring expert testimony on several complex issues necessary to establish liability, including loss causation and damages. *See*, *e.g.*, *Par Pharm.*, 2013 WL 3930091, at *4 ("Securities fraud class actions are notably complex, lengthy, and expensive cases to litigate."); *Fogarazzo v. Lehman Bros., Inc.*, No. 03 CIV. 5194 SAS, 2011 WL 671745, at *3 (S.D.N.Y. Feb. 23, 2011) ("securities actions are highly complex"); *In re Genta Secs. Litig.*, No. Civ. A. 04-2123 JAG, 2008 WL 2229843, *3 (D.N.J. May 28, 2008) ("This [securities fraud] action involves complex legal and factual issues, and pursuing them would be costly and expensive."); *In re Datatec Sys., Inc. Sec. Litig.*, 2007 WL 4225828, at *3 (D.N.J. Nov. 28, 2007) ("[R]esolution of [damages issues] would likely require extensive and conceptually difficult expert economic analysis…Trial on…[scienter and loss causation] issues would [be] lengthy and costly to the parties.").

As detailed in the Egan Declaration, Lead Plaintiff's Counsel and Lead Plaintiff URS faced significant risks to proving Defendants' liability, including on the elements of loss causation, and damages. *See* Egan Decl. at ¶¶ 45-52.  Throughout the Action, Defendants vigorously contested

14

URS' claims—*i.e.*, the materiality and falsity of Defendants' alleged false and misleading statements, including with respect to the central allegations regarding Defendants' alleged manipulation of reported earnings per share ("EPS"), whether Defendants acted with the requisite scienter, and whether Lead Plaintiff and the Settlement Class were damaged. *See id.* Proof of the necessary elements under URS' theory of liability, and the defenses proffered in response by Defendants, have and would continue to require sophisticated analysis of complex accounting rules and economic analyses of HCSG's stock price movement before the case could proceed to trial. Indeed, the complexity, expense, and duration of continued litigation through reply briefing on class certification (and likely appeals of any decision from this Court on class certification), full merits and expert discovery, summary judgment, trial, subsequent post-trial motion practice, and a jury verdict would be significant. *See id.* at ¶ 47. Barring a settlement, there is no question that this case could be litigated for years, taking a considerable amount of court time and costing hundreds of thousands of additional dollars, with the possibility that the end result would be no better for the Settlement Class, and possibly worse, than the Settlement. *See id.* at ¶ 49.

While Lead Plaintiff believes that its claims are meritorious, it recognizes that there are significant risks to the Settlement Class. Defendants presented several arguments in connection with their motion to dismiss and against class certification and likely would have raised numerous arguments at summary judgment or at trial on the merits. For example, Defendants maintain that they made no actionable misrepresentations; that any alleged "rounding" of EPS was known and immaterial to investors years before the close of the Class Period or Settlement Class Period; that Defendants did not act with the requisite scienter; that Defendants were under no obligation to disclose the existence of the SEC investigation any earlier than they did; and that Lead Plaintiff and the class were not damaged. *See id.* at ¶ 45. Moreover, Defendants maintain that the action could

15

not be certified as a class action because Lead Plaintiff's damages model does not adequately account for what Defendants contend are different theories of liability that purportedly impact different portions of the class, and that URS's asset manager did not rely on the alleged actionable misrepresentation. *Id.* The risk of dismissal in securities class actions is substantial and does not disappear as the case progresses. *See*, *e.g.*, *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-CIV-8557 CM, 2014 WL 7323417, at \*16 (S.D.N.Y. Dec. 19, 2014) (noting that "nearly 48% of all securities class actions have been dismissed on motions prior to trial, while plaintiffs who succeeded at trial have found their judgments overturned on post-trial motions or appeal").

Additionally, to prove its claims, Lead Plaintiff would need to rely extensively on expert witnesses on complex issues such as accounting, loss causation, and damages. *See* Egan Decl. at ¶ 48. Both sides would be required to rely on expert testimony at trial "with no guarantee whom the jury would believe." *Cendant I*, 264 F.3d at 239; *see also City of Providence v. Aeropostale, Inc.*, No. 11 CIV. 7132 CM GWG, 2014 WL 1883494, at \*9 (S.D.N.Y. May 9, 2014) ("Undoubtedly, the Parties' competing expert testimony on damages would inevitably reduce the trial of these issues to a risky 'battle of the experts' and the 'jury's verdict with respect to damages would depend on its reaction to the complex testimony of experts, a reaction that is inherently uncertain and unpredictable.'"), *aff'd sub nom., Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015). If the trier of fact were to find Defendants' experts more credible, it would negatively affect Lead Plaintiff's claims and might preclude any recovery by Lead Plaintiff. Moreover, if the trier of fact is persuaded by Defendants' truth-on-the market defense—that the fraud was revealed early in the Class Period when a short seller released a report in March of 2017—this could potentially reduce the total compensable pool of damages to less than $300,000. Egan Decl. at ¶¶ 45, 48, 52.

Even if Lead Plaintiff defeated summary judgment motions filed by Defendants and was

16

successful against Defendants at trial, Lead Plaintiff's efforts in establishing its claims in all likelihood would not end with a judgment at trial but would continue through one or more levels of appellate review. In complex litigation such as this, as Lead Plaintiff's Counsel is well aware, even a victory at the trial stage does not guarantee ultimate success. *See Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012) (following plaintiff verdict after four-week trial, court granted defendants' post-trial motion for judgment as a matter of law on loss causation grounds, which judgment was affirmed on appeal). "A trial of a complex, fact-intensive case like this could have taken weeks, and the likely appeals of rulings on summary judgment and at trial could have added years to the litigation." *In re Amgen Inc. Sec. Litig.*, No. CV 7-2536 (PLAX), 2016 WL 10571773, at *3 (C.D. Cal. Oct. 25, 2016).

While Lead Plaintiff's Counsel was prepared to litigate this case through trial and appeals if the Settlement had not been reached, Lead Plaintiff's Counsel believes that the Settlement is an excellent result for the Settlement Class due to the significant risks associated with continuing this complex litigation and the likely considerable delays that would inevitably come from further litigation. Accordingly, this factor strongly supports Lead Plaintiff's Counsel's requested fee award.

### 5. The Risk of Nonpayment Supports the Requested Fee

"Courts routinely recognize that the risk created by undertaking an action on a contingency fee basis militates in favor of approval." *In re Schering-Plough Corp. Enhance ERISA Litig.*, No. CIV.A. 08-1432 DMC, 2012 WL 1964451, at *7 (D.N.J May 31, 2012); *see also In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 104 (E.D. Pa. 2013) (finding risk of non-payment factor supports approval of the requested fee where counsel had "not received any payment" throughout the course of litigation); *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 516 (W.D. Pa. 2003) (finding "investment of time, personnel and resources" supported awarding requested fee). Lead Plaintiff's

17

Counsel undertook this action on an entirely contingent fee basis, taking the risk that the litigation would yield no or very little recovery and leave it uncompensated for its time, as well as for its out-of-pocket expenses. Egan Decl. at ¶ 74.

Here, Lead Plaintiff's Counsel prosecuted the action entirely on a contingent basis, knowing that it could require a significant amount of time, the expenditure of thousands of attorney hours, and significant expense, yet ultimately result in a loss and no recovery. *See Id*. at ¶¶ 61, 74. In fact, Lead Plaintiff's Counsel, who has incurred $4,746,493.50 in lodestar and $485,493.28 in unreimbursed expenses litigating for the benefit of the Settlement Class, has received no compensation during the entire time this action has been pending, and were never guaranteed recovery of these costs or the payment of any fee. *Id*. at ¶¶ 61-70, 74. Moreover, further significant uncompensated work in connection with the administration of the Settlement, including to oversee the work of the Claims Administrator during the claims administration process, will be required from Lead Counsel.

As a result of the risks and efforts undertaken by Lead Plaintiff's Counsel, a $16.8 million recovery was obtained for the benefit of the Settlement Class. This factor therefore supports a finding that the 25% fee request is reasonable.

### 6. The Amount of Time Devoted to the Action By Lead Plaintiff's Counsel Supports the Requested

The sixth *Gunter* factor looks at counsel's time devoted to the litigation. *Gunter*, 223 F.3d at 199. Here, Lead Plaintiff's Counsel have devoted 8,406.10 hours to the prosecution and settlement of this Action, with a resulting lodestar of $4,746,493.50. *See* Egan Decl. at ¶¶ 61-64. As noted herein, Lead Plaintiff's Counsel litigated this action vigorously and, among other things: (i) conducted a thorough investigation of Defendants' alleged fraudulent misrepresentations that included, *inter alia*, reviewing news articles, analyst reports, and other publicly available information concerning HCSG and the allegations at issue in this Action, interviewing a number of former HCSG

18

employees who provided information as detailed in the Amended Complaint, and other research and analysis of potential claims; (ii) drafted the Amended Complaint, which was filed on September 17, 2019; (iii) researched and drafted the successful opposition to Defendants' motion to dismiss, which the Court denied in its entirety on April 24, 2020 (ECF No. 42); (iv) researched and drafted the successful opposition to Defendants' motion for reconsideration, which the Court denied on July 13, 2020 (ECF. No. 51); (v) researched, drafted, and consulted with an expert in connection with a Motion for Class Certification filed on November 13, 2020 (ECF No. 61); (vi) conducted significant and meaningful discovery; (vii) engaged in an arm's-length mediation that led to the resolution of this matter; and (viii) negotiated and prepared the Stipulation and other Settlement-related documents, including the Plan of Allocation and the Notice provided to the Settlement Class. *See* Egan Decl. at ¶¶ 6, 18-37. At all times, Lead Plaintiff's Counsel conducted their work with skill and efficiency, conserving resources and avoiding any duplication of effort. The foregoing represents a very significant commitment of time and resources to this Action by Lead Plaintiff's Counsel, making this factor weigh in favor of approval of Lead Plaintiff's Counsels' fee request.

Courts frequently consider this factor in the context of the lodestar cross-check that is used as further assessment of the reasonableness of counsel's requested fee. Accordingly, the amount of time devoted by Lead Plaintiff's Counsel to this Action is also addressed in connection with the lodestar cross-check, which is discussed below.

### 7. The Requested Fee is Consistent with Awards in Similar Cases

Lead Plaintiff's Counsel's request for attorneys' fees in the amount of 25% of the Settlement Fund is fair and reasonable under the percentage-of-recovery method. While there is no established benchmark setting the percentage of a common fund that may be awarded, the Third Circuit has observed that fee awards generally range from 19% to 45% of a settlement fund. *See In re Gen.*

*Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d at 822; *see also In re Ikon Office Sols., Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) ("Percentages awarded have varied considerably, but most fees appear to fall in the range of nineteen to forty-five percent."); *cf. La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*, No. CIVA 03-CV-4372 DMC, 2009 WL 4730185, at *8 (D.N.J. Dec. 4, 2009) (noting that "[c]ourts within the Third Circuit often award fees of 25% to 33 1/3% of the recovery"); *Wilmington*, 2018 WL 6046452, at *7-8 (finding that the 28% fee award approved was "a typical fee percentage" in the Third Circuit, weighing in favor of approval of the fee request).

Courts in this Circuit routinely approve attorneys' fees representing twenty-five percent and higher of the settlement funds. *See*, *e.g.*, *Bodnar*, 2016 WL 4582084, at *6 (awarding 33% fee); *Schuler*, 2016 WL 3457218, at *9 (awarding fee of one third of settlement in case that settled before a decision on motion to dismiss); *In re Cent. European Dist. Corp. Secs. Litig.*, No. 11-CV-06247-JBS-KMW, 2014 WL 12608150, at *2 (D.N.J. Nov. 14, 2014) (awarding 30% fee); *In re Genta Secs. Litig.*, 2008 WL 2229843, at *11 (awarding 25% fee); *In re Ravisent Techs., Inc. Sec. Litig.*, No. CIV.A. 00-CV-1014, 2005 WL 906361, at *10-12 (E.D. Pa. Apr. 18, 2005) (awarding 33% fee); *In re ATI Techs., Inc. Sec. Litig.*, No. CIV.A. 01-2541, 2003 WL 1962400, at *3, *6 (E.D. Pa. Apr. 28, 2003) (awarding 30% fee); *In re Aetna Inc. Sec. Litig.*, No. CIV. A. MDL 1219, 2001 WL 20928, at *14-15 (E.D. Pa. Jan. 4, 2001) (awarding 30% fee).[13]

---

[13] *See also In re Merck & Co.*, 2010 WL 547613, at *11 ("review of 289 settlements demonstrates "average attorney's fees percentage [of] 31.71% with a median value that turns out to be one-third") (quoting *In re Remeron Direct Purchaser Antitrust Litig.*, No. CIV. 03-0085 FSH, 2005 WL 3008808, at *15 (D.N.J. Nov. 9, 2005)); *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 101 (D.N.J. 2001) (awarding one third of settlement fund and citing representative fee awards, which ranged from 27.5% to 33.8% with a median of 33.3%); *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 146 (E.D. Pa. 2000) (awarding one third of settlement fund); *ViroPharma,* 2016 WL 312108, at *17 (granting counsel's request of 30% attorneys' fees).

### 8.    First Additional *Prudential Consideration*: The $16.8 Million Recovery Here is Directly Attributable to the Efforts of Lead Plaintiff's Counsel

With respect to the first additional *Prudential* consideration that the Court may consider in its analysis of an attorneys' fee request, the full value of the $16.8 million Settlement achieved on behalf of the Settlement Class is directly attributable to the efforts of Lead Plaintiff's Counsel and does not merely "piggyback on a prior governmental proceeding." *Prudential*, 148 F.3d at 337. Here, Lead Plaintiff reached an agreement to settle this Action with Defendants at the Mediation on March 17, 2021, at which time Defendants agreed to pay $16.8 million to settle the claims asserted in this Action. The Settlement was documented over several months and filed with this Court on June 30, 2021. At the time of the Mediation, Lead Plaintiff understood that the SEC's investigation of the Company remained ongoing. It was not until August 24, 2021, more than six months after the Parties reached an agreement to settle this Action, and nearly two months after Lead Plaintiff filed papers seeking preliminary approval of the Settlement, that the SEC announced that it had reached a settlement with the Company to resolve its investigation. *See* U.S. Securities and Exchange Commission, *SEC Charges Healthcare Services Company and CEO for Failing to Accurately Report Loss Contingencies as part of Continuing EPS Initiative*, https://www.sec.gov/news/press-release/2021-162 (Aug. 24, 2021). In addition to coming later than the Settlement here, the SEC's settlement was for considerably less value ($6 million) and addressed a shorter time period (encompassing 2014 and 2015 only, a portion of the Settlement Class Period). *See id.* Thus, the concern underlying the first *Prudential* consideration, whether class counsel may have merely "piggyback[ed] on a prior governmental proceeding," 148 F.3d at 337, does not apply here. While the claims asserted in the Amended Complaint depend, in part, on allegations that Defendants improperly concealed an SEC investigation into EPS rounding at the Company that began in November 2017, and while Defendants produced documents to Lead

21

Plaintiff that had originally been produced to the SEC in connection with its investigation, the Settlement here was achieved entirely through the skill, diligence, and efforts of Lead Plaintiff's Counsel; the Settlement was in no way attributable to the efforts of the SEC or any other government agency. *Cf. id* at 338 (finding that it was not clear that class counsel, as opposed to a 30-state "Multi-State Life Insurance Task Force" led by state insurance commissioners, was primarily responsible for securing the benefits of the settlement).

At all times, Lead Plaintiff's Counsel assumed the entire risk and expense of prosecuting the case and negotiated this favorable settlement without the assistance of the SEC or any other governmental party prosecuting a parallel action. This is a "significant factor" supporting the fee award. *AT&T*, 455 F.3d at 173 (citing *Prudential*, 148 F.3d at 338); *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 749 (E.D. Pa. 2013).

### 9. Second Additional *Prudential Consideration*: The Requested Fee Percentage is Consistent With Contingent Fee Arrangements Negotiated in Non-Class Litigation

Lead Plaintiff's Counsel's requested fee is also reasonable under the second additional *Prudential* factor, in which the requested fee percentage is compared to "the percentage fee that would have been negotiated had the case been subject to a private [non-class] contingent fee agreement." *AT&T*, 455 F.3d at 165. *See also In re RJR Nabisco, Inc. Sec. Litig.*, No. 818 (MBM), 1992 WL 210138, at *7 (S.D.N.Y. Aug. 24, 1992) ("What should govern [contingent fee] awards is not the essentially whimsical view of a judge, or even a panel of judges, as to how much is enough in a particular case, but what the market pays in similar cases.").

As courts have found, customary fee arrangements in non-class contingent fee cases are typically higher than the 25% sought here: a range of 30% to 40% of the recovery is customary and typical. *See*, *e,g*., *Ikon*, 194 F.R.D. at 194 ("In private contingency fee cases, particularly in

22

tort matters, plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery."); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, No. 1014, 2000 WL 1622741, at *7 (E.D. Pa. Oct. 23, 2000) (noting typical private contingency fee agreements provide for "thirty to forty percent of any recovery"); *Blum v. Stenson*, 465 U.S. 886, 903 n.* (1984) (Brennan, J., concurring) ("In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery."). Accordingly, because the requested fee percentage here is below the typical range of privately agreed-upon contingent fee arrangements, this factor also supports the reasonableness of Lead Counsel's fee request.  Moreover, as discussed in Section III.C, *supra*, the 25% fee requested here comports with the retainer agreement entered into between URS – a sophisticated institutional investor – and Lead Counsel at the outset of Lead Plaintiff's participation in this Action.  *See* Catlett Decl. at ¶ 7.

### 10.    Third Additional *Prudential Consideration*: The Absence of Innovative Terms Does Adversely Affect the Fee Request

Finally, the third *Prudential* consideration, whether there are any "innovative" settlement terms, does not typically apply in typical securities class action settlements such as this one, which seeks to distribute a significant cash recovery to Settlement Class Members on a *pro rata* basis under the Plan of Allocation.  The absence of any "innovative" settlement terms does not, however, adversely affect the analysis of the reasonableness of Lead Plaintiff's Counsel's fee request.  *See DFC Glob.*, 2017 WL 4167440, at *9 (approving fee request where "parties have not alerted the Court to—nor has the Court uncovered—any creative settlement terms"); *Bradburn Parent Teacher Store, Inc. v. 3M*, 513 F. Supp. 2d 322, 340 (E.D. Pa. 2007) (the absence of any particularly innovative terms did not adversely affect counsel's fee request).

23

### E.    The "Lodestar Cross-Check" Supports the Requested Fee

Although courts in this Circuit apply the percentage-of-recovery approach to determine the reasonableness of an attorneys' fee request in common-fund cases like this one, the Third Circuit has "recommended that district courts use the lodestar method to cross-check the reasonableness of a percentage-of-recovery fee award." *AT&T*, 455 F.3d at 164.  "The lodestar cross-check, while useful, should not displace a district court's primary reliance on the percentage-of-recovery method." *Id.  See also Bodnar*, 2016 WL 4582084, at *5 (noting that, when used, "the lodestar cross-check does not trump the primary reliance on the percentage of the common fund").

"The [lodestar] crosscheck is performed by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier." *AT&T*, 455 F.3d at 164.  For purposes of the first step of the cross-check, lodestar is "calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *Rite Aid*, 396 F.3d at 305.  To the extent that the requested fee is greater than the calculated lodestar, the resulting "multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." *Id*. at 305-06.  A multiplier "need not fall within any pre-defined range, provided that the [d]istrict [c]ourt's analysis justifies the award." *Schuler*, 2016 WL 3457218, at *10 (alterations in original).  The analysis to be used for the lodestar cross-check "need entail neither mathematical precision nor bean-counting," and the court "may rely on summaries submitted by the attorneys and need not review actual billing records." *Rite Aid*, 396 F.3d at 306-07 (citing *Prudential*, 148 F.3d at 342) (footnote omitted).

The Egan Declaration contains the lodestar calculation and summary details for Lead Counsel and Liaison Counsel by timekeeper. *See* Egan Decl. at ¶ 61 and Ex. 3 (Declaration of Ira Neil Richards in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation

Expenses Filed on Behalf of Schnader Harrison Segal & Lewis LLP, the "Richards Declaration"). Through October 31, 2021, Lead Plaintiff's Counsel expended 8,406.10 hours of attorney and professional support staff time in the prosecution of this Action for the benefit of the Settlement Class. *See id.* at ¶¶ 61, 63-64. These hours have been multiplied by the current hourly rates[14] of the attorneys and professional support staff who worked on the Action to arrive at the lodestar amount of $4,746,493.50. *See id.* at ¶ 61 and Ex.3.[15]

Under the lodestar cross-check, a positive multiplier is reasonable to account for "the contingent nature or risk involved in a particular case and the quality of the attorneys' work." *Rite Aid*, 396 F.3d at 306. *See Martin v. Foster Wheeler Energy Corp.*, No. 3:06-CV-0878, 2008 WL 906472, at *8 (M.D. Pa. Mar. 31, 2008) ("Lodestar multiples of less than four (4) are well within the range awarded by district courts in the Third Circuit."); *Prudential*, 148 F.3d at 341 ("[m]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied") (alteration in original). Indeed, courts in this Circuit have approved substantially higher multipliers than the 1-4 range recognized by the Third Circuit. *See*, *e.g.*, *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. Civ.A. 03-4578, 2005 WL 1213926, at *18 (E.D. Pa. May

---

[14] The Supreme Court and courts in this Circuit have approved the use of current hourly rates to calculate the lodestar figure as a means of compensating for the delay in receiving payment, inflation, and the loss of interest. *See Mo. v. Jenkins by Agyei*, 491 U.S. 274, 284 (1989); *see also Ikon*, 194 F.R.D. at 195 (in conducting lodestar cross- check, "[e]ach attorney's hourly rates were appropriately calculated by reference to current rather than historic rates"). The Egan Declaration includes, as exhibits thereto, brief firm biographies that describe the legal background and experience of Berman Tabacco and Schnader, which support the hourly rates submitted. Egan Decl. at Ex.2 and Ex. 3 at Ex. A thereto. Here, the billing rates used are reasonable for complex securities litigation.

[15] Any time expended in connection with the preparation of this fee and expense application is not included in Lead Plaintiff's Counsel's lodestar. *See id.* at ¶ 61 & Ex. 3. Moreover, the lodestar reported here does not include work that Lead Counsel will continue to perform on behalf of the Settlement Class if the Court approves the Settlement. Additional work will be required to assist Settlement Class Members with inquiries about the Settlement and to work with the Claims Administrator throughout the claims process; no legal fees are being sought for this work.

19, 2005) (approving lodestar multiplier of 15.6); *Bodnar*, 2016 WL 4582084, at *6 (holding that a 4.69 multiplier was "appropriate and reasonable"); *Meijer, Inc. v. 3M*, No. CIV.A. 04-5871, 2006 WL 2382718, at *24 (E.D. Pa. Aug. 14, 2006) (approving lodestar multiplier of 4.77); *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 589-90 (E.D. Pa. 2005) (awarding multiplier of 6.96).

Here, however, there is no positive multiplier since the requested 25% fee, if awarded, represents a multiplier of 0.88 on Lead Plaintiff's Counsel's lodestar. *See* Egan Decl. at ¶¶ 45, 52. The fact that there is a "negative" multiplier on counsel's time further supports the reasonableness of the fee request. *See*, *e.g.*, *Blofstein v. Michael's Fam. Rest., Inc.*, No. CV 17-5578, 2019 WL 3288048 (E.D. Pa. July 19, 2019), at *11 (finding, using a lodestar cross-check, that a negative multiplier "provides additional support for the requested attorneys' fees"); *Wilmington Trust*, 2018 WL 6046452, at *10 n.4 (finding that a "negative multiplier" is an indicator of the fairness of the fee request). The requested fee here is therefore in line with, if not substantially lower than, multipliers applied in other securities fraud cases.

## IV.    LEAD PLAINTIFF'S COUNSEL'S LITIGATION EXPENSES ARE REASONABLE AND SHOULD BE REIMBURSED

Lead Plaintiff's Counsel also respectfully requests the reimbursement of $485,493.28 in litigation expenses that Lead Plaintiff's Counsel advanced in connection with the prosecution and resolution of this Action. All of those expenses, which are set forth in the Egan Declaration and the Richards Declaration, were reasonably necessary for the prosecution of this Action. Egan Decl. ¶¶ 65-68; Richards Decl. at ¶¶ 10-11.

Counsel in a class action is entitled to recover expenses that were "adequately documented and reasonably and appropriately incurred in the prosecution of the class action." *Viropharma*, 2016 WL 312108, at *18 (citation omitted). The types of expenses for which Lead Plaintiff's Counsel seek reimbursement were necessarily incurred in this Action and are of the type routinely charged to

classes in contingent litigation, as well as to hourly clients, including expenses associated with, among other things, expert and consultant fees, court fees, online research, court reporting and transcripts, photocopying, postage expenses, and mediation expenses. *See* Egan Decl. at ¶ 66; Richards Decl. at ¶ 10. *See also*, *e.g.*, *DFC Glob. Corp.*, 2017 WL 4167440, at \*9 (approving counsel's reimbursement of litigation expenses and noting such expenses included "[i]tems such as photocopying, telephone and fax charges, express mail charges, expert witness fees, travel and lodging, and computer-assisted research . . . necessary for the prosecution of a large class action lawsuit"); *In re Cendant Corp., Deriv. Action Litig.*, 232 F. Supp. 2d 327, 344 (D.N.J. 2002) (reimbursing expenses associated with consultants and computer assisted research); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 482 (S.D.N.Y. 2013) (reimbursing mediator's fees).

The largest portion of Lead Plaintiff's Counsel's expenses, $410,903.00, went to pay for the services of experts and consultants, including Plaintiff's expert at class certification, an accounting consultant who advised on the allegations in Complaint and a damages consultant who assisted URS and Lead Counsel in connection with the investigation of the claims, the mediation and preparing the Plan of Allocation. *See* Egan Decl. at ¶¶ 66-68. The second largest expense was $29,031.25, to pay for electronic document storage (or "hosting") and the use of the digital document review platform through which Lead Counsel reviewed the more than 450,000 pages of documents produced by Defendants in this Action. *See id.* Another large component of Lead Plaintiff's Counsel's expenses was $18,611.10 in online research costs for legal research related to, *inter alia*, analyzing and bringing the claims, opposing defendants' motions to dismiss and for reconsideration, filing Lead Plaintiff's motion for class certification, and addressing discovery concerns. *See id.*; Richards Decl. at ¶ 10. A further significant expense was the $11,925.86 in connection with court reporters and transcripts related to the five depositions taken in this action and transcripts of

27

proceedings in this Court.  *See* Egan Decl. at ¶¶ 66-68.  Lead Counsel also incurred expenses of $9,563.00 in connection with the formal Mediation session, as well as pre- and post-mediation discussions with Robert A. Meyer.  *Id.*  The other expenses for which Lead Plaintiff's Counsel seek reimbursement include, *inter alia*, travel, meal and lodging costs, court fees, document-reproduction costs, telephone/fax charges, and postage and delivery expenses.  *See id.*; *see also* Richards Decl. at ¶ 10.

The Court-approved Notice informed potential Settlement Class Members that Lead Plaintiff's Counsel would apply for the reimbursement of litigation expenses in an amount not to exceed $550,000.  *See* ECF No. 72 at Ex. A-1; A.B. Data Decl. at Ex. A.  As set forth above, to date, there have been no objections to the maximum expense amount set forth in the Notice, which is greater than the amount requested here.  Egan Decl. ¶¶ 71, 80.  Moreover, Lead Plaintiff URS supports the reimbursement of expenses incurred by counsel as "fair, reasonable, and necessary to the successful prosecution and resolution of this Action."  *See* Catlett Decl. at ¶ 7.  Accordingly, reimbursement of Lead Plaintiff's Counsel's expenses of $485,493.28 should be approved as fair, reasonable, and appropriate.

## V.   LEAD PLAINTIFF URS SHOULD BE REIMBURSED FOR ITS REASONABLE COSTS AND EXPENSES UNDER 15 U.S.C. § 78u-4(a)(4)

Lead Plaintiff's Counsel also seeks reimbursement of $12,500 in costs and expenses that were directly incurred by Lead Plaintiff URS in connection with its representation of the Settlement Class in this Action.  Pursuant to the PSLRA, an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class."  15 U.S.C. § 78u-4(a)(4).  The request here is only for the reimbursement of time spent by URS in connection with its service as the Court-appointed Lead Plaintiff in this Action, which is specifically permitted by the PSLRA.  *See* Catlett Decl. at ¶¶ 4-5.

As detailed in the Catlett Declaration, URS took an active role in the leadership of this Action and has been fully committed to pursuing this Action as a fiduciary for the class since URS was appointed Lead Plaintiff. *Id.* at ¶¶ 3-4. During the course of this litigation, Lead Plaintiff communicated regularly with Lead Counsel regarding litigation strategy and developments, reviewed pleadings, motions, discovery requests and responses, and the Court's related orders and opinions. *See id.* at ¶ 4. Lead Plaintiff also searched for and produced over 11,000 pages of documents, produced a Rule 30(b)(6) witness to testify at a deposition; and had a designee attend and actively participate at the Mediation. *See id.* Lead Plaintiff URS dedicated significant time and resources in these efforts, which required its employees to devote time to this Action that otherwise would have been devoted to their regular duties at URS.

Courts routinely approve similar, if not greater awards to reimburse lead plaintiffs for the time and effort spent in service on behalf of a class. *See*, *e.g.*, *Elkin v. Walter Inv. Mgmt. Corp.*, No. 2:17-CV-02025-JCJ, 2018 WL 8951073, at *2 (E.D. Pa. Dec. 18, 2018) (awarding lead plaintiff $10,000 in case that settled while a motion to dismiss was pending); *Andavarapu v. iBio, Inc. et al.*, 14-cv-1434-RGA (D. Del. April 21, 2016), ECF No. 69 (awarding $10,000 to lead plaintiff in case that settled before discovery); *Par Pharm.*, 2013 WL 3930091, at *11 (awarding $18,000 to lead plaintiff); *In re Veritas Software Corp.. Sec. Litig.*, No. 1:04-cv-00831-SLR, slip op. at 1 (D. Del. Aug. 5, 2008) (D.I. 144) (awarding each lead plaintiff $15,000 in PSLRA case); *Wilmington Tr.*, 2018 WL 6046452, at *10 (awarding institutional investor lead plaintiffs $55,456.06 in costs and expenses).

Moreover, the Court-approved Notice advised potential Settlement Class Members that URS would seek an award of up to $20,000 for its time and expenses incurred in representing the Settlement Class. *See* ECF No. 72 at Ex. A-1; A.B. Data Decl. Ex. A. To date, there have been no

29

objections to the amount of the maximum award to URS set forth in the Notice, which is greater than the amount requested here. *See* Egan Decl. at ¶ 80. Accordingly, the $12,500 award sought by Lead Plaintiff is reasonable and justified under the PSLRA based on URS's prosecution of the Action and should be granted.

## VI.    CONCLUSION

For the foregoing reasons, Lead Plaintiff's Counsel respectfully requests that the Court award attorneys' fees in the amount of 25% of the Settlement Fund, approve the reimbursement of $485,493.28 in litigation expenses, and approve the proposed award in the amount of $12,500 to Lead Plaintiff URS.

DATED:  December 3, 2021

**BERMAN TABACCO**

*/s/ Patrick T. Egan*
    Patrick T. Egan (*Pro Hac Vice*)

Steven J. Buttacavoli (*Pro Hac Vice*)
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
Email: pegan@bermantabacco.com
        sbuttacavoli@bermantabacco.com

**BERMAN TABACCO**
Nicole Lavallee (*Pro Hac Vice*)
Jeffrey Rocha (*Pro Hac Vice*)
44 Montgomery Street, Suite 650
San Francisco, CA  94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
        jrocha@bermantabacco.com

*Counsel for Lead Plaintiff Utah Retirement Systems & Lead Counsel for the Class*

and

**SCHNADER HARRISON SEGAL & LEWIS LLP**
Ira Neil Richards
Arleigh P. Helfer III

30

1600 Market Street, Ste. 3600
Philadelphia, PA 19103
Telephone: (215) 751-2503
Facsimile: (215) 751-2205
Email: irichards@schnader.com
        ahelfer@schnader.com

*Counsel for Lead Plaintiff Utah Retirement Systems
& Liaison Counsel for the Class*

31

## CERTIFICATE OF SERVICE

I certify that on the 3rd of December, 2021, a true and correct copy of the foregoing document was filed with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to all counsel of record.

*/s/ Patrick T. Egan*
Patrick T. Egan