IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
UTAH RETIREMENT SYSTEMS          :
individually and on behalf of    :    CIVIL ACTION
all others similarly situated    :    NO. 19-1227
                                 :
       v.                        :
                                 :
HEALTHCARE SERVICES GROUP, INC., :
et al.                           :
```

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          JANUARY 12, 2022

I. BACKGROUND ................................................... 2

  A.  Factual Background and Procedural History ........................... 2

  B.  The Proposed Class Action Settlement ............................... 3

    1.  The Class ................................................. 3

    2.  The Proposed Terms of the Settlement ................................ 4

II.  DISCUSSION................................................... 5

  A.  Whether Class Certification Is Proper ............................. 6

    1.  Rule 23(a) Factors .............................................. 7

    2.  Rule 23(b)(3) Factors ............................................. 11

    3.  Ascertainability ............................................... 14

  B.  Whether Notice to the Class Members Was Reasonable ................. 15

  C.  Whether the Proposed Settlement and Plan of Allocation Are Fair .... 15

    1.  The Rule 23(e)(2) Factors .......................................... 18

    2.  The Remaining Girsh Factors ....................................... 23

    3.  The Prudential Factors ........................................... 26

  D.  The Propriety of Attorney's Fees and Expenses. .................... 28

    1.  Attorney's Fees .............................................. 29

    2.  Litigation Expenses .............................................. 31

    3.  Lead Plaintiff's Costs and Expenses ............................... 32

III. CONCLUSION.................................................... 33

Presently before the Court is Lead Plaintiff's: (1)

motion for final approval of class action settlement and plan of

allocation and for certification of settlement class; and (2) motion for an award of attorneys' fees, reimbursement of litigation expenses, and award to lead plaintiff pursuant to 15 U.S.C. § 78u-4(A)(4). As provided below, the Court finds that the class certification requirements of Federal Rule of Civil Procedure 23(a) and 23(b)(3) have been met, and the settlement and plan of allocation are fair and reasonable under Federal Rule of Civil Procedure 23(e)(2). Similarly, the Court concludes that the fee and expense requests are reasonable. Thus, the Court will certify the settlement class and approve the settlement agreement, plan of allocation, and request for fees and expenses.

**I.   BACKGROUND**

   A.   <u>Factual Background and Procedural History</u>

        Lead Plaintiff contends that Defendants violated Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934. Specifically, Lead Plaintiff alleges that Defendants falsely claimed that Healthcare Services Group, Inc. ("HCSG") met or beat Wall Street analysts' consensus estimates for its earnings per share ("EPS") by manipulating net income and EPS to make it appear that HCSG consistently met analyst expectations. Lead Plaintiff also alleges that Defendants hid from investors an ongoing SEC investigation into the Company's EPS practices.

On September 14, 2021, the Court preliminarily certified the settlement class and approved the settlement agreement and method of notice to the potential class members. The approved notice consisted of direct mail notice to all settlement class members who were able to be identified with reasonable effort, the publication of a summary notice in Investor's Business Daily, and the creation of a settlement-specific website: http://www.HCSGSecuritiesLitigation.com. The evidence indicates that the Claims Administrator, A.B. Data, followed the approved notice plan.

While the Claims Administrator issued 161,839 notice packets to potential class members, no class member objected to the proposed settlement, plan of allocation, or attorney's fees, and only three individual investors opted out of the settlement.

On January 10, 2022, the Court held a hearing on the pending motions and to assess the overall fairness of the settlement.

B.   The Proposed Class Action Settlement

1.   The Class

The class is comprised of:

all persons who purchased or otherwise acquired the common stock of HCSG between April 8, 2014 through February 9, 2021, inclusive, and were allegedly damaged thereby.

Excluded from the Settlement Class are: (a) Defendants and any affiliates or subsidiaries of HCSG; (b) present or former officers, directors, or controlling persons of HCSG, its subsidiaries, or its affiliates, and their immediate family members; (c) Defendants' directors' and officers' liability carriers and any affiliates or subsidiaries thereof; (d) any entity in which any Defendant has or has had a controlling interest; and (e) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding categories.

### 2.   The Proposed Terms of the Settlement

In exchange for settling their claims, the class will receive $16,800,000, from which will be deducted: (1) 25% as fees for Lead Counsel; (2) $485,493.28 in Lead Counsel's litigation expenses; and (3) $12,500 in Lead Plaintiff's expenses pursuant to 15 U.S.C. § 78u-4(A)(4).

The remaining funds will be distributed per the parties' plan of allocation. In the plan of allocation, the calculation of a recognized loss for each claimant will depend on the date on which the claimant purchased their shares of HCSG common stock, whether shares were sold and, if so, at what price. The Claims Administrator will then proportionally allocate the net settlement fund to each authorized claimant on a pro rata basis; each pro rata share will be the authorized claimant's recognized loss divided by the total recognized losses of all authorized claimants and multiplied by the total amount in the net settlement fund.

## II.  DISCUSSION

The Court must first certify the settlement class. While the exact process a district court should follow when presented with a settlement class is not prescribed by Rule 23, under Third Circuit law, the court must determine that the settlement class meets the requirements for class certification under Rule 23(a) and (b), and must separately determine that the settlement is fair to that class under Rule 23(e). In re Nat'l Football League Players Concussion Inj. Litig., 775 F.3d 570, 581 (3d Cir. 2014) ("In re Nat'l Football League I"); In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 778 (3d Cir. 1995) (providing that settlement class status "should not be sustained unless the record establishes, by findings of the district judge, that the [ ]requisites of [ ] Rule [23(a) and (b)] are satisfied").

Under Federal Rule of Civil Procedure 23(e), the settlement of a class action requires court approval. Fed. R. Civ. P. 23(e)(2). A district court may approve a settlement agreement "only after a hearing and only on finding that it is fair, reasonable, and adequate." Id. The factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence. In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 320 (3d Cir. 2008). "The decision of whether to approve a proposed settlement of a class action is

left to the sound discretion of the district court." In re
Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions, 148
F.3d 283, 299 (3d Cir. 1998) (quoting Girsh v. Jepson, 521 F.2d
153, 156 (3d Cir. 1975)).

> A.   Whether Class Certification Is Proper

At the final fairness stage, the court must undertake
a "rigorous analysis" as to whether class certification is
appropriate. In re Nat'l Football League I, 775 F.3d at 582-83,
586. Under Rule 23(a), the plaintiffs must demonstrate that: (1)
the class is so numerous that joinder of all members is
impracticable; (2) there are questions of law or fact common to
the class; (3) the claims or defenses of the representative
parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately
protect the interests of the class. Fed. R. Civ. P. 23(a).

Rule 23(b)(3), under which Plaintiffs seek class
certification for this settlement, requires that "questions of
law or fact common to class members predominate over any
questions affecting only individual members, and that a class
action is superior to other available methods for fairly and
efficiently adjudicating the controversy." Fed. R. Civ. P.
23(b)(3).

Finally, in addition to the Rule 23(a) and (b)(3)
requirements, the Third Circuit imposes another requirement,

ascertainability of the class, that must be assessed during the Court's determination on class certification.

    1.   <u>Rule 23(a) Factors</u>

        a.   <u>Numerosity</u>

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds forty, the numerosity prong has been met. <u>Stewart v. Abraham</u>, 275 F.3d 220, 226-27 (3d Cir. 2001).

Numerosity is easily satisfied here since the proposed settlement class contains 161,839 potential class members.

        b.   <u>Commonality</u>

Rule 23(a)(2) requires a showing of the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This commonality element requires that the plaintiffs "share at least one question of fact or law with the grievances of the prospective class." <u>Rodriguez v. Nat'l City Bank</u>, 726 F.3d 372, 382 (3d Cir. 2013) (quoting <u>Baby Neal v. Casey</u>, 43 F.3d 48, 56 (3d Cir. 1994)). To satisfy the commonality requirement, class claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution--which means that determination of its truth or

falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).

Common questions in this case include: (1) whether Defendants violated the federal securities laws; (2) whether Defendants' public statements during the class period misrepresented or omitted material facts; (3) whether Defendants acted with scienter in issuing false and misleading statements; (4) whether and to what extent the price of HCSG common stock was artificially inflated by Defendants' false and misleading statements or omissions; (5) whether the members of the putative class suffered damages and what the appropriate measure of those damages is; and (6) whether the individual Defendants were controlling persons of the company under Section 20(a) of the Exchange Act.

Thus, the commonality requirement is met.

        c.   Typicality

Rule 23(a)(3) requires that the class representatives' claims be "typical" of the claims of the class. Fed. R. Civ. P. 23(a)(3). The typicality inquiry is "intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." Baby Neal, 43 F.3d at 57.

Where claims of the representative plaintiffs arise from the same alleged wrongful conduct on the part of the defendant, the typicality prong is satisfied. In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 532 (3d Cir. 2004). The typicality threshold is low. Seidman v. Am. Mobile Sys., Inc., 157 F.R.D. 354, 360 (E.D. Pa. 1994).

This element is satisfied because Lead Plaintiff and the putative settlement class members all purchased HCSG common stock and assert the same claims under Section 10(b), based on the same alleged misstatements and omissions by Defendants, and the same claim under Section 20(a), based on liability of the individual Defendants as "controlling persons" of the company.

### d.   Adequacy of Representation

Rule 23(a)(4) requires representative parties to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement "serves to uncover conflicts of interest between the named parties and the class they seek to represent." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997). The Third Circuit applies a two-prong test to assess the adequacy of the proposed class representatives. First, the court must inquire into the "qualifications of the counsel to represent the class," and second, it must assess whether there are "conflicts of interest between named parties

and the class they seek to represent." In re Prudential, 148
F.3d at 312 (internal quotation marks omitted).

Regarding the qualifications of counsel, Fed. R. Civ.
P. 23(g) provides that, in appointing class counsel, the court
must consider: (1) the work counsel has done in identifying or
investigating potential claims in the action; (2) counsel's
experience in handling class actions, other complex litigation,
and the types of claims asserted in the action; (3) counsel's
knowledge of the applicable law; and (4) the resources that
counsel will commit to representing the class.

As it concluded during the preliminary approval
process, the Court again concludes that Lead Counsel and Defense
counsel, have substantial experience litigating securities class
actions and possess sufficient knowledge regarding the relevant
law. Lead Counsel have also performed a substantial amount of
work in the case and have committed extensive resources without
seeking interim payment, including having exchanged discovery,
produced and reviewed hundreds of thousands of pages of
documents, taken expert depositions in connection with class
certification, prepared detailed mediation briefs, and
participated in mediation with an experienced, well-respected
mediator. Ultimately, Lead Counsel have devoted 8,406.10 hours

to the case, with a resulting lodestar[1] of $4,746,493.50, and have expended $485,493.28 in unreimbursed costs.

Second, Lead Plaintiff's interests are coextensive with, and not antagonistic to, the interests of the class since they all raise the same claims and seek the same relief: they share the same interest in holding Defendants accountable for their alleged misconduct. The Court concludes that there are no conflicts of interest between Lead Plaintiff and the class such that the adequacy of representation requirement is met.

In sum, Plaintiffs have demonstrated compliance with each of the Rule 23(a) prerequisites for class certification.

### 2.   Rule 23(b)(3) Factors

In addition to satisfying each of the prerequisites in Rule 23(a), a class representative must show that the action falls into at least one of the three categories provided in Rule 23(b). Plaintiffs seek certification of these claims under Rule 23(b)(3). Under Rule 23(b)(3), a class action may be maintained if: (1) common questions of law or fact predominate over questions affecting only individual members; and (2) a class

---

[1]   "The lodestar method multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services." In re AT&T Corp., 455 F.3d 160, 164 (3d Cir. 2006). When counsel is seeking fees based on a percentage of the recovery (as is the case here), the lodestar is often used as a cross-check on the reasonableness of the fee request. See, e.g., In re Prudential, 148 F.3d at 340-41.

action is superior to other available methods for fairly and
efficiently adjudicating the controversy.

The predominance inquiry "tests whether proposed
classes are sufficiently cohesive to warrant adjudication by
representation." Amchem, 521 U.S. at 623. Further, it assesses
whether a class action "would achieve economies of time, effort,
and expense, and promote uniformity of decision as to persons
similarly situated." Fed. R. Civ. P. 23(b)(3), Advisory
Committee's Note to 1966 Amendment.

The superiority requirement "asks the court to
balance, in terms of fairness and efficiency, the merits of a
class action against those of alternative available methods of
adjudication." In re Warfarin, 391 F.3d at 533-34 (internal
quotation marks omitted). Fed. R. Civ. P. 23(b)(3) lists four
factors a court must consider when determining whether the
proposed class action is superior to other alternatives: (A) the
class members' interests in individually controlling the
prosecution or defense of separate actions; (B) the extent and
nature of any litigation concerning the controversy already
begun by or against class members; (C) the desirability or
undesirability of concentrating the litigation of the claims in
the particular forum; and (D) the likely difficulties in
managing a class action. However, when assessing superiority and
"[c]onfronted with a request for settlement-only class

certification, a district court need not inquire whether the case, if tried, would present intractable management problems, . . . for the proposal is that there be no trial." Amchem, 521 U.S. at 620.

Here, common issues predominate the class' claims since each class member would have had to prove the same elements of the claims and rely on the same factual issues, such as whether Defendants' alleged misstatements and omissions violated securities law and whether such violations artificially inflated the cost of HCSG securities. The only issue that would be distinct for Lead Plaintiff and each class member would be the amount of damages owed. However, "[a]lthough individual damage claims will differ depending on when and what type of stock was acquired, these issues cast no doubt on the finding of predominance." In re Ikon Off. Sols., Inc. Sec. Litig., 194 F.R.D. 166, 178 (E.D. Pa. 2000).

The superiority requirement is also satisfied. First, the proposed settlement class consists of securities purchasers who are geographically dispersed and whose individual damages would be small enough to likely dissuade individual litigation. Second, the Court is unaware of any related individual actions. Third, concentrating the litigation in this forum avoids wasting judicial resources litigating multiple actions based on the same operative facts. Additionally, litigating this case as a class

action eliminates the possibility of inconsistent rulings across several jurisdictions. Fourth, securities class actions raise no unusual manageability issues.

Therefore, the Court concludes that Plaintiffs have also demonstrated compliance with each of the Rule 23(b)(3) prerequisites for class certification.

### 3.   Ascertainability

In addition to the Rule 23(a) and (b)(3) requirements, the Third Circuit imposes another requirement under Rule 23: ascertainability. Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015). In Byrd, the Third Circuit explained that "[t]he ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is defined with reference to objective criteria, and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." Id. (internal quotation marks and citation omitted).

The proposed class is defined by objective criteria in that it consists of all individuals and entities that purchased HCSG common stock during a specific period of time and were allegedly injured thereby. There is also a reliable method for identifying the class members since they can be identified through the shareholder records maintained by HCSG.

Based on the above, the settlement class satisfies the requirements of Rule 23(a) and (b)(3), as well as the Third Circuit's ascertainability requirement. Therefore, the Court shall certify the settlement class.

B.   <u>Whether Notice to the Class Members Was Reasonable</u>

As described above, the Court previously approved the notice scheme and it appears that the parties have successfully followed that procedure, which included direct mailed notice, a website, and notice publication in <u>Investor's Business Daily</u>. Therefore, the Court concludes that notice was reasonable. <u>See Harris v. Reeves</u>, 761 F. Supp. 382, 393 (E.D. Pa. 1991) ("[T]he trial court has broad discretion in determining the timing and manner" of class notice.).

C.   <u>Whether the Proposed Settlement and Plan of Allocation Are Fair</u>

In approving a class action settlement, the court must determine whether the proposed settlement is fair, reasonable, and adequate, as required by Rule 23(e)(2). <u>In re Prudential</u>, 148 F.3d at 316-17. Where the parties simultaneously seek certification and settlement approval, the Third Circuit requires "'courts to be even more scrupulous than usual' when they examine the fairness of the proposed settlement." <u>Id.</u> at 317 (quoting <u>In re Gen. Motors Corp.</u>, 55 F.3d at 805). This heightened standard is designed to ensure that class counsel has

demonstrated sustained advocacy throughout the course of the
proceedings and has protected the interests of all class
members. Id. Ultimately, "[t]he decision of whether to approve a
proposed settlement of a class action is left to the sound
discretion of the district court." Girsh, 521 F.2d at 156. There
is a presumption of fairness for a settlement negotiated at
arm's length by experienced advocates following sufficient
discovery whenever the settlement has not drawn meaningful
objections from class members. In re Cendant Corp. Litig., 264
F.3d 201, 232 n.18 (3d Cir. 2001)("In re Cendant Corp I"). In
that this is the posture of the case, the presumption applies.[2]

Rule 23(e)(2) sets forth the factors a court must
consider in determining the fairness of a class action
settlement. Specifically whether: (A) the class representatives
and class counsel have adequately represented the class; (B) the
proposal was negotiated at arm's length; (C) the relief provided
for the class is adequate, taking into account: (i) the costs,
risks, and delay of trial and appeal; (ii) the effectiveness of

---

[2]     Arguably, applying this "presumption" in cases where
the parties seek certification and settlement approval
contemporaneously is in tension with the mandate from the Court
of Appeals that courts are to act as fiduciaries to the class,
independently and scrupulously evaluating the terms of the
settlement regardless of the parties' positions. See, e.g., In
re Cendant Corp. I, 264 F.3d at 231; In Re Prudential, 148 F.3d
at 317. In this case, with or without applying the presumption,
the Court finds the settlement to be fair.

any proposed method of distributing relief to the class,
including the method of processing class-member claims; (iii)
the terms of any proposed award of attorney's fees, including
timing of payment; and (iv) any agreement required to be
identified under Rule 23(e)(3); and (D) the proposal treats
class members equitably relative to each other. Fed. R. Civ. P.
23(e)(2).

These factors are in many respects a codification of
various factors set forth in Girsh, 521 F.2d at 157, which the
Third Circuit has directed courts to consult in establishing the
fairness of a class action settlement.[3] The Third Circuit later
expanded on the Girsh factors in In re Prudential, 148 F.3d at
323, adding additional factors that the court may consider where
appropriate.[4] In re Nat'l Football League Players Concussion

---

[3]     The Girsh factors are: (1) the complexity, expense,
and likely duration of the litigation; (2) the reaction of the
class to the settlement; (3) the stage of the proceedings and
the amount of discovery completed; (4) the risks of establishing
liability; (5) the risks of establishing damages; (6) the risks
of maintaining the class action through trial; (7) the ability
of the defendants to withstand a greater judgment; (8) the range
of reasonableness of the settlement fund in light of the best
possible recovery; and (9) the range of reasonableness of the
settlement fund to a possible recovery in light of all the
attendant risks of litigation. Girsh, 521 F.2d at 157.

[4]     The Prudential factors are: (1) the maturity of the
underlying substantive issues, as measured by experience in
adjudicating individual actions, the development of scientific
knowledge, the extent of discovery on the merits, and other
factors that bear on the ability to assess the probable outcome
of a trial on the merits of liability and individual damages;

<u>Injury Litig.</u>, 821 F.3d 410, 437 (3d Cir. 2016) ("<u>In re Nat'l</u>
<u>Football League II</u>").

The Court will address the relevant Rule 23(e)(2),
<u>Girsh</u>, and <u>Prudential</u>, factors below.

1.   <u>The Rule 23(e)(2) Factors</u>

     a.   <u>Whether the Class Representatives and Class</u>
<u>Counsel Have Adequately Represented the</u>
<u>Class</u>

In making this determination, "the focus at this point
is on [counsel's] actual performance." Fed. R. Civ. P. 23(e)(2),
advisory committee's note to 2018 amendment. Lead Plaintiff's
claims are typical of the claims of the settlement class, and
they have no antagonistic interests. Moreover, Lead Counsel are
highly experienced in class action litigation and have decades
of experience in litigating securities fraud class actions.

The parties have been actively litigating this action
since early 2019, during which time Lead Counsel have engaged in
extensive litigation related to investigating claims, defeating
multiple attempts to dismiss the litigation, engaging in

---

(2) the existence and probable outcome of claims by other
classes and subclasses; (3) the comparison between the results
achieved by the settlement for individual class or subclass
members and the results achieved--or likely to be achieved--for
other claimants; (4) whether class or subclass members are
accorded the right to opt out of the settlement; (5) whether any
provisions for attorneys' fees are reasonable; and (6) whether
the procedure for processing individual claims under the
settlement is fair and reasonable. <u>In re Prudential</u>, 148 F.3d at
323.

document, deposition, and expert discovery, and consulting with damages and accounting consultants. Thus, this factor weighs in favor of approval.

> b.   Whether the Proposal Was Negotiated at Arm's Length

Here, all evidence points to an arm's length negotiation, including the involvement of a neutral mediator during an approximately fourteen-hour settlement conference. Fed. R. Civ. P. 23(e)(2), Advisory Committee's note to 2018 amendment ("[T]he involvement of a neutral or court-affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the class interests."). Therefore, this factor weighs in favor of approval.

> c.   Whether the Relief Provided for the Class Was Adequate

In connection with this factor, Rule 23(e) lists four subfactors for the Court to consider:

> (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3).

Fed. R. Civ. P. 23(e)(2)(C). This factor is related to the first Girsh factor which considers the complexity, expenses, and likely duration of the litigation, and the fourth and fifth

Girsh factors, which consider the risks of establishing liability and damage. Thus, the Court will consider these factors together.

Regarding the cost and risks, the proposed settlement creates a cash recovery of $16.8 million providing a substantial benefit to the class considering the risks posed by continued litigation. The recovery represents about 6.4% of the estimated total possible damages, which exceed the Third Circuit's median recovery of 5.2% in similar cases.[5] Lead Plaintiff's theory of liability, and the defenses proffered by Defendants, require sophisticated analysis of complex financial data and accounting rules before the case could proceed to trial. The Court concludes that without the settlement, the case would likely be in litigation for years and would cost hundreds of thousands of dollars to complete.

The Court further concludes that there are significant risks to the settlement class. Defendants presented several arguments in their motion to dismiss and against class certification and asserted numerous defenses on the merits. For example, if the jury were to be persuaded by Defendants' truth-

---

[5] Cornerstone Research, Securities Class Action Settlements: 2020 Review and Analysis at 20, available at https://www.cornerstone.com/Publications/Reports/Securities-Class-Action-Settlements-2020-Review-and-Analysis.

on-the market defense, the total pool of damages could be reduced to less than $300,000. To prove its claims, Lead Plaintiff would need to rely extensively on expert witnesses on issues ranging from accounting, loss causation, and damages. If the jury were to find Defendants' experts more credible, this could significantly hamper Lead Plaintiff's claims.

Regarding the method of processing claims and distributing relief, the plan of allocation will govern how settlement class members' claims will be calculated and, ultimately, how money will be distributed to authorized claimants. It was prepared with the assistance of Lead Plaintiff's damages consultant and is based primarily on the consultant's event study analysis estimating the amount of artificial inflation in the price of HCSG common stock during the class period.

Regarding the attorney's fees, Lead Counsel seek 25% of the settlement fund. The requested fee is consistent with the fee agreement between Lead Counsel and Lead Plaintiff which was entered into at the outset of the litigation and also the disclosures in the class notice. As discussed further below, Lead Counsel's proposed fee is within the range of reasonable attorneys' fees generally awarded in this Circuit.

Finally, regarding any agreements under Rule 23(e)(3), the parties entered into a supplemental agreement that provides

that if class members opt out of the settlement such that the
number of shares of HCSG common stock represented by such opt
outs equals or exceeds a certain amount, Defendants shall have
the option to terminate the settlement. However, with only three
opt-outs, this provision was not triggered.

Considering this series of factors in the aggregate,
it is clear that they support approving the settlement.

> d.    Whether the Proposal Treats Class Members
>       Equitably Relative to Each Other

This factor "calls attention to a concern that may
apply to some class action settlements--inequitable treatment of
some class members vis-a-vis others." Fed. R. Civ. P. 23(e)(2),
advisory committee's note to 2018 amendment. "Matters of concern
could include whether the apportionment of relief among class
members takes appropriate account of differences among their
claims, and whether the scope of the release may affect class
members in different ways that bear on the apportionment of
relief." Id.

All class members are treated equally because the plan
of allocation apportions the net settlement fund among class
members based on when they purchased and sold their HCSG common
stock. This method ensures that settlement class members'
recoveries are based on the relative losses they sustained, and

eligible class members will receive a pro rata distribution from the net settlement fund calculated in the same manner.

For these reasons, the Court concludes that an analysis of the Rule 23(e)(2) factors indicates that the settlement and plan of allocation are fair and reasonable.

2.    The Remaining Girsh Factors

In that the first, fourth and fifth Girsh factors were considered above, the Court will now analyze the other Girsh factors.

a.    The Reaction of the Class to the Settlement

In relation to the second Girsh factor, when the objectors are few and the class members many, there is a strong presumption in favor of approving the settlement. See, e.g., In re Cendant Corp. I, 264 F.3d at 235 ("The vast disparity between the number of potential class members who received notice of the [s]ettlement and the number of objectors creates a strong presumption that this factor weighs in favor of the [s]ettlement."). Here, the parties sent the class notice to approximately 161,839 potential class members. No class member objected to the settlement and only three individual investors opted out. Therefore, this factor weighs in favor of the settlement.

b.    The Stage of the Proceedings and the Amount of Discovery Completed

The third <u>Girsh</u> factor considers whether the parties'
attorneys have an "adequate appreciation of the merits of the
case before negotiating" the settlement. <u>In re Gen. Motors
Corp.</u>, 55 F.3d at 813. The parties reviewed hundreds of
thousands of documents, conducted four depositions (including
two expert depositions and the deposition of Lead Plaintiff's
Rule 30(b)(6) representative), and consulted with experts in the
fields of market efficiency, loss causation, damages, and
accounting. By the time of the mediation, the parties were well-
prepared to weigh the strengthens and weaknesses of their
respective positions. Therefore, this factor weighs in favor of
the settlement.

> c.   <u>The Risks of Maintaining the Class Action
>      Through Trial</u>

The Court concludes that the sixth <u>Girsh</u> factor is
neutral since there are no particular signs that the settlement
class could not be maintained throughout the suit. <u>See</u> <u>Ripley v.
Sunoco, Inc.</u>, 287 F.R.D. 300, 313 (E.D. Pa. 2012) (finding that
this <u>Girsh</u> factor was neutral where "there [wa]s no apparent
reason why the [c]ourt would decertify or modify [a] class at
any time during the litigation").

> d.   <u>The Ability of the Defendants to Withstand a
>      Greater Judgment</u>

The seventh <u>Girsh</u> factor is also neutral. Although
Defendants may be able to withstand a greater judgment, where

the other <u>Girsh</u> factors weigh in favor of approval, this factor should not influence the overall conclusions that the settlement is fair, reasonable, and adequate. <u>See</u> <u>In re Warfarin</u>, 391 F.3d at 538 (finding that the district court did not err in concluding that the Defendant's ability to pay a higher amount was irrelevant in determining the fairness of the settlement).

e.   <u>The Range of Reasonableness of the Settlement Fund</u>

The eighth and ninth factors are the range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation. These factors examine "whether the settlement represents a good value for a weak case or a poor value for a strong case." <u>In re Warfarin</u>, 391 F.3d at 538. The $16.8 million settlement is significant. Lead Plaintiff's expert estimates that total alleged damages during the class period were approximately $263.0 million. The $16.8 million settlement therefore represents approximately 6.4% of the estimated total alleged damages, which is in line with the median reported by Cornerstone Research[6] and exceeds the Third Circuit's median

---

[6]   Cornerstone Research estimates that median settlements as a percentage of "simplified tiered damages" in Rule 10b-5 cases have ranged between 3.9% and 8.9% for cases with estimated damages of between $150 million to $499 million since 2011. <u>See</u> Cornerstone Research, <u>Securities Class Action Settlements: 2020 Review and Analysis</u> at 6, available at

recovery of 5.2% of damages.[7] Cornerstone Research also concluded that the median settlement dollars for all securities fraud cases from 2016 to 2020, before rulings on class certification, is $13.8 million.[8]

Thus, these two factors weigh in favor of the settlement. As a result, the Court concludes that the <u>Girsh</u> factors favor approving the settlement.

3.    The Prudential Factors

Again, the non-mandatory <u>Prudential</u> factors are: (1) the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; (2) the existence and probable outcome of claims by other classes and subclasses; (3) the comparison between the results achieved by the settlement for individual

---

https://www.cornerstone.com/Publications/Reports/Securities-Class-Action-Settlements-2020-Review-and-Analysis.

[7]    Cornerstone Research, <u>Securities Class Action Settlements: 2020 Review and Analysis</u> at 20.

[8]    Cornerstone Research, <u>Securities Class Action Settlements: 2020 Review and Analysis</u> at 14. Here, after the Court denied the motion to dismiss, Lead Plaintiff filed a motion for class certification. However, the Court did not rule on the merits of that motion in light of the settlement.

class or subclass members and the results achieved--or likely to
be achieved--for other claimants; (4) whether class or subclass
members are accorded the right to opt out of the settlement; (5)
whether any provisions for attorneys' fees are reasonable; and
(6) whether the procedure for processing individual claims under
the settlement is fair and reasonable. In re Prudential, 148
F.3d at 323.

The first Prudential factor has been discussed within
the Rule 23(e)(2) and Girsh factors. It weighs in favor of the
settlement as discussed above.

The second factor asks whether other classes or
subclasses are getting a better deal. See, e.g., Vista
Healthplan, Inc. v. Cephalon, Inc., No. 06-CV-1833, 2020 WL
1922902, at *23 (E.D. Pa. Apr. 21, 2020) (finding that
settlement satisfied this factor because "there do not appear to
be any disparities in the success of the settlements obtained by
the various claimants"). The Court is unaware of any additional
classes asserting related claims against Defendants. Therefore,
this factor, as well as the third factor, are neutral.

The fourth factor supports approval of the settlement
because the class members were notified of the opportunity to
exclude themselves from the class and not be bound by the
settlement agreement. As stated, only three individual investors
opted out.

The fifth factor also favors approval. As discussed below, the Court concludes that counsel's fees are reasonable.

The sixth factor supports approval of the settlement agreement. The plan of allocation, which will govern the processing of claims and the allocation of settlement funds, is fair and reasonable and there were no objections to the plan. In the plan, the calculation of a recognized loss for each claimant will depend on the date on which the claimant purchased their shares of HCSG common stock, whether shares were sold and, if so, at what price. The Claims Administrator will then proportionally allocate the net settlement fund to each authorized claimant on a pro rata basis; each pro rata share will be the authorized claimant's recognized loss divided by the total recognized losses of all authorized claimants and multiplied by the total amount in the net settlement fund.

The Court concludes that a weighing of the <u>Prudential</u> factors also underscores the fairness of the settlement agreement. As a result, the Court will approve the settlement.

D.   <u>The Propriety of Attorney's Fees and Expenses.</u>

Lead Counsel move for an award of: (1) attorneys' fees in the amount of 25% of the $16,800,000 Settlement ($4,200,000); (2) $485,493.28 in litigation expenses; and (3) $12,500 for Lead Plaintiff to compensate it for the time and expenses it incurred

in representing the settlement class pursuant to 15 U.S.C. §
78u-4(A)(4).

       1.  <u>Attorney's Fees</u>

     A percentage of the recovery, which Lead Counsel
requests in this case, is the typical method of devising fees in
common fund cases. <u>In re Rite Aid Corp. Sec. Litig.</u>, 396 F.3d
294, 300 (3d Cir. 2005). The Third Circuit has stated that
"courts should accord a presumption of reasonableness to any fee
request submitted pursuant to a retainer agreement that was
entered into between a properly-selected lead plaintiff and a
properly-selected lead counsel." <u>In re Cendant Corp. Sec.
Litig.</u>, 404 F.3d 173, 199 (3d Cir. 2005) ("<u>In re Cendant Corp.
II</u>"). Given that Lead Plaintiff, a sophisticated entity,
reviewed and approved the fee, this presumption applies.

     In <u>Gunter v. Ridgewood Energy Corp.</u>, the Third Circuit
established non-exclusive factors to consider when weighing the
appropriateness of fees. 223 F.3d 190, 195 (3d Cir. 2000). These
factors include:

> (1) the size of the fund created and the number of
> persons benefited; (2) the presence or absence of
> substantial objections by members of the class to the
> settlement terms and/or fees requested by counsel; (3)
> the skill and efficiency of the attorneys involved; (4)
> the complexity and duration of the litigation; (5) the
> risk of nonpayment; (6) the amount of time devoted to
> the case by plaintiffs' counsel; and (7) the awards in
> similar cases.

<u>Gunter</u>, 223 F.3d at 195 n.1.

Regarding the first factor, and as stated above, the $16.8 million settlement, representing approximately 6.4% of the maximum estimated damages alleged, is in line with averages in this geographic area and will benefit a significant number of claimants given that 161,839 potential class members were sent notices of the suit.

Regarding the second factor, there were no objections to the settlement or to Lead Counsel's fee request.

Regarding the third factor, and as discussed above, Lead Counsel and Defense counsel are highly skilled in this area and Lead Counsel expended significant effort and resources on a contingency basis.

Regarding the fourth factor, securities litigation is inherently complex, expensive, and lengthy, usually requiring expert testimony on variety of issues. Without a settlement, a significant amount of time and resources would be necessary to bring the case to a close.

Regarding the fifth factor, Lead Counsel took this case on a contingency basis, risking that the litigation would yield little to no recovery. Lead Counsel, who has incurred $4,746,493.50 in lodestar and $485,493.28 in unreimbursed expenses, has received no compensation thus far. Moreover, Lead Counsel will be required to expend further significant uncompensated work in connection with the administration of the

settlement, including to oversee the work of the Claims Administrator during the claims administration process.

Regarding the sixth factor, Lead Counsel have devoted 8,406.10 hours to the prosecution and settlement of this action.

Regarding the seventh factor, the Third Circuit has observed that fee awards in common fund cases generally range from 19% to 45% of a settlement fund. See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 822 (3d Cir. 1995). Lead Counsel's request for 25% of the common fund is in line with this range. Indeed, during the January 10, 2022 hearing on this motion, Lead Counsel suggested that of the seventy-five fee orders they reviewed from last year, only twelve were less than 25%.

A review of the Gunter factors indicate that Lead Counsel's fee request is reasonable. Moreover, comparing Lead Counsel's lodestar of $4,746,493.50 as a cross-check to the $4,200,000 they seek, further indicates that their request is reasonable since the request is less than the lodestar. Therefore, the Court will grant Lead Counsel's fee request.

2.   Litigation Expenses

Lead Counsel seeks the reimbursement of $485,493.28 in litigation expenses. A review of the record indicates that the expenses were typical in this type of litigation and include expenses associated with expert and consultant fees, court fees,

online research, court reporting and transcripts, photocopying, postage expenses, and mediation expenses. The largest portion of Lead Counsel's expenses, $410,903.00, paid for the services of experts and consultants. The class action notice informed potential class members that Lead Counsel would seek reimbursement of litigation expenses not to exceed $550,000. Again, there were no objections to this amount.

Thus, the Court concludes that Lead Counsel's request for costs is reasonable and will grant it.

### 3.   Lead Plaintiff's Costs and Expenses

Lead Plaintiff also seeks reimbursement of $12,500 in costs and expenses. Pursuant to the Private Securities Litigation Reform Act, an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4).

Lead Counsel alleges that Lead Plaintiff took an active role in the leadership of the case and has been fully committed to pursuing it as a fiduciary for the class. According to Lead Counsel, Lead Plaintiff communicated regularly with Lead Counsel regarding litigation strategy and developments, reviewed pleadings, motions, discovery requests and responses, and the Court's related orders and opinions. Lead Plaintiff also produced over 11,000 pages of documents, produced a Rule

30(b)(6) witness to testify at a deposition; and had a designee attend and actively participate at the mediation. Lead Plaintiff dedicated significant time and resources in these efforts, which required its employees to devote time to the case that otherwise would have been devoted to their regular duties.

Moreover, the class action notice advised potential class members that Lead Plaintiff would seek an award of up to $20,000 for its time and expenses incurred in representing the settlement class. There were no objections to this amount.

The Court, finding Lead Plaintiff's costs reasonable, will grant the request for $12,500.

## III. CONCLUSION

In that Rules 23(a) and (b)(3) have been met, certification of the settlement class is proper. Moreover, a review of the Rule 26(e)(2), <u>Girsh</u>, and <u>Prudential</u> factors indicate that the terms of the settlement agreement and plan of allocation appear fair, reasonable, and adequate. The Court likewise finds that the fees and costs sought be Lead Counsel and Lead Plaintiff are fair and reasonable.

As a result, the Court will certify the settlement class and grant Lead Plaintiff's motions for approval of the settlement, plan of allocation, and for fees and costs.

Appropriate orders follow.